IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

---

NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S
MOTION PURSUANT TO 11 U.S.C. § 1112(b) TO CONVERT
CHAPTER 11 CASE TO CHAPTER 7

---

<u>NEGATIVE NOTICE PURSUANT TO LOCAL RULE 9013-1</u>

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute.

If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 24 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

There will be a hearing on this motion on January 31, 2024, at 11:00 a.m. (central) in Courtroom 403, 515 Rusk, Houston, Texas 77002.

TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") files this motion to convert this Chapter 11 case to one under Chapter 7 (the "Motion"), and in support for the Motion, submits the *Declaration of Charles C. Conrad* attached as Exhibit A and represents as follows.

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper under 28 U.S.C. § 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court has authority to enter a final order granting the relief requested. The bases for the relief requested are section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 1017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)") and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas ("Local Rule(s)").

### RELIEF REQUESTED

2.      NBK seeks entry of an order in the form attached as Exhibit B (the "Proposed Order") converting this Chapter 11 case to one under Chapter 7 of the Bankruptcy Code.

### INTRODUCTION

3.      Chapter 7 conversion is warranted because this case was filed in bad faith, the cause factors for conversion are met, and the best interests of creditors will be served by the immediate appointment of a Chapter 7 trustee to manage the estate's affairs.  Just thirty-four (34) days after its first bankruptcy case was dismissed, the Debtor filed this case (as in the first) to avoid the imminent foreclosure of its sole asset located at 2425 West Loop South, Houston, Texas 77027 (the "Property").  Nothing has changed since dismissal of the first bankruptcy case.

4.      The Debtor is a serial filer that misuses the legal system to prevent NBK from exercising its rights and remedies under the parties' loan documents and is still managed by an

ineffective team led by its principal owner, Mr. Ali Choudhri.  The Debtor also has no reasonable prospect of reorganization because it lacks the ability to pay any of its non-insider creditors and there are no new assets available for distribution to creditors.  Rental income from the Property has shrunk from the projections the Debtor submitted in its first bankruptcy case only a few short weeks ago, and the Property is encumbered by NBK's first lien securing a matured debt of about $63.6 million.  NBK's secured interest has eroded due to unpaid statutory tax liens and will erode even further if the Debtor's 2023 real estate taxes of approximately $587,554.00 are not paid by the end of January.  Even worse, the Debtor cannot pay NBK interest as required in single asset real estate cases, which was largely why Judge Lopez dismissed the first bankruptcy case.

5.      Chapter 7 liquidation is warranted and is the best option under the circumstances, and a Chapter 7 Trustee is needed now because management has proven that it cannot, or will not, operate the Property and the Debtor in a way that maximizes, or even preserves, value.

BACKGROUND

**A.      Galleria's Bankruptcy Filings**

6.      On December 5, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, its second bankruptcy petition in just five (5) months. The first bankruptcy case was filed on July 5, 2023 under the case caption *In re Galleria 2425 Owner, LLC*, Case No. 23-60036 (CML) ("*Galleria I*") and was dismissed on November 1, 2023 by the Honorable Christopher M. Lopez on the court's own motion.  As of the date of hereof, no trustee, examiner or official committee of unsecured creditors has been appointed in this case.

**B.      Ownership, Management and Operations**

7.      The Debtor's direct membership interests are held by Galleria 2425 JV, LLC ("Galleria JV"), and both the Debtor and Galleria JV are purportedly under common ownership

and control of Mr. Ali Choudhri ("Mr. Choudhri").  The Debtor's sole asset is the Property from which the Debtor generates substantially all of its supposed income.  The Property is reportedly managed by Mr. Dward Darjean and Jetall Companies, Inc. ("Jetall"), a company Mr. Choudhri owns and controls, and a tenant on the Property that does not pay rent.

**C.     NBK's Loan to the Debtor**

8.     On May 23, 2018, NBK loaned the Debtor $51,675,000 (the "Loan") to acquire the Property from 2425 WL LLC, another entity Mr. Choudhri owns and controls.  *See* Loan Agreement § 2.1.  NBK holds a first-priority lien on the Property,[1] and the Loan is secured by, among other things: (i) the Property, as well as all Improvements and Chattels (each as defined in the Deed of Trust); (ii) all leases in respect of the Property; (iii) all monies, bank accounts, accounts receivables, contract rights, other rights and any other intangible assets relating to the rental, operation and ownership of the Property; and (iv) all proceeds and replacements of the foregoing and of the other mortgaged property.  *See* Deed of Trust at 2-3.

9.     The Note had a five-year term and provided for interest only payments with principal due at maturity, May 23, 2023.  *See* Note § 1.  Among other things, the Loan Agreement required the Debtor to use loan proceeds to fund the Interest Reserve Account, as defined thereunder, in the amount of $2.5 million and pay costs and expenses incurred in connection with the closing of the Loan.  *See* Loan Agreement § 5.32.  The Interest Reserve Account was funded on or around the Closing Date with a deposit of a portion of the proceeds of the Loan.

---

[1]  The Loan and proceeds thereof are evidenced by the (i) Loan Agreement between NBK and the Debtor dated May 23, 2018 (the "Loan Agreement"), (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK (the "Note"), and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded RP 2018-235600 in the Real Property Records of Harris County, Texas (the "Deed of Trust", and together with the Loan Agreement, the Note, the "Loan Documents").  *See* ECF No. 44, Exs. A-C.

10.     The Loan Agreement also required the Debtor to pay or reimburse NBK for all actual costs and expenses (including reasonable third-party attorneys' fees and disbursements) incurred in connection with, among other things, enforcing the obligations or collecting payments due from the Debtor in respect of the Loan.  *See* Loan Agreement § 16.4.  The Loan Documents permit NBK to accelerate the Loan upon the occurrence and continuation of an Event of Default and exercise all rights and remedies thereunder, including foreclosing the Property (*see* Loan Agreement § 10.2; Deed § 2.01).

11.     On April 1, 2020, the Debtor defaulted on the Loan by failing to make the required payment of interest due that day; instead, the Debtor made only a partial payment.  The Debtor did not make any further interest payments (and has not made any principal payments) after April 1, 2020.  After the Debtor's default, on each payment date NBK applied the funds in the Interest Reserve Account to pay interest due until the account was depleted on March 6, 2021.  On June 29, 2021, NBK sent a letter to the Debtor informing the Debtor of the existence of an Event of Default under the Loan Documents and notifying the Debtor, among other things, of NBK's intent to accelerate the Loan if the default was not cured by July 12, 2021.  Various litigation maneuvers occurred for almost the next twelve months.

12.     In August 2022, the Debtor, NBK, Mr. Choudhri and Naissance Galleria, LLC (an entity Mr. Choudhri claims to control by assignment from its original owner and the mezzanine lender for the Property) entered into a confidential settlement agreement that, among other things, included dismissals with prejudice or releases of all claims by the Debtor, Naissance Galleria, LLC and Mr. Choudhri against NBK and afforded the Debtor numerous months to pay off the Loan in a discounted amount provided that such payment was made on or before a specified payment date.  Under the settlement, Mr. Choudhri assigned to NBK certain tax liens on the Property for tax years

2019 and 2020 (the "<u>Tax Liens</u>"), which he acquired from Caz Creek TX II, LLC ("<u>Caz Creek II</u>") pursuant to the Assignment of Tax Lien dated May 24, 2021 and recorded in RP-2021-508701 of the Official Public Records in Harris County, Texas.[2]  The Debtor defaulted under the settlement by failing to comply with its payment terms and thus NBK has retained the Tax Liens.

13.      On March 28, 2023, NBK noticed the Property for foreclosure sale and filed a request in state court to have a receiver appointed over the Property until it could be sold at public auction.  On April 11, 2023, the day before the hearing on NBK's receivership motion, the Debtor filed a request for a temporary restraining order (TRO(s)) in state court seeking to prevent the court from appointing a receiver and to stop the pending foreclosure.  On April 12, 2023, at the hearing on NBK's receivership motion, and in response to arguments by Debtor's counsel, the state court gave the Debtor several more months from the specified payment date to July 3, to make the required discounted payment to NBK under the settlement agreement.  During this extended period of performance, however, the state court required the Debtor to make three payments of $80,000 each to NBK, and the state court directed that any failure to make such payments would entitle NBK to foreclose.  However, even if the Debtor did timely make each $80,000 payment, the state court ordered that NBK could post the Property for a foreclosure sale on June 13, 2023, so that the statutory required notice period of 21-days could be provided.  NBK did so on June 13, 2023, in accordance with the state court's order, and the Property was posted for foreclosure on July 5, 2023 (the "<u>Initial Petition Date</u>").

---

[2]  Caz Creek II acquired the Tax Liens from certain taxing units pursuant to its rights under tax lien contracts entered into with the Debtor on January 31, 2020 and April 30, 2021 (the "<u>Tax Lien Contracts</u>").  The Tax Lien Contracts obligated Caz Creek II to pay the Debtor's 2019 and 2020 property tax obligations, which was secured by transfer of the Tax Liens from certain taxing units.  After payment of the tax obligations, the Tax Liens were transferred to Caz Creek II by certain taxing units under a certified statement of transfer of tax lien.  *See* Conrad Decl., Ex. 2.

14.     Despite failing to make the last $80,000 payment due on June 15, 2023, as ordered by the state court at the April 12, 2023 hearing, the Debtor nevertheless filed two more requests for TROs seeking to prevent that foreclosure (one on July 3, 2023, and the other on July 5, 2023). Each TRO was rejected by the state court. Minutes before the July 5 foreclosure sale, the Debtor filed *Galleria I*.

**D.     Galleria I**

15.     After *Galleria I*'s bankruptcy filing, NBK moved to dismiss the case because it was filed in bad faith (to prevent foreclosure of the Property) and the Debtor had no reasonable hope of a successful reorganization.  A day before the hearing on NBK's motion, the Debtor filed a proposed chapter 11 plan and later filed a disclosure statement.

16.     The Plan designated claims and interests[3] into eight classes and proposed that: (i) certain priority claims will be paid in full on the effective date of the Plan; (ii) Caz Creek II's tax lien claim of $698,006.68 will be paid over 120 months on an annual interest rate of 10.95%; (iii) 2425 WL LLC's insider claim will be treated as either a secured or unsecured claim; (iv) unsecured claims for repair and maintenance will be paid in full in eight quarterly payments; (v) other unsecured claims will be paid a *pro rata* share of $200,000 in eleven quarterly payments, and (vi) equity interests will be cancelled and an affiliated investor (*i.e.*, Mr. Choudhri or individuals related to him) will contribute $2.5 million to the Plan.

---

[3]  Among others, these proofs of claim were filed in *Galleria I*: (i) NBK for the Loan and Tax Liens in the amount of $63,552,988.79 and $1,696,384.85, respectively, *see* Conrad Decl., Exs. 1 and 2; (ii) Caz Creek TX, LLC for acquired tax liens in the amount of $807,099.36, *see id.*, Ex. 3; (iii) Jetall for services rendered in the amount of $2,134,469.99, *see id.*, Ex. 4, (iv) Mr. Choudhri for paying a bond for the Debtor in the amount of $960,000, *see id.*, Ex. 5, and (v) 2425 WL LLC for a loan in the amount of $25,092,415.80 and evidenced by a deed of trust that was not attached to the claim, *see id.*, Ex. 6.  Mr. Darjean filed the 2425 WL LLC claim even though Mr. Choudhri owns and controls the entity.  Without supporting documentation, no one could test whether the insider claim is a loan or equity.

17.     The Plan arranged NBK's approximately $63.6 million claim into two classes based on the Debtor's $18.6 million valuation of the Property. The Plan proposed that NBK's unsecured claim would receive the same treatment as other unsecured claims, and its secured claim will be paid in full in ten (10) years after the effective date of the Plan at an annual interest rate of 6% until the secured amount is refinanced or the Property is sold.  The Plan omitted NBK's Tax Liens and proposed to reinstate the Loan without payment of default interest.[4]  The Debtor proposed to fund the Plan through rental income over a projected period of time and the $2.5 million equity contribution, which Mr. Choudhri similarly proposed in another SARE case concerning one of his properties.[5]

18.     In *Galleria I*, the Debtor submitted a profit and loss statement showing rent projections for the period of August 2023 to December 2023.  For October and November 2023, the Debtor projected rent income for the Property of $229,579.02.  But, those projections have fallen short.  On December 18, 2023, the Debtor filed a profit and loss statement in this case which showed that rental income for October and November has been $97,530.08 and $121,985.11, respectively, a shortfall of about $130,000 and $108,000, respectively.  This statement also showed an aggregate loss for 2023 to date of $51,024.48.  Notably, this loss does not include any loan payments to NBK (interest payments on the Loan at the non-default rate total about $353,980.93 per month) or any payments of real estate taxes (which total about $500,000 or more per year).

---

[4]  The proposed reinstatement of the Loan under the Plan was at odds with the Debtor's proposal to bifurcate NBK's claim into an unsecured deficiency claim and a secured claim with new payment and interest terms.

[5]  The Plan did not disclose the equity sponsor. Galleria West Loop Investments, an entity owned and controlled by Mr. Choudhri, filed for bankruptcy in January 2023 and proposed to fund its chapter 11 plan with, among other things, a $2.5 equity contribution from an affiliated investor named 50BH Acquisition, LLC.  *See In re Galleria West Loop Investments, LLC*, Case No. 23-50027 (CAG) (Bankr. W.D. Tex. Jun. 15, 2023), ECF No. 69 ("Equity will be reissued to the new equity holder based on a $2.5 million contribution of new equity.  The equity contribution is being made by an affiliated investor called 50BH Acquisition, LLC").

19.     At the September 22, 2023 hearing on NBK's motion to dismiss, Judge Lopez

denied the motion without prejudice but expressed serious concerns about *Galleria I*, noting that:

> There's a fundamental problem with this case.  I'm not sure it can be fixed.
> And that's where we're going. . . .
>
> I'm like, and I'm really uncomfortable.  It's driving all of these problems
> that I have with the budget, which is, you know, is rent supposed to be free
> for Jetall?  Is it, you know, are they not supposed to be collected 19,000,
> you know, is the $19,000 fee really a pass-through fee?  I don't trust what
> I'm seeing.  And it makes me uncomfortable that I don't have an
> independent party telling me these answers. . . .
>
> I'm just telling you I'm uncomfortable with the lack of transparency. And
> I'm not saying it's there, but there's -- we don't have an independent here,
> and I don't know how to proceed. And it's going to flow.  It's going to get
> worse as my inquiry goes on . . . . We haven't talked about feasibility of a
> plan. . . .
>
> I don't trust the numbers. I don't trust the books. I don't have a true
> independent who can tell me what we've got going on here.
>
> I do have that Jetall is everywhere. And Mr. Choudhri is everywhere on
> these documents in some sense or another. I don't have enough today to get
> me comfortable, but when it comes to -- so I'm going to deny the motion to
> dismiss without prejudice. <u>If I find out that I get uncomfortable and say what
> you already know that I'm already on edge. I won't hesitate to convert the
> case or do something on my own and I have the authority to do it</u>. . . .
>
> So this case continues, but the case continues under really tight timelines
> and under really strict costs. And I don't like the position that I put you in.
> I just don't. I don't like the position I put others in. I do know as we get
> closer to the 90 days, they didn't raise it, but someone's going to have to
> start talking about interest payments and where this goes on the debt. If this
> case – I know there's a plan on file and I know what the Code says. <u>I got to
> make sure if we get there in the next two months that there's really, really a
> good market test, and in true independent looked at this</u>. . . .
>
> <u>And maybe we can all meet in about 30 days and see what this case really
> goes in the same way. It's just a – It's an extension</u>. I don't really know
> what I'm going to do yet, but I do know what I'm not doing today.

Conrad Decl., Ex. 7 at 119:22-25; 120:25-121:7; 124:23-125:5; 125:12-14; 199:25-200:8; 202:20-

203:5; 204:17-20.

20.     During a subsequent status conference on November 1, 2023, Judge Lopez, on his

own motion, dismissed *Galleria I* and noted:

> THE COURT: The Court's already held a hearing on a motion to dismiss
> the case based upon, among other things, the amount of money it would
> take to continue this case. The Court denied it based on the evidence
> presented to the Court at the time. . . . But for this case to continue there's
> going to have to be a lot of money. I'm going to have to require NBK to get
> paid interest. There's just not enough money in the budget, this Debtor is
> going to run out of money really fast. . . . The only way this case survives
> is if I don't require NBK to be paid any interest on that loan pending the
> resolution of State Court matters, the matters of plan confirmation, and I'm
> unwilling to do that, which makes this case immediately administratively
> insolvent. . . .
>
> This Debtor doesn't have enough money to pay even a half a month of
> interest on the secured loan and it would take until early 2024 to go deal
> with that. I'm dismissing this case effective today under Section 1112(b) for
> cause.

Conrad Decl., Ex. 8 at 64:8-65:8-8; 68:19-23.

**E.      Post-Galleria I**

21.     After *Galleria I*'s dismissal, NBK noticed the Property for foreclosure on

December 5, 2023.  Prior to that scheduled foreclosure sale, the Debtor filed several requests for

TROs in state court, all of which were denied,[6] and appealed those denials through the state court

system, including a request to the Texas Supreme Court.  All of those appeals were likewise

denied.  On December 5, 2023 (the "Second Petition Date"), just minutes before the scheduled

foreclosure sale of the Property, the Debtor filed this second bankruptcy case.  As of the Initial

Petition Date, the Debtor owed NBK $63,552,988.79 under the Loan Documents consisting of:[7]

---

[6]  Mr. Choudhri himself filed an intervention in the Debtor's state court proceeding seeking a TRO to enjoin
foreclosure; and Naissance Galleria, LLC (as directed by Mr. Choudhri) added NBK to the existing lawsuit against
Azeemah Zaheer to forestall foreclosure efforts. Both TROs were denied.

[7]  *See* ECF No. 44, Ex. D. The Payoff Statement is provided for illustrative purposes, and NBK reserves the right to
supplement the amount as permitted under the Loan Documents to reflect additional fees and costs incurred since
the Initial Petition Date.

|  |  |
|---|---|
| Unpaid Principal Balance: | $51,675,000.00 |
| Past Due Interest at Default Rate: | $8,521,760.78 |
| Unreimbursed Legal Fees: | $4,318,187.09 |
| Credits | $(961,959.08) |
| **TOTAL AMOUNT DUE:** | $63,552,988.79 |

<u>**ARGUMENT**</u>

**A.    Cause Exists to Convert this Chapter 11 Case to a Case under Chapter 7**

22.    Section 1112(b) of the Bankruptcy Code allows a bankruptcy court to convert a chapter 11 case to a case under chapter 7.  *See* 11 U.S.C. § 1112(b).  Historically, bankruptcy courts had discretion to convert a case to chapter 7 under section 1112(b) but the statute was amended to mandate conversion of a chapter 11 case to chapter 7 on a finding of "cause."  *See also In re Riverbend Cmty., LLC*, Case No. 11-11771 (KG), 2012 WL 1030340, at *3 n.6 (Bankr. D. Del. Mar. 23, 2012) ("Congressional intent that 'shall' really does mean 'must' in the convert or dismiss provision is readily apparent.  In 2005, Congress removed the word 'may' from Section 1112(b) and substituted 'shall' if a moving party establishes 'cause.' Congress clearly intended to make conversion or dismissal mandatory upon proof of 'cause.'") (internal citation omitted); *see also* 7 Collier on Bankruptcy ¶ 1112.04[4] (16th ed. 2023) ("If cause is established and unusual circumstances are not found by the court, the statute requires conversion to chapter 7").

23.    Section 1112(b) contains multiple factors that constitute "cause" for conversion, including (i) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," (ii) gross mismanagement of the estate, (iii) failure to comply with the Bankruptcy Rules, and (iv) "inability to effectuate substantial confirmation of a confirmed plan." 11 U.S.C. §§ 1112(b)(4)(A), (B), (F) and (M).  Any of these factors warrants conversion to prevent the debtor "'from gambling on the enterprise at the creditors' expense when

there is no hope of rehabilitation.'" *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)).

24.     Although section 1112(b) does not include "lack of good faith, courts have also incorporated lack of good faith into section 1112 because the Bankruptcy Code implicitly requires that chapter 11 petitions be filed in good faith." *See In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re GEL, LLC*, 495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012) ("[I]t is well established that bad faith may serve as a ground for dismissal [or conversion] of a bankruptcy petition." [internal quotation marks and citations omitted]). "The good faith standard protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *In re Elmwood Dev. Co.*, 964 F.2d 508, 510 (5th Cir. 1992).

**B.      This Case Should Be Converted to Chapter 7 for Lack of Good Faith Because There is No Valid Purpose for Reorganization or Unforeseen Change in Circumstances**

25.     The good faith inquiry generally requires courts to "examine the facts and circumstances germane to each particular case," and their determination "depends largely upon [an] on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Elmwood*, 964 F.2d at 510.[8]  However, when "a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings." *Id.* at 511.  In other words, a court's analysis must

---

[8]  Some, but not all, of the factors that courts have examined in making a determination of bad faith include: (i) the debtor has one asset and such asset is encumbered by creditors' liens; (ii) the debtor has engaged in improper pre-petition conduct; (iii) the debtor's property has been posted for foreclosure, and the debtor has tried unsuccessfully to prevent this foreclosure; (iv) the filing of bankruptcy enabled the debtor to evade court orders; (v) the debtor employs few or zero employees other than its principals; (vi) there is little cash flow or source of income to sustain a reorganization; and (vii) there are few, if any, unsecured creditors.  *See Little Creek*, 779 F.2d at 1073.

focus on whether "unforeseen changed circumstances" contributed to the debtor's second bankruptcy filing. *Id.* at 511, n.11. *See id.* at 513 (bankruptcy court properly dismissed second bankruptcy filing that "was not filed in good faith" because the debtor "had neither the purpose nor the ability to effectuate a reorganization plan" and there were no unforeseen change in circumstances); *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 489 (Bankr. S.D. Tex. 2013) (second bankruptcy filing may "be justified if unanticipated changed circumstances exist" (citing *Elmwood*, 964 F.2d at 512)); *In re Spectee Grp., Inc.*, 185 B.R. 146, 156 (Bankr. S.D.N.Y. 1995) (awarding sanctions against the debtor and its president because the second bankruptcy case was filed in bad faith to frustrate the secured creditor's efforts to foreclose, and the debtor did not show any unanticipated change in circumstances since the first bankruptcy case).

26.     It is obvious here that this case was filed in bad faith as nearly every single *Little Creek* factor is met, and "[a]ny other motive ascribed to the filing of the instant case[] is nothing more than 'transparent fiction.'" *GEL*, 495 B.R. at 248.  Both *Galleria I* and this case were filed the same day as NBK's scheduled foreclosure sales to delay and frustrate NBK's efforts in exercising its foreclosure rights under the Loan Documents.  The Debtor could have appealed or sought reconsideration of the dismissal order in *Galleria I* but it refused to and, instead, filed several TROs and had a hearing on its request for a temporary injunction through the state court system to forestall the foreclosure after *Galleria I*'s dismissal.  Those applications were denied, as were the Debtor's subsequent appeals, including the Debtor's emergency petitions to the 14th Court of Appeals of Texas and to the Supreme Court of Texas to stay the foreclosure sale.

27.     In *Galleria I*, Judge Lopez observed that there was "[n]o way [the] case could proceed" and that "[t]he only way [*Galleria I*] survives is if [he did not] require NBK to be paid any interest on th[e] loan pending the resolution of State Court matters, the matters of plan

confirmation," and he was "unwilling to do that, which [made *Galleria I*] immediately administratively insolvent."  Conrad Decl., Ex. 8 at 65:4-8.  Nothing has changed.  The Debtor still has no employees, the Property is encumbered by statutory tax liens and NBK's lien, there are very few non-insider unsecured creditors, and the Debtor cannot fund its operations and make required payments during chapter 11 from its cash flow. There is simply no valid purpose for reorganization here.

28.     Moreover, there is no unforeseen change in circumstances that justifies the filing of this case. Courts have found an unforeseen change in circumstances where (i) unexpected events may doom or frustrate a debtor's ability to perform under a confirmed plan such that plan confirmation must be revisited, (ii) a change in law may affect the debtor's interests in a property, (iii) termination of service by major counterparty crucial to a debtor's efforts to reorganize, or (iv) substantial adverse judgments.  *See In re Caviata Attached Homes, LLC*, 481 B.R. 34, 46-47 (B.A.P. 9th Cir. 2012) ("Examples of unforeseen changed circumstances in the above cases include a change in federal law affecting tenancy of an apartment building, termination of service by major airlines which had provided vital customers for an airport hotel, lost crops due to hail, cattle and pasture lost due to fire, and substantial adverse judgments") (collecting cases).

29.     The Debtor fails each one of these tests as the Plan in *Galleria I* was never confirmed, there is no change in any federal or state law that has affected the Debtor's interests in the Property, and NBK is unaware of any major trade party that terminated or threatened to terminate its service to the Debtor.  Even if the denials of the Debtor's TRO and temporary injunction requests are considered "substantial adverse judgments," the results were not unforeseeable but rather - predictable - because the requests were made to the same state court judge who knew the history of the parties' disputes and warned the Debtor that any future TROs

or filings relating to the confidential settlement may warrant sanctions for frivolous filings. *See Galleria I*, ECF No. 33 at 7.

30.     Further, *Galleria I*'s chapter 11 petition mirrors this case's chapter 11 petition because the creditors and claims are substantially the same. Management also has not changed considering that Mr. Darjean signed the Debtor's original and amended chapter 11 petitions and, upon information and belief, Mr. Choudhri still owns and controls the Debtor, and NBK is not aware of any alternative financing or new assets available for distribution to creditors. Moreover, the Debtor's financial capacity or ability to fund a chapter 11 case or a chapter 11 plan has not improved since *Galleria I* was dismissed.

31.     In sum, the facts and the Debtor's prepetition conduct clearly establish that this case was filed in bad faith. That alone should be enough to convert this case to a case under Chapter 7.

**C.     Cause Exists for Conversion under 11 U.S.C. §§ 1112(b)(4)(A), (B), (F) and (M)**

32.     In the alternative, the Court should convert this case to a case under Chapter 7 because cause exists to do so under Bankruptcy Code sections 1112(b)(4)(A), (B), (F) and (M).

     a.     11 U.S.C. § 1112(b)(4)(A)

        i.     *Substantial Loss and Diminution to the Estate*

33.     Section 1112(b)(4)(A) requires the movant to demonstrate that (1) there is a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation. *See In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015). The loss to the estate may be substantial or continuing, but it need not be both. *See In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) (finding cause under section 1112(b)(4) where debtors were losing value and had no path to reorganization). Courts evaluate substantial or continuing loss or diminution of the estate by looking "beyond a debtor's financial statements and mak[ing] a full evaluation of the present condition of the estate."

*In re Moore Constr. Inc.*, 206 B.R. 436, 437-8 (Bankr. N.D. Tex. 1997).  A loss is also substantial or continuing where the debtor continues to experience a negative cash flow after the bankruptcy filing. *See, e.g.*, *Loop Corp.*, 379 F.3d at 515-16 (8th Cir. 2004) ("Under the interpretation of § 1112(b)(1) consistently used in bankruptcy courts, this negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'" (quoting § 1112(b)(4)(A))); 7 Collier, *supra*, ¶1112.04[6][a] (section 1112(b)(4)(A) "tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values.").

34.    The Debtor's estate faces substantial or continuing loss or diminution in value if post-petition taxes are not paid. *See, e.g.*, *In re Hassen Imports P'ship*, No. 13-1042, 2013 WL 4428508, at *13-14 (B.A.P. 9th Cir. Aug. 19, 2013) (affirming conversion to chapter 7 because and non-payment of interest and penalties on delinquent property taxes and property tax accrual "established a continuing loss to, or diminution of, the estate."); *Moore Constr.*, 206 B.R. at 438-39 (chapter 7 conversion warranted after the court was "strongly influenced by the mounting post-petition tax debt" and "non-payment of post-petition tax debt, combined with financial statements that show a current inability to make a profit constitute[d] a continuing loss to or diminution to the estate."); *In re Telemark Mgmt. Co.*, 41 B.R. 501, 507 (Bankr. W.D. Wis. 1984) (unpaid postpetition taxes of $500,000 was evidence of continuing loss to or diminution of the debtor's estate).

35.    In Texas, property tax collection begins on October 1, and taxpayers have until January 31 to pay property taxes to appropriate taxing authorities without penalty or interest.  *See* Tex. Prop. Tax Code. § 32.01(a).  Thereafter, all unpaid property taxes become delinquent and penalties and interest are added to the original base tax amount until taxes are paid.  *See id.* §

31.02(a).  A statutory tax lien automatically attaches to the Property for unpaid property taxes and takes priority over NBK's first-lien Deed of Trust.  *See id.* §§ 32.01(d), 32.05(b).

36.     The Debtor's 2023 estimated property taxes is approximately $587,554.00,[9] and taxing authorities assess a 12% interest rate on unpaid property taxes.  *See* ECF No. 44, Exhibit E. Although the Bankruptcy Code allows the Debtor to defer payments for secured tax claims, interest and penalties will accrue if the 2023 property taxes remain unpaid by the end of January 2024. The Debtor cannot make the payment based on projections submitted in *Galleria I* that would cause it to operate at negative cash flow if the estimated taxes are paid, and "any negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of the creditors."  *Loop Corp.*, 379 F.3d at 516.

37.     The Debtor has not paid property taxes since 2019, all of which Caz Creek II agreed to pay except, at least so far, for 2023.  Unpaid property taxes have eroded the foreclosure value of NBK's secured interest in the Property and that erosion will continue to increase by $167,656.35 per month plus 12% interest.  *See In re Monroe Park*, 17 B.R. 934, 939 (D. Del. 1982) ("Obviously, any accruing property taxes . . . on the mortgaged property, which were not paid by Monroe Park during the pendency of the bankruptcy proceedings, would erode the value of Metropolitan's secured interest.  Because claims based on such unpaid fees would be superior to the mortgage lien, they would effect a decline in Metropolitan's security.").  Worse, while NBK believes that the Debtor's estate is already administratively insolvent, it most certainly would be if the estate must pay any of the 2023 estimated property taxes, operating expenses, ***and*** make monthly interest payments to NBK because it cannot confirm a plan in a reasonable time, let alone all three.

---

[9]  *See* https://harris.trueprodigy-taxtransparency.com/taxTransparency/property/192847/0.

ii.     *Absence of a Reasonable Likelihood of Rehabilitation*

38.     A debtor is unlikely to reasonably rehabilitate if it "lacks income," "lacks operating funds," or "lacks employees, capital, or "continuing revenue-generating activity.'' *In re Bay Area Material Handling, Inc.*, 76 F.3d 384, 1996 WL 29262, at *2 (9th Cir. 1996) (affirming conversion of chapter 11 case to chapter 7); *see also In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986) ("If it is apparent that the debtor has no profitable core around which to structure a plan of reorganization, if the debtor is faced with continuing losses, and if the debtor's assets are declining in value, the best interest of creditors may require the court to order liquidation of the debtor's estate under Chapter 7.").

39.     There is no reasonable likelihood that the Debtor can rehabilitate. Its financial position continues to deteriorate, and its financial projections from only a few short months ago have proven to be overly optimistic. And this is all without any payments to NBK or to the taxing authorities. The Court need not delay conversion when, as here, there is "no more than a 'hopeless and unrealistic prospect' of rehabilitation," and this case is being run for Mr. Choudhri's benefit – not creditors. *In re Econ. Cab & Tool Co. Inc.,* 44 B.R. 721, 724 (Bankr. D. Minn. 1984).[10]

40.     For the foregoing reasons, cause exists under section 1112(b)(4)(A) for conversion.

b.     11 U.S.C. § 1112(b)(4)(B) - Evidence of Gross Mismanagement

41.     Section 1112(b)(4)(B) provides that cause to convert exists when there has been gross mismanagement of the estate and focuses on postpetition conduct only. *See* 11 U.S.C.

---

[10]  *See also Tenn. Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18, 22 (1936) ("However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation."); *In re Johnston*, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992) (affirming chapter 7 conversion because where "there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case."); *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986) (on conversion, "the debtor should be given a fair opportunity to reorganize, but the debtor should not be permitted to continue in a futile effort to reorganize.").

§ 1112(b)(4)(D). A debtor "owes a fiduciary duty to its creditors," and "[g]ross mismanagement of the estate is a breach of that duty." *See In re Ozcelebi*, 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022).

42.    Days ago, the Debtor filed an emergency cash collateral motion for a hearing on December 15. In connection with this motion, Mr. Choudhri declared under penalty of injury that "[t]he Debtor requires the use of cash collateral to continue operation of the Property and will suffer irreparable harm and immediate harm" if the cash collateral motion was not granted, and that "an immediate and critical need exits for the Debtor to obtain funds in order to continue operating the Property, and *without such funds*, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services" to carry out the business. *See* ECF No. 43-3, ¶ 9 (emphasis added).[11] Nevertheless, the Debtor withdrew the motion immediately after NBK filed its omnibus objection without any compelling reason other than Debtor's counsel "word" that the estate will be funded by an undisclosed party without any evidence of such funding and on what terms and conditions it is to be made.

43.    The Debtor's reluctance and eleventh-hour refusal to deal with cash collateral issues in favor of an unidentified third-party funding source is problematic. And further, "scapegoating and blatant lying constitute gross mismanagement of the estate" because it leaves the "Court and all parties in interest with an inaccurate picture of Debtor's financial condition." *Ozcelebi*, 639 B.R. at 395. *See also* Conrad Decl., Ex. 7 at 125:12-14 (Even Judge Lopez stated, "I don't trust the numbers. I don't trust the books. I don't have a true independent who can tell me what we've got going on here."); *In re 210 W. Liberty Holdings, LLC*, No. 08-677, 2009 WL 1522047, at * 6 (Bankr. N.D. W.Va. May 29, 2009) (finding that the debtor grossly mismanaged

---

[11] Mr. Choudhri did not appear at the hearing on the Debtor's cash collateral motion, demonstrating even more gamesmanship by the Debtor, its management team and its purported owner.

the estate by failing to collect rent and allowing third parties to pay its expenses without any disclosure or court approval authorizing "receipt of the benefit of the[] post-petition transactions.").

44.     For the foregoing reasons, cause exists under section 1112(b)(4)(B) for conversion.

    c.    11 U.S.C. § 1112(b)(4)(F) - Failure to Timely File Schedules and SOFAs

45.     Section 1112(b)(4)(F) states that cause exists it convert a chapter 11 case for the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to" chapter 11 case. *See also* Local Rule 1017-2(a)(1) ("a case may be dismissed for want of prosecution" under Bankruptcy Rule 1017 for "late schedules filed by the debtor"). Bankruptcy Rule 1007 requires a debtor to file its schedules and statement of financial affairs ("SOFAs") within 14 days after the bankruptcy filing, which was due December 19, 2023 in this case. *See* Fed. R. Bankr. P. 1007(c). Even after the deadline had passed and the Court's December 20 denial of the Debtor's *untimely* request for an extension to file its schedules and SOFAs, the Debtor did not promptly file its schedules and SOFAs until December 23, 18 days after the Second Petition Date. *See* ECF Nos. 63, 64 and 70. The Debtor is clearly not serious about reorganizing and this tardiness is inexcusable, especially when the Debtor filed its schedules and SOFAs *just* five months ago in *Galleria I* but chose to pursue adversary cases instead.

46.     For these reasons, cause exists under section 1112(b)(4)(F) for conversion.

    d.    11 U.S.C. § 1112(b)(4)(M) - A Plan Cannot be Confirmed

47.     Conversion is appropriate if a debtor cannot "effectuate substantial consummation of a confirmed plan," which "may well turn on practical considerations, including whether confirmation can be achieved." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011). *See also Loop Corp.*, 379 F.3d at 515 n.2 (discussing bankruptcy court's skepticism about whether any plan would be confirmable as grounds for cause to convert) (citing *In re Fossum*, 764 F.2d 520, 521-

22 (8th Cir. 1985) ("A finding that the [debtors] were unable to effectuate any plan which would be confirmable is a proper basis for dismissal of the [debtors'] chapter 11 case.")); *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (a debtor cannot effectuate a plan where it "lacks the ability to formulate a plan or to carry one out."); *In re Lamar Estates, Inc.*, 6 B.R. 933, 936-37 (Bankr. E.D.N.Y. 1980) (debtors' inability to effectuate a plan is cause for chapter 7 conversion).

48.     Cause exists to convert this case under section 1112(b)(4)(M) because the Debtor cannot confirm a new plan under sections 1129(a)(11) and 1129(b)(2), regardless of whether NBK makes a section 1111(b) to treat its claim as fully secured, because the Debtor lacks sufficient funds to make the required payments under either scenario. *See In re Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless."); *In re Jones*, 152 B.R. 155, 174 (Bankr. E.D. Mich. 1993) ("an undersecured creditor can defend itself against strip down by making the § 1111(b)(2) election").

49.     If NBK's claim is bifurcated into secured and unsecured claims, NBK would control the unsecured class because of the potential size of its deficiency claim. *See, e.g.*, *In re Local Union 722 Int'l Bhd. of Teamsters*, 414 B.R. 443, 453 (Bankr. N.D. Ill. 2009) (section 1112(b) was present where plan confirmation was impossible because a single creditor held 70% of the unsecured debt and objected to the plan because his claim was impaired); *In re B & B W. 164th St. Corp.*, 147 B.R. 832, 842 (Bankr. E.D.N.Y. 1992) (cause under section 1112(b) was present where plan confirmation impossible over objection of creditor who controlled over one-third of a class). Thirteen creditors filed proofs of claim by the October 31, 2023 general bar date in *Galleria I*. Excluding Jetall, 2425 WL LLC and Mr. Choudhri's insider claims (which may be subordinated under any new plan and regardless, whose claims cannot be considered when

determining the acceptance of an impaired class of claims under section 1129(b)(10)),[12] the unsecured claims totaled approximately $1.9 million.  Although NBK disagreed with the Debtor's $18.6 million valuation of the Property, if that valuation is accepted, NBK would have a deficiency claim of approximately $45 million.

50.     Further, any new plan would be patently unconfirmable because the Debtor lacks the funding to make the required payments to NBK, let alone to any other creditor.   For example, to reinstate the Loan, which it must try to do as there is no conceivable prospect that the Debtor could pay off NBK's more than $63 million loan balance when the Debtor asserts the Property is worth less than $19 million, the Debtor must cure[13] any existing payment defaults under the Loan Documents and these amounts total approximately $10.31 million.

51.     For the foregoing reasons, cause exists under section 1112(b)(4)(M) for conversion.

**D.      Conversion to Chapter 7 is in the Best Interests of Creditors**

52.     After cause is established, the Court must decide whether conversion is in the best interests of creditors and the estate a bankruptcy court may deny conversion only if unusual circumstances exist such that conversion is not in the best interests of creditors and the estate.  *See In re Shea, Ltd.*, 545 B.R. 529, 535 (Bankr. S.D. Tex. 2016); 11 U.S.C. § 1112(b)(2).

53.     Chapter 7 conversion is in the best interest of creditors because the estate needs an independent party to manage and make decisions for the Debtor as existing management has proved not to be up to the task.  Mr. Darjean lacks any knowledge about the Debtor's finances because, in his words, he does not "*handle the finances*."  Conrad Decl., Ex. 7 at 113:4 (emphasis added).  In another case concerning another one of Mr. Choudhri's properties, this Court found

---

[12]  *See*, *supra*, n.3.

[13]  *See, e.g.*, *In re Golden Seahorse LLC*, 652 B.R. 593, 616 (Bankr. S.D.N.Y. 2023) (ruling that chapter 11 debtor must pay the secured lender default-rate interest before reinstatement of a loan under its proposed chapter 11 plan).

that Mr. Darjean had "an appalling lack of knowledge as to what's going to happen in th[e] case as far as a reorganization is concerned.  He can't tell me anything about the single asset real estate that effectively is the only way this Debtor reorganizes." Conrad Decl., Ex. 9 at 154:7-11.  Same here.

54.     Mr. Choudhri lacks independence, and his or Jetall's continued management is not in the best interests of the Debtor or its creditors.  Under current management, property taxes have accrued and have remain unpaid for nearly *five* years and since 2021, NBK also has not been paid any interest for the Loan advanced to the Debtor.  Further, it appears that there is no intention of reorganizing the Debtor, but rather an intent to use this Court (again) as a last resort to hold the Property.  As this Court said, "that's not what bankruptcy is for.  Bankruptcy is a shield.  The automatic stay is a shield.  It's not a sword." Conrad Decl., Ex. 9 at 153:3-4.  Given the history of the Debtor's misconduct, conversion is in the best interest of creditors, and the estate and will provide the potential for a greater recovery than dismissal.

55.     In sum, the best interests of creditors will be served by Chapter 7 conversion and appointment of a Chapter 7 trustee, who can manage and make independent decisions for the Debtor and decide whether to sell the Property and investigate, litigate, and settle any potential avoidance actions or claims against any of the Debtor's insiders.  *See, e.g.*, *In re Team Sys. Int'l LLC*, 640 B.R. 296, 320-21 (Bankr. D. Del. 2022) (conversion was in the best interests of creditors where a chapter 7 trustee could pursue any estate causes of action, including insider wrongdoing).

56.     For the foregoing reasons, cause exists to covert this case to chapter 7 because (i) this case was filed in bad faith and there is no unforeseen change in circumstance that justifies the filing, (ii) the estate is being grossly mismanaged and may suffer substantial or continuing losses

and there is no reasonable likelihood that the Debtor can rehabilitate, (iii) the Debtor cannot effectuate a plan without NBK's support, and (iv) conversion is in the best interests of creditors.

**<u>NOTICE</u>**

57.     Notice of this Motion has been provided to: (a) the Office of the United States Truste for the Southern District of Texas; (b) counsel to Naissance Galleria, LLC; (c) proposed counsel to the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (e) the Debtor's mailing matrix.  NBK submits that no other or further notice is required.

**<u>CONCLUSION</u>**

WHEREFORE, NBK respectfully requests that the Court enter the Proposed Order granting (i) the relief requested in the Motion and (ii) other relief as is just and proper.

DATED: December 27, 2023

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 27, 2023, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad