# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|   |   |
|---|---|
| In re: ) | Case No. 23-34815 |
| ) |   |
| GALLERIA 2425 OWNER, LLC, ) |   |
| ) | Chapter 11 |
| Debtor. ) |   |
| ) |   |

## TRUSTEE'S OMNIBUS REPLY TO OBJECTIONS TO THE BID PROCEDURES MOTION

Christopher R. Murray, the chapter 11 trustee (the "Trustee") in the above-captioned chapter 11 case, hereby replies to the **(a)** Objection to Chapter 11 Trustee's Motion for Entry of an Order: (I) Approving Procedures for the Sale of Property Free and Clear of All Liens, Claim and Encumbrances; (II) Scheduling an Auction; (III) Authorizing Entry into the Stalking Horse Purchase Agreement; (IV) Approving Assumption and Assignment Procedures; (V) Approving Form of Notice; and (VI) Granting Related Relief [ECF No. 243] (the "2425 WL Objection") and **(b)** Objection to Chapter 11 Trustee's Motion for Entry of an Order: (I) Approving Procedures for the Sale of Property Free and Clear of All Liens, Claim And Encumbrances; (II) Scheduling an Auction; (III) Authorizing Entry into the Stalking Horse Purchase Agreement; (IV) Approving Assumption And Assignment Procedures; (V) Approving Form of Notice; and (VI) Granting Related Relief [ECF No. 243] (the "Debtor Objection," and together with the 2425 WL Sale Objection, the "Bid Procedures Objections"), as follows:[1]

---

[1] Capitalized terms used but not defined in this Reply have the meanings ascribed to such terms in the Chapter 11 Trustee's Motion for Entry of an Order: (I) Approving Procedures for the Sale of Property Free and Clear of All Liens, Claims and Encumbrances; (II) Scheduling an Auction; (III) Authorizing Entry Into the Stalking Horse Purchase Agreement; (IV) Approving Assumption And Assignment Procedures; (V) Approving Form of Notice; and (VI) Granting Related Relief [ECF No. 188] (the "Bid Procedures Motion").

1. The 2425 WL, LLC ("<u>2425 WL</u>") and the Debtor (collectively, the "<u>Objectors</u>") either do not understand the point of an auction process in bankruptcy or, more likely, are pretending that they do not in an effort to to delay and increase the costs of administering this chapter 11 case. The Bid Procedures would accomplish the following:

- Allow the Trustee to obtain and consider all offers for the Property in an organized manner and compare the value to the estate of each offer;

- Provide transparency to all parties in interest of the various offers and the means by which the Trustee determined the highest and best offer for the Property;

- Provide certainty to parties interested in acquiring the Property of the steps they need to take to make an offer for the Property and the timing of a decision prior to such parties incurring the significant costs of preparing an offer;

- Provide a starting point for bids on the Property through the Stalking Horse Agreement; and

- Ensure that any offers for the Property genuine and that the potential buyer has the ability to close on a proposed transaction.

While these outcomes may be contrary to the Objectors' goals, they are necessary to preserve the value of the Debtor's bankruptcy estate, are consistent with the overarching goals of the Bankruptcy Code, and support the Trustee's exercise of business judgment.

2. The particular issues raised in the Bid Procedures Objections should not overcome the compelling reasons to enter the Bid Procedures Order. By and large, they ignore the financial realities of this case, are inapposite to the issue before the Court, or are just nonsense. The Trustee nevertheless addresses the Objectors' issues in turn below to facilitate the Court's evaluation.

**A. The marketing process for the Property is sufficient under the circumstances, considering the Property's cash flow, interest accruing for prior unpaid ad valorem property taxes, and the Debtor's prior representations.**

3. The Objectors assert that the time provided for marketing the Property is insufficient. (2425 WL Objection ¶ 3; Debtor Objection ¶¶ 3, 11). The Trustee, in his business

judgment, disagrees. The notion that a longer process would add, rather than decrease, the value of this property is speculative at best. The Debtor and its prior management have tried to "lease up" and market this property *for years* without success. Rather, there is substantial evidence that a prolonged process would be harmful to the estate and its creditors.

4. The unfortunate fact is that the estate is diminishing in value. The estate is projected to be cash-flow negative and interest is accruing on claims secured by tax liens. (Cash Collateral Budget [ECF No. 171-2]; April 5, 2024, Hrg. Tr. 26:7-11, 26:22-71:1, 29:7-12 (attached hereto as Exhibit A)); Cash Collateral Budget [ECF No. 171-2]). The process proposed by the Trustee is necessary to preserve the value of the estate in light of these financial realities. The Objectors may want this process to drag on indefinitely for their own purposes, but the Trustee's goal is a prompt resolution of this case for the benefit of the estate and its creditors.

5. The Objectors' contention is also based on the false premise that no efforts to market the Property have yet occurred. They know that is not true. The Trustee has received indications of interest and offer letters for the property already that were forwarded to the Trustee *by Ali Choudhri*, who is the person in control of both Objectors. A redacted version of one such proposal is attached hereto as Exhibit B.

6. Further, the Debtor represented to Judge Weems of the 281st District Court for Harris County, Texas (the "State Court") on June 7, 2023, that it had obtained an offer for the Property, another party was interested in acquiring the Property, and CBRE had been engaged to continue marketing the Property to find backup bidders. (June 7, 2023, State Court Hrg. Tr. 4:12-5:21 (attached hereto as Exhibit C). Unless the Debtor's statements to the Texas State Court were untrue, parties interested in acquiring the Property have been aware of a potential sale of the Property for more than a year by the time of the Auction.

7. Moreover, even if the Debtor misrepresented its prepetition marketing efforts to the Texas State Court, it previously indicated that a 60-day extension of the foreclose date would be sufficient. At an April 12, 2023, hearing before the State Court, the Debtor's attorney repeatedly indicated that a 60 to 90 day period for the Debtor to ***find and close*** with a buyer for the Property would be sufficient. (April 12, 2023, State Court Hrg. Tr. 43:6-10, 44:7-9, 45:8-17, 67:17-19 (attached hereto as <u>Exhibit D</u>)). The State Court accepted that representation and prevented NBK from foreclosing for 60 days. (April 12, 2023, State Court Hrg. Tr. 72:10-18). To the extent that does not give rise to judicial estoppel, the inconsistent statements demonstrate the Objectors' lack of credibility and the disingenuity of their arguments.

8. The timeframe proposed by the Bid Procedures is supported by legitimate business considerations. At most, the Objectors present reasons why the Trustee could have come to a different conclusion. But the standard is not whether the Objectors or even the Court would decide differently. The question is whether there is an articulated business justification that is sufficient under the circumstances. *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). There is such a business justification here.

**B. Increasing occupancy of the Property before a sale is not viable.**

9. 2425 WL also asserts that the Property should not be marketed until the Trustee attempts to increase occupancy of the building. (2425 WL Objection ¶ 4). However, the net benefit of such an exercise is speculative, and additional leases would not address the problem of funding the operation of the estate.

10. If locating tenants for the Property was as simple as 2425 WL LLC suggests, the Property would already be leased. From July 5, 2023, through November 1, 2023, and from December 5, 2023, through February 8, 2024—i.e., approximately 6 months total—the Debtor

4

operated as debtor in possession of its estate under chapter 11 and had the relevant powers of the Trustee pursuant to Bankruptcy Code § 1107. Even if the Debtor significantly mismanaged the Property—as 425 WL's position ironically requires—it is dubious that the increase in value to the Property from additional leases would offset the accrued interest on property tax claims and the administrative expenses resulting from the effort.

11. Further, customary tenant concessions would not result in additional cash flow to fund the administration of the estate. This is perhaps best demonstrated by the proposed lease with Hunan SanShang Trading Co, LTD (the "Proposed HST Lease" that the Debtor submitted with its Witness and Exhibit List [ECF No. 147-2] in connection with the final cash collateral hearing, a copy of which is attached hereto as Exhibit E.[2] The Proposed HST Lease provides for 12 months of no rent and $30.00 per square foot for leasehold improvements (totaling $810,000 under the 27,000 square foot lease), which may be offset against rent at the landlord's discretion. (Proposed HST Lease at p. 4, 37). The base rent is the greater of $900,000 per year or a percentage of gross revenue. (*Id*. at p. 4). The result is that the Proposed HST Lease would not provide any revenue to the estate for at least one year and possibly nearly two years. And the Proposed HST Lease would be *better* for cash flow than a typical new lease because it would not require associated broker's fees. It should be indisputable that leasing up the property is not a solution to the estate's cash flow problem.

12. Again, the Trustee's decision to seek a sale without the speculative attempt to increase occupancy at the Property is supported by valid business considerations. The strategy

---

[2] For the avoidance of doubt, the Trustee does not assert that the Proposed HST Lease reflects a bad deal. The lease was not provided to the Trustee in a manner that he could act on. It was buried in a folder of existing leases rather than brought to the Trustee's attention as a potential new lease. Further, the Trustee has received no information allowing him to determine whether the Tenant is creditworthy. The point that the Trustee makes here is that a lease like the Proposed HST Lease would not provide the estate with positive cash flow.

5

preferred by 2425 WL LLC may be among the permissible options available to the Trustee, but neither the Bankruptcy Code nor applicable law require the Trustee to take that gamble using the estate's money. The process the Trustee has proposed is well within the appropriate bounds of his business judgment.

   C. **Whether the National Bank of Kuwait should not be allowed to Credit Bid is not at issue in the Bid Procedures Motion and 2425 WL, LLC has already sought a determination of NBK's secured claim through an objection to claim.**

   13.     Much of the Bid Procedures Objections involves arguments that NBK should not be allowed to credit bid for the Property for various reasons. (2425 WL Objection ¶¶ 5, 6, 7, 8, 9; Debtor Objection ¶¶ 3, 6, 7). This is not an issue relevant to the Bid Procedures Motion. If the Objectors believe that NBK should not be allowed to credit bid, they need to obtain an order providing so prior to the Auction. The Bid Procedures will work whether or not such an order is entered.[3] Denying approval of the Bid Procedures requested by the Trustee is not the right way to address the dispute between the Objectors and NBK.

   14.     Absent an order prohibiting credit bidding, however, NBK is entitled to credit bid by the plain language of Bankruptcy Code § 363(k). The statute provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

The Court must order otherwise for cause to prevent NBK from credit bidding. The Court has not yet been presented with a motion for such an order, and the Bid Procedures Motion is not the

---

[3] Even if the Court orders that NBK is not entitled to credit bid at the Auction, the Stalking Horse Agreement is still relevant absent other qualified bidders. The Stalking Horse Agreement contemplates its approval through the NBK Plan. While a determination that NBK does not have a secured claim would likely lead to NBK's Plan not being confirmed, that does not negate the possibility of a cash bid for the Property.

appropriate vehicle. To the extent that the Trustee obtains information that leads him to believe that cause exists, he will seek such an order.

15. 2425 WL has already started a process that would potentially address the issue, albeit not in the procedurally ideal way. Immediately after the filing of the Objections, 2425 WL filed an objection to NBK's proof of claim, seeking, among other things, a determination of NBK's secured status. In a comical attempt to prevent the Auction from going forward as sought by the Trustee for reasons other than the merits, 2425 WL's objection was self-calendared for June 18, 2024 (the date of the Auction) despite June 5 and June 12 being available dates under the Court's procedures. In any event, a hearing on that objection or a more procedurally proper mechanism could be held prior to the Auction.

**D. Hilco Real Estate, LLC's agreement with the Debtor prior to the Trustee's appointment is inapposite.**

16. In a remarkable effort to be even more specious, the Debtor argues that the Confidentiality & Non-Disclosure Agreement (the "CNA Agreement") signed by Hilco Real Estate, LLC ("Hilco") prevents approval of the Bid Procedures Motion. According to the Debtor, Hilco's agreement to "not interfere with or impede on or with the sale of the [Property]" somehow prevents the Trustee from obtaining approval of the Bid Procedures by which he seeks to sell the Property. (Debtor Objection ¶ 8).

17. Even if the Debtor's actual point is that Hilco cannot be retained to assist the Trustee in implementing a sale process contemplated by the Bid Procedures Motion, the argument is utterly frivolous. First, the language prohibits interfering with or impeding a sale. The Trustee seeks to employ Hilco to assist with and facilitate a sale. Second, the CNA Agreement is dated January 24, 2024. The agreement was entered prior to the appointment of the Trustee, meaning

that the agreement was with the bankruptcy estate and Trustee is in control over those rights. The Debtor should not be attempting to control these rights, even if there was any merit to its position.

### E. The miscellaneous points raised by the Debtor should be rejected by the Court.

18. The Debtor makes further one-off objections without meaningful arguments or authorities supporting its position. To expedite the hearing on the Bid Procedures Motion, the Trustee addresses each in turn:

- Debtor Objection ¶ 4—The Debtor asserts that it does not understand what "if needed" refers to in paragraph 3(ii) of the Bid Procedures Motion. An Auction will not occur if there are no other qualified bids other than the Stalking Horse Agreement. Thus, if there are no other qualified bids, the Auction will not be needed.

- Debtor Objection ¶ 5—The Debtor asserts that "[t]he proposal by the Trustee to sell all of assets of the Debtor must have an approved plan to for the sale to occur." The Trustee is not proposing to sell all of the assets of the Debtor. And a sale of substantially all assets can happen outside a plan of reorganization.[4] *See, e.g.*, *In re 9 Hous. LLC*, 578 B.R. 600, 610 (Bankr. S.D. Tex. 2017) (analyzing the factors under *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and *In re Gulf Coast Oil Corp*, 404 B.R. 407 (Bankr. S.D. Tex. 2009). The Debtor cites no authority for its position because none exists.

- Debtor Objection ¶ 6—The Debtor asserts that the Debtor, Choudhri, and others have significant claims against NBK and this should prevent a sale that allows credit bidding by NBK. The Debtor's claims are property of the estate, Choudhri's unasserted claims are irrelevant, and conducting the Auction or selling the property to NBK pursuant to a credit bid would not effectuate a release of any of these claims. NBK can credit bid while still being liable for damages to the estate. Further, as set out above, the Debtor can seek the entry of an order prohibiting NBK from credit bidding. The Bid Procedures do not require NBK's ability to credit bid to work.

- Debtor Objection ¶ 12—The Debtor points out that the Trustee will give notice of the contemplated sale of the Property in a local publication but "[n]o information is provided as to what the broker may do to market the Property." The proper time to present evidence of the actual efforts to market the Property would be at the sale hearing. The Debtor is welcome to suggest steps that should be taken to market the Property, but the absence of an express requirement to perform marketing that the Debtor has not requested or even identified is not a basis for denial of the Bid Procedures Motion.

---

[4] Moreover, any sale under the Stalking Horse Agreement *would* be through a plan of reorganization unless the Court orders otherwise.

8

- <u>Debtor Objection ¶ 13</u>—The Debtor asserts that there are no facts supporting the statement that the Trustee has exercised sound business judgment. The record in this chapter 11 case is replete with example after example that support the Trustee's business judgment. Among other things, testimony was presented, and documentary evidence was admitted, at the April 5, 2024, hearing of the estate's negative cash flow and the continuing accrual of interest on secured ad valorem tax claims. Additional evidence of the Trustee's exercise of business judgment will be presented at the hearing.

- <u>Debtor Objection ¶ 14</u>—The Debtor asserts that "[t]he Assumption and Assignment Procedures could have a direct and adverse effect on tenants with leases on the Property" and vaguely references due process "[t]o the extent that such Assumption and Assignment Procedures are adopted by this court without the ability of the tenants to vote on a plan . . . ." It is unclear what argument the Debtor is advancing here. The Assumption & Assignment Procedures provide twenty-four (24) days' notice of potential assumption and assignment and a means for tenants to address any disputes regarding cure amounts.

19. The Trustee submits that any additional "arguments" that might be implied from the Objections requires a separate reply.

## **CONCLUSION**

7. At a minimum, the process proposed by the Trustee is well within the bounds of appropriate business judgment. Even if the Objectors could establish that their views are based on something more than fanciful imaginings the Trustee's decision to seek to market the Property and determine the highest and best offer through the Auction is clearly supported by sufficient business justifications. And there is ample time for the Objectors to obtain an order preventing NBK from credit bidding if have an actual legal basis that is supported by evidence. The remaining arguments raised in the Objections are off-point, irrelevant, and specious. For the reasons set out above, the Trustee respectfully submits that the Court should approve the Bid Procedures and overrule the Bid Procedures Objections.

Dated: April 28, 2024

Respectfully submitted,

SHANNON & LEE LLP

*/s/R. J. Shannon*
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Email: klee@shannonleellp.com
          rshannon@shannonleellp.com

*Counsel to the Chapter 11 Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service at the time of filing.

*/s/R. J. Shannon*