# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF GALLERIA 2425 OWNER LLC AND 2425 WL, LLC'S FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

THE COURT BY ORDER HAS REQUIRED THE FOLLOWING STATEMENT TO BE ADDED TO ANY DISCLOSURE STATEMENT FILED IN THIS CASE.

THERE ARE COMPETING DISCLOSURE STATEMENTS AND CHAPTER 11 PLANS FILED IN THIS CASE. YOU SHOULD REVIEW BOTH CHAPTER 11 PLANS AND DISCLOSURE STATEMENTS PRIOR TO VOTING. YOU MAY RECEIVE BOTH DOCUMENTS VIA CM/ECF OR MAIL AT OR ABOUT THE SAME TIME. THE COURT HAS NOT INDEPENDENTLY VERIFIED EITHER THE VALIDITY OR THE SOURCE OF THE INFORMATION CONTAINED THEREIN. YOU ARE ENCOURAGED TO SEEK THE ADVICE OF COUNSEL BEFORE VOTING AND TO REVIEW THE COURT'S DOCKET. THE COURT DOES NOT ENDORSE EITHER CHAPTER 11 PLAN AND EXPECTSTHAT THE PLAN CONFIRMATION HEARING WILL BE CONTESTED.

VOTING PARTIES ARE ENCOURAGED TO ATTEND ALL HEARINGS VIRTUALLY. CONNECTION INSTRUCTIONS ARE AVAILABLE ON THE COURTS WEBSITE. https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A CONDITIONAL

**DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY GALLERIA 2425 OWNER, LLC (THE "DEBTOR") AND 2425 WL, LLC, AND DESCRIBES THE TERMS AND PROVISIONS OF THE DEBTOR'S PLAN OF REORGANIZATION (THE "PLAN"). ANY TERM USED IN THIS DISCLOSURE STATEMENT THAT IS NOT DEFINED HEREIN HAS THE MEANING ASCRIBED TO THAT TERM IN THE PLAN.**

<u>**IF YOU ARE A CREDITOR OF THE DEBTOR AND/OR HAVE A CLAIM, PLEASE DO NOT DISCARD THESE DOCUMENTS AND REVIEW THEM IN FULL, AS YOUR CLAIM IS LIKELY BEING TREATED IN THE DEBTOR'S PLAN.**</u>

DATED: May 24, 2024

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENTS TO THE PLAN AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTOR AND ITS ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. TO THE EXTENT ANY RIGHTS, NOTES, OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, NEITHER THE OFFER NOR THE ISSUANCE OF ANY SUCH SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE 1933 ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO DO NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS

AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTOR AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding certain "forward-looking statements" within the meaning of Section 27A of the 1933 Act and Section 21E of the Securities Exchange Act of 1934, as amended, all of which are based upon various estimates and assumptions that the Debtor believes to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- Litigation risks and uncertainties;
- Costs associated with the Debtor's restructuring efforts, including its Chapter 11 filing; and
- Claim and liability estimates.

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement could cause future outcomes to differ materially from those expressed in such forward-looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtor undertakes no obligation to update or revise information concerning the Debtor's restructuring efforts or its cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

## I.
## SUMMARY OF THE PLAN

The Plan is proposed by Galleria 2425 Owner, LLC (the "Debtor") and 2425 WL, LLC (together the "Plan Proponents"). The Debtor owns that certain real property located at 2425 West Loop South, Houston, Texas (the "Property"). The assets of the Debtor constitute "single asset real estate" as that term is defined in Bankruptcy Code § 101(51B).

Generally speaking, the Plan provides for the payment as described below to Claims against the Debtor.  The Debtor's equity will be auctioned with a minimum bid of $2.5 million. Additionally, the Debtor has a commitment for exit financing in the amount of $35 million.  The funds to be used for the payment of Allowed Claims and other Distributions to be made under the Plan will come from the income generated from the Property plus the new equity plus any other available funds or property that the Reorganized Debtor may otherwise possess on or after the Effective Date.

## II.
## CONSIDERATIONS IN PREPARATION OF THE DISCLOSURE STATEMENT AND PLAN; DISCLAIMERS

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTOR PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE BANKRUPTCY CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR INFORMATION. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR, EXCEPT WHERE**

OTHERWISE SPECIFICALLY NOTED. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN. IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN, THE PROVISION OF THE PLAN SHALL CONTROL.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

*****

EXCEPT AS SET FORTH HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, SUCH SECURITIES TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS DETERMINED BY THE DEBTOR OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN

**ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.**

**INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.**

A.     <u>Disclosure Statement; Construction</u>

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtor to holders of Claims and Equity Interests for use in the solicitation of acceptances from the holders of Claims (the "Solicitation") of the Plan. **Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan.**

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, and (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By order of the Bankruptcy Court (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO**

**NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE EFFECTUATED.**

**B.      Sources of Information**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its business, property and management, and the Plan have been prepared from information furnished by the Debtor. Unless an information source is otherwise noted, the statement was derived from information provided by such parties. **The Debtor's management has prepared financial projections that are attached as exhibits to this Disclosure Statement. A large portion of the assumptions in those financial projections are based solely upon management's industry experience, judgment, and expectations. The assumptions used to derive any of the pro forma operating results are based on the Debtor's historical experience, industry information available to management, and management's experience in owning, operating, and rehabilitating similar properties.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND IS BASED, IN PART, UPON INFORMATION PREPARED BY PARTIES OTHER THAN THE DEBTOR. THEREFORE, ALTHOUGH THE DEBTOR HAS MADE EVERY REASONABLE EFFORT TO BE ACCURATE IN ALL MATERIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.**

Certain of the materials contained in this Disclosure Statement may have been taken directly from other readily accessible documents or are digests of other documents. While the Debtor has made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtor urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall control.

The Debtor has compiled information without professional comment, opinion or verification and does not suggest comprehensive treatment has been given to matters identified herein. Each Creditor and holder of an Equity Interest is urged to independently investigate any such matters prior to reliance.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the holder of a Claim or Equity Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be reported to counsel for the Debtor:  Reese Baker, Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024, Telephone 713-869-9200.

## III.
## INTRODUCTION

### A.      Filing of the Debtor's Chapter 11 Bankruptcy Case

On December 5, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), initiating the above-captioned bankruptcy case (the "Bankruptcy Case").

On February 9, 2024, the court appointed Christopher Murray as the chapter 11 trustee. Mr. Murray has continued as the chapter 11 trustee.

The Debtor and 2425 WL, LLC file this Plan to reorganize Debtor's financial affairs and hope that the Plan, as it may hereafter be amended, modified, or restated, in whole or in part, will be confirmed on a consensual basis through acceptance by all Classes of Creditors entitled to vote on the Plan. In the event that one or more of the Debtor's Creditor Classes fails to accept the Plan, the Plan Proponents will request the Court to confirm the Plan on a consensual basis through acceptance by all classes of creditors entitled to vote on the Plan. In the event that one or more of the Debtor's creditor classes fails to accept the Plan, the Plan Proponents will request the Court to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

Mr. Murray as the chapter 11 trustee has indicated that he intends to sell the Property by auction in July of 2024.  Contrary to what would be considered reasonable business practices, Mr. Murray has not approved any new leases for the Property even though the Debtor has proposed several very good leases with high quality tenants.  The Plan Proponents do not believe that the proposed auction sale of the Property in July is in the best interests of creditors or the Debtor's estate.

### B.      Purpose of Disclosure Statement

This Disclosure Statement is submitted in accordance with section 1125 of the Bankruptcy Code for the purpose of soliciting acceptances of the Plan from holders of certain Classes of Claims. The only Creditors whose acceptances of the Plan are sought are those whose Claims are "impaired" by the Plan, as that term is defined in section 1124 of the Bankruptcy Code and who are receiving distributions under the Plan. Holders of Claims that are not "impaired" are deemed to have accepted the Plan.

The Debtor and 2425 WL, LLC have prepared this Disclosure Statement pursuant to the provisions of section 1125 of the Bankruptcy Code, which requires that a copy of the Plan, or a summary thereof, be submitted to all holders of Claims against, and Equity Interests in, the Debtor, along with a written Disclosure Statement containing adequate information about the Debtor of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Creditors and holders of Equity Interests to make an informed judgment in exercising their right to vote on the Plan.

Section 1125 of the Bankruptcy Code provides, in pertinent part:

(b)     An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the Debtor or an appraisal of the Debtor's assets.

* * *

(d)     Whether a disclosure statement required under subsection (b) of this section contains adequate information is not governed by any otherwise applicable non-bankruptcy law, rule, or regulation, but an agency or official whose duty is to administer or enforce such a law, rule, or regulation may be heard on the issue of whether a disclosure statement contains adequate information. Such an agency or official may not appeal from, or otherwise seek review of, an order approving a disclosure statement.

(e)     A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the Debtor, of an affiliate participating in a plan with the Debtor, or of a newly organized successor to the Debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

Approval of this Disclosure Statement is required by the Bankruptcy Code and does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan, or as to the value or suitability of any consideration offered there under. Such approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of section 1125 of the Bankruptcy Code and contains adequate information to permit the holders of Allowed Claims, whose acceptance of the Plan is solicited, to make an informed judgment regarding acceptance or rejection of the Plan.

**THE DEBTOR AND 2425 WL, LLC BELIEVE THAT THE PLAN AND THE TREATMENT OF CLAIMS THEREUNDER IS IN THE BEST INTERESTS OF CREDITORS, AND URGES THAT YOU VOTE TO ACCEPT THE PLAN. THE DEBTOR AND 2425 WL, LLC BELIEVE THAT AN AUCTION SALE OF THE PROPERTY AT THIS TIME IS NOT REASONABLE NOR IN THE BEST INTERESTS OF THE CREDITORS OR THE ESTATE. THE DEBTOR BELIEVES THAT NEW LEASES CAN**

**BE ACQUIRED THAT WILL INCREASE THE OCCUPANCY AND INCOME OF THE PROPERTY.**

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission, nor has the Commission passed upon the accuracy or adequacy of the statements contained herein. Any representation to the contrary is unlawful.

This Disclosure Statement and the appendices to it contain forward-looking statements relating to business expectations, asset sales and liquidation analysis. Business plans may change as circumstances warrant. Actual results may differ materially as a result of many factors, some of which the debtor has no control over.

### C.    Hearing on Confirmation of the Plan

The Bankruptcy Court has set _____, 2024 at \_\_\_\_\_.m., prevailing central time, as the time and date for the hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice. Holders of Claims against the Debtor may vote on the Plan by completing and delivering the enclosed Ballot to: Reese W. Baker, Baker & Associates, 950 Echo Lane, Ste. 300, Houston, Texas 77024 Telephone:  713-869-9200. **Ballots must be actually received on or before 5:00 p.m., prevailing central time, on \_\_\_\_\_, 2024.** If the Plan is rejected by one or more impaired Classes of Creditors or holders of Equity Interests, the Plan, or a modification thereof, may still be confirmed by the Bankruptcy Court under section 1129(b) of the Bankruptcy Code (commonly referred to as a "cramdown") if the Bankruptcy Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of creditors or holders of Equity Interests impaired by the Plan. The procedures and requirements for voting on the Plan are described in more detail below.

### IV.
### EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs for the benefit of the debtor, its creditors, and other parties-in-interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a Chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession," as the Debtor in this Bankruptcy Case has since the Petition Date.

The filing of a Chapter 11 petition also triggers the automatic stay, which is set forth in section 362 of the Bankruptcy Code. The automatic stay essentially halts all attempts to collect on prepetition claims against or debts owed by a debtor or to otherwise interfere with the debtor's business or its estate.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. A plan sets forth the means for satisfying the claims of creditors against and interests of equity holders in the debtor. When the chapter 11 trustee was appointed, the debtor and creditors may file a plan.

**B.    Plan of Reorganization**

A plan of reorganization provides the manner in which a debtor will satisfy the claims of its creditors. After the plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the plan to be confirmed. At a minimum, however, a plan of reorganization must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan. The Bankruptcy Code also defines acceptance of a plan of reorganization by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and, thus, are not entitled to vote. Acceptances of the Plan in this Bankruptcy Case are being solicited only from those persons who hold Claims in an impaired Class (other than Classes of Claims that are not receiving any distribution under the Plan). A Class is "impaired" if the legal, equitable, or contractual rights attaching to the Claims or Equity Interests of that Class are modified. Modification does not include curing defaults and reinstating maturity or payment in full in cash.

Even if all classes of claims and interests accept a plan of reorganization, the Bankruptcy Court may nonetheless still deny confirmation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, the Bankruptcy Code requires that a plan of reorganization be in the "best interests" of creditors and shareholders and that the plan of reorganization be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to claimants and interest holders under a plan may not be less than those parties would receive if that debtor were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. A plan of reorganization must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan of reorganization and that the debtor will be able to continue operations without the need for further financial reorganization.

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and interests accept it. In order for a plan of reorganization to be confirmed despite the rejection of a class of impaired claims or interests, the proponent of the plan

must show, among other things, that the plan of reorganization does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan of reorganization.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides: (a) that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Bankruptcy Court must further find that the economic terms of the plan of reorganization meet the specific requirements of section 1129(b) of the Bankruptcy Code with respect to the particular objecting class. The proponent of the plan of reorganization must also meet all applicable requirements of section 1129(a) of the Bankruptcy Code (except section 1129(a)(8) if the proponent proposes to seek confirmation of the plan under the provisions of section 1129(b)). These requirements include the requirement that the plan comply with applicable provisions of the Bankruptcy Code and other applicable law, that the plan be proposed in good faith, and that at least one impaired class of creditors has voted to accept the plan.

# V.
# VOTING PROCEDURES; REQUIREMENTS FOR CONFIRMATION

If you are in one of the Classes of Claims whose rights are affected by the Plan (see "Description of the Plan" below), it is important that you vote. **If you fail to vote, your rights may be jeopardized.**

## A.  "Voting Claims": Parties Entitled to Vote

Pursuant to the provisions of section 1126 of the Bankruptcy Code, holders of Claims or Equity Interests that are (i) allowed, (ii) impaired, and (iii) that are receiving or retaining property on account of such Claims or Equity Interests pursuant to the Plan, are entitled to vote either for or against the Plan (hereinafter, "Voting Claims"). Accordingly, in this Bankruptcy Case, any holder of a Claim classified in Classes 1, 2, 3, 4, 5, and 6 of the Plan may have a Voting Claim and should have received a Ballot for voting with this Disclosure Statement and Plan materials (hereinafter, the "Solicitation Package") since these are the Classes consisting of impaired Claims that are receiving property.

As referenced in the preceding paragraph, a Claim must be allowed to be a Voting Claim. The Debtor filed schedules in this Bankruptcy Case listing Claims against the Debtor. To the extent a Creditor's Claim was listed in the Debtor's schedules, and was not listed as disputed, contingent, or unliquidated, it is deemed "allowed." Any Creditor whose Claim was not scheduled, or was listed as disputed, contingent, or unliquidated, must have timely filed a proof of claim in order to have an "allowed" Claim. Absent an objection to that proof of claim, it is deemed "allowed." In the event that any proof of claim is subject to an objection by the Debtor as of or during the Plan voting period (an "Objected-to Claim"), then, by definition, it is not "allowed" for purposes of

section 1126 of the Bankruptcy Code, and is not to be considered a Voting Claim entitled to cast a Ballot. Nevertheless, pursuant to Bankruptcy Rule 3018(a), the holder of an Objected-to Claim may petition the Bankruptcy Court, after notice and hearing, to allow the Claim temporarily for voting purposes in an amount that the Bankruptcy Court deems proper. Allowance of a Claim for voting purposes, and disallowance for voting purposes, does not necessarily mean that all or a portion of the Claim will be allowed or disallowed for distribution purposes.

**By enclosing a Ballot with the Solicitation Package, the Debtor is not representing that you are entitled to vote on the Plan.**

**B.      Return of Ballots**

If you are a holder of a Voting Claim, your vote on the Plan is important. Completed Ballots should be sent to counsel for the Debtor at the following address:

Reese W. Baker
Baker & Associates
950 Echo Lane, Ste. 300
Houston, Texas 77024
Email: courtdocs@bakerassociates.net
Fax:  713-869-9100

**C.      Deadline for the Submission of Ballots**

**Ballots must actually be received at the address listed above, whether by mail or hand-delivery, by _____, 2024 at   5:00 p.m., prevailing central time, (the "Ballot Return Date"). Any Ballots received after that time may not be counted. Any Ballot that is not executed by a person authorized to sign such Ballot will not be counted. If you have any questions regarding the procedures for voting on the Plan, contact counsel for the Debtor: Reese W. Baker, Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024; Telephone:  713-869-9200.**

**THE DEBTOR AND 2425 WL, LLC URGE ALL HOLDERS OF VOTING CLAIMS TO VOTE IN FAVOR OF THE PLAN.**

**D.      Confirmation of Plan**

**1.      Solicitation of Acceptances.** The Debtor and 2425 WL, LLC are soliciting your vote. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

**No representations or assurances, if any, concerning the Debtor (including, without limitation, its future business operations) or the Plan are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote that are other than herein contained should not be relied upon**

**by you in arriving at your decision, and such additional representations or inducements should be reported to counsel for the Debtor for such action as may be deemed appropriate.**

**This solicitation is solely by the Debtor and is not a solicitation by any Equity Holder, attorney, or accountant for the Debtor. The representations, if any, made herein are those of the Debtor and not of such Equity Holders, attorneys, or accountants, except as may be otherwise specifically and expressly indicated.**

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code. Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

2. **Requirements for Confirmation of the Plan.** At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court may enter an order confirming the Plan. For the Plan to be confirmed, section 1129 requires that the Bankruptcy Court find, among other things, that:

(a) the Plan complies with the applicable provisions of the Bankruptcy Code;

(b) the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(c) the Plan has been proposed in good faith and not by any means forbidden by law;

(d) any payment or distribution made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expense in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor, an affiliate of the Debtor participating in a plan with the Debtor, or a successor to the Debtor under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Equity Interests and with public policy; and the Debtor has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such insider;

(f)    any government regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)    with respect to each impaired Class of Claims or Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Plan or will receive or retain under the Plan on account of that Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code; or, if section 1111(b)(2) of the Bankruptcy Code applies to the Claims of a Class, that each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtor's interest in the property that secures that Claim;

(h)    each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

(i)    except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to or the Bankruptcy Code authorizes a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Claims shall be paid in full on the Effective Date or the date on which it is Allowed;

(j)    if a Class of Claims or Equity Interests is impaired under the Plan, at least one Class of Claims or Equity Interests that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest in that Class; and

(k)    confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that the Plan satisfies all of the statutory requirements of the Bankruptcy Code and that the Plan was proposed in good faith. The Debtor believes it has complied or will have complied with all the requirements of the Bankruptcy Code.

**3.**    **Acceptances Necessary to Confirm the Plan.** Voting on the Plan by each holder of a Claim or Equity Interest is important. Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim or Equity Interest vote in favor of the Plan in order for the Court to confirm the Plan. Generally, to be confirmed under the acceptance provisions of Section 1126(a) of the Bankruptcy Code, the Plan must

be accepted by each Class of Claims that is impaired under the Plan by Class members holding at least two thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class actually voting in connection with the Plan; in connection with a Class of Equity Interests, more than two-thirds (2/3) of the shares actually voted must accept to bind that Class. A Class of Equity Interests that is impaired under the Plan accepts the Plan if more than two-thirds (2/3) in amount actually voting vote to accept the Plan. Even if all Classes of Claims and Equity Interests accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

4. **Cramdown.** In the event that any impaired Class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for holders of secured and unsecured claims and equity interests:

(a)     with respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such secured creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan;

(b)     with respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan; and

(c)     with respect to an equity interest, "fair and equitable" means either (i) each impaired equity interest receives or retains, on account of that equity interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the equity interest; or (ii) the holder of any equity interest that is junior to the equity interest of that class will not receive or retain under the plan, on account of that junior equity interest, any property.

In the event one or more Classes of impaired Claims or Equity Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

The Plan Proponents believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims and Equity Interests. All Classes are impaired by the Plan.

# VI.
# BACKGROUND OF THE DEBTOR

## A.     Nature of the Debtor's Business

Galleria 2425 Owner, LLC is a Texas limited liability company founded in 2018. The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property").  As an office building, the Property was greatly affected by the Covid pandemic—indeed, during the pandemic, one of the Property's largest tenants filed for bankruptcy and ultimately rejected its lease at the Property, leading to significant vacancies.  Since then, the Debtor has worked hard to increase the occupancy of the Property, and the Property currently has a large number of commercial tenants from which Debtor derives its income.

## B.     The Debtor's Indebtedness and Creditors

As of the Petition Date, the Debtor's property was encumbered by a Deed of Trust to National Bank of Kuwait S.A.K.P. ("NBK"). The Property is the collateral for the Loan.

NBK and the Debtor have been involved in significant litigation over the years, and most recently regarding a 2022 settlement agreement between the parties.  The Debtor contends that NBK breached the settlement agreement and has filed an adversary proceeding and a state court action against NBK in which it asserts various claims, including claims for lender liability and tortious interference.  NBK contends that the Debtor breached the settlement agreement and that it should be permitted to foreclose on the Property.

The Debtor's remaining debt is generally comprised of (a) claims of taxing authorities; (b) a secured claim of Caz Creek Lending; (c) a secured claim of 2425 WL, LLC; (d) any deficiency claim owed to the Lender; and (e) unsecured claims.

An analysis of the claims in the case is attached as Exhibit A.

## C.     Existing and Potential Litigation.

### 1.     Litigation.

The Debtor was engaged in litigation with National Bank of Kuwait in Harris County under Cause No. 2021-63370 when this bankruptcy case was filed.  The case in state court is still

ongoing.  In addition, the Debtor filed an adversary proceeding against NBK in the bankruptcy case (23-03263) in which the Debtor asserts various claims, including claims for lender liability and tortious interference.   The adversary proceeding is ongoing.  The litigation involving NBK is based on the facts set forth below:

a.   In 2018, NBK loaned certain funds to Debtor.  There have been various disputes between the Debtor and NBK about the timeliness of payments and the extent and validity of NBK's security, but the main issues between the Debtor and NBK involve the continued interference by NBK with the Debtor's ability to lease the Property to produce revenue and Debtor's ability to sell the Property to pay NBK. Every time NBK has so interfered, it has then blamed the Debtor for the Debtor's inability supposedly to meet some of the loan terms.

b.   For example, in January 2021, the owner of the Debtor had the Property "sold" for a purchase price of $85 million, more than enough to clear NBK's debt.  The purchase by SIBS International would have paid off not only NBK, but left the Debtor and the others with significant value.  NBK, rather than approve and allow the sale to close, issued a formal notice of default to the Debtor and its intent to accelerate the loan on June 29, 2021, while the SIBS International deal was in progress, killing that deal.

c.   The same was true with regard to NBK's interference with the Debtor's attempt to lease space in the Property to provide revenue so it could operate and make loan payments. By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases that the Debtor on August 13, 2021 sent NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which NBK would approve.

d.   On August 16, 2021 counsel for the Debtor sent an email to NBK forwarding multiple leases for approval that NBK had failed to approve or even respond to.  NBK continued to refuse to approve the leases.

e.   This lack of approval, or finding obstacles to approve, was not new.  In September 2019, Related Group had reached out to lease the parking garage located at the Property to be used for overflow, for parking up to 110 spaces.  NBK's authorized representative, Michael Carter, would not approve the lease, which would have generated a great deal of revenue for the Debtor.

f.   The situation became so untenable that in September 2021, Debtor initiated a lawsuit against NBK.

g.   In good faith, even during the pendency of this litigation, the Debtor was still trying to get tenants into the building and get NBK's approval for new leases.  On July 2, 2022, the Debtor sent NBK five leases for approval, which NBK did not approve.

h.   The parties litigated until August 22, 2022, when they entered into a Confidential Settlement Agreement.  The Debtor will submit the Confidential Settlement Agreement to the Court *in camera* at the appropriate time.   The breach of the Settlement Agreement by NBK is not only actionable, but was also devastating to Debtor.  NBK has prevented Debtor's successful performance under agreements it has with NBK, including the Confidential Settlement Agreement.

i.   The Confidential Settlement Agreement permitted a timeframe in which Debtor could sell the Property. The Debtor was successful in receiving a Letter of Intent dated January 17, 2023 to purchase the building by Caldwell Soames.  While the negotiations were

ongoing, NBK took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure on March 29, 2023 in breach of the Confidential Settlement Agreement.   The Debtor believes that the action occurred intentionally to prevent the sale.  The sale would have cleared the NBK debt as it stood at that time and left great value for the other parties.  Debtor believes that NBK recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

j.     There are many factual inaccuracies that NBK represents to courts and continues into the bankruptcy proceedings.  For example, in its Motion to Dismiss the Debtor's prior Bankruptcy case, while it is true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the Property, they were also granted.

k.     Additionally, NBK posted the Property for foreclosure in early 2023, and against an extended grace period that a State Court had given Debtor, which chilled the bidding process and interest in the Property completely.  Properties posted for foreclosure are not easily sellable, especially for fair market value. Debtor believes that NBK knew this and did it on purpose to prevent the Debtor from successfully selling the Property and paying off the loan, so NBK could foreclose and become the owner of the Property.

l.     Not the least of the misstatements that NBK makes about the Debtor are those statements that the Debtor has not made any payments to NBK since March 6, 2021.

m.    The opposite is true.  Representatives of NBK have admitted in writing that the following payments have been made to NBK well after March 6, 2021:

-$801,509.42 paid by Debtor to NBK on August 27, 2022;
-$80,000 paid by Debtor to NBK on April 18, 2023;
-$80,000 paid by Debtor to NBK on May 10, 2023.

n.     These payments are almost One Million Dollars ($1,000,000) that not only does NBK not give credit to the Debtor for having made the payments, but again saying exactly the opposite that no payments (zero) have been made since March 6, 2021.

o.     After NBK's disclosures of the terms of the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the Property disappeared.  Apparently the potential purchasers became potential purchasers of the NBK Note and began negotiating with NBK.  NBK materially breached the Confidential Settlement Agreement and interfered with these potential purchases and with these business relationships.

The Debtor has proposed to the chapter 11 trustee that Jerry Alexander of Passman Jones be retained to prosecute the lender liability and other claims against NBK.  The chapter 11 trustee has not engaged Mr. Alexander,but has stated that he is investigating the claims..     Mr. Alexander has litigated several significant lender liability claims with success.

The Debtor and other entities were also engaged in litigation in state court with a former tenant, Sonder USA Inc., in which the Debtor contends that Sonder USA, Inc. breached its real property lease at the Property. The case is still ongoing.  The Debtor cannot estimate recovery at

this time; however, the Debtor believes that it could receive significant funds in a settlement with Sonder.  The chapter 11 trustee has filed a motion to sell these claims to 2425 WL, LLC for $100,000.

The Debtor is indirectly involved in litigation where Naissance Galleria, LLC has sued Azeemeh Zaheer in state court.  The case had been removed to the bankruptcy case of the Debtor and has now been remanded back to state court.

2425 WL, LLC has also filed Adv. No. 24-3043 against National Bank of Kuwait seeking equitable subordination and damages for fraud. The National Bank of Kuwait has filed a motion to dismiss.

### 2.     **Potential Litigation.**

While the Debtor has no immediate or definite plans to file any further litigation, the Debtor nevertheless retains the right to pursue all causes of action post-confirmation, including but not limited to the above litigation, under the Plan, along with any additional litigation that may arise between the Debtor and its various tenants under governing real property leases.

The Debtor may have claims against other persons or entities as set forth in the Statement of Financial Affairs including without limitation, Claims and causes of action against Azeemeh Zaheer, Osama Abdulatiff, Rodney Drinnon and/or David Tang.  The Debtor reserves the right to pursue any or all of these claims.

### 3.     **Preservation of Rights of Action.**

#### (a)     **Litigation Not Yet Commenced**.

The Plan preserves all causes of action, unless expressly otherwise released, and provides for them to be transferred to the Reorganized Debtor on the Effective Date of the Plan.  The causes of action include certain avoidance actions and other claims that the Debtor holds against third parties.  The Estate holds the following causes of action, among others, all of which shall be preserved and transferred to the Reorganized Debtor (unless expressly otherwise released by the Plan):

#### (b)     **Preferences, Fraudulent Transfers and Other Avoidance Actions**.

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety days immediately prior to the filing of its bankruptcy petition with respect to preexisting debts to the extent the transferee received more than it would have in respect of the preexisting debt had the transferee not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to their ordinary business terms are generally not recoverable.  Furthermore, if the

Disclosure Statement under 11 U.S.C. § 1125 in Support of
Galleria 2425 Owner, LLC and 2425 wl, LLC's Joint Chapter 11 Plan of Reorganization Page 21
of 44

transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a preferential transfer were recovered by the debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the debtor receives less than fair value for such property.  In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property.

      **(c)**    **<u>Other causes of action</u>**.

         **(1)**    **<u>Investigation of causes of action</u>**.

The Reorganized Debtor will continue the investigation, analysis, and pursuit of causes of action against a number of persons or entities, relating to, among other things, the following:

Any lawsuits for, or in any way involving, the collection of accounts receivable;

Any litigation or lawsuit initiated by the Debtor that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal;

Any and all causes of action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and

Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtor's business operations.

In addition, there may be numerous other causes of action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such causes of action are based are not fully or currently known by the Debtor and as a result, cannot be raised during the pendency of the Bankruptcy Case (collectively, "Unknown Causes of Action").  The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtor to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtor or the Reorganized Debtor (as applicable).  The Reorganized Debtor will pursue Unknown Causes of Action to the extent they become known in its discretion.

         **(2)**    **<u>Preservation of All causes of action Not Expressly Settled or Released</u>**.

The Debtor has attempted to disclose herein certain material causes of action including avoidance actions and other actions that they may hold against third parties.  However, the Debtor has not concluded the investigation and analysis of all potential claims and causes of action against third parties.  It is the contemplation of the Plan that such investigation and analysis will continue post-Confirmation by the Reorganized Debtor.  You should not rely on the omission of the

disclosure of a claim or cause of action to assume that the Debtor holds no claim or cause of action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or causes of action against third parties are specifically reserved and will vest in or be transferred to the Reorganized Debtor, including but not limited to any such claims or causes of action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, lender liability, improper assignments of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt recharacterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

The Reorganized Debtor may pursue claims, including the following claims and causes of action, all of which shall be preserved for the benefit of the Reorganized Debtor:

- Preference claims under section 547 of the Bankruptcy Code;

- Fraudulent transfer and other avoidance claims arising under sections 506, 542 through 551, and 553 of the Bankruptcy Code and various state laws, including, but not limited, to claims against any recipients of transfers included in the Debtor's Statements of Financial Affairs;

- Unauthorized post-petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and causes of action asserted in current litigation, whether commenced pre- or post-petition, including all litigation referenced in the Debtor's Statements of Financial Affairs;

- Counterclaims asserted in current litigation;

- Potential claims set forth in the Debtor's Schedule B;

- All claims and causes of action that the Debtor may hold against any current or previous tenant; and

- Actions against any taxing authority with respect to the contest of any taxes assessed against any of the Properties.

The Reorganized Debtor may pursue all persons, entities, or defendants described in this Disclosure Statement for all claims and causes of action described herein that are not resolved by the Debtor prior to the Effective Date.  Pursuit of a claim or cause of action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Reorganized Debtor to obtain a resolution of such claim or cause of action. In the event the Reorganized Debtor is not able to resolve any claims and causes of action described in the Disclosure Statement, the Reorganized Debtor will escalate its pursuit of claims and causes of action by any means authorized under the Plan, Disclosure Statement, and applicable law, including litigation in such forum as the Reorganized Debtor deems appropriate.  Resolution of the claims and causes of action described in this Disclosure Statement by the Reorganized Debtor shall be in accordance with the requirements and procedures set forth in the Plan.

Except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Reorganized Debtor shall be transferred all causes of action, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the causes of action.  Except as otherwise ordered by the Bankruptcy Court or expressly released in the Plan, the Reorganized Debtor shall be vested with authority and standing to prosecute any causes of action.

The Debtor's failure to identify a claim or cause of action herein is specifically not a waiver of any claim or cause of action.  The Debtor will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any cause of action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or causes of action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtor's failure to identify a claim or cause of action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or causes of action which could be asserted against third parties, including holders of Claims against or Equity Interests in the Debtor who may be reading this Disclosure Statement and/or casting a Ballot, except where such claims or causes of action have been explicitly released in the Plan or the Confirmation Order.

In addition, the Debtor and the Reorganized Debtor expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtor is a party.

**PLEASE TAKE NOTICE THAT, WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE REORGANIZED DEBTOR PURSUANT TO THE PLAN.  THE**

Disclosure Statement under 11 U.S.C. § 1125 in Support of
Galleria 2425 Owner, LLC and 2425 wl, LLC's Joint Chapter 11 Plan of Reorganization   Page   24
of 44

LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE DEBTOR INTENDS FOR THE PLAN TO PRESERVE AND TRANSFER TO THE REORGANIZED DEBTOR ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR AND ITS ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.

## VII.
## PRE- AND POST-PETITION OPERATIONS

### A.  Events Leading to the Debtor's Bankruptcy Filing

The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is fully covered by commercial property and liability insurance.

As of the Petition Date, the Debtor was allegedly indebted to National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") pursuant to a loan made to the Debtor by NBK (the "Loan"). The Loan is evidenced by, *inter alia*: (i) a *Loan Agreement* by and between the Debtor and NBK dated May 23, 2018; (ii) a *Promissory Note* dated May 23, 2018 made by the Debtor; and (iii) that certain *Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing* dated May 23, 2018 by and between the Debtor and NBK; and (iv) a 2022 settlement agreement between the parties (collectively, the "Loan Documents"). The Loan is allegedly secured by various instruments, including a deed of trust and UCC-1 financing statements, which were allegedly filed of record in appropriate jurisdictions. Collateral for the Loan includes, *inter alia*, the Property and rents received from the operation of the Property.  The loan documents were executed by

### B.  Events Transpiring After Bankruptcy

The Debtor filed for bankruptcy protection under Chapter 11 in order to protect and preserve the Property and its ability to pay creditors by enabling it to reorganize and restructure its financial affairs to fund operations and payments to creditors. In order to satisfy the Lender's and other creditors' claims, the Debtor may market the Property for sale to a third party or seek refinancing of Lender's claim from other lenders. The Debtor will continue to manage and operate the Property until any potential refinancing or sale is closed.

The Debtor had filed a prior case in July of 2023 that was dismissed on November 1, 2023. The dismissal occurred, from the perspective of the Debtor, by wrongful actions of Azeemeh Zaheer and her attorneys in a document filed for her on or about October 31, 2023.  The argument was made that Azeemeh Zaheer was still the owner/manager of Naissance Galleria, LLC and had the ability to control the Debtor. The claim contradicts her emails and signed documents that she had relinquished her control in 2021 and statements made by her to attorneys and others as to her relinquishment of control.

After the dismissal, the Debtor's Property was again posted for foreclosure for December 5, 2023 by NBK.  Due to the inability of the Debtor to delay the December 5, 2023, foreclosure, the Debtor filed this bankruptcy case.

*Management and Officers, Directors after Confirmation*

Under the Plan, QB Loop Property, LP will become the sole member of the Debtor in return for a capital contribution of $2,5 million. QB Loop Property, LP will designate one or more managers to operate the Debtor's business. Such designation shall be made in writing at least seven days before the Confirmation Hearing.However, the Plan provides that there will be an auction for the equity of the Debtor. If a party other than QB Loop Property, LP is the successful bidder for the Debtor's equity then that party will become the sole member of the Debtor.

1.     **Professionals Being Paid by the Debtor and Fees to Date**

   a.     Professionals Employed by the Debtor. The Debtor employed the law firm of Baker & Associates ("Baker") as its Chapter 11 bankruptcy counsel.

   b.     Fees to Date. The Debtor's professionals have not filed fee applications seeking approval of any fees and expenses incurred in this case through the date of this Disclosure Statement. Baker received retainers from an entity that is not the Debtor in the approximate amount of $50,000 for payment of its professional fees and expenses. The Debtor estimates that the aggregate amount of professional fees and expenses incurred by Baker through February of 2024 to be approximately $75,000.

   c.     Chapter 11 Trustee Professionals.  The Chapter 11 retained the law firm of Shannon and Lee.    Fees to be paid to Shannon and Lee are unknown and are subject to the approval of the bankruptcy court.

   d.      Chapter 11 Trustee. The Chapter 11 trustee is entitled to receive fees under the bankruptcy code.  Effectively the chapter 11 trustee may be entitled to receive approximately 3% of amounts distributed to creditors.

2.     **Operations During the Bankruptcy Case.** The Debtor has continued to operate its business and the Property during the pendency of the Bankruptcy Case. Operations have been under the control of the chapter 11 trustee since February 9, 2024.  Copies of the Debtor's operating reports, which are filed with the Bankruptcy Court pursuant to Rule 2015(a)(3) of the Federal Rules of Bankruptcy Procedure, are available from the Bankruptcy Court.

On May 24, 2024, the Debtor and 2425 WL, LLC filed their *Fifth Amended Joint Plan of Reorganization* [Docket No. 365] (the "Plan"), which provided for, *inter alia*, that the secured tax claims would be paid in full, that NBK would receive payment of approximately $26 million on

its secured and unsecured claims or would receive payment of approximately $62 million under a Section 1111(b) election and that unsecured creditors would receive 90% on their claims.

## VIII.
## DESCRIPTION OF THE PLAN

**A.    Introduction**

A summary of the principal provisions of the Plan and the treatment of Allowed Claims and Equity Interests is set forth in the first part of this Disclosure Statement. The summary is qualified in its entirety by the Plan.

**B.    Designation of Claims and Equity Interests**

The following is a designation of the Classes of Claims and Equity Interests under the Plan. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class or Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied before the Effective Date; a Claim or Equity Interest which is not an Allowed Claim or Allowed Equity Interest is not in any Class. Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim or Equity Interest which is not an Allowed Claim or Allowed Equity Interest.

| Class | Voting Status |
|---|---|
| Priority Claims | |
| Class 1: Certain Priority Claims | Impaired |
| | |
| Secured Claims | |
| Class 2: Secured Claim of Taxing Authorities | Impaired |
| Class 3: Assigned Tax Claims Claimed by National Bank of Kuwait and Ali Choudhri | Impaired |
| Class 4: Secured Claim of Caz Creek Holdings 2, LLC | Impaired |
| Class 5: Secured Claim of National Bank of Kuwait | Impaired |
| Class 6: Allowed Claim of 2425 WL, LLC | Impaired |
| | |
| Unsecured Claims | |
| Class 7: Unsecured Claim of NBK | Impaired |
| Class 8: General Unsecured Claims | Impaired |
| | |
| Equity Interest Holders | |
| Class 9: Equity Interest Holders | Impaired |

C.      **Treatment of Claims and Interests**

**Class 1: Certain Priority Claims**. Allowed Administrative and Priority Claims entitled to priority treatment pursuant to Section 507(a)(1), (a)(6), (a)(7), (a)(9), and (a)(10) of the Bankruptcy Code shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Priority Claim without interest when such Claim is Allowed; (ii) the amount of such holder's Allowed Claim paid in twelve equal monthly payments, with the first payment due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date; (iii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iv) such other treatment as may be agreed to in writing by such priority Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court.

**Class 2 Claim: Secured or Priority Claim(s) of Taxing Authorities.**  The Class 2 claims shall be paid, together with interest arising under applicable non-bankruptcy law from the Petition Date to the date of payment  in sixty equal installments with the first payment due on the Effective Date. Class 2 will retain its liens and will recover interest at the statutory rate of 1% per month until paid in full.

Post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction.

Class 2 Claims are impaired by the Plan.

Class 3: Assigned Tax Claims claimed by  Bank of Kuwait, S.A.K.P., New York Branch and Ali Choudhri.   Both the Bank of Kuwait and Ali Choudhri have filed claims with respect to certain assigned tax claims. The Bank's claim is Claim No.13-1. Mr. Choudhri's claim is Claim No. 21-1. The Debtor shall pay whichever creditor is determined to own the tax claim in sixty equal installments including interest at the non-default contract rate. The first payment shall be due on the Effective Date. Until the ownership of the claim is determined by a final order, Debtor shall make its payments into a separate account established for the purpose of holding such payments. Class 3 shall retain its liens until paid.

Class 3 is impaired.

Class 4 Claim: Secured Claims of Caz Creek Holdings II, LLC. The Allowed Secured Claim of Caz Creek shall be Allowed in the amount of approximately $879,098 and shall be paid in sixty equal monthly payments beginning on Effective Date with interest at the non-default contract rate of 10.95%.

The written agreements by and between Caz Creek and the Debtor will remain the same, except to the extent that the terms therein are modified by this Plan, and such agreements will be deemed to be modified to comport with this Plan.

All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived, and all amounts owed will be deaccelerated and paid in accordance with the terms of this Plan. Except as provided by this Plan, no default interest, late charges, or other penalties arising or accruing after the Petition Date shall be required to be paid to Caz Creek, provided, however, that Caz Creek shall be entitled to charge, collect, and receive late charges and other amounts provided by the written agreements between the Debtor and Caz Creek in the event of the Debtor's failure to timely make a payment to Caz Creek on the Allowed Secured Claims under this Plan after Confirmation.  Class 4 shall retain its liens until paid.

Class 4 Claims are Impaired by the Plan.

Class 5: Secured Claim of National Bank of Kuwait, S.A.K.P., New York Branch.

NBK shall receive one of three options depending upon the conditions provided below.

Option 1:

Option 1 shall apply if the Court determines that the Confidential Settlement Agreement between NBK, the Debtor and Ali Choudhri remains enforceable. If the Court makes this finding, then NBK shall receive payment of $$26,038,490.58 in full satisfaction of all claims secured and unsecured, such payment to be made within thirty (30) days after the Effective Date. If Option 1 applies, NBK shall also receive the releases provided in para. 10.6 of the Plan and its claim shall not be subject to further objection, offset or counterclaim.

Option 2:

Option 2 shall apply if  the Court does not find that Option 1 applies and NBK makes the Section 1111(b) election and the Court finds that such election is legally valid.[1] Under Option 2, NBK shall receive payment of its Allowed Claim in 480 equal monthly installments without interest such that the total amount of payments to NBK shall equal the amount of its Allowed Claim and the present value of the stream of payments shall be equal the value of the Allowed Secured Claim.

Option 3:

Option 3 shall apply if neither Option 1 nor Option 2 applies.  Under Option 3, the Allowed Secured Claim of NBK will be determined by the value of NBK's interest in the Collateral securing such Allowed Claim, which value will be determined by agreement of the parties or by the Bankruptcy Court following a valuation proceeding in accordance with the Bankruptcy Code.  NBK has valued the Property for purposes of this plan at $18,600,000. This value will control unless the Court determines that a different value should be used. As such, and because the

---

1 The Plan Proponents and any other parties in interest reserve the right to challenge the validity of any election under Section 1111(b).

respective taxing authorities and tax lenders hold a higher priority lien on the properties, the Debtor believes that NBK's Allowed Secured Claim will be an amount equal to the difference between the value of the Property less the outstanding property taxes and senior debt owed with respect to the Property. The ad valorem taxing authorities or their assignees have filed claims for $6,455,683.92. Thus, unless the Court determines otherwise, the Secured Claim of NBK will be $12,144,316.08.[2] The Debtor therefore believes that NBK's claim is undersecured and that NBK mayl have a deficiency claim against the Debtor's Estate, which amount will be included and treated as a Class 7 unsecured claim under the Plan. Under Option 3, the Class 5 Allowed Secured Claim of NBK in the amount of approximately $12,144,316.08 shall be paid with post-confirmation interest at the non-default contract rate within 30 days after the Effective Date.

All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived, and all amounts owed will be deaccelerated and paid in accordance with the terms of this Plan. Except as provided by this Plan, no default interest, late charges, or other penalties arising or accruing after the Petition Date shall be required to be paid to NBK, provided, however, that NBK shall be entitled to charge, collect, and receive late charges and other amounts provided by the written agreements between the Debtor and NBK in the event of the Debtor's failure to timely make a payment to NBK on its Allowed Secured Claim under this Plan after Confirmation.

Regardless of which Option applies, Class 5 shall retain its liens to the same priority, extebt and validity as they existed on the Petition Date until paid.

Class 5 Claims are Impaired by the Plan.

Class 6: Allowed Claim of 2425 WL, LLC. Except as provided herein, the Allowed Secured Claim of 2425 WL, LLC, will be determined by the value of 2425 WL LLC's interest in the Collateral securing such Allowed Claim, which value will be determined by agreement of the parties or by the Bankruptcy Court following a valuation proceeding in accordance with the Bankruptcy Code. 2425 WL, LLC has sought equitable subordination against the National Bank of Kuwait. As a compromise and for purposes of this Plan only, 2425 WL, LLC agrees to dismiss such claims and recognize the lien priority of National Bank of Kuwait. 2425 WL, LLC reserves the right to continue to challenge the Bank's lien position if this Plan is not confirmed. NBK has valued the Property for purposes of this plan at $18,600,000. This amount shall control unless the Court finds that a different value should be used. As such, and because the respective taxing authorities and tax lenders hold a higher priority lien on the Property, the Debtor believes that 2425 WL, LLC's' Allowed Secured Claim will be fully unsecured. The Allowed Claim of 2425 WL, LLC shall be satisfied by assigning all of the Estate's claims and causes of action other than Released Claims to 2425 WL, LLC upon the Effective Date. Class 6 shall not retain its liens.

Class 6 Claims are Impaired by the Plan.

---

2 All creditors and parties in interest reserve and retain the right to argue as to the value of the secured claim.

Class 7:  Allowed Unsecured Claim of National Bank of Kuwait, S.A.K.P., New York Branch.  Class 7 shall consist of the Allowed Unsecured Claim of National Bank of Kuwait, S.A.K.P., New York Branch.

If the Court finds that Option 1 or Option 2 apply to the Class 5 Secured Claim of NBK, then NBK shall not hold a Class 7 Unsecured Claim. If NBK does hold a Class 7 Allowed Unsecured Claim, Class 7 shall receive a payment which, when added to the amount paid to National Bank of Kuwait, S.A.K.P. on account of its secured claim, will equal $26,038,490.58. Any amounts paid by the Debtor or any party related to the Debtor subsequent to the Petition Date but prior to the Effective Date shall be credited to such payment. Such amount shall be paid within 30 days after the  Effective Date.

Class 7 is impaired.

Class 8: General Unsecured Claims.

The Reorganized Debtor will pay a total of 90% of the Allowed Claims of unsecured creditors other than National Bank of Kuwait, S.A.K.P. New York Branch and 2425 WL, LLC. Such payment shall be made within 120 days after the Effective Date. The Plan Proponents reserves the right to dispute the claim of any creditor unless expressly stated in this plan.

Class 8 Claims are impaired by the Plan.

Class 9: Equity Interest Holders. The Class 9 Allowed Interests of the Equity Interest Holders shall be cancelled upon the Effective Date. New Equity shall be issued as provided herein.

Class 9 Interests are impaired by the Plan and are deemed to reject the Plan.

**D.      Treatment of Executory Contracts and Unexpired Leases.**

The Plan shall constitute a motion to reject all Executory Contracts and Leases other than (1) the real property leases between the Debtor and its tenants, (2) management agreement between the Debtor and Jetall, and (3) contracts between the Debtor and services for the Property such as utilities, internet, and similar services.  All real property leases and maintenance contracts are assumed.

**E.      Means for Execution and Implementation of the Plan.**

**1.      New Equity.**  .  New equity shall be issued in the Reorganized Debtor. If there is not a class of Allowed Unsecured Claims which rejects the Plan, then the New Equity shall be issued to QB Loop Property, LP in return for a payment of $2.5 million. Those parties owning at least 10% of the equity in QB Loop Property, LP are:

**Lahori, Inc.,          24.5%**
Lahori, Inc. is owned 100% by Anwar Qadeer

**T.A.B. Lone Star Holdings, Inc.      25.0%**
T.A.B. Lone Star Holdings, Inc. is 100% owned by ZT Wealth, LLC, which is owned 99% by Taseer A. Badar and 1% by Badar ZT Management Trust

**Amad Ali Partners, Ltd.          20.0%**
Amad Ali Partners is owned by Asaf R. Qadeer, Tahseen Qadeer, Ali Qadeer and Amad Qadeer

Several other entities each own less than 10% each.

In the event that there is a class of Allowed Unsecured Claims which rejects the Plan, New Equity in the Debtor shall be sold to the highest bidder. QB Loop Property, LP shall make an initial bid of $2.5 million. Such bid shall be evidenced by a commitment letter to be executed in form acceptable to the Plan Proponents and filed with the Court within three (3) business days of approval of the Disclosure Statement. At the same time, QB Loop Property, LP shall provide proof of funds sufficient to show that it has good funds of at least $2.5 million sufficient to bid upon the equity. Any other party wishing to bid upon the New Equity shall provide proof of funds acceptable to the Plan Proponents by the deadline for voting upon or objecting to the Plan. All parties seeking to bid upon the New Equity shall make a deposit of $500,000 which shall be held by the Trustee pending the outcome of the New Equity Auction.  In the event that any party shall object to the ability of any party to bid upon the New Equity, the Court shall resolve such objection prior to the commencement of bidding. In the event that more than one party shall qualify to bid, there shall be an auction for the New Equity at the Confirmation Hearing (:the New Equity Auction"). In the event that more than one party shall qualify to bid, bidding shall proceed in increments of $250,000.00. All bids shall be made in cash without any financing contingency.  At the conclusion of the New Equity Auction, the Court shall determine the prevailing party in the auction. That party shall be required to close within five (5) business days of the Confirmation Hearing. If such party shall successfully close, it shall become the equity owner of the Reorganized Debtor. If such party shall fail to close, it shall forfeit its deposit as liquidated damages.

2.      Exit Funding. In the event that NBK does not make a Section 1111(b) election or such election is not allowed by the Court, Debtor shall obtain exit financing from Legalist in the amount of $35 million pursuant to the Summary of Key Terms of and Conditions for Debtor-in-Possession Term Loan Facility dated May 3, 2024 and attached hereto as Exhibit B. .  Such funding shall not constitute a "priming" lien and shall not take priority over any lien which is retained under this Plan. Legalist shall provide proof of a "Commitment to Lend" not later than 5:00 p.m. on June 7, 2024 which shall be filed with the Court.  In the alternative, the Plan Proponents shall provide a commitment to lend from a similarly creditworthy lender. In addition to filing such commitment with the court, the Plan Proponents shall provide evidence of the creditworthiness of the lender to the Trustee.

3.      New Leases.   **The Debtor will seek to improve the occupancy level of the property by entering into new leases such as those attached as Exhibits C and D.**

4..      Release of Claims. In the event that the Court finds that Option 1 for treatment of the Class 5 Secured Creditor shall apply, then Confirmation of this Plan shall constitute a mutual

release and extinguishment of all claims by and between the following parties other than obligations under this Plan:  (i) the Chapter 11 Trustee and his professionals, (ii) the NBK Parties, and (iii) the Debtor-Related Parties.  NBK Parties shall mean National Bank of Kuwait, S.A.K.P., New York Branch and its officers, agents, affiliates, attorneys and employees. Debtor-Related Parties shall mean the Debtor, QB Loop Property, LP, 2425 WL, LLC, Ali Choudhri and any entity owned or controlled by Ali Choudhri together with their officers, agents, affiliates, attorneys and employees. These shall be known as the Released Claims. The parties to the Released Claims shall dismiss any adversary proceedings or lawsuits by or between them and shall execute global and mutual releases of any and all claims (other than obligations provided under the Plan), whether known or unknown, contingent, unliquidated, in tort or in contract up through and including the Effective Date in form acceptable to National Bank of Kuwait, S.A.K.P., New York Branch.

**5.** **Preservation of Rights of Action.** Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all rights pursuant to sections 502, 510, 544, 545, and 546 of the Bankruptcy Code, all preference claims under section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under section 549 of the Bankruptcy Code, all claims recoverable under section 550 of the Bankruptcy Code, and all claims and causes of action asserted in current litigation, whether commenced pre- or post-petition, and all potential litigation referenced herein and in the Debtor's schedules and statement of financial affairs, including litigation against Sonder USA Corporation, and others described herein are hereby preserved and retained for enforcement by the Reorganized Debtor, in its sole and absolute discretion, subsequent to the Effective Date. In addition, all claims, rights, remedies, and causes of action that the Debtor may hold against a current or previous tenant at the Property with respect to a real property lease are hereby preserved and retained for enforcement by the Reorganized Debtor, in its sole and absolute discretion, subsequent to the Effective Date. The Reorganized Debtor shall also be vested with and retain all rights of offset or recoupment and all counterclaims against any Claimant. The Reorganized Debtor shall retain and may enforce the rights of the Debtor to object to Claims on any basis. The Reorganized Debtor may pursue any and all rights, remedies, actions, proceedings, and similar actions against any of the judgment debtors obligated and liable in respect of the judgment. The Reorganized Debtor may pursue those rights of action, as appropriate, in accordance with what is in the best interests of the Reorganized Debtor.

**6.** **Objections to Claims.**  All objections to Claims shall be served and filedwithin sixty (60) days after the Effective Date.. Any Contested Claims may be litigated to Final Order or may be settled between the objecting party and the affected creditor, provided that any settlement of a claims objection must be approved by the Court under Bankruptcy Rule 9019. Any party in interest may file an objection to claim.

**F.** **Conditions to Effectiveness of the Plan**

**1.** **Conditions to Effectiveness.** The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following condition(s) shall have been satisfied or waived in the Debtor's sole and absolute discretion: the

Confirmation Order, in a form and substance reasonably acceptable to the Debtor, shall have become a Final Order and shall, among other things (i) confirm this Plan, (ii) find that the Debtor have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e), and (iii) find that the Debtor is authorized to take all actions and consummate all transactions contemplated under this Plan.

2. **Waiver of Conditions.** The Debtor may waive any condition set forth in the Plan at any time, without notice, without leave of or order of the Court, and without any formal action other than proceeding to consummate the Plan.

## G.   **Effects of Plan Confirmation**

1. **Binding Effect.** The provisions of this Plan shall bind all holders of Claims and equity Interests and their respective successors and assigns, whether or not they accept this Plan.  On and after the Effective Date, except as expressly provided in this Plan, all holders of Claims, Liens and equity Interests shall be precluded from asserting any Claim, cause of action or Liens against the Debtor, the estate, the Reorganized Debtor or their respective property and assets based on any act, omission, event, transaction, or other activity of any kind that occurred or came into existence prior to the Effective Date.

2. **Moratorium, Injunction and Limitation of Recourse for Payment.** From and after the Effective Date, all holders of Claims shall be permanently restrained and enjoined from: (a) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Reorganized Debtor or the Assets; (b) enforcing, attaching, collecting, or recovering on account of any Claim by any manner or means, any judgment, award, decree, or order against the Reorganized Debtor or the Assets except pursuant to and in accordance with this Plan; (c) creating, perfecting, or enforcing any encumbrance of any kind against either the Assets or the Reorganized Debtor; (d) asserting any control over, interest, rights or title in or to any of the Assets except as provided in this Plan; (e) asserting any setoff, or recoupment of any kind against any obligation due the Reorganized Debtor as assignee, except upon leave of the Bankruptcy Court or except as authorized by section 553 of the Bankruptcy Code; and (f) performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that this injunction shall not bar any Creditor from asserting any right granted pursuant to this Plan; provided, further, however, that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking Allowance of such Contested Claim pursuant to the Plan.

Confirmation of the Plan shall also discharge the Debtor from all claims that arose before the Confirmation Date. After Confirmation, the rights and remedies of any Creditor or Equity Holder shall be governed and limited by the Plan, which shall be binding upon the Debtor, its estate, the Reorganized Debtor, Creditors, Equity

Holders, and all other parties in interest, regardless of whether any such Person voted to accept the Plan, and the Pre-Petition Loan Documents shall be deemed to have been amended to comport with the treatment being accorded to the Lender under the Plan. All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured, and any defaults and events of default resulting from the confirmation of the Plan, the occurrence of the Effective Date, and/or the actions and transactions contemplated by the Plan, including the payments to be made under the Plan and changes in ownership and control effectuated by the Plan, shall be waived and of no effect.

The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtor and all Assets.

3. **Revesting.** On the Effective Date, equity will continue to be held by the Equity Holders.  The Debtor will be vested with all the property of its estate free and clear of all Claims and other interests of Creditors and Equity Holders, except as provided in the Plan; provided, however, that the Debtor shall continue as a debtor-in-possession under the Bankruptcy Code until the Effective Date, and, thereafter, the Reorganized Debtor may conduct its business free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

4. **Other Documents and Actions.** The Debtor and Reorganized Debtor may execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

5. **Term of Injunctions or Stays.** Unless otherwise provided, all injunctions or stays provided for in the Debtor's Bankruptcy Case pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

## H.     **Confirmability of Plan and Cramdown.**

The Debtor requests confirmation under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation of the Plan under section 1129(b) of the Bankruptcy Code requires modification.

## I.     **Retention of Jurisdiction.**

The Plan provides for the Bankruptcy Court to retain the broadest jurisdiction over the Bankruptcy Case as is legally permissible so that the Bankruptcy Court can hear all matters related to the consummation of the Plan and the claims resolution process. Until the Bankruptcy Case is closed, the Court shall retain exclusive jurisdiction of all matters arising under, or related to, these proceedings, including, but not limited to, the jurisdiction to:

a.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim not otherwise Allowed under the Plan, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims;

b.      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code for professional fees and expenses incurred on or before the Effective Date;

c.      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

d.      effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

e.      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Bankruptcy Case, or the causes of action retained by the Debtor in the Plan;

f.      enter such orders as may be necessary or appropriate to execute, enforce, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

g.      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

h.      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j.      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k.      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

l.      enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Bankruptcy Case (whether or not the Bankruptcy Case has been closed);

m.     except as otherwise limited herein, recover all Assets of the Debtor and property of the Estate, wherever located;

n.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

o.      hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

p.      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

q.      enter a final decree closing the Bankruptcy Case.

## J.      **Assumption of Allowed Claims**

As of the Effective Date, the Reorganized Debtor shall assume the liability for and obligation to perform and make all Distributions or payments on account of all Allowed Claims in the manner provided in this Plan.

## K.      **Attorneys' Fees and Costs**

To the extent any holder of a Secured Claim asserts a right to attorneys' fees and costs pursuant to section 506(b) of the Bankruptcy Code, unless otherwise agreed between the Debtor or Reorganized Debtor and such Secured Creditor, the allowance of such fees and expenses shall be handled as set forth in this paragraph. Within twenty (20) days after the Effective Date, the Secured Creditor shall file an application with the Bankruptcy Court for allowance of such fees and expenses. Within twenty (20) days after such application is filed, the Reorganized Debtor may file any objections thereto, and the Secured Creditor shall file any response within ten (10) days thereafter. If the Secured Creditor and the Reorganized Debtor are unable to reach agreement, the matter shall then be submitted to the Bankruptcy Court for determination on no less than twenty (20) days-notice of the hearing.

L.   **Exemption from Transfer Taxes and Recording Fees**

In accordance with Bankruptcy Code § 1146(a), none of the issuance, transfer or exchange of any securities under the Plan, the release of any mortgage, deed of trust or other Lien, the making, assignment, filing or recording of any lease or sublease, the vesting or transfer of title to or ownership of any of the Debtor's interests in any property, or the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with the Plan, including the releases of Liens contemplated under the Plan, shall be subject to any document recording tax, stamp tax, conveyance fee, sales or use tax, bulk sale tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state and/or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.   **Modification of Plan**

The Plan may be amended, modified, supplemented, restated, or altered in whole or in part upon request, motion, or application of the Debtor at any time prior to Confirmation without notice and hearing, and without additional disclosure pursuant to Bankruptcy Code section 1125, if the Court finds and concludes that any such amendment, modification, supplement, restatement, or other alteration does not materially and adversely affect any Creditor or any Claim. After the Confirmation Date and prior to the Effective Date, the Debtor may, under Bankruptcy Code § 1127(b): (i) amend the Plan so long as such amendment shall not materially and adversely affect the treatment of any holder of a Claim, (ii) institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and (iii) amend the Plan as may be necessary to carry out the purposes and effects of the Plan so long as such amendment does not materially or adversely affect the treatment of holders of Claims or Equity Interests under the Plan; provided, however, prior notice of any amendment shall be served in accordance with the Federal Rules of Bankruptcy Procedure or an order of the Bankruptcy Court.

N.   **Waiver of Stay**

Notwithstanding Rules 3002(e), 6004(h), and 6006(d) of the Federal Rules of Bankruptcy Procedure, the Debtor shall be authorized to consummate the Plan and the transactions and transfers contemplated thereby immediately upon and after entry of the Confirmation Order.

**IX.**
**FEASIBILITY OF THE PLAN**

A.   **Feasibility**

The Debtor believes that the Plan is feasible. The funds to be used for the payment of Claims or other Distributions to be made under the Plan will come from the Debtor's Cash on

hand, the income generated from the Property, the new equity contribution provided herein and the exit financing to be provided (if applicable) by Legalist,

1. **Projections.** The Plan depends upon QB Loop, LP to make an initial contribution of $2.5 million to fund the Plan.Additional funding of $35 million will be provided through exit financing provided by Legalist, although such financing will not be provided if NBK is permitted to make the Section 1111(b) election.

2. **Rent Roll.** The Debtor will provide its current and past rent rolls for the Property if requested by any creditor on a confidential basis.

**B.** **Alternatives to Confirmation of the Plan**

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case, (b) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by some other party.

1. **Dismissal.** If the Debtor's Bankruptcy Case were to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. The Lender would then have the right to exercise its rights as a secured creditor to seek to foreclose on the Property.

2. **Chapter 7 Liquidation.** If the Plan is not confirmed, it is possible that the Debtor's Bankruptcy Case will be converted to a case under Chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, secured creditors, Administrative Claims, and Priority Claims are entitled to be paid in cash and in full before unsecured creditors receive any funds.

If the Debtor's Bankruptcy Case were converted to Chapter 7, the present Priority Claims may have a priority lower than priority claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

The Debtor believes that liquidation under Chapter 7 would result in significantly less distributions to unsecured creditors and to Administrative and Priority Claimants.

According to a May 2023 appraisal conducted by NBK, the Property is worth $18,600,000. Thus, the Property is worth far less than the secured debt against it, including NBK and Secured Tax Claims. In a liquidation, NBK would likely be permitted to exercise its rights as a secured creditor to foreclose on the Property in a Chapter 7 liquidation. While NBK would pay any Secured Tax Claims upon a

foreclosure, NBK would receive much less through foreclosure than the amounts proposed to be paid to it under the Plan, and the Debtor's other creditors, both secured and unsecured, would not receive any distributions from the Property.

Even if NBK were not allowed to foreclose and the Debtor's Assets were liquidated, and if a receiver or trustee were appointed to supervise the liquidation of the Debtor's Assets, there would be significant costs associated with such liquidation, and such costs would increase due to fees and charges for such persons, including brokers retained to sell the Property and attorneys retained to pursue potential litigation claims.  It is unlikely that the liquidation of the Debtor's Assets would be sufficient to enable a Trustee to make any significant distribution to unsecured creditors because Administrative and Priority Claims, Secured Tax Claims, and the Lender's Secured Claim would consume all of such proceeds. Moreover, the timing of any distribution to unsecured creditors would be conditioned upon the ability to liquidate the Debtor's litigation claims against NBK, Sonder, and others, and potential Avoidance Actions that could take years to resolve.

In 2022 due to continuing issues between the Debtor and NBK, the parties entered into a confidential settlement agreement. The litigation involving NBK is described in more detail above. The Debtor believes that if this case is converted to a Chapter 7 case, the litigation may have a much less value due to a chapter 7 trustee possibly selling the litigation claims.

During the ninety (90) days prior to the Petition Date, the Debtor made payments to various non-insider creditors and vendors that provided services to the Property. The Debtor believes those payments were made in the ordinary course of its business and are also subject to potential new value defenses. Therefore, the Debtor does not believe that such payments are subject to avoidance and recovery by the Debtor's estate as preferential transfers pursuant to Sections 547 and 550 of the Bankruptcy Code.

During the years preceding the Petition Date, the Debtor also made payments to insiders, including Jetall Companies, Inc. There is a written property management agreement between the Debtor and Jetall Companies, Inc. under which Jetall Companies, Inc. is entitled to property management fees equal to the greater of 4% of gross receipts or $14,750.00 a month, construction management fees, and reimbursements for other expenditures, including employees that provide services to the Property. Jetall contends that the Debtor owes it significant amounts in unpaid management fees, commissions, and expense reimbursements.  Thus, a Chapter 7 Trustee's ability to recover Avoidance Actions against insiders is uncertain and would require significant time and expense.  A Chapter 7 Trustee may or may not decide to pursue the Debtor's litigation claims.  A Chapter 7 Trustee may elect to "sell" the litigation claims for a small amount of money and limit any recovery to the unsecured creditors.

Under the Plan, Administrative, Secured Claims, and Priority Tax Claims are paid in full and Unsecured Creditors will receive more than $2.3 million in distributions, rendering the Plan far better than a Chapter 7 liquidation.

**3.**     **Alternative Plan.**  The Debtor understands that the chapter 11 will be proposing the sale of the Property by auction in July of 2024.  The sale at auction is apparently the goal of NBK and the chapter 11 trustee for unknown reasons has agreed to pursue this course of action.   The auction sale will be without the execution of any new leases by the chapter 11 trustee, although the chapter 11 trustee has been presented with proposed leases that are with high quality tenants and would increase the value of the Property.  The chapter 11 trustee has refused to retain an attorney to pursue lender liability claims against NBK.  The alternative plan that the Debtor understands will be proposed by the chapter 11 trustee appears to only benefit NBK and the chapter 11 trustee.

The Debtor believes the Plan provides the best prospect for reorganizing the Debtor and maximizing creditor recoveries that can be achieved quickly. The Debtor believes that any material delay in the Debtor's exit from bankruptcy will harm its business and lessen creditor recoveries. By exiting bankruptcy, the Debtor will eliminate the expense of being in bankruptcy.

# X.
# RISK FACTORS

The primary risk factor associated with the Plan is the Debtor's ability to lease and collect rents with respect to the Property.  While there can be no assurance that the Debtor will be able to lease the Property in the current market, the Debtor will be able to sell the Property in the event that the Debtor is unable to stabilize the Property.

Section 1129 of the Bankruptcy Code provides certain requirements for a Chapter 11 plan to be confirmed. Parties-in-interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtor believes that the Plan complies with the requirements of the Bankruptcy Code.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of Claims and Equity Interests encompass Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class.

The Debtor cannot ensure it will receive enough acceptances to confirm the Plan. But, even if the Debtor does receive enough acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. Even if enough acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not

to confirm the Plan or may require additional solicitations or consents prior to confirming the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order approving any transactions contemplated thereunder. As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and effectuated and the liquidation completed.

Although the Debtor believes that the Effective Date may occur within a reasonable time following the Confirmation Date, there can be no assurance as to such timing.

## XI.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.  General

Under the Internal Revenue Code of 1986, as amended (the "Tax Code"), there could be certain significant federal income tax consequences associated with the Plan described in this Disclosure Statement. Certain of these consequences are discussed below. Due to the unsettled nature of certain of the tax issues presented by the Plan, the differences in the nature of Claims of the various creditors, their taxpayer status, residence and methods of accounting (including creditors within the same creditor class) and prior actions taken by creditors with respect to their Claims, as well as the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions, the tax consequences described below are subject to significant considerations applicable to each creditor.

**HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS RESPECTING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

### B.  Tax Consequences to the Debtor

Material tax consequences may exist with respect to the Debtor under the Plan. To the extent any of its debts are discharged under the Plan, the Debtor does not believe such discharge will result in any "discharge of indebtedness" income, although other tax attributes of the Debtor, such as the amount of its net operating loss carrybacks or carryovers may be reduced or affected thereby.

### C.  Tax Consequences to Creditors

The tax consequences of the implementation of the Plan to a creditor will depend in part upon whether the creditor's present debt constitutes a "security" for federal income tax purposes, the type of consideration received by the creditor in exchange for its Allowed Claim, whether the creditor reports income on the accrual or cash basis, whether the creditor receives consideration in more than one tax year of the creditor, whether the creditor is a resident of the United States, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction.

## D. <u>Creditors Receiving Solely Cash</u>

A creditor who receives cash in full satisfaction of its Claim may be required to recognize gain or loss on the exchange. The creditor may recognize gain or loss equal to the difference between the amount realized in respect of such Claim and the creditor's tax basis in the Claim.

## E. <u>Backup Withholding</u>

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding". Withholding generally applies if the holder: (a) fails to furnish his social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.

**XII.**
**<u>CONCLUSION</u>**

This Disclosure Statement has attempted to provide information regarding the Debtor's estate and the potential benefits that might accrue to holders of Claims against and Equity Interests in the Debtor under the Plan as proposed. The Plan is the result of the effort of the Debtor and its advisors and management to pay allowed claims against it. The Debtor believes that the Plan is feasible and will provide holders of Claims against the Debtor far greater benefits than those that would be received by liquidating the Debtor's Assets as apparently will be proposed by the chapter 11 trustee, or by any alternative plan. The Debtor, therefore, hereby urges you to vote in favor of the Plan.

**Whether or not you expect to attend the Confirmation Hearing, which is scheduled to commence on _____, 2024 at _____.m., prevailing central time, you must sign, date, and mail your Ballot as soon as possible for the purpose of having your vote count at such hearing. All Ballots must be returned to counsel for the Debtor: Reese W. Baker, Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024. All Ballots must be returned on or before 5:00 p.m., prevailing central time, on _____, 2024. Any ballot which is illegible or which fails to designate an acceptance or rejection of the Plan will not be counted.**

Dated: May 21, 2024

Respectfully submitted,

**GALLERIA 2425 OWNER, LLC**

By: */s/ Ali Choudhri*
    Ali Choudhri
    **MANAGER OF GALLERIA 2425 OWNER, LLC**

**2425 WL, LLC**

    By: */s/Ali Choudhri*
    Ali Choudhri
    Manager of 2425 WL, LLC

Exhibit A

Galleria 2425 Owner, LLC Claims Analysis

| | Scheduled | | POC | | Claim No. | Disputed? | Insider? |
|---|---|---|---|---|---|---|---|
| **Secured Creditors** | | | | | | | |
| City of Houston | $ | 544,604.20 | $ | 403,589.29 | 1 | | |
| Houston ISD | $ | 979,200.35 | $ | 743,365.22 | 2 | | |
| Houston Community College System | $ | 97,110.05 | $ | 72,059.60 | 3 | | |
| Harris County, et al | | | $ | 512,253.35 | 5 | | |
| 2425 WL, LLC | $ | 25,092,415.80 | $ | 22,968,231.58 | 7 | Yes | |
| HNB Construction, LLC | $ | 84,853.00 | $ | 94,336.13 | 11 | Yes | Unsecured |
| CC2 TX, LLC | $ | 800,238.37 | $ | 859,961.40 | 12 | | |
| National Bank of Kuwait | $ | 1,696,384.00 | $ | 3,864,455.06 | 13 | Yes | |
| National Bank of Kuwait | $ | 63,552,988.00 | $ | 67,153,845.15 | 14 | Yes | |
| 2425 West Loop, LLC | Unknown | | $ | 248,340.70 | 16 | Yes | Unsecured |
| Arin-Air, Inc. | | | $ | 50,605.53 | 17 | Yes | Unsecured |

| | Scheduled | | POC | | Claim No. | Disputed? | Insider? |
|---|---|---|---|---|---|---|---|
| **Unsecured Claims** | | | | | | | |
| ADT | $ | 1,487.00 | | | | | |
| Ash Automated Control Systems | $ | 1,548.31 | | | | | |
| CFI Mechanical, Inc. | $ | 668.44 | | | | | |
| Choudhri, Ali | $ | 6,771,235.00 | $ | 4,176,657.46 | 21 | Yes | |
| Choudhri, Ali | | | $ | 1,844,500.45 | 22 | Yes | |
| Cirro Electric | $ | 22,928.00 | | | | | |
| City of Houston Water | $ | 6,126.00 | | | | | |
| Comcast | $ | 300.00 | | | | | |
| Datawatch Systems | $ | 22,990.00 | | | | | |
| Drinnon, Rodney | | | $ | 277,450.00 | 6 | Yes | |
| Environmental Coalition | $ | 800.85 | | | | | |
| Ferguson Facilities Supplies | $ | 2,001.00 | | | | | |
| Firetron | $ | 30,040.34 | | | | | |
| First Insurance Funding | $ | 5,507.36 | | | | | |
| Gulfstream Legal Group | $ | 57,799.06 | | | | | |
| Heyward, PLLC | $ | 97,193.00 | $ | 97,193.22 | 18 | | |
| Jetall Companies, Inc. | $ | 2,204,801.00 | $ | 3,180,223.30 | 20 | Yes | |
| Jetall Companies, Inc. | | | $ | 1,699,750.00 | 23 | Yes | |
| Jetall Companies, Inc. | | | $ | 1,699,750.00 | 24 | Yes | |
| Kelley, Lloyd | | | $ | 3,000,000.00 | 19 | Yes | |
| Kings 111 Emergency | $ | 315.95 | | | | | |
| Lexitas | $ | 2,771.25 | | | | | |
| Logix Fiber Networks | $ | 323.42 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Mueller Water Treatment | $ | 950.00 | | | |
| Naissance Galleria, LLC | | | $ | 200,000.00 | 10 Yes |
| Nationwide Security | $ | 32,549.70 | | | |
| Nichamoff Law Firm | $ | 46,984.22 | $ | 1,030,694.02 | 9 Yes |
| Smart Office Solutions | $ | 1,877.00 | | | |
| Sonder USA, Inc. | | | $ | 23,027,492.09 | 15 Yes |
| T & R Mechanical | $ | 4,216.34 | | | |
| TKE | $ | 76,935.35 | | | |
| U.S. Retailers, LLC | | | $ | 62,405.41 | 8 |
| U.S. Trustee | | | $ | 345.00 | 4 |
| Waste Management | $ | 456.00 | | | |
| Zindler Cleaning Service | $ | 4,221.00 | | | |

**May 3, 2024**

**Summary of Key Terms of and Conditions for**
**DEBTOR-IN-POSSESSION TERM LOAN FACILITY**

Galleria 2425 Owner, LLC
<u>c/o</u>: Ali Choudhri
Jetall Capital
ali@jetallcapital.com

**CC: Heather Davey**

The following summarizes the key terms (the "**Term Sheet**") on which certain investment fund(s) for which Legalist, Inc. serves as investment adviser (the "**DIP Lender**") are willing to extend post-petition financing (the "**DIP Loans**") to Galleria 2425 Owner, LLC (the "**Debtor**") in connection with its chapter 11 case pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), in an aggregate principal amount of $35,000,000 (the "**DIP Commitment**").

Prior to satisfaction of the Conditions Precedent to funding, this Term Sheet shall be *confidential, non-binding, for discussion purposes only, and not a commitment to lend*.

| | |
|---|---|
| **Overview** | The DIP Loans shall be made available to the Debtor in the aggregate amount of the DIP Commitment for the following uses:<br><br>1. Fees for all Estate Professionals;<br>2. Refinance/pay down prepetition lender(s), as applicable;<br>3. Operating expenses of the Debtor; and<br>4. Other agreed-on uses. |
| **Conditions Precedent to DIP Draw** | The DIP Lender will make available DIP Loans in multiple draws, provided no event of default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom, upon (such date, the "**Effective Date**"):<br><br>1. The DIP Lender's completion, to its own satisfaction, of any remaining due diligence including representations and warranties confirmed to be true and accurate;<br>2. The Debtor's delivery of a fully executed credit agreement in Approved Form;[1]<br>3. The Debtor's delivery of an appraisal of the DIP Collateral (defined below) in Approved form; and<br>4. The Bankruptcy Court's entry of a final financing order approving the DIP Loans and otherwise in Approved Form (the "**DIP Order**"), which remains in full force and effect.<br><br>The Debtor shall file a motion for expedited approval of the DIP Loans no later than three weeks from the execution of this Term Sheet, or an additional one-time **"Reserved Funds Fee"** of 1.00% of the DIP Commitment shall be earned. |
| **Interest; Default Interest; Undrawn Line Fee** | The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations (defined below)) shall accrue interest monthly in arrears from the Effective Date at the U.S. prime rate plus 5.00% per year.<br><br>While an event of default has occurred and is continuing, such amounts shall accrue an additional 4.75% in interest per year. If the DIP Loans are not borrowed in full in a single draw, any undrawn portion of the DIP Commitment shall accrue an "**Undrawn Line Fee**" from the Effective Date at 2.50% per year. Any default interest and all such fees shall accrue and be compounded and capitalized monthly and be due and payable in cash upon the Maturity Date. |
| **Other Costs of Borrowing** | A onetime "**Commitment Fee**" of 2.50% of the DIP Commitment and "**Underwriting Fee**" of 2.00% of the DIP Commitment shall be fully and irrevocably earned upon the Effective Date, due and payable in cash upon the Effective date, or paid in-kind as of the Maturity date for an additional 0.50% of the DIP Commitment, at the Debtor's election. In addition, a "**Monitoring Fee**" of 0.50% of the DIP |

---

[1] "**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

| | Commitment per year shall accrue and be compounded and capitalized monthly, due and payable in cash upon the Maturity Date. |
|---|---|
| **Prepayments** | The DIP Loans shall be mandatorily repaid from, and within 10 days of the Debtor's receipt of, proceeds from any sale or other disposition of DIP Collateral; <u>provided</u> that any such disposition shall occur in Approved Form. Any repayment required to be made within 180 days of the Effective Date shall be accompanied by a "**Makewhole Fee**" of 2.50% of the amount required to be repaid. The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 90 days after the Effective Date; <u>provided</u> that voluntary repayments made within 180 days of the Effective Date shall be subject to a Makewhole Fee. |
| **Maturity Date** | The DIP Loans shall mature, and all unpaid DIP Obligations shall be due and payable, upon the earliest (the "**Maturity Date**") of (i) 12 months after the Effective Date, with one six-month extension option for an additional 1.50% of interest, based on mutually agreed-upon Milestones between the Debtor and the DIP Lender; and (ii) acceleration of the DIP Loans following an event of default. |
| **Superpriority Claims; DIP Liens; DIP Collateral** | Subject to a customary carveout for estate professional fees and other administrative expenses, all DIP Obligations shall constitute DIP Claims,[2] payable from the DIP Collateral and all other property of the Debtor's estate. The DIP Order shall grant the DIP Lender automatically perfected security interests (collectively, the "**DIP Liens**"), senior to all pre- and postpetition liens, on all present or future estate property (collectively, the "**DIP Collateral**"). |
| **Work Fee** | No later than three (3) business days after the execution of this Term Sheet, the Debtor shall pay a work fee in two parts: 1) payment for a $7,000 appraisal of the DIP Collateral, in Approved Form; and 2) no later than three (3) business days after the DIP Lender's receipt of the appraisal, the amount of $250,000, which shall be credited against the DIP Lender Expenses below; provided, however, such Work Fee is fully earned and payable in cash upon the execution of the Term Sheet. |
| **DIP Lender Expenses; Other DIP Obligations** | The Debtor shall pay, no later than the Maturity Date, all reasonable costs and expenses of the DIP Lender incurred in connection with the DIP Loans (collectively, the "**DIP Lender Expenses**"). The DIP Lender Expenses, together with all principal of, and interest and fees on, the DIP Loans, together with any other amount owed by the Debtor in connection therewith shall constitute "**DIP Obligations**" secured by the DIP Liens. The Debtor shall indemnify, pay and hold harmless the DIP Lender (and each of their respective directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, willful misconduct or actual fraud of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). <br><br> The DIP Orders shall contain stipulations and releases for the DIP Lender (in any capacity) and the prepetition secured parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions. |
| **Miscellaneous Provisions** | Customary and as reasonably required by the DIP Lender, including: <br><br> ● Debtor's representations, warranties, and covenants (including budget and reporting); <br> ● Stay waiver (notwithstanding Bankruptcy Rule 6004); <br> ● Releases, Exculpation, Limitation of Liabilities and Indemnity of DIP Lender, the DIP Agent and their affiliates; <br> ● Section 364(e) "good faith" findings in favor of the DIP Lender; <br> ● DIP Order and DIP Agreements acceptable to the DIP Lender in its sole discretion; <br> ● DIP Budget acceptable to the DIP Lender in its sole discretion; |

---

[2] "**DIP Claims**" means "superpriority" administrative-expense claims with priority over (i) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code and (ii) all other unsecured claims against the Debtor.

|  | <ul><li>No portion of the Debtor's cash collateral and other cash (collectively, the "**Cash Collateral**"), the DIP Loans or the Collateral may be used to investigate, commence or prosecute any action, proceeding or objection with respect to or related to the claims, liens or security interests of the DIP Agent and the DIP Lender.</li><li>Events of default and DIP Lender's rights and remedies; and</li><li>Governing Law (Bankruptcy Code / New York State).</li></ul> |
|---|---|

**This Term Sheet shall expire and be without further effect if not signed by both parties by May 2, 2024.**

Accepted and agreed to, as of the first date written above:

**DEBTOR:**

GALLERIA 2425 OWNER, LLC

By: _____

Name: Ali Choudhri,

Title: Authorized Representative

*Signing on behalf of the debtor, not
the chapter 11 Trustee.

**DIP LENDER:**

By: LEGALIST, INC., as Investment Adviser

By: _____

Name: Christian G.B. Haigh
Title: Chief Investment Officer

Exhibit C



# LEASE BETWEEN:

# GALLERIA 2425 OWNER, LLC

# and

# VAXANIX BIO LTD., a Nevada corporation

**TwentyFour25**
2425 West Loop South
Houston, Texas 77027

## Contents

1. Definitions and Basic Provisions ...................................................................... 3

2. Services by Landlord ...................................................................................... 5

3. Full Service Lease ......................................................................................... 5

4. Electricity ................................................................................................... 6

5. Payments and Performance ............................................................................. 6

6. Late Fees .................................................................................................... 6

7. Installation of Improvements; ADA Compliance .................................................. 6

8. Completion of Improvements and Commencement of Rent ..................................... 7

9. Repairs and Reentry ...................................................................................... 7

10. Alterations and Additions by Tenant ............................................................... 7

11. Entry for Repairs and Inspection .................................................................... 7

12. Mechanic's Liens ........................................................................................ 7

13. Tenant's Use .............................................................................................. 8

14. Common Area Usage .................................................................................... 8

15. Valet ....................................................................................................... 8

16. Laws and Regulations; Rules of the Building ...................................................... 8

17. Idemnity, Liability, Loss, or Damage and Covenant not to sue ................................. 9

18. No Subrogation; Insurance. .......................................................................... 9

19. Fire and Casualty. ...................................................................................... 10

20. Condemnation ........................................................................................... 10

21. Relocation of Premises ................................................................................. 10

22. Assignment and Subletting ............................................................................ 10

23. Holding Over ............................................................................................ 11

24. Abandoned Property .................................................................................... 11

25. Taxes. ..................................................................................................... 13

26. Transfer of Landlord's Rights ......................................................................... 13

27. Default .................................................................................................... 13

28. Security Deposit ......................................................................................... 16

29. Landlord's Lien and Security Interest ................................................................ 16

30. Remedies ................................................................................................. 17

31. Joint and Several Liability ............................................................................. 17

32. Constructive Eviction ................................................................................... 17

33. Building Name ........................................................................................... 17

34. Subordination and Attornment; Notice to Mortgagee. .......................................... 18

35. Lease Certificates; Financial Statements ........................................................... 18

36. Limitation of Landlord Liability ...................................................................... 19

37. Consents .................................................................................................. 19

38. Notices .................................................................................................... 19

39. Brokerage ................................................................................................. 19

40. Force Majeure ........................................................................................... 20

41. No Third Party Beneficiary ............................................................................ 20

42. Severability…………………………………………………………………..20

43. Binding Effect………………………………………………………………..20

44. Applicable Law; Consent to Jurisdiction………………………………………20

45. Mandatory Mediation………………………………………………………...20

46. Entire Agreement; No Warranties…………………………………………….20

47. No Implied Representations……………………………………………………21

48. Effective Date…………………………………………………………...21

SIGNATURE PAGE TO LEASE AGREEMENT ............................................................. 22

EXHIBIT A TO LEASE AGREEMENT ......................................................................... 23

EXHIBIT B TO LEASE AGREEMENT ......................................................................... 24

EXHIBIT C TO LEASE AGREEMENT ......................................................................... 25

   a.   Parking Privileges ................................................................................... 25

EXHIBIT D TO LEASE AGREEMENT ......................................................................... 27

   h.   Leasehold Improvements Agreement .................................................. 27

EXHIBIT E TO LEASE AGREEMENT .......................................................................... 28

   i.   Building Rules and Regulations............................................................. 28

EXHIBIT F TO LEASE AGREEMENT .......................................................................... 31

   j.   Mandatory Mediation............................................................................ 31

<u>**LEASE AGREEMENT**</u>

**THIS LEASE AGREEMENT** (this **"Lease"**) is entered into by the Landlord and Tenant hereinafter named.

1.<u>**Definitions and Basic Provisions**</u>. The terms defined below shall have the respective meanings stated when used elsewhere in this Lease, and such terms and the following basic provisions constitute an integral part of this Lease:

   a.   **"Landlord": Galleria 2425 Owner, LLC**

   b.   **"Tenant":    Vaxanix Bio Ltd., a Nevada corporation**

   c.   **"Premises":**  That certain space in a building owned by Landlord (the "Building") located at 2425 West Loop South, Houston, Texas, on a tract of land (the "Land") situated in the City of Houston, Harris County, Texas, described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes.  The Premises are to be located on the ninth (9th) floor(s) of the Building, as shown on the floor plan(s) attached hereto as <u>Exhibit B</u> and made a part hereof for all purposes. Subject to Exhibit B below, the parties hereby agree that for purposes of this Lease the Premises contains approximately 13,121 square feet of Rentable Space (as defined below), and that there are approximately 281,590 square feet of Rentable Space in the Building.

   d.   **"Lease Term**":  a period of 5 years, commencing on May 1, 2024 (the "Commencement Date"), and ending on April 30, 2029.

   e.   **"Renewal Period":** The Tenant may renew this Lease. The Tenant may have the option to renew this Agreement with a total of two (2) renewal period(s) with each term being five (5) years, which may be exercised by giving written notice to the Landlord no more than 24 months, and less than 12 months prior to the expiration of this Lease or renewal period thereafter ("Renewal Periods"). Rent for the renewal period shall be the lesser of: 1) one-hundred percent (100%) of the then fair market value or rate for the Premises, or 2) calculated by multiplying the Base Rent by the annual change in the Consumer Price Index (CPI) published by the Bureau of Labor Statistics by the most recent publication to the Renewal Period start date.

   f.   **"Base Rent":  Base Rent will be payable as follows:**

| Period From | Period To | # Months | Base Rent | Annual Rent |
| --- | --- | --- | --- | --- |
| 05/01/24 | 04/30/25 | 12 | $43,736.67 | $524,840.00* |
| 05/01/25 | 04/30/26 | 12 | $45,048.77 | $540,585.19 |
| 05/01/26 | 04/30/27 | 12 | $46,400.23 | $556,802.78 |
| 05/01/27 | 04/30/28 | 12 | $47,792.24 | $573,506.86 |
| 05/01/28 | 04/30/29 | 12 | $49,226.01 | $590,712.08 |

   \* Minus the amount abated as provided in Section 1h.

   g.   **Rental Adjustment.** [Intentionally Deleted].

   h.   **Rental Concessions.** For the first eight (8) months after this Lease Commences, Landlord shall reduce Tenant's Base Rent and Adjusted Base Rent (if owed) to $0.00. Should Tenant breach this Lease, be evicted, or terminate early for any reason that is not the fault of Landlord, Tenant shall be liable to pay Landlord the Base Rent or Adjusted Base Rent which accrued during any months of free rent received by Tenant under this Lease, as well as any and all brokerage fees or commissions paid for the Tenant's Lease. The terms of this provision of the

Lease do not relieve Tenant of its duty to provide monthly accounting and financial records under paragraph 1(g), and Tenant shall provide such records as required by that section of the Lease, even in months where these Rental Concessions are granted to Tenant.

i.    **Rent Payment.** Tenant agrees to pay all Base Rent to Landlord at the following address: 1001 West Loop South, Suite 700 Houston, Texas 77027 (or at such other place as Landlord may designate from time to time in writing) in monthly installments, in advance and without demand on the first day of each calendar month during and throughout the Lease Term.

j.    **"Prepaid Rent":**  $0, representing payment of Base Rent for the first month to be paid on the date of execution of this Lease.

k.    **"Security Deposit":**  $0, to be paid on the date of execution of this Lease.

l.    **"Sole Permitted Use":**   General office use. Any change in the above-mentioned purposes of the Premises shall only be permitted upon the Landlord's prior written consent.

m.   **"Termination Option":** Landlord shall NOT have the right to terminate all or any portion of the Lease unless the tenant violated the lease terms. In case of a lease violation landlord shall give one-hundred and twenty (120) days advance written notice to the other party.  No such termination shall excuse any liability owing by Tenant to Landlord as of such termination date.

n.    **"Rentable Space":**  The total area attributable to a leased premises within the Building, i.e., being deemed by the parties to be appropriate for purposes of determining the Base Rent, the Allowance, rent adjustments, etc. under this Lease, with such total attributed area being determined by (a) using the American National Standard method for measuring Rentable Area in office buildings, as described in the pamphlet entitled Standard Method for Measuring Floor Area in Office Buildings, published by the Building Owners and Managers Association International (ANSI/BOMA Z65.1-1996), and then (b) adjusting the floor-by-floor results thus achieved by the factor being used by Landlord to more uniformly allocate to the tenants in the Building the first floor lobby, the elevator lobbies and the other common areas of the Building.

o.    **"Normal Business Hours":** 7:00 a.m. until 12:00 a.m. Monday through Thursday (except holidays, as defined below), and from 8:00 a.m. until 3:00 a.m. on Fridays and Saturdays

p.    **Lease of Premises**; Parking Privileges. In consideration of the obligation of Tenant to pay rent as provided in this Lease, and in further consideration of the other terms, covenants and conditions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises for the Lease Term specified herein, all upon and subject to the terms and conditions set forth in this Lease. This Lease and all of the obligations of Landlord hereunder are conditioned upon faithful performance by Tenant of all of the agreements and obligations herein set out and agreed to by Tenant.

i.    Tenant does not own the furnishings, appliances, equipment and/or supplies currently in the Leased Premises.  Any furniture or other design changes in the Premises shall be first approved in writing by Landlord.  Tenant may not alter, sell or otherwise dispose of any of the furnishings, appliances, equipment and/or supplies without Landlord's written consent. Landlord may at any time remove the furnishings, appliances, equipment and/or supplies.

ii.    Landlord and Landlord's agents shall, at all times during normal business hours, have access to and may not exhibit the Premises as a model office space to prospective tenants. Tenant shall at all times maintain the Premises in clean appropriate condition to exhibit for the purpose of use stated herein.

iii.    In addition, at all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord hereby agrees to make parking privileges available to Tenant, as explained on, and governed by, <u>Exhibit C</u> attached to this Lease.  In this regard, Tenant acknowledges that in order for Landlord to be able to comply with parking allotments for all tenants in the Building, Tenant must assure that the aggregate of all parking utilized by Tenant, its owners, officers, employees, agents and invitees, does not exceed the parking allotment for Tenant as specified in <u>Exhibit C</u>.

2.**Services by Landlord**.  At all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord shall furnish the following services to the Premises, all of such services to be at Landlord's cost and expense except as specifically provided to the contrary elsewhere in this Lease:

a.    Cold and warm water at those points of supply provided for general use of tenants in the Building.

b.    Heated and refrigerated air conditioning in season during Normal Business Hours and at such temperatures and in such amounts as are reasonably considered by Landlord to be standard and as is consistent in quality and quantity as furnished in other comparable quality office buildings in the vicinity of the Building.  Such services at all other times and on Sundays and holidays shall be furnished only at the request of Tenant, with said costs of overtime air conditioning having a cost of $0.00 per hour.  Whenever machines or equipment that generate abnormal heat and affect the temperature otherwise maintained by the air conditioning system are used in the Premises, Landlord shall have the right to install supplemental air conditioning units in the Premises; and the cost thereof, including the cost of installation, operation, use and maintenance, shall be paid by Tenant to Landlord promptly on demand.

c.    Elevator service in common with other tenants for ingress and egress from the Premises, provided that Landlord may reasonably limit the number of elevators to be in operation at times other than Normal Business Hours.

d.    Electric current in the manner and to the extent reasonably standard for the purpose of Tenant's use. The failure to any extent to furnish or any stoppage of these defined utilities and services resulting from any cause whatsoever shall not render Landlord liable in any respect for damages to either person, property or business, nor be construed as an eviction of Tenant, nor entitle Tenant to any abatement of rent, nor relieve Tenant from fulfillment of any covenant or agreement contained herein.  Should any malfunction of the Building improvements or facilities occur for any reason, and Tenant provides written notice to Landlord, Landlord shall use reasonable diligence to repair same promptly.  Tenant shall have no claim for rebate or abatement of rent or damages on account of such malfunction or of any interruptions in service occasioned thereby or resulting therefrom; provided, however, that if any interruption or cessation of service continues for seven (7) consecutive days after written notice from Tenant to Landlord (and to any mortgagee of Landlord of whom Tenant has received written notice, designating a specific address for notice to such mortgagee), identifying the problem with reasonable specificity and being labeled "URGENT/IMMEDIATE ACTION REQUIRED" in all capital letters, and if such interruption or cessation after the 7 day cure period causes fifty percent (50%) or more of the Premises to be untenable in the reasonable judgment of Tenant, then notwithstanding any provision of this Lease to the contrary, Tenant's Base Rent and Tenant's share of Operating Expenses under this Lease will abate as of the tenth (10th) day and continue abated until the service is resumed.  Tenant's obligation to give written notice to Landlord of any continuing interruption or malfunction of Building improvements or facilities is a continuing obligation.

3.**Full Service Lease**. It is recognized by both Parties that the Rent is the entirety of the payments to the Landlord, and that this Lease is a considered a full-service lease. Therefore, the Tenant is not obligated to pay any additional expenses, which include utilities, real estate taxes, insurance (other than on the Tenant's personal property), charges, or expenses of any nature whatsoever in connection with the ownership and operation of the Premises. The Landlord shall

be obligated to maintain the general exterior structure of the Premises, in addition, shall maintain all major systems such as the heating, plumbing, and electrical. The parking area shall be maintained by the Landlord, including the removal of any snow or environmental hazards as well as the grounds and lands surrounding the Premises.

4.**Electricity**.  If Landlord, in its reasonable discretion, believes that Tenant is consuming substantially more electricity in the Premises than Landlord, in its reasonable discretion, Landlord may have an electric power consumption survey conducted with respect to the Premises by a qualified electrical engineer selected by Landlord for the purpose of establishing as closely as reasonably possible Tenant's average monthly consumption of electricity, which consumption shall be expressed by such engineer in terms of kilowatt hours per month.  Tenant agrees to pay to Landlord within thirty (30) days after receipt of any such monthly statement, the amount, if any, by which (i) the product of the number of kilowatt hours estimated by such engineer to be consumed by Tenant, multiplied by the average rate paid by Landlord for one kilowatt hour, exceeds by more than thirty percent (30%) (ii) the product of the number of kilowatt hours of usage that is normal and customary for the amount of space occupied by Tenant, multiplied by the average paid by Landlord for one kilowatt hour.

Without Landlord's prior written consent, Tenant shall not install any equipment in the Premises that will require any electrical current or equipment for its use, other than that supplied by Landlord for normal office usage, and the cost of special electrical installations approved by Landlord shall be paid by Tenant.

5.**Payments and Performance**.  Tenant agrees to pay all rents and sums provided to be paid by Tenant pursuant to this Lease at the times and in the manner herein provided, without any setoff, deduction or counterclaim whatsoever.  To the extent any written notice of rents sent to the Tenant differs from the amounts due under this Lease, the amounts stated herein shall control, and Tenant shall be liable for the full amounts stated in this Lease, plus any late fees that accrue if full payment is not timely delivered. No statement, in writing or otherwise, by any employee, agent, or property manager of Landlord shall alter the terms of this Lease or the amount of any rental obligation due hereunder, unless such agreement is reduced to a written lease amendment and is subsequently signed by both Tenant and Landlord. Should this Lease commence on a day other than the first day of a calendar month or terminate on a day other than the last day of a calendar month, the rent for such partial month shall be proportionately reduced.  The Base Rent for the first partial month, if any, shall be payable at the beginning of said period or as Prepaid Rent.  The obligation of Tenant to pay rents is an independent covenant, and no act or circumstance whatsoever, whether such act or circumstance constitutes a breach of covenant by Landlord or not, shall release Tenant from the obligation to pay rents.

6.**Late Fees**. In the event any Base Rent or Adjusted Base Rent amount is not received within five (5) days after the due date as defined in paragraph 1(e), then in addition to the past due amount Tenant shall pay to Landlord a late charge in an amount equal to five percent (5%) of the accumulative sums of all rental obligations then due, in order to compensate Landlord for its administrative and other overhead expenses.  Any such late charge shall be payable on demand as additional rent.  In addition, if rent is paid by a check which is returned for insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, in such event Tenant shall also pay to Landlord not only the late charge specified above in this Paragraph 6 (i.e., if and to the extent that such dishonored check causes the rent to become past due by more than three days), but also an additional fee of $250.00 to compensate Landlord for its expense and effort in connection with the dishonored check. After the first check is returned for insufficient funds, Tenant shall be required to provide all future payments via cashier's check, money order, or Electronic Fund Transfer at Landlord's discretion.

7.**Installation of Improvements; ADA Compliance**.  All improvements to be installed in the Premises at the commencement of this Lease shall be installed as specified in the Leasehold Improvements Agreement attached hereto as <u>Exhibit D</u> and made a part hereof.  Landlord will assure that the "Required Improvements" (hereafter defined) comply with the Americans With Disabilities Act of 1990, as amended, and all related state and local laws (collectively, the "**ADA**"); and Landlord agrees that the remainder of the Building, other than the Premises, and including any common areas or other improvements made to the Premises by Landlord, without regard to the special needs of the Tenant's employees, shall be in compliance with the ADA (also taking into account the fact that the Building was constructed before the effective date of the

ADA).  Tenant shall be responsible for causing its business operations within the Premises to comply with the ADA.

8.**Completion of Improvements and Commencement of Rent**. Tenant's obligation to commence paying rent on the Commencement Date stated in Paragraph 1(d) shall be effective without regard to the progress of any construction or improvements being made in the Premises.

9.**Repairs and Reentry**. Tenant will, at Tenant's own cost and expense, maintain and keep the Premises and any alterations and additions thereto in sound condition and good repair, ordinary wear and tear excepted, and shall pay for the repair of any damage or injury done to the Building or any part thereof by Tenant or Tenant's agents, employees and invitees; provided, however, that Tenant shall make no repairs to the Premises without the prior written consent of Landlord. The performance by Tenant of its obligation to maintain and make repairs shall be conducted after plans and specifications have been approved by Landlord.  Tenant will not commit or allow any waste or damage to be committed on any portion of the Premises, and upon the termination of this Lease by lapse of time or otherwise, Tenant shall deliver up the Premises to Landlord in as good condition as at date of possession, ordinary wear and tear excepted.  Upon such termination of this Lease, Landlord shall have the right to reenter and resume possession of the Premises.  Notwithstanding the foregoing provisions of this Paragraph 10, any repairs to the Premises or the Building that are necessitated because of any damage caused by fire or other casualty shall be governed by the provisions of Paragraph 18 below.   Landlord shall be responsible for maintenance to the exterior, structural and common areas of the Building.

10.**Alterations and Additions by Tenant**.  Tenant may make  alterations to the Premises  All alterations, additions, and improvements made to or fixtures or improvements placed in or upon the Premises by either party (except only moveable trade fixtures of Tenant) shall be deemed a part of the Building and the property of the Landlord at the time they are placed in or upon the Premises, and they shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, unless Landlord shall elect otherwise, whether such termination shall occur by the lapse of time or otherwise.  In the event Landlord shall elect that certain alterations, additions and improvements made by Tenant in the Premises shall be removed by Tenant, Tenant shall remove them and Tenant shall restore the Premises to its original condition, at Tenant's own cost and expense, prior to the termination of the Lease Term.  Alterations and additions to the Premises will be performed by Landlord at Tenant's cost and expense.

11.**Entry for Repairs and Inspection**.  Landlord and its agents and representatives shall have the right to enter into and upon any and all parts of the Premises at all reasonable hours and with reasonable prior notice when possible (or, in any emergency, at any hour) to inspect same or clean or make repairs or alterations or additions as Landlord may deem necessary, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof.  During the period of sixty (60) days prior to the expiration date of this Lease, Landlord and Landlord's agents may exhibit the Premises to prospective tenants at reasonable hours and upon prior notice to Tenant.

12.**Mechanic's Liens**.  Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber the title of Landlord in and to the Premises or the Building or any part thereof; and if any mechanic's or materialman's lien is filed or claimed against the Premises or Building or any part thereof in connection with any work performed, materials furnished or obligation incurred by or at the request of Tenant, Tenant will indemnify, defend and hold Landlord harmless from any claims, losses or liabilities arising out of any liens filed or claimed against the Premises or building or any part thereof, by, through or under Tenant, except to the extent that Tenant bonds around such liens in accordance with the provisions of the Texas Property Code or causes such liens to be released.  If the lien is not released of record or bonded around as provide above and default in payment thereof shall continue for twenty (20) days after written notice thereof from Landlord to Tenant, Landlord shall have the right and privilege at Landlord's option of paying the same or any portion thereof without inquiry as to the validity

thereof, and any amounts so paid, including expenses and interest, shall be repaid to Landlord immediately on demand therefore as additional rent.


13. **Tenant's Use**.  Landlord will be solely responsible for obtaining all necessary certificates (e.g., Certificate of Occupancy) and licenses necessary for Tenant's occupancy of the Premises and conducting its business therein.  Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use or for any purpose which is unlawful or which, in the good faith judgment of Landlord, is disreputable or which is hazardous due to risk of fire, explosion or other casualty.  Tenant will be permitted occupancy or use of the Premises by more than five (5) persons per 1,000 square feet of Rentable Space of the Premises; Tenant will not permit anything to be done which will in any way (i) increase the rate of fire and casualty insurance on the Building or its contents, (ii) tend to lower the first-class character of the Building, (iii) create unreasonable elevator loads or otherwise interfere with standard building operations, or (iv) affect the structural integrity or design capabilities of the Building or any portion thereof (e.g., a floor being occupied by Tenant).  In the event that, by reason of any act or conduct or business of Tenant, there shall be any increase in the rate of insurance on the Building or its contents created by Tenant's acts or conduct or business, then Tenant hereby agrees to pay Landlord the amount of such increase on demand.  Tenant will conduct its business, and control its agents, employees, and invitees in such manner as not to create any nuisance or interfere with, annoy or disturb other tenants or Landlord in the management of the Building.


14. **Common Area Usage**. Tenant shall, upon obtaining prior written approval of Landlord, which can be withheld by Landlord in Landlord's sole and absolute discretion, be permitted to use the common area spaces in the Building (i.e. front lobby, conference area) for special events and/or holiday celebrations, subject to all of the other provisions of the Lease, and Exhibit E, which are the building rules and regulations. Such use of these spaces will be first-come first-served, at the then-current market rate, which shall be set by Landlord in Landlord's sole and absolute discretion, and Tenant shall be required to deliver the full amount of the sums owed for the requested use, as well as a security deposit, before use of the space is guaranteed and reserved for Tenant's exclusive use. At no point in time may the Tenant use or create events which impede ingress and egress of other tenants, invitees, or licensees in any part of the Building, or in a manner which interferes with the quiet use and enjoyment of other tenants in the Building. Tenant is not permitted to remove art or other items hanging on the walls in common area spaces at any time. Tenant shall be required to fully clean the common area spaces after such use, to dispose of all trash, and to return all furniture, undamaged, to its original position. Tenant shall pay Landlord for any cleaning required and to reimburse Landlord for damage caused during its use of the rented space(s), and Tenant agrees that such charges shall be added to Tenant's rental ledger, and shall be made part of Tenant's rental obligations accruing under the Lease.


15. **Valet**. N/A

16. **Laws and Regulations; Rules of the Building.**

a.   Tenant at its sole expense will maintain the Premises in a clean and healthful condition and will comply with all laws, ordinances, orders, rules and regulations of any governmental authority having jurisdiction over the use, conditions or occupancy of the Premises.  Without limiting the generality of the foregoing, Tenant shall comply strictly and in all respects with the requirements of all Hazardous Waste Laws and shall indemnify, defend and hold Landlord harmless from and against any liability, costs or expenses that may arise on account of the release, discharge, storage, disposal, treatment, processing or other handling or discovery of any Hazardous Substance within the Premises, or the discharge, release, disposal, storage, treatment, processing or other handling of any Hazardous Substance by Tenant, its employees, agents, contractors, or invitees anywhere on the Land or within the Building, or off site.  As used herein, "Hazardous Substance" means any substance, material or matter that may give rise to liability under any Hazardous Waste Laws, including (but not limited to) medical waste and petroleum products or petroleum wastes.  "Hazardous Waste Laws" shall mean any local,

state or federal laws, rules, ordinances, regulations, and policy and guidance statements by the Environmental Agencies, either in existence as of the date hereof, or enacted, promulgated or issued after the date of this Lease, that concern the management, control, discharge, treatment, containment or removal of substances or materials that are or may become a threat to public health or the environment.  To the best of Landlord's knowledge, Landlord represents and warrants that the Premises are free from Hazardous Substances as of the commencement of this Lease, to the extent that any Hazardous Substance is in violation of Hazardous Waste laws.

b.   Tenant and Tenant's agents, employees, and invitees will comply fully with all Rules and Regulations of the Building which are attached hereto as <u>Exhibit E</u> and made a part hereof as though fully set out herein.  As more particularly provided therein, Landlord shall at all times have the right to change such rules and regulations or to amend them in such reasonable manner as may be deemed advisable for the safety, protection, care and cleanliness of the Building and appurtenances and for preservation of good order therein, all of which rules and regulations, changes and amendments will be forwarded to Tenant in writing and shall be complied with and observed by Tenant; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

17. **<u>Indemnity, Liability, Loss or Damage and Covenant Not To Sue</u>**.  By moving into the Premises or taking possession thereof, Tenant accepts the Premises as suitable for the purposes for which they are leased and accepts the Building and each and every appurtenance thereof and waives any and all defects therein (with the exception of latent defects of which Tenant gives Landlord written notice within one year after the Commencement Date).  Landlord shall not be liable to Tenant or Tenant's agents, employees, guests, invitees or any person claiming by, through or under Tenant for any injury to person, loss of or damage to property, or for loss of or damage to Tenant's business, occasioned by or through the acts or omissions of Landlord, or by any cause whatsoever except Landlord's negligence or willful wrongdoing.  Unless arising solely from or out of Landlord's negligence or willful wrongdoing, Landlord shall not be liable for, and Tenant shall indemnify, defend and hold Landlord harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of the Premises or any part thereof, or occasioned wholly or in part by any action or omission of Tenant, its agents, contractors, employees, invitees, or licensees.  If Landlord shall, without fault on its part, be made a party to any action commenced by or against Tenant, Tenant shall indemnify, defend and hold Landlord harmless therefrom and shall pay all costs, expenses, and reasonable attorney's fees to Landlord incurred in connection therewith.  Unless arising solely from Landlord's negligence or willful wrongdoing, Tenant shall not be liable for, and Landlord shall indemnify, defend and hold Tenant harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of the sole negligence or willful wrongdoing any action or omission of Landlord, its agents, contractors, employees, invitees, or licensees. Tenant hereby covenants not to sue Landlord, hereby waiving its right to a trial, instead agreeing to resolve any of its claims or causes of action, of any, by means set out in Section 47 of this Lease.

18. **<u>No Subrogation; Insurance.</u>**

a.   Tenant hereby waives any cause of action it might have against Landlord on account of any loss or damage that is insured against under any insurance policy that covers the Premises, Tenant's fixtures, personal property, leasehold improvements or business and which names Tenant as a party insured.  Landlord hereby waives any cause of action it might have against Tenant because of any loss or damage that is insured against under any insurance policy that covers the Building or any property of Landlord used in connection with the Building and which names Landlord as a party insured; provided, however, that Tenant shall remain liable to Landlord for the amount of the "deductible" applicable to Landlord's insurance coverage, not to exceed $10,000.  This provision is cumulative of Paragraph 18.

b.    Tenant shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense, insuring Tenant and Landlord against liability for injury to or death of a person or persons, occasioned by or arising out of or in connection with the use or occupancy of the Premises, the limits of such policy or policies to be in an amount not less than $1,000,000.00 with respect to injuries to or death of any one person and in an amount of not less than $1,000,000.00 with respect to any one accident or disaster, and shall furnish evidence satisfactory to Landlord of the maintenance of such insurance.  Tenant shall obtain a written obligation on the part of each insurance company to endeavor to notify Landlord at least 10 days' notice prior to cancellation of such insurance.  Tenant shall carry fire and extended coverage insurance on its personal property, and Landlord shall in no event be required to rebuild, repair or replace any part of the furniture, equipment, fixtures and other improvements which may have been placed by Tenant on or within the Premises.

**19.** **Fire and Casualty.**

a.    If the Premises are damaged by fire or other casualty and if such damage is not susceptible of repair within 180 days (as estimated, as soon as reasonably practicable after the occurrence of such damage, by an architect of recognized good reputation selected by Landlord), then in such event this Lease, at the option of Landlord exercised by giving written notice thereof to Tenant within 30 days after receipt of a certificate of the architect so selected, shall terminate as of the date of such loss, and Tenant shall pay the rent hereunder apportioned to the time of such loss and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

b.    If the damage described above is susceptible of repair within 180 days, or if the damage is not susceptible of repair within 180 days but Landlord fails to exercise its option to terminate this Lease, Landlord shall enter and make the necessary repairs without affecting this Lease, but the rent hereunder shall be reduced or abated based upon the extent to which such damage and repairs materially interfere with the Tenant's business in the Premises, until such repairs are made, unless less than 5% of the Premises is not materially interfered with, in which case the rent hereunder shall not be abated or reduced.  Notwithstanding the foregoing, Landlord shall have the option to terminate this Lease and shall not be obligated to repair the Premises or the Building if the damage is not covered by insurance or if Landlord's mortgagee applies any portion of the insurance proceeds to the unpaid balance of its loan.

c.    In the event the Building is so badly damaged or injured by fire or other casualty, even though the Premises may not be affected, that Landlord decides, within 30 days after such destruction, not to rebuild or repair the Building (such decision being vested exclusively in the discretion of Landlord), then in such event Landlord shall so notify Tenant in writing and this Lease shall terminate as of the date of Landlord's written notice to Tenant effecting its decision not to rebuild, and the Tenant shall pay rent hereunder apportioned to the date of such notice (subject to subparagraph (b) immediately above) and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

d.    Notwithstanding the foregoing provisions of this Paragraph 18, Tenant agrees that if the Premises or any other portion of the Building is damaged by fire or other casualty resulting from the fault or negligence of Tenant or any of its agents, employees, or invitees, then there shall be no abatement of rent before or during the repair of such damage.

20. **Condemnation**. If all of the Premises, or so much thereof as would materially interfere with Tenant's use of the remainder, shall be taken or condemned for any public use or purpose by right of eminent domain, with or without litigation, or be transferred by agreement in connection with or in lieu of or under threat of condemnation, then the term of this Lease and the leasehold estate created hereby shall terminate as of the date title shall vest in the condemnor or transferee.  If

only a portion of the Building, but not the Premises, is taken or condemned or transferred as aforesaid, Landlord shall have the option to terminate this Lease effective as of the date title shall vest in the condemnor or transferee. Landlord shall receive the entire award from any taking or condemnation (or the entire compensation paid because of any transfer by agreement), and Tenant shall have no claim thereto.

21.**Relocation of Premises.** Landlord shall not relocate Tenant into another location in the Building for the Premises, for any reason.

22.**Assignment and Subletting.**

a. Tenant shall not assign or mortgage this Lease or any right hereunder or interest herein, and Tenant shall not sublet the Premises in whole or in part or grant any license, concession or other right of occupancy of any portion of the Premises, without the prior written consent of Landlord. Any such assignment, mortgage or subletting without Landlord's consent shall be void and shall, at the sole option of the Landlord, be deemed a material breach of this Lease. Notwithstanding any assignment, mortgage or subletting consented to by Landlord, Tenant and each assignee shall at all times remain fully responsible and liable for the payment of the rent herein specified and for compliance with all of Tenant's other covenants and obligations under this Lease. No consent to any assignment or mortgage of this Lease or any subletting of the Premises shall constitute a waiver of the provisions of this paragraph except as to the specific instance covered thereby. If Tenant is a corporation or partnership, an assignment prohibited by this Paragraph 21 shall be deemed to include one or more sales or transfers, by operation of law or otherwise, or creation of new stock or partnership interests, by which a majority of the voting shares of the corporation or interests in the partnership shall be vested in a party or parties who are not owners of a majority of the voting shares or partnership interests of Tenant as of the date hereof; provided, however, that the foregoing provisions of this sentence shall not be applicable if Tenant's stock is listed on a recognized security exchange. Any transfer by operation of law shall also constitute an assignment prohibited by this paragraph.

b. Landlord and Tenant hereby agree that the granting of consent by Landlord (i.e., if such consent is granted) shall, at a minimum, be preconditioned upon the fulfillment of the following requirements of Landlord, as well as any other reasonable requirements of Landlord:

i. Landlord shall be entitled to review Tenant's proposal notice for at least thirty (30) days after receiving same from Tenant;

ii. Tenant shall remain primarily liable under this Lease and shall guaranty the Lease if Landlord so requests;

iii. Any proposed assignee or sublessee shall assume, in a written instrument acceptable to Landlord, all of the obligations of Tenant hereunder;

iv. No use shall be employed in connection with the Premises other than the Sole Permitted Use set forth in this Lease;

v. The Premises shall remain intact and shall not be altered in any manner whatsoever unless Tenant and the prospective assignee or sublessee shall pay the entire cost thereof, and Landlord's prior written approval is obtained pursuant to Paragraph 10 above;

vi.   The tangible net worth of the proposed subtenant/assignee must be reasonably sufficient for the obligations under this Lease;

vii.   Any use of the Premises permitted hereunder by the proposed sublessee/assignee must not (i) violate or create any potential violation of any laws, nor (ii) violate any other agreements affecting the Premises, the Building or Landlord, nor (iii) increase by more than 5% the density of employees and/or other persons using the Premises from the density maintained by Tenant;

viii.   The proposed subtenant/assignee will not create traffic congestion or an unreasonable burden on existing parking or elevators;

ix.   Tenant shall pay any and all reasonable attorney's fees or other costs associated with Landlord's review and approval of a prospective assignee or sublessee, not to exceed $1,000.00;

x.   No assignment or sublease shall be to a person or entity with whom Landlord is then negotiating, has negotiated with within the previous six months or currently is a tenant within the Building.

c.   In the event of a sublease approved by Landlord where the monthly rent per square foot of space subleased which is payable by any sublessee to Tenant (including any bonuses or any other consideration paid directly or indirectly by the sublessee to Tenant) exceeds the monthly rent per square foot for the same space payable for the same month by Tenant to Landlord, Tenant shall be obligated to pay the amount of such excess to Landlord as additional rent hereunder within twenty (20) days after it is received by Tenant from the sublessee.  In the event of an assignment approved by Landlord where Tenant receives any consideration from an assignee other than the assumption by the assignee of Tenant's obligations hereunder, Tenant shall be obligated to pay the amount of such consideration to Landlord as additional rent hereunder within twenty (20) days after the date it is received by Tenant.  Landlord, at Landlord's option, may elect to require that rent payable by any sublessee be paid directly to Landlord and offset Tenant's rent obligations accordingly.

d.   Notwithstanding the foregoing, the provisions of Sections 21(a)-(c) will not apply to an assignment or sublease to a parent, subsidiary, affiliate, entity under common ownership or successor in interest arising out of or resulting from a merger or the sale of substantially all of the stock or assets of Tenant.  Under such circumstances, Tenant will only be obligated to notify Landlord of such assignment or sublease and deliver a copy of the assignment or sublease, if applicable, to Landlord.

23.**Holding Over.**  Should Tenant continue to hold the Premises after this Lease terminates, whether by lapse of time, termination, expiration, or otherwise, such holding over shall, unless otherwise agreed to by Landlord in writing and signed by both Landlord and Tenant, constitute and be construed as a tenancy at will in continuation of this Lease, at a daily rent equal to one-thirtieth (1/30) of an amount equal to 150% of the amount of the monthly Base Rent or Adjusted Base Rent payable during the last month prior to the termination of this Lease, and upon and subject to all of the other terms and provisions set forth herein except any right to renew this Lease.  This provision shall not be construed, however, as permission by Landlord for Tenant to hold over.

24.**Abandoned Property.**  All personal property of Tenant remaining in the Premises after the expiration of the Lease Term or after the abandonment of the Premises by Tenant may be treated by Landlord as having been abandoned by Tenant, and Landlord shall have the right to remove such personal property from the Premises without any obligation to deliver such personal property to Tenant and without any liability to Tenant whatsoever, it being agreed that Tenant shall have no right to reclaim such property.  Landlord shall have no duty to notify Tenant that Landlord may dispose of Tenant's property.  Tenant shall be presumed conclusively to have abandoned the Premises if the amount of Tenant's property removed or being removed by Tenant from the Premises is substantial enough to indicate a probable intent to abandon the Premises, and such removal is not within the normal course of Tenant's business, or if Tenant removes or is removing any material amount of Tenant's personal property from the Premises at a time when Tenant is in default in the payment of rent due hereunder and such removal is not within the normal course of Tenant's business. Nothing contained in this paragraph shall prejudice or impair Landlord's rights as a lienholder and secured party under Paragraph 28 hereof, and the rights granted to Landlord under this paragraph shall be cumulative of its rights as a lienholder and secured party.

25.**Taxes.**

   a.   Tenant shall be liable for all current taxes levied or assessed against all personal property, furniture and fixtures placed by Tenant, or on Tenant's behalf, in the Premises.  If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, and Landlord elects to pay the taxes based on such increase, Tenant shall pay Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

   b.   Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and absolute right to contest taxes levied against the Premises and the Building (other than taxes levied directly against Tenant's personal property within the Premises).  Accordingly, Tenant, to the maximum extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 of the Texas Property Tax Code, as such section may be amended and/or supplemented from time to time).  Additionally, Tenant, to the maximum extent permitted by law, hereby assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 and 42.015 of the Texas Property Tax Code, as such sections may be amended and/or supplemented from time to time).  To the maximum extent permitted by law, Tenant agrees that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord.

26.**Transfer of Landlord's Rights.** In the event Landlord transfers its interest in the Building, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of the Landlord for the performance of such obligations.

27.**Default.**

   a.   The following events shall be deemed to be events of default by Tenant under this Lease:

      i.  Tenant shall fail to pay any rent or other sums payable by Tenant hereunder as and when such rent or other sums become due and payable and any such failure shall continue for a period of five (7) days after written notice from Landlord to Tenant (provided, however, that if in any calendar year Landlord has given at least one written notice of rent defaults to Tenant, then for

the remainder of that particular calendar year the grace period shall be reduced to five (7) days and there shall be no requirement of written notice from Landlord to Tenant);

ii. Tenant shall fail to comply with any other provision, condition or covenant of this Lease and any such failure shall continue for a period of ten (10) days after Landlord gives written notice thereof to Tenant;

iii. Tenant shall abandon, vacate or fail to physically occupy any substantial portion of the Premises;

iv. any petition shall be filed by or against Tenant or any guarantor of Tenant's obligations under this Lease pursuant to any section or chapter of the present federal Bankruptcy Act or under any future federal Bankruptcy Act or under any similar law or statute of the United States or any state thereof, or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed under any section or chapter of the present federal bankruptcy act or under any future federal bankruptcy act or under any similar law or statute of the United States or any state thereof;

v. Tenant of Tenant's obligations under this Lease shall become insolvent or make a transfer in fraud of creditors;

vi. Tenant of this Lease shall make an assignment for the benefit of creditors; or

vii.      a  receiver or trustee shall be appointed for Tenant or any of the assets of Tenant.

b.   Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following without any further notice or demand, in addition to and not in limitation of any other remedy permitted by law or by this Lease:

i.  Landlord may enforce, by all legal suits and other means, its rights hereunder, including the collection of Base Rent and any other sums payable by Tenant hereunder, without reentering or resuming possession of Premises and without terminating this Lease.

ii.  Landlord may do whatever Tenant is obligated to do by the provisions of this Lease; and to the extent that Landlord deems it necessary or otherwise appropriate for Landlord to enter the Premises, Landlord may enter the Premises, by force, if necessary (but only if and to the extent permitted by law), in order to accomplish this purpose.  Tenant hereby waives any and all claims for damages caused by Landlord's actions pursuant to this subparagraph (b)(2), and Tenant also agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in thus effecting compliance with this Lease on behalf of Tenant.

iii. If (but only if) Tenant is in arrears in its rents by more than three months, Landlord may enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution of any claims for damages therefor, and Landlord may relet the Premises for the account of Tenant.  Tenant shall pay to Landlord all arrearages of Base Rent, Adjusted Base Rent and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Lease Term the installments of Base Rent and other sums due hereunder, less such part, if any, that Landlord shall have been able to collect from a new tenant upon reletting.  In

this regard the parties further agree that although Landlord shall use its reasonable efforts to relet the Premises after Tenant has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 26(b)(3) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in the final two sentences of Paragraph 26(b)(5) below and Landlord shall have the right at any time to demand final settlement as provided therein.

iv. If (but only if) Tenant is in arrears in its rents by more than three months, Landlord may enter upon the Premises by use of a duplicate key, a master key, an electronic pass card, a locksmith's entry procedures or any other means not involving personal confrontation, and change, alter or modify the door locks on all entry doors of the Premises, thereby excluding Tenant and its agents, employees, representatives and invitees, from the Premises. In such event Landlord shall not be obligated to place any written notice on the Premises explaining Landlord's action; moreover, Landlord shall not be required to provide the new key (if any) to Tenant until and unless all rent defaults of Tenant have been fully cured.

v. If (but only if) Tenant is in arrears in its rents by more than three months, Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may without notice and without prejudice to any other remedy Landlord may have, enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor; and upon any such termination, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rent and other sums due and owing by Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for damages. Tenant shall pay to Landlord as damages on the same days as Base Rent and other payments are expressed to be due under the provisions of this Lease, the total amount of such Base Rent and other payments, less such part, if any, of such payments that Landlord shall have been able to collect from a new tenant upon reletting. In this regard the parties further agree that although Landlord shall use its reasonable effort to relet the Premises after Tenant has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. Landlord shall have the right at any time to demand final settlement. Upon demand for a final settlement, Landlord shall have the right to receive, and Tenant hereby agrees to pay, as damages for Tenant's breach and in addition to the Reimbursable Costs prescribed in the final section of this Paragraph 26, the difference between the total rent provided for in this Lease for the remainder of the Lease Term and the reasonable rent value of the Premises for such period, such difference to be discounted to present value at a rate equal to the rate of interest allowed by law (at the time the demand for final settlement is made) when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of 6% per annum).

vi. If (but only if) Tenant is in arrears in its rents by more than three (3) months, Landlord may enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution of any claims for damages therefor.  If Tenant continues to be in default of the payment of the security deposit, rent, taxes, or any substantial invoices for goods after Landlord sends a notification of delinquency, and Tenant fails to cure the deficiency within the applicable time period set out in Paragraph 26, this significant breach of the Lease will make due the entire rent and other sums required under the lease during the remainder of the term (after discounting future rents to present value) which are classified as "liquidated damages."  Landlord shall provide Tenant future credit or offsets if Landlord eventually relets the premises.  In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 26(b)(6) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in the final two sentences of Paragraph 26(b)(5) above and Landlord shall have the right at any time to demand final settlement as provided therein.

vii. Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity.  Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other peaceable means.  Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect.  Any reletting shall be for such term or terms (which may be greater or less than the period which constitutes the balance of the Lease Term) and on such terms and conditions (which may include free rent, rent concessions or tenant inducements of any nature) as Landlord in its absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting.  In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting (the "**Reimbursable Costs**"). In the event any rents actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rent payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord, and Tenant shall have no right with respect thereto (except, however, same shall be applied to Tenant's deficiency, if any).  In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rent or any other sum due hereunder or any deficiency between the rent and any other sum provided for by this Lease for a calendar month and the rent and any other sum actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rent deficiencies at one time.  Any suit shall not prejudice in any way the right of Landlord to bring a similar action for any subsequent rent deficiency or deficiencies.

28. **Security Deposit.**  No Security Deposit shall be held by Landlord.

29. **Landlord's Lien and Security Interest.**  Landlord shall have a Landlord's statutory lien, and in addition thereto Landlord shall have, and Tenant hereby grants unto Landlord, a security interest in fixtures, of Tenant now or hereafter placed in, upon, or about the Premises and all proceeds thereof, as security for all of the obligations of Tenant under this Lease, provided that Tenant shall have the right to make sales of its goods, wares and merchandise to its customers in the normal and regular course of its business conducted in the Premises free and clear of the aforesaid lien and security interest.  Tenant shall not remove any of said personal property from the Premises until all of Tenant's obligations under this Lease have been satisfied in full.  Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession by peaceable means of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated on the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant

reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made; and at any such sale the Landlord or its assigns may purchase unless otherwise prohibited by law.  The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this Paragraph 29.  Any surplus shall be paid to Tenant or as otherwise required by law; and Tenant shall pay any deficiencies forthwith.  Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Texas Uniform Commercial Code.  Upon request by Landlord, Tenant shall provide the name and address of any entity that has, or claims to have, an interest in any property located on the Premises and a description of such property.  Failure to provide such list shall result in a presumption that all property located in the Premises belongs to Tenant free from all claims.  Without intending to exclude any other manner of giving Tenant any required notice, any requirement of reasonable notice to Tenant of Landlord's intention to dispose of any collateral pursuant to the enforcement of said security interest shall be met if such notice is given in the manner prescribed in Paragraph 37 of this Lease at least five days before the time of any such disposition.  Landlord shall have all of the rights and remedies of a secured party under law.  Landlord will subordinate its lien to Tenant's banking institution.

30. **Remedies.**  No act or thing done by Landlord or its agents during the term hereof shall be deemed an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord.  No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention is given to Tenant.  Notwithstanding any such reletting or reentry or taking possession, Landlord may at any time thereafter elect to terminate this Lease for a previous default.  Landlord's acceptance of rent following an event of default hereunder shall not be construed as Landlord's waiver of such event of default.  No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default.  The failure of Landlord to enforce the rules described in Paragraph 15 against Tenant or any other tenant in the Building shall not be deemed a waiver of any such rules.  No provisions of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and is signed by Landlord.  The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.  If Landlord brings any action under this Lease or consults or places this Lease or any amount payable by Tenant hereunder with an attorney for the enforcement of any of Landlord's rights hereunder, then Tenant agrees to pay to Landlord the reasonable attorney's fees and other costs and expenses incurred by Landlord in connection therewith.

31. **Joint and Several Liability.**  If there are two or more parties comprising Tenant, the obligations imposed upon Tenant pursuant to this Lease shall be joint and several.  If there is a guarantor of Tenant's obligations under this Lease, the obligations of Tenant shall be joint and several obligations of Tenant and such guarantor, and Landlord need not first proceed against Tenant hereunder before proceeding against such guarantor; nor shall any such guarantor be released from its guarantee for any reason whatsoever, including, without limitation, any amendment of this Lease, any forbearance by Landlord or waiver of any of Landlord's rights, the failure to give Tenant or such guarantor any notices, or the release of any party liable for the payment of Tenant's obligations hereunder.

32.**Constructive Eviction.**  Tenant shall not be entitled to claim a constructive eviction from the Premises unless Tenant shall have first notified Landlord in writing of the condition or conditions giving rise thereto, and, if the complaints be justified, unless Landlord shall have failed to remedy such conditions within a reasonable time after receipt of said notice.

33.**Building Name.**  Landlord reserves the right at any time to change the name by which the Building is designated, and Landlord shall have no obligation or liability whatsoever for costs or expenses incurred by Tenant as a result of such name change of the Building.

34.**Subordination and Attornment; Notice to Mortgagee. PLEASE PROVIDE A SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT IN FAVOR OF THE TENANT. THIS IS A PREREQUISITE TO TENANT APPROVING THIS LEASE.**

a.   This Lease and all rights of Tenant hereunder are subject and subordinate to any deeds of trust, mortgages or other instruments of security which do now or may hereafter cover the Building and the Land or any interest of Landlord therein, and to any and all advances made on the security thereof, and to any and all increases, renewals, modifications, consolidations, replacements and extensions of any of such deeds of trust, mortgages or instruments of security.  This provision is hereby declared by Landlord and Tenant to be self-operative and no further instrument shall be required to affect such subordination of this Lease.  Tenant shall, however, upon demand at any time or times execute, acknowledge and deliver to Landlord any and all instruments and certificates that, in the judgment of Landlord, may be necessary or proper to confirm or evidence such subordination, and Tenant hereby irrevocably appoints Landlord as Tenant's agent and attorney in fact for the purpose of executing, acknowledging and delivering any such instruments and certificates.   However, notwithstanding the generality of the foregoing provisions of this Paragraph 34, Tenant agrees that any such mortgagee shall have the right at any time to subordinate any such deeds of trust, mortgages or other instruments of security to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion.   Tenant further covenants and agrees upon demand by Landlord's mortgagee at any time, before or after the institution of any proceedings for the foreclosure of any such deeds of trust, mortgages or other instruments of security, or sale of the Building pursuant to any such deeds of trust, mortgages or other instruments of security or voluntary sale, to attorn to such purchaser upon any such sale and to recognize and attorn to such purchaser as Landlord under this Lease.  The agreement of Tenant to attorn upon demand of Landlord's mortgagee contained in the immediately preceding sentence shall survive any such foreclosure sale or trustee's sale.

b.   Tenant further agrees that whenever Tenant receives written notice of a deed of trust, mortgage or other instrument of security affecting the Land and/or Building, then Tenant shall give to the mortgagee written notice of each and every default under this Lease by Landlord; moreover, Tenant shall not exercise any remedies under this Lease unless the mortgagee fails to cure such default within twenty (20) days, or within such longer period as may be reasonably necessary if such default cannot be cured within twenty (20) days, after the mortgagee has received such notice.  Notwithstanding anything to the contrary which may be contained in this subsection (b), Tenant further agrees that this subsection (b) is solely for the benefit of an applicable mortgagee, i.e., granting to a mortgagee the option to cure a default by Landlord; and no mortgagee shall ever have any obligation to cure a default by Landlord.

c.   Tenant hereby agrees to execute, acknowledge and deliver to Landlord's mortgagee any and all instruments and certificates that in the judgment of Landlord's mortgagee may be necessary or proper to confirm or evidence the agreements set out above in this Paragraph 33, and Tenant hereby irrevocably appoints Landlord's mortgagee as Tenant's agent and attorney in fact for the purpose of executing, acknowledging and delivering any such instruments and certificates.

35.**Lease Certificates; Financial Statements.** Tenant agrees to furnish from time to time, within ten (10) days after requested by Landlord, a certificate signed by Tenant and addressed to Landlord -- or at Landlord's direction to any potential successor to Landlord or any existing or potential holder of a deed of trust or mortgage covering the Land and Building or any interest of Landlord therein -- to the effect that this Lease is then presently in full force and effect and specifying any modifications; that the term of this Lease has commenced and the full rent is then accruing hereunder; that Tenant has accepted possession of the Premises and that any improvements required by the terms of this Lease to be made by Landlord have been completed to the satisfaction of Tenant; that no rent under this Lease has been paid more than thirty (30) days in advance of its due date; that the address for notices to be sent to Tenant is as set forth in this Lease; that Tenant, as of the date of such certificate, has no charge, lien or claim of offset under this Lease or otherwise against rents or other charges due or to become due hereunder; and that to the knowledge of Tenant, Landlord is not then in default under this Lease. The certificate shall also contain an acknowledgment by Tenant of receipt of notice of the assignment of this Lease to such holder and the agreement by Tenant with such holder that from and after the date of such certificate, will not surrender or consent to the modification of any of the terms of this Lease nor to the termination of this Lease by Landlord, and will not seek to terminate this Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to the holder of such deed of trust or mortgage (at such holder's last address furnished to Tenant) and until a reasonable period of time shall have elapsed following the giving of such notice, during which period such holder shall have the right, but shall not be obligated, to remedy such act or omission; provided, however, that if Tenant's certificate is executed before the assignment of Landlord's interest in the Lease to such holder, then the agreement of Tenant described in this sentence will be of no effect under such certificate unless Tenant is furnished with a copy of the assignment to such holder within ninety (90) days after the date of such certificate. Tenant shall also furnish to Landlord when requested by Landlord, but no more often than one time per calendar year, a statement of the financial condition of Tenant prepared by an independent Certified Public Accountant and in form reasonably satisfactory to Landlord.

36.**Limitation of Landlord Liability.** In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages. Tenant hereby waives the benefit of any laws, or remedies or claims. The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Building and the Land, and Landlord shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord.

Notwithstanding anything to the contrary contained in this Lease, in the event Landlord sells, assigns, transfers or conveys its interest in the Land, Landlord shall have no liability for any acts or omissions that occur after the date of said sale, assignment, transfer or conveyance.

This Lease and all of the obligations of Landlord hereunder are conditioned upon faithful performance by Tenant of all of the agreements and obligations herein set out and agreed to by Tenant. All obligations of Landlord hereunder will be construed as covenants, not conditions, and all such obligations will be binding upon Landlord as set out herein, only during the period of its possession of the Building and not thereafter. Under no circumstances whatsoever shall Landlord ever be liable for consequential, incidental, punitive or special damages.

37.**Consents.** Except as expressly provided elsewhere herein, all provisions requiring Landlord's consent shall be in the sole discretion and authority of Landlord.

38.**Notices.** Any notice required or permitted to be given hereunder by Tenant to Landlord shall be deemed to be delivered three (3) business days after deposit in the United States mail, certified or registered mail, return receipt requested, with sufficient postage prepaid, or hand delivered, addressed to the respective party to whom notice is intended to be given at the address listed below. Either party hereto may at any time by giving written notice to the other party in the aforesaid manner designate any other address in substitution of the foregoing address to which

any such notice shall be given.  Any notice required or permitted to be given hereunder by Landlord to Tenant shall be deemed to be given when sent by read receipt email to the email address(es) set forth.

        TENANT:               Vaxanix Bio Ltd.
                                     Attn: Amir Jafri, President

        LANDLORD:           Galleria 2425 Owner, LLC
                                       1001 West Loop South, Suite 700
                                     Houston, Texas 77027

39.**Brokerage.**  Landlord has dealt with a broker or agent in connection with the negotiation or execution of this Lease; Landlord agrees to indemnify Tenant and hold the other party harmless from and against any and all costs, expenses or liability for commissions or other compensation or charges claimed by any other broker or agent, through commitments of the indemnifying party with respect to this Lease, unless and until Tenant breaches this Lease in any manner, at which point Tenant shall reimburse Landlord for all brokerage fees paid in connection with this Lease. If Tenant chooses to and/or Landlord consents to review or expand on this Lease, Landlord, as a general practice, will not be obligated to pay a leasing commission for any expanded space, or for any renewal period.

40.**Force Majeure.**  Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, acts of war, terrorism, terrorist activities, inability to obtain services, labor, or materials or reasonable substitutes therefore, governmental actions, civil commotions, fire, flood, earthquake or other casualty, and other causes beyond the reasonable control of the party obligated to perform, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

41.**No Third Party Beneficiary.**  This Lease is for the sole benefit of Landlord, its successors and assigns, and Tenant, its permitted successors and assigns, and it is not for the benefit of any third party.

42.**Severability.**  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

43.**Binding Effect.**  The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and to their respective heirs, personal representatives, successors and assigns, subject to the provisions of Paragraph 21, Paragraph 25, Paragraph 35 and Paragraph 46 hereof.

44.**Applicable Law; Consent to Jurisdiction**.  This Lease shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States applicable to transactions in the State of Texas.  Tenant hereby irrevocably agrees that any legal action or

proceeding against it with respect to this Lease may be maintained in the courts of county where rent is payable under this Lease, or at Landlord's option in the U.S. District Court for the Northern District of Texas; and Tenant hereby consents to the jurisdiction and venue of such courts.

45.**Mandatory Mediation**.  In the event of any controversy or claim arising out of or relating to this agreement, or a breach thereof, the parties hereto shall first attempt to settle the dispute by the Mandatory Mediation Agreement, attached as Exhibit F to this lease.

46.**Entire Agreement; No Warranties**.  This Lease contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements, understandings, promises, and representations made by either party to the other concerning the subject matter hereof and the terms applicable hereto.  It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that there have been no agreements pertaining to the Premises, the Building or this Lease not incorporated in writing herein and that this Lease shall not be altered, waived, amended or extended, except by a written agreement signed by the parties hereto, unless otherwise expressly provided herein. Landlord's duties and warranties are limited to those set forth in this Lease, and shall not include any implied duties or warranties, all of which are hereby disclaimed by Landlord and waived by Tenant.  In particular, Landlord disclaims, and Tenant waives, any warranty that the Premises are suitable or fit for any particular purpose or use.

47.**NO IMPLIED REPRESENTATIONS**.   LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION, PROMISE OR UNDERSTANDING OF THE OTHER, OR OF ANY LEASING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH BELOW:

NONE.

48.**Effective Date**.  This Lease shall be effective when it has been executed by both Landlord and Tenant.

*[SIGNATURES PAGE FOLLOW]*

## SIGNATURE PAGE TO LEASE AGREEMENT

**LANDLORD:**

**Galleria 2425 Owner, LLC**

By:_____
     Authorized Representative

Title: _____

Date: _____

**TENANT:**

**Vaxinex Bio. Ltd.**

By:_____
     Authorized Representative

Title: _____

Date: _____

# EXHIBIT A TO LEASE AGREEMENT

## 2425 West Loop South

Being 2.4462 Acres (called 2.4455) of land out of the William White survey, Abstract No. 836 and out of a 7.913 acre tract of land described as two in a deed from Anna Skinner Green to R.E. Smith Dated August 15, 1950 as recorded at Volume 2145, Page 350 in the deed records of Harris County, Texas; and being more particularly described by metes and bounds as follows:

COMMENCING: at a found 5/8-inch iron rod in the Northerly right-of-way line of Westheimer Road (R.O.W. varies), being the Southeast corner of a 2.4385 acre parcel conveyed by Lincoln National Life Insurance Company to Red Lion Hotels, Inc. in a deed recorded in Harris County Clerk's File No. S056346 and the southwest corner of the 3.4385 acre parcel conveyed by Harvey R. Houck, Jr. to Restprop, Ltd. in a deed recorded in Harris County Clerk's File No. R2288886;

THENCE: Northerly N 2 deg 23 min 52 sec West 204.61 feet along the common line of the aforesaid 2.3468 acre parcel to the west and 3.4385 acre parcel to the east, to the Northeast corner of the 2.3468 acre parcel being the southeast corner of the herein described parcel and the POINT OF BEGINNING, from which a found ½-inch iron rod in a 12-inch Hackberry Tree bears North 58 deg 29 min West 0.72 feet;

THENCE: Westerly along the common line of the 2.3468 acre parcel to the south and the herein described parcel the north South 87 deg 44 min 46 sec West 464.50 feet (called 464.47 feet) to a point on the Easterly right-of-way (R.O.W.) line in Interstate 610 West Loop and the southwest corner of the herein described parcel, whence a found X in concrete bears South 39 deg 35 min West 0.71 feet from whence a found railroad spike with X bears South 19 deg 50 min East 0.34 feet;

THENCE: Northerly along the easterly R.O.W. line of Interstate 610 West Loop (R.O.W. 350 feet) North 10 deg 55 min 17 sec East 251.27 feet to a point whence a found X in concrete bears North 33 deg 17 min East 0.53 feet and whence a found P.K. nail bears South 11 deg 55 min East 0.39 feet said point also being the southwest corners of a 7.8998 acre parcel as shown on the Houston Venture Plan Unrestricted Reserve A Filed in the Harris County Map Records as Film Code Number 356074, and the northwest corner of the herein described parcel;

THENCE: Easterly along the common line of the above indicated 7.8998 acre parcel to the north and the herein described parcel to the south N 87 deg 44 min 46 sec East 406.61 feet (called 406.40 feet), to a point of the westerly line of a 3.4385 acre parcel of land presently owned by X in concrete bears North 12 deg 36 min East 0.34 feet;

THENCE: Southerly along a common line of the above indicated 3.4385 acre parcel to the east and therein described parcel to the west, South 02 deg 23 min 52 sec East 244.64 to the POINT OF BEGINNING containing 106,557 square feet, 2.4462 acres more or less.

**EXHIBIT B TO LEASE AGREEMENT**



# 2425 WEST LOOP SOUTH
## FLOOR 09

## <u>EXHIBIT C TO LEASE AGREEMENT</u>

a. **Parking Privileges**

**1.   <u>Parking Spaces.</u>**  At all times during the Lease Term and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease as defined in Paragraph 27 of this Lease, Landlord hereby agrees to make parking spaces available to Tenant as follows:  unlimited parking spaces in the Building garage and in front of the building entrance.

**2.   <u>Parking Rent.</u>**  The rent for all parking spaces which are allotted to Tenant pursuant to Paragraph 1 immediately above shall be the rate which is from time to time designated by Landlord as standard for the Building.  On the execution date of the Lease, the rate is $0 per month for each "reserved" parking space located in the parking garage, and $0.00 per month for each "unreserved" parking space.  Landlord shall provide Tenant with thirty (30) days' notice of any change in the parking rates, and Tenant shall pay the adjusted rent after the expiration of the 30-day notice period.  All payments of rent for parking spaces shall be made (i) at the same time as each Base Rent is due under the Lease and (ii) to Landlord or to such persons as Landlord may direct from time to time.  Tenant shall have the option to terminate the reserved parking with thirty (30) days written notice to Landlord.

**3.   <u>Parking; Allocation Devises.</u>**  Landlord reserves the right to change its system for allocating parking spaces, e.g., magnetic parking cards, parking stickers and other devices or forms of identification.  If Landlord issues magnetic parking cards, parking stickers or any other device or form of identification, they shall remain the property of Landlord and shall not be transferable.  Tenant will be obligated to pay a replacement charge, equal to the amount posted from time to time by Landlord, for loss or other replacement of any magnetic parking card or parking sticker issued by Landlord.

**4.   <u>Damage to or Condemnation.</u>**  If Landlord fails or is unable to provide any parking space to Tenant pursuant to Paragraph 1 above because of damage or condemnation, such failure or inability shall never be deemed to be a default by Landlord as to permit Tenant to terminate the Lease, either in whole or in part.  Instead, Tenant's obligation to pay rent for any such parking space, which is not provided by Landlord shall be abated for so long as Tenant does not have the use of such parking space, and such abatement shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of such failure or inability to provide Tenant with such parking space.

**5.   <u>Rules and Regulations.</u>**  A condition of any parking shall be compliance by the parker with garage or lot rules and regulations, including any sticker or other identification system which may be established by Landlord.  The following rules and regulations are in effect until notice is given to Tenant of any change.  Landlord reserves the right to modify and/or adopt such other reasonable and generally applicable rules and regulations for the applicable parking areas as it deems necessary for the operation of such areas.

b.   Cars must be parked entirely within the painted stall lines.

c.   All directional signs and arrows must be observed.

d.   The speed limit shall be five (5) miles per hour.

e.   Parking is prohibited in areas not striped for parking, aisles, areas where "no parking" signs are posted, in cross hatched areas and in such other areas as may be designated by Landlord or Landlord's agent(s) including, but not limited to, areas designated as "Visitor Parking" or reserved spaces not rented under this Agreement.

f.   Every parker is required to park and lock his or her own car.  All **responsibility for damage** to cars or persons or loss of personal possessions is assumed by the parker.

g.   Spaces which are designated for small, intermediate or full sized cars shall be so used. No intermediate or full size cars shall be parked in parking spaces limited to compact cars.

**6.   Special Provisions Regarding Over-Parking.**  Landlord agrees to use its good faith efforts to monitor the parking usage of tenants in the Building and attempt to restrict tenants against permitting their owners, officers, employees, agents and invitees to utilize more parking spaces than they are allotted pursuant to their respective leases.  Tenant agrees to cooperate with Landlord's efforts in this regard.   In addition, and without limiting the generality of the immediately preceding sentence, Tenant further agrees that if and to the extent requested in writing by Landlord because of Landlord's concern that Tenant's owners, officers, employees, agents and/or invitees are utilizing more parking spaces than Tenant has been allotted under this Exhibit C, then at Landlord's option any one or more of the following shall apply (i.e., the following are cumulative and not mutually exclusive):

a.   Tenant shall deliver written notices to all employees and other persons who might be utilizing parking spaces, advising them of the parking limits under this Exhibit C.

b.   Tenant shall furnish to Landlord a complete list of license numbers of all automobiles operated by Tenant and its owners, officers, employees, agents.

c.   If any automobile or other vehicle owned by Tenant or any of its employees, agents is utilizing a parking space in excess of those allotted to Tenant under this Exhibit C, Tenant shall pay to Landlord as additional rent upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, that such automobile or other vehicle is so parked.

d.   If any overparking by Tenant, its employees, agen, persists after notice thereof from Landlord to Tenant, such continued overparking shall constitute a failure of Tenant to comply with this Exhibit C; and such written notice from Landlord shall constitute the "written notice thereof" which is contemplated in item (ii) of Section 26(a) of this Lease, i.e., the overparking shall constitute an event of default under this Lease if not cured within 30 days after such written notice.

**7.   Redevelopment.**  Landlord reserves the right to redevelop the parking garage structure on the Property.

## <u>EXHIBIT D TO LEASE AGREEMENT</u>

**Leasehold Improvements Agreement**


      THIS LEASEHOLD IMPROVEMENTS AGREEMENT (this **"Agreement"**) is hereby incorporated into the attached Lease Agreement (the **"Lease"**), executed concurrently herewith by and between the **"Landlord"** and the **"Tenant"** described in such Lease, and constitutes the entire agreement of Landlord and Tenant with respect to the construction and completion of the Premises described in the Lease.  In the event of a conflict between the provisions of this Agreement and other provisions of the Lease, the provisions of this Agreement, as amended, will control.  Terms defined in the Lease, when used herein, shall have the same meanings as are ascribed to them in the Lease.

1.   **Premises Condition and Landlord's Work**.  Tenant accepts the Premises in "As-Is" Condition, however, during the initial six months of the initial term of the Lease, Landlord will alter the Premises with the addition of modular walls partitioning the open desk areas of the Premises into offices, in the same manner and quality as the partitions made for the tenant on the seventh floor of the Building (the "Landlord's Work"). In the event Landlord does not commence the Landlord's Work within the first 120 days of the initial term of the Lease, the Landlord, the Tenant may commence the Landlord's Work at its own direction and expense and offset, dollar-for-dollar, the cost incurred by Tenant in performing the Landlord's Work.

2.   **Certificate of Occupancy; Tenant's Occupancy of the Premises.**  Landlord and Tenant agree that Landlord will be responsible for obtaining whatever Certificate of Occupancy  as required by applicable law in connection with the Landlord's Work, provided that Tenant cooperates in connection therewith and Tenant will occupy the Premises as soon as possible after the date of this Lease.

## EXHIBIT E TO LEASE AGREEMENT

h.  **Building Rules and Regulations**

1.   Sidewalks, doorways, vestibules, corridors, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises and for going from or to another part of the Building.  Nothing of Tenant's may be placed anywhere outside Tenant's Leased Premises.

2.   Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable materials shall be thrown or placed therein. Damage resulting to any such fixtures or appliances or surrounding areas from misuse by Tenant shall be repaired or replaced at the sole cost and expense of Tenant, and Landlord shall not in any case be responsible therefor.

3.   No signs, advertisements or notices shall be painted or affixed on or to any windows or doors or other parts of the Building except of such color, size and style and in such places as shall be first approved in writing by Landlord.  No nails, hooks or screws shall be driven or inserted in any part of the Building except by the Building maintenance personnel nor shall any part of the Building be defaced by Tenant.

4.   Landlord will provide and maintain an alphabetical directory of each Tenant's firm name on the first floor (main lobby) of the Building.  No other directory shall be permitted unless previously consented to by Landlord in writing.

5.   Tenant shall not place any additional lock or locks on any doors in or to the Premises without Landlord's prior written consent.  A reasonable number of keys or badges to the locks on the doors which access the Premises from the Common Areas shall be furnished by Landlord to Tenant, and Tenant shall not have any duplicate keys made.  Should Tenant request additional keys or badges, or replacements for lost or stolen keys or badges, Tenant shall pay $100.00 for each additional or replacement key or badge. Upon termination of the Lease, Tenant shall return all keys to Landlord and shall provide to Landlord a means of opening all safes, cabinets and vaults being left with the Premises.

6.   With respect to work being performed by Tenant in the Premises with the approval of Landlord, Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service to them to Landlord for Landlord's supervision, approval and control before the performance of any contractual services.  This provision shall apply to work performed in the Building including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and any and all installation of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building.  Tenant must have Landlord's written approval prior to employing any contractor or causing or allowing any equipment, fixtures, or significant materials to be brought into the building, or having any work performed in the premises.  Any and all such contractors shall comply with these Rules and Regulations for such services including, but not limited to, insurance requirements.  All work in or on the Building shall comply with any and all codes.

7.   Tenant must have prior written approval from Landlord for any movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of any bulky materials, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be restricted to such hours as Landlord shall

designate.  All such movement shall be under the supervision of Landlord and in the manner agreed between Tenant and Landlord by prearrangement before performance.  Such prearrangement initiated by Tenant will include determination by Landlord, and subject to its decision and control, as to the time, method and routing of movement and as to limitations for safety or other concerns which may prohibit any article, equipment or any other item from being brought into the Building.  Tenant is to assume all risk as to damage to articles moved and injury to person or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord and other tenants if damaged or injured as a result of acts in connection with carrying out this service for Tenant from the time of entering the property to completion of work; and Landlord shall not be liable for acts of any person engaged in, or any damage or loss to any of said property or persons resulting from any act in connection with such service performed for Tenant.

8.   Landlord shall have the power to prescribe the weight and position of safes and other heavy equipment, which shall, in all cases, be positioned to distribute the weight and stand on supporting devices approved by Landlord.  All damage done to the Building by taking in or putting out any property of Tenant, or done by Tenant's property while in the Building, shall be repaired at the expense of Tenant.

9.   Tenant, in its capacity as an employer, shall establish -- and shall use reasonable measures to enforce -- a policy for its employees which prohibits firearms (including, but not limited to, concealed handguns) in the Building and the Premises.

10.  Tenant shall cooperate with Landlord's employees in keeping its Premises neat and clean. Landlord shall be in no way responsible to Tenant, its agents, employees or invitees for any loss of property from the Premises or public areas or for any damage to any property thereon from any cause whatsoever. Tenant shall not have any property that is not trash placed near the trash receptacles.

11. To ensure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to the Premises except by persons appointed or approved by Landlord in writing.

12. Corridor doors, when not in use, shall be kept closed.

13. Should Tenant require telegraphic, telephonic, annunciator or other communication service, Landlord will direct the electrician in writing where and how wires are to be introduced and placed and none shall be introduced or placed except as Landlord shall direct. Electric current could be used for power in excess of standard office use or heating with Landlord's prior written permission.  Landlord shall have the sole discretion as to which communication company or companies are permitted to enter the Building and service tenants in the Building.

14. Tenant shall not make or permit any improper odors in the Building or otherwise interfere in any way with other tenants or persons having business with them.

15. Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No animals shall be brought into or kept in, on or about the Premises.

16.  No machinery other than standard office equipment shall be operated by Tenant in its Premises without the prior written consent of Landlord, nor shall Tenant use or keep in the Building any flammable or explosive fluid or substance.

17.  No portion of the Premises shall at any time be used or occupied as sleeping or lodging quarters.

18.  Landlord will not be responsible for money, jewelry or other personal property lost or stolen in or from the Premises or public areas regardless of whether such loss or theft occurs when the area is locked against entry or not.

19.  Landlord reserves the right to rescind any of these rules and regulations and to make such other and further rules and regulations as in its judgment shall from time to time be advisable for the safety, protection, care and cleanliness of the Building, the use and operation thereof, the preservation of good order therein and the protection and comfort of the tenants and their agents, employees and invitees, which rules and regulations, when made and written notice thereof is given to Tenant, shall be binding upon Tenant in like manner as if originally herein prescribed; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

20.  Canvassing, soliciting or peddling on or about any portion of the Property is prohibited and Tenant shall cooperate to prevent same.

21.  Tenant shall fully cooperate and participate in all evacuation, fire safety and related emergency or security procedures established from time to time by Landlord.

## EXHIBIT F TO LEASE AGREEMENT

i.  **Mandatory Mediation**

Prior to any litigation or mandatory arbitration ordered by any court of competent jurisdiction, in the event to any dispute between the parties, Landlord and Tenant will engage in face-to-face negotiations in an attempt to resolve any disagreements as to Tenant's rights to offset such amounts.  The parties shall participate in good faith in such negotiations.  Each party shall be represented in the negotiation by a person with authority to settle the dispute.  If the parties shall fail to negotiate a resolution within such ten (10) day period, then the parties shall choose a mutually agreeable third party neutral, who shall mediate the dispute between the parties during the fifteen (15) day period following the expiration of such ten (10) day period.  The mediator shall be a person qualified under the Texas Alternative Dispute Resolution Procedures Act mutually acceptable to Landlord and Tenant. Mediation shall be non-binding and shall be confidential.  The parties shall refrain from court proceedings during the mediation process insofar as they can do so without prejudicing their legal rights. The parties shall participate in good faith and shall follow the procedures for mediation as suggested by the mediator.  All expenses of mediation except expenses of the individual parties, shall be shared equally by the parties.  Each party shall be represented in the mediation by a person with authority to settle the dispute.  To the extent such dispute has not been resolved at mediation.  Landlord and Tenant agree to attend binding arbitration to resolve Tenant's claim or cause of action to be commenced within fourteen (14) days of an impasse being called by the mediator

_____          _____
Tenant             Landlord

Exhibit D



**LEASE BETWEEN:**

**2425 GALLERIA OWNER, LLC**
**and**
**Hunan SanShang Trading Co, LTD**

**TwentyFour25**
2425 West Loop South
Houston, Texas 77027
**www.TwentyFour25.com**

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

**Contents**

1. Definitions and Basic Provisions ........................................................................................... 4

    a. "Landlord" ........................................................................................................................ 4

    b. "Tenant" ........................................................................................................................... 4

    c. "Premises" ....................................................................................................................... 4

    d. "Lease Term" ................................................................................................................... 4

    e. "Base Rent" ...................................................................................................................... 4

    f. Rental Adjustment. ................................................................**Error! Bookmark not defined.**

    g. Rent Payment .................................................................................................................. 4

    h. "Prepaid Rent" ........................................................................**Error! Bookmark not defined.**

    i. "Security Deposit" ........................................................................................................... 4

    j. "Sole Permitted Use" ...................................................................................................... 5

    k. "Termination Option" ..................................................................................................... 5

    l. "Rentable Space" ............................................................................................................. 5

    m. "Normal Business Hours" ............................................................................................... 5

    n. Lease of Premises; Parking Privileges. ........................................................................... 5

2. Services by Landlord .............................................................................................................. 6

3. Definitions of Operating Expenses and Property Taxes ........................................................ 7

4. Electricity ............................................................................................................................... 8

5. Payments and Performance ..................................................................................................... 9

6. Installation of Improvements; ADA Compliance ................................................................... 9

7. Completion of Improvements and Commencement of Rent ................................................. 10

8. Limited Right to Calculate Rentable Space; Subsequent Liquidation .................................. 10

9. Repairs and Reentry ............................................................................................................. 11

10. Alterations and Additions by Tenant. .................................................................................. 11

11. Entry for Repairs and Inspection. ........................................................................................ 12

12. Mechanic's Liens ................................................................................................................. 12

13. Tenant's Use ........................................................................................................................ 12

14. Laws and Regulations; Rules of the Building ...................................................................... 13

15. Indemnity, Liability, Loss or Damage and Covenant .......................................................... 14

16. No Subrogation; Insurance. ................................................................................................. 14

17. Fire and Casualty. ................................................................................................................ 15

18. Condemnation ...................................................................................................................... 16

19. Relocation of Premises. ....................................................................................................... 16

20. Assignment and Subletting. ................................................................................................. 16

21. Holding Over. ...................................................................................................................... 18

22. Abandoned Property. ........................................................................................................... 18

23. Taxes. ................................................................................................................................... 19

24. Transfer of Landlord's Rights. ............................................................................................. 19

25. Default .................................................................................................................................. 20

26. Security Deposit ................................................................................................................... 23

27. Landlord's Lien and Security Interest. ................................................................................. 24

28. Remedies .............................................................................................................................. 24

| | | |
|---|---|---|
| 29. | Joint and Several Liability. | 25 |
| 30. | Constructive Eviction. | 25 |
| 31. | Building Name. | 25 |
| 32. | Subordination and Attornment; Notice to Mortgagee. | 25 |
| 33. | Lease Certificates; Financial Statements. | 27 |
| 34. | Limitation of Landlord Liability. | 27 |
| 35. | Consents. | 28 |
| 36. | Notices. | 28 |
| 37. | Brokerage. | 28 |
| 38. | Force Majeure. | 28 |
| 39. | No Third Party Beneficiary. | 29 |
| 40. | Severability. | 29 |
| 41. | Binding Effect. | 29 |
| 42. | Applicable Law; Consent to Jurisdiction | 29 |
| 43. | Mandatory Mediation. | 29 |
| 44. | Entire Agreement; No Warranties | 29 |
| 45. | NO IMPLIED REPRESENTATIONS | 30 |
| 46. | Effective Date | 30 |
| | SIGNATURE PAGE TO LEASE AGREEMENT | 31 |
| | EXHIBIT A TO LEASE AGREEMENT | 32 |
| | EXHIBIT B TO LEASE AGREEMENT | 33 |
| | EXHIBIT C TO LEASE AGREEMENT | 34 |
| | Parking Privileges | 34 |
| 1. | Parking Spaces. | 34 |
| 2. | Parking Rent. | 34 |
| 3. | Parking; Allocation Devises. | 34 |
| 4. | Damage to or Condemnation. | 34 |
| 5. | Rules and Regulations. | 34 |
| 6. | Special Provisions Regarding Over-Parking. | 35 |
| 7. | Redevelopment. | 36 |
| | EXHIBIT D TO LEASE AGREEMENT | 37 |
| | Leasehold Improvements Agreement | 37 |
| 1. | Premises Condition and Landlord's Work. | 37 |
| 2. | Certificate of Occupancy; Tenant's Occupancy of the Premises. | 37 |
| | EXHIBIT E TO LEASE AGREEMENT | 39 |
| | Building Rules and Regulations | 39 |
| | EXHIBIT F TO LEASE AGREEMENT | 43 |
| | JANITORIAL SPECIFICATIONS | 43 |
| | EXHIBIT G TO LEASE AGREEMENT | 45 |
| | Mandatory Mediation | 45 |
| | EXHIBIT H TO LEASE AGREEMENT | 46 |
| | Form of Acceptance of Premises | 46 |

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this **"Lease"**) is entered into by the Landlord and Tenant hereinafter named.

1.  **Definitions and Basic Provisions**.  The terms defined below shall have the respective meanings stated when used elsewhere in this Lease, and such terms and the following basic provisions constitute an integral part of this Lease:

    a.   **"Landlord"**:  Galleria 2425 Owner, LLC

    b.   **"Tenant"**:   Hunan Sanshang Trading Co., LTD

    c.   **"Premises"**:  That certain space in a building owned by Landlord (the **"Building"**) located at 2425 West Loop South, Houston, Texas, on a tract of land (the **"Land"**) situated in the City of Houston, Harris County, Texas, described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes. The Premises are to be located on the second (2nd) floor(s) of the Building, as shown on the floor plan(s) attached hereto as <u>Exhibit B</u> and made a part hereof for all purposes. Subject to Paragraph 9 below, the parties hereby agree that for purposes of this Lease the Premises contains approximately 27,000 square feet of Rentable Space (as defined below), and that there are approximately 281,590 square feet of Rentable Space in the Building.

    d.   **"Lease Term"**:  a period of one hundred twenty (130) months, commencing on March 1, 2024 (the **"Commencement Date"**),

    e.   **"Rent"**:  Rent will be payable as follows:

| Lease Month From | Lease Month To | # Months | Annual Rent* |
|---|---|---|---|
| 03/01/24 | 02/28/25 | 12 | $0.00 |
| | 02/28/34 | 120 | Base Rent $900,000/year or 10% of up to $10million gross sales, which ever greater. 8.25% of after $10million of total gross sales |

    f.   **Rent Payment**. Tenant agrees to pay all the percentage Rent to Landlord at the following address: **1001 West Loop South, Suite 700 Houston, Texas 77027** (or at such other place as Landlord may designate from time to time in writing) in monthly installments, in advance and without demand on the first day of each calendar month during and throughout the Lease Term.

    g.   **"Security Deposit"**: None.



Tenant          Landlord

4

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

h.   **"Sole Permitted Use"**:  Class A office, retail, & showroom showcasing fine residential and commercial furnishings, fixtures and construction material as well as AI robotics. Subject to Paragraph 14 and other relevant provisions of this Lease.

i.   **"Termination Option"**: Landlord shall have the right to terminate all or any portion of the Lease upon ninety (90) days advance written notice to the other party.  No such termination shall excuse any liability owing by Tenant to Landlord as of such termination date.

j.   **"Rentable Space"**:  The total area attributable to a leased premises within the Building, i.e., being deemed by the parties to be appropriate for purposes of the Allowance, rent adjustments, etc. under this Lease, with such total attributed area being determined by (a) using the American National Standard method for measuring Rentable Area in office buildings, as described in the pamphlet entitled Standard Method for Measuring Floor Area in Office Buildings, published by the Building Owners and Managers Association International (ANSI/BOMA Z65.1-1996), and then (b) adjusting the floor-by-floor results thus achieved by the factor being used by Landlord to more uniformly allocate to the tenants in the Building the first floor lobby, the elevator lobbies and the other common areas of the Building.

k.   **"Normal Business Hours"**:  6:00 a.m. until 7:00 p.m. on weekdays (except holidays, as defined below), and from 7:00 a.m. until 5:00 p.m. on Saturdays (except holidays).  For purposes of this Lease, holidays are deemed to mean the following:

| | |
|---|---|
| January 1st | New Year's Day |
| Last Monday in May | Memorial Day |
| July 4th | Independence Day |
| First Monday in September | Labor Day |
| Fourth Thursday in November | |
| plus, Friday following | Thanksgiving Holidays |
| December 25th | Christmas Day |

l.   **Lease of Premises; Parking Privileges.** In consideration of the obligation of Tenant to pay rent as provided in this Lease, and in further consideration of the other terms, covenants and conditions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises for the Lease Term specified herein, all upon and subject to the terms and conditions set forth in this Lease. This Lease and all of the obligations of Landlord hereunder are conditioned upon faithful performance by Tenant of all of the agreements and obligations herein set out and agreed to by Tenant.

i.   Tenant does not own the furnishings, appliances, equipment and/or supplies currently in the Leased Premises.  Any furniture or other design changes in the Premises shall be first approved in writing by Landlord.  Tenant may not alter, sell or otherwise dispose of any of the furnishings, appliances, equipment and/or supplies without Landlord's written consent.  Landlord may at any time remove the furnishings, appliances, equipment and/or supplies.



Tenant                    Landlord

5

DocuSign Envelope ID: 2C64CF0A-36BA-46F5-9B12-1F7EAF0179BE

     ii.    Landlord and Landlord's agents shall, at all times during normal business hours, have access to and may exhibit the Premises as a model office space to prospective tenants upon prior notice to Tenant. Tenant shall at all times maintain the Premises in clean appropriate condition .

     iii.    In addition, at all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord hereby agrees to make parking privileges available to Tenant, as explained on, and governed by, Exhibit C attached to this Lease. In this regard, Tenant acknowledges that in order for Landlord to be able to comply with parking allotments for all tenants in the Building, Tenant must assure that the aggregate of all parking utilized by Tenant, its owners, officers, employees, agents and invitees, does not exceed the parking allotment for Tenant as specified in Exhibit C.

    2.    **Services by Landlord**. At all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord shall furnish the following services to the Premises, all of such services to be at Landlord's cost and expense except as specifically provided to the contrary elsewhere in this Lease:

    a.    Cold and warm water at those points of supply provided for general use of tenants in the Building.

    b.    Heated and refrigerated air conditioning in season during Normal Business Hours and at such temperatures and in such amounts as are reasonably considered by Landlord to be standard and as is consistent in quality and quantity as furnished in other comparable quality office buildings in the vicinity of the Building. Such services at all other times and on Sundays and holidays shall be furnished only at the request of Tenant, with said costs of overtime air conditioning having a cost of $35.00 per hour. Whenever machines or equipment that generate abnormal heat and affect the temperature otherwise maintained by the air conditioning system are used in the Premises, Landlord shall have the right to install supplemental air conditioning units in the Premises; and the cost thereof, including the cost of installation, operation, use and maintenance, shall be paid by Tenant to Landlord promptly on demand.

    c.    Elevator service in common with other tenants for ingress and egress from the Premises, provided that Landlord may reasonably limit the number of elevators to be in operation at times other than Normal Business Hours.

    d.    Janitorial cleaning services may, in the reasonable judgment of Landlord, be required in the normal operation of the Building (but no less frequently than five times per week).

    e.    Electric current in the manner and to the extent reasonably standard for office use. The failure to any extent to furnish or any stoppage of these defined utilities and services resulting from any cause whatsoever shall not render Landlord liable in any respect for damages to either person, property, or business, nor be construed as an eviction of Tenant, nor entitle Tenant to any abatement of rent, nor relieve Tenant from fulfillment of any covenant or agreement contained

*ml*

6

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

herein. Should any malfunction of the Building improvements or facilities occur for any reason, and Tenant provides written notice to Landlord, Landlord shall use reasonable diligence to repair same promptly. Tenant shall have no claim for rebate or abatement of rent or damages on account of such malfunction or of any interruptions in service occasioned thereby or resulting therefrom; provided, however, that if any interruption or cessation of service continues for thirty (30) consecutive days after written notice from Tenant to Landlord (and to any mortgagee of Landlord of whom Tenant has received written notice, designating a specific address for notice to such mortgagee), identifying the problem with reasonable specificity and being labeled "URGENT/IMMEDIATE ACTION REQUIRED" in all capital letters, and if such interruption or cessation after the 30 day cure period causes fifty percent (50%) or more of the Premises to be untenable in the reasonable judgment of Tenant, then notwithstanding any provision of this Lease to the contrary, Tenant's Base Rent and Tenant's share of Operating Expenses under this Lease will abate as of the thirty-first (31st) day and continue abated until the service is resumed. Tenant's obligation to give written notice to Landlord of any continuing interruption or malfunction of Building improvements or facilities is a continuing obligation.

3. **Definitions of Operating Expenses and Property Taxes.**

a. The term "Operating Expenses" shall mean all costs of management, operation, and maintenance of the Land, the Building, the garage associated with the Building, all other improvements on the Land and all appurtenances thereto, as well as any Office Complex (defined below) of which the Building is a part, including the costs of maintaining any common facilities allocated from time to time to the Building, all accrued and based on an annual period consisting of a calendar year, as determined by generally accepted accounting principles. By way of illustration but not limitation, Operating Expenses shall include expenditures for maintenance and repairs; a reasonable amortization of any capital expenditures incurred by Landlord with a principal purpose to (i) effect a reduction in the Operating Expenses of the Building, or (ii) keep the Building in compliance with all applicable governmental rules and regulations from time to time; assessments and governmental charges (including taxes on rents or services); ad valorem property taxes with respect to such year; charges for electricity, water, sewerage, and gas; cleaning, including supplies, janitorial services and pest control; licenses, permits and inspection fees; refuse collection; insurance; administrative expenses, including on-site and off-site (but if off-site, equitably prorated to account for service to the Building) office rent, salaries and other expenses for labor and management, office equipment, telephone, and supplies; management fees payable by Landlord with respect to the Land, Building and common facilities; a reasonable allocation of the salary and other compensation paid to persons servicing the Building; fire protection; snow and ice removal; landscape maintenance; professional services; and security (if and to the extent provided by Landlord, i.e., with Landlord making no representation or warranty to Tenant in this regard). If the Building is part of an office building complex (an "Office Complex") owned by Landlord, or owned by one or more entities affiliated with Landlord, then Landlord may allocate to the Building a reasonable proportion of Operating Expenses incurred in connection with the Office Complex. The foregoing expenses shall be at the Landlord's sole cost and expense.

b. The term "Operating Expenses" shall not include: depreciation of the original construction of the Building; capital expenditures other than those referenced in the previous



Tenant          Landlord

7

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

sentence; cost of Building alterations or renovations for other tenants in the Building; advertising; commissions paid for leasing; cost of repairs occasioned by fire, windstorm, or other casualty (but only to the extent reimbursed by insurance proceeds); and wages, salaries, or other compensation paid to any executive above the grade of building manager (i.e., with the director of engineering and/or operations not being deemed to be included in this proscription); mortgage principal payments, mortgage interest payments, refinancing costs, ground rent and related costs, management fees in excess of three percent (3%) of gross receipts, costs of complying with government regulations, except as otherwise provided above, interest or penalties resulting from late payments by landlord except to the extent caused by Tenant's failure to timely pay Base Rent, tenant alterations, costs reimbursed by tenants, costs reimbursed by insurance, costs reimbursed by government authorities (condemnation), special services paid for by tenants, legal fees for enforcing other tenants' leases, artwork in the building, off-site management personnel and overhead, and operation of any services of amenities for which landlord collects a fee or charge. Further, Operating Expenses will not include net income, capital, stock, succession, transfer, franchise, gift, estate, or inheritance taxes.

c.    The term "Property Taxes" as used herein shall include all real estate taxes or personal property taxes and other taxes, charges or assessments, unforeseen as well as foreseen, which are levied with respect to the Premises and any improvements, fixtures and equipment and other property of Landlord, real or personal, located in or on the Premises and used in connection with the operation of the Premises by any governmental or quasi-governmental entity or private association with power to levy such assessments or taxes for each calendar year during the Lease Term (with any partial year to be prorated based upon the number of days in such calendar during which the Lease is in effect) and shall include any tax, surcharge or assessment which shall be levied in addition to or in lieu of real estate or personal property taxes and the costs and expenses of contesting the validity or amount of such assessments, real estate or other taxes, and shall also include any rental, excise, sales, transaction, privilege, or other tax or levy, however denominated, imposed upon or measured by the rental reserved hereunder or on Landlord's business of leasing the Premises, excepting only Landlord's net income taxes. In the event that Landlord elects in any one calendar year to contest or appeal the applicable tax assessment for the Premises for such year with the applicable taxing authority, Tenant agrees at Landlord's option, to reimburse Landlord costs associated with to the consultants and attorneys selected by in furtherance of such contest or appeal as Additional Rent hereunder upon evidence of paid receipts for all sums so expended. In the event Landlord elects to make the tax appeal, the appeal shall be made timely. Nothing contained in this Lease shall obligate Landlord to bring any application or proceeding seeking a reduction in Taxes. Tenant, for itself and its immediate and remote subtenants and successors in interest hereunder, hereby waives, to the extent permitted by law, any right Tenant may now or in the future have to protest or contest any Taxes or to bring any application or proceeding seeking a reduction in Taxes. Property taxes shall be at the Landlord's sole cost and expense.

4.    **Electricity**. If Landlord, in its reasonable discretion, believes that Tenant is consuming substantially more electricity in the Premises than Landlord, in its reasonable discretion, considers standard for normal office usage (whether by reason of type of usage, hours of operation, heat generation or otherwise), Landlord may have an electric power consumption survey conducted with respect to the Premises by a qualified electrical engineer selected by Landlord for the purpose



8

Tenant                Landlord

of establishing as closely as reasonably possible Tenant's average monthly consumption of electricity, which consumption shall be expressed by such engineer in terms of kilowatt hours per month. Tenant agrees to pay to Landlord within thirty (30) days after receipt of any such monthly statement, the amount, if any, by which (i) the product of the number of kilowatt hours estimated by such engineer to be consumed by Tenant, multiplied by the average rate paid by Landlord for one kilowatt hour, exceeds (ii) the product of the number of kilowatt hours of usage that is normal and customary for the amount of space occupied by Tenant, multiplied by the average paid by Landlord for one kilowatt hour.

Without Landlord's prior written consent, Tenant shall not install any equipment in the Premises that will require any electrical current or equipment for its use, other than that supplied by Landlord for normal office usage, and the cost of special electrical installations approved by Landlord shall be paid by Tenant.

5.    **Payments and Performance**. Tenant agrees to pay all rents and sums provided to be paid by Tenant pursuant to this Lease at the times and in the manner herein provided, without any setoff, deduction, or counterclaim whatsoever. To the extent any written notice of rents sent to the Tenant differs from the amounts due under this Lease, the amounts stated herein shall control, and Tenant shall be liable for the full amounts stated in this Lease, plus any late fees that accrue if full payment is not timely delivered. Should this Lease commence on a day other than the first day of a calendar month or terminate on a day other than the last day of a calendar month, the rent for such partial month shall be proportionably reduced. The Base Rent for the first partial month, if any, shall be payable at the beginning of said period or as Prepaid Rent. The obligation of Tenant to pay rents is an independent covenant, and no act or circumstance whatsoever, whether such act or circumstance constitutes a breach of covenant by Landlord or not, shall release Tenant from the obligation to pay rents. In the event any rent is not received within five (5) days after the due date as defined in paragraph 1(e), then in addition to the past due amount Tenant shall pay to Landlord a late charge in an amount equal to five percent (5%) of the accumulative rent then due, in order to compensate Landlord for its administrative and other overhead expenses. Any such late charge shall be payable on demand as additional rent. In addition, if rent is paid by a check which is returned for insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, in such event Tenant shall also pay to Landlord not only the late charge specified above in this Paragraph 6 (i.e., if and to the extent that such dishonored check causes the rent to become past due by more than three days), but also an additional fee of $250.00 to compensate Landlord for its expense and effort in connection with the dishonored check. After the first check is returned for insufficient funds, Tenant shall be required to provide all future payments via cashier's check, money order, or Electronic Fund Transfer at Landlord's discretion.

6.    **Installation of Improvements; ADA Compliance**. All improvements to be installed in the Premises at the commencement of this Lease shall be installed as specified in the Leasehold Improvements Agreement attached hereto as Exhibit D and made a part hereof. Landlord will assure that the "Required Improvements" (hereafter defined) comply with the Americans With Disabilities Act of 1990, as amended, and all related state and local laws (collectively, the **"ADA"**); and Landlord agrees that the remainder of the Building, other than the Premises, and including any common areas or other improvements made to the Premises by Landlord, without regard to the



Tenant          Landlord

9

special needs of the Tenant's employees, shall be in compliance with the ADA (also taking into account the fact that the Building was constructed before the effective date of the ADA). Tenant shall be responsible for causing its business operations within the Premises to comply with the ADA.

7.    **Completion of Improvements and Commencement of Rent**. Tenant's obligation to commence paying rent on the Commencement Date stated in Paragraph 1(d) shall be effective upon substantial completion of the Premises; provided, however, that if the Premises are not ready for occupancy for any reason other than Tenant's Delay (as defined in Exhibit D), then the rent shall abate and not commence until the date the leasehold improvements to the Premises are substantially complete.    Notwithstanding the foregoing, if Tenant, with Landlord's consent, occupies the Premises after substantial completion of Tenant's leasehold improvements but prior to the beginning of the Lease Term set forth herein, all of the terms and provisions of this Lease shall be in full force and effect from the commencement of such occupancy and the Lease Term shall commence on the date on which Tenant first occupies the Premises and shall expire the same period of months thereafter as shown in Paragraph 1(d); no change shall occur in the length of the Lease Term.

8.    **Limited Right to Calculate Rentable Space; Subsequent Liquidation**.

a.    Landlord and Tenant agree that at any time within sixty (60) days after the Commencement Date of this Lease, either party may, at its sole expense, employ a licensed architect to calculate the Rentable Space of the Premises and/or of the Building. If the architect performing any such services should issue a written statement within one hundred twenty (120) days after the date of this Lease, which indicates that the Rentable Space specified for either the Premises or the Building should be modified (a "Modification Statement"), and if the other party to this Lease agrees with such Modification Statement, then Landlord and Tenant shall execute a written Amendment to Lease confirming the mutually agreed information and the appropriate rent adjustment which results from the corrected information (e.g., increasing or decreasing the Base Rent proportionate with the increase or decrease in the Rentable Space). If the architect performing any such services should issue a Modification Statement within one hundred twenty (120) days after the Commencement Date of this Lease, and if the other party to this Lease does not agree with such Modification Statement, then the other party may, at its sole expense, within sixty (60) days after the date of the Modification Statement, employ a licensed architect to review and respond to the Modification Statement (the "Response").

If the two architects fail to reach agreement within thirty (30) days after the date of the Response, then they shall select a third licensed architect (either by agreement between the two architects or, if they fail to agree on the third architect, by requesting that the Houston chapter of the American Institute of Architects provide the third architect), with the fees of the third architect to be shared equally by Landlord and Tenant.  Upon agreement between the two architects selected by the parties, or upon the final decision of the third architect, Landlord and Tenant shall execute a written



10

Tenant            Landlord

Amendment to Lease confirming the final determination and, if necessary, the appropriate rent adjustment.

b. Notwithstanding anything contained in this Lease to the contrary, both Landlord and Tenant acknowledge and confirm their mutual desire to have all financial obligations under this Lease fixed and liquidated as soon as possible so that they can account for and plan such obligations with greater certainty. Accordingly, the parties agree that if neither party employs a licensed architect to perform any of the above-listed services within sixty (60) days after the Commencement Date of this Lease, or if no Modification Statement is delivered within ninety (90) days after the Commencement Date of this Lease, then the provisions of Paragraph 9(a) shall be null and void and of no further force or effect; and in such event (i) so that both parties to this Lease can be assured that they will not have to expend monies for professional fees regarding Rentable Space determinations after the deadlines established in Paragraph 9(a), they hereby agree that the Rentable Space for the Premises and for the Building, as specified in Paragraph 1(c) above, shall conclusively be deemed to be applicable to this Lease; and (ii) so that both parties to this Lease can be assured as to their financial obligations after the deadlines established in Paragraph 9(a), they further agree that Base Rent, the Allowance, rent adjustments and all other aspects of this Lease which are based in whole or in part upon Rentable Space shall be deemed to be final and no longer subject to adjustment based upon inaccuracies and/or errors, if any, in the Rentable Space determinations specified in Paragraph 1(c).

9. **Repairs and Reentry.** Tenant will, at Tenant's own cost and expense, maintain and keep the Premises and any alterations and additions thereto in sound condition and good repair, ordinary wear and tear excepted, and shall pay for the repair of any damage or injury done to the Building or any part thereof by Tenant or Tenant's agents, employees, and invitees; provided, however, that Tenant shall make no repairs to the Premises without the prior written consent of Landlord. The performance by Tenant of its obligation to maintain and make repairs shall be conducted after plans and specifications have been approved by Landlord. Tenant will not commit or allow any waste or damage to be committed on any portion of the Premises, and upon the termination of this Lease by lapse of time or otherwise, Tenant shall deliver up the Premises to Landlord in as good condition as at date of possession, ordinary wear and tear excepted. Upon such termination of this Lease, Landlord shall have the right to reenter and resume possession of the Premises. Notwithstanding the foregoing provisions of this Paragraph 10, any repairs to the Premises or the Building that are necessitated because of any damage caused by fire or other casualty shall be governed by the provisions of Paragraph 18 below. Landlord shall be responsible for maintenance to the exterior, structural and common areas of the Building.

10. **Alterations and Additions by Tenant.** Tenant shall make no alterations to the Premises without the prior written consent of Landlord in its sole discretion, and all alterations, additions, and improvements made to or fixtures or improvements placed in or upon the Premises by either party (except only moveable trade fixtures of Tenant) shall be deemed a part of the Building and the property of the Landlord at the time they are placed in or upon the Premises, and they shall

*mL*

11

Tenant          Landlord

remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, unless Landlord shall elect otherwise, whether such termination shall occur by the lapse of time or otherwise. In the event Landlord shall elect those certain alterations, additions and improvements made by Tenant in the Premises shall be removed by Tenant, Tenant shall remove them and Tenant shall restore the Premises to its original condition, at Tenant's own cost and expense, prior to the termination of the Lease Term. Alterations and additions to the Premises will be performed by Landlord at Tenant's cost and expense.

11.  **Entry for Repairs and Inspection.** Landlord and its agents and representatives shall have the right to enter into and upon any and all parts of the Premises at all reasonable hours and with reasonable prior notice when possible (or, in any emergency, at any hour) to inspect same or clean or make repairs or alterations or additions as Landlord may deem necessary, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof. During the period of sixty (60) days prior to the expiration date of this Lease, Landlord and Landlord's agents may exhibit the Premises to prospective tenants at reasonable hours and upon prior notice to Tenant.

12.  **Mechanic's Liens.** Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber the title of Landlord in and to the Premises or the Building or any part thereof; and if any mechanic's or materialman's lien is filed or claimed against the Premises or Building or any part thereof in connection with any work performed, materials furnished or obligation incurred by or at the request of Tenant, Tenant will indemnify, defend and hold Landlord harmless from any claims, losses or liabilities arising out of any liens filed or claimed against the Premises or building or any part thereof, by, through or under Tenant, except to the extent that Tenant bonds around such liens in accordance with the provisions of the Texas Property Code or causes such liens to be released. If the lien is not released of record or bonded around as provide above and default in payment thereof shall continue for twenty (20) days after written notice thereof from Landlord to Tenant, Landlord shall have the right and privilege at Landlord's option of paying the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses and interest, shall be repaid to Landlord immediately on demand therefore as additional rent.

13.  **Tenant's Use.** Tenant will be solely responsible for obtaining all necessary certificates (e.g., Certificate of Occupancy) and licenses necessary for Tenant's occupancy of the Premises and conducting its business therein. Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use or for any purpose which is unlawful or which, in the good faith judgment of Landlord, is disreputable or which is hazardous due to risk of fire, explosion or other casualty. Tenant will not permit occupancy or use of the Premises by more than five (5) persons per 1,000 square feet of Rentable Space of the Premises; nor will Tenant permit anything to be done which will in any way (i) increase the rate of fire and casualty insurance on the Building or its contents, (ii) tend to lower the first-class character of the Building, (iii) create unreasonable elevator loads or otherwise interfere with standard building operations, or (iv) affect the structural integrity or design capabilities of the Building or any portion thereof (e.g., a floor

*ml*

12

Tenant            Landlord

being occupied by Tenant). In the event that, by reason of any act or conduct or business of Tenant, there shall be any increase in the rate of insurance on the Building or its contents created by Tenant's acts or conduct or business, then Tenant hereby agrees to pay Landlord the amount of such increase on demand. Tenant will conduct its business, and control its agents, employees, and invitees in such a manner as not to create any nuisance or interfere with, annoy or disturb other tenants or Landlord in the management of the Building.

14. **Laws and Regulations; Rules of the Building.**

a. Tenant at its sole expense will maintain the Premises in a clean and healthful condition and will comply with all laws, ordinances, orders, rules and regulations of any governmental authority having jurisdiction over the use, conditions or occupancy of the Premises. Without limiting the generality of the foregoing, Tenant shall comply strictly and in all respects with the requirements of all Hazardous Waste Laws and shall indemnify, defend and hold Landlord harmless from and against any liability, costs or expenses that may arise on account of the release, discharge, storage, disposal, treatment, processing or other handling or discovery of any Hazardous Substance within the Premises, or the discharge, release, disposal, storage, treatment, processing or other handling of any Hazardous Substance by Tenant, its employees, agents, contractors, or invitees anywhere on the Land or within the Building, or off site. As used herein, "Hazardous Substance" means any substance, material or matter that may give rise to liability under any Hazardous Waste Laws, including (but not limited to) medical waste and petroleum products or petroleum wastes. "Hazardous Waste Laws" shall mean any local, state, or federal laws, rules, ordinances, regulations, and policy and guidance statements by the Environmental Agencies, either in existence as of the date hereof, or enacted, promulgated or issued after the date of this Lease, that concern the management, control, discharge, treatment, containment or removal of substances or materials that are or may become a threat to public health or the environment. To the best of Landlord's knowledge, Landlord represents and warrants that the Premises are free from Hazardous Substances as of the commencement of this Lease, to the extent that any Hazardous Substance is in violation of Hazardous Waste laws.

b. Tenant and Tenant's agents, employees, and invitees will comply fully with all Rules and Regulations of the Building which are attached hereto as Exhibit E and made a part hereof as though fully set out herein. As more particularly provided therein, Landlord shall at all times have the right to change such rules and regulations or to amend them in such reasonable manner as may be deemed advisable for the safety, protection, care and cleanliness of the Building and appurtenances and for preservation of good order therein, all of which rules and regulations, changes and amendments will be forwarded to Tenant in writing and shall be complied with and observed by Tenant; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.



Tenant          Landlord

13

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

15.   **Indemnity, Liability, Loss or Damage and Covenant** Not To Sue. By moving into the Premises or taking possession thereof, Tenant accepts the Premises as suitable for the purposes for which they are leased and accepts the Building and each and every appurtenance thereof and waives any and all defects therein (with the exception of latent defects of which Tenant gives Landlord written notice within one year after the Commencement Date). Landlord shall not be liable to Tenant or Tenant's agents, employees, guests, invitees, or any person claiming by, through or under Tenant for any injury to person, loss of or damage to property, or for loss of or damage to Tenant's business, occasioned by or through the acts or omissions of Landlord, or by any cause whatsoever except Landlord's negligence or willful wrongdoing. Unless arising solely from or out of Landlord's negligence or willful wrongdoing, Landlord shall not be liable for, and Tenant shall indemnify, defend and hold Landlord harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of the Premises or any part thereof, or occasioned wholly or in part by any action or omission of Tenant, its agents, contractors, employees, invitees, or licensees. If Landlord shall, without fault on its part, be made a party to any action commenced by or against Tenant, Tenant shall indemnify, defend, and hold Landlord harmless therefrom and shall pay all costs, expenses, and reasonable attorney's fees to Landlord incurred in connection therewith. Unless arising solely from Landlord's negligence or willful wrongdoing, Tenant shall not be liable for, and Landlord shall indemnify, defend, and hold Tenant harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of the sole negligence or willful wrongdoing any action or omission of Landlord, its agents, contractors, employees, invitees, or licensees. Tenant hereby covenants not to sue Landlord, hereby waiving its right to a trial, instead agreeing to resolve any of its claims or causes of action, of any, by means set out in Section 47 of this Lease.

16.   **No Subrogation; Insurance.**

a.   Tenant hereby waives any cause of action it might have against Landlord on account of any loss or damage that is insured against under any insurance policy that covers the Premises, Tenant's fixtures, personal property, leasehold improvements or business and which names Tenant as a party insured. Landlord hereby waives any cause of action it might have against Tenant because of any loss or damage that is insured against under any insurance policy that covers the Building, or any property of Landlord used in connection with the Building and which names Landlord as a party insured; provided, however, that Tenant shall remain liable to Landlord for the amount of the "deductible" applicable to Landlord's insurance coverage, not to exceed $10,000. This provision is cumulative of Paragraph 16.

b.   Tenant shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense, insuring Tenant and Landlord against liability for injury to or death of a person or persons, occasioned by or arising out of or in connection with the use or occupancy of the Premises, the limits of such policy or policies to be in an amount not less than

*ml*                                14

Tenant              Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

$1,000,000.00 with respect to injuries to or death of any one person and in an amount of not less than $1,000,000.00 with respect to any one accident or disaster, and shall furnish evidence satisfactory to Landlord of the maintenance of such insurance. Tenant shall obtain a written obligation on the part of each insurance company to endeavor to notify Landlord at least 10 days' notice prior to cancellation of such insurance. It is recommended that Tenant carry fire and extended coverage insurance on its personal property, as Landlord shall in no event be required to rebuild, repair, or replace any part of the furniture, equipment, fixtures and other improvements which may have been placed by Tenant on or within the Premises.

17.   **Fire and Casualty.**

a.    If the Premises are damaged by fire or other casualty and if such damage is not susceptible of repair within 180 days (as estimated, as soon as reasonably practicable after the occurrence of such damage, by an architect of recognized good reputation selected by Landlord), then in such event this Lease, at the option of Landlord exercised by giving written notice thereof to Tenant within 30 days after receipt of a certificate of the architect so selected, shall terminate as of the date of such loss, and Tenant shall pay the rent hereunder apportioned to the time of such loss and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

b.    If the damage described above is susceptible of repair within 180 days, or if the damage is not susceptible of repair within 180 days but Landlord fails to exercise its option to terminate this Lease, Landlord shall enter and make the necessary repairs without affecting this Lease, but the rent hereunder shall be reduced or abated based upon the extent to which such damage and repairs materially interfere with the Tenant's business in the Premises, until such repairs are made, unless less than 5% of the Premises is not materially interfered with, in which case the rent hereunder shall not be abated or reduced. Notwithstanding the foregoing, Landlord shall have the option to terminate this Lease and shall not be obligated to repair the Premises or the Building if the damage is not covered by insurance or if Landlord's mortgagee applies any portion of the insurance proceeds to the unpaid balance of its loan.

c.    In the event the Building is so badly damaged or injured by fire or other casualty, even though the Premises may not be affected, that Landlord decides, within 30 days after such destruction, not to rebuild or repair the Building (such decision being vested exclusively in the discretion of Landlord), then in such event Landlord shall so notify Tenant in writing and this Lease shall terminate as of the date of Landlord's written notice to Tenant effecting its decision not to rebuild, and the Tenant shall pay rent hereunder apportioned to the date of such notice (subject to subparagraph (b) immediately above) and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.



Tenant              Landlord

15

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

d.   Notwithstanding the foregoing provisions of this Paragraph 18, Tenant agrees that if the Premises or any other portion of the Building is damaged by fire or other casualty resulting from the fault or negligence of Tenant or any of its agents, employees, or invitees, then there shall be no abatement of rent before or during the repair of such damage.

18.   **Condemnation**. If all of the Premises, or so much thereof as would materially interfere with Tenant's use of the remainder, shall be taken or condemned for any public use or purpose by right of eminent domain, with or without litigation, or be transferred by agreement in connection with or in lieu of or under threat of condemnation, then the term of this Lease and the leasehold estate created hereby shall terminate as of the date title shall vest in the condemnor or transferee. If only a portion of the Building, but not the Premises, is taken or condemned or transferred as aforesaid, Landlord shall have the option to terminate this Lease effective as of the date title shall vest in the condemnor or transferee. Landlord shall receive the entire award from any taking or condemnation (or the entire compensation paid because of any transfer by agreement), and Tenant shall have no claim thereto.

19.   **Relocation of Premises.** Landlord in its sole and absolute discretion reserves the right to relocate Tenant into another location in the Building for the Premises at any time, for any reason, for the same percentage Rent, during the term of this Lease; (but not more than two occasions); provided, however, (i) that the alternate Premises shall be reasonably similar in size to Tenant's initial Premises, (ii) that Tenant shall be notified in writing at least thirty (30) days prior to said relocation, and (iii) that Landlord shall pay Tenant's out-of-pocket moving expenses upon the direct cost .

20.   **Assignment and Subletting.**

a.   Tenant shall have the right to Sublet the subject space to up to 30 factories.

b.   In the event that Tenant desires to assign or mortgage this Lease or sublet all or any part of the Premises (with the term "sublet" being deemed, for purposes of this Paragraph 20, to include Tenant's grant of a license, concession or other right of occupancy of any portion of the Premises), Tenant shall notify Landlord in writing (a "Proposal Notice") and shall state in the Proposal Notice the name of the proposed assignee, mortgagee or sublessee and the terms of the proposed assignment, mortgage or sublease. In the Proposal Notice Tenant shall also provide financial information and state the nature and character of the business of the proposed assignee, mortgagee, or sublessee. Notwithstanding such Proposal Notice to Landlord, Tenant shall not assign or mortgage this Lease or any right hereunder or interest herein, and Tenant shall not sublet the Premises in whole or in part or grant any license, concession, or other right of occupancy of any portion of the Premises, without the prior written consent of Landlord. Any such assignment, mortgage or subletting without Landlord's consent shall be void and shall, at the sole option of the Landlord, be deemed a breach of this Lease. Notwithstanding any assignment, mortgage or subletting consented to by Landlord, Tenant and each assignee shall at all times remain fully



16

Tenant            Landlord

responsible and liable for the payment of the rent herein specified and for compliance with all of Tenant's other covenants and obligations under this Lease. No consent to any assignment or mortgage of this Lease or any subletting of the Premises shall constitute a waiver of the provisions of this paragraph except as to the specific instance covered thereby. If Tenant is a corporation or partnership, an assignment prohibited by this Paragraph 20 shall be deemed to include one or more sales or transfers, by operation of law or otherwise, or creation of new stock or partnership interests, by which a majority of the voting shares of the corporation or interests in the partnership shall be vested in a party or parties who are not owners of a majority of the voting shares or partnership interests of Tenant as of the date hereof; provided, however, that the foregoing provisions of this sentence shall not be applicable if Tenant's stock is listed on a recognized security exchange. Any transfer by operation of law shall also constitute an assignment prohibited by this Paragraph 21.

c.    Landlord and Tenant hereby agree that the granting of consent by Landlord (i.e., if such consent is granted) shall, at a minimum, be preconditioned upon the fulfillment of the following requirements of Landlord, as well as any other reasonable requirements of Landlord:

i.    Landlord shall be entitled to review Tenant's Proposal Notice for at least ten (10) days after receiving same from Tenant;

ii.    Tenant shall remain primarily liable under this Lease and shall guaranty the Lease if Landlord so requests;

iii.    Any proposed assignee or sublessee shall assume, in a written instrument acceptable to Landlord, all of the obligations of Tenant hereunder;

iv.    No use shall be employed in connection with the Premises other than the Sole Permitted Use set forth in this Lease;

v.    The Premises shall remain intact and shall not be altered in any manner whatsoever unless Tenant and the prospective assignee or sublessee shall pay the entire cost thereof, and Landlord's prior written approval is obtained pursuant to Paragraph 10 above;

vi.    The tangible net worth of the proposed subtenant/assignee must be reasonably sufficient for the obligations under this Lease;

vii.    Any use of the Premises permitted hereunder by the proposed sublessee/assignee must not (i) violate or create any potential violation of any laws, nor (ii) violate any other agreements affecting the Premises, the Building or Landlord, nor (iii) increase by more than 5% the density of employees and/or other persons using the Premises from the density maintained by Tenant;



17

Tenant            Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

viii.    The proposed subtenant/assignee will not create traffic congestion or an unreasonable burden on existing parking or elevators;

ix.    Tenant shall pay any and all reasonable attorney's fees or other costs associated with Landlord's review and approval of a prospective assignee or sublessee, not to exceed $1,000.00;

x.    No assignment or sublease shall be to a person or entity with whom Landlord is then negotiating, has negotiated with within the previous six months or currently is a tenant within the Building.

d.    In the event of a sublease approved by Landlord where the monthly rent per square foot of space subleased which is payable by any sublessee to Tenant (including any bonuses or any other consideration paid directly or indirectly by the sublessee to Tenant) exceeds the monthly rent per square foot for the same space payable for the same month by Tenant to Landlord, Tenant shall be obligated to pay the amount of such excess to Landlord as additional rent hereunder within twenty (20) days after it is received by Tenant from the sublessee. In the event of an assignment approved by Landlord where Tenant receives any consideration from an assignee other than the assumption by the assignee of Tenant's obligations hereunder, Tenant shall be obligated to pay the amount of such consideration to Landlord as additional rent hereunder within twenty (20) days after the date it is received by Tenant. Landlord, at Landlord's option, may elect to require that rent payable by any sublessee be paid directly to Landlord and offset Tenant's rent obligations accordingly.

e.    Notwithstanding the foregoing, the provisions of Sections 21(a)-(c) will not apply to an assignment or sublease to a parent, subsidiary, affiliate, entity under common ownership or successor in interest arising out of or resulting from a merger or the sale of substantially all of the stock or assets of Tenant. Under such circumstances, Tenant will only be obligated to notify Landlord of such assignment or sublease and deliver a copy of the assignment or sublease, if applicable, to Landlord.

21.    **Holding Over.**  Should Tenant continue to hold the Premises after this Lease terminates, whether by lapse of time or otherwise, such holding over shall, unless otherwise agreed to by Landlord in writing, constitute and be construed as a tenancy at will at a daily rent equal to one-thirtieth (1/30) of an amount equal to 150% of the amount of the monthly rent payable during the last month prior to the termination of this Lease, and upon and subject to all of the other terms and provisions set forth herein except any right to renew this Lease. This provision shall not be construed, however, as permission by Landlord for Tenant to hold over.

22.    **Abandoned Property.**  All personal property of Tenant remaining in the Premises after the expiration of the Lease Term or after the abandonment of the Premises by Tenant may be treated by Landlord as having been abandoned by Tenant, and Landlord shall have the right to remove such personal property from the Premises without any obligation to deliver such personal



18

Tenant               Landlord

property to Tenant and without any liability to Tenant whatsoever, it being agreed that Tenant shall have no right to reclaim such property. Landlord shall have no duty to notify Tenant that Landlord may dispose of Tenant's property. Tenant shall be presumed conclusively to have abandoned the Premises if the amount of Tenant's property removed or being removed by Tenant from the Premises is substantial enough to indicate a probable intent to abandon the Premises, and such removal is not within the normal course of Tenant's business, or if Tenant removes or is removing any material amount of Tenant's personal property from the Premises at a time when Tenant is in default in the payment of rent due hereunder and such removal is not within the normal course of Tenant's business. Nothing contained in this paragraph shall prejudice or impair Landlord's rights as a lienholder and secured party under Paragraph 28 hereof, and the rights granted to Landlord under this paragraph shall be cumulative of its rights as a lienholder and secured party.

23. **Taxes.**

a.   Tenant shall be liable for all current taxes levied or assessed against all personal property, furniture and fixtures placed by Tenant, or on Tenant's behalf, in the Premises. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, and Landlord elects to pay the taxes based on such increase, Tenant shall pay Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

b.   Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and absolute right to contest taxes levied against the Premises and the Building (other than taxes levied directly against Tenant's personal property within the Premises). Accordingly, Tenant, to the maximum extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 of the Texas Property Tax Code, as such section may be amended and/or supplemented from time to time). Additionally, Tenant, to the maximum extent permitted by law, hereby assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 and 42.015 of the Texas Property Tax Code, as such sections may be amended and/or supplemented from time to time). To the maximum extent permitted by law, Tenant agrees that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord.

24. **Transfer of Landlord's Rights.** In the event Landlord transfers its interest in the Building, Landlord shall thereby be released from any further obligations hereunder, and Tenant



Tenant          Landlord

19

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

agrees to look solely to the successor in interest of the Landlord for the performance of such obligations.

25. **Default.**

a.   The following events shall be deemed to be events of default by Tenant under this Lease:

i.   Tenant shall fail to pay any rent or other sums payable by Tenant hereunder as and when such rent or other sums become due and payable and any such failure shall continue for a period of ten (10) days after written notice from Landlord to Tenant (provided, however, that if in any calendar year Landlord has given at least one written notice of rent defaults to Tenant, then for the remainder of that particular calendar year the grace period shall be reduced to five (5) days and there shall be no requirement of written notice from Landlord to Tenant);

ii.   Tenant shall fail to comply with any other provision, condition, or covenant of this Lease and any such failure shall continue for a period of twenty (20) days after Landlord gives written notice thereof to Tenant;

iii.   Tenant shall abandon, vacate, or fail to physically occupy any substantial portion of the Premises;

iv.   any petition shall be filed by or against Tenant or any guarantor of Tenant's obligations under this Lease pursuant to any section or chapter of the present federal Bankruptcy Act or under any future federal Bankruptcy Act or under any similar law or statute of the United States or any state thereof, or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed under any section or chapter of the present federal bankruptcy act or under any future federal bankruptcy act or under any similar law or statute of the United States or any state thereof;

v.   Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent or make a transfer in fraud of creditors;

vi.   Tenant or any guarantor of this Lease shall make an assignment for the benefit of creditors; or

vii.   a receiver or trustee shall be appointed for Tenant or any of the assets of Tenant.

b.   Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following without any further notice or demand, in addition to and not in limitation of any other remedy permitted by law or by this Lease:



Tenant            Landlord

20

i.    Landlord may enforce, by all legal suits and other means, its rights hereunder, including the collection of Base Rent and any other sums payable by Tenant hereunder, without reentering or resuming possession of Premises and without terminating this Lease.

ii.    Landlord may do whatever Tenant is obligated to do by the provisions of this Lease; and to the extent that Landlord deems it necessary or otherwise appropriate for Landlord to enter the Premises, Landlord may enter the Premises, by force, if necessary (but only if and to the extent permitted by law), in order to accomplish this purpose.  Tenant hereby waives any and all claims for damages caused by Landlord's actions pursuant to this subparagraph (b)(2), and Tenant also agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in thus effecting compliance with this Lease on behalf of Tenant.

iii.    If (but only if) Tenant is in arrears in its rents by more than one month, Landlord may enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution of any claims for damages therefor, and Landlord may relet the Premises for the account of Tenant.  Tenant shall pay to Landlord all arrearages of Base Rent and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Lease Term the installments of Base Rent and other sums due hereunder, less such part, if any, that Landlord shall have been able to collect from a new tenant upon reletting.  In this regard the parties further agree that although Landlord shall use its reasonable efforts to relet the Premises after Tenant has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant.  Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26.  In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 26(b)(3) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in the final two sentences of Paragraph 26(b)(5) below and Landlord shall have the right at any time to demand final settlement as provided therein.

iv.    If (but only if) Tenant is in arrears in its rents by more than one month, Landlord may enter upon the Premises by use of a duplicate key, a master key, an electronic pass card, a locksmith's entry procedures or any other means not involving personal confrontation, and change, alter or modify the door locks on all entry doors of the Premises, thereby excluding Tenant and its agents, employees, representatives, and invitees, from the Premises.  In such event Landlord shall not be obligated to place any written notice on the Premises explaining Landlord's action; moreover, Landlord shall not be required to provide the new key (if any) to Tenant until and unless all rent defaults of Tenant have been fully cured.

*mL*

21

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

v.   If (but only if) Tenant is in arrears in its rents by more than one month, Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may without notice and without prejudice to any other remedy Landlord may have, enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor; and upon any such termination, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rent and other sums due and owing by Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for damages. Tenant shall pay to Landlord as damages on the same days as Base Rent and other payments are expressed to be due under the provisions of this Lease, the total amount of such Base Rent and other payments, less such part, if any, of such payments that Landlord shall have been able to collect from a new tenant upon reletting.  In this regard the parties further agree that although Landlord shall use its reasonable effort to relet the Premises after Tenant has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. Landlord shall have the right at any time to demand final settlement. Upon demand for a final settlement, Landlord shall have the right to receive, and Tenant hereby agrees to pay, as damages for Tenant's breach and in addition to the Reimbursable Costs prescribed in the final section of this Paragraph 26, the difference between the total rent provided for in this Lease for the remainder of the Lease Term and the reasonable rent value of the Premises for such period, such difference to be discounted to present value at a rate equal to the rate of interest allowed by law (at the time the demand for final settlement is made) when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of 6% per annum).

vi.   If (but only if) Tenant is in arrears in its rents by more than three (3) months, Landlord may enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution of any claims for damages therefor. If Tenant continues to be in default of the payment of the security deposit, rent, taxes, or any substantial invoices for goods after Landlord sends a notification of delinquency, and Tenant fails to cure the deficiency within the applicable time period set out in Paragraph 26, this significant breach of the Lease will make due the entire rent and other sums required under the lease during the remainder of the term (after discounting future rents to present value) which are classified as "liquidated damages." Landlord shall provide Tenant future credit or offsets if Landlord eventually relets the premises. In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 26(b)(6) and then subsequently elects to terminate this Lease,



22

Tenant            Landlord

Tenant shall be liable to Landlord for damages as set forth in the final two sentences of Paragraph 26(b)(5) above and Landlord shall have the right at any time to demand final settlement as provided therein.

vii.   Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity. Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other peaceable means. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which constitutes the balance of the Lease Term) and on such terms and conditions (which may include free rent, rent concessions, or tenant inducements of any nature) as Landlord in its absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing, and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting (the **"Reimbursable Costs"**). In the event any rents actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rent payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord, and Tenant shall have no right with respect thereto (except, however, same shall be applied to Tenant's deficiency, if any). In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rent or any other sum due hereunder or any deficiency between the rent and any other sum provided for by this Lease for a calendar month and the rent and any other sum actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rent deficiencies at one time. Any suit shall not prejudice in any way the right of Landlord to bring a similar action for any subsequent rent deficiency or deficiencies.

26.   **Security Deposit.** The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of rent or a measure of Landlord's damages in case of default by Tenant upon the occurrence of any event of default by Tenant or upon termination of this Lease. Landlord may commingle the Security Deposit with Landlord's other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant within thirty (30) days of the



Tenant              Landlord

23

termination of this Lease.  If Landlord transfers its interest in the Premises during the term of this Lease, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

27.     **Landlord's Lien and Security Interest.**  Landlord shall have a Landlord's statutory lien, and in addition thereto Landlord shall have, and Tenant hereby grants unto Landlord, a security interest in all of the goods, wares, furniture, fixtures, office equipment, supplies and other property of Tenant now or hereafter placed in, upon, or about the Premises and all proceeds thereof, as security for all of the obligations of Tenant under this Lease, provided that Tenant shall have the right to make sales of its goods, wares and merchandise to its customers in the normal and regular course of its business conducted in the Premises free and clear of the aforesaid lien and security interest.  Tenant shall not remove any of said personal property from the Premises until all of Tenant's obligations under this Lease have been satisfied in full.  Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession by peaceable means of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated on the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made; and at any such sale the Landlord or its assigns may purchase unless otherwise prohibited by law.  The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this Paragraph 28.  Any surplus shall be paid to Tenant or as otherwise required by law; and Tenant shall pay any deficiencies forthwith.  Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Texas Uniform Commercial Code.  Upon request by Landlord, Tenant shall provide the name and address of any entity that has, or claims to have, an interest in any property located on the Premises and a description of such property.  Failure to provide such list shall result in a presumption that all property located in the Premises belongs to Tenant free from all claims.  Without intending to exclude any other manner of giving Tenant any required notice, any requirement of reasonable notice to Tenant of Landlord's intention to dispose of any collateral pursuant to the enforcement of said security interest shall be met if such notice is given in the manner prescribed in Paragraph 37 of this Lease at least five days before the time of any such disposition.  Landlord shall have all of the rights and remedies of a secured party under law. Landlord will subordinate its lien to Tenant's banking institution.

28.     **Remedies.**  No act or thing done by Landlord or its agents during the term hereof shall be deemed an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord.  No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to

_ml_                                     24

_____        _____
Tenant              Landlord

terminate this Lease unless a written notice of such intention is given to Tenant. Notwithstanding any such reletting or reentry or taking possession, Landlord may at any time thereafter elect to terminate this Lease for a previous default. Landlord's acceptance of rent following an event of default hereunder shall not be construed as Landlord's waiver of such event of default. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default. The failure of Landlord to enforce the rules described in Paragraph 15 against Tenant or any other tenant in the Building shall not be deemed a waiver of any such rules. No provisions of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and is signed by Landlord. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies. If Landlord brings any action under this Lease or consults or places this Lease or any amount payable by Tenant hereunder with an attorney for the enforcement of any of Landlord's rights hereunder, then Tenant agrees to pay to Landlord the reasonable attorney's fees and other costs and expenses incurred by Landlord in connection therewith.

29.    **Joint and Several Liability.** If there are two or more parties comprising Tenant, the obligations imposed upon Tenant pursuant to this Lease shall be joint and several. If there is a guarantor of Tenant's obligations under this Lease, the obligations of Tenant shall be joint and several obligations of Tenant and such guarantor, and Landlord need not first proceed against Tenant hereunder before proceeding against such guarantor; nor shall any such guarantor be released from its guarantee for any reason whatsoever, including, without limitation, any amendment of this Lease, any forbearance by Landlord or waiver of any of Landlord's rights, the failure to give Tenant or such guarantor any notices, or the release of any party liable for the payment of Tenant's obligations hereunder.

30.    **Constructive Eviction.** Tenant shall not be entitled to claim a constructive eviction from the Premises unless Tenant shall have first notified Landlord in writing of the condition or conditions giving rise thereto, and, if the complaints be justified, unless Landlord shall have failed to remedy such conditions within a reasonable time after receipt of said notice.

31.    **Building Name.** Landlord reserves the right at any time to change the name by which the Building is designated, and Landlord shall have no obligation or liability whatsoever for costs or expenses incurred by Tenant as a result of such name change of the Building.

32.    **Subordination and Attornment; Notice to Mortgagee.**



25

Tenant            Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

a. This Lease and all rights of Tenant hereunder are subject and subordinate to any deeds of trust, mortgages or other instruments of security which do now or may hereafter cover the Building and the Land or any interest of Landlord therein, and to any and all advances made on the security thereof, and to any and all increases, renewals, modifications, consolidations, replacements, and extensions of any of such deeds of trust, mortgages, or instruments of security. This provision is hereby declared by Landlord and Tenant to be self-operative, and no further instrument shall be required to affect such subordination of this Lease. Tenant shall, however, upon demand at any time or times execute, acknowledge, and deliver to Landlord any and all instruments and certificates that, in the judgment of Landlord, may be necessary or proper to confirm or evidence such subordination, and Tenant hereby irrevocably appoints Landlord as Tenant's agent and attorney in fact for the purpose of executing, acknowledging, and delivering any such instruments and certificates. However, notwithstanding the generality of the foregoing provisions of this Paragraph 33, Tenant agrees that any such mortgagee shall have the right at any time to subordinate any such deeds of trust, mortgages, or other instruments of security to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Tenant further covenants and agrees upon demand by Landlord's mortgagee at any time, before or after the institution of any proceedings for the foreclosure of any such deeds of trust, mortgages or other instruments of security, or sale of the Building pursuant to any such deeds of trust, mortgages or other instruments of security or voluntary sale, to attorn to such purchaser upon any such sale and to recognize and attorn to such purchaser as Landlord under this Lease. The agreement of Tenant to attorn upon demand of Landlord's mortgagee contained in the immediately preceding sentence shall survive any such foreclosure sale or trustee's sale.

b. Tenant further agrees that whenever Tenant receives written notice of a deed of trust, mortgage or other instrument of security affecting the Land and/or Building, then Tenant shall give to the mortgagee written notice of each and every default under this Lease by Landlord; moreover, Tenant shall not exercise any remedies under this Lease unless the mortgagee fails to cure such default within twenty (20) days, or within such longer period as may be reasonably necessary if such default cannot be cured within twenty (20) days, after the mortgagee has received such notice. Notwithstanding anything to the contrary which may be contained in this subsection (b), Tenant further agrees that this subsection (b) is solely for the benefit of an applicable mortgagee, i.e., granting to a mortgagee the option to cure a default by Landlord; and no mortgagee shall ever have any obligation to cure a default by Landlord.

c. Tenant hereby agrees to execute, acknowledge, and deliver to Landlord's mortgagee any and all instruments and certificates that in the judgment of Landlord's mortgagee may be necessary or proper to confirm or evidence the agreements set out above in this Paragraph 33, and Tenant hereby irrevocably appoints Landlord's mortgagee as Tenant's agent and attorney in fact for the purpose of executing, acknowledging and delivering any such instruments and certificates.



26

Tenant        Landlord

33.   **Lease Certificates; Financial Statements.** Tenant agrees to furnish from time to time, within ten (10) days after requested by Landlord, a certificate signed by Tenant and addressed to Landlord -- or at Landlord's direction to any potential successor to Landlord or any existing or potential holder of a deed of trust or mortgage covering the Land and Building or any interest of Landlord therein -- to the effect that this Lease is then presently in full force and effect and specifying any modifications; that the term of this Lease has commenced and the full rent is then accruing hereunder; that Tenant has accepted possession of the Premises and that any improvements required by the terms of this Lease to be made by Landlord have been completed to the satisfaction of Tenant; that no rent under this Lease has been paid more than thirty (30) days in advance of its due date; that the address for notices to be sent to Tenant is as set forth in this Lease; that Tenant, as of the date of such certificate, has no charge, lien or claim of offset under this Lease or otherwise against rents or other charges due or to become due hereunder; and that to the knowledge of Tenant, Landlord is not then in default under this Lease. The certificate shall also contain an acknowledgment by Tenant of receipt of notice of the assignment of this Lease to such holder and the  agreement by Tenant with such holder that from and after the date of such certificate, will not surrender or consent to the modification of any of the terms of this Lease nor to the termination of this Lease by Landlord, and will not seek to terminate this Lease by reason of any act or omission until Tenant shall have given written notice of such act or omission to the holder of such deed of trust or mortgage (at such holder's last address furnished to Tenant) and until a reasonable period of time shall have elapsed following the giving of such notice, during which period such holder shall have the right, but shall not be obligated, to remedy such act or omission; provided, however, that if Tenant's certificate is executed before the assignment of Landlord's interest in the Lease to such holder, then the agreement of Tenant described in this sentence will be of no effect under such certificate unless Tenant is furnished with a copy of the assignment to such holder within ninety (90) days after the date of such certificate. Tenant shall also furnish to Landlord when requested by Landlord, but no more often than one time per calendar year, a statement of the financial condition of Tenant prepared by an independent Certified Public Accountant and in form reasonably satisfactory to Landlord.

34.   **Limitation of Landlord Liability.** In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages. Tenant hereby waives the benefit of any laws, or remedies or claims. The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Building and the Land, and Landlord shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord.

Notwithstanding anything to the contrary contained in this Lease, in the event Landlord sells, assigns, transfers, or conveys its interest in the Land, Landlord shall have no liability for any acts or omissions that occur after the date of said sale, assignment, transfer or conveyance.

This Lease and all of the obligations of Landlord hereunder are conditioned upon faithful performance by Tenant of all of the agreements and obligations herein set out and agreed to by

27

_ml_

_____    _____
Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

Tenant. All obligations of Landlord hereunder will be construed as covenants, not conditions, and all such obligations will be binding upon Landlord as set out herein, only during the period of its possession of the Building and not thereafter. Under no circumstances whatsoever shall Landlord ever be liable for consequential, incidental, punitive or special damages.

35. **Consents.** Except as expressly provided elsewhere herein, all provisions requiring Landlord's consent shall be in the sole discretion and authority of Landlord.

36. **Notices.** Any notice required or permitted to be given hereunder by Tenant to Landlord shall be deemed to be delivered three (3) business days after deposit in the United States mail, certified or registered mail, return receipt requested, with sufficient postage prepaid, or hand delivered, addressed to the respective party to whom notice is intended to be given at the address listed below. Either party hereto may at any time by giving written notice to the other party in the aforesaid manner designate any other address in substitution of the foregoing address to which any such notice shall be given. Any notice required or permitted to be given hereunder by Landlord to Tenant shall be deemed to be given when sent by email to the email address set forth.

      TENANT:     Hunan Sanshang Trading Co LTD
                    17619 Cypress Fields AVE
                    Cypress Tx 77429

      LANDLORD: Galleria 2425 Owner, LLC
                    1001 West Loop South, Suite 700
                    Houston, Texas 77027

37. **Brokerage.** Landlord and Tenant warrant to each other that they have not had any dealings with any broker or agent in connection with the negotiation or execution of this Lease; and each party agrees to indemnify the other party and hold the other party harmless from and against any and all costs, expenses or liability for commissions or other compensation or charges claimed by any other broker or agent, through commitments of the indemnifying party with respect to this Lease. If Tenant chooses to and/or Landlord consents to review or expand on this Lease, Landlord, as a general practice, will not be obligated to pay a leasing commission.

38. **Force Majeure.** Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, acts of war, terrorism, terrorist activities, inability to obtain services, labor, or materials or reasonable substitutes therefore, governmental actions, civil commotions, fire, flood, earthquake or other casualty, and other causes beyond the reasonable control of the party obligated to perform, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.



                                28

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

39. **No Third Party Beneficiary.** This Lease is for the sole benefit of Landlord, its successors and assigns, and Tenant, its permitted successors, and assigns, and it is not for the benefit of any third party.

40. **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

41. **Binding Effect.** The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and to their respective heirs, personal representatives, successors and assigns, subject to the provisions of Paragraph 21, Paragraph 25, Paragraph 35 and Paragraph 46 hereof.

42. **Applicable Law; Consent to Jurisdiction.** This Lease shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States applicable to transactions in the State of Texas. Tenant hereby irrevocably agrees that any legal action or proceeding against it with respect to this Lease may be maintained in the courts of county where rent is payable under this Lease, or at Landlord's option in the U.S. District Court for the Northern District of Texas; and Tenant hereby consents to the jurisdiction and venue of such courts.

43. **Mandatory Mediation.** In the event of any controversy or claim arising out of or relating to this agreement, or a breach thereof, the parties hereto shall first attempt to settle the dispute by the Mandatory Mediation Agreement, attached as Exhibit G to this lease.

44. **Entire Agreement; No Warranties.** This Lease contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements, understandings, promises, and representations made by either party to the other concerning the subject matter hereof and the terms applicable hereto. It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that there have been no agreements pertaining to the Premises, the Building or this Lease not incorporated in writing herein and that this Lease shall not be altered, waived, amended, or extended, except by a written agreement signed by the parties hereto, unless otherwise expressly provided herein. Landlord's duties and warranties are limited to those set forth in this Lease, and shall not include any implied duties or warranties, all of which are hereby disclaimed by Landlord and waived by Tenant. In particular, Landlord disclaims, and Tenant waives, any warranty that the Premises are suitable or fit for any particular purpose or use.

_m⌐_

29

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

45.  **NO IMPLIED REPRESENTATIONS**.  LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION, PROMISE OR UNDERSTANDING OF THE OTHER, OR OF ANY LEASING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH BELOW:

NONE. _____

_____

_____

- •  IN THIS LEASE.

- •  IN _____ AS WELL AS IN THIS LEASE.

NOTE: IF NO "X" (OR OTHER MARK DESIGNATING A CHOICE) IS PLACED IN EITHER BOX IN THIS PARAGRAPH 47, THEN THE FIRST BOX WILL BE DEEMED TO HAVE BEEN MARKED.

46.  **Effective Date**.  This Lease shall be effective when it has been executed by both Landlord and Tenant.

*[SIGNATURES PAGE FOLLOW]*

Tenant          Landlord

30

## SIGNATURE PAGE TO LEASE AGREEMENT

**LANDLORD:**

**Galleria 2425 Owner, LLC**

By:_____
    Authorized Representative

Title: _____

Date: _____

**TENANT:**

**Hunan Sanshang Trading Co,LTD**

By: *Michelle Lee*    Michelle Lee
    Authorized Representative

Title: V.P._____

Date 2/15/2024_____

Email: michelle@canaanpark.com_____

Phone: 9367772258_____

Fed Tax ID: _____

*ml*

Tenant    Landlord

31

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

## EXHIBIT A TO LEASE AGREEMENT

### 2425 West Loop South

Being 2.4462 Acres (called 2.4455) of land out of the William White survey, Abstract No. 836 and out of a 7.913 acre tract of land described as two in a deed from Anna Skinner Green to R.E. Smith Dated August 15, 1950 as recorded at Volume 2145, Page 350 in the deed records of Harris County, Texas; and being more particularly described by metes and bounds as follows:

COMMENCING: at a found 5/8-inch iron rod in the Northerly right-of-way line of Westheimer Road (R.O.W. varies), being the Southeast corner of a 2.4385 acre parcel conveyed by Lincoln National Life Insurance Company to Red Lion Hotels, Inc. in a deed recorded in Harris County Clerk's File No. S056346 and the southwest corner of the 3.4385 acre parcel conveyed by Harvey R. Houck, Jr. to Restprop, Ltd. in a deed recorded in Harris County Clerk's File No. R2288886;

THENCE: Northerly N 2 deg 23 min 52 sec West 204.61 feet along the common line of the aforesaid 2.3468 acre parcel to the west and 3.4385 acre parcel to the east, to the Northeast corner of the 2.3468 acre parcel being the southeast corner of the herein described parcel and the POINT OF BEGINNING, from which a found ½-inch iron rod in a 12-inch Hackberry Tree bears North 58 deg 29 min West 0.72 feet;

THENCE: Westerly along the common line of the 2.3468 acre parcel to the south and the herein described parcel the north South 87 deg 44 min 46 sec West 464.50 feet (called 464.47 feet) to a point on the Easterly right-of-way (R.O.W.) line in Interstate 610 West Loop and the southwest corner of the herein described parcel, whence a found X in concrete bears South 39 deg 35 min West 0.71 feet from whence a found railroad spike with X bears South 19 deg 50 min East 0.34 feet;

THENCE: Northerly along the easterly R.O.W. line of Interstate 610 West Loop (R.O.W. 350 feet) North 10 deg 55 min 17 sec East 251.27 feet to a point whence a found X in concrete bears North 33 deg 17 min East 0.53 feet and whence a found P.K. nail bears South 11 deg 55 min East 0.39 feet said point also being the southwest corners of a 7.8998 acre parcel as shown on the Houston Venture Plan Unrestricted Reserve A Filed in the Harris County Map Records as Film Code Number 356074, and the northwest corner of the herein described parcel;

THENCE: Easterly along the common line of the above indicated 7.8998 acre parcel to the north and the herein described parcel to the south N 87 deg 44 min 46 sec East 406.61 feet (called 406.40 feet), to a point of the westerly line of a 3.4385 acre parcel of land presently owned by X in concrete bears North 12 deg 36 min East 0.34 feet;

THENCE: Southerly along a common line of the above indicated 3.4385 acre parcel to the east and therein described parcel to the west, South 02 deg 23 min 52 sec East 244.64 to the POINT OF BEGINNING containing 106,557 square feet, 2.4462 acres more or less.

*m£*

Tenant        Landlord

32

## EXHIBIT B TO LEASE AGREEMENT

# FLOOR 02



Tenant        Landlord

33

## EXHIBIT C TO LEASE AGREEMENT

### Parking Privileges

1.   **Parking Spaces.**  At all times during the Lease Term and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease as defined in Paragraph 26 of this Lease, Landlord hereby agrees to make parking spaces available to Tenant as follows: 3 parking spaces per 1,000 RSF unreserved parking spaces and zero (0) reserved parking spaces in the Building garage.  The location of garage reserved spaces shall be as Landlord designates in Landlord's sole and absolute discretion.

2.   **Parking Rent.**  The rent for all parking spaces which are allotted to Tenant pursuant to Paragraph 1 immediately above shall be the rate which is from time to time designated by Landlord as standard for the Building.  On the execution date of the Lease, the rate is $75.00 per month for each "reserved" parking space and $0.00 per month for each "unreserved" parking space.  Landlord shall provide Tenant with thirty (30) days' notice of any change in the parking rates, and Tenant shall pay the adjusted rent after the expiration of the 30-day notice period.  All payments of rent for parking spaces shall be made (i) at the same time as each Base Rent is due under the Lease and (ii) to Landlord or to such persons as Landlord may direct from time to time.  Tenant shall have the option to terminate the reserved parking with thirty (30) days written notice to Landlord.

3.   **Parking; Allocation Devises.**  Landlord reserves the right to change its system for allocating parking spaces, e.g., magnetic parking cards, parking stickers and other devices or forms of identification.  If Landlord issues magnetic parking cards, parking stickers or any other device or form of identification, they shall remain the property of Landlord and shall not be transferable.  Tenant will be obligated to pay a replacement charge, equal to the amount posted from time to time by Landlord, for loss or other replacement of any magnetic parking card or parking sticker issued by Landlord.

4.   **Damage to or Condemnation.**  If Landlord fails or is unable to provide any parking space to Tenant pursuant to Paragraph 1 above because of damage or condemnation, such failure or inability shall never be deemed to be a default by Landlord as to permit Tenant to terminate the Lease, either in whole or in part.  Instead, Tenant's obligation to pay rent for any such parking space, which is not provided by Landlord shall be abated for so long as Tenant does not have the use of such parking space, and such abatement shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of such failure or inability to provide Tenant with such parking space.

5.   **Rules and Regulations.**  A condition of any parking shall be compliance by the parker with garage or lot rules and regulations, including any sticker or other identification system which

DS

*mℓ*

34

Tenant            Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

may be established by Landlord. The following rules and regulations are in effect until notice is given to Tenant of any change. Landlord reserves the right to modify and/or adopt such other reasonable and generally applicable rules and regulations for the applicable parking areas as it deems necessary for the operation of such areas.

    a.   Cars must be parked entirely within the painted stall lines.

    b.   All directional signs and arrows must be observed.

    c.   The speed limit shall be five (5) miles per hour.

    d.   Parking is prohibited in areas not striped for parking, aisles, areas where "no parking" signs are posted, in cross hatched areas and in such other areas as may be designated by Landlord or Landlord's agent(s) including, but not limited to, areas designated as "Visitor Parking" or reserved spaces not rented under this Agreement.

    e.   Every parker is required to park and lock his or her own car. All **responsibility for damage** to cars or persons or loss of personal possessions is assumed by the parker.

    f.   Spaces which are designated for small, intermediate, or full-sized cars shall be so used. No intermediate or full-size cars shall be parked in parking spaces limited to compact cars.

    6.   **Special Provisions Regarding Over-Parking.** Landlord agrees to use its good faith efforts to monitor the parking usage of tenants in the Building and attempt to restrict tenants against permitting their owners, officers, employees, agents and invitees to utilize more parking spaces than they are allotted pursuant to their respective leases. Tenant agrees to cooperate with Landlord's efforts in this regard. In addition, and without limiting the generality of the immediately preceding sentence, Tenant further agrees that if and to the extent requested in writing by Landlord because of Landlord's concern that Tenant's owners, officers, employees, agents and/or invitees are utilizing more parking spaces than Tenant has been allotted under this Exhibit C, then at Landlord's option any one or more of the following shall apply (i.e., the following are cumulative and not mutually exclusive):

    a.   Tenant shall deliver written notices to all employees and other persons who might be utilizing parking spaces, advising them of the parking limits under this Exhibit C.
    b.   Tenant shall furnish to Landlord a complete list of license numbers of all automobiles operated by Tenant and its owners, officers, employees, agents, and invitees who might be utilizing parking spaces.

    c.   If any automobile or other vehicle owned by Tenant or any of its employees, agents or other invitees is utilizing a parking space in excess of those allotted to Tenant under this Exhibit C,

35

Tenant         Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

Tenant shall pay to Landlord as additional rent upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, that such automobile or other vehicle is so parked.

d.   If any overparking by Tenant, its employees, agents and other invitees, persists after written notice thereof from Landlord to Tenant, such continued overparking shall constitute a failure of Tenant to comply with this Exhibit C; and such written notice from Landlord shall constitute the "written notice thereof" which is contemplated in item (ii) of Section 26(a) of this Lease, i.e., the overparking shall constitute an event of default under this Lease if not cured within 30 days after such written notice.

7.   **Redevelopment.**  Landlord reserves the right to redevelop the parking garage structure on the Property.

36

Tenant                    Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

## EXHIBIT D TO LEASE AGREEMENT

### Leasehold Improvements Agreement

THIS LEASEHOLD IMPROVEMENTS AGREEMENT (this **"Agreement"**) is hereby incorporated into the attached Lease Agreement (the **"Lease"**), executed concurrently herewith by and between the **"Landlord"** and the **"Tenant"** described in such Lease, and constitutes the entire agreement of Landlord and Tenant with respect to the construction and completion of the Premises described in the Lease.   In the event of a conflict between the provisions of this Agreement and other provisions of the Lease, the provisions of this Agreement, as amended, will control.   Terms defined in the Lease, when used herein, shall have the same meanings as are ascribed to them in the Lease.

1.   **Premises Condition and Landlord's Work**.   Tenant accepts the Premises in "As-Is" Condition.    Landlord's work is none. Landlord shall provide Tenant with a Tenant Improvement Allowance of $30.00 per Rentable square foot to be used for leasehold improvements or, at Landlord's sole discretion may be used to offset rent that becomes due and payable.

2.   **Certificate of Occupancy; Tenant's Occupancy of the Premises.**   Landlord and Tenant agree that (a) Tenant will be responsible for obtaining whatever Certificate of Occupancy may be required by applicable law in connection with the Required Improvements, provided that Tenant cooperates in connection therewith and Tenant will occupy the Premises as soon as possible after the date of this Lease.

37

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE



Tenant            Landlord

38

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

## EXHIBIT E TO LEASE AGREEMENT

**Building Rules and Regulations**

1.   Sidewalks, doorways, vestibules, corridors, stairways, and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises and for going from or to another part of the Building. Nothing of Tenant's may be placed anywhere outside Tenant's Leased Premises.

2.   Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags, or other unsuitable materials shall be thrown or placed therein. Damage resulting to any such fixtures or appliances or surrounding areas from misuse by Tenant shall be repaired or replaced at the sole cost and expense of Tenant, and Landlord shall not in any case be responsible therefor.

3.   No signs, advertisements or notices shall be painted or affixed on or to any windows or doors or other parts of the Building except of such color, size, and style and in such places as shall be first approved in writing by Landlord. No nails, hooks or screws shall be driven or inserted in any part of the Building except by the Building maintenance personnel, nor shall any part of the Building be defaced by Tenant. No curtains or other window treatments will be placed between the glass and the Building standard window treatments.

4.   Landlord will provide and maintain an alphabetical directory of each Tenant's firm name on the first floor (main lobby) of the Building. No other directory shall be permitted unless previously consented to by Landlord in writing.

5.   Tenant shall not place any additional lock or locks on any doors in or to the Premises without Landlord's prior written consent. A reasonable number of keys to the locks on the doors which access the Premises from the Common Areas shall be furnished by Landlord to Tenant, and Tenant shall not have any duplicate keys made. Upon termination of the Lease, Tenant shall return all keys to Landlord and shall provide to Landlord a means of opening all safes, cabinets and vaults being left with the Premises.

6.   With respect to work being performed by Tenant in the Premises with the approval of Landlord, Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service to them to Landlord for Landlord's supervision, approval, and control before the performance of any contractual services. This provision shall apply to work performed in the Building including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and any and all installation of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building. Tenant must have Landlord's written approval prior to employing any contractor or causing or allowing any equipment, fixtures, or significant materials to be brought into the building, or having

39

_mł_
_____          _____
Tenant                         Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

any work performed in the premises. Any and all such contractors shall comply with these Rules and Regulations for such services including, but not limited to, insurance requirements. All work in or on the Building shall comply with any and all codes.

7.   Tenant must have written approval from Landlord for any movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of any bulky materials, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be restricted to such hours as Landlord shall designate. All such movement shall be under the supervision of Landlord and in the manner agreed between Tenant and Landlord by prearrangement before performance. Such prearrangement initiated by Tenant will include determination by Landlord, and subject to its decision and control, as to the time, method and routing of movement and as to limitations for safety or other concerns which may prohibit any article, equipment or any other item from being brought into the Building. Tenant is to assume all risk as to damage to articles moved and injury to person or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord and other tenants if damaged or injured as a result of acts in connection with carrying out this service for Tenant from the time of entering the property to completion of work; and Landlord shall not be liable for acts of any person engaged in, or any damage or loss to any of said property or persons resulting from any act in connection with such service performed for Tenant.

8.   Landlord shall have the power to prescribe the weight and position of safes and other heavy equipment, which shall, in all cases, be positioned to distribute the weight and stand on supporting devices approved by Landlord. All damage done to the Building by taking in or putting out any property of Tenant, or done by Tenant's property while in the Building, shall be repaired at the expense of Tenant.

9.   Tenant, in its capacity as an employer, shall establish -- and shall use reasonable measures to enforce -- a policy for its employees which prohibits firearms (including, but not limited to, concealed handguns) in the Building and the Premises.

10.  Tenant shall cooperate with Landlord's employees in keeping its Premises neat and clean. Tenant shall not employ any person for the purpose of such cleaning other than the Building's cleaning and maintenance personnel. Landlord shall be in no way responsible to Tenant, its agents, employees, or invitees for any loss of property from the Premises or public areas or for any damage to any property thereon from any cause whatsoever. Tenant shall not have any property that is not trash placed near the trash receptacles.

11.  To ensure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to the Premises except by persons appointed or approved by Landlord in writing.

12.  Corridor doors, when not in use, shall be kept closed.

*ml*

40

Tenant                    Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

13. Should Tenant require telegraphic, telephonic, annunciator or other communication service, Landlord will direct the electrician in writing where and how wires are to be introduced and placed and none shall be introduced or placed except as Landlord shall direct. Electric current shall not be used for power in excess of standard office use or heating without Landlord's prior written permission. Landlord shall have the sole discretion as to which communication company or companies are permitted to enter the Building and service tenants in the Building.

14. Tenant shall not make or permit any improper odors or noises or other nuisances in the Building or otherwise interfere in any way with other tenants or persons having business with them.

15. Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No animals shall be brought into or kept in, on or about the Premises.

16. No machinery other than standard office equipment shall be operated by Tenant in its Premises without the prior written consent of Landlord, nor shall Tenant use or keep in the Building any flammable or explosive fluid or substance.

17. No portion of the Premises shall at any time be used or occupied as sleeping or lodging quarters.

18. Landlord will not be responsible for money, jewelry or other personal property lost or stolen in or from the Premises or public areas regardless of whether such loss or theft occurs when the area is locked against entry or not.

19. Landlord reserves the right to rescind any of these rules and regulations and to make such other and further rules and regulations as in its judgment shall from time to time be advisable for the safety, protection, care and cleanliness of the Building, the use and operation thereof, the preservation of good order therein and the protection and comfort of the tenants and their agents, employees and invitees, which rules and regulations, when made and written notice thereof is given to Tenant, shall be binding upon Tenant in like manner as if originally herein prescribed; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

20. Canvassing, soliciting, or peddling on or about any portion of the Property is prohibited and Tenant shall cooperate to prevent same.

21. Landlord reserves the right to exclude or expel from the Property any person who, in the judgment of Landlord is under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.



41

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

22. Tenant shall fully cooperate and participate in all evacuation, fire safety and related emergency or security procedures established from time to time by Landlord.

_mℓ_

42

Tenant          Landlord

## EXHIBIT F TO LEASE AGREEMENT

**JANITORIAL SPECIFICATIONS**

Landlord's janitorial service shall perform according to the following specifications:

**NIGHTLY FIVE (5) NIGHTS PER WEEK**

<u>Dust and Damp Mopping</u>

All hard surfaced floors, including hallways, office areas, etc.

<u>Vacuuming</u>

All carpeted areas will be completely vacuumed.

<u>Spot Cleaning</u>

All carpeted areas to remove deposits of grease, oil, beverages, etc.
All walls, doors, windowsills, ledges, elevator doors, etc., to remove smudges, fingerprints and splash marks.
Wall areas around light switches.
All hard surfaced floor areas to remove spillage and other marks.

<u>Dusting</u>

All desks that are clear of paper; items on desk will be dusted, but not moved.
All telephones
All file cabinets
All chair rails
All tables, counter tops, lounge chairs, etc.
Furnishings, horizontal and vertical.

<u>Stairwell/Storage Rooms</u>

Will be swept and mopped as necessary.

<u>Elevators</u>

Vacuum carpets and spot clean.
Clean elevator threshold tracks.
Clean interior wall surfaces.
Clean elevator doors.

*mL*

Tenant             Landlord

43

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

Drinking Fountains

All fountains will be cleaned with germicidal cleaner.

Lavatories

Plumbing fixtures, including all basins, bowls, urinals and toilet seats will be cleaned and disinfected.
Sweep and wet mop floors with germicidal cleaner.
Dust all ledges, vents, and partitions.
Polish all mirrors and bright-work.
Damp wipe all partitions.
Restock all restroom dispensers.
All counter surfaces will be cleaned and disinfected.
Clean all soap and paper good dispensers.

Waste Baskets/Trash & Recycle

Will be emptied and wiped clean; if liners are used, will be emptied only.  (Liners replaced as needed.)  Outside of wastebaskets will be wiped as necessary.
All trash will be collected and deposited in an area designated by Landlord and in dumpsters provided by Landlord.
Boxes marked "TRASH" will be collected and deposited in an area designated by Landlord.

Entrance Lobby

Vacuum receptionist area completely.
Polish elevator cabs.
Sweep and/or vacuum walk-off mats.
Broom sweep front and sidewalk to entrance lobby.
The entrance lobby will receive special attention to maintain an eye-pleasing appearance at all times.
Planters will be checked nightly for litter.

***Landlord reserves the right to makes changes and adjustments to the schedule periodically.***

44

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

## EXHIBIT G TO LEASE AGREEMENT

**Mandatory Mediation**

Prior to any litigation or mandatory arbitration ordered by any court of competent jurisdiction, in the event to any dispute between the parties, Landlord and Tenant will engage in face-to-face negotiations in an attempt to resolve any disagreements as to Tenant's rights to offset such amounts. The parties shall participate in good faith in such negotiations. Each party shall be represented in the negotiation by a person with authority to settle the dispute. If the parties shall fail to negotiate a resolution within such ten (10) day period, then the parties shall choose a mutually agreeable third party neutral, who shall mediate the dispute between the parties during the fifteen (15) day period following the expiration of such ten (10) day period. The mediator shall be a person qualified under the Texas Alternative Dispute Resolution Procedures Act mutually acceptable to Landlord and Tenant. Mediation shall be non-binding and shall be confidential. The parties shall refrain from court proceedings during the mediation process insofar as they can do so without prejudicing their legal rights. The parties shall participate in good faith and shall follow the procedures for mediation as suggested by the mediator. All expenses of mediation except expenses of the individual parties, shall be shared equally by the parties. Each party shall be represented in the mediation by a person with authority to settle the dispute. To the extent such dispute has not been resolved at mediation. Landlord and Tenant agree to attend binding arbitration to resolve Tenant's claim or cause of action to be commenced within fourteen (14) days of an impasse being called by the mediator.

_ml_

45

Tenant          Landlord

DocuSign Envelope ID: 2C64CF0A-36BA-45F5-9B12-1F7EAF0179BE

## EXHIBIT H TO LEASE AGREEMENT

**Form of Acceptance of Premises**

This memorandum is an amendment to the lease agreement for Second Floor at 2425 West Loop South, Houston, Texas 77027

Landlord and Tenant hereby agree that:

- The Leased Premises are tenantable, the Landlord has no obligation for construction, and the Tenant acknowledges that the Leased Premises are complete.
- Lessee has received key(s) access to space.
- The Rent Commence Date of the Lease is hereby agreed to be February 1, 2024.

All other terms and conditions of the Lease are hereby ratified and acknowledge to be unchanged.

Signature: _____     Date: _____

Printed Name: _____

Title: _____

*ml*

Tenant          Landlord

46