| | |
|---|---|
| **From:** | Chandler, Sheryl on behalf of Alexander, Jerry |
| **To:** | R. J. Shannon; James Q. Pope; Ali @ Jetall; jwetwiska@akingump.com |
| **Cc:** | Kyung S. Lee; Christopher Murray; Melissa Hayward |
| **Subject:** | RE: Galleria 2425 - Lender Liability Claims against NBK |
| **Date:** | Monday, February 26, 2024 1:43:50 PM |
| **Attachments:** | image001.png |
| | 369 Findings of Fact and Conclusions of Law.pdf |
| | 001 Original Complaint.pdf |

Dear Mr. Shannon:

Attached is the Bailey Tool Opinion the Chief Bankruptcy Judge for the Northern District of Texas issued and sent to me on December 23, 2021. It is a major lender liability case and at last count approximately twenty-five (25) articles had been written about it.

I was lead counsel in the case and did the following:

1. Conceived and drafted all the causes of action/Complaints in the lawsuit (Adv. No. 16-03025 - Bailey Tool & Manufacturing Company, Hunt Hinges, Inc. and Cafarelli Metals, Inc. v. Republic Business Credit, LLC; In the United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

2. Drafted all the written discovery, conducted the depositions of the principal witnesses for Bailey Tool;

3. Hired and coordinated counsel for John Buttles, the founder and CEO of Bailey Tool;

4. Hired and tasked and directed all of Bailey Tool's experts;

5. Made opening and 3/4 of closing statements;

6. Prepared and presented the founder and CEO of Bailey Tool in direct testimony at trial;

7. Cross-examined Melissa Baines, who is prominently and negatively portrayed in the Court's Opinion;

8. Dealt with numerous objections and motions during the trial.

In many ways the case against Bank of Kuwait is less complex and has a greater upside. This case should be pursued vigorously and not settled nominally or as part of some global resolution favoring Bank of Kuwait.

Bank of Kuwait prevent Galleria 2425's performance of payment obligations in two different scenarios – the original obligation and under the Settlement Agreement. Bank of Kuwait is liable in both instances.

I look forward to our call.

Best Regards,
Jerry


**JERRY C. ALEXANDER**
214-742-2121 ext. 3579
214-748-7949 fax
alexanderj@passmanjones.com

Passman & Jones,
      A Professional Corporation
1201 Elm Street, Suite 2500
Dallas, TX 75270-2599
www.passmanjones.com



**Confidential Information**:   This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**Disclosure**:  Any U.S. federal tax advice included in this communication was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal tax penalties.


**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Monday, February 26, 2024 10:39 AM
**To:** James Q. Pope <jamesp@thepopelawfirm.com>; Alexander, Jerry <alexanderj@passmanjones.com>
**Cc:** Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray <christopher.murray@jonesmurray.com>
**Subject:** RE: Galleria 2425 - Lender Liability Claims against NBK

James—We reached out to Jerry as well separately, but if it makes the most sense to discuss with him we can do that.

Jerry—Let us know if you have some availability.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

rshannon@shannonleellp.com

**From:** James Q. Pope <jamesp@thepopelawfirm.com>
**Sent:** Monday, February 26, 2024 10:34 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>
**Cc:** Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray
<christopher.murray@jonesmurray.com>; Jerry C. Alexander <alexanderj@passmanjones.com>
**Subject:** Re: Galleria 2425 - Lender Liability Claims against NBK

Good Morning,

I have some time during the afternoon both today and tomorrow.  However, Jerry Alexander is
the counsel who was consulted and who we planned to take the lead role on the lender liability
claims against NBK.  I've copied Mr. Alexander on this email, as he would be the best person to
fully explain the strength of the lender liability claims.

James Q. Pope
Attorney at Law
The Pope Law Firm
6161 Savoy, Suite 1125
Houston, Texas 77036
PH: 713-449-4481
FX: 281-657-9693

**CONFIDENTIALITY/PRIVILEGE NOTICE:** The information in this email may be
confidential and/or privileged. This email is intended to be reviewed by only the individual or
organization named above. If you are not the intended recipient or an authorized representative
of the intended recipient, you are hereby notified that any review, dissemination or copying of this
email and/or its attachments, if any, or the information contained herein is strictly prohibited. If
you have received this email in error, please immediately notify the sender by return email and
delete this email from your system. Thank You.

On Monday, February 26, 2024 at 10:18:54 AM CST, R. J. Shannon
<rshannon@shannonleellp.com> wrote:

James,

We represent Chris Murray, the chapter 11 trustee in Galleria 2425 Owner LLC's bankruptcy
case.

Are you available to discuss the potential lender liability claims against NBK today or tomorrow?
We are evaluating how we want to address the claims and want to get an idea of the strength of
the claims and discuss with potential special counsel.

Thank you,

R. J.

--

**R. J. Shannon**

Partner

**Shannon & Lee LLP**

Central Square

2100 Travis Street, STE 1525

Houston, TX 77002

Cell: (512) 693-9294

rshannon@shannonleellp.com

Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@FranklinHayward.com
Julian Vasek
  Texas Bar No. 24070790
  JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 North Central Expy, Suite 106
Dallas, Texas 75231
(972) 755-7100 (*tel.*)
(972) 755-7110 (*facsimile*)

*Counsel for the Debtors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **BAILEY TOOL & MANUFACTURING** | § | **Case No. 16-30503-bjh11** |
| **COMPANY, et al.** | § | **Chapter 11** |
| | § | **(Jointly Administered)** |
| Debtors. | § | |
| | § | |
| **BAILEY TOOL & MANUFACTURING** | § | |
| **COMPANY, HUNT HINGES, INC., and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Adv. No. _____** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| Defendant. | § | |

## DEBTORS' ORIGINAL COMPLAINT AND APPLICATION FOR
## A TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION

TO THE HONORABLE BARBARA J. HOUSER,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

    NOW COME Bailey Tool & Manufacturing Company ("Bailey"), Hunt Hinges, Inc.

("Hunt"), and Cafarelli Metals, Inc. ("Cafarelli" and with Bailey and Hunt, the "Debtors"), and

file this *Original Complaint and Application for a Temporary Restraining Order and Permanent Injunction* against Republic Business Credit, LLC ("Republic"), in support of which they would respectfully show as follows:

## I.     JURISDICTION AND VENUE

1.      The Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O).

2.      Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

3.      To the extent the Court determines that any of the claims asserted herein are not core, the Debtors hereby expressly consent to the entry of final orders and judgments by the Bankruptcy Court.

## II.     PARTIES

4.      Bailey is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases.

5.      Hunt is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases.

6.      Cafarelli is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases.

7.      Republic is a Louisiana limited liability company that is authorized to do, and that actually does, business in Texas. Republic may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint to its registered agent, National Corporate Research, Ltd., 206 E. 9th Street, Suite 1300, Austin, TX 78701.

## III.   FACTS

8.      On February 1, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing its respective bankruptcy case.

9.      The Debtors continue to operate and manage their businesses as "debtors in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.     No trustee or examiner has been appointed in the chapter 11 cases pursuant to section 1104 of the Bankruptcy Code.

11.     Generally speaking, the Debtors are in the business of metal fabrication.

12.     The Debtors are based in Lancaster, Texas, where they operate out of a 105,000 square foot facility located at 600 W. Beltline Rd., Lancaster, TX 75146 (the "Lancaster Property"), which houses engineering, heavy forming, machining, welding, assembly and shipping operations.

13.     Bailey operates a steel stamping facility and possesses fully integrated, state-of-the-art tooling production capabilities.

14.     Bailey's business focuses primarily on manufacturing stamped and fabricated metal components used in the automotive, truck, defense, munitions, industrial, and transportation industries, as well as machine and tool and die building.

15.     Hunt is a wholly owned subsidiary of Bailey that manufactures continuous hinges in stainless steel, aluminum, steel, galvannealed steel, and galvanized steel.

16.     Hunt can modify and customize any of its continuous steel hinges to suit any purpose, and Hunt collaborates with Bailey to offer customers a versatile stamping facility and a

state-of-the-art tool and die facility, which allows Hunt to offer complete and quick turnaround on custom stamping products to complement its hinges.

17.     Cafarelli is also a wholly owned subsidiary of Bailey that provides metal slitting services, which is a shearing operation that cuts a large roll of metal into narrower rolls.

18.     Cafarelli offers slitting to precision widths and can slit coiled metals of various widths and even make use of old material by slitting unused coils, thereby turning them into productive stock.

19.     Historically, Bailey's core customer group has been Tier One and Tier Two automotive and truck suppliers that supply OEM and aftermarket parts in the United States.

20.     However, in light of the economic downturn that particularly struck the automotive industry, Bailey began to diversify its customer base beyond the automotive industry into the oil and gas, defense and transportation, and munitions equipment and production industries.

21.     Bailey accordingly began a sales and marketing push to provide stamped and fabricated metal components to the government contracting and oil & gas markets, and Bailey had some initial success winning bids for government contracting projects, most of which were defense munitions metal-stamped and fabricated components.

22.     Unfortunately, however, Bailey's attempts to diversify required Bailey to spend significant amounts on research and development, while at the same time certain of Bailey's automotive customers lost their contracts with the end-user automotive companies.

23.     This caused a significant loss to both Bailey's cash flow and profitability, and it caused Bailey's primary secured lender, Comerica Bank, to terminate Bailey's line of credit at the end of 2014.

24.     Comerica was the Debtors' primary pre-petition secured creditor, and Comerica's liens extend to substantially all of the Debtors' assets.

25.     In the beginning of 2015, after losing their Comerica line of credit, the Debtors entered into a purported factoring and inventory financing arrangement with Republic using the Debtors' accounts receivable and inventory to finance their working capital needs.

26.     At the same time, Comerica entered into a subordination agreement with Republic in which Comerica agreed to subordinate its liens on the Debtors' accounts receivable and inventory to Republic.

27.     With respect to the factoring aspect of the arrangement with Republic, the Debtors would allegedly assign accounts receivable to Republic by submitting a schedule of such accounts to Republic via Republic's online portal, and then Republic would advance funds based on the amount of those accounts.

28.     After about three months, the relationship between Republic and the Debtors soured when Republic began to claim that the Debtors were overextended on their inventory line of credit.

29.     Republic also made bad-faith allegations at the time that the Debtors' accounts receivable were uncollectable and ineligible for factoring.

30.     Such allegations were clearly made in bad faith because such accounts were clearly collectable and were in fact collected by Republic.

31.     Upon making such bad-faith allegations, Republic began to wrongfully reduce funding to the Debtors, thereby constricting operations and cash flow and making it impossible for the Debtors to buy materials and deliver customers' orders on time.

32.     Later, the relationship between Republic and the Debtors turned hostile, and Republic began to engage in a concerted effort to take control of the Debtors' business, including by, inter alia, controlling the Debtors' accounts payable and vendor payments, refusing to make the Debtors' payroll, installing armed security guards and cameras at the Debtors' facility, fabricating alleged "thefts" of materials and sending police to the Debtors' facility in an effort to manipulate and intimidate the Debtors' employees and management, and dealing directly with the Debtors' customers and vendors.

33.     When dealing directly with the Debtors' vendors, Republic would fraudulently promise to issue payment on a COD basis for materials and then later refuse to pay when the material was delivered.

34.     Republic even coerced the Debtors' principal into granting Republic a lien on his homestead and wrongfully collected amounts from the proceeds of the sale of the homestead in direct violation of the Texas Constitution and other applicable law.

35.     Republic's wrongful actions caused and continue to cause the Debtors significant financial harm, damaged the Debtors' reputation with their vendors and customers, and even forced the Debtors' to shut down operations on several occasions.

36.     At some point in August 2015, Republic stopped advancing money to the Debtors altogether.

37.     In late September 2015, the Debtors had no choice but to seek funding from one of their customers, and that customer provided funding to the Debtors up to the Petition Date by paying in advance for its orders.

38.     In late September and early October, the Debtors and Republic engaged in settlement discussions in an effort to resolve the outstanding issues between them.   Such settlement discussions ultimately fell apart on October 2, 2014.

39.     Notwithstanding, on or about October 2, 2015, unbeknownst to the Debtors at the time, Republic applied a $75,000 termination fee against money Republic had collected from the Debtors' accounts receivable.

40.     The Debtors purportedly assigned the last set of invoices to Republic on November 5, 2015, by submitting a schedule of such invoice via Republic's online portal.

41.     Republic never advanced funds with respect to any of the invoices purportedly assigned between the cessation of funding in August 2015 and the last submission of invoices on November 5, 2015.

42.     When Republic wrongfully ceased funding, it put incredible strain on the Debtors' business operations and jeopardized their ability to continue operating, including the Debtors' ability to pay their employees, who number in excess of forty.

43.     Based on information available from Republic's online portal, on the other hand, Republic has collected the November 5 invoices and other allegedly uncollectable invoices in full, despite never advancing funds in exchange for the purported assignment of such invoices.

44.     Indeed, by November 20, 2015, Republic had collected all accounts receivable that Republic previously and in bad faith deemed uncollectable, which satisfied the outstanding balance owed to Republic in full.

45.     Nevertheless, Republic continued to wrongfully collect the Debtors' accounts receivable and refused to turn over such funds.

46. Upon information and belief, Republic even collected accounts receivable that the Debtors never submitted to Republic for factoring.

47. Upon information and belief, Republic is, at present, wrongfully holding no less than $300,000 of the Debtors' cash (the "Funds"), notwithstanding that the credit facility it provided has been paid in full since mid-November 2015, notwithstanding that many of the accounts receivable that Republic has since collected were never purportedly assigned to Republic in the first place, notwithstanding that Republic never provided funding on any of those invoices, and notwithstanding the fact that Republic paid itself a termination fee from the Debtors' account more than four months ago.

48. On December 3, 2015, the Debtors' counsel sent a letter to Republic's counsel expressly terminating the factoring agreement—to the extent that it had not already been terminated—and demanding turnover of the wrongfully withheld funds.

49. Republic responded by refusing to turn over the Funds until the Debtors executed a broad, general release absolving Republic of liability for its wrongful actions.

50. Republic's actions ultimately forced the Debtors' financial distress to escalate past the breaking point, and the Debtors were forced to seek bankruptcy protection to protect their valuable assets and business and to restructure and reorganize their financial affairs.

51. The day after the Petition Date, February 2, 2016, the Debtors' counsel again sent a letter to Republic's counsel demanding turnover of the wrongfully withheld funds.

52. Despite repeated demands, however, Republic has expressly refused to turn over the Debtors' cash in an attempt to extort a general release from the Debtors.

53.     On February 10, 2016, ten days into the Debtors' bankruptcy case, S. Joseph Brown ("Brown"), counsel for Republic, sent an email to Sheryl Toby, counsel for Trelleborg Automotive USA, Inc. ("Trelleborg"), one of the Debtors' customers.[1]

54.     Trelleborg has been withholding the funds that it owes the Debtors for products shipped to Trelleborg for the past several months due to the ongoing issues between Republic and the Debtors and Republic's wrongful claim that it was entitled to those funds (even after the credit facility had been paid in full).

55.     Upon information and belief, Sheryl Toby had called Republic's counsel that same day to discuss the funds that Trelleborg had been holding, which total more than $100,000, and to notify Republic of Trelleborg's desire to remit such funds to the Debtors.

56.     In the email, Brown, on behalf of Republic, demanded that Trelleborg not pay the Debtors, but instead pay Republic, and asserted a right to setoff, among other things.

57.     There is absolutely no question that Republic never advanced funds to purchase at least some of the accounts it is seeking to collect post-petition from Trelleborg, and with respect to any Trelleborg invoices that Republic did advance funds on, such advances have since been paid in full through Republic's collection of other accounts receivable.

58.     There is likewise no question that Brown had notice of the Debtors' bankruptcy cases when he sent this email, as the email specifically references the bankruptcies.

59.     Upon information and belief, Republic has collected and continues to collect the Debtors' accounts receivable for other of the Debtors' customers in direct violation of the automatic stay.

---

[1]      A copy of the email is attached hereto as Exhibit 1.

60.     This continued theft of the Debtors' property—indeed, property of the Debtors' estates—places considerable strain on the Debtors' ability to operate in chapter 11, and it significantly impedes their ability to seek, much less obtain, the fresh start the Congress intended.

61.     Indeed, between the funds that Trelleborg is withholding due to Republic's assertion of an interest in such funds and the Funds that Republic has wrongfully collected and refused to turn over to the Debtors since its credit facility was paid, the Debtors have been deprived of no less than $400,000 of their property.

62.     Had the Debtors received the funds that Republic continues to wrongfully exercise control over, the Debtors may not have had to seek bankruptcy protection in the first place.

## IV.     CAUSES OF ACTION

**Count 1:     Violation of the Automatic Stay / Contempt of Court.**

63.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

64.     One violates the automatic stay by undertaking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[2]

65.     One also violates the automatic stay by undertaking "any act to create, perfect, or enforce any lien against property of the estate."[3]

66.     One also violates the automatic stay by undertaking "any act collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code.]"[4]

---

[2]     11 U.S.C. § 362(a)(3).

[3]     11 U.S.C. § 362(a)(4).

67.     One also violates the automatic stay by undertaking "the setoff of any debt owing to the debtor that arose before the commencement of the case … against any claim against the debtor."[5]

68.     One also violates the automatic stay when one exercises control over property to which the debtor only has an arguable claim of right.[6]

69.     Willful violations of the automatic stay are punishable by the Court's inherent contempt power and its authority under section 105(a) of the Bankruptcy Code.

70.     Republic violated the automatic stay by demanding post-petition that Trelleborg not pay the Debtors but pay Republic instead, even if the Debtors' right to collect the accounts receivable in question is in dispute.

71.     Republic has also violated the automatic stay to the extent it has exercised any purported pre-petition right to setoff after the Petition Date.

72.     Republic has also violated the automatic stay by collecting the Debtors' accounts receivable after the Petition Date.

73.     Accordingly, the Debtors request that the Court award them compensatory and exemplary damages in an amount to be determined at trial.

74.     The Debtors also request that the Court enjoin Republic from further violations of the automatic stay.

**Count 2:       Turnover of Property of the Estate.**

75.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

---

[4]         11 U.S.C. § 362(a)(6).

[5]         11 U.S.C. § 362(a)(7).

[6]         *See Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298 (5th Cir. 2005) ("Here, we face the question whether the creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right …. We answer in the affirmative ….").

76.     Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held."[7]

77.     Property of the estate also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate."[8]

78.     The Funds are property of the estate.

79.     Any entity in possession, custody, or control of property of the estate must deliver and account for such property to the Debtors.[9]

80.     Accordingly, the Debtors request that the Court enter an order compelling Republic to turn over the Funds, along with an accounting, to the Debtors immediately.

**Count 3:          Declaratory Relief**

81.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

82.     The Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[10]

83.     "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."[11]

84.     Accordingly, the Debtors request that the Court declare as follows:

    a.     The alleged contracts between the Debtors and Republic are unenforceable due to lack of consideration.

    b.     The alleged contracts between the Debtors and Republic are unenforceable due to failure of consideration.

---

[7]     11 U.S.C. § 541(a)(1)

[8]     11 U.S.C. § 541(a)(6).

[9]     11 U.S.C. §§ 542(a), 543(b), and 1107(a).

[10]     28 U.S.C. § 2201.

[11]     *Id.*

c. The alleged contracts between the Debtors and Republic are unenforceable due to economic duress.

d. The alleged contracts between the Debtors and Republic are unenforceable due to business compulsion.

e. The alleged contracts between the Debtors and Republic are unenforceable due to unconscionability.

f. The alleged contracts between the Debtors and Republic are unenforceable due to fraud in the inducement.

g. The Funds held by Republic are property of the Debtors' bankruptcy estate.

h. The Debtors' customers will not incur liability to Republic by paying the Debtors any outstanding or future accounts receivable.

**Count 4:** **Conversion.**

85. The Debtors incorporate the foregoing paragraphs as if fully set forth here.

86. Conversion occurs when (a) the plaintiff owned, possessed, or had the right to immediate possession of property; (b) the property was personal property; (c) the defendant wrongfully exercised dominion or control over the property; and (d) the plaintiff suffered injury.

87. Debtors owned, continue to own, and had and have a right to immediate possession of the Funds.

88. The Funds are personal property.

89. Republic wrongfully exercised and continues to wrongfully exercise control over the Funds.

90. The Debtors suffered injury as a result of Republic's wrongful actions.

91. Accordingly, the Debtors request that the Court award them compensatory damages in an amount to be determined at trial for conversion of the Funds.

**Count 5:** **Texas Theft Liability Act.**

92. The Debtors incorporate the foregoing paragraphs as if fully set forth here.

93.     Republic has committed theft within the meaning of Tex. Penal Code § 31.03 because it unlawfully appropriated the Funds.

94.     Republic therefore committed theft within the meaning of Tex. Civ. Prac. & Rem. Code § 134.002.

95.     Republic is liable for damages resulting from such theft.[12]

96.     Accordingly, the Debtors request that the Court award them compensatory damages in an amount to be determined at trial plus $1000 for each account receivable that Republic wrongfully stole from the Debtors.[13]

**Count 6:**     **Tortious Interference with Contract / Business Relations.**

97.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

98.     The Debtors have valid contracts with their customers and vendors.

99.     Republic has willfully and intentionally interfered with those contracts.

100.     Republic's interference has caused significant injury to the Debtors.

101.     Accordingly, the Debtors request that the Court award them compensatory damages in an amount to be determined at trial.

**Count 7:**     **Fraud.**

102.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

103.     By entering into the inventory loan agreement and the factoring agreement, Republic falsely represented to the Debtors that it would lend the Debtors money and pay the Debtors to purchase the Debtors' accounts receivable as part of the Debtors' efforts to rehabilitate their business.

104.     But that was never Republic's true intention.

---

[12]     Tex. Civ. Prac. & Rem. Code § 134.003.

[13]     Tex. Civ. Prac. & Rem. Code § 134.005(a)(1).

105.    Instead, Republic intended to usurp the Debtors' business and steal the Debtors' income under color of fraudulently obtained contractual rights.

106.    Indeed, Republic ultimately attempted to take control of the Debtors' business, even involving the police, and Republic collected accounts receivable for which it never paid.

107.    When Republic fraudulently induced the Debtors to enter into the inventory financing agreement and the factoring agreement, it falsely represented its intent to perform under those agreements, and it made such representation with the intent that the Debtors would act on it.

108.    The Debtors relied on such representations and purportedly assigned accounts receivable to Republic.

109.    As a result, the Debtors have suffered significant injury, including deprivation of the Funds.

110.    Accordingly, the Debtors request that the Court award them compensatory and exemplary damages in an amount to be determined at trial.

**Count 8:        Fraudulent Transfer.**

111.    The Debtors incorporate the foregoing paragraphs as if fully set forth here.

112.    The Debtors may avoid any transfer of an interest of the Debtors in property that was made within four years before the Petition Date in exchange for less than reasonably equivalent value because the Debtors were insolvent at the time.[14]

113.    The Debtors were also engaged in a business or transaction, or were about to engage in a business or transaction, for which their capital was unreasonably small.[15]

---

[14]        11 U.S.C. § 548(a)(1)(B)(ii)(I); Tex. Bus. & Comm. Code § 24.006(a).

[15]        11 U.S.C. § 548(a)(1)(B)(ii)(II); Tex. Bus. & Comm. Code § 24.005(a).

114.     To the extent that Republic contends that it owns all of the Debtors' accounts receivable and the proceeds thereof, including the Funds, despite never having advanced money in exchange for them and/or having already been paid in full from the collection of other accounts receivable, then the transfer of such accounts and proceeds constituted a fraudulent transfer.

115.     Accordingly, the Debtors may avoid such transfers and recover them from Republic in an amount to be determined at trial.[16]

**Count 9:       Breach of Contract.**

116.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

117.     To the extent there is a valid, enforceable contract between the Debtors and Republic, the Debtors are proper parties to sue under such contract.

118.     The Debtors performed their contractual obligations or were excused from doing so.

119.     Republic has breached the contract by, *inter alia*, collecting accounts receivable it did not purchase and refusing to advance funds after submission of accounts receivable by the Debtors.

120.     These breaches and other have caused the Debtors significant injury.

121.     Accordingly, the Debtors request that the Court award them compensatory damages in an amount to be determined at trial.

**Count 10:     Breach of Duty of Good Faith and Fair Dealing.**

122.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

123.     All contracts are governed by an implied covenant of good faith and fair dealing.

---

[16]     11 U.S.C. §§ 544(b)(1); 550(a)(1).

124.     Republic breached this covenant by refusing to release collateral after it had been paid.

125.     Republic also breached this covenant by manipulating the value of its collateral to force a default.

126.     Republic also breached this covenant by unreasonably and unilaterally refusing to advance funds to the Debtors.

127.     Republic's breaches have caused the Debtors significant harm and damage.

128.     Accordingly, the Debtors request that the Court award them compensatory damages in an amount to be determined at trial.

**Count 11:     Breach of Fiduciary Duty.**

129.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

130.     As a result of its excessive efforts to take control of the Debtors' business, Republic owed fiduciary duties to the Debtors, including the duty of care, the duty of loyalty, the duty to act fairly, and the duty of good faith and fair dealing.

131.     Republic breached these duties by using its control over the Debtors' business to steal from the Debtors.

132.     Republic's breaches of fiduciary duty and the resulting theft has significantly damaged the Debtors' business.

133.     Accordingly, the Debtors request that the Court award them compensatory and exemplary damages in an amount to be determined at trial.

**Count 12:     Liability to Creditors.**

134.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

135.     Republic exercised excessive control over the Debtors' business and caused the Debtors' not to be able to pay many of their creditors, ultimately resulting in these bankruptcy cases.

136.     As a result of Republic directly causing damage to the Debtors' creditors through its control of the Debtors, Republic is directly liable to those creditors for any such damages.

137.     As a result of these bankruptcy cases, however, the Debtors, as debtors in possession, are the proper parties to bring any claims that belong to the Debtors creditors generally.

138.     Accordingly, the Debtors respectfully request that the Court enter a judgment providing that Republic is liable to the Debtors for all claims filed in these bankruptcy cases.

**Count 13:     Equitable Subordination.**

139.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

140.     Republic has engaged in inequitable conduct that caused significant harm to the Debtors.

141.     The Debtors therefore request that the Court equitably subordinate Republic's claim, if any, to the claims of all creditors and interest holders.

**Count 14:     Attorneys' Fees and Costs.**

142.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

143.     The Debtors are entitled to an award of attorneys' fees and costs under Tex. Bus. & Comm. Code § 24.013 and Tex. Civ. Prac. & Rem. Code § 38.001 & 134.005(b).

144.     The Debtors are also entitled to an award of attorneys' fees and costs under the Court's contempt power.

**Count 15:**     **Exemplary Damages.**

145.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

146.     The Debtors are entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003 because Republic acted fraudulently and with malice.

**Count 16:**     **Temporary and Permanent Injunction.**

147.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

148.     The Debtors request that the Court enter a temporary and ultimately a permanent injunction that: (i) restrains and enjoins Republic from contacting the Debtors' customers for any reason; (ii) restrains and enjoins Republic from instructing the Debtors' customers to pay accounts receivable to Republic; (iii)  to the extent that any of the Debtors' customers contact Republic, (a) commands Republic to instruct such customers to pay the Debtors and not Republic, and (b) restrains and enjoins Republic from providing such customers with any other information or making any other assertions; (iv) restrains and enjoins Republic from collecting any further accounts receivable that are based on goods or services provided by the Debtors; (v) restrains and enjoins Republic from dissipating the Funds pending trial of this matter; and (vi) restrains and enjoins Republic from further violating the automatic stay.

**Count 17:**     **Temporary Restraining Order.**

149.     The Debtors incorporate the foregoing paragraphs as if fully set forth here.

150.     Republic has continuously and aggressively sought unlawfully to deprive the Debtors of funds to which the Debtors are entitled.  Before this bankruptcy case, Republic went so far as to attempt an actual, physical coup of the Debtors' business operations, even involving local police.  Republic has collected and continues to collect accounts receivable that the Debtors never purportedly assigned to Republic and for which Republic never paid.  This bad-faith,

unlawful behavior ultimately led to the Debtors seeking refuge in this Court under the protection of the automatic stay.

151.     Perhaps unsurprisingly, Republic appears to believe that it is exempt from the automatic stay, despite the stay's unquestionably broad reach.  Even after the Petition Date, Republic expressly instructed one of the Debtors' customers not to pay the Debtors, regardless of the fact that the Debtors never assigned, and Republic never paid for, the accounts receivable in question and/or Republic had already been paid in full for any advances made on such accounts receivable through its collection of other accounts.  This clear and unapologetic stay violation demonstrates that Republic will not comply with federal law without the Court's prompt intervention.

152.     As a direct result of Republic's unlawful activity, at least one customer is withholding more than $100,000 in funds from the Debtors that are unquestionably due. Depending on the scope of Republic's unlawful activity, which is not currently known, allowing Republic to continue to influence the Debtors' customers in this way could cause the Debtors irreparable injury.  Republic's actions could ultimately result in these chapter 11 cases failing and being converted to chapter 7.  If that happens, the Debtors will be liquidated and their business will be lost forever, along with the jobs the Debtors provide to their employees.

153.     Accordingly, the Debtors respectfully request that the Court enter a temporary restraining order that: (i) restrains and enjoins Republic from contacting the Debtors' customers for any reason; (ii) restrains and enjoins Republic from instructing the Debtors' customers to pay accounts receivable to Republic; (iii)  to the extent that any of the Debtors' customers contact Republic, (a) commands Republic to instruct such customers to pay the Debtors and not Republic, and (b) restrains and enjoins Republic from providing such customers with any other

information or making any other assertions; (iv) restrains and enjoins Republic from collecting

any further accounts receivable that are based on goods or services provided by the Debtors; (v)

restrains and enjoins Republic from dissipating the Funds pending trial of this matter; and (vi)

restrains and enjoins Republic from further violating the automatic stay

## V.    **PRAYER**

WHEREFORE, CONSIDERING THE FOREGOING, the Debtors respectfully request

that Republic be cited to appear and answer this Complaint and, upon trial of this adversary

proceeding, that the Court award the Debtors the following:

A.    A temporary restraining order that: (i) restrains and enjoins Republic from contacting the Debtors' customers for any reason; (ii) restrains and enjoins Republic from instructing the Debtors' customers to pay accounts receivable to Republic; (iii)  to the extent that any of the Debtors' customers contact Republic, (a) commands Republic to instruct such customers to pay the Debtors and not Republic, and (b) restrains and enjoins Republic from providing such customers with any other information or making any other assertions; (iv) restrains and enjoins Republic from collecting any further accounts receivable that are based on goods or services provided by the Debtors; (v) restrains and enjoins Republic from dissipating the Funds pending trial of this matter; and (vi) restrains and enjoins Republic from further violating the automatic stay;

B.    A temporary and permanent injunction that: (i) restrains and enjoins Republic from contacting the Debtors' customers for any reason; (ii) restrains and enjoins Republic from instructing the Debtors' customers to pay accounts receivable to Republic; (iii)  to the extent that any of the Debtors' customers contact Republic, (a) commands Republic to instruct such customers to pay the Debtors and not Republic, and (b) restrains and enjoins Republic from providing such customers with any other information or making any other assertions; (iv) restrains and enjoins Republic from collecting any further accounts receivable that are based on goods or services provided by the Debtors; (v) restrains and enjoins Republic from dissipating the Funds pending trial of this matter; and (vi) restrains and enjoins Republic from further violating the automatic stay;

C.    The following declarations: (i) the contracts between the Debtors and Republic are unenforceable due to lack of consideration; (ii) the contracts between the Debtors and Republic are unenforceable due to failure of consideration; (iii) the contracts between the Debtors and Republic are unenforceable due to economic duress; (iv) the contracts between the Debtors and Republic are unenforceable due to business compulsion; (v) the contracts between the Debtors and Republic are unenforceable due to unconscionability; (vi) the contracts between the Debtors

and Republic are unenforceable due to fraud in the inducement (vii) the Debtors' accounts receivable and the Funds held by Republic are property of the Debtors' bankruptcy estate; and (viii) the Debtors' customers will not incur liability to Republic by paying the Debtors any outstanding or future accounts receivable;

D.      Money damages, including compensatory and exemplary damages, in an amount to be determined at trial;

E.      Reasonable attorneys' fees and costs;

F.      Prejudgment and post-judgment interest on any monetary award as is otherwise provided for by law; and

G.      Such other and further legal or equitable relief as may be just and proper.


Dated February 19, 2016.

Respectfully submitted,

/s/  *Melissa S. Hayward*

Melissa S. Hayward
   Texas Bar No. 24044908
   MHayward@FranklinHayward.com
Julian Vasek
   Texas Bar No. 24070790
   JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 North Central Expy, Suite 106
Dallas, Texas 75231
(972) 755-7100 (*tel.*)
(972) 755-7110 (*facsimile*)

***Counsel for the Debtors***



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 23, 2021**

_____
United States Bankruptcy Judge

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **BAILEY TOOL &** | § | **Case No. 16-30503-SGJ-7** |
| **MANUFACTURING COMPANY.** | § | **Chapter 7** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Adv. No. 16-03025-SGJ** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| Defendant and Counter-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |

**CAFARELLI METALS, INC.,** §
§
Counter-Defendant. §
§
_____ §  _____
§
**REPUBLIC BUSINESS CREDIT, LLC,** §
§
Third-Party Plaintiff, §
§
**v.** §
§
**JOHN BUTTLES, TENNECO, INC.,** §
**TRELLEBORG AUTOMOTIVE** §
**USA, INC.** §
§
Third-Party Defendants. §

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT IMPOSING LIABILITY ON FACTORING COMPANY, REPUBLIC BUSINESS CREDIT, LLC

## I.
## INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") involves: (a) a decades-old metal fabricating business; (b) its long-time owner; and (c) a factoring company. There was a short-lived financing arrangement among the parties that went terribly wrong. This is, at bottom, a "lender liability suit" that was commenced after the business (actually, three related businesses) filed Chapter 11 and later converted their cases to Chapter 7.

The bankruptcy trustee (now standing in the shoes of the failed business enterprise) and the former owner of the businesses each allege that: (a) improper conduct of the factoring company ultimately destroyed the business enterprise which—although experiencing financial distress— had prestigious customers and a hopeful future; and (b) the factoring company unlawfully put a lien on and coerced the former owner to sell his exempt homestead and pay over the sale proceeds to the factoring company (based on a broken promise to resume factoring, if he did). The

bankruptcy trustee and former owner allege more than a dozen torts against the factoring company, in addition to breach of contract.

In a nutshell, the theory of the bankruptcy trustee's case is that the factoring company: (i) refused to advance funds under the applicable factoring and inventory loan agreements in good faith and in the manner promised—in fact, almost immediately taking a stance that the businesses were in an "over-advanced" position, which was not only *not* a defined concept in the agreements, but was problematic in light of several weeks of due diligence and awareness regarding certain slow-paying accounts and inventory status; (ii) charged fees, expenses, penalties and other items against "reserves" (contributing to the alleged "over-advanced" position), without any transparency; (iii) exercised excessive control over the businesses, by controlling what vendors, employees, and expenses got paid, and insisting on direct payments to them by the factoring company rather than funding to the businesses as contemplated by the underlying agreements (*i.e.,* the argument being that this was an improper exertion of control; there were no amendments of documents or forbearance agreements to justify deviating from the underlying agreements). This, collectively, is argued to have caused the businesses' failure.

As for the owner of the businesses, the factoring company allegedly wrongfully coerced him to transfer to it his equity from his exempt homestead in violation of the Texas Constitution and Texas Property Code (and misrepresented in the process that the factoring company would resume making advances on accounts receivable if he did so, with no intention of doing so and, in fact, never doing so). The factoring company took a termination fee of $75,000 immediately after receiving $225,000 of sale proceeds from the home, without disclosing the termination fee. The factoring company thereafter continued to accept accounts receivable collections but extended no funding.

The factoring company denies culpability and claims it is still owed money. The court held a bench trial ("Trial") over seven and one-half days in the summer of 2021.[1] The court received over one thousand exhibits and heard from 11 witnesses (one of whom was called multiple times). This was an excruciatingly difficult case but, on balance, the court has determined that the factoring company breached its agreements in certain ways and committed various torts. While the factoring company has essentially argued that the businesses involved here were dead-on-arrival and it did not cause their demise, the court strongly believes this is an incorrect assessment. The evidence strongly supported the notion that the businesses were "walking wounded" but could have reorganized, if not for improper actions of the factoring company. These are the court's Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Bankruptcy Procedure 7052, in support of a Judgment Imposing Liability on Republic Business Credit, LLC in this Adversary Proceeding (which will be subsequently issued). Any Finding of Fact set forth herein that should be considered a Conclusion of Law should be regarded as such, and vice versa.

## II.
## FINDINGS OF FACT

A.  **Procedural Background and Parties.**

1.  Bailey Tool & Manufacturing Company ("Bailey") is a Texas corporation and was a debtor-in-possession in the above-referenced, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases. James W. Cunningham was appointed the trustee of Bailey's bankruptcy estate.

---

[1] The Trial was held on June 14, 15, 16, 17, 18, 21 & 22, 2021, with closing arguments on July 6, 2021. This Trial was delayed many times due to judge reassignments and later COVID.

2. Hunt Hinges, Inc. ("Hunt") is a Texas corporation and was a debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases. James W. Cunningham was appointed the trustee of Hunt's bankruptcy estate.

3. Cafarelli Metals, Inc. ("Cafarelli") is a Texas corporation and was a debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases. James W. Cunningham was appointed the trustee of Cafarelli's bankruptcy estate.

4. Collectively, the foregoing entities may sometimes be referred to herein as "Bailey," "Debtors," or "Company."

5. Republic Business Credit, LLC ("Republic") is a Louisiana limited liability company authorized and conducting business in Texas.

6. On February 1, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing their respective bankruptcy cases (collectively, the "Bankruptcy Case").

7. The Debtors continued to operate and manage their businesses as "debtors in possession" pursuant to Sections 1107 and 1108 of the Bankruptcy Code until January 26, 2017.

8. On February 19, 2016, the Debtors filed this Adversary Proceeding against Republic, which asserted numerous claims against Republic. On March 23, 2016, Republic filed an answer.

9. On May 31, 2016, Republic filed its Amended Answer and Counterclaim, which also asserted new claims against the Debtors' former owner, John Buttles ("Buttles"). A formal appearance, answer, and third-party counterclaim was filed by Buttles on September 23, 2016.

10.   On January 26, 2017, the Bankruptcy Case was converted to a Chapter 7, and James W. Cunningham was appointed Chapter 7 Trustee ("Cunningham" or the "Bankruptcy Trustee") on January 27, 2017, pursuant to 11 U.S.C. § 701(a).

**B.   General History of the Debtors.**

   **i.   The Debtors' Business.**

11.   In 1989, John Buttles bought the company that ultimately became known as Hunt Hinges, Inc. Four years later, in 1993, Buttles acquired Bailey Tool & Equipment Company, which was founded in 1969. Approximately five years later, Buttles continued to build the enterprise by acquiring Cafarelli Metals, Inc.

12.   Buttles, who was born in Geneva, Switzerland, lived all over the world as a child, moving with his father who was a foreign service officer. His family moved to the U.S. when he was an adolescent, and Buttles eventually obtained a bachelor's degree from Rochester Institute of Technology and a master's degree in glass blowing. He moved to Texas in 1977 and worked for a steel foundry for many years, working his way up through the business, before eventually acquiring his own businesses.

13.   Hunt created and manufactured metal hinges; Bailey was a metal fabrication company; and Cafarelli slit metal coils to custom widths for Bailey, Hunt, and outside customers, to use in manufacturing their products. Over time, Buttles expanded the combined companies' capabilities to include not merely metal fabrication, but also product engineering and design.

14.   Historically, Bailey's core customers were "Tier One and Two" suppliers to automotive manufacturers in the United States and Mexico. The Company operated in three

locations in the Dallas area, employed as many as 130 people, and had annual revenues ranging from $7.9 million to $11.6 million in 2012-2014. *See* **TR 509, 511.**[2]

15.     In the economic downturn of 2008-2009, the automotive industry suffered significantly, and so did Bailey's business.  In response, the Company expanded into manufacturing oilfield service equipment.  It also used its engineering and design abilities to develop entirely new opportunities.

16.     Beginning in 2012, the Company developed additional products of a sophisticated nature, including components of rocket engines for Elon Musk and Space X and seamless acceleration chambers for sub-automatic particles for the United States Department of Energy. One such product (a large copper piece of equipment) was brought into the courtroom and shown and described by Buttles to the court.

17.     One of Bailey's new opportunities that it considered very promising for its future was defense contracting and Bailey's new technology to manufacture bullets.  Buttles credibly testified that when Bailey embarked on this new endeavor, ammunition manufacturers were still using bullet-manufacturing machines that were built during World War II.   Under contract with the United States Army, Bailey designed and built an entirely new and more efficient machine for manufacturing bullets, using state-of-the-art technology and processes.  Buttles credibly testified that this project created two new markets for Bailey—not only designing and building the actual machines for possible re-sale but also for Bailey itself to manufacture bullets.

---

[2] Trial Exhibits will herein be referenced as follows:  Bankruptcy Trustee's as "TR ___"; Buttles' as "BUTTLES ___"; Republic's as "DX___."

ii.      **Bailey's Early Dealings with Republic and, Ultimately, the Factoring Agreements and Inventory Loan Agreements.**

18.      While the Company had made progress in developing new markets after the world economic recession of 2008-2009, it was still in transition, revenues had not yet returned to pre-recession levels, and its new markets continued to demand additional capital for research and development. It was in this context that Bailey's primary lender, Comerica Bank (which had provided both a line of credit to the Company, secured by accounts receivables and inventory, and term loans secured by real estate at which the Company operated) decided it no longer wanted to be a lender for Bailey's working capital needs. It asked the Company to move its business to a new lender in 2014.

19.      Buttles credibly testified that Bailey found a receptive audience at Regions Bank for a new lending arrangement. However, as part of the move, Regions Bank suggested that Bailey utilize a factoring company for a few months as a "bridge" from Comerica Bank to Regions Bank. While this factoring "cleanup" period occurred, the rest of the Bailey bank debt with Comerica (two notes secured by the real estate where the Company's plants were located that were guaranteed by Buttles) would remain with Comerica Bank.

20.      Buttles credibly testified that Bailey was not opposed to this suggestion of an interim factoring arrangement because the Company had successfully used a factoring company in the past, following another economic downturn. One of the companies that Regions Bank recommended for factoring was the Defendant herein, Republic.

21.      In late 2014 and in early 2015, the Company discussed a factoring and inventory financing package with Republic to meet its working capital needs. As noted, the arrangements were intended to be a short-term bridge, as Regions Bank had suggested.

22.     Republic performed due diligence regarding the Company for several months (from October 2014 through February 2015).  Buttles credibly testified that Bailey showed Republic every document that Republic requested and explained to Republic its history and the intended move to Regions Bank.  An individual at Republic named LaCour Miller was responsible for the underwriting on behalf of Republic.

23.     Republic's due diligence was reflected in a December 31, 2014 report and accompanying e-mail from LaCour Miller (again, Republic's underwriter) to Republic's credit committee.  Based on Republic's due diligence, Mr. Miller, in an email to five colleagues at Republic, assessed the proposed transaction with the Company as a "strong deal" for Republic:



**From:** LaCour Miller [lmiller@republicbc.com]
**Sent:** 12/31/2014 8:00:44 AM
**To:** Allen E. Frederic Jr. [afrederic@republicbc.com]; Stewart Chesters [schesters@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Diane Josephik [djosephik@republicbc.com]; Danika Louis [dlouis@republicbc.com]
**Subject:** CCCA Bailey Tool and Subsidiaries
**Attachments:** CCCA_Bailey Tool & Manufacturing_141231.pdf

All,

Please see the attached CCCA for Bailey Tool.  Overall, it seems to be a strong deal.  Below are the known issues.

**TR 169.**

24.     Mr. Miller's e-mail to his Republic colleagues identified the following as the "known issues:"

- **Issue**: Bailey had failed to pay its 2013 ad valorem taxes to Dallas County, owed $120,000 on that bill, and was engaged in a payment plan agreed to by the County of $20,000 per month; it had not paid its 2014 ad valorem taxes either;
  - **Solution**: To deal with the tax arrearages, Miller recommended that Republic take control over tax payments from Bailey after the deal closed;
- **Issue**: Bailey's accounts payable were stretched well beyond 90 days, and half of its trade debt was more than a year old;
  - **Solution**: Bailey acknowledged that it could probably settle its outstanding trade debt for fifty cents on the dollar, but didn't want to do so, and was making a priority for paying down old accounts payable;

- **Issue**: Bailey stood a good chance of receiving further orders from the Defense Department for its bullet machine, but payments were made on a milestone rather than progress billing basis;
  - o **Solution**: Milestone payments, being irregular, are unattractive to a factor and would need to be closely monitored, so Republic indicated a need to review future contracts and bill on progress rather than milestones.

**TR 509, 511**.

25. Thus, Republic was aware, before deciding to lend to or factor with the Company, that it was past due on both ad valorem taxes and trade payables and that its accounts receivable from the U.S. Defense Department were slow-paying or irregular in payment.

26. Buttles credibly testified that, at the time the Company met Republic, the Company had new business lines with Elon Musk's Space X, the U.S. Army, Nammo Defense and the U.S. Department of Energy. Buttles further credibly testified that the Company also had an impressive list of continuing long-time customers, as set forth below:

| Customers Bailey had for 15 or more years | | |
|---|---|---|
| **Customer** | **Years a Customer** | **Annual Revenue** |
| Tenneco | 15 | $3,250,000.00 |
| Imperial (Peterbilt) | 25 | $650,000.00 |
| Nammo | 21 | $450,000.00 |
| Oshkosh Truck | 26 | $300,000.00 |
| Chaparral Boat | 25 | $240,000.00 |
| Tracker | 23 | $165,000.00 |
| Fishing Holdings | 24 | $140,000.00 |
| | | $5,195,000.00 |

**TR 818**.

27. The uncontroverted and credible testimony of the Bankruptcy Trustee's expert witness, Greg Scheig, corroborated the Company's and Buttles' view that—despite its financial distress in late 2014—there was significant enterprise value of Bailey at the time Republic began negotiations with Bailey and at the inception of the factoring arrangement between Republic and

Bailey. According to Mr. Scheig, Bailey had an enterprise value at the end of 2014 of at least $5.279 million and possibly as much as $6.455 million. Mr. Scheig calculated these values using generally accepted and reliable methodology employed in the business valuation industry. Importantly, Mr. Scheig based his values on the same information Republic used to underwrite its loan with Bailey, which lends further credibility to his opinions of value.

28.     Republic's internal Client Credit Committee Application ("CCCA") regarding the Company contained the following analysis:

> Company has positive net worth. Current ratio is above 1. Both assets and liabilities have decreased from 2013 to the 3rd quarter of 2014. This is primarily because the Company sold one of its two facilities. Balance sheet shows around $412K of Accrued Expenses. The Accrued Expenses are primarily payroll, accrued real estate taxes, unpaid bill to hospitals for self insured medical plan, professional fees, and accrued interest. As of 9/30/2014, the Company reported cash of $127,374. Company is amending 2012 and 2013 tax returns. The expectation is that the Company will receive approximately $500K in R&D tax credits

**TR 509**.

29.     The 2012 and 2013 federal tax returns for Bailey which Republic referenced above as part of its due diligence showed losses, but it appears that Republic realized those were mainly paper losses due to having expensed research and development ("R&D"), rather than having capitalized it (and was amending the tax returns in that regard). **TR 509**.

30.     Despite Republic ultimately determining to proceed with factoring and lending to the Company, at Trial Republic made much of significant tax losses that Bailey suffered in 2013 and 2014 as an indicator that the Company had no enterprise value. But the uncontroverted testimony of the Bankruptcy Trustee's expert, Mr. Scheig, was that those tax losses were not real earnings losses, but were, in fact, paper losses as a result of the Company's failure to capitalize R&D expenses and a change in accounting method in 2014. Mr. Scheig calculated that, if one added back those "losses" and looked at earnings before tax and depreciation, the losses were ultimately far less significant and showed both positive cash earnings and a positive growth trend line until the time of Bailey's ultimate bankruptcy filing in 2016. For example, the reported tax

loss in 2014 was approximately $3.73 million. In reality, the earnings loss was likely only $279,000 and the Company had positive cash earnings of $106,909 in 2015, even with the extreme difficulties it experienced in 2015. Mr. Scheig's testimony on these points was uncontroverted and undisputed.

31. Based on LaCour Miller's e-mail and the attached CCCA, Republic's credit committee approved entering into a factoring arrangement with Bailey the same day that LaCour Miller submitted his report. Allen Frederic, Republic's Chief Operating Officer ("COO"), and Stewart Chesters, Republic's Chief Executive Officer ("CEO"), both expressly approved the transaction:

| Message | |
|---|---|
| **From:** | Allen Frederic [afrederic@republicbc.com] |
| **Sent:** | 12/31/2014 1:58:23 PM |
| **To:** | Stewart Chesters [schesters@republicbc.com] |
| **CC:** | LaCour Miller [lmiller@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Diane Josephik [djosephik@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| **Subject:** | Re: CCCA Bailey Tool and Subsidiaries |

I approve

Sent from my iPhone

On Dec 31, 2014, at 8:14 PM, Stewart Chesters <schesters@republicbc.com> wrote:
Approved

Stewart Chesters | Republic Business Credit | COO, Managing Member
t: 504.262.8602 | f: 504.262.8699 | c: 312.622.5994
www.republicbc.com

**TR 508**.

32. Before the credit committee's approval, LaCour Miller sought confirmation from Bailey on how it would spend the first funds advanced by Republic. Bailey's Chief Financial Officer ("CFO"), Jeff Worley, replied that it intended to use funds to pay off Bailey's working

capital/inventory loan from Comerica,[3] meet immediate working capital needs, and ramp up manufacturing in the early months of the year:

> The proceeds will be used for:
>
> - Payoff of Comerica
> - Working Capital
> - Ramping up (equipment) for new contracts coming in the first quarter
>
> Not knowing the functionality of the line, we need to payoff Comerica at initial funding and we have some immediate working capital needs (I am planning on having additionally borrowing capacity for working capital over the next 60 days). Since I have not been here through the Nov – Jan cycle I do not know what to anticipate during the seasonally slower time. We do expect to ramp up manufacturing in February and possibly January as well.
>
> Let me know if you need additional clarity.
>
> Thanks, Jeff

**TR 681 (December 31, 2014 e-mail from Jeff Worley to LaCour Miller).**

33.    Significantly, the evidence showed that, in their negotiations, Republic represented that its advance rate on Bailey's accounts receivables would be 90%, and Republic would take its fees and expenses out of the 10% it held back.  In fact, it appears that the advance rate on receivables was a focal point of negotiations:

---

[3] To be clear, prior to the factoring agreement, Comerica had a first-priority lien against Bailey's receivables. Apparently, Comerica's lien was subordinated to Republic's interest as part of the Bailey/Republic transaction.

> **From:** LaCour Miller <lmiller@republicbc.com>
> **Date:** Friday, December 12, 2014 at 3:20 PM
> **To:** John Buttles <jbuttles@baileytool.com>, Jeff Worley <jworley@ccgpllc.net>, "Allen E. Frederic Jr."
> <afrederic@republicbc.com>, Underwriting <credit@republicbc.com>
> **Subject:** Republic Business Credit
>
> John and Jeff,
>
> I am pleased to present you with the updated Republic proposal. You will note that the advance rate on the A/R has been increased to 90%. Also, we have agreed to move the funding fee down from 2.5% to 2.25%.
>
> I hope our call today was informative and that you all have a better understanding of the proposed facility. If you have any further questions or concerns, please do not hesitate to give Allen or me a call.
>
> Warm Regards,
>
> LaCour Miller
>
> Exhibit

**TR 166**.

34.    Ultimately, on February 25, 2015, Republic and the Company entered into both: (a) a factoring agreement (*i.e.,* an "Agreement for Purchase and Sale"—one for each of the Debtors—collectively, the "Factoring Agreements"); and (b) a "Revolving Inventory Loan and Security Agreement" (one for each of the Debtors—collectively the "Inventory Loan Agreements"). **TR 51, 52, 53, 54, 55 & 56**. These agreements will sometimes collectively be referred to as the "Agreements."

35.    The Agreements (prepared by Republic) were not a model of clarity, to put it kindly.

36.    <u>The Inventory Loan Agreements.</u>   The court will start by summarizing the Inventory Loan Agreements.  Even though the relationship between the Company and Republic has often been referred to as a factoring arrangement, there was definitely a traditional lending component to the arrangement.  The Inventory Loan Agreements were, according to their terms, *each intended to be a revolving line of credit for the Company's working capital under which*

*Republic might make advances from time to time*. **TR 54-56 (Section 2.1)**. Republic's "Collateral" was to be not merely "Inventory," wherever located, but general intangibles, accounts, and proceeds. It was contemplated that the Company could request borrowing ("advances") by providing a request to Republic. *Id.* **(Section 2.2)**. While there was an aggregate maximum amount of borrowing contemplated for all three Debtors of $500,000, there was a "Borrowing Base" definition in the Inventory Loan Agreements that further restricted the possible loan amounts. Specifically, there had to be a certain amount and quality of inventory on hand ("Borrowing Base") for the Company to obtain a loan advance. In the definition of "Eligible Inventory," for purposes of the "Borrowing Base," Republic had wide discretion not to consider certain inventory eligible. *Id.* **(Section 1.2).** For example, it could exclude "Inventory" determined by Republic "to be not in good condition, slow-moving, obsolete or not currently usable or salable in the ordinary course of the Borrower's business." "The eligibility of Inventory shall be determined by [Republic] in its reasonable commercial discretion." *Id*. The lending arrangement also contemplated Borrowing Base Certificates to calculate Borrowing Base.

37.     As far as the pricing, the interest rate under each Inventory Loan Agreement was rather pricey: 8.85% above prime rate, per annum, and in no event less than 12.1%. In the event of a default, an extra 5% per annum default rate was to be applied above the regular interest rate (not to exceed 18%). There was also a closing fee of $2,500 for each borrower.

38.     Pursuant to the defined terms for "Collateral" and "Obligations" at Section 1.2 of the Inventory Loan Agreements, and Section 7.1(a)-(c) ("Events of Default") thereof, it appears that the Inventory Loan Agreements and Factoring Agreements were cross-collateralized and subject to cross-default provisions. ***Moreover, even without any event of default, Section 2.9 of the Inventory Loan Agreements permitted Republic to pay any amount due and owing under***

*them from any amounts that would otherwise be payable to the Company under the Factoring Agreements*. **TR 54-56**. And pursuant to Section 7.1 of the Inventory Loan Agreements, an "Event of Default" could include many different occurrences or circumstances. Among other things included were failure to perform covenants, defaults in payments, and "[a]ny deterioration or impairment of the Collateral or any decline or depreciation in the value of the Collateral (whether actual or reasonably anticipated by [Republic]) which, in [Republic's] discretion, causes the character or value of the Collateral to become unsatisfactory to [Republic]." *Id.* **(Section 7.1(g))**. "Event of Default" included circumstances when Republic "reasonably and in good faith deems itself to be insecure because any of the following . . . (iii) there is a Potential Default." *Id.* **(Section 7.1(f))**. "Potential Default" was defined as "any event or condition which with notice or the passage of time would constitute an Event of Default." So, basically, an Event of Default occurred if Republic felt insecure about a "Potential Default."

39.    Without a doubt, the Inventory Loan Agreements were: (a) very expensive (as far as interest rate and fees); (b) very restrictive (as far as Republic's ability to decide not to loan based on its assessment of what was "Eligible Inventory" in the "Borrowing Base"); (c) in some ways a hindrance to the companion Factoring Agreements (since Republic could pay down the Inventory Loans any time it chose to with what otherwise should have been funding available to the Company under the Factoring Agreements); and (d) not very reliable sources for working capital since Republic could declare a default any time it "reasonably and in good faith deem[ed] itself to be insecure" because of a potential decline or anticipated decline in the value of the Collateral. *Id.* **(Section 7.1)**.

40.    <u>The Factoring Agreements.</u> The court will now summarize the Factoring Agreements. These agreements, like typical factoring arrangements, describe the anticipated

transactions as "purchases" by Republic and "sales" by the Company of the Company's accounts receivable, not secured lending transactions. However, the agreements also grant security interests in the accounts receivable to Republic and contemplate the filing of UCC financings statements (which were filed). **TR 51-53 (Section 6; *see also* Section 1.5)**.

41.     The lawyers generally described these agreements as establishing a facility limit of $2.5 million.  This might create the impression that the Debtors would sell, and Republic would purchase, up to $2.5 million of accounts receivable. However, that's not precisely how the Factoring Agreements were worded. Rather, the Factoring Agreements describe $2.5 million as the "***collective maximum amount of 'Net Funds Employed'***" under the three Factoring Agreements. ***Id.* (Section 2.3)**. "Net Funds Employed" was defined as "***all Advances plus all Purchase Fees***." ***Id.* (Annex A thereto)**. An "Advance" was defined as "the amount Purchaser may pay Seller upon delivery of Accounts offered for sale based upon the applicable Advance Rate." ***Id.***   And "Purchase Fees" meant:  a "Service Fee" (a monthly service fee of .55% on monthly average Net Funds Employed) and a "Funding Fee" (a fee of 2.25% above Prime Rate for each Account Purchased for which the Seller has received an Advance, which Funding Fee shall be calculated on Net Funds Employed and shall in no event be less than 5.5%). ***Id.* (Section 2.1)**. This is all very confusing, but the point is that ***"Net Funds Employed" (which was capped at $2.5 million) actually incorporated a significant amount of fees too, not merely the funds that were advanced to the Company.***

42.     The "Advance Rate" is, obviously, an important aspect of the Factoring Agreements.  It was defined as "an amount up to Ninety Percent (90.0%) of the Aggregate Net Face Value of Accounts identified in each Assignment Schedule delivered to Purchaser."  ***Id.* (Section 2.2)**.  But, similar to the Inventory Loan Agreements, there was an "eligibility" concept

incorporated into the Factoring Agreements. For one thing, the definition of "Eligible Accounts" provided that there "may" be excluded from eligibility any invoices over 90 days old and any invoices in dispute. *Id.* (**Annex A thereto**). Additionally, there was a defined term for "Available Funds." While confusing, the "Available Funds" term contemplates a formula whereby many items would be subtracted when calculating available funding for the Company including "(iv) any and all expenses arising in connection with the [Factoring] Agreement; (v) any and all fees; (vi) all other costs or expenses incurred by Purchaser; and (vii) Purchaser's right to use such Available Funds to secure any Obligation." *Id.* The Factoring Agreements were yet more confusing because "[Republic] had the right to require that Advances on any Accounts be Chargedback [sic] at any time, either before or after maturity, for any reason." *Id.* (**Section 9.5**). Purchaser [Republic] also had the right to "set a funding limit for each Account Debtor." *Id.* (**Section 9.7**). Also "[a]ll Advances and distribution of Available Funds shall be subject to Purchaser's right to maintain a Reserve. . . . Purchaser may, in its sole and exclusive discretion, increase or decrease such Reserve as Purchaser may deem necessary to protect Purchaser's interests." *Id.* (**Section 4**).

43.     While there were many eligibility and funding restrictions that worked in favor of Republic, the Factoring Agreements made clear that Republic had the right to buy all of the Company's accounts receivable, that the Company was required to submit an Assignment Schedule to Republic showing all of the accounts receivable with invoices and other documentation, and that upon Seller's submission of an Assignment Schedule, "Purchaser shall be deemed to have purchased the Accounts set forth therein" and Republic was to be deemed to own all such accounts receivable regardless of whether an advance was made on them. *Id.* (**Sections 1.1, 1.2, and 2;** *see also* **Annex A thereto, part C**).

44. Again, assuming that Republic decided an account receivable met all of the eligibility requirements and funding restrictions, the "Advance Rate" on an eligible receivable would be up to 90% of the "Aggregate Net Face Value of Accounts" identified in each Assignment Schedule delivered to the Purchaser." *Id.* (**Section 2.2 & Annex A thereto**).

45. As far as pricing, the Factoring Agreements have fees sprinkled throughout that are hard to track, frankly. The court deciphers at least the following *15 categories of fees and expenses* that Republic intended to charge to the Company (in no particular order—again, since they are somewhat scattered throughout the Factoring Agreements):

(a) <u>Service Fee.</u> .55% on monthly average Net Funds Employed. *Id.* (**Section 2.1b**).

(b) <u>Funding Fee.</u> 2.25% above prime rate for each Account Purchased for which the Seller has received an Advance, which Funding Fee would be calculated on Net Funds Employed and would in no event be less than 5.5%. *Id.* (**Section 2.1c**).

(c) <u>Closing Fee.</u> .5% of the Facility Limit (presumably .5% times $2,500,000 = $12,500). *Id.* (**Section 2.5**).

(d) <u>Sales Term Fee.</u> Never defined, but Section 3 of the Factoring Agreements state that if the Company grants any extension to an account debtor of sales terms with a due date for payment beyond 60 days from the date of invoice without Republic's prior written approval, Republic "reserves the right to assess a "Sales Term Fee.'" *Id.* (**Section 3; *see also* Annex A, Pact C, "Maximum Sales Terms"**).

(e) <u>Minimum Sales Shortfall Fee.</u> Fee incurred in the event the Company experienced a "Minimum Sales Shortfall;" the following formula is used for computing this, which incorporates defined terms scattered throughout the Factoring Agreements: "(Minimum Sales minus Actual Sales) x Purchase Fees, provided, however, that for purposes of

calculating the Minimum Sales Shortfall, Purchase Fees shall not include any Funding Fees." *Id.* **(Annex A, Part C).**

(f) <u>Operational Fees.</u> A very broad defined term that includes such things as search fees, filing fees, financial institution fees, and "all other costs or expenses incurred by [Republic], including but not limited to, all costs and expenses relating to a notice of lien, audit, lien and title examinations, or expenses incurred in protecting and preserving Accounts or the Collateral, and professional fees, including accountant and attorney's fees, related to the foregoing." *Id.* **(Section 3 & Annex A, Part C).**

(g) <u>Default Fees.</u> For unpaid accounts receivable, started at 3% after 30 days late, with incremental 3% Default Fees for each 15-day period thereafter. *Id.* **(Section 7.2).**

(h) <u>Termination Fee.</u> Payable in certain circumstances of an early termination—the higher of (1) 3% of the Facility Limit; (2) 50% of the average monthly Purchase Fees of the 3-month periods prior to the date of such termination multiplied by the remaining month period in the Term or any portion thereof. *Id.* **(Section 8.3 & Annex A, Part C).**

(i) <u>Chargeback Fee.</u> 2% for each Account Purchased that the Company fails to repurchase (Republic had the right to "[c]hargeback at any time" on any Advances it had made "for any reason"). *Id.* **(Section 9.5 & Annex A, Part C).**

(j) <u>Liquidation Administration Fees.</u> 5% of the face value of each unpaid Account during the Liquidation Period. *Id.* **(Annex A, Part C).**

(k) <u>Misdirected Payment Fees.</u> The greater of: (1) 15% of the amount of any payment; or (2) $1,000, which would be assessed in the event the Company received payment on an account payable and did not deliver it to Republic in kind on the next Business Day or 30% of the amount of any such payment "which has been received by [the Company] as a result

of action taken by [the Company] to cause such payment to be made to [the Company] in order to compensate [Republic] for the reasonably likely additional administrative expense caused by this conduct." *Id.* **(Annex A, Part C).**

(l) <u>Missing Payment Notation [sic] Fee.</u> "[S]hall mean fifteen percent (15%) of the amount due on an Account Purchased at the time of purchase." *Id.* **(Annex A, Part C)**. The court cannot find any references to this fee (to understand how/when it is assessed), as it appears to be simply in the Definition section of the Factoring Agreements. However, there is another term in the Definition section of "Payment Notation" as follows: "'Payment Notation" shall mean the following text:  This Account has been assigned and is payable directly to Republic Credit, LLC at Republic Business Credit, LLC at Republic Credit, LLC; P O Box 203152, Dallas, TX, 75320-3153.  All payments must be made to Account No: 4123012635 Bank ABA (WIRE/ACH): 121000248, Benefit of: [the Company], Fax Remittance Advice to: 504.262.8690."

(m)  <u>Over 90 Day Fee.</u>  A fee in the amount of .5% "for each Account Purchased for which [the Company] has received an Advance, which Account represents any [sic] invoice over ninety (90) days old and which fee shall continue at a rate of one half of one percent (0.5%) for each fifteen (15) day period or any portion thereof for as long as such Account Purchased remains over ninety (90) days old, which Over 90 Day Fee shall be an Obligation of [the Company] and which shall be in addition to any other fees due to [Republic] hereunder." *Id.* **(Annex A, Part C).**

(n)  <u>General Fee and Expense Reimbursement.</u>  The Company was also required to reimburse Republic "for all reasonable attorney's fees, court costs and other expense

incurred by Purchaser arising under or related to this Purchase Agreement. *Id.* **(Section 10.4).**

(o) <u>Field Review or Audit Expenses.</u> $800 per day plus travel expenses. *Id.* **(Annex A, Part C)**.

46.     While the Agreements were, again, not a model of clarity (to put it mildly), Buttles credibly testified that he believed that the factoring of accounts receivable would work as follows, based on his communications with Republic:

- Bailey would ship product and send its customer an invoice;
- Bailey simultaneously, or shortly thereafter, would submit the receivable to Republic;
- Republic would promptly examine the receivable and determine whether it was eligible for an advance;
- If eligible, Republic would wire 90% of the receivable to Bailey within 24 hours;
- Customer payment would go to Republic's lockbox; and
- Republic would take its fees from the customer payment and return the balance to Bailey.

47.     The problem, from the court's perception of the evidence, is that: (a) Republic charged fees and expenses with abandon—charging them against accounts receivable collections (without transparency of that); (b) Republic was deeming itself "insecure" almost immediately (despite doing months of due diligence); and (c) Republic was not making advances on accounts receivable with any reliability—certainly not anywhere close to the "up to 90%" Advance Rate—because of either (i) feeling insecure, (ii) deeming accounts ineligible (again, despite months of due diligence), or (iii) deeming itself   "over-advanced"—a term not even defined in the Agreements and never mathematically explained to the Debtors.

### iii.     Republic Analyzes Bailey's Receivables.

48.     Just days prior to signing the Agreements, and unbeknownst to Bailey at the time, Republic personnel became concerned about the collectability of a certain large receivable—the

Company's United States Army receivable (the "Army Receivable"). The Army Receivable amounted to approximately $270,000 out of Bailey's approximately $1 million of accounts receivable. The Army Receivable related to a bullet assembly machine and there had been delays finalizing it and getting paid, due to the Army sending Bailey some wrong specifications. In a series of in-house emails, Republic officers debated whether, and how much, to advance on to the Army Receivable.

49.     Republic's underwriter, LaCour Miller, set out the problem. If Republic made the entire Army Receivable ineligible, Bailey's collateral value would be approximately $50,000 short of the amount necessary to payoff Comerica's working capital loan (and, recall, Comerica maintained a prior lien on accounts receivable and inventory). On the other hand, if Republic gave full credit to the Army Receivable, Republic could advance funds necessary to pay off Comerica and there would still be $213,067.05 of collateral value availability to advance to Bailey:



From: LaCour Miller [mailto:lmiller@republicbc.com]
Sent: Monday, February 23, 2015 7:50 AM
To: Allen E. Frederic Jr.; Stewart Chesters; Melissa Baines; Diane Josephik
Subject: Bailey Tool

All,

We have received updated financials and the A/P Aging from Bailey Tool. We also received information regarding its two largest invoices which are with the Army.

I am a bit concerned about the Army invoices as they account for approximately $270K of the $1MM in A/R. These invoices are related to the BAM (bullet assembly machine) project. The project ran into issues and was delayed as a result of the Army providing Bailey Tool with lead projectiles that were not to specification. In addition, the invoices have not been provided to the Army because Bailey's attorney is working to add damages that resulted from the delays to the amount owed. I would say that we simply make these invoices ineligible until any issues are resolved, but I am not sure if we make them completely ineligible that we will have enough to make the payoff to Comerica.

• • •

Best Regards,

LaCour Miller

TR 521

Republic Business Credit, LLC
201 St. Charles Avenue, Suite 2210
New Orleans, LA 70170

**TR 521**.

50.    Republic's management, CEO Stuart Chesters, chose to "mitigate risk" with a work-around of sorts.  Rather than declaring the Army Receivable ineligible, and rather than advancing against it at the 90% rate discussed at Section 2.2 of the Factoring Agreements, Republic would make a 65% advance on the Army Receivable:

| From: | Stewart Chesters <schesters@republicbc.com> |
|---|---|
| Sent time: | 02/24/2015 03:19:23 PM |
| To: | LaCour Miller <lmiller@republicbc.com> |
| Cc: | Allen E. Frederic Jr. <afrederic@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com>; Danika Louis <dlouis@republicbc.com> |
| Subject: | Re: Bailey Tool Borrowing Base |

My feeling would be to give 65% advance on Army stuff. That should give them 100-125 over and above payoff, we are mitigating risk. But in essence it is understood that we are effictively collateralizing an overadvance.

*See* **TR 524**.

51.    To be clear, Republic was not required to factor at the rate of 90%. This was simply the reasonable expectation of the Company of what would happen, based on Section 2.2 of the Factoring Agreements and the parties' negotiations. **TR 51, 52, 53 (Section 2.2 therein of each) & TR 166**.

52.    Republic COO Allen Frederic added that, in addition to the lower advance rate, Republic could further protect itself by making the receivables ineligible "***at a later date***:"

| From: | Stewart Chesters <schesters@republicbc.com> |
|---|---|
| Sent time: | 02/23/2015 11:49:07 AM |
| To: | Allen Frederic <afrederic@republicbc.com> |
| Cc: | LaCour Miller <lmiller@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com> |
| Subject: | Re: Bailey Tool |

I concur with Allen. When we have payoff number lets have brief meeting to look at numbers on A/R and Inventory.

On Mon, Feb 23, 2015 at 9:43 AM, Allen Frederic <afrederic@republicbc.com> wrote:

Depending on info we receive, use lower advance rate on those invoices. This is better than doing overadvance although we may make them ineligible at a later date. Let me and STEWART KNOW GAP BETWEEN REAL ELIGIBLES AND OAYOFF AMOUNT

*See* **TR 521**.

53.    No one at Republic told the Company or Buttles about the discussions and concerns regarding the Army Receivable. More importantly, Republic did not tell Bailey or Buttles that

Republic was contemplating categorizing the Army Receivable ineligible soon after the deal was signed.

54. The Trustee argues the "eligible/ineligible" assessment that Republic made as to accounts receivable was a very subjective, arbitrary exercise in which Republic began to engage almost immediately, and throughout the relationship with Bailey, such that Republic was not acting in good faith and was limiting the advances to Bailey to well below 90%.

55. As some evidence of this, the Trustee points to Allen Frederic wanting to know what the "REAL ELIGIBLES" were on February 23, 2015, just prior to entering into the Agreements on February 25, 2015.

| From: | Stewart Chesters <schesters@republicbc.com> |
| --- | --- |
| Sent time: | 02/23/2015 11:49:07 AM |
| To: | Allen Frederic <afrederic@republicbc.com> |
| Cc: | LaCour Miller <lmiller@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com> |
| Subject: | Re: Bailey Tool |

I concur with Allen. When we have payoff number lets have brief meeting to look at numbers on A/R and Inventory.

On Mon, Feb 23, 2015 at 9:43 AM, Allen Frederic <afrederic@republicbc.com> wrote:

Depending on info we receive, use lower advance rate on those invoices. This is better than doing overadvance although we may make them ineligible at a later date. Let me and STEWART KNOW GAP BETWEEN REAL ELIGIBLES AND OAYOFF AMOUNT

*See* **TR 521**.

56. Again, none of Republic's behind-the-scenes concerns about the large Army Receivable, in the days leading up to the closing on the Agreements, was shared with Bailey. Instead, on February 24, 2015, Republic sent (along with the transactional documents for signature) a Borrowing Base Certificate to Bailey showing that Bailey would have some borrowing availability after the takeout of Comerica (with only $17,000 in ineligible accounts). *See, e.g.,* **TR 718** (February 25, 2015 e-mail from LaCour Miller to Jeff Worley of Bailey, with attached borrowing base).

57.     To be clear, the Borrowing Base Certificate anticipated there would be $624,700 borrowing availability on February 24, 2015, $500,000 of which related to the inventory borrowing base and $124,700 of which related to the accounts receivable borrowing base.

58.     The court finds that the Company and Buttles reasonably relied on Republic's representations and the Borrowing Base Certificate described above (**TR 718**), when on February 27, 2015, the Company and Buttles signed the Factoring Agreements, the Inventory Loan Agreements, and Buttles' personal guaranty, effective on February 25, 2015. *See* **TR 51-57**.  At the time, the Company reasonably believed and understood that only $17,000 of its accounts receivable would be considered ineligible by Republic, going forward after Republic paid Comerica.

59.     Soon after the Agreements were signed, on or about March 3, 2015, Republic paid off Comerica (in connection with Comerica's prior revolving credit loan to the Company that was secured by inventory and accounts receivable) in the amount of approximately $1,258,000. **TR 703**.

60.     Then, just days thereafter, in mid-March 2015, Bailey made its first draw request, expecting availability in the range of the Borrowing Base Certificate received on February 25, 2015. In fact, it appears from the evidence (email correspondence) there may have been yet another Borrowing Base Certificate prepared by Republic at closing showing only $2,000 of ineligible accounts receivable, and still another borrowing base prepared by Republic in early March 2015 showing $134,000 of borrowing base availability for the Company. The Company requested $135,000 of funding around that time frame (the Company's first request for funding). **TR 719**.

61.     In response, Republic's Relationship Manager Vanessa Blade sent a Borrowing Base Certificate showing that Bailey's ineligible accounts had jumped from $17,000 on February

24, 2015 (immediately prior to closing; apparently the number Republic used in its actual closing

borrowing base for ineligibles was only $2,000), to **$142,310.87** on March 12, 2015, and further

showed **negative availability of $342,978.27 for purposes of account receivable factoring**. **See**

**TR 715**. Only then did Bailey learn that, once it had signed the Factoring Agreements, Republic

had internally decided that the Army Receivable should not be considered an "eligible receivable."

62. Bailey promptly brought the issue to Republic's attention:

| Message | |
|---|---|
| From: | Jeff Worley [jworley@baileytool.com] |
| Sent: | 3/18/2015 7:37:35 AM |
| To: | LaCour Miller [lmiller@republicbc.com] |
| CC: | John Buttles [jbuttles@baileytool.com] |
| Subject: | Re: Republic Business Credit |

Just wanted to keep you updated on a few post closing items. I have been working with Vanessa and her group on this, except the potential for additional funding on the PO piece, just want to make sure we are all on the same page.

- I am working on missing invoices and post closing recon on the borrowing base. Because the closing was delayed there are missing invoices and payments that came in prior to closing. I am through most of this now and sent over an assignment schedule yesterday for Bailey and will send over more invoices today for Hunt to Vanessa.
- One item that we are discussing with Vanessa is the Ineligible accounts, that were projected at $2k in the closing borrowing base you prepared and was at $134k in the last BB we received from Vanessa's group last week. Tenneco are largest customer who plays like clock work and the US Govt were included. I am not sure why that changed, but I may need for you to intercede in the future on this, as I don't remember these invoices being an issue. Obviously $130k+ in liquidity is a big deal to us right now.

**See TR 719** ("US Govt" refers to the Army Receivable).

63. Despite Bailey's questioning of the sudden decision to categorize the Army

Receivable as ineligible (a receivable that Bailey felt sure would be collected), Republic would

not restore the Army Receivable to eligible status and, thus, Bailey had lower availability than it

had anticipated.

64. As best this court can decipher from convoluted testimony on the subject, Republic

considered itself to be in an "over-advanced" position **almost immediately** after the parties

executed their transaction documents. While "over-advanced" or "over-advance" are not defined

terms in the Agreements, they are terms that Republic (through witness Melissa Baines) frequently

used in testimony. Melissa Baines testified that "over-advance" was a concept that meant Republic's collateral was insufficient to cover funds Republic had "employed." In any event, when Bailey apparently continued to ask for funds, Bailey obtained a wire for $135,000, but Republic treated such funds as an "over-advance"—requiring in connection therewith a "Service Fee 2.0% of over-advance balance each 30 days or partial increment thereof Prime + 9.75% based on 360 days amortization on actual daily balance." This "over-advance" was represented by a separate document entitled "Over-Advance Approval" which was signed by Bailey and dated April 14, 2015. **DX-336 & TR 529**. While other funding extensions during the parties' relationship were referred to as "over-advances" by Republic, this first one that it regarded as such was the only one that was specially documented as an "over-advance."[4]

65.     In April 2015, Bailey had an excellent month and billed $755,000 in Receivables, but advances made by Republic were only at a 70% rate on these ($532,671.28 of advances were made). **TR 817**. Buttles credibly testified that he believed Republic almost immediately imposed a new deal on Bailey (in mid-March) that was not the one that Bailey had signed up for a mere three weeks before. The lower-than-anticipated funding in April, coupled with Republic's unexpected stance that the Army Receivable should be categorized as "ineligible," put Bailey in a position of distress that it had not anticipated just two months into the relationship.

66.     Bailey felt stuck: its old Comerica revolver no longer existed, and it had to make the best of the new situation until it could move the relationship to Regions Bank. Accordingly,

---

[4] While the evidence was not entirely clear, it appears to the court that Republic may have capitulated on the $135,000, since the delay in collecting the Army Receivable was indisputably brought on by the Army giving Bailey some wrong specifications for a bullet assembly machine that the Army was acquiring from Bailey. To be clear, the delay in finishing the product and collecting the Army Receivable was not at all Bailey's fault. Additionally, Republic may have believed that Bailey's inventory had value (even if the accounts receivable were upside down).

the Company moved ahead, having to deal with funds suddenly less available and costing much more.

67.     By the end of June 2015 (just four months into the relationship), Bailey was in a precarious cash position.

### iv.     Republic Declares Default and Essentially Takes Control of Bailey's Business.

#### 1)     The Quick Downward Spiral

68.     The consequences of Republic's early decisions that: (a) the Army Receivable should be treated ineligible; (b) it should treat itself as in an "over-advanced" position; and (c) it should not advance anywhere close to 90% on accounts receivable were significant and adverse for Bailey.

69.     Among other things, Bailey had an overdue property tax obligation owing to Dallas County (for the 2013 calendar year), on which it had a payment plan in place to pay $20,000 per month. Barely two months after entering into the Agreements with Republic, Bailey did not have the cash to meet the full May installment of its tax payment plan with Dallas County and, in June, it could not make its monthly payment to it.   Republic knew about these tax payments and had even agreed internally to make them for Bailey. **TR 509**.

70.     Additionally, Comerica remained as a lender to the Company on a term loan, as to which it had a first security position on equipment and real estate (Comerica's line of credit secured by accounts receivable and inventory had, of course, been paid off in connection with the Republic Agreements).   On June 29, 2015, Comerica sent Bailey and Buttles a letter which stated that an event of default had occurred under its term loan, based on the fact that Bailey had accumulated yet more unpaid property taxes (owed for the 2014 calendar year) and gave Bailey a month to either pay them or file a letter memorializing an agreement with the taxing authorities for a payout. A copy of the Comerica conditional default letter was sent to Republic. **TR 795**.

71.     On July 9, 2015, Republic declared a default under its various Agreements because of the default declared by Comerica in its June 29, 2015 letter, and gave the Company until July 31, 2015 to cure the defaults with Comerica.  **DX 100**.

72.     After Republic received its copy of the June 29, 2015 Comerica letter, Republic took the following actions:

a.      On July 2, 2015, Republic stopped advancing any funds to Bailey. **Testimony of Melissa Baines**. From this date forward, Republic *never advanced funds to the Company directly ever again*.

b.      On July 7, 2015, without notice to Bailey, Republic transferred $76,473.60 of Bailey Accounts Receivables collections (that were in Republic's lockbox, where collections went) to itself to pay down the indebtedness on the Company's Inventory Loans. **TR 816; Testimony of Melissa Baines**.

| Date | Batch ID | Type | Purchases | Gross Receipts | Discounts | Other | A/R Adj | Funding | Cash Receipts | Charges/Fees | Expenses | Adjustments | A/R Bal | Funding Bal | Reserve |
|------|----------|------|-----------|----------------|-----------|-------|---------|---------|---------------|--------------|----------|-------------|---------|-------------|---------|
| 3/4/2015 | 101 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | 500,000.00 | -- | 500,000.00 | (500,000.00) |
| 3/4/2015 | 0 | CHK | -- | -- | -- | -- | -- | -- | -- | -- | 2,500.00 | -- | 502,500.00 | (502,500.00) |
| 3/5/2015 | 102 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (2,500.00) | -- | 500,000.00 | (500,000.00) |
| 3/31/2015 | 103 | FEE | -- | -- | -- | -- | -- | -- | -- | 4,706.40 | -- | -- | 504,706.40 | (504,706.40) |
| 4/23/2015 | 105 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (4,706.40) | -- | 500,000.00 | (500,000.00) |
| 4/30/2015 | 106 | FEE | -- | -- | -- | -- | -- | -- | -- | 5,076.47 | -- | -- | 505,076.47 | (505,076.47) |
| 5/31/2015 | 107 | FEE | -- | -- | -- | -- | -- | -- | -- | 5,262.62 | -- | -- | 510,339.09 | (510,339.09) |
| 6/10/2015 | 108 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (12,054.40) | -- | 498,284.69 | (498,284.69) |
| 6/30/2015 | 109 | FEE | -- | -- | -- | -- | -- | -- | -- | 5,060.84 | -- | -- | 503,345.53 | (503,345.53) |
| 7/6/2015 | 110 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (3,345.53) | -- | 500,000.00 | (500,000.00) |
| 7/7/2015 | 111 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (76,473.60) | -- | 423,526.40 | (423,526.40) |
| 7/16/2015 | 112 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (147,751.20) | -- | 275,775.20 | (275,775.20) |
| 7/16/2015 | 113 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (25,661.47) | -- | 250,113.73 | (250,113.73) |
| 7/31/2015 | 114 | FEE | -- | -- | -- | -- | -- | -- | -- | 3,640.18 | -- | -- | 253,753.91 | (253,753.91) |
| 8/11/2015 | 115 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (20,000.00) | -- | 233,753.91 | (233,753.91) |
| 8/31/2015 | 117 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (15,000.00) | -- | 218,753.91 | (218,753.91) |
| 8/31/2015 | 118 | FEE | -- | -- | -- | -- | -- | -- | -- | 2,497.77 | -- | -- | 221,251.68 | (221,251.68) |
| 9/30/2015 | 119 | FEE | -- | -- | -- | -- | -- | -- | -- | 2,230.95 | -- | -- | 223,482.63 | (223,482.63) |
| 10/1/2015 | 120 | FEE | -- | -- | -- | -- | -- | -- | -- | 75.12 | -- | -- | 223,557.75 | (223,557.75) |
| 10/2/2015 | 123 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | (223,557.75) | -- | -- | -- |
| | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28,550.35 | 0.00 | (28,550.35) | 0.00 | 7,348,221.30 | (7,348,221.30) |

**TR 816**. The normal terms of the Inventory Loan Agreements were that only monthly payments of interest were due, with principal not due until maturity (although Republic did have discretion to pay amounts owing under the Inventory Loan Agreements from amounts

that would otherwise be payable to the Company under the Factoring Agreements). **TR 54, 55 & 56 (Sections 2.4 & 2.9)**.

c. In a phone call on July 9, 2015, Melissa Baines informed the Company (Jeff Worley and John Buttles) that Republic was not going to advance any funds that would be necessary for the Company to make payroll the next day because Bailey was "over-advanced" and had no "availability." **Testimony of Melissa Baines; DX 99**.

d. Yet, that same day, July 9, 2015, in which Melissa Baines informed the Company that it had no "availability," she drafted and sent an email to her superiors at Republic indicating that "we are in the best position we have been in right now with around $100k in availability on A/R."[5] **TR 557**.

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/9/2015 12:51:06 PM |
| To: | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| CC: | Vanessa Blade [vblade@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| Subject: | RE: BTM |

My further thoughts...

1. We are in the best position we have been in right now with around $100k in availability on A/R (if we would be comfortable putting the inventory back at $500k until 7/31/2015, as previously discussed with BTM). This is assuming they get the $164k DFAS invoice properly uploaded into the WAWF system for payment.
2. We are not really in a position to shut them down in an orderly way, allowing us to secure the inventory, which could cost us in the liquidation. (however, LaCour and Cole confirmed they could both be on a plane this afternoon, if needed)

**TR 557**.

e. In any event, without the benefit of the $76,473 of Accounts Receivable collections (that Republic had used on July 7, 2015 to pay down the Company's Inventory

---

[5] Melissa Baines testified as an adverse witness under questioning from Bailey's counsel on the first day of trial that she was scrupulously truthful and precise in internal e-mails regarding sums of money to Mr. Frederic and Mr. Chesters.

Loans), and without the benefit of the $100,000 of borrowing availability mentioned in the July 9, 2015 email, the Company was unable to make the July 10, 2015 payroll.

        f.        Thus, on July 10, 2015, the Company's payroll was missed, the employees walked out, and the plant was shut down.

        g.        Also on July 10, 2015, Bailey received another default letter from Republic's counsel.  **DX 104**.  The letter stated:

> This letter is formal notice of Events of Default by each of Bailey, Cafarelli and Hunt Hinges (the "Affiliated Entities" and each an "Affiliated Entity") under its respective Purchase Agreement and Loan Agreement.  Each of the Affiliated Entities has effectively ceased to trade due to an Insolvency Event (as defined in each Purchase Agreement) and is unable to pay the Obligations due and owing to RBC under its respective Purchase Agreement and Loan Agreement.

**DX 104**.

        h.        The statement that Bailey had "ceased to trade" referred to the missed payroll and the resulting plant shutdown.

        i.        The timing of the refusal to advance funds—resulting in the missed payroll and plant shutdown—and then the second default letter calling a default (essentially because of the shutdown), all occurred within less than 24 hours.

        j.        Melissa Baines gave testimony at Trial indicating that a valuation report for the Company's inventory that Republic received in June 2015, performed by the advisory firm Hilco, was part of the reason Republic felt "insecurity," which she testified could also be an event of default.  However, on July 9, 2015, one day before receipt of the second default letter, a 50-minute telephone conversation occurred, a portion of which was played to the court by Republic.  **DX 99**.  There was no mention in the call of the Hilco report or its being the cause of some "insecurity" on the part of Republic.  More importantly, the default letter of July 10, 2015 makes no mention of the Hilco Report or the Inventory Loan.

k.      On July 13, 2015, Melissa Baines, in a telephone call with John Buttles, asked for additional collateral, ***including John Buttles' homestead***. **TR 297/DX 177**.

l.      On July 16, 2015, Republic made still more payments to itself from Bailey's Accounts Receivables lockbox to further pay down the inventory loan: a payment of $147,751.20 and another payment of $25,661.47. **TR 816; Testimony of Melissa Baines**.

m.      To be clear, in the roughly two-week period after Comerica sent a letter to Bailey and Buttles (copying Republic) regarding Bailey's unpaid 2014 property taxes (giving Bailey a month to either pay them or file a letter memorializing an agreement with the taxing authorities for a payout—and, of course, Bailey had reached payout agreements in the past), Republic wastes no time: (i) it declares a default under its own Agreements because of the unpaid taxes; (ii) it applies a total of $249,886.27 of collections on Bailey Accounts Receivable to indebtedness on the Inventory Loans; (iii) it stops all funding to Bailey; and (iv) it declares a second default when Bailey shuts down (*i.e.,* "ceased to trade" because it had no funding and could not pay its employees. ***This was the beginning of the end for Bailey—approximately four months into the Republic relationship***.

n.      While the relationship continued with Republic for a while after these events, the course of conduct became quite different. After July 2, 2015, Republic never made any advances to the Company directly (after some delay in any funding, it began paying select payroll, vendors, and other parties of Republic's choosing).

o.      Republic also became involved in trying to get management of its choosing in the Company and otherwise micromanaging the Company. And, it began putting pressure on Buttles to give Republic a lien on his exempt homestead—all as further set forth below.

p.      On July 13, 2015, Republic funded directly "critical payroll" and a materials supplier. But the temporary July shutdown and related delays in work and fulfilling orders led to the lowest dollar amount of new invoices in the month of August 2015, at only $486,008.32. **TR 817**.

q.      On July 23, 2015, Melissa Baines drafted and sent an internal memo to Allen Frederic of Republic. **TR 749**.  The memo highlights at least a couple of things to this court.  First, it shows how things were pivoting in July to Republic micromanaging the Company—which seems rather shocking, that this could all be triggered by one letter from Comerica regarding unpaid 2014 taxes (as a reminder, Comerica no longer had a lien on inventory or accounts receivable; as a further reminder, Republic had indicated pre-closing that it would likely pay property taxes itself directly). **TR 509.** Second, despite Republic's representations to the Company, Republic internally thought that there was "availability" to factor receivables. **TR 749**.

Message

| | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/23/2015 3:25:23 PM |
| To: | Allen Frederic [afrederic@republicbc.com] |
| CC: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | Bailey Tool |

Hi Allen,

We were able to fund the last week critical payroll and material supplier to get aluminum and stainless steel released from their main supplier (with signed agreement and confirmation that all materials were approved and en route) for a total of $38k.  We have $20k remaining in availability on the account, and we have received additional billing from work completed this week of $155k.

We should, at the end of today, have approximately $159k in availability.  There is a $40k payroll request that needs to be funded by 3:30pm directly to the payroll company for this week's payroll (this is reduced by $35k from previous payroll requests).  I would be okay with this given the additional collateral that has been generated, but I have prepared them that this wire may not be processed, as I am also always weary and have no issue telling them they are not going to have the payroll checks for this week until Monday.

Thank you,

Melissa Baines
Risk Manager

**TR 749**.

r.    On July 24, 2015, Allen Frederic and Melissa Baines conducted a phone call to start the process to convince a fellow named Bob McGovern (a consultant working for Buttles), to take over the sole decision-making and executive functions of Bailey. **TR 308**. In that call Allen Frederic stated that because he got tired of Buttles, he "shut it [Bailey] down." He also stated that Republic was not going to approve any funds in the future for payments on property taxes or to pay a certain SBA loan, and he knew the SBA was not going to sit there forever and do nothing. None of this information was passed on to Buttles. **Testimony of Bob McGovern.**

73.    The court finds that Republic did, indeed, cause the shutdown of Bailey in July 2015 as indicated by Mr. Frederic in the call. **TR 308**. Bailey appears to have had actual availability of accounts receivable throughout the month of July. **TR 816, TR 557, TR 749**.

### 2)    If There Was Unavailability at Any Time in July 2015, the Cause Was Republic's Payment to Itself

74.    As referenced above, Republic made large paydowns to itself on the Inventory Loan facility in July—from accounts receivables collections—just after the Comerica letter regarding unpaid 2014 property taxes and at a time when Republic had cut off funding to Bailey, alleging lack of "availability." It is clear that Republic began to substantially improve its own position, to Bailey's detriment.

a.    Specifically, Republic paid itself approximately $76,473.60 on July 7, 2015 to reduce the outstanding balance on its Inventory Loan facility (on which only monthly interest payments were typically due prior to maturity, per its terms). **TR 816**. To be clear, Republic paid itself these monies from Bailey's accounts receivable collections that might otherwise be available to the Company pursuant to the factoring arrangements.

b.      It appears to the court from the evidence that the payment on July 7 was not disclosed to Bailey, despite Republic and Bailey being in daily and almost constant communication during this time.  Instead, Bailey was told consistently and repeatedly that it was in an "over-advanced" position and had no availability under the Factoring Agreements to fund operations.  But Republic's own internal records revealed that by July 9, 2015, Republic was in the best collateral position it had been in on the loan since the beginning of the relationship.  The court finds that this was intentionally not communicated to Bailey.  **TR 557**.

c.      The following week, on July 16, 2015, Republic again paid itself on the Inventory Loan facility from Bailey's accounts receivable collections.  Republic paid itself down an additional $173,412.67.  **TR 816**.  It appears from the evidence that these payments were also made without any specific notice to Bailey.  All told, Republic paid itself $249,886.27 in the time period between July 7 and July 16, 2015, to reduce an outstanding balance on the Inventory Loans.

75.     Bailey Actually Had Availability.

a.      On July 7, 2015, Republic's own documents show, and Ms. Baines confirmed in her Trial testimony, that Bailey had approximately $76,259.65 of funds available for release before Republic paid itself down on the inventory loan. On July 9, 2015, Ms. Baines testified that Bailey still had approximately $55,698.01 in available funds. She further testified that if the $76,473.60 inventory paydown had been reversed, the Company would have had in excess of $130,000 in availability. **Testimony of Melissa Baines; TR 557**.

b.     Instead of having between $75,000 and $130,000 in available funds to be released to fund operations, Bailey missed a payroll, was forced to shut down and had customer relationships impaired—according to the credible testimony of Buttles. Meanwhile, Republic was steadily improving its own collateral position and collecting payments without any kind of transparency to Bailey. There was some testimony from Melissa Baines that Republic had a "portal" on which information was constantly available to customers. The court finds the testimony of Mr. Buttles to be compelling that the Republic portal was incomprehensible. The court was shown some screen shots of it and the court agrees. The court was provided very little evidence regarding what was accessible on the portal and how user-friendly it may have been. The court believes Mr. Buttles that it was not at all transparent—particularly considering the examples that were presented to the court.

c.     By July 23, 2015, Bailey's true availability had grown to $159,000.00, as proven by Republic's internal communications and, all along, Republic repeatedly told Bailey it had no availability. **TR 749**.

76.     After the cessation of funding and temporary shutdown in July, as alluded to above, Republic eventually began to fund again—but in a micro-managing sort of way. Republic took complete and total control of Bailey's cash. It controlled not only the collections through the lockbox as it had before but now controlled all disbursements, too. To be clear, all funds advanced from that point forward were sent directly to Bailey's vendors, payroll company, etc. by Republic.

77.     Republic's new protocol appears to have been not only different from the past, but inconsistent with the parties' Agreements—specifically, the Factoring Agreements contemplated that Republic would "pay to Seller [the Company] an Advance." **TR 51, 52 & 53 (Section 2)**.

Melissa Baines acknowledged that the Agreements were never amended to reflect the new procedure. **Testimony of Melissa Baines**.

78.     Additionally, while Republic began funding again, it essentially ceased acting as a factor. In other words, ***advances were not tied in any manner to the receivables purchased***. Instead, Republic required Bailey to provide a list of ***payables*** to Republic on a daily or weekly basis. Melissa Baines of Republic would then decide which of Bailey's payables she would pay, based on whether or not the payable itself would generate new receivables.

79.     Ms. Baines summarized Republic's new view of the "factoring" arrangement in a July 10, 2015 e-mail to Buttles. **TR 688**.

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/10/2015 12:22:11 PM |
| To: | John Buttles [jbuttles@baileytool.com]; Jeff Worley [jworley@baileytool.com] |
| CC: | Danika louis [dlouis@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| Subject: | RE: BTM |

Hi John,

Please confirm my understanding from our earlier conversation. It is expected there will be additional critical funds needed, not just the c$6,300 Fuchs payment, to generate $75,000 in receivables.

Maybe a better way to back into this is to start with the in-house orders that you could have the ability to produce and will be accepted by the customers. For example, if you have $100,000 in confirmed orders in-house that could be produced and shipped next week, how much in absolutely critical payments will be requested from Republic to generate that $100,000 in orders? The goal, of course, being a significant positive margin between receivables generated and RBC's cash outlay. And, are these orders going to be accepted by the customers without penalties or counter-claims taken against the payments if they are shipped past the need-by date?

Please let me know if you need further clarification as to the information I am requesting.

Regards,

**Melissa Baines**
**Risk Manager**

**TR 688**.

80.     Since advances were no longer based on receivables but were based upon whether a certain type of expenditure might be "absolutely critical" toward generating a good, dependable

receivable, the new oversight process caused huge delays. It disrupted normal production schedules that in some cases had worked successfully for decades. These factors caused deliveries to be late and customers to become dissatisfied and to look elsewhere for a supplier. **Testimony of John Buttles and Bob McGovern.**

> **3)** **Republic Essentially Took Over the Management of the Manufacturing Function of Bailey**

81. Besides micromanaging which of the Company's expenses should be paid (and paying them directly), Republic began micromanaging Bailey's manufacturing. Melissa Baines testified that she had no formal education or practical experience in managing or running a manufacturing business.

82. As one example, in mid-July 2015 (soon after Republic had ceased factoring), Bailey needed oil to run all of its manufacturing machines. Bailey owed money to its oil supplier, Fuchs. Rather than advancing funds directly to Bailey so Bailey could pay Fuchs and obtain the much-needed oil so its machinery could run, Republic required an explanation of "how much" in receivables would be generated if Republic paid the oil supplier:

---

**From:** mbaines@republicbc.com [mailto:mbaines@republicbc.com]
**Sent:** Wednesday, July 08, 2015 12:13 PM
**To:** John Buttles
**Cc:** Danika Louis; Bob McGovern; Jeff Worley; Melissa Baines
**Subject:** Re: Bailey tools press down

Hi John,

I really need an understanding of how much in $ will be generated if we wire $10,000 to the oil supplier. Can you provide me with an estimate on this?

Thank you,

Melissa Baines
Republic Business Credit, LLC

---

**TR 116**.

83.     Bailey needed that $10,000 to buy oil, so that its machines could operate and fill whatever orders had been placed. Without that $10,000 for oil, no production of any kind could take place because the machines could not be run without oil. They would burn up. Apparently, Republic had no appreciation of this. **Testimony of John Buttles.**

84.     On July 13, 2015, Republic also micromanaged the decision as whether Bailey should receive $2,330 of funding so that an electric motor could be retrieved from a repair shop to run a machine at Bailey. The Bailey machine to which the motor related was used to make parts for an important customer of Bailey: Trane Air Conditioning. If Trane did not get the parts it had ordered from Bailey, not only would this extinguish a receivable that Bailey would otherwise have, but Trane itself would have to shut down its own production line.

---

From: John Buttles [mailto:jbuttles@baileytool.com]
Sent: Monday, July 13, 2015 5:18 AM
To: Danika Louis; Melissa Baines; Bob McGovern
Subject: Fwd: Bailey tools press down

This has stop do with the motor rewind - this press produces parts for Trane air conditioning compressor production.

I emailed you the vendor invoice and the Letter of Direction on Friday.

Trane will be calling us at 10am I believe - please note they say they are shutting down die to lack of parts.

This invoice needs to be paid so we can pick that motor up and return to production.

John Buttles

Begin forwarded message:

    From: Rudy Cortez <rcortez@baileytool.com>
    Date: July 10, 2015 at 3:46:59 PM CDT
    To: John Buttles <jbuttles@baileytool.com>
    Subject: Fwd: Bailey tools press down

    Fyi) Trane.

---

-------- Original message --------
From: "Paez, Julio" <JULIO.PAEZ@IRCO.COM>
Date:07/10/2015 3:43 PM (GMT-06:00)
To: Rudy Cortez <rcortez@baileytool.com>, "Beltran, Claudia Elena"
<ClaudiaElena.Beltran@irco.com>, George Diaz <gdiaz@baileytool.com>
Cc: "Tesh, Danny" <Danny_Tesh@irco.com>, "Quiroga, Ricardo"
<Ricardo.Quiroga@irco.com>, "Edwards, Daniel" <Daniel_Edwards@irco.com>
Subject: RE: Bailey tools press down

Rudy,
We need to know when you'll be able to ship, Monday, Tuesday?
I need to plan for people, plant will be shutting down Monday by the end of the shift?
Thanks,

Julio Paez
Materials Planning Manager

**TR 120.**

85.    Ms. Baines wanted to know how much in receivables would be generated if Republic allowed the $2,330 expenditure.

On Jul 13, 2015, at 9:10 AM, Melissa Baines <mbaines@republicbc.com> wrote:

John,

We want to help you get up and running; however, you have not provided the necessary information for us to do this.

I must have a complete schedule of required, critical payments that need to be made in order to produce xx dollars in accounts receivable. As I understand it, it is going to cost more than just the part cost to get invoices generated. If I am mistaken about this, and all you require to start generating invoicing is $2,330 to get the machine up and running, please let me know ASAP, along with how much in billing (conservatively) will be generated by that one payment before Friday.

Have you spoken to any of the employees to gain their support to work with you, at least, through Tuesday's REA settlement conference?

Regards,

Melissa Baines
Risk Manager

**TR 120**.

86.     Delays caused by Republic's new protocol of dictating who got paid and when caused resulting delays with various of the Company's long-standing customers and damaged the Company's relations with those customers. For example:

a.     The Tulsa, Oklahoma plant of long-standing customer Tenneco was nearly shut down. **TR 781**.

b.     Tenneco's line for Harley Davidson was almost shut down because of the need for some inexpensive fasteners. **TR 45**.

87.     Buttles credibly testified that in the "Just in Time" world of manufacturing, "almost late" will cause customers to look elsewhere for supply.

### 4)     Peterbilt Truck Steps

88.     At one point in July 2015, Mr. Buttles, feeling pressure to pay his employees, collected $10,000 of funds owed to Bailey from a scrap dealer it used, and used it to pay employees in cash in order to complete production on certain truck steps that the Company manufactured for customer Peterbilt, so that the Peterbilt line did not have to be shut down at its two million square foot factory. Peterbilt was a customer from whom the Company received an average of $50,000 per month of receivables. **Testimony of John Buttles.** Republic learned of this and became furious (as it was a cash transaction and Republic believed the $10,000 should be viewed as its collateral; Mr. Buttles credibly testified that the money owing to the Company from the scrap dealer dated back to a pre-Republic time period). It is quite clear to the court that Republic's behavior starting in July 2015 caused delays and problems for Bailey with its customers. **TR 585 & 121**.

89.     Republic's control of disbursements did not stop at vendors. It permeated every last detail of the Company's operations. Republic even micromanaged the Company's purchase of basic office supplies.

Findings of Fact and Conclusions of Law                    Page 43

90.　In one instance, Republic refused to allow Bailey to purchase Gatorade for the Bailey workers who worked in the un-air-conditioned shop in Texas in August, referring to it as a luxury item.



**TR 622**.

91.　Republic also criticized Bailey for desiring to enter into payment plans with critical suppliers, suggesting instead that finding a new supplier was more favorable than paying past due debts:

| Message | |
| --- | --- |
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 8/28/2015 9:29:09 AM |
| **To:** | Bob McGovern [rjmcgovern@msn.com] |
| **CC:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | RE: RE: RE: Samuel and Sons |

Thank you, Bob.

I understand the pressures from those critical suppliers, but I hope you understand that these need to be weeded out. All other avenues of dealing with these situations (i.e. replacing the supplier) need to be attempted before we start looking to pay past dues. I agree that the risk Comerica is going to have a large issue with paying a supplier before them is very real. And, they may not only have an issue with Bailey...chances are they'd be upset with RBC, which is not good for anyone in this situation right now.

**TR 619**.

<div align="center">

5)      **Republic's Insertion of Itself into Bailey's Payroll Decisions**

</div>

92.      To be clear, Republic's new protocols were not limited to Bailey's suppliers.

93.      In fact, Republic inserted itself into Bailey's personnel and human resources management, dictating that funding would only be forthcoming from Republic for "actively employed AND critical employees," not those who were "non-engaged (*i.e.*, not showing up on Monday).":

<div style="border:1px solid black; padding:8px;">

Message

| | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 7/23/2015 3:34:53 PM |
| **To:** | jbuttles@baileytool.com; Bob McGovern [rjmcgovern@msn.com] |
| **CC:** | Melissa Baines [mbaines@republicbc.com]; Marilyn Calder [mcalder@baileytool.com]; Gayla Flowers [gflowers@baileytool.com]; Danika Louis [dlouis@republicbc.com] |
| **Subject:** | FW: |
| **Attachments:** | BAILEY CK REGISTER WE 07_12_15.xls; HUNT CK REGISTER WE 07_12_15.xls |

John,

Please confirm that all employees listed as to be paid on the attached payroll registers are actively employed AND critical employees, and please also confirm that none of these amounts are being paid to non-engaged (i.e. not showing up on Monday) or other non-critical payments.

</div>

**TR 717**.

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 7/24/2015 9:40:31 AM |
| **To:** | Bob McGovern [rjmcgovern@msn.com]; John Buttles [jbuttles@baileytool.com] |
| **CC:** | Allen Frederic [afrederic@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | Re: Updated Cash Flow |

Bob and John,

Bob, you and I, recently spoke about communication. We really need to limit the communication coming from your side. I cannot continue to keep up with the volume of emails and requests and comments, and I will not be putting money out the door if I cannot be firm on the cash flow position, which I'm not with the minute by minute play by play. I need one point of communication, whether that continues to be you or Jeff, so we can efficiently process information.

As previously discussed or requested, I still need:

1. An absolute confirmation that the payroll is for essential (i.e. critical) personnel that are adding and will continue adding value to the cash flow in the short term.
2. One email daily which presents a complete list of the day's requests with each line item, including personnel, stating what value it adds to the cash flow to justify each expense. This list should prioritize each line item (with "must be paid by" dates) and the necessary LOD's should be attached.

**TR 587**.

94.     In July 2015, Republic collected a total of $591,212.83 in the Bailey lockbox, the largest collection since the relationship began. **TR 817**.

95.     On July 23, 2015, Melissa Baines wrote internally that Bailey had $159,000 in availability:

---

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/23/2015 3:25:23 PM |
| To: | Allen Frederic [afrederic@republicbc.com] |
| CC: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | Bailey Tool |

Hi Allen,

We were able to fund the last week critical payroll and material supplier to get aluminum and stainless steel released from their main supplier (with signed agreement and confirmation that all materials were approved and en route) for a total of $38k. We have $20k remaining in availability on the account, and we have received additional billing from work completed this week of $155k.

We should, at the end of today, have approximately $159k in availability. There is a $40k payroll request that needs to be funded by 3:30pm directly to the payroll company for this week's payroll (this is reduced by $35k from previous payroll requests). I would be okay with this given the additional collateral that has been generated, but I have prepared them that this wire may not be processed, as I am also always weary and have no issue telling them they are not going to have the payroll checks for this week until Monday.

Thank you,

**Melissa Baines**
**Risk Manager**

---

**TR 749**.

96.    Republic never told Bailey it had any availability.  The totality of the evidence, including the credible testimony of Mr. Buttles and Bob McGovern, was that Republic ***repeatedly*** represented to Bailey it was in default and "over-advanced."

### 6)    Republic's Surreptitious, Attempted Management Changes at Bailey

97.    Not only did Republic insert itself with regard to how many workers should be employed and who got paid, it also secretly communicated with one of Bailey's consultants/managers (Bob McGovern), encouraging him to work with Republic toward replacing Mr. Buttles as president of Bailey and making McGovern the president with sole authority to make business decisions or execute business plans on behalf of Bailey.  This effort began on a phone call on July 24, 2015 (**TR 308**), and was followed up with a request from Melissa Baines and Allen Frederic to meet with Bob McGovern for a "confidential" discussion:



**TR 133**.

98.    A meeting occurred subsequent to the above email, at a location fifteen miles away from Bailey's plant, at the Stoneleigh Hotel in Dallas. The testimony from Melissa Baines and Bob McGovern was consistent that, at the meeting, Melissa Baines and Allen Frederic suggested that McGovern should persuade Buttles to relinquish his role as Bailey's president and chairman, and let McGovern fill those roles.

99.    Republic even supplied Bob McGovern with a draft board resolution and advice about how the bylaws and corporate governance documents should be amended to carry out the plan:

| Message | |
|---|---|
| **From:** | R McGovern [rjmcgovern@msn.com] |
| **Sent:** | 7/31/2015 8:38:02 AM |
| **To:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | Re: Update on Bailey |

Melissa
Am I mistaken, I thought Allen offered and recommended that your legal dept would draft a short agreement that met the need to transfer authority and indemnify.

On Jul 31, 2015 5:34 AM, Melissa Baines <mbaines@republicbc.com> wrote:
Hi Bob,

It was a pleasure meeting you today. I had not seen your email prior to our meeting, and I apologize for not specifically addressing these items. Though, I believe we did touch on some of this.

At this time, the tasks with the most priority are:

1. getting proper authority from John for you to act and execute on behalf of the company. This should easily be taken care of by a resolution (sample previously supplied) whereby making you CEO or President for each corporation. I understand your concern over liabilities, but I would imagine a standard consulting contract should provide you with the necessary hold harmless and indemnification language;

**TR 135**.

100. Melissa Baines then provided Bob McGovern with a corporate resolution making him President of Bailey. **TR 36**. She also advised him on how to change corporate governance documents to make the President the "sole authority" to make business decisions and execute documents on behalf of the corporation. **TR 807**.

**JOINT ACTION BY WRITTEN CONSENT
OF ALL OF THE
SHAREHOLDERS AND DIRECTORS OF
BAILEY TOOL & MANUFACTURING COMPANY**

The undersigned, being all of the shareholders and directors of Bailey Tool & Manufacturing Company, a Texas corporation (hereinafter the "Company"), do hereby acknowledge, represent and consent to the following action to be taken by unanimous written consent of all of the shareholders and directors pursuant to §<<subsection>> of the <<Texas Code>> in lieu of the Annual Meeting of the Company.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned Shareholders have reviewed and hereby approve the following Resolutions by their unanimous written consent:

RESOLVED, that the number of directors shall remain at one (1).

RESOLVED, that the following persons are hereby elected to serve as the directors of the Company, each to serve until a successor is duly elected and qualified or until his or her earlier resignation, removal or death:

John Buttles

RESOLVED, that each of the actions taken on behalf of the Company by its officers and directors since the date of the last Annual Meeting is hereby ratified.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned Directors have reviewed and hereby approved the following Resolution by their unanimous written consent:

RESOLVED, that each of the following persons is hereby elected to the office set forth opposite his or her name, to serve until a successor is duly elected and qualified, or until his or her earlier resignation, removal from office, or death:

| CEO | John Buttles |
| President | Robert McGovern |
| Secretary | _____ |
| Treasurer | _____ |

The undersigned being all of the shareholders and directors of Bailey Tool & Manufacturing Company have executed these Resolutions this _____ day of July, 2015.

By: _____
   John Buttles
   Shareholder and Director

**TR 36**.

> **Message**
>
> | | |
> |---|---|
> | From: | Melissa Baines [mbaines@republicbc.com] |
> | Sent: | 7/29/2015 3:00:16 PM |
> | To: | Bob [rjmcgovern@msn.com] |
> | Subject: | RE: Payroll |
> | Attachments: | SAMPLE_Joint Action by Written Consent_BTM.docx |
>
> Hi Bob,
>
> <center>•••</center>
>
> He really should be providing a POA or Resolution allowing you to act in an authorized executive capacity, as well. I am attaching a document similar to what we have received in the past. Of course, this document is simply an example and is not intended to stand in for legal counsel. It also assumes that the By-Laws and any corporate governance provide the president with sole authority to make all business decisions and execute all corporate documents. I have plugged in Bailey's information to the best of my ability to give you an idea of how it looks, but I have not validated the information is true and correct. Again, this would probably be something legal counsel could review and validate.
>
> Regards,
>
> **Melissa Baines**
> **Risk Manager**

**TR 807.**

101.     Republic's plan was for Bob McGovern, the Bailey consultant, to be President under the amended bylaws and corporate governance documents, that way McGovern would have "sole authority" to make decisions and execute corporate documents. **TR 36**.

102.     In these discussions, Allen Frederic not only entertained a possible salary for McGovern as president and CEO, but suggested that McGovern should be given an equity participation in Bailey:



**TR 138**.

103.    On the same day, to keep the ball rolling, McGovern sent Baines a copy of his resume.

**TR 139**.

104.    A few days later, Baines sent McGovern a draft employment contract for his new role as president and CEO.  **TR 142**.

> From: Melissa Baines [mbaines@republicbc.com]
> Sent: 8/10/2015 2:41:56 PM
> To: Bob McGovern [rjmcgovern@msn.com]
> CC: Melissa Baines [mbaines@republicbc.com]
> Subject: BTM Employment Agreement
> Attachments: Form Interim President Employment Agreement.docx; Republic Business Credit_Bailey Tool & Manufacturing Special Director Co....doc
>
> Bob,
>
> In response to your request, I attach a draft form interim CEO/President Executive Services Agreement. RBC is providing this form as an accommodation to your request for a form document, and your use of the form or any provision therein constitutes your agreement that RBC will have no liability for such use and you will indemnify and hold RBC harmless for any such use. You should have your attorney review the document to draft of the specifics of your engagement.
>
> Regards,
>
> Melissa Baines
> Risk Manager
>
> Republic Business Credit, LLC

**TR 142**.

105.     Republic also hired armed guards to patrol Bailey's premises at Bailey's expense (presumably since the Factoring Agreements allowed Republic to charge against "Available Funds" expenses associated with the Factoring Agreements). Bailey felt like this was an unnecessary intimidation tactic—a notion with which this court tends to agree under all the facts and circumstances.

> On Sep 1, 2015 3:27 PM, Melissa Baines <mbaines@republicbc.com> wrote:
> Bob,
>
> Upon installation and DVR capability being up and running, I did replace the armed officers with guards, which is less than half the cost. I have not received confirmation that the live feed is up and running yet. Upon confirmation the live feed is working and being monitored, I will be able to back the guards off.
>
> Regards,
>
> Melissa Baines
> Risk Manager

**TR 626**.

106.    The court finds that Republic's transition to exercising excessive control over Bailey (beyond certainly what the parties' Agreements contemplated) caused Bailey catastrophic harm. It appears that Republic choked the Company's ability to serve existing customers, generate new accounts receivable, generate cash flow, and successfully transition into the Regions Bank relation. Further, that control and decision-making destroyed Bailey's relationship with its suppliers, ended its ability to expand new lines of business, and crippled its chances to continue as a going concern.

107.    It appears to this court that Republic was, in fact, conducting an "unannounced liquidation" of Bailey beginning in early-July, 2015, when Melissa Baines believed Republic was in the "best position" it had been in with respect to collateral. **TR 557**. That position even improved as the month wore on. **TR 749**.

108.    While hindsight is always 20-20, it appears to this court that there was no rational reason to shut Bailey down, or take any of the actions Republic did starting in July 2015, because:

a.      Bailey had "availability" (it was generating accounts receivable and collections). **TR 557 & 749**.

b.      Any deficiencies in "availability" were caused by Republic in using Bailey receivables to prepay the Inventory Loans ahead of what the Inventory Loan Agreements contemplated. **TR 816.**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/7/2015 | 111 | TFR | -- | | -- | -- | -- | -- | -- | -- | -- | (76,473.60) | -- | 423,526.40 | (423,526.40) |
| 7/16/2015 | 112 | TFR | -- | | -- | -- | -- | -- | -- | -- | -- | (147,751.20) | -- | 275,775.20 | (275,775.20) |
| 7/16/2015 | 113 | TFR | -- | | -- | -- | -- | -- | -- | -- | -- | (25,661.47) | -- | 250,113.73 | (250,113.73) |

**TR 816**.

(The court notes anecdotally that, while there was discretion in the Agreements to prepay the inventory loans from accounts receivable that might otherwise be factored, Republic prepaid itself on these loans without notice to Bailey and even charged Bailey a prepayment

penalty of $20,339.45. **TR 714.** While Republic insists that Bailey could have deciphered this from the portal, the court is not at all convinced. The court finds from the credible evidence that, during the last half of 2015, the Company was trying mightily to understand why it did not have availability, and Republic was not being candid about either the prepayments on the Inventory Loans or its ever mounting fees and expenses it was charging back to what would otherwise be available funds.

      c.     The cash collections coming into the Republic lockbox were good and steady:

| | |
|---|---|
| April | $584,315.91 |
| May | $579,055.12 |
| June | $565,351.68 |
| July | $591,212.83 |

**TR 817.**

      d.     There was no reasonable cause for Republic or Ms. Baines to "feel insecure."

**v.     Republic's accounting systems were not transparent, visibility to Bailey was unreliable, and the records are generally not credible.**

109.    The court heard credible testimony from the Bankruptcy Trustee's expert that the advance rate on new receivables from the inception of the relationship with Republic to July was only 57%. After the new cash-control protocols were implemented by Republic, the percentage of advance on new receivables, from July 1, 2015 to termination on November 5, 2015, was only 33%. **Testimony of Mitchell Carter**.

110. While this testimony for the July 2015 through November 2015 time frame reflected a 33% advance rate, as a technical matter, *after September 11, 2015, there were no advances whatsoever to or on behalf of the Company from Republic*.

111. To be clear, for the last fifty-five days of the relationship (from September 12, 2015 through November 6, 2015), there were no advances on accounts receivable that Republic considered itself to have purchased and on which Republic made collections.

112. In fact, Republic collected $921,100.81 of the Company's receivables during those last fifty-five days.

113. With regard to the earlier-mentioned "portal," there is some controversy pertaining to whether Bailey had uninterrupted access to this online platform, which Republic contends contained accounting records and information useful to the Company regarding the status of its accounts and loan balances.

114. Whether there was uninterrupted access or not, the court agrees with the Bankruptcy Trustee's testimony that *Republic's reporting system was not at all transparent; it was insufficient to allow the Company to fully understand its financial position with respect to Republic at any time*.

### 1) Credibility of Business Records

115. The court, as the trier of fact, can judge the weight and credibility of any evidence in any form. Generally, the "business records" of Republic do not have sufficient credibility to be relied upon when challenged.

a. The Bankruptcy Trustee credibly testified that he found them to be inconsistent, opaque, and incomprehensible. **Testimony of James Cunningham.**

b. Republic's Melissa Baines could not explain Republic's records to the court's satisfaction.

      c.      Republic's expert, Mr. Orr, could not explain Republic's records to the court's satisfaction.

      d.      When Melissa Baines was asked how she could navigate all of the different reports with seemingly incomplete information on them to figure out what was going on financially day to day, she replied that she had access to the General Ledger. The General Ledger was not produced or introduced at the Trial and, during the relationship, Bailey did not have access to the General Ledger.

      e.      Mitchell Carter, the Bankruptcy Trustee's forensic accountant, had to abandon these records and the way Melissa Baines said they were supposed to operate, and simply use standard forensic accounting techniques and trace cash, in order to find the true balances and information useful to the court. **Testimony of Mitchell Carter;** *e.g.,* **TR 817**.

116.    Frankly, the records seemed designed to let Republic do whatever it wished in determining eligibility, availability, or defaults. The glossary of its terms and additional terms used by Ms. Baines in her testimony demonstrate this.

117.    For example, availability of funds to the Company was affected by the eligibility of accounts receivable. Eligibility/Ineligibility was further subdivided into the following categories:

      a.  Eligible;

      b.  Ineligible;

      c.  General Ineligible;

      d.  Cross-ineligible;

      e.  Available for Recourse Ineligible;

f.   Ineligible Disputed; and

g.   Set Aside Ineligible,

and in the end seemed to be determined at Republic's discretion. **Testimony of Melissa Baines.**

### 2)   Real Eligibles

118.   Apparently, there were also the "REAL ELIGIBLES" Republic's Allen Frederic wanted to know about. **TR 521.**

> On Mon, Feb 23, 2015 at 9:43 AM, Allen Frederic <afrederic@republicbc.com> wrote:
>
> Depending on info we receive, use lower advance rate on those invoices. This is better than doing overadvance although we may make them ineligible at a later date. Let me and STEWART KNOW GAP BETWEEN REAL ELIGIBLES AND OAYOFF AMOUNT

**TR 521.**

### 3)   Over-advances

119.   The term "over-advance" was used throughout Ms. Baines testimony, yet the term does not appear in the Agreements and no document was ever produced or introduced showing how this "over-advance" arose.  There was one structural over-advance actually memorialized in a separate document.  **DX 336.**  It was paid.

120.   Republic's attempts to defend its actions are based on the following three grounds for which it has produced no Republic figures, documents, or account records to establish, confirm, or justify them.

a.   Republic argues that because of the Hilco Report, Republic became "under-collateralized on the inventory loan" in the June/July 2015 time frame, yet Republic did not produce, much less introduce into evidence and discuss, any inventory report to show what the value of the inventory actually was in June or July 2015 or any calculations showing the comparison of the balance owed against the collateral.

     b.     The term "over-advance" does not appear in the Agreements and no written record of the "over-advance" was ever produced or introduced into evidence to show the accrual of this "debt" of Bailey, which became sizeable.

     c.     Ms. Baines admitted in her testimony that there was no way to reconstruct what was eligible or ineligible on any given date from any of the records Republic produced or introduced into evidence or discovery. Eligibility was extremely important, because it was the determiner of availability, which was how much cash Bailey was entitled to at any given time from its receivables. The purported lack of availability that Republic claimed in July in order to call and perpetrate a default, thus, cannot be proven by any record Republic has.

121.    The fact that documents necessary to prove the under-securitized Inventory Loan, the over-advances, and the eligibility of accounts have not been brought forward by Republic is enough to find Republic's business records not credible.

122.    For example, despite the importance of eligibility criteria to Republic's stated position regarding funds available for release, there are no historical daily records of ineligibility and, as a result, it is not possible to recreate a historical daily eligibility versus ineligibility position on the Debtors' receivables. **Testimony of Melissa Baines.**

123.    Ms. Baines further testified that the only way for a customer to view an expense or fee charged against their account was through the "client activity statement," available on the portal. However, this report contained only the total number for expenses or fees; it did not separate out the charges by line item or list a specific reason the fees were charged.

124.    Certain specific, internal emails of Melissa Baines about numbers (*i.e.,* dealing with sums of money) are credible and should be considered admissions. **TR 557, 749, & 664**. Ms.

Baines testified on the first day of Trial she was absolutely accurate in e-mails to Messrs. Chesters and Frederic about figures involving money. **Testimony of Melissa Baines**.

125.    Melissa Baines wrote in an internal memo as follows:

> As a point of reference, we have collected $75,000 in Termination Fees and $284,038.13 in Default Rate, in addition to our standard factoring and line fees, to date.

**TR 664**.

126.    There is no mention of this $284,038.13 collected, or numbers that would total up to that amount, in any Republic record introduced or testified about at trial.

127.    Based on the totality of evidence and credible testimony, the court finds that the reporting systems of Republic required the Company's personnel to look at multiple reports and reconcile differing balances across the Republic accounting system to attempt to arrive at what should have been a relatively simple number: how much did the Company owe Republic on any given day. Republic's accounting systems had the effect of reducing, or eliminating entirely, visibility into the Company's financial position on any given day.  **Testimony of John Buttles; Testimony of James Cunningham.**

128.    The expert witness, Mitchell Carter, whom the court finds to be credible, testified about eleven accounts totaling $209,000 of receivables which were:

        a.      Declared ineligible by Republic;

        b.      never advanced or funded upon;

        c.      collected by Republic; and

        d.      never credited to Bailey in any fashion.

**Testimony of Mitchell Carter** (this testimony was uncontroverted by Republic).

129.    In addition, both Ms. Baines and Republic's testifying expert, Terry Orr, confirmed that accounts receivable that were "charged back" to the Company were removed from both the

gross outstanding accounts receivable balances, as well as the cash reserves from which Republic would calculate the amount of monies advanced to the Company. But according to Republic, any amounts collected on these "charged back" receivables were still retained by Republic. The net effect of this would be to understate the amount collected and paid back to Republic. The uncontroverted testimony of the Trustee's expert, Mr. Carter, is that this amount was at least $209,000. The Company could not have known about these amounts from the reports available on the portal as described during the testimony from Republic's own witnesses.

130.     Finally, there was no accounting maintained or available on any specific account or invoice that Republic purchased. In other words, there was no way for the Company to know how much was advanced on any given account receivable invoice; rather, Republic purchased batches of assignments and aggregated releases of funds versus a pool of receivables. The problem with that is there was no method to tell what was "available" at any time because individual accounts were made ineligible in these batches or lost or regained eligibility basically at the discretion of Republic.  The eligibilities and availabilities changed daily. **Testimony of Melissa Baines.**

131.     The court finds that Republic's customer accounting reports through the online portal were confusing, opaque, and evasive to the extent that the Company could not have reasonably been expected to understand them.

### vi.     Republic Demands and Gets a Lien on Buttles' Homestead.

132.     In addition to exercising extensive control of Bailey's business, *the evidence shows Republic coerced CEO and owner Buttles and his wife into giving Republic a lien on their Texas homestead*. While Republic contends that Buttles "volunteered" the homestead as collateral, a telephone conversation recorded by Republic on July 13, 2015, reveals that Melissa Baines first raised the issue and made clear that Republic would not make further advances to the Company

without additional collateral. Melissa Baines expressed dissatisfaction in many regards. She emphasized that Republic would only pay Company employees who were actually producing product. She expressed dissatisfaction and frustration that Buttles could not or would not personally pay $2,300 for an electric motor that was needed for a Company machine. She also pressed Buttles to give more collateral and asked whether he had other personal property that could be sold to raise cash, such as stock. Buttles replied that his net worth was in the Company, and he had no further ability to absorb costs. Baines then focused on Buttles' homestead, in particular, as collateral. **TR 287/DX115 at 8:01-9:04 & 9:30-13:26**.

133. As discussed further below, it became clear in subsequent communications that Republic required a lien on Buttles' homestead as a condition for future funding of Bailey. Republic made this demand without regard to the prohibitions on homestead liens in Texas, which are well known to commercial lenders doing business in Texas.

134. By the middle of July 2015 (almost immediately after Republic declared a first default because of the Comerica letter regarding late 2014 property taxes and then the second default because of the temporary shutdown of the Company due to Republic's cessation of funding), Republic's management was putting its homestead lien demands in writing.

> | Message | |
> |---|---|
> | **From:** | Melissa Baines [mbaines@republicbc.com] |
> | **Sent:** | 7/20/2015 10:50:57 AM |
> | **To:** | jbuttles@baileytool.com |
> | **CC:** | Jeff Worley [jworley@baileytool.com]; Allen Frederic [afrederic@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
> | **Subject:** | FW: Mortgage - 600 Beltline |
> | **Attachments:** | Untitled attachment 00695.htm; 3124_001.pdf |
>
> John,
>
> I am reforwarding you the mortgage sent to you Friday for Lancaster. As we discussed, we could look to take a position on the commercial properties which may decrease the exposure on the primary residence; however, we will continue to require the second position on your primary residence to collateralize any overadvances necessary to finance the continuance of operations.
>
> Regards,
>
> **Melissa Baines**
> **Risk Manager**

**TR 721**.

> ### vii. Buttles Lists His House for Sale.

135.     In light of the July 13 telephone conversation with Melissa Baines, Buttles (who had no personal legal counsel at the time) decided that he must put his house on the market. He and his wife signed a listing agreement with their realtor, Mark Cain, on July 15, 2015. **TR 812**. The court believes Buttles' testimony that he felt he had virtually no choice in the matter, in that Republic had taken him off the Bailey payroll, and he had no other way to pay the monthly mortgage. After consulting with their realtor, Cain, Mr. and Mrs. Buttles elected to list the house at $2,295,000, an amount which Buttles understood to be both "aggressive" and "under-market." **Testimony of John Buttles**.

136.     Although Cain stated the house was priced at market on direct examination by Republic's counsel, he conceded on cross-examination that the house was "priced aggressively" to sell quickly. Cain did not explain how a listing could be priced aggressively to sell quickly while at the same time being priced at market. Finally, Cain conceded that he did not perform any

sort of evaluation or appraisal of fair market value before advising Mr. and Mrs. Buttles about setting the listing price. **Testimony of Mark Cain**.

137. This under-market valuation was confirmed at Trial by the testimony of professional home appraiser Mark Milliorn, who concluded that the house was worth $2,500,000 at the time of sale. **Testimony of Mark Milliorn**.

138. Additional testimony also revealed that the purchaser, who was a neighbor, flipped the house a few months later for $2,550,000. **Testimony of Mark Milliorn and John Buttles**.

**viii.    Republic Gets Its Lien.**

139. Melissa Baines testified at Trial that she assured herself of the homestead lien's validity by contacting Chicago-based real estate counsel and speaking with a Texas-based acquaintance who was in the factoring business. **Testimony of Melissa Baines**.

140. Relying upon these things, Republic represented to Buttles that it was entitled to the mortgage and the lien was necessary to permit Bailey's survival. The demands appeared to be part carrot, part stick. On July 20, 2015, Baines told Buttles that the lien would both "collateralize any [claimed] overadvances" and "finance the continuance of operations." **TR 721**.

141. Although Republic had been pressing for a lien since at least July 13, 2015, Buttles was apparently too slow to give in to the pressure from the perspective of Allen Frederic, Republic's COO. Seeing the carrot fail, Republic's COO abandoned all pretense of an arms-length negotiation, or for that matter, courtesy:

> **From:** Allen Frederic [mailto:afrederic@republicbc.com]
> **Sent:** Monday, July 20, 2015 9:27 AM
> **To:** John Buttles
> **Subject:** Re: RE: Re:
>
> The residence you dummy how many times did we say this
>
> Sent from my iPad
>
> On Jul 20, 2015, at 9:13 AM, John Buttles <jbuttles@baileytool.com> wrote:
>
>> Melissa,
>>
>> I don't see one for the Lancaster building…    my assumption was that we were going to use the two industrial buildings at 906 Mercury and 600 W. Belt Line Road for the security.  I am prepared to sign them.
>>
>> John

**TR 254**.

142.    At Trial, Melissa Baines testified that Allen Frederic intended to send this shockingly rude and unprofessional email to make his position clear to Buttles. **Testimony of Melissa Baines.**  Allen Frederic did not testify at or attend Trial.

143.    In any event, on or about July 21, 2015, under what this court wholly believes to have been **extreme duress** and an immediate threat of losing the business Buttles had owned and operated for decades, Mr. and Mrs. Buttles executed and delivered to Republic a mortgage on their Dallas homestead. **TR 583**.

144.    The demands for liens on the Bailey plant buildings and Buttles' homestead were fraught with misrepresentations and made to coerce Buttles into putting up his homestead and company buildings as additional collateral.

145.    At this point in mid-July, Republic's misrepresentations regarding the homestead were as follows:

- Republic was over-advanced, when in fact it had availability. **TR 749; TR 297/DX 177 at 11:37-15:31; Testimony of John Buttles.**

- The Buttles' homestead was to be used as backup collateral and would only be used if Republic's accounts receivable and inventory collateral proved insufficient. **TR 297/DX 177 at 18:24-21:20; Testimony of John Buttles**.

- Once the additional collateral was secured, advances based on accounts receivable collections would start again. **TR 297/ DX 177 at 29:09-31:11. Testimony of John Buttles**.

### ix. The Effects of Republic's Shutdown Manifest Themselves.

146.     After Republic began micromanaging and controlling disbursements of cash in early July, Bailey's long-standing, core automotive customers, such as Tenneco and Trelleborg, began to find that Bailey could not fill their orders in a timely fashion.  Buttles credibly testified that in "Just in Time" manufacturing chains, this is simply not acceptable and customers will leave. **Testimony of John Buttles and Bob McGovern.**

147.     These problems appeared immediately.  On July 13, Buttles told Melissa Baines that Bailey's delays in getting a press repaired were shutting down a Trane Heating & Air Conditioning production line:

This has stop do with the motor rewind - this press produces parts for Trane air conditioning compressor production.

I emailed you the vendor invoice and the Letter of Direction on Friday.

Trane will be calling us at 10am I believe - please note they say they are shutting down die to lack of parts.

This invoice needs to be paid so we can pick that motor up and return to production.

John Buttles

**TR 120**.

148.     Republic's answer (reflective of the control they had assumed by this point) was:



On Jul 13, 2015, at 9:10 AM, Melissa Baines <mbaines@republicbc.com> wrote:

John,

We want to help you get up and running; however, you have not provided the necessary information for us to do this.

I must have a complete schedule of required, critical payments that need to be made in order to produce xx dollars in accounts receivable. As I understand it, it is going to cost more than just the part cost to get invoices generated. If I am mistaken about this, and all you require to start generating invoicing is $2,330 to get the machine up and running, please let me know ASAP, along with how much in billing (conservatively) will be generated by that one payment before Friday.

Have you spoken to any of the employees to gain their support to work with you, at least, through Tuesday's REA settlement conference?

Regards,

Melissa Baines
Risk Manager

**TR 120**.

149.     The problems also extended to Bailey's automotive customers ten days after the Trane difficulties. Bailey's consultant, Bob McGovern, was having to deal with the displeasure of Peterbilt and Imperial, two of its largest automotive accounts:



From: Bob [mailto:rjmcgovern@msn.com]
Sent: Thursday, July 23, 2015 9:04 AM
To: 'Melissa Baines'
Subject: Morning Operational Review

AS promised – current issues we are dealing with

1) Payroll should be to you by this is for the 20 – pay per Cash flow (we have to get final # from Paycom)
2) Payroll 2 should be to you by 10 am – this is for the full week pay – approx. 43K
3) The scrap reconciliation is attached
4) Peterbilt –
    a.    The customer visit is at 9:30 am tomorrow. The concern is that they do an audit on our supplier status. This is why aluminum metal is now critical to show them we are running the product and have the inventory on hand to fill short term orders. We are 3 weeks behind, they likely will ask us to provide a catch up schedule. We do not want to damage this relationship.
    b.    Imperial (who is also a supplier Peterbilt) is also involved in the visit. They are a tier 1 supplier to Peterbilt and we supply them as well. So they will also be looking for assurances.
5) I propose we have a better document for funding/Letter of Direction control. I am working on that today and hopefully will send you something that makes both of our lives easier.
6) The 50,000 for the 556 tooling did not get into your system. We have a large backlog of invoices caused by losing one of the 2 invoicing people and the double payroll. I want to find a way to get this better under control and visible to you and ourselves.

Bob

**TR 585**

RBC0012218

**TR 585**.

150. The problems with automotive customers were no better by August 2015. On August 11, a Tenneco procurement officer was telling Mr. Buttles that its delivery delays were becoming critical:

```
From:        William Weaver/US/TEN
To:          Rudy Cortez <rcortez@baileytool.com
<mailto:rcortez@baileytool.com> >, Randy Burris/US/TEN@TEN, Troy
Osborne/US/TA.NA@TEN <mailto:Osborne/US/TA.NA@TEN> ,
Cc:          James Brown <JBrown3@Tenneco.com <mailto:JBrown3@Tenneco.com>
>,
John Buttles <jbuttles@baileytool.com <mailto:jbuttles@baileytool.com> >
Date:        08/11/2015 08:26 AM
Subject:     RE: 260746 Up date Status
_____


John  or Rudy,

This is unacceptable, you have been waiting on this material for almost
two weeks now. Bailey Tool needs to have material expedited in immediately
or will be shut down Tulsa plant on Monday 08/17. I need all of the 260746
in house tomorrow, Seward has to make shipment by Thursday 08/13. A plan
must be put in to place to get this material in, I will schedule a
conference call 11 AM (CT) so we can discuss a plan of action.

Thanks,

Bill Weaver
Customer Product Liaison
```

**TR 781**.

151. Two weeks later, Bailey's inability to perform threatened to shut down an entire Tenneco factory in Mexico that made components for Harley Davidson, which in turn would have to shut its production down.

National Kwikmetal "refused" to sign the agreement when I presented it – I believe I reported that at some point.... (at least internally). They might reconsider after talking to Melissa. There are no past-due balances at NKS. Buckeye is still under discussion as we know – the Buckeye weldnut is critical to Bailey – we will shut Harley Davidson production at Tenneco down without that nut in the immediate future.

Fuchs is releasing product but wanted more paydown on old balances to secure release on the next order (critically needed) I placed with them. Yes, we are paying old balances at Fuchs and the account remains on Net 30 terms...  the very first payment Melissa made was to Fuchs and it cleared up old balances, allowing them to ship product in and continue net 30 account status.

What else is needed??

John

**TR 622**.

152.     Eventually, because of Republic's actions, Bailey lost the following customers who had been customers of Bailey's for decades:

| | Customers Bailey had for 15 years or longer | | | | | |
|---|---|---|---|---|---|---|
| Rank | Customer | Annual Revenue | Net Profit | Profit Rate | Years as customer | Lost profits 2016 - 2021.5 |
| 1 | Tenneco | $3,250,000.00 | $130,000.00 | 4.00% | 15 | $812,500 |
| 2 | Imperial (Peterbilt) | $650,000.00 | $48,750.00 | 7.50% | 25 | $304,688 |
| 3 | Nammo | $450,000.00 | $54,000.00 | 12.00% | 21 | $337,500 |
| 4 | Oshkosh Truck | $300,000.00 | $31,500.00 | 10.50% | 26 | $196,875 |
| 5 | Chaparral Boat | $240,000.00 | $28,800.00 | 12.00% | 25 | $180,000 |
| 6 | Tracker | $165,000.00 | $17,325.00 | 10.50% | 23 | $108,281 |
| 7 | Fishing Holdings | $140,000.00 | $16,800.00 | 12.00% | 24 | $105,000 |
| | | $5,195,000.00 | $327,175.00 | 6.30% | | $2,044,844 |
| NOTE: Lost profits are calculated at 75% of 2016, 100% of 2017-2020 and 50% of 2021 | | | | | | |

**TR 818**.

153.     Given its success in debt reduction by the middle of September, Republic apparently decided that it no longer made sense to allow Bailey any more money.  In fact, the last payment it made to Bailey vendors was on September 11, 2015.  **TR 752**.

**x.     Republic Takes the Homestead Proceeds.**

154.     From late August 2015 onward, Republic stepped up its campaign to get money from Buttles' homestead.

155.     On August 17, 2015, after being on the market for one month, Buttles received a purchase offer for his homestead of $2,315,000, which was $20,000 above the asking price.  The offer, which Mr. and Mrs. Buttles accepted, was scheduled to close on September 16, 2015.  **TR 811.**  Realtor Mark Cain's group was representing both Buttles and the buyer in the transaction.  **Testimony of Mark Cain and John Buttles**.

156.     On August 26, 2015, Melissa Baines asked Bob McGovern to drive by Buttles' house to determine if it was on the market and if it had a sale pending sign. **TR 329 at 1:54-3:37;**

**Testimony of Bob McGovern; TR 138**. On August 28, 2015, Melissa Baines told Buttles that she would be willing to open up additional availability on the financing if he would send her the realtor listing agreement and assured her that the homestead was for sale. **TR 334/DX 203 at 0:36-3:24.**

157.    On the eve of the projected house closing of September 16, 2015, Melissa Baines told Buttles that Republic's receiving the money from the homestead would help cover the Inventory Loan and over-advance on the Army Receivable, allow Republic to start funding the business again, and allow Buttles to resume receiving a salary:



**TR 745.**

158.    In the email above, Melissa Baines refers to returning a call to attorney Robert Blanshard at the title company.  Baines had learned that Republic's invalid lien would delay the closing.  As a result, Baines and Alan Frederic took counsel with each other on a new way to ensure that Republic got the money from Buttles' homestead:

> **Message**
>
> **From:** Melissa Baines [mbaines@republicbc.com]
> **Sent:** 9/15/2015 4:07:39 PM
> **To:** Allen Frederic [afrederic@republicbc.com]
> **Subject:** Bailey Email
>
> Hi Allen,
>
> I think we need to send the email you dictated earlier today, but I don't think it needs to come from the attorney. John confirmed in an email the closing is "currently scheduled for late afternoon" tomorrow. You okay with me sending? The fact that the listing agreement we were provided shows the house was listed when they executed the RBC mortgage, which would constitute intent to defraud.
>
> "RBC was induced to continue funding the companies based upon receiving a second mortgage on the personal residence and in reasonable reliance of the house being listed for sale, which proceeds of such sale would repay RBC's overadvance position. As stated, this sale transaction is scheduled to close tomorrow afternoon. Accordingly, RBC will be prepared to continue funding upon receipt of the second mortgage payoff amount of $463,544.02."
>
> Melissa Baines
> Risk Manager

**TR 753**.

159.    Thirty-four minutes after devising the language, Baines sent those very words to

Buttles in an email at 4:41 p.m. on September 15:

> **From:** Melissa Baines [mailto:mbaines@republicbc.com]
> **Sent:** Tuesday, September 15, 2015 4:41 PM
> **To:** John Buttles <jbuttles@baileytool.com>
> **Cc:** Allen Frederic <afrederic@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Jeff Worley <jworley@baileytool.com>; R McGovern <rjmcgovern@msn.com>; Jennifer Buttles <JenButtles@baileytool.com>
> **Subject:** RE: Bailey Tool / Sale of Personal Residence
>
> John,
>
> RBC was induced by you to continue funding the companies based upon your agreeing to sell your personal residence, which proceeds of such sale would repay RBC's overadvance position. We understand that you are scheduled to close on the sale of your house tomorrow afternoon. Accordingly, RBC will be prepared to continue funding upon receipt of the overadvance amount of $463,544.02.
>
> Regards,
>
> Melissa Baines
> Risk Manager

**TR 754.**

160.    At Trial, Baines claimed she could not recall why she and Frederic chose such

language, other than that Republic was frustrated. **Testimony of Melissa Baines.**  However,

Buttles answered Baines email the next day at 11:25 a.m., stating:

> It is in both of our interests to resolve this in the near term. We do not want to lose our buyer and my guess you want to have a better resolution than you currently have. Having the business operate efficiently, sell down assets, invoice and collect the REA and assure customers are willing to meet their payment obligations is in both of our interests. Therefore, I suggest we begin discussions immediately to achieve these aims.

**TR 754.**

161.    At Trial, Buttles credibly testified he believed Baines was accusing him of misleading Republic. In addition, he credibly testified he relied upon Baines' misrepresentation that "RBC will be prepared to continue funding" if he sent the money Republic required from his homestead sale. **Testimony of John Buttles.**

162.    Upon receiving Buttles' reply set forth above, Allen Frederic reacted with what can best be described as great anger and frustration, and directed Baines to squeeze Buttles in his most vulnerable area – the one asset he had left:

| From: | Allen Frederic <afrederic@republicbc.com> |
|---|---|
| Sent time: | 09/16/2015 11:49:09 AM |
| To: | Melissa Baines <mbaines@republicbc.com> |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Yes tell them we will stop funding, end of game, we will wait until he can't make house payments and bid it in at auction, call our atty and confirm we can do this even with personal bankruptcy but this does not appear to be good faith on their part and there is no other good collateral that I seem accordingly I think we assume more risk by continuing to fund. Have our lawyer advise them that we will peruse foreclosure

**TR 754**.

163.    Two minutes later, Baines told Frederic that Stewart Chesters of Republic disagreed with this strategy regarding Buttles' homestead and shutting down the business:

On Sep 16, 2015, at 11:51 AM, Melissa Baines <mbaines@republicbc.com> wrote:

I will, as Stewart is not exactly on board with the foreclosure plan. He's supportive of not funding until we get this worked out, but he has concerns over shutting the business down.

Will you be available in 20 minutes or so?

**Melissa Baines**
**Risk Manager**

**TR 755**.

164.   Frederic responded that foreclosure was the only thing that would get the desired movement from Buttles:

| Message |  |
| --- | --- |
| **From:** | Allen Frederic [afrederic@republicbc.com] |
| **Sent:** | 9/16/2015 11:54:54 AM |
| **To:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | Re: Bailey Tool / Sale of Personal Residence |

Yes I am available. The point is if we don't fund it shuts down by default, if we fund we are held hostage and house never sells, we don't solve overadvance position. Our threat to foreclose should get movement on his part, nothing else will work

**TR 755**.

165.   During the same conversation, Frederic told Baines to keep a guard posted at the Bailey plant until Buttles gave them his homestead equity.  **TR 756**.

166.   Baines replied that while she was about to pull the guard service, upon getting Frederic's email, she told the guard service to keep the guard on site, and the guard might be increased to armed status:

On Sep 16, 2015, at 11:52 AM, Melissa Baines <mbaines@republicbc.com> wrote:

Haha. I was just about to pull, but I have already emailed Mike at Hilco to leave the guard on and we may be stepping up again to armed services.

**Melissa Baines**
**Risk Manager**

**TR 756**.

167.   Less than an hour later, Frederic told Baines that negotiating with Buttles was useless, and they simply had to remain firm:

> On Sep 16, 2015, at 12:01 PM, Allen Frederic <afrederic@republicbc.com> wrote:
>
> My suggestion is not to go to dallas to meet with him on his turf but to communicate our position clearly and firmly in writing. Based on his communication a meeting is a waste of time and money. We have both a trust issue and compentancy issue with management and are in the best collateral position we will ever be in at this moment

**TR 643**.

168.    Barely forty-five minutes later, Frederic reiterated his position:

| From: | Allen Frederic <afrederic@republicbc.com> |
|---|---|
| Sent time: | 09/16/2015 12:48:44 PM |
| To: | RBC <mbaines@republicbc.com> |
| Cc: | Stewart Chesters <schesters@republicbc.com>; Laurie A Martin Montplaisir <lmontplaisir@srcattorneys.com>; dhanson@srcattorneys.com |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Remember our current mortgage value is worth considerably more than the amount of our pay down. Any substitution of collateral must be cash or equivalent and get approval of our atty regards preference  and other potential bankruptcy issues. However their will be no funding based on promise to substitute or any type of promise but only after our approval and his performance

**TR 643**.

169.    After the homestead sale failed to close on September 16, 2015, the title company confirmed that the Republic lien was invalid and unenforceable, and a sale could not close until it was released. **TR 810**.

From: Blanshard, Bob <bblanshard@firstam.com>
Sent: Thursday, September 24, 2015 5:28 PM
To: dhanson@srcattorneys.com
Cc: John Buttles
Subject: Lien on 9995 Hollow Way Road in Dallas
Attachments: SCAN6215_000.pdf; SCAN6217_000.pdf; ATT00001.txt

Dear Doug,

The situation with Mr. and Mrs. Buttles involves an invalid and unenforceable lien filed against their homestead. Even though the lien may be invalid, we need a release of that lien in order to proceed with the closing. When we see this fact situation, we turn to the controlling case law that deals with the situation. I have attached a copy of that controlling case: Tarrant Bank v. Miller, 833 SW 2d 666. In addition, I have attached a Release of Lien form that you can use to get someone at Republic Business Credit, LLC to sign and send to me for filing.

I have been involved in numerous transactions wherein a previous seller had the same problem that Mr. and Mrs. Buttles have. Upon my sending a copy of this decision to those lenders, I can't remember a lender who refused to sign a release form of some kind. If I need to revise this release form, I'm happy to do that so long as the revision doesn't render the release ineffective. Moreover, I'm happy to discuss the situation with you if you want. Please let me know if there is anything else I can do to assist you further.

Best Regards,

Bob



**Bob Blanshard**
Executive Vice President/Escrow Officer
8333 Douglas Avenue, Suite 130
Dallas, TX 75225
Office Direct: 214-378-3133
Fax: 214-987-3351
BBlanshard@firstam.com

**TR 810**.

170. Upon receiving this response from the title company, Republic released its lien.

**DX 299**. Nonetheless, Republic's counsel continued to press for proceeds from the sale of Buttles'

homestead as a condition of future funding. **Testimony of Melissa Hayward**.

171. The closing of the homestead sale occurred on October 2, 2015. According to the

closing statement, Republic received the $225,000 which it demanded. **DX 316**.

### xi.     The Parties Continued to Negotiate

172.    Within the climate shown above, Bailey, Buttles, and Republic had settlement discussions in late September and early October 2015 to resolve the outstanding issues between them and permit Bailey to operate without interference or further demands from Republic. **TR 79**.

173.    In the settlement correspondence, the most important portions of which occurred from September 29 through October 2, 2015, Republic officers and counsel demanded $275,000 from the imminent homestead sale to fund the settlement under discussion, and Buttles' contribution of the rest of the sale proceeds to fund Bailey operations. **TR 79.** Subsequent exchanges of correspondence between the Republic representatives reduced the cash component to be funded from the sale of the Buttles homestead to $225,000 and left up to Buttles the amount of cash he would put into Bailey. **TR 79.**

174.    On September 30, 2015, Republic's counsel, Laurie Montplaisir, wrote that the revised settlement terms were acceptable and that she would begin preparing a forbearance agreement. **TR 79**.

### xii.     No Deal Finalized and Republic Keeps the Money.

175.    The homestead sale closed on October 2, 2015. Buttles acknowledged at Trial that when he directed the title company to wire $225,000 to Republic, he knew that a final agreement had not been reached, although he understood it to be very close. He further credibly testified that he believed transferring the money was necessary to demonstrate his good faith. **Testimony of John Buttles.**

176.    When Bailey's recently-retained counsel, Melissa Hayward, learned that the money had already been sent, she sent the following email to Republic's counsel:



TR 79.

      **xiii.   Republic Keeps the Homestead Proceeds.**

     177.   On the same day, Republic disbursed the $225,000 to itself. Baines testified that Republic had received the money, and because an amount had been agreed to between the parties – even though there was no overall settlement – Republic could keep the money and do with it as it pleased. **Testimony of Melissa Baines.** Republic's counsel was of the same mind:

| From: | Montplaisir, Laurie A. Martin <lmontplaisir@srcattorneys.com> |
|---|---|
| Sent: | Friday, October 2, 2015 3:31 PM |
| To: | Melissa Hayward |
| Cc: | Brown, S. Joseph; Vickie.Driver@lewisbrisbois.com; Melissa Baines |
| Subject: | RE: RE: Bailey-Confidential Settlement Communication Subject to the FRE |

Melissa: My client never agreed to hold any money in trust. The funds have been applied to the inventory over advance.
Laurie

Laurie A. Martin Montplaisir
Schuyler, Roche & Crisham, P.C.

TR 780.

     178.   At Trial, Bailey counsel Melissa Hayward testified that by pocketing Buttles' homestead money, she believed Republic had ratified the agreement. **Testimony of Melissa Hayward.**

179. Baines testified that Republic used Buttles' funds to repay the alleged over-advance entirely. She also admitted that Republic never made another advance to Bailey after receiving the funds. **Testimony of Melissa Baines**.

180. These actions contradicted Republic's earlier assurances that (i) the Buttles' homestead was to be used as backup collateral and would only be used if Republic's accounts receivable and inventory collateral proved insufficient (**TR 297/DX 177 at 18:24-21:20; Testimony of John Buttles**); and (ii) if the over-advance were covered, advances based on accounts receivable collections would start again. These statements were false. **TR 297/ DX 177 at 29:09-31:11; Testimony of John Buttles**.

181. As demonstrated in the email exchanges set out above, Buttles relied on Republic's false representations that: (i) it was necessary to sell the homestead; (ii) Republic was entitled to the $225,000 of sale proceeds; and (iii) the money was necessary to pay off the over-advance and conclude the settlement of the parties, so that (iv) funding could return to normal.

182. The court finds that Republic demonstrated bad faith in the homestead closing for a whole host of reasons. For one thing, Republic's counsel instructed the title company that "Republic Business Credit has agreed to the $225,000 figure. Please confirm when the wire has been sent pursuant to the wire transfer instructions previously sent to you." **TR 716**. Buttles testified that to expedite the resumption of an ordinary funding relationship and show his good faith, he instructed the title company to send the funds to Republic. Then, to Buttles' dismay, he learned from Bailey's counsel that the settlement had broken down, and Republic refused to return the money. **Testimony of John Buttles**. But more importantly, any sophisticated lender doing business in Texas has every reason to know that homesteads are exempt from liens such as the kind Republic placed on Mr. Buttles house. Republic pressured Buttles, called him a "dummy,"

and dangled the carrot in front of him that the Company would get funding again from Republic if he would give to it what it was not entitled. Republic lied. The totality of the evidence is clear that Republic was "finished" with Bailey and was taking everything it could extract at this point.

### xiv. The Secret Termination Fee.

183. On or about October 2, 2015, the same day as Buttles' homestead closing, Republic took a $75,000 termination fee against money collected from Bailey's accounts. Republic gave the Company no formal notice of its taking the termination fee.

184. Bailey was beginning to believe it should be fully paid up with Republic, especially since Republic had taken Buttles' homestead money and, in fact, collections should have been good, as best Mr. Buttles knew from operations (recall, collections went to Republic's lockbox and the portal was difficult to follow).

185. In fact, around this time frame, Republic had collected $624,037.20 in cash payments from Bailey receivables in August and $677,824.38 in cash payments/collections in September. However, Republic decided to stop funding Bailey on September 11, 2015, during the biggest collection month in the relationship.

186. The following timeline is instructive:



*See* **TR 817** (derived from the Summary of Monthly Advances & Collections).

187.    In spite of: (a) these large collections, and (b) Republic's representations made during the homestead discussions, Republic never funded any advances again.

**xv.    Republic is Paid in Full but Attempts to Extort a Release from the Debtors.**

188.    After collecting Buttles' homestead equity on October 2, 2015, Republic continued to collect all the Company's accounts receivable through the lockbox arrangement created at the start of the relationship.

189.    On November 5, 2015, the Company ceased submitting receivables to Republic. *See* **Adv. Dkt. 165, Report and Recommendation to the District Court Regarding Debtors' Motion for Partial Summary Judgment (herein, "Adv. Dkt. 165"), p. 6.**   ("[a]ccording to the testimony of Marylyn Calder, the Debtors ceased submitting Accounts to Republic on Assignment Schedules on November 5, 2015").

190.    By mid-November 2015, Republic seemed well-aware that it had collected more than enough to pay off its facility in full.   **TR 664**.   Those collections included the Army Receivable:

| Message |
|---|
| **From**:     Danika Louis [dlouis@republicbc.com] |
| **Sent**:     11/19/2015 9:42:03 AM |
| **To**:     Melissa Baines [mbaines@republicbc.com] |
| **CC**:     Vanessa Blade [vblade@republicbc.com]; Allen Frederic [afrederic@republicbc.com]; Stewart Chesters [schesters@republicbc.com] |
| **Subject**:     Re: FW: W15QKN-12-C-0109 BAM REA Shipment #REA0002Z |
| |
| The REA payment was released to our account today.  We should receive the $156k tomorrow!!!!!!! |

**TR 663**.

191.    After Republic collected the Army Receivable, Ms. Baines alerted her superiors that Republic was "collected out" of Bailey and that she was ready to send a General Release to Buttles.   Melissa Baines also admitted that: (1) all Default Rates and Termination Fees had been recovered; and (2) she could not find any additional, significant fees that Republic "might be able to charge:"

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 11/20/2015 2:23:09 PM |
| **To:** | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com] |
| **CC:** | Danika Louis [dlouis@republicbc.com; vblade@republicbc.com; Melissa Baines [mbaines@republicbc.com]; Laurie A Martin Montplaisir [lmontplaisir@srcattorneys.com] |
| **Subject:** | Bailey Tool, et al. |

All,

We are officially collected out of Bailey.  I am ready to send the General Release to John Buttles.  I am going to reserve for $2,500 for legal fees, but all Default Rates and Termination Fees have been recovered.  I have reviewed the contract for any additional fees which we might be due, but I do not think that any fees we might be able to charge total an amount worth risking us getting an executed General Release.  I would chalk them up to consideration in exchange for the General Release.  In the event he does not execute the Release, we are free to continue accruing the Default Rate and charging any other fees we are due under the Purchase Agreement.

As a point of reference, we have collected $75,000 in Termination Fees and $284,038.13 in Default Rate, in addition to our standard factoring and line fees, to date.

Regards,

Melissa Baines
Risk Manager

**TR 664**.

192.    Nowhere is there any mention of the $284,038.13 default rate interest, nor any numbers that would total that amount, in any of the documents Republic either produced or furnished to Bailey.

193.    The same day, Melissa Baines sent an e-mail to Buttles confirming the facility had been paid in full, stating that Republic was holding over $150,000 and would turn it over to the Debtors, so long as the Debtors executed full releases of any claims they had against Republic:

From: Melissa Baines <mbaines@republicbc.com>
Date: November 20, 2015 at 6:09:50 PM CST
To: jbuttles@baileytool.com
Cc: Melissa Baines <mbaines@republicbc.com>
Subject: Bailey Tool, et al. / RBC

John,

With the posting of today's collections, the amounts due as of today to RBC from the companies under the Purchase Agreements have been collected. Upon full execution of the attached General Release Agreement, but not before the Date of the General Release Agreement (Monday, November 23, 2015), the Obligation due and owing to RBC will be considered satisfied.

Please review the attached documents and have them executed with a notarized signature. As there are three separate clients, thereby three separate Releases, I have included a Letter of Direction for the small amount due under the Bailey Tool account, which Letter of Direction provides for RBC to reduce the amount from the total due to Hunt Hinges.

The consolidated wire amount due to the companies, effective November 23, 2015, will be $152,064.03. Please provide direction as to where you would like those funds wired. I have provided a blank Letter of Direction for you to complete with the directions for the release of funds to each of Hunt Hinges, Inc. and Cafarelli Metals, Inc. (i.e. please do a letter of direction for each of the companies). In the event they are directed to the same account, we can send as one wire, if you prefer.

Please let me know if you have any questions.

Regards,

**Melissa Baines**
**Risk Manager**

**TR 255**.

194.     The Debtors declined to execute the release. ***See* TR 777 & 775**.

195.     The bankruptcy court (formerly Bankruptcy Judge Douglas Dodd presiding) has since held that Republic was never entitled to hold out for a release since it took the Termination Fee route to termination. ***See* Adv. Dkt. 165, p. 7** ("Republic argues that § 8.1 requires that ***any*** termination of an Agreement by a Debtor requires the Debtor to sign a general release. ***This Court disagrees*.**") (Emphasis added).[7]  Since Republic was not entitled to a release (again, pursuant to

---

[7] The above-signing judge on this opinion inherited this case and Adversary Proceeding after they were reassigned multiple times, due to prior judges' assignments and commitments in other districts.

Judge Dodd's ruling at **Adv. Dkt. 165, p. 7**), the contract was at an end. Republic should have sent Bailey's money to it and considered the relationship ended.

196.     This bankruptcy court likewise has previously held that Republic did not own, and was not entitled to collect, Bailey receivables generated on or after November 5, 2015. Only after filing a motion to enforce the court's turnover order in the Summer of 2020 (over four years after Bailey's bankruptcy filing) did Republic finally return the $82,121.58 it wrongfully collected on Bailey's accounts generated on or after November 5, 2015 and had withheld from Bailey for that time. *See* **Adv. Dkt. 297** ("Order Regarding Trustee's Motion to Enforce Order and Compel Turnover").

### xvi.     The Debtors File Chapter 11, and Disputes with Republic Scuttle Reorganization.

197.     From mid-November through Bailey's bankruptcy filing on February 1, 2016 (the "Petition Date"), Republic continued to collect Bailey's accounts receivable.

198.     In fact, as of the Petition Date, the Company and its counsel calculated that Republic was holding at least $450,000 that it had collected from Company customers, even though its debt facility had been paid in full approximately three months prior. **Testimony of Melissa Hayward**.

199.     Upon learning of the bankruptcy, Republic itself admitted holding at least $300,000 of Bailey's money in internal e-mail correspondence:

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 2/2/2016 4:29:08 PM |
| To: | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com] |
| CC: | Danika Louis [dlouis@republicbc.com]; vblade@republicbc.com; Melissa Baines [mbaines@republicbc.com] |
| Subject: | Bailey Tool, et al. filed for Chapter 11 Bankruptcy protection yesterday |

They have made a written demand on us for the $300k we are currently holding. Joe and Laurie are all over it.

**Melissa Baines**
**Risk Manager**

**TR 701**.

200.    Republic's counsel subsequently told the Bankruptcy Trustee that Republic was holding $450,000 of Bailey's money.  **Testimony of James Cunningham.**

201.    The Bankruptcy Trustee also elicited expert testimony from forensic accountant Mitchell Carter to explain how much cash Republic was holding that belonged to Bailey.  Mr. Carter performed a cash reconciliation analysis using Republic's own accounting documents.  Mr. Carter analyzed how much cash Republic actually collected, as reported in its own documents, and compared that to actual advances of dollars made to Bailey. Based on Mr. Carter's analysis, which was credible and relied on generally accepted and reliable methodologies employed by forensic accountants in their field, *Republic was holding approximately $584,250.00 of monies that it over-collected from Bailey*.  This amount was not challenged by Defendant's expert, Mr. Orr, but he did question one of the methods used.  Mr. Orr never provided an alternate number, so Mr. Carter's number is basically uncontroverted, and partially confirmed by Republic counsel's statement to the Trustee that it was holding $450,000.

202.    Mr. Carter also rendered an opinion that, based on cash collections from Bailey *vis-à-vis* advances to Bailey, Republic was actually paid in full on October 23, 2015. Mr. Carter's opinion was based on a simple rollback of the daily cash collection position of Republic as

compared to various fees and charges it was continuing to charge Bailey in the weeks leading up to the November 5, 2015 contract termination date. The analysis was credible and largely uncontroverted.

203.    Mr. Orr, Republic's testifying expert, attempted to critique Mr. Carter's analysis by claiming that his analysis did not take into account eligible accounts receivable versus ineligible accounts receivable. This point seems irrelevant since eligibility of receivables has nothing to do with ultimate collections of the accounts receivable, even those Republic formally "charged back" to Bailey. Indeed, Mr. Orr conceded that Republic's own "formula" for determining how much was owed at the end of the day did not account for receivables "charged back" to Bailey, because Republic collected approximately $209,000 in such accounts. However, Republic removed them entirely from Republic's Reserve Report and Gross Outstanding Accounts Receivable Balance. Ultimately, a cash accounting of collections versus advances seems to be the most reliable method to determine how much is owed between the parties, and only the Bankruptcy Trustee presented credible expert testimony establishing these amounts.   That cash accounting of collections vs. advances clearly shows Republic over-collected and withheld from Bailey $584,250.00.

204.    On and after the Petition Date, Republic continued to claim that: (i) the Factoring Agreements had not been terminated, which (ii) gave it title to all of Bailey's accounts receivable in perpetuity, (iii) regardless of whether Bailey had tendered those accounts to Republic. This behavior extended to Republic's contacting and even suing Bailey customers post-petition and representing that there was a "very active and non-terminated factoring agreement, which exists in place." An e-mail from Stephen "Joseph" Brown, one of Republic's attorneys, to the attorney for a Bailey customer, *after* Bailey had filed for Chapter 11 is instructive and reproduced below:

I work with Laurie Montplaisir on her RBC team as her insolvency specialist. I therefore represent RBC, as does the local counsel (Vickie Driver) that we specifically hired to appear on RBC's behalf in the Bailey bankruptcy. I CC Vickie Driver above, and I also CC Melissa Hayward, Bankruptcy Counsel to Bailey. As I understand, you have called Laurie expressing frustration that the status quo leaves your client, a Bailey customer, in a bind. You need the provision of additional goods or services from Bailey, but Bailey insists that you pay Bailey first. And you claim that you cannot pay because of the continuing effect and existence of RBC's 9-406(a) claim on the funds that you hold that you might otherwise turn over to Bailey.

Here are a few observations and suggestions:

1          There is no doubt that RBC continues to assert an active claim on the funds that your client holds. Those funds belong to RBC under a very active and non-terminated factoring agreement, which exists in place. Under the status quo, your client is obliged to pay such funds only to RBC. So you are absolutely correct that your client would be exposed to potential double liability if you turn the funds over to Bailey. We will not simply waive our rights, or give you a get-out-of-jail free card on this point;

2          RBC's current claim on the funds that your client holds is a legally valid contractual claim that will withstand any future legal scrutiny. We are currently preserving a prepetition right of setoff, which controlling law gives us the right to do even after a bankruptcy. Your client has no recourse to, no privity with, and no cause of action against mine. There are no threats that you can credibly make against RBC. If anything, your continued insistence that you be given permission to release the funds indicate that there are no contractual defenses to payment.

And

3          Here is how we might help each other: If RBC can simply get a proper termination of its factoring agreement as well as fulsome releases from Bailey and its insiders and affiliates, we would be prepared to waive our claim on the funds that your client holds. That would require, however, 9019 motion practice to obtain a court approval of the arrangement before we could give you our waiver. Hence, I CC Ms. Hayward above. Everybody would win: My client could safely exit the situation in the knowledge that it would not be sued down the road; you get the product that you need; Ms. Hayward's client gains access to funds and a job to do. Indeed, such an arrangement would actually allow for a greater amount of funds than you currently hold to reach Bailey (we hold some as well, that would also be released).

THIS IS A FRE RULE-408-PROTECTED OFFER OF COMPROMISE. You will note that what RBC attempts here is merely to exit the situation, turn over excess funds to the estate, help your client out, and be left in peace. This is not an attempt to collect a prepetition debt. Please do not attach this email to any Court pleading or otherwise make its contents public.

**Stephen "Joseph" Brown**
Partner
SJBrown@SRCattorneys.com
312.565.8339 tel · 312.565.8300 fax

**TR 788; TR 238**.

205.          Republic used the position set forth in the above email (which was subsequently rejected by Bankruptcy Judge Dodd and the District Court) (**Adv. Dkt. 165**) as a sword throughout the Chapter 11 phase of the bankruptcy case, which hindered reorganization attempts. Among other things, Republic argued that the Company could not use cash collateral or obtain debtor-in-possession financing because Bailey did not own its receivables but had sold them all to Republic.

206.     Leaving aside Judge Dodd's determination that the Factoring Agreements terminated on November 5, 2015 (**Adv. Dkt. 165**), Republic's position seems wholly insupportable, given that (i) Republic had taken a termination fee; (ii) the facility had been paid in full; (iii) Republic had not advanced any funds since September 11, 2015; and (iv) Bailey had notified Republic that Bailey considered the agreement terminated.

207.     It appears to this court, based on the totality of the evidence, that Republic's unjustified refusal to release the cash destroyed Bailey's ability to continue in business by severely limiting its working capital.  In the process of doing so and continuing to wrongfully claim ownership of Bailey's Receivables, Republic's actions also destroyed customer relations, which it had taken Bailey decades to develop, irreparably damaging the Company and dooming its chapter 11 case to failure.  The bankruptcy estate likewise incurred the following administrative expenses:

     a.     Chapter 11 administrative expenses are $490,000.00.

     b.     Chapter 7 administrative expenses through the date of trial are $211,000.00 (not including the attorney's fees of the attorneys who have pursued this Adversary Proceeding).  **Testimony of James Cunningham** (uncontroverted by Republic).

This court believes that Republic should be required to reimburse all of these charges as a result of its violations of the automatic stay (exercising control over property of the estate—the Company's accounts receivable after termination of the Agreements) and the hindering of the Debtors' reorganization efforts.

208.     The court finds the testimony of both Melissa Hayward and the Bankruptcy Trustee, James Cunningham, to be wholly credible that, with the money Republic owed Bailey at the time, Bailey could have successfully reorganized.  The $584,250.00 in cash, on the day the Chapter 11

was filed, not only would have made a difference in the case, but it may have made the filing unnecessary.

209. The bullet/ammunition business was already tangible and getting underway. Bailey had orders from Fiocchi, one of the largest ammunition suppliers in the world, for a million brass cartridges that was renewable. Bailey already had in-house the machinery and personnel to fill these orders. **Testimony of John Buttles** (uncontroverted by Republic).

210. A successful reorganization would have meant that Bailey would have been able to pivot to an ammunition-focused manufacturing business. The Trustee's valuation expert, Greg Scheig, testified credibly concerning the projected value of Bailey's reorganized business. Mr. Scheig testified that the financial projections prepared during the bankruptcy were both reasonable and reliable from a financial valuation perspective. In other words, the projections were precisely the type of financial projections that valuation experts in the valuation industry rely on every day to attempt and determine a future value of a company. Specifically, Mr. Scheig used an income approach and a risk adjusted discounted cash flow method to determine a reasonable range of value.

211. Mr. Scheig testified that the reasonable range of values for Bailey's reorganized business would have been $7.3 million to $14.4 million. The range in values is based on various risk adjustments Mr. Scheig performed, in order to both sensitivity-test his valuation opinion and also provide a range of reasonable values of expected outcomes. The low-end valuation of $7.3 million is based on a risk adjusted growth rate of Bailey hitting only 50% of its projections. The high-end valuation of $14.4 million is based on a relatively straightforward 18% discount rate, which Mr. Scheig believed was a reasonable discount rate based on the nature of the business generally. Mr. Scheig ultimately testified that the midpoint valuation range of $9.3 million was

also reasonable because it reflected the median of the risk ranges, as well as approximated a $10.339 million valuation he had calculated if a 21.5% discount rate was applied. The higher discount rate would reflect an approximate 9% systemic risk premium, which was likely appropriate given the position of the business emerging from bankruptcy.

212.  Importantly, Republic offered no controverting expert testimony to Mr. Scheig's valuation opinions. Instead, Republic attacked the underlying financial information Mr. Scheig relied upon as being inherently unreliable and speculative because Bailey did not have a history of sales or profits in the ammunition industry. Republic's criticisms are not well-founded.

213.  First, Mr. Scheig acknowledged that the financial information was based on Bailey's projections, but in his opinion he believed it was reliable information because it was a thorough and robust business plan that was not overly aggressive. In fact, Bailey's business plan did not project to have gross revenues exceeding that of the legacy business pre-bankruptcy until year 3 of the plan.

214.  Second, Mr. Scheig both interviewed the owner and reviewed supporting financial information that corroborated the general nature of the projections. In particular, Mr. Scheig reviewed copies of actual purchase orders (that were renewable) of ammunition from Fiocchi, a large ammunition supplier, that demonstrated significant interest and demand for the purchase of ammunition even before the business had begun producing ammunition casings.  Mr. Buttles, the owner, also credibly testified that Bailey had the machinery and personnel already in house to produce the casings ordered by Fiocchi.

215.  Third, Mr. Scheig credibly testified that business valuations are often reliant on a dearth of financial information, which is why the valuation itself performs risk adjustments to reflect a present value with a risk adjusted value. In other words, the systemic risk adjustments and

small business risk adjustments take into account the potentially unreliable or speculative nature of projected financial information for new business divisions. Again, and importantly, Mr. Scheig's expert opinions were uncontroverted by any of the expert testimony from Republic.

### xi. Republic Celebrates Bailey's Demise.

216.    If any doubt remained about Republic's motives, Risk Manager Melissa Baines put them to rest in an in-house email—which is almost as disturbing as the one in which Republic's COO, Allen Frederic, called Buttles a "dummy" for resisting handing over his homestead to Republic—seemingly rejoicing at what she called Bailey's "implosion," and wishing she could be in the courtroom to see the "walls come crashing down:"

> On Jun 1, 2016, at 4:09 PM, Melissa Baines <mbaines@republicbc.com> wrote:
>
> Unofficially, Bailey Tool has imploded.  The official nail is expected to hit in the next 7 to 30 days.  Comerica has pulled their consent to the cash collateral order, and they have given Debtors 30 days to COMPLETE a 363 sale, but only to the extent they can pull together a cash flow by early next week, which shows the Debtors making it to the sale and which CANNOT include any expenses to fight this adversary proceeding, AND Debtors must get the APA in place before the cash collateral hearing, which is not yet scheduled but expected to be next week.  Also, Comerica will let this crash a burn before they agree to take a haircut on any 363 sale Buttles thinks he can pull together, so the APA must be for Comerica's nut or more.  In all likelihood (and then some), these are all unattainable benchmarks, and time of death will be officially called at the cash collateral hearing next week.  Oh, what I wouldn't do to be there to see the walls come crashing down...
>
> We will still have to settle this adversary proceeding at some point, but we will be dealing with the trustee or Comerica, either of which parties will be more rational to deal with than John Buttles.
>
>
> **Melissa Baines**
> **Risk Manager**
>
> Republic Business Credit, LLC
> 201 St. Charles Avenue, Suite 2210
> New Orleans, LA 70170
> t: 504.262.8604

**TR 253**.

217.     Allen Frederic suggested Melissa Baines she should attend the court hearing as a reward. **TR 253** ("Go to the hearing, you earned it.").  Ms. Baines responded:

| Message | |
|---|---|
| From: | RBC [mbaines@republicbc.com] |
| Sent: | 6/2/2016 12:09:08 AM |
| To: | afrederic@republicbc.com |
| CC: | Stewart Chesters [schesters@republicbc.com]; Robert Meyers [rmeyers@republicbc.com] |
| Subject: | Re: Bailey Tool |

Lol! I wish I could! May be sadistic, but it would really make my day. We'll see when it is, and I might take you up on that if I can work out logistics.

Melissa Baines
Republic Business Credit, LLC

**TR 253**.

218.     Republic's management was pleased with the change since it expected this Adversary Proceeding would go away since it could not be funded, and a Chapter 7 trustee would be more "reasonable." *Id.*

219.     In addition to the difficulties caused to Buttles by the liquidation of the Company, Comerica Bank also brought suit against him personally on his guarantee of the Comerica debt in December 2018.   On May 12, 2020, Comerica obtained a judgment against Buttles for $1,963,482.35, plus interest and attorneys' fees.  **TR 497**.

220.     When put in a list, Republic's destructive acts are many.  By the time of Bailey's conversion to Chapter 7, Republic had:

- Refused to advance funds under the Factoring Agreements in good faith (seemingly all because Comerica sent the company a letter on June 29, 2015 about unpaid 2014 taxes—which constituted a default under Comerica's term loans and gave the Company a month to get it all sorted out; notably, Republic had indicated before the Agreements were signed that it probably should and would pay property taxes directly). **TR 509**.
- Stopped sending any funds directly to Bailey and instead started paying third party vendors and employees of Republic's choosing (despite there being no documentation authorizing this change in protocol).

- Exercised excessive control over the Debtors' business, seemingly causing its failure (by any reasonable estimation).
- Misled Bailey about there being no accounts receivable/funding availability, without being transparent that it was prepaying the Inventory Loans, which was what was eliminating "availability" from the cash generated by the receivables.
- Wrongfully placed a lien on Buttles' exempt homestead and extorted Buttles' equity from it with a false promise to resume funding to the Company.
- Called a default, arguably with no reasonable basis (*i.e.*, because the Company had been temporarily shut down) when Republic essentially had caused the shut down by arbitrarily withholding funding based on a false premise that there was no funding availability.
- Took an undisclosed termination fee of $75,000 at the same time Republic had just taken Buttles' homestead proceeds, with representations that Republic would resume funding after getting the homestead proceeds.
- Wrongfully held out for a release.
- Wrongfully exercised control over proceeds of Accounts Receivable created on or after November 5, 2015.
- Wrongfully withheld $584,250.
- Exercised control over funds withheld based on undisclosed fees, charges, penalties and unexplained "over-advances" (unexplained in that they could not be seen with any reasonable specificity from the portal).
- Knowingly violated the automatic stay.
- Thwarted the Debtors' ability to obtain debtor-in-possession financing by maintaining the insupportable (and now judicially refuted) claim that Republic owned Bailey's Accounts in perpetuity.
- Thwarted the Debtors from maintaining existing customers or developing new customers and from reorganizing.

221. Republic's actions destroyed a decades-old company, put dozens of employees out of work, and took away Buttles' homestead equity.

**C.** **Fees Charged by Republic that Damaged Bailey and Were Not Proven Necessary Under that Agreement.**

222. Republic charged Bailey in excess of $69,000 in legal fees in 2015 and 2016. Section 10.4 of the Agreement grants Republic the right to charge Debtors for "reasonable" attorneys' fees for "protecting or enforcing" Republic's interests in the accounts receivable and the collateral securing them, as well as "in connection with any Insolvency Event." While the fees

charged were in connection with the enumerated categories, the court finds that the amount of fees were not reasonable. The amount of fees charged far exceed a reasonable amount for the extent of legal representation that Republic would have needed during the Agreements, had it interpreted the Agreements in good faith. Further, after the Agreements terminated on November 5, 2015, the obligation of Debtors to pay for Republic's legal fees terminated as well. Therefore, Debtors are not responsible for any of Republic's legal fees incurred after November 5, 2015 ($16,721.00) and are responsible only for a reasonable amount of legal fees while the Agreements were in effect, which the court calculates as $20,000.00. The court orders a Judgment be entered against Republic in the amount of the difference between $69,000 and $20,000, which is $49,000.00.

223.    Republic also charged Bailey $54,834.00 for Hilco security services and the installation of a CC-TV system. Section 10.4 of the Factoring Agreements requires that Debtors reimburse Republic for a "reasonable" amount of fees related to "protecting or enforcing" Republic's interests in the accounts receivable. The court finds that expenses for armed guards is not within the meaning of Section 10.4 of the Factoring Agreements. It is not reasonable to extend the meaning of Section 10.4 to include such services, *as Bailey had never required armed security in the past, and there was no evidence of any security incidents during Republic's and the Debtors' relationship that would have justified the expense*. The court finds, based on the totality of the evidence, that this was an intimidation tactic. Therefore, Debtors are not obligated to reimburse Republic for the Hilco security expenses. The court orders that Republic is liable for the full amount of security expenses, $54,834.00, and Judgment be entered against Republic for that amount.

224.    It is law of the case (Judge Dodd) that the Agreements terminated at the latest on November 5, 2015. **Adv. Dkt. 165, p. 8**.

225.     Republic charged the following additional fees against Debtors from July 1, 2015 through November 20, 2015:

    a.    $75,000 Termination Fee. **TR 664**.

    b.    $284,038.13 in Default interest. **TR 664.**

    c.    $55,274.10 in attorneys' fees. **TR 5**.

    d.    $54,834.88 in security expenses. **TR 5**.

This totals $469,146.00.  "All of these fees and expenses are in addition to Republic's standard factoring and line fees, to date."  **TR 664**.  This means that an average of $93,829.42 per month was taken out of Republic's lockbox for the Company's receivables each month, from July through November for which Bailey received no benefit.

226.     The last advance that Republic made on Debtors' behalf was September 11, 2015. The Termination Fee of $75,000, at least half the Default Rate (approximately $142,000), attorneys' fees of $33,951.23, and $10,770.88 in security fees (a total of $261,722.11) were taken out of Debtor's cash in its receivables lockbox after September 11, 2015, the date of the last advance made by Republic.  "All of these fees and expenses are in addition to [Republic's] standard factoring and line fees, to date."  **TR 664**.

227.     Debtors were receiving no advances after September 11, 2015, and yet were being charged in excess of $250,000.00 of fees by Republic during that time frame, which substantially delayed Debtors' payoff date.

**D.**    <u>**Republic Acted in Bad Faith at Various Times, and Even Occasionally with Malice**</u>

228.     The court fully recognizes that the Agreements (the Factoring Agreements as well as the Inventory Loan Agreements) were quite replete with rights, fees, and other provisions that heavily favored Republic (as discussed early in these Findings).  In fact, the Agreements were shockingly one-sided in favor of Republic. And, generally, a contract is a contract. Be that as it

may, the following are non-exclusive examples that the court finds demonstrated Republic's bad

faith and, at times, even malice toward Bailey and Buttles, especially from July 1, 2015 forward.

These are, in some cases, relevant to certain causes of action and damages discussed in the

Conclusions of Law section later:

       a.     Allen Frederic (barely five months into what was supposed to be only a one-

year factoring arrangement) quite clearly developed a strong desire to oust Buttles from his

wholly owned Company that Buttles had owned for decades and, instead, put Bob

McGovern in place as president; meanwhile Allen Frederick did not he want to pay Buttles

any further compensation and also wanted Buttles' home equity.  With regard to that, Bob

McGovern made suggestions to Allen Frederic regarding how to handle Buttles:

> • John – I understand your thinking that as owner he is last in. It is important he does not falter on his house payment ($7100).  It may be something to pay directly.  When it sells I can readjust his compensation to a more agreeable level as needed  I suggest total payment (including house) be $2200 a week  which will not allow any discretionary spending and keep them motivated to move the home.

**TR 138**.

       b.     Allen Frederic, agreed with this suggestion of at least paying John Buttles

enough to make his house payment (but not allowing him enough for discretionary

spending), and not only approved McGovern's plan, but also approved McGovern's

projected salary as the new president and CEO, and suggested to Melissa Baines that

McGovern should be given an equity participation in Bailey:



**TR 138**.

        c.     McGovern stated in his testimony that he provided information to Republic about Buttles' personal financial distress, and he thought this gave Republic an advantage in its negotiations regarding Bailey and Buttles' home; the following email was sent from Allen Frederic to Melissa Baines about Buttles thereafter:

| From: | Allen Frederic <afrederic@republicbc.com> |
|---|---|
| Sent time: | 09/16/2015 11:49:09 AM |
| To: | Melissa Baines <mbaines@republicbc.com> |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Yes tell them we will stop funding, end of game, we will wait until he can't make house payments and bid it in at auction, call our atty and confirm we can do this even with personal bankruptcy but this does not appear to be good faith on their part and there is no other good collateral that I seem accordingly I think we assume more risk by continuing to fund. Have our lawyer advise them that we will peruse foreclosure

**TR 754**.

        d.     Bottom line, Republic's rights under its Agreements were apparently not nearly enough, in Allen Frederic's mind. He wanted Buttles' exempt house.

        e.     Later, after Republic had gotten Buttles' homestead and treated the Agreements as terminated (and taken a $75,000 termination fee), Melissa Baines seemed gleeful at Bailey's ultimate demise.  **TR 253**.

> On Jun 1, 2016, at 4:09 PM, Melissa Baines <mbaines@republicbc.com> wrote:
>
> Unofficially, Bailey Tool has imploded. The official nail is expected to hit in the next 7 to 30 days. Comerica has pulled their consent to the cash collateral order, and they have given Debtors 30 days to COMPLETE a 363 sale, but only to the extent they can pull together a cash flow by early next week, which shows the Debtors making it to the sale and which CANNOT include any expenses to fight this adversary proceeding, AND Debtors must get the APA in place before the cash collateral hearing, which is not yet scheduled but expected to be next week. Also, Comerica will let this crash a burn before they agree to take a haircut on any 363 sale Buttles thinks he can pull together, so the APA must be for Comerica's nut or more. In all likelihood (and then some), these are all unattainable benchmarks, and time of death will be officially called at the cash collateral hearing next week. Oh, what I wouldn't do to be there to see the walls come crashing down…
>
> We will still have to settle this adversary proceeding at some point, but we will be dealing with the trustee or Comerica, either of which parties will be more rational to deal with than John Buttles.

**TR 253**.

> f. Allen Frederic, who, of course, was Melissa Baines's boss, suggested she should attend the bankruptcy hearing at which Bailey's Chapter 11 case was expected to unravel as a reward. **TR 253** ("[g]o to the hearing, you earned it."). Melissa Baines responded:

```
Message

From:        RBC [mbaines@republicbc.com]
Sent:        6/2/2016 12:09:08 AM
To:          afrederic@republicbc.com
CC:          Stewart Chesters [schesters@republicbc.com]; Robert Meyers [rmeyers@republicbc.com]
Subject:     Re: Bailey Tool

Lol!  I wish I could!  May be sadistic, but it would really make my day.  We'll see when it is, and I might take you up on
that if I can work out logistics.

Melissa Baines
Republic Business Credit, LLC

(504) 262-8604 -Office
(847) 778-2905 -Mobile
mbaines@republicbc.com

Sent from my iPhone

On Jun 1, 2016, at 9:04 PM, afrederic@republicbc.com wrote:

          Go to the hearing, you earned it
```

**TR 253**.

257.     The overall theme of Republic's defense in this matter seemed to be that: (a) Bailey was dead-on-arrival by the time Republic started its relationship with Bailey and, thus, Republic cannot be held accountable for Bailey's financial demise; (b) Buttles was dishonest before, during, and after the Republic relationship (including during Trial); and (c) some of the alleged damages here are Buttles' fault because he would not sign a release in favor of Republic. The court does not believe the evidence supports these arguments.

258.     The overall theme of the Trustee's argument in this matter seemed to be that: (a) Republic was at all times oversecured, over-reacted, and over collected; (b) it committed bad faith breaches of contract throughout the relationship with the Debtor; and (c) Republic made fraudulent misrepresentations throughout the relationship with the Debtor. The court believes the evidence largely supports this (at least during the latter part of the relationship).

259.     The overall theme of Buttles' argument is that the conduct in which Republic engaged with regard to his homestead was tortious (under various tort causes of action) and was so egregious, in fact, that exemplary damages are appropriate.  The court believes the evidence supports this argument.

232.     If any Finding of Fact herein is more appropriate as a Conclusion of Law, it is deemed as such and incorporated into the Conclusions of Law.

### III.
### CONCLUSIONS OF LAW PERTAINING TO TRUSTEE'S CLAIMS

**A.     Jurisdiction and Venue.**

233.     The court has jurisdiction over this Adversary Proceeding under 28 U.S.C. § 1334.  This Adversary Proceeding contains some core proceedings, under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O), and some non-core causes of action.

234.     Venue is proper in this court under 28 U.S.C. §§ 1408 and 1409.

235.     With regard to the claims that are not core, all parties expressly consented to the entry of final orders and judgments by the Bankruptcy Court.

**B.     Applicability of Louisiana Statutes with regard to Breach of Contract Claims and Damages Pursuant Thereto.**

236.     Section 10.1 of the Factoring Agreements provides that the law of the "Chosen Forum" will apply to the Agreement.  "Chosen Forum" is defined in Annex A of the Agreement to be Louisiana.  Section 12.5.1 of the Inventory Loan Agreements has the same language.

a.     Louisiana law nullifies any clause in a contract that, "in advance, excludes or limits the liability of one party for ***intentional or gross*** fault that causes damage to the other party."  LA. CIV. CODE ART. 2004.  The Fifth Circuit recently held that, under Art. 2004, "gross fault" includes "not only gross negligence, but also bad faith breach of contract or fraud."  *Alonso v. Westcoast Corp.,* 920 F.3d 878, 885 (5th Cir. 2019).  Further,

the Fifth Circuit explained that "actual or constructive fraud or refusal to fulfill contractual obligations" constitutes bad faith breach of contract. *Id.* Section 12.5 of the Factoring Agreement between Republic and Bailey provides:

> Under no circumstances shall Purchaser be liable for any incidental, special or consequential damages, including, but not limited to, loss of goodwill, loss of profit, or any other losses associated therewith, whether Purchaser did or did not have any reason to know of a loss that may result from any general or particular requirement of Seller.

Because Section 12.5 covers any act committed by Republic, it contemplates acts of intentional and gross fault. Republic breached the Factoring Agreements in bad faith—as further set forth below. Therefore, this court finds that Section 12.5 of the Factoring Agreement is null, and that Debtors are not precluded from recovering consequential damages against Republic for their bad faith breaches of the Factoring Agreements or those caused by gross fault.

b. Under Louisiana law, by statute "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." LA. CIV. CODE ART. 1997. As further set forth below, Republic failed to perform in accordance with the contract in various respects, interfered with Debtors' operations and attempted reorganization, and made numerous misrepresentations over the course of the Agreements. This court concludes that Republic acted in bad faith in its failure to perform in accordance with the Agreements. Therefore, Republic is liable in the amounts shown in the Breach of Contract section hereof.

## C. Applicability of Texas Law with regard to Tort-Based Claims

237. It appears uncontested that Texas law applies to the Bankruptcy Trustee's tort-based claims. *See, e.g.,* Republic's Motion for Partial Summary Judgment Against Debtors and Memorandum in Support [**Adv. Dkt. 235**] and Trustee's Responses thereto [**Adv. Dkt. 247**].

Nevertheless, the court also independently concludes that Texas law should govern the Trustee's tort-based claims because Texas has the most significant relationship to such claims. *See Benchmark Electronics, Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 727-28 (5th Cir. 2003).

**D.      The Trustee's Claims.**

238.      The Trustee has asserted numerous alternate theories of relief in this Adversary Proceeding. Distilled to their essence, the Trustee asserts claims that:   (1) there were material misrepresentations made in the inducement of the relationship; (2) Republic failed to live up to its end of the bargain captured in the Factoring Agreements and breached them in bad faith; (3) that Republic concealed its liquidation efforts in a manner that did maximum harm to the Debtors' business; (4) that Republic continually misrepresented the status of Bailey's credit facility in and after July 2015 and took control of Bailey by the force and effect of these misrepresentations; and (4) Republic prevented Bailey from reorganizing. The court will address the Trustee's claims below.

**i.      Breach of Contract.**

239.      Louisiana law requires a plaintiff to establish three elements to prevail on a claim for breach of contract. A plaintiff must establish "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the oblige." *Favrot v. Favrot*, 68 So.3d 1099, 1108-09 (La. App. 4 Cir. 2011). The Trustee has established by a preponderance of evidence each of the elements for a breach of contract.

240.      While this court believes that Republic's conduct was in many ways tortious (and shocking), the breach of contract analysis here is actually quite vexing.  As alluded to earlier, the Agreements are amazingly one-sided.  In fact, they are so one-sided (*i.e.,* providing a smorgasbord of rights, remedies, and discretion in favor of Republic, with very few rights in favor of Debtors)

that there seem to be very few breaches of contract. In other words, many of the alleged bad acts articulated by the Trustee were seemingly permitted by the terms of the Agreements.

241.    For example, the Trustee argues that Republic began breaching the Agreements at least as early as July 9 and 10, 2015, by unreasonably deeming itself insecure and declaring: (a) a default under the Factoring Agreements after **Comerica** (Debtors' real estate and equipment lender) sent its own default letter, on June 29, 2015, regarding the Debtors' unpaid 2014 property taxes (when Republic knew the Debtor had unpaid taxes prior to beginning the lending relationship and, in fact, contemplated paying property taxes itself directly in the future); and (b) another default under both the Factoring Agreements and the Inventory Loan Agreements alleging, among other things, that the Debtors had "ceased to trade due to any Insolvency Event" (after Debtors failed to make payroll and temporarily shut the business down in early July—due to a lack of funding by Republic starting on July 2, 2015—at a time when the Debtors appeared to have available accounts receivable for factoring (in fact, Republic paid its inventory loan down by $76,473.60 on July 7, 2015 and by another $176,000 on July 16, 2015).

242.    While these default-declarations certainly seemed to precipitate a downward spiral, and could easily be considered an over-reaction, they were not *per se* breaches of contract. Republic was within its rights under the Agreements to declare an event of default at this point in time. For example, Section 6.3 of the Inventory Loan Agreements contained a covenant requiring Debtors to keep all taxes current, and Section 7.1(c) therein made it an "Event of Default" if Bailey failed "to observe or perform any of the covenants, conditions and agreements . . . contained herein or in any of the other Financing Documents." *See* **TR 54, 55, & 56**. And the Factoring Agreements stated that there would be an "Event of Default" thereunder when there was an "Event of Default" under the Inventory Loan Agreements. **TR 51, 52, & 53 (Section 7.1(m)**. The court concludes

that Republic did not waive its remedy of declaring the unpaid *2014* property taxes a default, simply because it knew about Bailey's unpaid *2013* property taxes before entering into the Agreements and did not follow up on its intentions to start paying property taxes itself directly. *See* **TR 51, 52 & 53 (Section 12)**; **TR 54, 55, & 56 (Section 12.9)**. Thus, Republic's July 9, 2015 letter declaring a default was not a breach of contract—even if there was availability of accounts receivable at that time. The Factoring Agreements provided that upon the occurrence of an Event of Default, Republic had "the right, at its discretion, to cease further Advances and/or terminate [the Factoring Agreements], all of which may be done without notice to [Debtors] and [Republic] may immediately exercise all rights and remedies" under the Factoring Agreements. **TR 51, 52, & 53 (Section 7.2)**.

243.    Additionally, Republic's more fulsome July 10, 2015 default letter (based on, among other things, the Debtor's temporary cessation of trading—but which actually contained a long laundry list of defaults under Section 7.1 of the Factoring Agreements and Section 7.1 of the Inventory Loan Agreements) did not run afoul of the technical terms of those Agreements. Among other things, Republic cited as Events of Default under the Factoring Agreements:  (a) an "Insolvency Event" pursuant to Section 7.1(b) (under the defined terms for "Insolvency" and "Solvency" in the Factoring Agreements, this seems plausible); and (b) a "material adverse change occurs in [Debtors'] financial condition, business or operations" (again, this seems plausible—as Bailey was now facing a default declared from its term lender Comerica, which might or might not be resolved).  Additionally, Republic cited as Events of Default under the Inventory Loan Agreements:  (a) a cross-Event of Default under the Factoring Agreements, pursuant to Section 7.1(a); (b) the fact that "Purchaser is no longer making Advances to Seller as set forth in" the Factoring Agreements, pursuant to Section 7.1(b); (c) failure to "perform any of the covenants"

contained in the Inventory Loan Agreements (again this included covenants to pay taxes), pursuant to Section 7.1(c); (d) Bailey's "default in the . . . performance of any material obligation under any . . . mortgage, deed of trust or other agreement or instruments to which [Bailey] is a party or by which it is bound" (again, this would seem to encompass the Comerica default), pursuant to Section 7.1(e); and (e) Republic "reasonably and in good faith" deeming itself to be "insecure" because of, among other things, a "Potential Default," pursuant to Section 7.1(f). Once again, Republic's July 10, 2015 letter declaring a default was not a breach of contract—even if there was availability of accounts receivable at that time. Again, the Factoring Agreements provided that upon the occurrence of an Event of Default, Republic had "the right, at its discretion, to cease further Advances." **TR 51, 52, & 53 (Section 7.2)**.

244.    However, the court concludes Republic did breach the Agreements with the Debtors in a few other ways.

245.    Republic, from July 2015 (once it resumed funding again), to the end of the relationship, clearly breached the Agreements ***by not funding Bailey directly, but instead putting in place a procedure to only pay certain vendors and employees that Republic deemed advantageous to enhance its collections***.  Paragraph 2 of the Purchase Provisions of the Factoring Agreements (**TR 51, 52, & 53**) provides "Available Funds will be distributed to Seller…[Bailey]." See also Section 2.2 of the Inventory Loan Agreements (consistent language making proceeds available to "Borrower" [Bailey]). **TR 54, 55 & 56**.  Since these provisions of the Agreements are the only references to the manner in which funds are supposed to flow under the Agreement, the court concludes this is a mandate that Bailey be in control of any distributions received from Bailey's receivables, not Republic. ***The Agreements were never amended or supplemented to***

*countenance this—for example, in some sort of forbearance or similar agreement, after Bailey allegedly went into default*.

246.    The court concludes that Republic also breached the Factoring Agreements when it charged a Termination Fee against the Debtor's accounts receivable collections on October 2, 2015 (by the way, the same day that it accepted $225,000 of sale proceeds from Buttles' homestead), but *then continued to take the position that the Agreements were not terminated, insisting that it was entitled to a release before termination was deemed to have occurred, and thereafter refused to turn over funds collected for which it had never made any advances to the Debtors* (again, making an improper demand that the Debtors provide a release of liability).  **Adv. Dkt. 165.**

247.    Parsing further through the Factoring Agreements carefully is crucial on this point. The Factoring Agreements provided that upon the occurrence of an Event of Default, Republic had "the right, at its discretion, . . . to *terminate [the Factoring Agreements] . . . without notice* to [Debtors]" (emphasis added). **TR 51, 52, & 53 (Section 7.2)**.  Section 8.3 (although poorly drafted) further seemed to elaborate that Republic was not required to give the Debtors any notice of an early termination unless the Debtors requested notice of early termination "in writing." *Id.* There was no evidence that Debtors had made this request in writing.  Then, Section 8.3 goes on to provide that if there is an "Event of Default under the [Factoring] Agreement that results in an early termination of this Agreement by either [Debtors or Republic], [Debtors] shall pay [Republic] the Termination Fee, which Termination Fee shall be in addition to any other fees due to Purchaser hereunder." *Id.*  "Termination Fee" is defined with a formula in Annex A to the Factoring Agreements, and it appears it was calculated by multiplying 3% times $2.5 million (the maximum amount of borrowing under both the Inventory Loans and Factoring Agreements).

Moreover, Section 7.6 of the Factoring Agreements provides that "[u]pon an Event of Default," the Debtors' access to Republic's online internet available services shall be provisional and Republic "may limit or terminate" Debtors' access to the online services (with further acknowledgements about online services fulfilling any duty of Republic to respond to requests for accounts or statements of account pursuant to the UCC). *Thus, as incredibly onerous as this was for the Debtors, it appears that Republic could contractually terminate the Factoring Agreement after it validly declared an Event of Default and charge a $75,000 Termination Fee—all without giving notice to the Debtors*.

248.    One could easily interpret the termination of the Agreements to have occurred on October 2, 2015—the date that Republic charged the $75,000 Termination Fee against the Debtors' receivables—particularly since Republic never again made advances to the Debtors after that date (and, in fact, never made advances to the Debtors after September 11, 2015). However, the law of this case is that the Agreements terminated on *November 5, 2015*, when the Debtors officially stopped submitting accounts receivable schedules to Republic under the Agreements, triggering a termination under Section 8.2 of the Factoring Agreements (pursuant to a ruling of Former Judge Douglas Dodd, on a motion for summary judgment, which was adopted by the District Court). *See* **Adv. Dkt. 165 & 220**. Judge Dodd recommended that the District Court hold (and it did so hold) that "Republic's control over Accounts and the proceeds of Accounts generated by the Debtors on and after November 5, 2015 was a violation of the automatic stay." This court holds that it was also a breach of contract. *The breach of contract here was Republic withholding accounts receivable of the Debtors that the Debtors generated after November 5, 2015, insisting that the Debtors must provide a release to Republic in connection with the termination.* Republic has argued that termination of the Agreements did not affect its ownership of accounts receivable, and

it could continue to collect accounts receivable essentially ad infinitum, until all Obligations under the Agreements were paid in full—presumably finding some support for that argument in Section 8.4 of the Factoring Agreements. Judge Dodd has already ruled that accounts receivable generated after November 5, 2015 belonged to the Debtors. Even if this ruling were not the law of the case, and even if Republic is correctly interpretating the Factoring Agreements at Section 8.4, the evidence reflected that in mid-November 2015, Republic was internally communicating that it as "collected out" of Bailey and "all Default Rates and Termination Fees had been recovered" and that the risk manager could not find any additional significant additional fees that Republic "might be able to charge." **TR 664 & TR 255**. Thus, mimicking the language of Section 8.4, it would appear that all "Obligations" under the Agreements had been "satisfied in full."

249. Republic further breached the Factoring Agreements by continuing (after taking the Termination Fee and after November 5, 2015) to demand performance from Debtors after the contract had terminated, and by demanding Debtors continue to send their receivables to Republic and telling the Debtors' customers, potential customers, and potential lenders the Factoring Agreement was still in force and effect and that all customer payments should be sent to Republic. *See* **TR 788**.

250. The court concludes that Republic breached the Agreements with Bailey by over-collecting and holding monies that rightfully belonged to Bailey.

251. The court concludes that all of the above breaches of the Agreements by Republic were intentional or the result of gross misconduct and caused Bailey damage.

252. The court concludes that, but for the actions of Republic, Bailey would not have failed as a going concern and would not have had to go into bankruptcy in February 2015.

253.     Republic's breaches of contract ultimately caused Republic to over-collect on its debt obligations from Bailey. Republic caused approximately $584,250 in damages to Bailey in connection with its over-collection of accounts receivable.

254.     In addition, Republic's breaches of contract ultimately caused Bailey's bankruptcy, the associated destruction of Bailey's enterprise value, and future as a going concern. Republic's material breaches of contract caused substantial and lasting negative impacts on Bailey's cash flows at a time when Bailey's very future was on the brink, and just as the Company was anticipating a pivot to a likely lucrative ammunition manufacture business model. It was reasonably foreseeable for a factoring company dealing with distressed businesses to know and understand that depriving a business of essential cash flow when at its most dire position would cause lasting and permanent economic losses. Bailey was no exception. As a result, Bailey was unable to successfully transition or pivot its business to a more sustainable and valuable ammunition manufacturing business.

255.     At a minimum, Republic's material breaches of contract caused the loss of the *legacy* business as a going concern. The uncontroverted expert testimony placed the lost value of Bailey's *legacy* business, as valued through the same financial information Republic relied upon in underwriting its loan agreements with Bailey, at approximately $4.974 million.

256.     Further, the uncontroverted expert testimony placed the lost value of Bailey's *anticipated future ammunitions-focused* business at a range between $7.3 million to $14.4 million, based on various risk adjustments (with the low-end valuation of $7.3 million based on an assumption that Bailey would hit 50% of its projections).

257.     The court concludes that the actions of Republic in wrongfully withholding monies owed to Bailey and making claims to new receivables after the sums owed to Republic had been paid by Bailey, likewise, violated the automatic stay and prevented the reorganization of Bailey.

258.     The Trustee has established by a preponderance of the evidence that Republic's breaches of contract resulted in damages in the amount of: (1) $584,250 in funds over-collected and wrongfully withheld; (2) $4.974 million in damages for the destruction of the Debtor's ***legacy*** business; and (3) $7.3 million in damages for the lost value of the anticipated ***ammunitions-focused*** business (the court has used the low-end of Trustee's expert's valuation on this).

### ii.     Breach of the Duty of Good Faith and Fair Dealing.

259.     Under Louisiana Law, "[c]ontracts must be performed in good faith." *See* LA. CIV. CODE CH. 8, SEC. 1, ART. 1983; *Grisaffi v. Dillard Department Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995) ("Good faith performance is an implied requirement of every contract under Louisiana law."). The court concludes that Republic, in various ways, did not engage in good faith performance of its Agreements and, as a result, breached the duty of good faith. It breached its duty of good faith in at least the following respects:

a.     Republic, from July 2015 to the end of the relationship, breached the duty of good faith and fair dealing by not funding Bailey directly, but instead made advances directly only to vendors and employees of Republic's choosing. Paragraph 2 of the Purchase Provisions of the Factoring Agreement (**TR 51, 52 & 53**) provides "Available Funds will be distributed to Seller…[Bailey]." Since this is the only mention of the way funds are supposed to flow in the Agreements, the court concludes this is a mandate that Bailey be in control of any distributions received from Bailey's receivables, not Republic. The Agreements were never amended to countenance this. **Testimony of Melissa Baines**. The evidence reflected that Republic's behavior was rather outrageous on various

occasions—fussing with the Debtors over such things as Bailey's request to buy oil for machines to run and Gatorade to provide to employees on an un-air-conditioned manufacturing floor.

     b.     Republic also breached the duty of good faith and fair dealing by taking a Termination Fee on October 2, 2015, then taking the position that the Agreements were not terminated, and that it was entitled to ***collect accounts receivable, ad infinitum, until the Debtors signed a release of claims against Republic***. Under paragraph 8.3 of the Factoring Agreements, a termination fee is to be taken only upon "termination of the Agreements." **TR 51, 52 & 53**. Republic specifically breached the duty of good faith and fair dealing under the Factoring Agreements when it refused to turn over funds collected after the termination (*i.e.,* funds against which Republic had made no advances) until the Debtors provided a release of liability. The Factoring Agreements did not require the Debtors to provide a release upon termination. **Adv. Dkt. 165**. Republic further breached the duty of good faith and fair dealing by continuing to demand performance from Debtors after the Agreements had terminated, and by demanding Debtors continue to send their receivables to Republic and telling the Debtors' customers, potential customers, and potential lenders the Factoring Agreements were still in force and effect and that all customer payments should be sent to Republic. **See TR 788**.

     c.     The court concludes that Republic breached the duty of good faith and fair dealing with Bailey by over-collecting and holding monies that rightfully belonged to Bailey.

      d.      The court further concludes that Republic breached the duty of good faith and fair dealing by taking the following acts which were not authorized under the Agreements:

- Essentially taking over the manufacturing function through approving or not approving payments to certain vendors and materials suppliers, and ordering and reordering the sequence in which different products at Bailey were manufactured, and changing the manufacturing priorities from keeping long-term customers, to doing "quick-turn" projects (*See* **Findings of Fact 74-88**);
- Controlling the work force at Bailey through controlling the payroll and ordering who got paid and who did not and what types or classifications of employees could get paid (*See* **Findings of Fact 89-91**);
- Trying to force vendors of Bailey to pay Republic instead of Bailey, destroying the goodwill that Bailey had built up with these vendors, all of whom were continuing to service Bailey on credit terms before Bailey had to shut down in July when Republic stopped funding**.**

      e.      The court concludes that all of the above breaches of good faith and fair dealing by Republic were intentional, the result of grossly overreaching conduct, and caused Bailey damage.

      f.      The court further concludes that, but for the actions of Republic, Bailey would not have failed as a going concern and would not have had to go into bankruptcy.

260.    Republic's failure and breach of the duty of good faith and fair dealing resulted in damages to the Debtors in the amount of: (1) $584,250 in funds over-collected and wrongfully withheld; (2) $4.974 million in damages for the destruction of the Debtors' *legacy* business; and (3) $7.3 million in damages for the lost value of the future *ammunitions-focused* business (the court used the low-end of the Trustee's expert's valuation).

### iii.    Lender Liability

261.    "Lender liability" is a broad umbrella term often used to describe various theories through which a borrower (or its trustee in bankruptcy) seeks to impose liability (or a remedy of some sort) against a former lender in a lending relationship that has soured. Sometimes, too much

control exercised by a lender over a borrower can generate causes of action in tort. Normally, a lender-borrower relationship is not that of a fiduciary. If a lender exercises excessive control over a borrower, however, a lender can assume the role of a fiduciary rather than a mere creditor. When such a change occurs, the lender must refrain from misleading or concealing information from the borrower and the lender is required to make decisions in the best interests of the borrower, even if contrary to the best interest of the lender. Alternatively, even if a fiduciary duty is *not* established, if a lender takes a particularly active role in the business decisions of the borrower and, in an attempt to secure the course of the borrower's business, the lender intentionally interferes with such things as management selection and borrower's business contracts, a lender may become liable for tortious interference. Additionally, many lender liability cases, in the context of bankruptcy, involve attempts at equitably subordinating a lender's claim, pursuant to Section 510 of the Bankruptcy Code. *See, e.g., Smith v. Assocs. Comm. Corp. (In re Clark Pipe & Supply Co., Inc.),* 893 F.2d 693 (5th Cir. 1990).

262.     Here, the Trustee has asserted numerous possible torts. The court does not conclude that a fiduciary relationship evolved here on the part of Republic. However, the court concludes that two torts have been established, by a preponderance of the evidence, to have been committed by Republic against the Debtors: fraud (through fraudulent misrepresentations) and interference with business and contractual relations. Additionally, the court concludes that the preponderance of the evidence established that Republic committed the torts of fraud, fraud in a real estate transaction, and negligent misrepresentation against Buttles, personally.

263.     Before launching into the court's specific conclusions on these torts, the court believes it is important to re-explore the seminal case in Texas that addresses certain of these torts in a lending-relationship-gone-bad context. *State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661

(Tex. Ct. App. 1984). The 47-page *Farah* case, while dating back to 1984, has been cited 880 times, at this court's last count (only six times negatively). In *Farah*, a jury found (after a more-than-two-month trial) that a defendant bank, acting alone or in conspiracy with two other lenders, committed acts of fraud, duress, and interference, proximately resulting in damages to the borrower-plaintiff, and set damages at $18,947,348.77. The court of appeals affirmed.

264. The facts were that Farah Manufacturing Company, Inc. ("FMC") had been a family-owned apparel manufacturer that began business in 1919. It went public in 1967. Willie Farah ("Farah") was the CEO for many years, but after some tumult in the business and substantial losses, Farah had been forced by its board to resign as CEO in July 1976 (with him staying on as a director on the company's board).

265. Shortly thereafter, in October 1976, FMC obtained a $22 million loan agreement (FMC had been negotiating the loan since Spring of 1976). There were three lenders on the loan facility and Republic Bank was the agent. The loan agreement had a so-called "management clause." The clause was amended in 1977 and provided it would be an ***event of default*** under the loan if there occurred: "Any change in the office of President and Chief Executive Officer of [FMC] or any other change in the executive management of [FMC] which any two Banks shall consider, for any reason whatsoever, to be adverse to the interests of the Banks."

266. In March 1977, more in-fighting erupted on FMC's board, and Farah sought to return to his role as CEO. The board had some concern about needing to consult with the lender group and hear its position on the subject. The board suggested that Farah personally present his management proposal to the lenders. He did so at Republic Bank in Dallas on March 14, 1977, stressing his return as CEO was the only way to save FMC. No decision was reached by the lenders. Farah was informed of their indecision and that a change in CEO could constitute a violation of

the management change clause.  The *Farah* opinion reflects that numerous conversations occurred in the following days between members of the FMC board and members of the lender group. Apparently, the lender group got together at some point and decided (according to a credible witness), among other things, that they would "[t]ell Willie we pull the plug if he goes in as CEO," but when asked if any decision had been made at that point to actually call the loan if Farah were elected as CEO, the witness responded, "[t]here was no decision."  *Id.* at 671. Other evidence likewise suggested that no decision had been made whether a default would be declared if Farah was restored to the CEO position.

267.    In any event, on March 22, the lender group sent to the FMC board a letter which stated:  "The Banks wish to advise the Board that a change of executive management which includes the election of Mr. William Farah as chief executive of the Company or results in his being the power to generally supervise and control the operations and affairs of the Company is unacceptable to the Banks, and the Banks will not grant any waiver of default based thereon. The Banks are, however, willing to consider a waiver of the default clause ... if the Board decides that a change in the office of the Chief Executive of the Company (involving others than Mr. Farah) is in the best interests of the Company."  The bank officer for Republic testified that: "the lenders did not want to call the loan and create a default which would result in FMC's bankruptcy." *Id.* at 672. FMC was not in any other type of default during this time.

268.    Thereafter, there was still more infighting at the FMC board (with Farah undeterred, thinking he would still become CEO and the lenders would not call the loan) and certain board members were having one-off discussions with certain lender representatives.  In fact, the next day, March 23, the lenders met with various of the FMC board members, which group included Farah.  The evidence indicated that the spokesman for the lender group (hereinafter, "Lender

Spokesman") opened the meeting by saying that "Willie [Farah] was not acceptable as a chief executive officer and president" and further stating that if, "it got to the point where if Willie Farah was elected president of the company, why, he would automatically bankrupt the company and he would padlock it the next day." One of the FMC board members further testified that, after talking to his attorney on the phone, he came back and told the Lender Spokesman that "he could take his loan agreement and shove it up his ass." The witness explained he said that "trying to determine how serious they were about bankrupting and closing the company . . .. I intended to push him to the very brink and very edge and find out." The witness testified that the Lender Spokesman's response was "[w]e will." The witness testified that he then believed the lenders would bankrupt and padlock the company if the board elected Farah and, as a result of the meeting, "I was fearful of putting the company in bankruptcy. So I agreed to talk to Mr. Farah and ask him to stand down and not stand for election." *Id.* at 673-674. Other witnesses in attendance at the meeting disputed that these "bankrupting and padlocking" statements were the exact words of the Lender Spokesman. In any event, there was evidence that there was yet another discussion later the same day between Farah and the Lender Spokesman where the Lender Spokesman again said he "was going to put the company into bankruptcy and padlock the doors the next morning" and that he "pounded on the table right in front of me, right in my face there," and repeated the statement regarding bankrupting the company and padlocking the doors. *Id.* at 674. After all of this, Farah backed off from seeking the CEO position and a different person was elected by the board (a gentleman who happened to be a board member of one of the lenders)—and the lenders agreed not to deem this an event of default. Board minutes reflected that the Lender Spokesmen and various other lender representatives were at the FMC board meeting where the new CEO was elected.

269.    The new CEO was short-lived, and then a new consultant was brought on that became CEO.  FMC continued with a downward trend in sales. Auctions of assets and paydown of the loan occurred. FMC continued to deteriorate in almost every way. Farah eventually returned as CEO. While at some point, FMC was in monetary default on its loan, it eventually was able to refinance and payoff the loan in full. Evidence showed that, upon Farah's return to management, FMC turned things around dramatically and consistently experienced an increase in sales and profits and regained its position as an effective competitor with other manufacturers of apparel.

270.    <u>FMC's Fraud Claim</u>.  FMC asserted a cause of action for fraud, focused upon the March 22 lender letter and the statements made by the Lender Spokesman to Farah and other board members on March 23 regarding "bankruptcy" and "padlocking" if Farah were elected as CEO. The court of appeals held that the evidence was legally and factually sufficient, albeit conflicting, that on March 21 ***the lenders had either decided not to declare a default which would result in FMC's bankruptcy or reached no decision on the matter. Neither position was conveyed to the FMC board***. Regardless of the position taken, the "warnings" (representations) made in the letter and by the Lender Spokesman were characterized by FMC as false threats constituting fraud. The court of appeals held that the lenders could not overcome the legal and factual sufficiency of the evidence that the lenders made false material representations which they knew to be false and which, as intended, were relied and acted upon by Farah and other board members. The representations that a default would be declared, and the company bankrupted and padlocked if Farah were elected as CEO, were material facts and amounted to more than mere opinions, judgments, probability or expectation on the part of the lenders. ***The March 22 letter and table-pounding representations created a false impression regarding the lenders' decision (or lack of decision) to declare a default.***

271. <u>FMC's Interference with Business Cause of Action</u>. FMC asserted that after Farah was neutralized, the lenders continued to interfere with FMC's rights to lawful management and proper corporate governance, by installing a fellow named Conroy as CEO, forcing Farah's resignation, and substituting another fellow named Gordon Foster as chairman. FMC urged that the evidence showed that the lenders' acts of interference were patent, continuing and without justification.

272. The court stated: "To maintain the action for interference with the contract, it must be established that (1) there was a contract subject to interference, (2) the act of interference was wilful and intentional, (3) such intentional act was a proximate cause of Plaintiff's damage, and (4) actual damage or loss occurred. The proof of these elements establishes a prima facie case of interference. It then becomes incumbent upon the part of the defendant to show that his acts were either justified or privileged."

273. The court elaborated that "[i]nterference embraces within its scope all intentional invasions of contractual relations, including any act injuring or destroying property and so interfering with the performance of the contract itself, regardless of whether breach of contract is induced." It encompasses the situation where complained of acts "do not rest on some legitimate interest or if there is *sharp dealing or overreaching* or other conduct below the behavior of fair men similarly situated." (emphasis added).

274. The court ultimately held that: "In view of the foregoing principles, the evidence is legally sufficient that the lenders interfered with FMC's business relations, its election of directors and officers and its protected rights. FMC was entitled to have its affairs managed by competent directors and officers who would maintain a high degree of undivided loyalty to the company. . . . The evidence is factually sufficient that the interference compelled the election of directors and

officers whose particular business judgment and inexperience and whose divided loyalty proximately resulted in injury to FMC. The interference by the lenders was done willfully, intentionally and without just cause or excuse. As a matter of law, FMC has established a cause of action for interference."

275.    The court will now turn to these legal principles as they apply to Bailey and Buttles.

### iv.    Fraud.

276.    As gleaned from *Farah* and numerous other cases, to establish a claim for fraud, the Trustee must prove by a preponderance of evidence the following elements: (1) Republic made a representation to the Debtors; (2) the representation was material; (3) the representation was false; (4) when Republic made the representation, it either knew the representation was false or positively asserted the representation recklessly and without knowledge of whether it was true; (5) Republic made the representation with the intent that the Debtors act on it; (6) that the Debtors did rely on the representation; and (7) the representation caused the Debtors injury. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011); *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex. 2011).

277.    Texas case law also makes clear that a representation consists of **words or other conduct manifesting to another the existence of a fact**, including a state of mind. It may be made directly to the plaintiff or by a manifestation to other persons intended to reach the plaintiff. A misrepresentation is a representation which, under the circumstances, amounts to an assertion not in accordance with the facts. *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas*, 516 S.W.2d 138, 142-43 (Tex.1974).

278.  *Republic's words and conduct constituted misrepresentations—i.e., assertions that were simply not in accordance with the facts or its intentions or state of mind*. They occurred over time as follows:

a.  First, on July 9, 2015, Republic declared a default, purportedly due to the Comerica default notice to Bailey regarding *unpaid property taxes.*

b.  Second, on July 10, 2015, Republic sent a second default notice, purportedly due to a long laundry list of reasons—the primary reasons being Bailey's *ceasing to trade*, and delays with collecting both an Army receivable and a Department of Defense receivable. **DX 104**.

c.  The July 9 and 10, 2015 default notices did not state anything per se about "over-advances." These communications could reasonably create the impression that Bailey could cure the defaults and bring things back on track with the factoring arrangement.

d.  But Republic thereafter *repeatedly created the impression in communications* (until the termination of the relationship and even afterwards) that Bailey was in default due to being *over-advanced* (as stated earlier, it is not even a defined term in the Agreements).

e.  Putting aside for the moment that "over-advanced" was not a defined term, and the term was not used in the July 9 and 10, 2015 default notices, it appears from the evidence that this "over-advanced" status simply was not true. And yet, Republic continually communicated that Bailey was "over-advanced" and used it as a reason to threaten the Debtors with either no funding or foreclosure, to withhold payroll, to take over the paying of vendors and creditors (paying them in arbitrary and capricious fashion), and

sending in armed guards—in this court's estimation—to intimidate Buttles and the other employees of the Debtors' business.

    f.      To be clear, the court concludes that Republic misrepresented and concealed from Bailey its funds availability status. Republic did not share information with Bailey in July 2015 regarding where Bailey actually stood with respect to its facility balances. The court concludes from the evidence that Republic's so-called portal was incomprehensible as a disclosure tool.

    g.      While Republic was representing to Bailey that there was a lack of availability of funds, it did the following which shows a pattern of both misrepresenting and concealing information about its intentions, the facts, and its state of mind:

- On July 7, 2015, without any transparency or notice, Republic transferred $76,473.60 in funds from Bailey's receivables lockbox to itself to pay down the inventory line of credit. **TR 816; testimony of Melissa Baines**.

| Date | Batch ID | Type | Purchases | Gross Receipts | Discounts | Other | A/R Adj | Funding | Cash Receipts | Charges/Fees | Expenses | Adjustments | A/R Bal | Funding Bal | Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/4/2015 | 101 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | 500,000.00 | -- | 500,000.00 | (500,000.00) |
| 3/4/2015 | 0 | CHK | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,500.00 | -- | 502,500.00 | (502,500.00) |
| 3/5/2015 | 102 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (2,500.00) | -- | 500,000.00 | (500,000.00) |
| 3/31/2015 | 103 | FEE | -- | -- | -- | -- | -- | -- | -- | 4,706.40 | -- | -- | -- | 504,706.40 | (504,706.40) |
| 4/23/2015 | 105 | FEE | -- | -- | -- | -- | -- | -- | -- | -- | -- | (4,706.40) | -- | 500,000.00 | (500,000.00) |
| 4/30/2015 | 106 | FEE | -- | -- | -- | -- | -- | -- | -- | 5,076.47 | -- | -- | -- | 505,076.47 | (505,076.47) |
| 5/31/2015 | 107 | FEE | -- | -- | -- | -- | -- | -- | -- | 5,262.62 | -- | -- | -- | 510,339.09 | (510,339.09) |
| 6/10/2015 | 108 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (12,054.40) | -- | 498,284.69 | (498,284.69) |
| 6/30/2015 | 109 | FEE | -- | -- | -- | -- | -- | -- | -- | 5,060.84 | -- | -- | -- | 503,345.53 | (503,345.53) |
| 7/6/2015 | 110 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (3,345.53) | -- | 500,000.00 | (500,000.00) |
| 7/7/2015 | 111 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (76,473.60) | -- | 423,526.40 | (423,526.40) |
| 7/16/2015 | 112 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (147,751.20) | -- | 275,775.20 | (275,775.20) |
| 7/16/2015 | 113 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (25,661.47) | -- | 250,113.73 | (250,113.73) |
| 7/31/2015 | 114 | FEE | -- | -- | -- | -- | -- | -- | -- | 3,640.18 | -- | -- | -- | 253,753.91 | (253,753.91) |
| 8/11/2015 | 115 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (20,000.00) | -- | 233,753.91 | (233,753.91) |
| 8/31/2015 | 117 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (15,000.00) | -- | 218,753.91 | (218,753.91) |
| 8/31/2015 | 118 | FEE | -- | -- | -- | -- | -- | -- | -- | 2,497.77 | -- | -- | -- | 221,251.68 | (221,251.68) |
| 9/30/2015 | 119 | FEE | -- | -- | -- | -- | -- | -- | -- | 2,230.95 | -- | -- | -- | 223,482.63 | (223,482.63) |
| 10/1/2015 | 120 | FEE | -- | -- | -- | -- | -- | -- | -- | 75.12 | -- | -- | -- | 223,557.75 | (223,557.75) |
| 10/2/2015 | 123 | TFR | -- | -- | -- | -- | -- | -- | -- | -- | -- | (223,557.75) | -- | | |
| | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28,550.35 | 0.00 | (28,550.35) | 0.00 | 7,348,221.30 | (7,348,221.30) |

**TR 816**.

        As earlier mentioned, using accounts receivable collections to pay down the Inventory Loans early was technically contractually allowed (and didn't even contractually require notice to Bailey), but by not telling Bailey, Republic was keeping Bailey in a perpetual state of confusion as to why Republic was

considering itself "over-advanced." ***Republic was creating an impression that there was a lack of collections.***

- On July 9, 2015, just two days after the $76,473.60 transfer of accounts receivable to paydown the Inventory Loans, Melissa Baines informed Jeff Worley and John Buttles on a phone call that Republic was not going to fund the payroll for the next day because Bailey was "over-advanced" and had no "availability"—mentioning nothing about the Inventory Loans paydown, and creating an impression that there were no receivables. **Testimony of Melissa Baines; Phone Recording DX 99**.[8]

- That same day, July 9, 2015, Melissa Baines drafted and sent **TR 557** to her superiors at Republic:[9]

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/9/2015 12:51:06 PM |
| To: | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| CC: | Vanessa Blade [vblade@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| Subject: | RE: BTM |

My further thoughts...

1. We are in the best position we have been in right now with around $100k in availability on A/R (if we would be comfortable putting the inventory back at $500k until 7/31/2015, as previously discussed with BTM). This is assuming they get the $164k DFAS invoice properly uploaded into the WAWF system for payment.
2. We are not really in a position to shut them down in an orderly way, allowing us to secure the inventory, which could cost us in the liquidation. (however, LaCour and Cole confirmed they could both be on a plane this afternoon, if needed)

**TR 557**.

- On July 10, 2015, the following day, the payroll was missed, the employees walked out, and the plant was shut down.

- On July 13, 2015, Melissa Baines, in a telephone call with John Buttles, asked for additional collateral, including John Buttles' homestead. **TR 297/DX 177**.

- On July 16, 2015, there were more, early paydowns of the Inventory Loans. Republic made payments to itself of $147,751.20 and $25,661.47 from Bailey's receivables lockbox to further pay down the Inventory Loans, which technically had no principal due for six months. **TR 816; Testimony of Melissa Baines**.

---

[8] All phone recordings in existence were made by Republic without the knowledge or consent of Bailey. **Testimony of Melissa Baines; Testimony of John Buttles**.

[9] Melissa Baines testified as an adverse witness under questioning from Bailey's counsel on day one of trial that she was scrupulously truthful and precise in internal e-mails regarding sums of money to Mr. Frederic and Mr. Chesters.

- On July 17, 2015, no funding from Republic resulted in another missed payroll. **Testimony of John Buttles**.

- On July 20, 2015, Republic said no operational payroll funds would be advanced unless Mr. Buttles signed a mortgage on his house. **TR 721**.

- On July 23, 2015, Melissa Baines drafted and sent **TR 749 <u>internally</u>**:



**TR 749**.

> The court concludes that it was disingenuous, based on the entirety of this record, for Republic to be representing to Bailey that it was "over-advanced" and had no funds availability in July 2015. It had availability—Republic was simply exercising its contractual rights to use accounts receivable to pay down the Inventory Loan instead of making funds available to Bailey. And Republic was also charging fees and expenses with reckless abandon (for example, armed security guards) without any clear accounting. The problem is that, all the while, it was creating the impression that there were simply inadequate collections.

- Melissa Baines at Trial gave testimony that indicated a Hilco inventory valuation report that Republic received in June 2015 had something to do with Republic feeling "insecurity," which "insecurity" could serve as a basis for declaring a default under the Agreements. Such valuation was not submitted into evidence. In any event, on July 9, 2015, one day before receipt of the default letter, a 50-minute telephone conversation occurred among Republic and Bailey (**DX 99**), a portion of which was played to the court by Republic,

and there was no mention in the call of the Hilco report or its being the cause of some "insecurity" on the part of Ms. Baines or Republic. And, of course, the default letter of July 10, 2015 makes absolutely no mention of the Hilco report or the Inventory Loan. **TR 565.**

- On July 24, 2015, Allen Frederic and Melissa Baines of Republic conducted a phone call to start the process to convince Bob McGovern, the consultant working for Mr. Buttles, to take over the sole decision-making and executive functions of Bailey Tool. **TR 308.** In that call Allen Frederic stated, among other things, that Republic was not going to approve any funds in the future for payments on property taxes or to pay the SBA loan, and he (Frederic) knew that the SBA was not going to sit there forever and do nothing. None of this information was passed on to Mr. Buttles. **Testimony of Bob McGovern; Testimony of John Buttles**.

h.       Republic repeatedly misrepresented and/or concealed: (i) why it considered Bailey to be in default, (ii) the status of its funds availability or lack thereof, (iii) what it was doing with the funds (*i.e.,* paying down the Inventory Loans and charging fees and expenses), and (iv) that it would resume funding if Buttles would give Republic his homestead equity, and if the Debtors would simply forward more account invoices for processing and more money was collected.  The evidence and pattern of conduct reflect that Republic never intended to do so.   Republic continued making these misrepresentations even after taking a Termination Fee on **October 2, 2015**.  Republic's taking the Termination Fee was not disclosed to Debtors.  Republic continued to claim the Agreements were still in force and effect after it had taken a Termination Fee.

279.     Republic knew the misrepresentations were false and Republic made the representations recklessly and with gross fault. The Trustee established that, but for these representations, the Debtors would never have continued forwarding account invoices for processing on the promise of continued funding when none was forthcoming, and would not have stayed in the relationship if Bailey had known Republic's intent was to simply pay down its

position with everything it collected. And certainly, Buttles would have never been coerced into paying over his homestead equity if he had known Republic would never fund again.

280. The false representations caused significant financial injury to the Debtors, including the loss of the value of the business. Plaintiffs have established by a preponderance of the evidence that the damages sustained for the destruction of the Debtors' *legacy* business are $4.974 million and for the loss of the *future ammunitions business* are another $7.3 million.[10]

### v. Tortious Interference with Contractual and Business Relationships

281. In Texas, a party bringing suit for tortious interference with a contract must prove four elements: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's damage; and (4) actual damage or loss occurred. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

282. In general terms, Republic grossly interfered with the Debtors' business by injecting itself into corporate governance, where there was no contractual right (through interactions with Bob McGovern) and through its micromanaging what expenses the Debtors paid beginning in July 2015 and insisting on paying vendors and employees itself directly.

283. But more specifically, the Debtors had valid contracts with their customers and vendors, including the customers listed on **TR 818**, which had been customers of Bailey for decades:

---

[10] In the event this court has erred in concluding a cause of action for fraudulent misrepresentation was legally established, the court concludes that, at a minimum, the facts established a cause of action for negligent misrepresentation. *See* legal discussion, *infra*, in Part IV, regarding Buttles' Count 6 claim for negligent misrepresentation.

| Customer | Years as customer |
|---|---|
| Tenneco | 15 |
| Imperial (Peterbilt) | 25 |
| Nammo | 21 |
| Oshkosh Truck | 26 |
| Chaparral Boat | 25 |
| Tracker | 23 |
| Fishing Holdings | 24 |

**TR 818**.

Republic willfully and intentionally interfered with those contracts by, for example, claiming that Trelleborg should not pay the Debtors; threatening Trelleborg with litigation if Trelleborg were to pay the Debtors; and intentionally and wrongfully withholding funds from the Debtors, thereby causing the Debtors to be unable to fulfill orders to these customers. Republic also interfered with Debtors' relationship with all of the customers listed above in similar fashion. Republic also interfered with Debtors' vendors by not allowing Debtors to pay them in a manner to keep them supplying Debtors, which in turn caused Debtors to miss delivery windows or not be able to fill the order at all.

284.     The evidence was legally sufficient to establish that Republic's acts of interference were patent, continuing, and without justification. They caused significant financial injury to the Debtors.   Their acts were *overreaching* and drove away the customers listed and made it impossible for the Debtors to fill orders from customers, large and small, because of interference with its vendors and thereby stay in business. Republic's actions directly and proximately caused damages at least in the amount of $2,044,844, the net profit from the customers Bailey has been deprived of.  **TR 818**.

### vi.    Violation of the Automatic Stay

285.    A party violates the automatic stay by undertaking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). A party violates the automatic stay by undertaking "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). A party violates the automatic stay by undertaking "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy case]." 11 U.S.C. § 362(a)(6). A party violates the stay by attempting "the setoff of any debt owing to the debtor that arose before the commencement of the case . . . against any claim against the debtor." 11 U.S.C. § 362(a)(7). Finally, a party violates the stay if they exercise control over property to which the debtor has even an arguable claim of right. *See Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 300 (5th Cir. 2005) ("Here, we face the question whether the creditor violates the stay if, without permission of the bankruptcy Court, he forecloses on an asset to which the debtor has only an arguable claim of right …. We answer in the affirmative ….").

286.    Willful violations of the automatic stay are punishable by the court's inherent contempt power and the authority vested in the Bankruptcy Court under Section 105(a) of the Bankruptcy Code. *See In re MD Promenade, Inc.*, 2009 WL 80203, at *12 (Bankr. N.D. Tex. 2008) (unpublished) ("However, this Court may award damages to a corporate debtor (or, in this case, the trustee of the estate of a corporate debtor) *in the form of contempt sanctions in order to enforce this Court's civil contempt power pursuant to this Court's equitable authority under* section 105(a).") (emphasis in original). An individual debtor may recover actual damages, including costs and attorneys' fees, and, potentially, exemplary damages for willful violations of the automatic stay. 11 U.S.C. § 362(k).

287.    Republic acted willfully in its efforts to ensure collections were prioritized for its benefit, to the detriment of the Debtors and the bankruptcy estate, in violation of Republic's agreements and representations. Republic violated the automatic stay by demanding post-petition (and after the contract had terminated) that customers (*e.g.,* Tenneco and Trelleborg) not pay the Debtors, but pay Republic directly instead. The Debtors clearly owned the majority of those receivables and had an absolute claim of right to the proceeds and accounts receivable from customers Bailey generated after the November 5, 2015 termination date of the Factoring Agreements. Republic's efforts to direct these proceeds be paid directly to it instead of the Debtors or the bankruptcy estates was a willful violation of the automatic stay.

288.    Republic also willfully violated the automatic stay by: (a) refusing to turn over cash it held after the bankruptcy cases were commenced (which cash the court subsequently had to order to be turned over to the Debtors, pursuant to a turnover motion); and (b) continuing to insist the Factoring Agreements were still in effect *after* it had taken a Termination Fee and when it had no intention of advancing any more funds—in fact, telling that to existing customers, future customers, and potential lenders and investors during the Chapter 11.

289.    Republic willfully violated the automatic stay when their insolvency counsel, Stephen Brown, directed one of the Debtors' customers to pay funds to Republic during the Debtors' bankruptcy and to pressure the Debtors into giving Republic a release. Mr. Brown was aware of the Debtors' bankruptcy filing and demanded that Trelleborg direct funds to Republic, threatening that if they failed to do so they would be subject to liability, and offering to forego the threat and the money being held in return for Trelleborg, a very important customer of Bailey, "convincing" Bailey to give Republic a release. Mr. Brown's acts were intentional and were a

violation of the automatic stay, as the causes of action that could have been released at the time were property of the estate.

290.     Republic continued to claim ownership of Debtors' receivables after the Agreements terminated and during Debtors' bankruptcy case. **TR 788**.  As a result, Debtors were not able to immediately obtain debtor-in-possession financing.  Communications from Republic, including threats and suits against Bailey's customers, also slowed collections for Bailey. **Testimony of Melissa Hayward**.  These acts were intentional and interfered with Debtors' ability to reorganize under Chapter 11. The court concludes that Republic caused the Debtors' unsuccessful reorganization and accordingly, orders damages in the amount of $490,000.00, which represents the estate's administrative fees during the attempted Chapter 11. **Testimony of James Cunningham (uncontroverted by Republic)**.

291.     Because of Republic's willful conduct, punitive damages in the amount of three times that amount ($1,470,000) are justified and awarded in the court's discretion.

292.     Republic admitted in internal e-mails postpetition that it was holding as much as $300,000 of Bailey's money.  **TR 701.**  Republic's counsel told the Trustee at the time of his appointment that the amount being withheld was $450,000. **Testimony of James Cunningham (uncontroverted by Republic)**. The court finds and concludes that Republic's refusal to release these funds contributed substantially to Debtors' unsuccessful reorganization. These confirmations by Republic substantiate the above damages findings, especially the Debtors' administrative costs throughout the bankruptcy ($490,000).  The court additionally concludes that, but for this interference, the Debtors would have successfully reorganized. **Testimony of James Cunningham and Melissa Hayward (uncontroverted by Republic)**.

### vii. Equitable Subordination

293.     Equitable subordination, first recognized at common law, is codified in Section 510(c) of the Bankruptcy Code and provides, in relevant part:

> after notice and a hearing, the Court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest ...

294.     The elements of equitable subordination in the Fifth Circuit are as follows: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *See Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008). Further, "[e]quitable subordination is remedial, not penal, in nature, and in the absence of actual harm, equitable subordination is inappropriate." *Id.* at 361. Equitable subordination does require some level of actual harm to the Debtors and its unsecured creditors. *See id.* at 361-62; *see also Smith v. Assocs. Comm. Corp. (In re Clark Pipe & Supply Co., Inc.)*, 893 F.2d 693, 700 (5th Cir. 1990) (providing analysis of equitable subordination remedy and stating, "[t]hrough its loan agreement, every lender effectively exercises 'control' over its borrower to some degree. . . . The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender."); *Bergquist v. First National Bank (In re American Lumber Co.)*, 5 B.R. 470 (D. Minn. 1980) (court affirmed equitable subordination as to a lender that had forced the termination of all the debtor's employees allowing only those necessary for liquidation to be rehired, contracted with security guards to watch over

the debtor's premises, cut corporate officers' salaries to one-sixth their original amount, and determined which of debtor's creditors would be paid and made sure that the only accounts paid were those which it felt would enhance its position).

295.    From early-July 2015 through mid-September 2015, Republic controlled virtually every major component of the Debtors' business:

- Republic paid the Debtors' employees directly;

- Republic decided which employees would be paid;

- Republic decided which employees were "absolutely necessary;"

- Republic ordered layoff of employees;

- Republic hired security personnel and installed cameras at the Debtors' facility;

- Republic required the Debtors' vendors to enter into "Three Party Payment Agreements," under which Republic imposed terms on the vendors;

- Republic paid the Debtors' vendors directly;

- Republic determined when and what raw materials the Debtors purchased; and

- Republic controlled the Debtors' purchase of basic business supplies.

296.    Republic's conduct satisfies the elements of equitable subordination and, to the extent Republic has or is later determined to have any claims, the claims of Republic are deemed subordinated to all other classes of creditors and interests. Republic's conduct related to the Debtors was inequitable. Republic took advantage of its financial relationship with the Debtors so as to ensure that it was over-collected, and during a time of financial distress or crisis at the Debtors. Republic's charging of a secret termination fee and refusal to advance funds on invoices assigned to it—while simultaneously collecting proceeds and paying down Inventory Loans and paying itself for enormous, undisclosed expenses and fees—caused actual harm to the Debtors and

the trade creditors of the Debtors. Subordinating Republic's claims is consistent with the purposes of the Bankruptcy Code.

### viii. Attorneys' Fees

297.    Trustee has shown himself entitled to recover his attorneys' fees under:

      a.    TEXAS BUSINESS AND COMMERCE CODE Section 24.013 in the amount to be determined at a subsequent hearing; and

      b.    TEXAS CIVIL PRACTICE AND REMEDIES CODE Sections 38.001 and 134.005(b) in the amount to be determined at a subsequent hearing.

### ix. Republic's Offset

298.    Republic is not entitled to an offset as represented in Republic's Payoff Amount Calculation effective as of June 14, 2021. **DX 367**. Paragraph 9.5 of the Agreement of Purchase and Sale states:

> 9.5    All Accounts sold to and purchased by Purchaser are with recourse to Seller and at Seller's sole credit risk. Purchaser shall have the right to require **any Advances on any accounts be Chargedback** at any time, either before or after maturity, for any reason, including but not limited to recourse for an Account or in connection with the termination of the Purchase Agreement. In the event of a Chargedback Account: (I) Seller agrees to pay Purchaser the fully amount thereof, and failing to do so, Seller shall be responsible for all damages, including all expenses incurred by Purchaser in attempting to collect or enforce payment of such accounts; and (II) In addition to Purchaser's right to receive its other fees set forth in the Purchase Agreement, Purchaser shall be entitled to assess a Chargeback Fee. Any Account over ninety (90) days old on which Account Seller has received an Advance may be charged an Over 90 Day Fee at the sole discretion of Purchaser, in addition to any other fees charged to such account.

(emphasis added).

299.    Republic's payoff calculation, however, assumes that (1) Bailey had to buy back the uncollected receivable at face value and (2) default rates could continue after all the Advances had been paid back and the Agreements had ended. Neither is supported by the parties' Agreements. The language quoted above clearly states that only the **Advances** are to be paid back.

The evidence is uncontroverted that no Advances of any kind were made by Republic after September 11, 2015. The invoices that are the basis of Republic's Payoff Amount Calculation are predominately dated after September 11, 2015. **TR 13**. Since no Advance was made to Bailey on these post-September 11, 2015 invoices they cannot have been "purchased" since no consideration was paid therefor.

300. Even for the relatively few invoices dated before September 11, 2015, their status is of no moment, because all advances had been repaid and Republic was "collected out" even by its own calculus on November 20, 2015. Republic said so both internally (**TR 664**) and to Bailey (**TR 255**). Republic's Melissa Baines admitted in her testimony, elicited by her counsel, that once Republic was paid back and the Agreements terminated, the unpaid receivables reverted to Bailey.

301. Mitigation and equitable subordination also all weigh against Republic "earning" a $1,711,217.75 Default Rate Fee on less than $400,000 in accounts receivable outstanding calculated in **DX 367**. As pointed out in the cross-examination of Ms. Baines, the original payoff calculation for November 23, 2015 had more than ample funds to pay off the Default Rate and still yield a positive balance to Bailey. **DX 351**. Republic could have and should have paid themselves the Default Fee and ended the obligation. Republic failed to do so in what appears to be a pre-emptive effort to establish, intentionally, an offset because of their belief they would ultimately be sued for their conduct.

302. The Agreements terminated either on October 2, 2015 when Republic took the $75,000 Termination Fee, on October 22, 2015 when Republic was completely paid in full (**Testimony of Mitchell Carter (uncontroverted by Republic)**), or on November 5, 2015 when Bailey stopped sending receivables to Republic. **Adv. Dkt. 165, at p. 8**.

303. In any event, all obligations of all the parties, even according to Republic, ended by November 23, 2015 (**TR 255**) except for payment to Bailey of the over-collection by Republic. Republic's demand for a release was a breach of the contract by Republic (and did not extend the contract obligations). **Adv. Dkt. 165, at p. 7**.

304. Moreover, since no advances were made on these invoices and all other advances had been paid, Bailey would be entitled to return of these receivables under Section 548 of the Bankruptcy Code, with Republic having paid no consideration therefor.

305. Finally, as further addressed above, under the doctrine of equitable subordination, the court has concluded as a matter of law that, any claims of Republic are equitably subordinated to all other claims of all creditors and should also be subordinated to the equity of Buttles, the owner of Bailey.

## IV.
## CONCLUSIONS OF LAW REGARDING BUTTLES' CLAIMS

### A.  <u>Jurisdiction and Venue.</u>

306. The court has jurisdiction of this Adversary Proceeding under 28 U.S.C. § 1334. This Adversary Proceeding contains some core causes of action under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O) and some non-core proceedings and causes of action.

307. Venue is proper in this court under 28 U.S.C. §§ 1408 and 1409.

308. All parties consented to the entry of Final Orders by the bankruptcy court.

### B.  <u>Buttles' Claims</u>

309. Buttles asserts numerous alternate theories of relief in this Adversary Proceeding. Distilled to their essence, he claims that Republic repeatedly misled him regarding its actual intentions both in carrying out the Agreements and extracting additional collateral from him personally. The combined effect of these actions was to destroy the Company, wrongly take

property from Buttles, and destroy his life's work and livelihood. While many of the causes of action in this Adversary Proceeding belong to the Trustee (i.e., the Debtors' bankruptcy estate), the ones pertaining to Buttles' homestead belong to him and are particularly egregious, in this court's estimation.

### Legal Standards Relating to the Homestead Counts

**Validity of Lien on a Homestead, Counts 1, 2, and 6**

310. The Texas Constitution provides that a debtor's homestead cannot be seized for payment of debt except for certain categories such as purchase money, taxes, repairs, and other specified obligations. Tex. Const. art. 16, § 50. Under that provision, "[t]he homestead of a family . . . shall be, and is hereby protected from forced sale, for the payment of all debts . . ." *Id.* The exemption is codified in Chapter 41 of the Texas Property Code and extends to the proceeds of a sale of the homestead property for a period of six months following the sale. Tex. Prop. Code § 41.001(c).

311. Buttles' giving the lien requested by Republic upon his homestead does not fall under any approved uses set out in either the Texas Constitution or the Texas Property Code.

312. Laws protecting a homestead against foreclosure or the payment of debt must be liberally construed. *Grant v. Clouser*, 287 S.W.3d 914, 919 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 807 (Tex. App.—Austin 2004, pet. denied). ***Any attempt to mortgage homestead property, except as approved by the Texas Constitution, is void.*** *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 545 (Tex. 2016). A mortgage or lien that is void because it was illegally levied against homestead property can never have any effect, even after the property is no longer impressed with the homestead character. *Laster v. First Huntsville Properties Co.*, 826 S.W.2d 125, 130 (Tex. 1991).

313.    Historically, constitutionally noncompliant homestead liens were absolutely void. *See, e.g., Tex. Land & Loan Co. v. Blalock*, 76 Tex. 85, 89 (Tex. 1890); *Inge v. Cain*, 65 Tex. 75, 79 (1885). What the Constitution forbids cannot be evaded even by agreement of the parties, *Tex. Land & Loan Co.*, 76 Tex. 85, 89, and what is "never valid is always void," *Inge,* 65 Tex. at 80. *See also Laster*, 826 S.W.2d at 130 (Tex. 1991) ("A mortgage or lien that is void because it was illegally levied against homestead property can never have any effect, even after the property is no longer impressed with the homestead character.").

314.    In 1997, the Constitution was amended to permit homestead liens to secure home-equity loans, but, consistent with Texas's long tradition of protecting the homestead, the amendments prescribed very specific and extensive limitations on those encumbrances. Tex. Const. art. XVI, § 50(a)(6)(A)-(Q). Section 50 allows such loans to be secured by the homestead only if, among other things, they are made on the condition that forfeiture of all principal and interest is available if the loan is constitutionally noncompliant and the lender fails to cure within 60 days of being given notice by the borrower. § 50(a)(6)(Q)(x). The Constitution provides simple methods for curing specific defects, including refunding any overcharges and a catch-all cure for defects that are irremediable by the other methods. § 50(a)(6)(Q)(x)(a)-(f); *see also Wood*, 505 S.W.3d at 545-6. As noted above, Buttles' lien did not comply with any of the permitted reasons for a homestead lien.

## Count 1 – Fraud

315.    As shown in the Findings of Fact, Buttles has demonstrated that Republic's actions satisfy the elements of common law fraud under Texas law.

316. Fraud is "the successful employment of cunning, deception or artifice to circumvent, cheat or defraud another to his [or her] injury." *International Life Insurance Company v. Herbert*, 334 S.W.2d 525, 530 (Tex. Civ. App.—Waco 1960, writ ref'd n.r.e.).

317. To reiterate earlier discussions herein, the following elements must be shown to establish common law fraud based on misrepresentation:

- a material representation was made;
- the representation was false;
- when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;
- the speaker made the representation with the intent that the other party should act upon it;
- the party acted in reliance on the representation; and
- the party thereby suffered injury

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Aquaplex, Inc. v. Rancho la Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam); *De Santis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990); *Stone*, 554 S.W.2d at 185.

318. Republic made repeated representations to Buttles regarding its intentions to carry out the Agreements and requirement for additional collateral from him personally.

319. Those representations were false, and at the time Republic made them, it knew them to be so; alternatively, the court concludes that Republic made the representations recklessly, as a positive assertion and without knowledge of the truth.

320. The representations Republic made to Buttles were material, and it did so with the intention that Buttles act upon them, which he did, to his injury.

321. "*Material*" is defined in case law as meaning "a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions

in the transaction in question." *Italian Cowboy Partners*, 341 S.W.3d at 337 (quoting *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)). There is no question from the record that Buttles, in fact, did rely on Republic's representations. Republic's control of the situation and its unannounced intent to no longer advance funds to Bailey also put it in a position of superior knowledge over Buttles. Therefore, its promises of future action for a present concession by Buttles were not mere expressions of opinion; "when an opinion is based on past or present facts ... special knowledge establishes a basis for fraud." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). Thus, most simply, "[s]uperior knowledge by one party may also provide the occasion for fraud." *Faircloth*, 898 S.W.2d at 277; *see also Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. App.—Waco 2007, no pet.) The trial record demonstrates that Republic's representatives were at all times in possession of superior knowledge, which allowed them to consistently mislead Buttles and benefit Republic.

322. The injuries caused by Republic foreseeably include:

(i)    Republic's initial improper obtaining of a mortgage on Buttles' homestead;

(ii)   Taking $225,000 in proceeds from the sale; and

(iii)  Pressuring Buttles to hurriedly sell his homestead for $2,315,000 when the fair market value was $2,500,000, causing him a further loss of $185,000.

Together, these actions by Republic damaged Buttles in the amount of no less than $410,000.00.

## Count 2 – Fraud in a Real Estate Transaction (Tex. Bus. & Com. Code §27.01(a) *et seq.*

323. Buttles has demonstrated that Republic's actions satisfy the elements of fraud in a real estate transaction under Texas law. Tex. Bus. & Com. Code Ann. § 27.01, *et seq.*[11]

**Basic Liability Under the Statute**

---

[11] The mere fact that a transaction concerns real estate does not prevent a plaintiff from claiming damages for common-law fraud instead of or in addition to statutory damages. Section 27.01 neither supersedes the common-law rule nor provides an exclusive remedy for the recovery of damages in an action based on fraud in a transaction involving real estate or stock. *Sibley v. Southland Life Ins. Co.*, 36 S.W.2d 145, 146 (Tex. 1931); *El Paso Dev. Co. v. Ravel*, 339 S.W.2d 360, 364–365 (Tex. App.—El Paso 1960, writ ref'd n.r.e.).

324.     The Fifth Circuit has held that the requirements of Section 27.01 (a) are satisfied in a real estate transaction when:

- the defendant makes a false representation of a past or existing material fact
- to a person for the purpose of inducing that person to enter into a contract, that is
- relied upon by that person in entering into that contract.

*Elbar Invs., Inc. v. Prins (In re Okedokun)*, 968 F.3d 378, 389-90 (5th Cir. Tex. 2020) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343 (5th Cir. 2008)).  The Texas Supreme Court found essentially the same thing in *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001).

325.     A viable claim for statutory fraud must also relate to "a transaction involving real estate or stock in a corporation." Tex. Bus. & Com. Code Ann. § 27.01(a).  This requirement is satisfied because the record demonstrates the central role of Republic's demand was for a lien on Buttles' homestead.

326.     It is important to note that the elements under the statute differ from common law fraud because *there is no requirement to prove the defendant made the alleged misrepresentation either knowing it was false or with recklessness to its truth. See FirstMerit*, 52 S.W.3d at 758; *Diversified, Inc. v. Walker*, 702 S.W.2d 717, 723 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

327.     More specifically, Buttles has demonstrated the elements of § 27.01 (a), in that:

(i)     There was a transaction involving real estate between Republic and Buttles wherein Buttles granted liens to Republic for his homestead.

(ii)     In that transaction, Republic made false representations of fact, false promises, and/or benefited by not disclosing that its promises and representations were false, in that:

    a.  Republic represented to Buttles that giving it a mortgage on his homestead would allow Republic to resume, or to continue to advance monies to the Company,

    b.  when in fact it had no intention of doing so, but

    c.  instead, it was simply seeking to enhance its collateral position during the time it was anticipating the liquidation of the Company.

(iii)    Republic intended its representations and promises to induce Buttles into giving the mortgage, and

(iv)    Buttles relied on those false representations when he did so.

(v)    Buttles' actions in reliance on Republic's representations injured Buttles.

**Exemplary Damages Under the Statute**

328.    Because Buttles demonstrated that Republic was "actually aware" of its false statements, failed to disclose the falsity, and benefited from the act, Buttles is also entitled to exemplary damages under Section 27.01(d) of the statute. Actual awareness may be inferred when objective manifestations indicate that the person acted with actual awareness. Tex. Bus. & Com. Code § 27.01(c) & (d). Republic's "actual awareness" was demonstrated at trial by:

- Representing that normal funding would resume when it received the homestead lien, when in fact the funding allowed after July 7, 2015 constituted advances of only 37%, not 90%;
- Saying funding would resume and Buttles could receive a salary if Republic got money from the homestead closing, when in fact it had decided to make no further advances;
- Representing it was overadvanced when, in fact, the evidence shows there should have been availability in the facility; and
- Representing it was undersecured when in fact it knew it was oversecured.

**Attorneys' Fees Under the Statute**

329.    Because Buttles has proved Republic's liability under Section 27.01 (a), he is also entitled to recover his attorney's fees. Tex. Bus. & Com. Code Ann. § 27.01(e) ("Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees").

**Total Damages Under the Statute**

330.    Accordingly, Buttles is entitled to the remedies provided in Chapter 27 Texas Business and Commerce Code, including the damages provided by Section 27.01(b)-(e), being the recovery of all damages he suffered, including but not limited to:

(i)     the $225,000 cash fraudulently coerced from him;

(ii)    the loss of additional value in his homestead equal to $185,000.00. Together, these actions by Republic damaged Buttles in the amount of $410,000.00;

(iii)   exemplary damages; and

(iv)   attorneys' fees.

### Count 6 – Negligent Misrepresentation

331.    To prevail on a cause of action for negligent misrepresentation, a plaintiff must show:

- a representation made by a defendant in the course of its business or in a transaction in which it has a pecuniary interest;

- the representation conveyed 'false information' for the guidance of others in their business;

- the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and

- the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018) (citing

*Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1992)).

332.    The standards for these elements are well-developed in Texas law:

(i)     "False information" requires a misstatement of an existing fact rather than a promise of future conduct. *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 379 (Tex.App.–Houston [1st Dist.] 2007, no pet.).

(ii)    "Justifiable reliance" usually presents a question of fact. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 584 (Tex. App.—San Antonio 2011, pet. denied).

(iii)   Plaintiff must show that the defendant's misrepresentation was a proximate cause of his damages. See *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 189 (Tex. App.--Waco 1987, writ denied).

Significantly, and unlike common law fraud, negligent misrepresentation does not require

knowledge of the falsity or reckless disregard of the truth or falsity of the representation at the time

it was made. *See Milestone Properties, Inc., v. Federated Metals Corp.*, 867 S.W.2d 113, 119 (Tex.

App.--Austin 1993, no writ).

333.    Buttles has demonstrated that Republic's actions satisfy the elements of negligent misrepresentation.  The evidence adduced at trial shows the factual elements of Republic's negligent misrepresentation under Texas law, in that:

(i)     Republic made representations to Buttles in the course of its business dealings with him that

    a.  It must receive a pledge of personal assets from him and was entitled to a mortgage on his homestead,

    b.  If he gave them a mortgage on his homestead, Republic would continue to fund the Company, and

    c.  He would thereafter be able to receive a salary;

(ii)    In making those representations, Republic supplied false information by which it intended to guide Buttles' actions;

(iii)   In doing so, Republic did not exercise reasonable care or competence in obtaining or communicating that information;

(iv)    Buttles justifiably relied on them;

(v)     Republic's negligent misrepresentation proximately caused Buttles' injury, in that he was coerced to hurriedly sell his homestead at a price $185,000 below fair market value and also pay Republic $225,000 of the proceeds to which it had no right under Texas law.

Together, these negligent misrepresentations by Republic damaged Buttles in the amount of no less than $410,000.

## Count 8 – Objection to Claim

334.    By demonstrating his entitlement to relief under Counts 1, 2, and 6, Buttles provided ample grounds to disallow all claims filed by Republic in the cases from which this Adversary Proceeding originates.

335.    As a party in interest, Buttles has standing under 11 U.S.C. § 502(a) to object to Republic's claims in this case, and he did so in his Complaint.

336. Each of Republic's claims filed in these bankruptcy cases should therefore be disallowed entirely.

### Count 9 – Exemplary Damages

337. Buttles has demonstrated that Republic's actions satisfy the requirements needed to entitle him to an award of exemplary damages under Texas law, in that he has shown that

- He was injured through conduct by Republic which amounted to gross negligence, malice, or actual fraud; and

- He has shown a right to recover damages on the causes of action set out in his Counts 1, 2, and 6.

338. Exemplary damages refer to damages awarded as a penalty or by way of punishment but not for compensatory purposes. Tex. Civ. Prac. & Rem. Code § 41.001(5). This definition makes it clear that compensatory damages redress concrete losses caused by the defendant's wrongful conduct, while exemplary damages are aimed at deterrence and retribution. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 873 (Tex. 2017).

339. Exemplary damages are a form of excess recovery available when a wrong is accompanied by an aggravating circumstance such as malice, fraud, or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003(a). The aggravating circumstance must be shown by clear and convincing evidence and may not be shifted to the defendant. Tex. Civ. Prac. & Rem. Code § 41.003(a), (b).

340. Fraud will support an award of exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003(a)(1); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 306 n.26 (Tex. 2006).

341. The record abundantly establishes Republic's fraudulent and misleading conduct in this case.

342. In determining the amount of exemplary damages to award, the trier of fact is to consider evidence relating to the following:

- the nature of the wrong;

- the character of the conduct involved;

- the degree of culpability of the wrongdoer;

- the situation and sensibilities of the parties concerned;

- the extent to which such conduct offends a public sense of justice and propriety; and

- the defendant's net worth.

Tex. Civ. Prac. & Rem. Code § 41.011(a). The statutory factors for the trier of fact to consider in determining the amount of exemplary damages are not exclusive, but any additional common law factors considered must be consistent with the punitive purpose of the award. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 237–38 (Tex. 2011).

343.     Under Chapter 41, exemplary damages awarded against any defendant may not exceed the greater of the following: (1) two times the amount of economic damages, plus an amount equal to any noneconomic damages found by the trier of fact, not to exceed $750,000 or (2) $200,000. Tex. Civ. Prac. & Rem. Code § 41.008(b).

344.     Republic's conduct, as demonstrated above in the court's Finding of Fact, entitles Buttles to exemplary damages in the amount of $750,000, which the court determines to be appropriate punishment for Republic and to serve as notice to the financial community that similar conduct will not be tolerated.

### Count 10 – Attorneys' Fees and Expenses, and Costs of Court

345.     Buttles has demonstrated that Republic's actions satisfy the requirements for awarding attorneys' fees and expenses, and costs of court under Texas law, in that such award, is provided for by statute as it applies to Count 2 (Texas Business and Commerce Code Sec. Tex.

Bus. & Com. Code §27.01(a) *et seq*.) and Count 5 (Texas Civil Practice and Remedies Code Sec. 38.001).

346.    As demonstrated above in the court's Finding of Fact, Republic's conduct entitles Buttles to attorneys' fees and expenses and court costs in an amount to be determined at a subsequent hearing.

**Prejudgment Interest**

347.    The Texas Supreme Court recognizes two separate bases for the award of pre-judgment interest: (1) an enabling statute; and (2) general principles of equity. *See Int'l Turbine Servs. v. VASP Brazilian Airlines*, 278 F.3d 494, 499 (5th Cir. 2002). Though Section 27.01 does not provide for an award of pre-judgment interest, neither does it preclude a court from awarding pre-judgment interest for equitable reasons.

348.    Given the delay in coming to Trial in this matter, equity requires that pre-judgment interest be awarded.

<u>**CONCLUSION**</u>

All other relief requested by any of the parties that is not herein addressed is denied.

The Trustee and Buttles shall each submit a fee application setting forth their requests for attorney's fees within 21 days. Republic will thereafter have 10 days to file any objection to the reasonableness of the fee request. The court will separately review the fee applications and, if there are objections by Republic, set a hearing. If there are no objections, the court will make its decision promptly after these deadlines regarding the fees' reasonableness and how much shall be allowed as part of the ultimate Judgment.

The court will thereafter issue a Judgment, consistent with these Findings of Fact and Conclusions of Law, that reflects the attorneys' fees awarded plus the other damages awarded herein.  To summarize, the damages awarded herein are:

The Trustee's damages (before attorney's fees and prejudgment interest) calculate to **$16,966,928**, consisting of: (a) **$12,962,084** for breach of contract damages and breach of duty of good faith and fair dealing damages ($584,250 + $49,000 + $54,834 + $4.974 million + $7.3 million), (b) $12,274,000 for the tort of fraudulent misrepresentations damages ($4.974 million + $7.3 million)—which damages the court determines are duplicative of the breach of contract and breach of good faith and fair dealing damages and, therefore, will not be separately awarded, but should stand if the breach of contract and breach of duty of good faith and fair dealing damages should at any point be set aside as error; (b) **$2,044,844** for the separate tort of contractual and business interference; and (c) **$1,960,000** for willful automatic stay violations consisting of actual damages ($490,000) and punitive damages ($1,470,000).

Buttles' personal damages (before attorney's fees and prejudgment interest) calculate to a separate **$1,160,000** ($410,000 actual damages + $750,0000 exemplary damages) for the various torts that are addressed herein pertaining to his homestead.

### # # # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # # #