IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re: §
§ Case No. 23-34815 (JPN)
**GALLERIA 2425 Owner, LLC** §
§ Chapter 11
Debtor. §
§

---

**NATIONAL BANK OF KUWAIT S.A.K.P., NEW YORK BRANCH'S
MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR
AND OMNIBUS REPLY TO OBJECTIONS THERETO**

---

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Jurisdiction ............................................................................................................................ 2

Background ............................................................................................................................ 2

I.  Chapter 11 Case ............................................................................................................ 2

II.  Summary of the Plan ..................................................................................................... 3

III. Plan Solicitation and Voting Tabulation ...................................................................... 4

IV. Plan Supplement and Objections to the Plan ................................................................ 6

Argument ............................................................................................................................... 6

I.  The Plan Complies With Section 1129(a)(1) ................................................................ 7

    A.  The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122 ................. 7

    B.  The Plan Satisfies the Mandatory Requirements of 11 U.S.C. § 1123(a) ................. 9

    C.  Section 1123(b): The Plan Incorporates Certain Permissive Provisions ................ 11

    D.  Section 1123(d): Curing of Defaults ....................................................................... 20

    E.  Section 1129(a)(2): Compliance with the Bankruptcy Code's Applicable
        Provisions ................................................................................................................ 20

    F.  Section 1129(a)(3): Good Faith ............................................................................... 22

    G.  Section 1129(a)(4): Professional Fees Subject to Court Approval .......................... 24

    H.  Section 1129(a)(5): Compliance with Disclosure Requirements ............................ 24

    I.  Section 1129(a)(6): No Rate Changes ..................................................................... 25

    J.  Section 1129(a)(7): Best Interests Test .................................................................... 25

    K.  Section 1129(a)(8): Acceptance of Impaired Classes .............................................. 26

    L.  Section 1129(a)(9): Payment in Full of Administrative and Priority Claims .................. 27

    M. Section 1129(a)(10): Impaired Accepting Class ..................................................... 27

    N.  Section 1129(a)(11): The Plan is Feasible ............................................................... 27

    O.  Section 1129(a)(12): Payment of U.S. Trustee Quarterly Fees .............................. 29

    P.  Inapplicable Provisions:  11 U.S.C. §§ 1129(a)(13), (a)(14), (a)(15) and (a)(16) ........... 29

    Q.  Section 1129(b): Cramdown of Non-Accepting Classes ........................................ 30

    R.  Section 1129(d): Principal Purpose of Plan Is Not Avoidance of Taxes .................. 33

CONCLUSION ................................................................................................................... 34

i

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*In re AJ Town Centre, LLC*,
No. 2:10-bk-17310-GBN, 2012 WL 2524731 (Bankr. D. Ariz. Jan. 5, 2012) .......................17

*In re ASARCO LLC*,
No. 05-21207, 2009 WL 8176641 (Bankr. S.D. Tex. Jun. 5, 2009)........................................13

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)........................................................................................................25, 33

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) ...........................................................................13, 15

*In re Cajun Elec. Power Coop.*,
150 F.3d 503 (5th Cir. 1998) ................................................................................................21

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..................................................................................23

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ...........................................................................21, 31

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)...........................................................................7, 13, 31

*In re Foster Mort. Corp.*,
68 F.3d 914 (5th Cir.1995) ...................................................................................................15

*In re Franco's Paving LLC*,
654 B.R. 107 (Bankr. S.D. Tex. 2023) ..................................................................................31

*Galleria 2425 Owner LLC v. National Bank of Kuwait, S.A.K.P., New York Branch et al*,
Adv. Pro. No. 23-03263 ........................................................................................................15

*In re General Homes Corp. FGMC*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) ..................................................................................13

*In re Gilbert*,
104 B.R. 206 (Bankr. W.D. Mo. 1989)..................................................................................32

*In re Goodrich Petroleum Corp.*,
No. 16-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016)...........................................................19

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007) ........................................................................ 13, 28

*In re Hot'z Power Wash, Inc.*,
655 B.R. 107 (Bankr. S.D. Tex. 2023) ......................................................................... 22, 31

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009),
*aff'd, In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) ................................................... 8

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*
*Kane v. Johns- Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .......................................... 31

*In re Lichtin/Wade, LLC*,
No. 12-00845-8-RDD, 2012 WL 3260315 (Bankr. E.D.N.C. Aug. 8, 2012) .......................... 32

*In re MCorp Financial, Inc.*,
160 B.R. 941 (S.D. Tex. 1993) ................................................................................... 32

*In re Meruelo Maddux Properties, Inc.*,
637 F. Appx. 1012 (9th Cir. 2016) .............................................................................. 32

*In re Moore*,
608 F.3d. 253 (5th Cir. 2020) ................................................................................... 15

*Nextpoint Advisors, L.P. v. Highland Capital Mgmt, L.P. (In re Highland Capital Mgmt., L.P.)*,
48 F.4th 419 (5th Cir. 2022) ................................................................................. 18, 19

*In re Ngan Gung. Rest.*,
254 B.R. 566 (Bankr. S.D.N.Y. 2000) ......................................................................... 23

*In re PWS Holding Corp.*,
228 F.3d 224 (3d. Cir. 2000) ................................................................................... 18

*In re RAAM Global Energy Co.*,
No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 19, 2016) ..................................................... 19

*In re Sandy Ridge Dev. Corp.*,
881 F.2d 1346 (5th Cir. 1989) .............................................................................. 23, 28

*In re Save Our Springs (S.O.S.) All., Inc.*,
632 F.3d 168 (5th Cir. 2011) ..................................................................................... 7

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ......................................................................... 30

iii

*In re Star Ambulance Serv., LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) ...............................................................7, 23

*In re Sun Country Dev. Inc.*,
764 F.2d 406 (5th Cir. 1985) ...........................................................................23

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) ...........................................................................28

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) .........................................................................25

*In re Weatherford Int'l PLC, et al.*,
No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019).........................................19

National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") files this memorandum of law and omnibus reply (the "Memorandum") in support of confirmation of the *Chapter 11 Plan of Liquidation of the Debtor*, dated April 10, 2024 [ECF No. 194] (as may be amended or supplemented, the "Plan").[1]  In further support of confirmation of the Plan, NBK submits the *Declaration of Michael C. Carter* dated June 14, 2024 (the "Carter Declaration") and respectfully states as follows:

<div align="center">

**PRELIMINARY STATEMENT**

</div>

1.       The Plan complies with the Bankruptcy Code's requirements for confirmation and provides for a value maximizing sale transaction for creditors and the estate.  Under the Plan, administrative expense claims, priority claims, and secured claims (other than NBK's) will be paid in full, as the Bankruptcy Code requires.  General unsecured trade creditors—creditors who likely are 'out of the money'—will receive a guaranteed recovery irrespective of whether the Sale generates value beyond the Property's secured debt.  This guaranteed recovery for trade creditors is based on a cash contribution from NBK (if it is the Successful Bidder) or from the third-party Purchase Price and will provide value to those creditors that would not be received in a chapter 7 liquidation.  For these reasons and others, the Plan should be confirmed.

2.       The objections to the Plan filed by the Debtor and 2425 WL, LLC ("2425 WL"), another entity owned by the Debtor's principal, Mr. Choudhri, are yet another self-serving attempt by Mr. Chouhri to retain his economic interest in the Property at the expense of creditors and the estate. As set forth below, these objections are entirely without merit.  All other objections to the Plan (formal and informal) raised by the Office of the United States Trustee and tax lien claimants

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

are expected to be resolved between now and the confirmation hearing through additions or changes to the Confirmation Order.

<div align="center">

**JURISDICTION**

</div>

3.      This Court has jurisdiction to consider this matter under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<div align="center">

**BACKGROUND**

</div>

**I.      Chapter 11 Case**

4.      On December 5, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101 et seq.).[2]  The estate's sole asset is certain real property and improvements located at 2425 West Loop South, Houston, Texas 77027 (the "Property").[3]

5.      On January 31, 2024, the Court entered an order directing the appointment of a chapter 11 trustee.  *See* ECF No. 99.  On February 9, 2024, Christopher R. Murray was appointed as trustee of the Debtor's estate, and his appointment became effective on February 13, 2024 (the "Chapter 11 Trustee").  *See* ECF Nos. 116 and 121.  Upon the Chapter 11 Trustee's appointment, the Debtor's exclusive right to file and try to confirm a plan terminated.[4]

6.      On April 10, 2024, NBK filed the Plan and *Disclosure Statement for Chapter 11 Plan of Liquidation of the Debtor* (the "Disclosure Statement").  *See* ECF Nos. 194 and 195.

7.      On April 29, 2024, the Court entered an order (the "Bid Procedures Order") approving bid procedures for the sale of the Property and a form stalking horse purchase agreement

---

[2]  Unless otherwise stated, all references to 'section' or 'subsection' are references to the Bankruptcy Code.

[3]  Additional factual background is set forth in detail in the National Bank of Kuwait, S.A.K.P. New York Branch's Motion Pursuant to 11 U.S.C. § 1112(b) to Convert Chapter 11 Case to Chapter 7.  See ECF No. 72.

[4]  *See* 11 U.S.C. § 1121(c).

<div align="center">

2

</div>

(the "Stalking Horse Agreement") with the Debtor, as seller, and NBK, as the stalking horse purchaser based on a credit bid of $18,600,000. *See* ECF No. 254.

8.     Pursuant to the Bid Procedures Order, if the Chapter 11 Trustee receives qualified competing bids to purchase the property by the bid deadline of June 14, 2024 at 5:00 p.m. (prevailing Central Time), the Chapter 11 Trustee will conduct a court-supervised auction of the Property on June 18, 2024 at 1:00 p.m. (prevailing Central Time). If there are no qualified competing bids, NBK will purchase the Property pursuant to the Stalking Horse Agreement, subject to Court approval.

9.     On April 30, 2024, the Court entered an order approving the retention of Hilco Real Estate, LLC to market the Property. *See* ECF No. 257.

10.     On June 10, 2024, the Chapter 11 Trustee filed a status report on the marketing process [ECF No. 452] reporting that at least fifty (50) parties have initiated contact to request information regarding the Property, at least twenty-four (24) parties have signed non-disclosure agreements to receive information, and at least eight (8) parties have conducted on-site inspections.

## II.     Summary of the Plan

11.     Among other things, the Plan provides for the following:

- The liquidation of the Debtor's estate, including the Sale of the Property. *See* Plan § VI.

- Creation of a Liquidation Trust that will receive an assignment of certain causes of action of the estate (the "Transferred Actions" as defined by the Plan). *See* Plan § VI.F-G. A trustee for the Liquidation Trust will administer the trust and its assets, including by prosecuting or compromising causes of action for the benefit of unsecured creditors.

- If NBK is the Successful Bidder, a contribution by NBK in the amount equal to (i) all Distribution Account Claims (which includes, without limitation, administrative expense, tax and other priority claims, and secured claims other than NBK), (ii) $150,000 as initial funding for the Liquidation Trust, and (iii) $238,307.99 for Trade General Unsecured Claims. *See* Plan § VI.C.

- Treatment for the eight (8) creditor classes under the Plan are set forth on Schedule 1. This treatment includes:

  o Class 1 (Other Secured Claims), consisting of secured creditors other than NBK, as well as Class 2 (Other Priority Claims), will receive payment in full on the Effective Date (or in the case of Class 1, payment in full or the property securing the claims in full satisfaction thereof). *See* Plan § III.B.b-c.

  o Class 5(a) (Trade General Unsecured Claims) will receive a recovery of seventy percent (70%) in Cash on or after the Effective Date *plus* a pro rata share of the Liquidation Trust Assets. The Plan provides this recovery for trade creditors irrespective of whether NBK is the Successful Bidder in the Sale: if NBK is the Successful Bidder, then this recovery is funded by NBK's cash contribution, and if a third-party is the Successful Bidder, then this recovery is funded by the Purchase Price for the Property before payment on account of NBK's secured claim. *See* Plan § VI.C.

  o Class 5(b) (Other General Unsecured Claims) will receive a pro rata share of the Liqudiation Trust Assets. Class 5(b) creditors consist mostly of attorneys formerly employed by the Debtor and, an unsecured deficiency claim by NBK equal to ninety-percent (90%) of the amount of its deficiency as determined by the Successful Bid and section 506(b).

- A release of estate claims against NBK. *See* Plan § IX.

## III.  Plan Solicitation and Voting Tabulation

12.  On May 3, 2024, the Court entered an order (i) approving the Disclosure Statement; (ii) scheduling the confirmation hearing for June 7, 2024; (iii) setting June 3, 2024 as the deadline for creditors to vote on the Plan (the "Voting Deadline"), (iv) setting June 3, 2024 at 4:00 p.m. as the confirmation objection deadline (the "Objection Deadline"); and (iv) directing NBK to serve the Plan, Disclosure Statement and a form ballot (the "Ballot" and together with the Plan and Disclosure Statement, the "Solicitation Package") on creditors entitled to vote on the Plan. *See* ECF No. 276.

13.  On May 6, 2024, NBK served the Solicitation Package on Holders of Claims in Class 4, Class 5(a) and Class 5(b) (the "Voting Classes") and a notice of non-voting status on

4

Holders of Claims Class 1 and 2 who are deemed to accept the Plan (the "Unimpaired Classes") and Holders of Claims and Interests in Classes 3, 6, 7 and 8 who are deemed to reject the Plan (the "Impaired Classes", together with the Unimpaired Claims, the "Non-Voting Classes").  *See* ECF No. 290.

14.     On May 13, 2024, the Court entered an order adjourning the hearing on confirmation of the Plan to June 17, 2024 at 9:00 a.m. (the "Confirmation Hearing").  *See* ECF No. 324.

15.     On May 14, 2024, NBK served an amended notice of the Confirmation Hearing on the Voting Classes and the Non-Voting Classes.  *See* ECF No. 328.  On June 5, 2024, the Solicitation Agent filed the *Ballot Summary* (the "Voting Summary") [ECF No. 428].

16.     The Voting Summary shows that NBK was the only member of the Voting Classes to cast a vote and that it cast its votes in Class 4 and Class 5(b) to accept the Plan. While 2425 WL's claims are classified in Class 6, and therefore not entitled to vote on the Plan, it nevertheless submitted a ballot rejecting the Plan.  2425 WL's vote is disregarded because it is in Class 6.

17.     The Voting Summary shows that Class 4 and 5(b) accepted the Plan and that none of the Voting Classes rejected the Plan.

18.     On June 13, 2024, the Court denied a motion by 2425 WL to cancel the confirmation hearing alleging that NBK failed to provide proper service of the Plan.  *See* ECF No. 507.  The Court found that "the service of the plan proponent [NBK] is legally sufficient to meet the requirements of actual notice and due process."  ECF No. 507. The Court also found that to the extent necessary, pursuant to the Federal Rules of Bankruptcy Procedure 2002 and 9007, the Court "modifies the notice required by its Order (ECF No. 276) to the notice provided by NBK (ECF No. 290)."  *Id.*

## IV. **Plan Supplement and Objections to the Plan**

19.     On June 3, 2024, 2425 WL and the Debtor each filed an objection to the Plan. *See* ECF Nos. 401 and 409.

20.     On June 10, 2024, CC2 TX, LLC ("CC2 TX") filed an objection to the Plan. *See* ECF No. 454.

21.     NBK received an informal objection from the Office of the United States Trustee (the "U.S. Trustee") and agreed to extend the U.S. Trustee's time to file a formal objection while NBK worked with the U.S. Trustee to attempt to resolve its comments. If they are unable to do so, NBK reserves the right to file a response to any objection submitted by the UST.

22.     In addition to the formal objection by CC2 TX [ECF NO. 454], tax lien holders raised informal objections to the Plan requesting that it provide for payment of statutory interest accruing from the Petition Date until such claims are paid full. The proposed Confirmation Order filed herewith should resolve these formal and informal objections by providing for the payment of post-petition statutory interest on tax lien claims through the date of payment.

23.     Attached as **Exhibit A** is a summary chart of the formal objections and responses to each objection.

### ARGUMENT

24.     Section 1129(a) of the Bankruptcy Code governs confirmation of a chapter 11 plan. To confirm a plan, the Court must find that each of the requirements of section 1129(a) are met. For the reasons set forth below, NBK submits that the Plan satisfies all of the requirements of section 1129(a) and thus the Plan should be confirmed. If, however, the Court determines that all requirements for confirmation are met except for subsection 1129(a)(8), then NBK submits that the Plan should still be confirmed pursuant to section 1129(b) because it satisfies the so-called 'cramdown' requirements of that subsection.

6

## I.     The Plan Complies With Section 1129(a)(1)

25.     Section 1129(a)(1) provides that a plan "complies with the applicable provisions of [the Bankruptcy Code]" and courts have interpreted this provision as requiring compliance with sections 1122 and 1123 governing classification of claims and contents of a plan, respectively.[5] As explained below, the Plan complies with the requirements of sections 1122 and 1123 and all other applicable provisions of the Bankruptcy Code.

### A.     The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122

26.     Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[6]  Section 1122(b) permits separate classification of certain claims for purposes of administrative convenience.[7]  For a classification structure to satisfy section 1122, it is not necessary that all substantially similar claims or interests be designated in the same class, but only that all claims or interests designated in a particular class be substantially similar to each other.[8] In addition, a plan proponent is afforded "significant flexibility in classifying claims under section 1122(a) provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."[9]

---

[5]   H.R. Rep. No. 95-595, at *412; *see also In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.") (citing *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 174 (5th Cir. 2011)).

[6]   11 U.S.C. § 1122(a).

[7]   *See* 11 U.S.C. § 1122(b).

[8]    *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes." (citations omitted)).

[9]   *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), *aff'd*, *In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011).

27.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 because the Plan separately classifies claims and interests based on the legal or factual basis of the claim.  The separate classification of claims and interests are:

- Class 1 - Other Secured Claims
- Class 2 - Other Priority Claims
- Class 3 - NBK Tax Claim
- Class 4 - NBK Secured Claim
- Class 5(a) - Trade General Unsecured Claims
- Class 5(b) - Other General Unsecured Claims
- Class 6 - Insider Claims
- Class 7 - Subordinated Claims
- Class 8 - Interests

28.     Claims and interests assigned to each of these classes are substantially similar to the other claims and interests in that class. As explained below, the separate classes under the Plan are based on the different factual or legal bases for the Claims and no unfair discrimination exists:[10]

- Each member of Class 1 (Other Secured Claims), Class 3 (NBK Tax Claim) and Class 4 (NBK Secured Claim) hold secured claims against the Debtor.  While the claims in Class 1 and Class 3 each relate to tax liens against the Property, those claims are classified separately because the claims in Class 1 will be paid in full whether or not NBK is the Successful Bidder at the auction while the claims in Class 3 will be waived if NBK is the Successful Bidder. The Claims in Class 4 are classified separately from those in Class 1 and Class 3 because Class 4 claims arise out of the loan documents between the Debtor and NBK.

- The claims in Class 2 (Other Priority Claims) are classified separately due to their required treatment under section 507 of the Bankruptcy Code.

- The Plan includes two sub-classes of general unsecured claims. Class 5(a) consists of general unsecured claims arising from maintenance and related work performed by creditors at the Property while the claims in Class 5(b) arise

---

[10]  For the reasons set forth herein, including NBK's responses in Exhibit A hereto, the objections by 2425 WL and the Debtor with respect to classification should be overruled.  *See* 2425 WL Objection ¶ 9(b) and Debtor Objection at 13.

out of other commercial contracts between creditors and the Debtor, including claims by former attorneys for the Debtor and NBK's deficiency claim on account of its loan to the Debtor. These general unsecured claims are classified separately because they are different in nature and type.

- The claims in Class 6 (Insider Claims) are separately classified because they are claims asserted by the Debtor's insiders, whose votes are not counted under section 1129(a)(10) (requiring at least one impaired class to vote to accept the plan without regard to any insider vote).

- The Claims in Class 7 (Subordinated Claims) are separately classified due to their statutory subordination and treatment under section 510(b) of the Bankruptcy Code. There are no members of Class 7.

- The Claims in Class 8 (Interests) are separately classified from other claims because they represent equity interests in the Debtor and are therefore different in nature and type from other claims.

29.    The Plan's classification structure complies with the Bankruptcy Code because it provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests. As a result, the Plan complies with section 1122.

B.    *The Plan Satisfies the Mandatory Requirements of 11 U.S.C. § 1123(a)*

30.    Section 1123(a) mandates that a plan:

(1) designate classes of claims and interests; (2) specify unimpaired classes of claims and interests; (3) specify treatment of impaired classes of claims and interests; (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest; (5) provide adequate means for implementation of the plan; (6) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (7) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the

manner of selection of the reorganized company's officers and directors.[11]

31.     Article III of the Plan satisfies the first <u>three</u> requirements of section 1123(a) by: (i) designating the eight (8) classes of claims and interests described above (section 1123(a)(1)); (b) specifying the classes of claims and interests that are unimpaired (section 1123(a)(2) with respect to Class 1 and Class 2); and (iii) specifying the treatment of claims and interests that are impaired (section 1123(a)(3) with respect to Classes 4, 5(a), 5(b), 6, 7 and 8).

32.     Article IV of the Plan satisfies the <u>fourth</u> requirement (section 1123(a)(4)) because it provides for equal treatment of all claims and interests within each class: all claims in Class 1 and Class 2 are unimpaired, all claims in Class 6 and Class 7 are impaired and will be discharged and extinguished, and all interests in Class 8 are impaired and will be cancelled and extinguished.

33.     NBK is the sole Holder of a Claim in Class 3 and such claim is impaired.  If NBK is the Successful Bidder, it will waive its Class 3 Claim.  If NBK is not the Successful Bidder, then its Class 3 Claim will be paid in full in cash.  NBK is also the sole Holder of an impaired claim in Class 4 and will be entitled to credit bid at the auction (if necessary) or receive the Remaining Cash as defined in the Plan and any excess proceeds after the Distribution Account Claims are paid in full.  Holders of Claims in Class 5(a) and Class 5(b) are also impaired.  Holders of Trade General Unsecured Claims in Class 5(a) will receive 70% of their Allowed Claims and a *pro-rata* share of the Liquidation Trust Assets, and Holders of Other General Unsecured Claims in Class 5(b) will receive a *pro-rata* share of the Liquidation Trust Assets, except that NBK agrees to reduce its unsecured claim in Class 5(b) to 90% of the Allowed amount of its deficiency claim.

34.     The Plan satisfies the <u>fifth</u> requirement (section 1123(a)(5)) because Article VI of the Plan provides adequate means for implementation as described in section II *supra*.

---

[11] *See* 11 U.S.C. § 1123(a)(1)-(7).

35.     The sixth requirement (section 1123(a)(6)) - that the Plan prohibit the issuance of non-voting equity securities - does not apply because no securities will be issued under the Plan.

36.     Finally, the Plan satisfies the seventh requirement (section 1123(a)(7)), which requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."[12]

37.     On the Effective Date of the Plan, all managers, officers and directors of the Debtor shall be deemed to have resigned from their respective positions, and the Chapter 11 Trustee's position will be terminated.  The Liquidation Trustee will be appointed to liquidate remaining assets, if any, prosecute affirmative claims, resolve claims against the estate and distribute funds to holders of Allowed Claims in accordance with the terms of the Plan.  The Liquidation Trustee's appointment on the Effective Date is consistent with the interests of creditors and public policy because it provides an independent fiduciary to continue to manage and wind down the estate and prosecute and recover claims for the benefit of unsecured creditors as permitted under the Liquidation Trust Agreement.  The current Chapter 11 Trustee will serve as the Liquidation Trustee, and his appointment to this role is consistent with the interests of creditors and equity holders and public policy.  Therefore, the Plan satisfies section 1123(a)(7).[13]

### C.      Section 1123(b): The Plan Incorporates Certain Permissive Provisions

---

[12]  11 U.S.C. § 1123(a)(7).

[13]  For the reasons set forth herein, including NBK's responses in Exhibit A hereto, the objections by 2425 WL and the Debtor with respect to identifying the Liquidation Trustee should be overruled.  *See* 2425 WL Objection ¶ 10 and Debtor Objection at 14-15.

38.     Section 1123(b) identifies various discretionary provisions that may be included in a chapter 11 plan, including a catch-all provision providing that a plan of reorganization may "include any other appropriate provision not inconsistent with the applicable provisions of [title 11]." *See* 11 U.S.C. § 1123(b)(6).  Here, the Plan complies with all applicable provisions of section 1123(b).

   i.  Sections 1123(b)(1) and (2).

39.     Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."[14]  Section 1123(b)(2) allows a plan to provide for assumption, assumption and assignment, or rejection of executory contracts and unexpired leases under section 365.[15]

40.     The Plan impairs certain Claims and Interests (Classes 3, 4, 5(a), 5(b), 6, 7 and 8) and leaves other Claims Unimpaired (Class 1 and Class 2).

41.     Article V.D of the Plan provides for the automatic rejection of executory contracts and unexpired leases to which the Debtor is a party if NBK is the Successful Bidder.  If NBK is not the Successful Bidder, then the Chapter 11 Trustee and the Purchaser will determine what contracts and leases will be assumed or rejected as provided for under the Plan.

   ii.  Section 1123(b)(3).

42.     Section 1123(b)(3)(A) provides that a chapter 11 plan may settle or adjust "any claim or interest belonging to the debtor or to the estate."[16]  In considering the propriety of estate releases, courts frequently use the reasonableness standards for approval of a settlement under Bankruptcy Rule 9019 or require a showing that granting the releases is a valid exercise of the

---

[14] *See* 11 U.S.C. § 1123(b)(1).

[15] *See* 11 U.S.C. § 1123(b)(2).

[16] *See* 11 U.S.C. § 1123(b)(3)(A).

debtor's business judgment.[17]  Approval of a proposed settlement under Bankruptcy Rule 9019 is within the "sound discretion" of the bankruptcy court, but a court should not substitute its judgment for that of a debtor.  "Rather than being forced to decide all questions of law and fact that are settled, a Court need only 'canvas the issues [to] see whether the settlement fall[s] below the lowest point in the range of reasonableness.'"[18] By its terms, the Plan settles and adjusts claims or interests of the estate.

43.     Under section 1123(b)(3)(B) a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim or interest.[19]  As section 1123(b)(3)(B) permits, Article VI.K of the Plan transfers the Transferred Actions into the Liquidation Trust and allows the Liquidation Trustee to commence, pursue and settle the Transferred Actions for the benefit of unsecured creditors.

       iii.     Section 1123(b)(4).

44.     Section 1123(b)(4) permits a plan of reorganization to provide for the sale of all or substantially all of the property of the estate, and distribution of the proceeds of such sale among holders of claims and interests.[20]  As discussed above, the Plan incorporates the Chapter 11 Trustee's sale of the Property and provides for distribution of sale proceeds in the event that NBK is not the Successful Bidder. If NBK is the Successful Bidder, its cash contribution to the estate will be distributed to creditors in the same manner.

---

[17]  *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate.") (emphasis omitted); *In re General Homes Corp. FGMC*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A).").

[18]  *In re ASARCO LLC*, No. 05-21207, 2009 WL 8176641, at *10 (Bankr. S.D. Tex. Jun. 5, 2009) (quoting *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992)).

[19]  11 U.S.C. § 1123 (b)(3)(B).

[20]  *See* 11 U.S.C. § 1123(b)(4).

45.     Accordingly, the Plan satisfies section 1123(b)(4).

      iv.      Section 1123(b)(5).

46.     Section 1123(b)(5) provides that a plan may modify the rights of holders of secured claims or holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.[21]  As section 1123(b)(5) permits, the Plan modifies the rights of Holders of Claims or Interests in the Impaired Classes (Classes 3, 4, 5(a), 5(b), 6, 7 and 8), and leaves unaffected the rights of Holders of Claims in the Unimpaired Classes (Class 1 and Class 2).

      v.      Section 1123(b)(6).

47.     Section 1123(b)(6) provides that a Plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."  Here, in accordance with section 1123(b)(6), the Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code and other applicable law.  Specifically, the release, exculpation, and injunction provisions are appropriate and consistent with the applicable Bankruptcy Code provisions and Fifth Circuit law.[22]

      1.      Estate Release

48.     Under Article IX.D of the Plan, the Chapter 11 Trustee is releasing the Estate's Claims, Interests, or Causes of Action,[23] other than the retained actions identified on the Schedule

---

[21] *See* 11 U.S.C. § 1123(b)(5).

[22] For the reasons set forth herein, including NBK's responses in Exhibit A hereto, the objections by 2425 WL and the Debtor with respect to the exculpation and release provisions should be overruled.  *See* 2425 WL Objection ¶¶ 9(a), 9(e) and 15 and Debtor Objection at 12-14, 16-17.

[23] The Estate Release provides that:

    Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and this Estate will be deemed to have forever released, waived and discharged the Released Parties from any and all Actions, Claims, obligations, suits, judgments, damages, demands, debts, rights, and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection

14

of Retained Causes of Action, against each Released Party (including NBK)[24] (the "Estate Release").

49.     The Estate Release should be approved because it is "fair and equitable and in the best interest of the [e]state."[25]  The Debtor commenced an adversary proceeding against NBK by removing its state court lawsuit to this Court.  *See Galleria 2425 Owner LLC v. National Bank of Kuwait, S.A.K.P., New York Branch et al*, Adv. Pro. No. 23-03263 (the "Estate Lawsuit").  The Estate Lawsuit asserts tortious interference and lender liability claims against NBK, which stem from NBK's alleged breach of a confidential settlement agreement between Mr. Ali Choudhri, the Debtor, NBK, and the Debtor's mezzanine lender.  Pursuant to Bankruptcy Rule 2012(a), the Chapter 11 Trustee was substituted as the plaintiff in the Estate Lawsuit.

50.     After the Chapter 11 Trustee's appointment, the Court also entered a *Final Order Authorizing the Trustee to Use Cash Collateral* [ECF No. 187] (the "Final Cash Collateral Order").

51.     The Final Cash Collateral Order provided for the investigation of claims by the Chapter 11 Trustee against NBK and the ability to "challenge the amount or allowance of the NBK Claim, or seek to equitably subordinate that claim, up to ten (10) days before a hearing on any plan

---

with indebtedness for money borrowed by the Debtor, taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, or the Plan. This release does not release any Action, Claim, obligation, suit, judgment, damages, demands, debts, rights, and liabilities of a Released Party arising under or pursuant to the Plan or Purchase Agreement, and the contracts, instruments, releases and other agreements delivered in connection with the Plan or Purchase Agreement, which may be enforced only by the Chapter 11 Trustee, NBK, the Purchaser, the Distribution Agent or the Liquidation Agent, as applicable.

[24]  "*Released Parties*" means (a) the Chapter 11 Trustee; (b) NBK; (c) the Liquidation Trustee, and (d) each Related Party of each Entity in clause (a) through this clause (d).  For avoidance of doubt the Debtor, its current and former equity holders and Related Parties are not Released Parties.

"*Releasing Parties*" means, collectively, and in each case solely in their capacity as such, each of the Released Parties.

[25]  *Bigler*, 442 B.R. at 543 n.6 ("[S]ettlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under Rule 9019.").  *See also In re Moore*, 608 F.3d. 253, 263 (5th Cir. 2020) ("(1) the probability of success in litigation, with due consideration for uncertainty in fact and law; (2) complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, including difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of creditors and proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on wisdom of compromise.") (citing *In re Foster Mort. Corp.*, 68 F.3d 914, 917-18 (5th Cir.1995)).

of reorganization for the Debtor is *first scheduled for hearing* with any such challenge to be heard and determined in connection with that hearing (the "Challenge Period")." Final Cash Collateral Order ¶ 3(a) (emphasis added). Because the Chapter 11 Trustee did not challenge NBK's Claim, the Final Cash Collateral Order bound the Chapter 11 Trustee and "all other parties in interest and all of their respective successors and assigns" by the stipulations in that order concerning the amount, validity, perfection and enforceability of NBK's claims. *Id.* ¶ 4.

52. NBK understands that the Chapter 11 Trustee, with the assistance of its advisors, investigated and assessed claims and causes of action against the Released Parties. With respect to NBK, NBK produced documents to the Chapter 11 Trustee in response to requests and based on that investigation, NBK and the Chapter 11 Trustee have agreed settle any and all potential Estate issues and claims against NBK.

53. NBK understands that the Chapter 11 Trustee's decision not to bring a challenge despite the Challenge Period in the Cash Collateral Order reflects the Chapter 11 Trustee's determination, after its investigation, that any claims against NBK lack sufficient merit or otherwise were not in the best interests of the estate to pursue. NBK, therefore, believes that the Estate Release is reasonable and understands that the Chapter 11 Trustee believes giving the Estate Release reflects his sound business judgment.

54. In addition, the Estate Release is the result of arm's length negotiations between the Chapter 11 Trustee and NBK and is essential to the conclusion of this case and consummation of the Plan. Absent the Estate Release, NBK would not be obligated to fund the Plan, potentially leaving unsecured creditors with nothing. Given the Chapter 11 Trustee's investigation, evaluation, and decision not to challenge NBK's Claim, as well as the cost that would be incurred pursuing those claims against NBK, the Estate Release is fair and equitable, in the best interests of creditors,

and is an integral part of the Plan and the global settlement. The Chapter 11 Trustee's decisions to grant the Estate Release to NBK is a reasonable exercise of the Truste's business judgment, satisfies the standards under Bankruptcy Rule 9019 and should be approved.

55.     Further, the Estate Release only effects the release of direct or derivative claims belonging to the Estate.

### 2. Exculpation

56.     Unlike a release, the Exculpation does not affect the liability of Exculpated Parties *per se*, but rather sets a standard of care of actual fraud, willful misconduct, or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of this case.[26]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 case because a bankruptcy court must find a plan has been proposed in good faith in order to confirm such a plan.[27]  As such, an exculpation provision represents a legal conclusion that flows inevitably from several findings a bankruptcy court must reach in confirming a plan,[28] as well as the statutory exculpation in section 1125(e) of the Bankruptcy Code.[29]

57.     Once the court makes its good faith finding, it is appropriate to set the standard of care of the parties involved in the formulation of that chapter 11 plan.[30] Exculpation provisions, therefore, appropriately prevent future collateral attacks against fiduciaries of a chapter 11 estate.

---

[26] *In re AJ Town Centre, LLC*, No. 2:10-bk-17310-GBN, 2012 WL 2524731, p. 4 (Bankr. D. Ariz. Jan. 5, 2012).

[27] *See* 11 U.S.C. § 1129(a)(3).

[28] *See* 28 U.S.C. § 157(b)(2)(L) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 . . . [c]ore proceedings include, but are not limited to . . . confirmations of plans").

[29] *See* 11 U.S.C. § 1125 ("A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.").

[30] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d. Cir. 2000) (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

58.     In light of an informal objection received from the UST, NBK has agreed to limit the exculpation provision in Article IX.C of the Plan (the "Exculpation") to reflect the Fifth Circuit Court of Appeal's decision in *Highland Capital*, which held that a bankruptcy court's ability to exculpate non-debtors is limited to creditors' committee members, trustees, and independent directors (in that case, acting as a quasi-trustee for the debtor-in-possession).[31]  The Exculpation in the Plan will be limited by adding the following paragraph to the Confirmation Order which eliminates all parties other than the Chapter 11 Trustee (and its Related Parties) from the Exculpation, including NBK:

> Notwithstanding any provision in the Plan, including Article IX.C of the Plan and the definition of Exculpated Party contained in Article I.A.39, the Exculpated Parties under the Plan shall mean only the Chapter 11 Trustee and any Related Parties.

59.     As modified, the Exculpation is appropriate and vital because it provides protection to the Chapter 11 Trustee in connection with this case.[32] The Exculpation is narrowly tailored to exclude acts of willful misconduct or gross negligence, and relates only to acts or omissions in connection with, or arising out of, the administration of this case.

60.     Accordingly, the Exculpation should be approved.

---

[31] *See Nextpoint Advisors, L.P. v. Highland Capital Mgmt, L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 437-38 (5th Cir. 2022) (finding that an exculpation in a chapter 11 plan with respect to non-debtors may only cover a "creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties….")

[32] The Exculpation states:

Except as otherwise provided in the Plan, to the maximum extent permitted by the Bankruptcy Code and applicable law, no Exculpated Party shall have or incur any liability to any Person, including, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating this Plan, the Purchase Agreement, or the property to be distributed under this Plan, including all activities leading to the promulgation and Confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtor or this Chapter 11 Case; *provided*, *however*, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

### 3. Injunction and Gatekeeping Provision

61.     Article IX.E of the Plan contains an injunction provision that permanently enjoins all Persons from commencing any action or proceeding against the Released Parties with respect to any Claims that have been discharged, released or exculpated under the Plan, [33] and a "gatekeeper provision" [34] that requires any party in interest to seek leave of this Court before commencing or pursuing a Claim or Action against the Released Parties that relate to the Debtor that arose before the Petition Date or arose in connection with this chapter 11 case, negotiations over the Plan and certain other Plan-related actions (collectively, the "Injunctions"). [35]

62.     The Injunctions are key provisions of the Plan because they enforce the release, discharge, and exculpation provisions that are central to the Plan and are narrowly tailored to achieve that purpose.  With respect to the gatekeeper provision, it does not prejudice any party because the Court would in any event have jurisdiction over any colorable claims raised by such

---

[33] The injunction provision states:

Except as otherwise provided herein, on the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person (excluding the Liquidation Trustee) that has held, currently holds or may hold a Claim, Action or liability that is released pursuant to Article IX(D) from enforcing or attempting to enforce any such Claim, Action or liability against any Released Party or any of their respective Property….

[34] The gatekeeping provision states:

[N]o Person who has held, holds, or may hold Claims, Interests, or Action may commence or pursue a Claim or Action, as applicable, of any kind in any way related to the Debtor against any Released Party that arose before the Petition Date or arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the Debtor's business, the administration of the Liquidation Trust, or the transactions in furtherance of the foregoing without the Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party that such person has standing and is otherwise entitled to assert such claim or cause of action and (ii) specifically authorizing such Releasing Party to bring such claim or cause of action against any such Released Party.

[35]  *See, e.g.*, *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 439 (5th Cir. 2022) ("Courts have long recognized bankruptcy courts can perform a gatekeeping function" and "[w]e otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.")*; In re Weatherford Int'l PLC, et al.*, at ¶ 28, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019) [ECF No. 343] (approving similar injunctions and finding that they are "an integral part of th[e] Plan and essential to its implementation."); *In re Goodrich Petroleum Corp.*, ¶¶ 29, 108, No. 16-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016) [ECF No. 531] (approving substantially similar injunction as being "necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Release, and the Exculpation, and . . . narrowly tailored to achieve this purpose"); *In re RAAM Global Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 19, 2016) [ECF No. 376] (approving similar injunction provision).

party after plan confirmation. The Plan's gatekeeping provision is not a release, but it is intended to protect against a party seeking to pursue non-meritorious litigation based on a Claim that belongs to, and is released under the Plan by, this Estate (so-called "derivative claims"). Given the history of vexatious litigation against NBK, this provision is especially important here.

63.     For the foregoing reasons, each of the permissive provisions discussed are appropriate and consistent with section 1123(b) and should be approved.

     D.     *Section 1123(d): Curing of Defaults*

64.     Section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[36] This provision generally does not apply because all executory contracts and unexpired leases are being rejected under the Plan if NBK is the Successful Bidder. *See* Plan § V.A.  If NBK is not the Successful Bidder, Plan § V.A complies with Section 1123(d) because it contemplates the assumption/assignment (and cure) of any executory contracts designated by any third-party purchaser of the Property.  *See id*.

     E.     *Section 1129(a)(2): Compliance with the Bankruptcy Code's Applicable Provisions*

65.     Section 1129(a)(2) requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[37] This provision has been interpreted to include the disclosure and solicitation requirements of sections 1125 and 1126.[38]  As explained in section III in the background section of this Memorandum, NBK complied with the notice and solicitation requirements of section 1125.

---

[36]  *See* 11 U.S.C. § 1123(d).

[37]  *See* 11 U.S.C. § 1129(a)(2).

[38]  *See, e.g.*, *In re Cajun Elec. Power Coop.*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125." (citation omitted))

66.     Section 1126 sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof.  Pursuant to section 1126, only holders of allowed, impaired claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject a plan.[39]

67.     As set forth in section III in the background section of this Memorandum, in accordance with section 1125, NBK solicited acceptances or rejections of the Plan from Holders of Allowed Claims in Class 4, Class 5(a), and Class 5(b) because the claims in these Classes are impaired and will receive distributions[40] under the Plan.  NBK did not solicit votes from Holders of Claims in Class 1 and Class 2 because claimholders in these classes are Unimpaired and are conclusively presumed to have accepted the Plan. *See* Section 1126(f). NBK did not solicit votes from Holders of Claims and Interests in Classes 3, 6, 7, and 8 because they will not receive any distribution on account of their Claims and Interests and are deemed to reject the Plan under section 1126(g).

68.     Sections 1126(c) and 1126(d) specify the requirements for acceptance of a plan by classes of claims and interests:

> (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

> (d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) or this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under

---

[39]  *See* 11 U.S.C. § 1126(a), (f) and (g).

[40]  Because Class 3, NBK's tax lien claim, will not receive a distribution in the event a third party is the Successful Bidder, it is deemed under the Plan to be a Non-Voting Class.

subsection (e) of this section, that have accepted or rejected such plan.[41]

69. As shown in the Voting Summary, NBK voted to accept the Plan based on its claims in Class 4 and Class 5(b) and no other members of the Voting Classes cast a ballot. *See* ECF No. 428. 2425 WL purported to cast a ballot to reject the Plan, but its vote is not counted because it is already conclusively deemed to have rejected the Plan.

70. No votes were cast in Class 5(a), but this failure to vote does not require a cramdown of that Class. A class that fails to vote for a plan should simply be ignored in tabulating votes on a plan.[42]

71. However, if cram down of Class 5(a) is required, the Plan satisfies the cram down provisions of section 1129(b).

72. Based on the foregoing, the Plan satisfies the requirements of section 1129(a)(2).

F.    *Section 1129(a)(3): Good Faith*

---

[41] 11 U.S.C. §§ 1126(c) and (d).

[42] *See In re Hot'z Power Wash, Inc.*, 655 B.R. 107 (Bankr. S.D. Tex. 2023) (finding that non-voting class was not counted as an acceptance or rejection (*i.e.*, ignored) for purposes of section 1129(a)(8)).

73.     Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[43]  This section addresses the process of the plan development rather than the plan's contents.[44]

74.     Where the plan proponent proposes the plan with the legitimate and honest purpose to reorganize or liquidate and has a reasonable hope of success, the plan proponent satisfies the good faith requirement of section 1129(a)(3).[45]  "Good faith" is evaluated in light of the totality of the circumstances surrounding the development of the plan.[46]

75.     Here, the Plan has been proposed in good faith because it is designed to distribute value to the estate's creditors and is grounded in the court-supervised auction being conducted by the Chapter 11 Trustee.[47]  Under the Plan, secured and priority claims will be paid in full and trade creditors will receive a guaranteed distribution regardless of the outcome of the auction. In addition, other unsecured creditors, including the Debtor's former counsel who have not been paid for their work *against* NBK, could receive distributions under NBK's Plan if the Liquidation Trustee successfully prosecutes claims against third parties. The Plan also reflects the Chapter 11 Trustee's input on classification of claims, which included changes to the classification structure to afford recoveries to non-insider creditors adverse to NBK and ensure that trade creditors who have not been paid for their work receive substantial recoveries under the Plan.

---

[43] 11 U.S.C. § 1129(a)(3).

[44] *See In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (S.D. Tex. 2015) ("As several courts have observed, the good faith requirement should be viewed in light of the totality of the circumstances surrounding the plan, and 'the requirement of Section 1129(a)(3) speaks more to the process of plan development than to the content of the plan.'") (quoting *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010)).

[45] *See In re Sun Country Dev. Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *see also In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir. 1989) ("although Chapter 11 is titled 'Reorganization,' a plan may result in the liquidation of the debtor").

[46] *See In re Sun Country Dev., Inc.*, 764 F.2d at 408.

[47] *See, e.g.*, *In re Ngan Gung. Rest.*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) (emphasizing the equitable distribution of value to creditors as the primary objective in chapter 11 cases).

76.     In sum, in proposing its liquidation Plan of the Debtor NBK has satisfied its good faith obligations under section 1129(a)(3).[48]

G.      *Section 1129(a)(4): Professional Fees Subject to Court Approval*

77.     Section 1129(a)(4) requires the Court to review and approve "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case," including professionals.[49]

78.     The Plan complies with this provision because all fees for services rendered and expenses incurred in connection with this case, including Professional Fee Claims, are subject to Court approval.  Only Allowed Professional Fee Claims based on all final requests for payment filed no later than forty-five (45) days after the Effective Date (in accordance with Bankruptcy Code procedures, Bankruptcy Rules, and prior Court orders) will be paid.  NBK's fees and expenses will not be paid by the estate.

H.      *Section 1129(a)(5): Compliance with Disclosure Requirements*

79.     Section 1129(a)(5)(A)(i) requires the plan proponent to disclose "the identity and affiliation of any individual proposed to serve" as a director or officer of the debtor or a successor to the debtor under the plan.[50]  Section 1129(a)(5)(A)(ii) requires that the appointment or continuance of such officers and directors be "consistent with the interests of creditors and equity security holders and with public policy."[51]

80.     The Plan provides that the Chapter 11 Trustee will serve as the Liquidation Trustee. NBK believes that the appointment of the Chapter 11 Trustee as the Liquidation Trustee on the

---

[48] For the reasons set forth herein, including NBK's responses in Exhibit A hereto, the objections by 2425 WL and the Debtor with respect to the Plan's good faith should be overruled.  *See* 2425 WL Objection ¶ 10 and Debtor Objection at 14.

[49] 11 U.S.C. § 1129(a)(4).

[50] 11 U.S.C. § 1129(a)(5)(A)(i).

[51] 11 U.S.C. § 1129(a)(5)(A)(ii).

Effective Date is consistent with public policy, and no party in interest has objected to the Plan on these grounds.

81.     The Plan satisfies section 1129(a)(5)(A).

*I.      Section 1129(a)(6): No Rate Changes*

82.     Section 1129(a)(6) requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[52]

83.     This provision does not apply because no governmental regulatory commission has jurisdiction over the Debtor.

*J.      Section 1129(a)(7): Best Interests Test*

84.     Section 1129(a)(7) sets forth the so-called "best interests test."  That section provides that each holder of an impaired class of claims or interests must receive or retain at least what it would have if the debtor were liquidated under Chapter 7.[53]  The "best interests of creditors" test is satisfied where the estimated recoveries in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest that rejects the plan. [54]

85.     As section 1129(a)(7) makes clear, the best interests test analysis applies only to non-accepting impaired claims or interests.  If a class of impaired claims or interests unanimously accepts the plan, the best interests test is deemed satisfied for all members of that class.[55]

---

[52]  11 U.S.C. § 1129(a)(6).

[53]  *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

[54]  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

[55]  *See* 11 U.S.C. § 1129(a)(7)(A)(i).

86.     The Plan satisfies section 1129(a)(7) because creditors in Classes 5(a) and 5(b) receive more under the Plan than they would in a chapter 7 liquidation while creditors in Class 6 and interest holders in Class 8[56] receive the same recovery.

87.     NBK will file a liquidation analysis estimating the range of recoveries under a hypothetical chapter 7 liquidation (the "Liquidation Analysis").  *See* Plan Supplement.  In a hypothetical chapter 7 liquidation, the Liquidation Analysis shows that Holders of unsecured claims receive nothing.  By contrast, under the Plan, creditors in Class 5(a) will receive a 70% recovery on account of their allowed claims, plus their share of the Liquidation Trust Assets and creditors in Class 5(b) will receive their share of the Liquidation Trust Assets.

K.     *Section 1129(a)(8): Acceptance of Impaired Classes*

88.     Section 1129(a)(8) requires that each class of claims or interests either accept a plan or not be impaired by a plan.[57]  A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8).[58]  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[59]  As discussed below, if any class of claims or interests rejects a plan, such plan must satisfy the "cramdown" requirements of section 1129(b).

---

[56]  There are no members of Class 7.

[57]  *See* 11 U.S.C. § 1129(a)(8).

[58]  *See* 11 U.S.C. § 1126(f).

[59]  *See* 11 U.S.C. § 1126(c).

89.     Only NBK voted to accept the Plan based on its Impaired Claims in Class 4 and Class 5(b).  The Impaired Claims in Class 6, Class 7 and Class 8 are deemed to reject the Plan.[60]

90.     The Plan is still confirmable over these rejecting Impaired Classes of Claims because it complies with section 1129(a)(10) and section 1129(b)'s cram down requirements as discussed further below.

   L.     *Section 1129(a)(9): Payment in Full of Administrative and Priority Claims*

91.     Section 1129(a)(9) requires that claims entitled to priority under section 507(a) of the Bankruptcy Code must be paid in full in cash, unless the holder thereof agrees to a different treatment with respect to such claim.[61]

92.     Article II of the Plan complies with section 1129(a)(9) because it provides full payment of Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims on the Effective Date of the Plan or as soon as reasonably practicable thereafter.

   M.     *Section 1129(a)(10): Impaired Accepting Class*

93.     Section 1129(a)(10) requires acceptance of the Plan by at least one class of impaired claims, excluding "acceptance of the plan by any insider."[62]

94.     The Plan complies with section 1129(a)(10) of the Bankruptcy Code because NBK voted to accept the Plan based on its Impaired Claims in Class 4 and Class 5(b) and based on those votes both Class 4 and Class 5(b) have accepted the Plan. NBK is not an insider within the meaning of the relevant provisions of the Bankruptcy Code.

   N.     *Section 1129(a)(11): The Plan is Feasible*

---

[60] For the reasons set forth herein, including NBK's responses in Exhibit A hereto, the objections by 2425 WL and the Debtor with respect to section 1129(a)(8) should be overruled.  *See* 2425 WL Objection ¶ 12 and Debtor Objection at 16.

[61] *See* 11 U.S.C. § 1129(a)(9).

[62] 11 U.S.C. § 1129(a)(10).

95.     Section 1129(a)(11) requires the court to determine, in relevant part, that confirmation of the plan is not likely to be followed by liquidation or further financial reorganization unless such liquidation is proposed in the plan.[63]  This has been interpreted by courts as requiring a determination that the plan has a "reasonable probability of success."[64]

96.     A liquidating plan is not exempt from meeting the requirements under this section, but it does reduce the emphasis on future performance after the plan becomes effective.[65]  To demonstrate that a liquidating plan is feasible, a plan proponent need only show that "the successful performance of [the plan's] terms is not dependent or contingent upon any future, uncertain event."[66] A plan proponent does not need to establish that the success of any future litigation is guaranteed or that a trust's funds will never run out.[67]

97.     The Plan is feasible.  It ensures the payment of claims regardless of the outcome of the auction. As stated, if NBK is the Purchaser, it will make a cash contribution to the estate in amounts sufficient to fund the Liquidation Trust, pay trade creditors in Class 5(a) 70% of their allowed claims, and pay all other Holders of the Distribution Account Claims in full, except the NBK Tax Claim which is waived if NBK is the Purchaser.  NBK has the means to make the payments contemplated under the Plan.  Based on National Bank of Kuwait S.A.K.P.'s annual financial report for 2023, its profit for 2023 was $1,918,086,000 and, as of December 31, 2023, it held cash and other short-term funds in the amount of $14,294,050,000.  *See* Carter Decl., Exhibit A at 119-21.  The New York Branch does not publish separate public financial reports.

---

[63]  11 U.S.C. § 1129(a)(11).

[64]  *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997).

[65]  *See T-H New Orleans*, 116 F.3d at 802 (citing *Sandy Ridge*, 881 F.2d at 1152-53) and explaining that even a liquidating chapter 11 plan does not violate section 1129(a)(11)).

[66]  *Heritage Org.*, 375 B.R. at 311 (holding that the creation of a creditor trust with *res* consisting of estate cash and the proceeds of any future successful litigation in addition to a fixed trust governance mechanism qualified as feasible).

[67]  *See T-H New Orleans*, 116 F.3d at 801 (a bankruptcy court "need not require a guarantee of success").

98.    If NBK is not the Purchaser, the same payments will be made from the sale proceeds paid by the Successful Bidder. In addition, creditors may receive additional distributions from the Liquidation Trust because the Liquidation Trust Assets include retained causes of action that the Liquidation Trustee may pursue against third parties.

99.    Overall, the Plan provides a process and a fixed trust governance mechanism for creditors, and performance of its terms does not hinge on any future or uncertain events. The Plan is feasible. [68]

O.    *Section 1129(a)(12): Payment of U.S. Trustee Quarterly Fees*

100.    Section 1129(a)(12) requires the payment of "[a]ll fees payable under Section 1930 [of title 28 of the United States Code], as determined by the Court at the Confirmation Hearing.[69] Section 507 provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[70]

101.    Article XI of the Plan complies with section 1129(a)(12) because it provides for the payment of all statutory fees until this case is converted, dismissed or closed.

P.    *Inapplicable Provisions: 11 U.S.C. §§ 1129(a)(13), (a)(14), (a)(15) and (a)(16)*

102.    Section 1129(a)(13) requires a plan to provide for retiree benefits at levels established under section 1114 of the Bankruptcy Code.[71] Section 1129(a)(14) relates to the payment of domestic support obligations.[72] Section 1129(a)(15) applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).[73] Section 1129(a)(16)

---

[68] *See id.*

[69] 11 U.S.C. § 1129(a)(12).

[70] 11 U.S.C. § 507(a)(2).

[71] *See* 11 U.S.C. § 1129(a)(13).

[72] *See* 11 U.S.C. § 1129(a)(14).

[73] *See* 11 U.S.C. § 1129(a)(15).

applies to transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust made in accordance with applicable provisions of nonbankruptcy law.[74]

103.    These provisions do not apply because the Debtor: (i) is not an individual or subject to any domestic support obligations; and (ii) is a moneyed, business, or commercial corporation.

Q.    *Section 1129(b): Cramdown of Non-Accepting Classes*[75]

104.    Section 1129(b) provides a mechanism for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests. Under section 1129(b), the court may "cramdown" a plan over the dissenting vote of an impaired class of claims or interests so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.[76]  By its terms, section 1129(b) only applies to a class of creditors or interest holders that reject a plan.[77]

105.    Here, Class 6 and Class 8 are deemed to reject the Plan because they will not receive any property under the Plan on account of their Claims or Interests and as discussed below the Plan satisfies both cramdown requirements with respect to those Classes.  To the extent that the Plan must satisfy those requirements with respect to Class 5(a), where no votes were cast, it clearly does so; but cramdown of this Class is not required because Class 5(a) effectively is ignored.[78]

i.    The Plan Does Not Discriminate Unfairly

---

[74]  *See* 11 U.S.C. § 1129(a)(16).

[75]  NBK has an impaired claim in Class 3 based on certain tax liens and is deemed to reject the Plan.  As plan proponent, it is presumed that the cram down requirements have been satisfied with respect to the treatment of such claim.  In addition, NBK is not aware of any Subordinated Claims in Class 7.  Thus, cram down is not issue for such claims.

[76]  *See In re Sentry Operating Co. of Tex., Inc.,* 264 B.R. 850, 862 (Bankr. S.D. Tex. 2001).

[77]  *See* 11 U.S.C. § 1129(b)(1).

[78]  *See In re Franco's Paving LLC*, 654 B.R. 107, 108-09 (Bankr. S.D. Tex. 2023) (holding that where no votes are cast for a class of creditors, that class either is ignored for confirmation purposes or deemed to accept); *see also Hot'z Power Wash*, 655 B.R. at 118 (same).

106.    Section 1129(b)(1) does not prohibit discrimination between classes; rather, it prohibits unfair discrimination.   Under section 1129(b), a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.[79]   As between two classes of claims or classes of interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims,[80] or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[81]

107.    The Plan does not discriminate unfairly.  With respect to the non-voting Holders of Claims in Class 5(a), none of them objected to the Plan and they will receive property under the Plan which they would not otherwise receive.  Regardless of the outcome of the auction, it is likely that NBK will have a significant deficiency claim, meaning that the sale will not generate sufficient proceeds to pay anything to unsecured creditors.  In the Plan, however, NBK has ensured that unsecured creditors obtain a recovery through a guaranteed cash payment and interests in the Liquidation Trust.

108.    With respect to Holders of Claims and Interests in Class 6 (Insider Claims), their treatment under the Plan is proper. Class 6 includes parties that arguably hold general unsecured claims, which are likely 'out of the money' and not entitled to receive any distribution.  In addition, NBK notes that the Chapter 11 Trustee has objected to and sought disallowance of those claims because they lack any factual or legal basis. *See* ECF No. 403. In addition, it is appropriate to

---

[79]   *See Cypresswood Land Partners*, 409 B.R. at 434.

[80]   *See, e.g.*, *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom*. *Kane v. Johns- Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[81]   *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

separately classify the Insider Claims[82] as the votes of insiders are not considered under section 1129(a)(10).[83]

109.    With respect to the Holders of Interests in Class 8 (Interests) it does not unfairly discriminate against equity interest holders to classify them separately from the holders of creditor claims because of their different legal nature and the different facts that give rise to the claims of interest holders and creditors.  For all these reasons, the Plan does not unfairly discriminate against the Holders of Claims in Class 6 and Class 8 that are deemed to reject the Plan.

110.    Further, the Plan does not unfairly discriminate against the non-voting Holders of Claims in Class 5(a), to the extent those non-voting Holders are deemed to reject the Plan, because Holders in 5(a) are receiving value under the Plan that they are not entitled to receive.

ii.    The Plan Is Fair and Equitable

111.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[84]  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution

---

[82]  *See In re MCorp Financial, Inc.*, 160 B.R. 941, 949 (S.D. Tex. 1993) ("An insider is someone connected to or in a position of authority with the debtor. 11 U.S.C. § 101(31) (Supp. IV 1992). An insider's acceptance does not count. 11 U.S.C. § 1129(a)(10) (1988)."); *In re Meruelo Maddux Properties, Inc.*, 637 F. Appx. 1012, 1015 (9th Cir. 2016) ("The bankruptcy court did not err in confirming the plan of reorganization that divided insider and non-insider shareholders into separate classes."); *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 WL 3260315, at *2 (Bankr. E.D.N.C. Aug. 8, 2012) (finding that the debtor's amended plan did not improperly classify claims, including Class 8, which "consists of insider claims whose votes will not be considered for purposes of 11 U.S.C. § 1129(a)(10)."); *In re Gilbert*, 104 B.R. 206, 210 (Bankr. W.D. Mo. 1989) ("Protecting the interests of other creditors also seems to be the driving force behind the preclusion of insiders of an impaired class from voting on a reorganization plan under Section 1129(a)(10).").

[83]  For the reasons set forth herein, including NBK's responses in Exhibit A hereto, the objections by 2425 WL and the Debtor with respect to unfair discrimination in Class 6 should be overruled.  *See* 2425 WL Objection ¶ 14 and Debtor Objection at 16.

[84]  *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii).

32

under a plan on account of its junior claim or interest.[85]  Additionally, for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (i.e., no class of creditors may receive more than 100% of its claims).

112.    The Plan is fair and equitable to the Holders of Claims in Classes 6 and 8 (as well as Class 5(a), to the extent necessary) because there is no value available to make distributions to these creditors, and the Plan does not provide for recoveries for claims or interests junior to these Classes.

113.    In sum, the Plan satisfies the requirements of section 1129(b) because it meets all the requirements of section 1129(a), except for subsection (a)(8), and does not discriminate unfairly and is fair and equitable with respect to Claims in Classes 6 and 8.

*R.*      *Section 1129(d): Principal Purpose of Plan Is Not Avoidance of Taxes*

114.    Section 1129(d) prohibits the Court from confirming "a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[86]

115.    The Plan complies with this provision because it is not designed to avoid taxes or Section 5 of the Securities Act.  Article II.C of the Plan contemplates payment of Allowed Priority Tax Claims.

*S.*      <u>Waiver of Bankruptcy Rule 3020(e)</u>

116.    To implement the Plan, NBK seeks a waiver of the 14-day stay of an order confirming the Plan under Bankruptcy Rule 3020(e).  Entry of the Confirmation Order will enable

---

[85]  *See 203 N. LaSalle P'ship*, 526 U.S. at 459.
[86]  11 U.S.C. § 1129(d).

the Chapter 11 Trustee to effectuate the sale of the Property contemplated in the Plan, with the Successful Bidder knowing that the terms of the Plan have otherwise been approved, and immediate entry and effect of the Confirmation Order will permit the sale to close and the Plan to go effective promptly.

## **<u>CONCLUSION</u>**

117.    For the foregoing reasons, the Court should confirm the Plan by entering an order attached as **<u>Exhibit B</u>**, overrule any objections, and grant further relief as is just and proper.

DATED: June 14, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Andrew M. Troop*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Andrew V. Alfano (Bar No. NY5525241)
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
andrew.alfano@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 14, 2024, a true and correct copy of this document was served via the Court's CM/ECF system on the Chapter 11 Trustee, the Debtor's counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached service list.

_/s/ Andrew M. Troop_
Andrew M. Troop

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

## DECLARATION OF MICHAEL C. CARTER IN SUPPORT OF CONFIRMATION OF NATIONAL BANK OF KUWAIT S.A.K.P., NEW YORK BRANCH'S CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR

I, Michael C. Carter, hereby declare under penalty of perjury:

1. I am the Vice President of National Bank of Kuwait, S.A.K.P.'s New York Branch ("NBK") and I also serve as the relationship manager for Galleria 2425 Owner, LLC (the "Debtor").

2. I submit this declaration (this "Declaration") in support of the Memorandum of Law (the "Confirmation Brief") in Support of Confirmation of the Chapter 11 Plan of Liquidation of the Debtor (the "Plan").[1]

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, including documents and other information supplied to me, or my opinion based on my personal experience, knowledge, and information concerning the Debtor's operations and financial condition.

---

[1] Capitalized terms used but not defined in this Declaration shall have the meanings given those terms in the Plan and the Confirmation Brief, as applicable.

4.      I am over the age of 18 and am authorized to submit this Declaration on behalf of NBK.  If called to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

### PROFESSIONAL QUALIFICATIONS

5.      I obtained my Bachelor of Arts degree from Trinity College-Hartford and a Master of Business Administration (MBA) degree with a focus on Accounting and Finance from Columbia Business School.  I joined NBK as its Vice President and Head of Real Estate Lending in May 2018.  Before joining NBK, I served in various senior positions, including Head of New York Representative Office and Head of US Real Estate Finance at HSH Nordbank (2006-2017), Senior Vice President at Aareal Bank (2002-2006), Senior Vice President at Forest City Ratner Companies (1999-2002), Senior Vice President at Credit Lyonnais (1992-1997) and Assistant Vice President at Bank of New York (1988-1992).

6.      I have managed a team of loan originators and credit analysts.  My professional experience includes financial structuring, portfolio management, credit analysis, asset management, foreclosure, investment banking, property development, loan origination, loan structuring, portfolio management, non-performing loans, debt restructuring, loan workouts, loan sales, mezzanine loans, loan syndication, subordinate debt, senior debt, construction loans, and foreclosures.

### BACKGROUND

7.      This case involves a single real estate asset located at 2425 West Loop South, Houston, Texas 77027 (the "Property").  Additional factual background about this case and the history between the Debtor and NBK is set forth in detail in the *National Bank of Kuwait, S.A.K.P. New York Branch's Motion Pursuant to 11 U.S.C. § 1112(b) to Convert Chapter 11 Case to Chapter 7.  See* ECF No. 72.

## LIQUIDATION PLAN

8.      The Plan is based on the sale of Property at a public auction scheduled for June 18, 2024. The Trustee will conduct the sale under the supervision of this Court and the value of the Property will be determined by the winning bid at auction. Additional information about the public auction is set forth in the *Chapter 11 Trustee's Motion for Entry of an Order (I) Approving Procedures for the Sale of Property Free and Clear of All Liens, Claims and Encumbrances; (II) Scheduling an Auction; (III) Authorizing Entry Into the Stalking Horse Purchase Agreement; (IV) Approving Assumption and Assignment Procedures; (V) Approving Form of Notice; and (VI) Granting Related Relief* (the "Sale Procedure Motion")  *See* ECF No. 188.

9.      As described in the Confirmation Brief and Sale Procedure Motion, pursuant to the Stalking Horse Agreement, NBK has agreed to purchase the Property for $18,600,000 by way of a credit bid, subject to (i) higher and better offers at a public auction, and (ii) outstanding claims secured by *ad valorem* tax liens which will be paid under the Plan.

10.     The Plan provides the following recoveries for creditors:

> ***Class 1: Other Secured Claims***.  Each Holder of an Allowed Other Secured Claim will receive Cash in an amount equal to the Allowed amount of such Claim or, at the discretion of the Liquidation Trustee, shall be given the property securing its claim in full satisfaction of that claim.
>
> ***Class 2: Other Priority Claims***.  Each Holder of an Allowed Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Claim.
>
> ***Class 3: NBK Tax Claim***.  The Holder of an Allowed NBK Tax Claim will receive Cash equal to the Allowed amount of such Claim if NBK is not the Purchaser of the Property. However, if NBK is the Purchaser, the Holder of a Claim in Class 3 will not receive a distribution on account of such Claim.
>
> ***Class 4: NBK Secured Claim***.  The Holder of an Allowed NBK Secured Claim will not receive any distribution if NBK is the Purchaser of the Property. If NBK is not the Purchaser, the Holder of such Claim will receive in full and final satisfaction of the NBK Secured Claim: (x) the Remaining

Cash and (y) any excess proceeds after payment of the Distribution Account Claims.

*Class 5(a): Trade General Unsecured Claims*.  Each Holder of an Allowed Trade General Unsecured Claim will receive (x) Cash equal to 70% of the Allowed amount of such Claim, and (y) a *pro-rata* share of the Liquidation Trust Assets.

*Class 5(b): Other General Unsecured Claims.*  Each Holder of an Allowed Other General Unsecured Claim will receive a *pro-rata* share of the Liquidation Trust Assets; *provided*, *however*, NBK will have an Other General Unsecured Claim equal to 90% of the Allowed amount of the NBK Deficiency Claim as determined by the Successful Bid and in accordance with section 506 of the Bankruptcy Code.

*Class 6: Insider Claims*. Each Holder of an Insider Claim will not receive or retain any property under the Plan on account of such Insider Claims.

*Class 7: Subordinated Claims*.  Each Holder of a Subordinated Claim will not receive or retain any property under the Plan on account of such Subordinated Claims.

*Class 8: Interests*.  Each Holder of an Interest in the Debtor will not receive or retain any property under the Plan on account of such Interests.

11.     If NBK is not the Successful Bidder, then the sale proceeds of the Property will be used first to pay (i) Allowed Administrative Claims (including any commission owed to the Broker), (ii) Allowed Priority Tax Claims, (iii) Allowed Other Secured Claims (which includes a Claim of a governmental unit and Caz Creek TX, LLC for the payment of *ad valorem* real estate taxes that is secured by the Property), (iv) Allowed Other Priority Claims, (v) the Allowed NBK Tax Claim, and (vi) 70% of the Allowed Amount of Trade General Unsecured Claims. The total amount of these payments together with $150,000 to fund the Liquidation Trust is estimated to be $6.2 million, and the balance will be paid to NBK on the NBK Secured Claim.

12.     If NBK is the Successful Bidder through its credit bid, NBK will contribute cash to the estate in the amounts necessary to pay (i) Allowed Administrative Claims (including any commission owed to the Broker), (ii) Allowed Priority Tax Claims, (iii) Allowed Other Secured

Claims (which includes a Claim of a governmental unit and Caz Creek TX, LLC for the payment of *ad valorem* real estate taxes that is secured by the Property), (iv) Allowed Other Priority Claims, (v) the Allowed NBK Tax Claim, and (vi) 70% of the Allowed Amount of Trade General Unsecured Claims. The total amount of these payments, together with $150,000 to fund the Liquidation Trust is estimated to be $3.6 million.

### THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

13.     I understand that confirmation of the Plan requires the satisfaction of various requirements set forth in the Bankruptcy Code. The following summarizes my understanding of the reasons the Plan satisfies these requirements. Unless otherwise stated, all section references are references to sections of the Bankruptcy Code.

A.     Section 1122: Classification Requirements

14.     I understand that section 1122(a) permits a plan to place a claim or interest in a different class so long as that claim or interest is substantially similar to the other claims or interests within that class. I further understand that section 1122(b) permits separate classification of certain claims for purposes of administrative convenience.

15.     I believe that the Plan complies with the requirements of section 1122 because the Plan provides for separate classification of Claims and Interests based on the differing factual and legal nature and priority of such Claims and Interests. Each of the Claims and Interests within a Class is substantially like the other Claims and Interests in that Class, and the Plan's classification scheme tracks the underlying debts and instruments, or circumstances giving rise to such Claims and Interests, and complies with applicable provisions of the Bankruptcy Code.

B.     Section 1123(a): Mandatory Requirements

16.     I understand that section 1123(a) requires that the Plan meet certain mandatory requirements, each of which I believe have been satisfied.

5

17.     I believe that the Plan satisfies sections 1123(a)(1)-(3) because Article III of the Plan designates the eight classes of claims and interests, specifies the classes of claims and interests that are unimpaired,[2] and specifies the treatment of claims and interests that are impaired.[3]

18.     I believe that the Plan satisfies section 1123(a)(4) because Article III of the Plan provides for equal treatment of all claims and interests within each class.  The Plan does not provide for different treatment among the members of a specific class.  In other words, all holders of allowed claims or interests within a class receive the same treatment under the Plan.  Paragraph 10, above, summarized the treatment of each class under the Plan.

19.     I believe that the Plan satisfies section 1123(a)(5) because Article VI of the Plan provides adequate means for implementation as described in paragraphs 11 and 12 hereof.

20.     I believe that the Plan satisfies section 1123(a)(6) because no securities will be issued under the Plan and thus non-voting equity securities will not be issued.

21.     I believe that the Plan satisfies section 1123(a)(7), which requires that the selection of "any officer, director, or trustee under the" Plan "be consistent with the interests of creditors and equity security holders."  On the Effective Date, all managers, officers and directors of the Debtor shall be deemed to have resigned from their respective positions, the Chapter 11 Trustee's appointment will terminate, and a Liquidating Trustee will be appointed to liquidate remaining assets, if any, prosecute affirmative claims, resolve claims against the estate and distribute funds to holders of Allowed claims in accordance with the terms of the Plan.  The current Chapter 11 Trustee will serve as the Liquidation Trustee, and his appointment to this role is consistent with the interests of creditors and equity holders and public policy.

---

[2]  Claims and interests that are unimpaired are in Class 1 and Class 2 (collectively, the "Unimpaired Classes").

[3]  Claims and interests that are impaired are in Class 3, Class 4, Class 5(a), Class 5(b), Class 6, Class 7, and Class 8 (together, the "Impaired Classes").

C.     Section 1123(b): Plan Incorporates Certain Permissive Provisions

22.     I understand that section 1123(b) identifies certain provisions that may be incorporated into a chapter 11 plan.  The Plan incorporates the following permissive provisions, which I believe comply with section 1123(b):

23.     **Impairment and Unimpairment**.  As permitted by section 1123(b)(1), the Plan impairs Claims and Interests in Classes 3, 4, 5(a), 5(b), 6, 7 and 8 and leaves other Claims unimpaired in Classes 1 and 2.

24.     **Assumption and Rejection**.  As permitted by section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides for the assumption or rejection of the Debtor's executory contracts and unexpired leases.  If NBK is the Successful Bidder, all executory contracts and unexpired leases will be deemed rejected.  If a party other than NBK is the Successful Bidder, that party will determine what executory contracts and unexpired leases will be assumed or rejected.

25.     **Compromise, Settlement, and Retention of Causes of Action**.  As permitted by section 1123(b)(3), the Plan effectuates a compromise and settlement of claims and Article IX.D of the Plan provides for a release of certain Claims and Causes of Action of the Estate.  Article VI.K of the Plan preserves the Liquidation Trustee's rights to commence, pursue and settle all Causes of Action, whether arising before or after the Petition Date, including any actions enumerated in the Schedule of Retained Causes of Action that will be filed in the Plan Supplement (the "Retained Causes of Action").

26.     **Other Appropriate Provisions**.  As permitted by section 1123(b)(4)-(5), the Plan (i) encompasses the sale of all or substantially all of the property of the estate through the auction process described above, and distribution of the proceeds of such sale among holders of claims and interests pursuant to the Plan, and (ii) modifies the rights of Holders of Claims or Interests in

the Impaired Classes (Classes 3, 4, 5(a), 5(b), 6, 7 and 8), and leaves unaffected the rights of Holders of Claims in the Unimpaired Classes (Class 1 and Class 2).

27. **Estate Release**. As permitted by sections 1123(b)(3)(A) and 1123(b)(6), the Plan contains an Estate Release, under which the Trustee is releasing the Estate's Claims, Interests, or Causes of Action against each Released Party, including NBK, other than any obligations arising under the Plan and the Confirmation Order and the Retained Causes of Action.  I believe the Estate Release is reasonable and understand that the Trustee believes giving the Estate Release reflects his sound business judgment. I understand that the Trustee, with the assistance of its advisors, investigated and assessed claims and causes of action against the Released Parties.  With respect to NBK, I understand that NBK produced documents to the Trustee in response to requests and based on that investigation, NBK and the Trustee have agreed settle any and all potential issues relating to NBK, which will be reflected in a settlement agreement and for which separate court approval will be requested and which will include a release of the Estate's Claims, Interests and Causes of Action against NBK.  I note that if any claims were to be asserted against NBK, NBK would defend against those claims vigorously and without the Estate Release, NBK will not be obligated to fund the Plan.

28. **Exculpation**.  As permitted by section 1123(b)(6), the Plan contains an Exculpation, which provides protection to Exculpated Parties while also carving out fraud, gross negligence, and willful misconduct in relation to court-approved transactions that contribute to the Estate's administration.  In light of the United States Trustee's informal objection to the Exculpation, I understand that the Confirmation Order to be presented to the Court will address this issue by making it clear that only the Trustee is being exculpated and NBK is not being exculpated. I believe that the modified Exculpation is appropriate and necessary because, without

it, the Exculpated Parties would likely not have been willing to continue to assist the estate during this case and the only alternative would been to convert this case to Chapter 7 to detriment of unsecured creditors who will not receive any recovery as demonstrated in the Liquidation Analysis.

29.     **Injunction and Gatekeeping Provision**.  As permitted by section 1123(b), the Plan contains an Injunction, which permanently enjoins all Persons from commencing  any action or proceeding against the Released Parties with respect to any Claims that have been discharged, released or exculpated under the Plan, and a "gatekeeper provision" that requires any party to seek court approval before that party can try sue or continue a suit against any Released Parties based on a claim related to the Debtor that the party believes is not a claim that has been discharged, released or exculpated under the Plan.  I believe that the Injunction is appropriate and necessary to preserve and enforce other provisions in the Plan, including the release, discharge, and exculpation provisions that are central to the Plan and are narrowly tailored to achieve that purpose.  With respect to the gatekeeper provision, it does not prejudice any party affected by the provision because it is tailored to permit claims which are not without merit and have not been released, discharged or exculpated under the Plan.

D.     <u>Section 1123(d): Curing Defaults</u>

30.     I understand that section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."

31.     I believe that the Plan satisfies section 1123(d) because Article V.D of the Plan provides for the payment of Allowed Cure Claims in cash on the Effective Date or in the ordinary course of business, or as otherwise agreed by a counterparty to any assumed (and assigned) executory contract or unexpired lease.

E.    Section 1129(a)(2): Applicable Provisions of the Bankruptcy Code

32.    I understand that section 1129(a)(2) requires the plan proponent to comply with applicable provisions of the Bankruptcy Code, including the disclosure and solicitation of requirements of sections 1125 and 1126.

33.    I understand that NBK solicited votes on the Plan in accordance with the Court's order that directed NBK, among other things, to transmit the Disclosure Statement and Plan to the Voting Classes.   Further, I understand that NBK complied with the notice requirements by (i) noticing and soliciting acceptances from Holders of Claims in the Voting Classes; and (ii) noticing but not soliciting votes to accept or reject the Plan from Holders of Claims and Interests in the Non-Voting Classes.  As I understand it, Voting Classes are classes of claims which are receiving something of value under the Plan but are not being paid in full or getting the full legal benefit of their claims against the Estate, and Non-Voting Classes are classes of claims which either are (a) being paid in full and thus are deemed to have accepted the Plan under section 1126(f), or (b) are getting nothing of value under the Plan and thus are deemed to have rejected the Plan.

F.    Section 1129(a)(3): Good Faith

34.    I understand that section 1129(a)(3) of the Bankruptcy Code requires a plan to be "proposed in good faith and not by any means forbidden by law."

35.    I believe the Plan satisfies this requirement because it is proposed with the legitimate and honest purpose of liquidating the Estate and maximizing value for creditors through a competitive auction process. Any bidder (including insiders of the Debtor) determined to be qualified by the Trustee can participate in the auction and the Successful Bidder will be determined by the Trustee.  Furthermore, to the extent that NBK is the Successfully Bidder, it will fund various

payments under the Plan as set forth above and unsecured creditors will get the benefit of recoveries from any Retained Causes of Action prosecuted by the Liquidation Trustee.

G.   Section 1129(a)(4): Payment of Certain Administrative Payments

36.   I understand that Section 1129(a)(4) requires the Court to approve all payments made or to be made by NBK as the Plan proponent for services or costs and expenses in or in connection with the case and Plan to be approved by the Court as reasonable.

37.   I believe the Plan satisfies section 1129(a)(4) because all fees for services rendered and expenses incurred by the Trustee and other professionals in connection with this case, including all Professional Fee Claims, are subject to review and approval by the Court.  Only Allowed Professional Fee Claims based on all final requests for payment filed no later than 45 days after the Effective Date (in accordance with Bankruptcy Code procedures, Bankruptcy Rules, and prior Court orders) will be paid.  I understand that NBK's costs and expenses incurred in connection with this Chapter 11 Case or proposing the Plan will not be paid from the Estate.

H.   Section 1129(a)(5): Governance Disclosure Requirement

38.   I understand that section 1129(a)(5) requires the plan proponent to disclose the identity and affiliations of new directors or officers to serve in such capacity for the Debtor and the identity of any insider to be employed by the Debtor.

39.   I believe the Plan satisfies section 1129(a)(5) because (a) the Estate will be liquidated and no new directors or officers are being appointed for the Debtor and (b) Article VI of the Plan and the Plan Supplement (containing the Liquidation Trust Agreement) provides information about the Liquidation Trustee (the current Trustee) and the way the trustee will be selected, which is consistent with the Bankruptcy Code and the interests of creditors and public policy.

I.      Section 1129(a)(6): The Plan Does Not Require Regulatory Approval

40.     I understand that section 1129(a)(6) permits plan confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change (e.g., the price of utility services) provided for in the plan.

41.     I believe this requirement does not apply to the Plan because no governmental regulatory commission has jurisdiction over the Debtor or will have jurisdiction over the Debtor after confirmation of the Plan.

J.      Section 1129(a)(8) and (10) and 1129(b): Acceptance by Impaired Classes

42.     I understand that, in combination, sections 1129(a)(8), 1129(a)(10) and section 1129(b) provide that if not all classes of claims or interests accept the Plan or are unimpaired, a Plan may still be confirmed under section 1129(b) if at least one impaired class of claims accepts the Plan, without counting the votes of insiders.  Because the Impaired Classes 4, 5(a) and 5(b) which contain only non-insiders voted to accept the Plan, I understand the Plan may still be confirmed and "crammed down" on the Impaired Classes 6, 7 and 8 that are deemed to reject the Plan based these sections of the Bankruptcy Code.

K.      Section 1129(a)(9): Treatment Of Administrative And Priority Tax Claims

43.     I understand that section 1129(a)(9) generally requires that claims entitled to administrative priority be paid in full in cash on the Effective Date or in the ordinary course of business and that priority tax claims also be paid in full on the Effective Date or paid over time pursuant to certain payment terms provided in the Bankruptcy Code.

44.     I believe the Plan satisfies this requirement because Article II of the Plan provides for full payment of Administrative Claims and Priority Tax Claims on the Effective Date or as soon as reasonably practicable thereafter.

L.     Section 1129(a)(11): Feasibility

45.     I understand that section 1129(a)(11) requires a plan to be feasible.  I believe that the Plan is feasible because it ensures the payment of claims regardless of the outcome of the auction.  Attached as Exhibit A is a true and correct copy of the 2023 annual report for National Bank of Kuwait S.A.K.P. (the New York Branch does not publish separate public reports of its financial condition).  I understand based on this report that the bank's profit for 2023 was $1,918,086,000 and that as of December 31, 2023 the bank held cash and other short term funds in the amount of $14,294,050,000. *See* Exhibit A at 119-21.

M.     Section 1129(a)(12): Full Payment of Statutory Fees

46.     I understand that section 1129(a)(12) requires all fees payable under section 1930 of title 28 of the United States Code to be paid when due and payable, and that section 507 of the Bankruptcy Code provides that those fees be treated as administrative expenses.  I believe the Plan satisfies this requirement because Article XI of the Plan provides for the payment of all statutory fees until this case is converted, dismissed or closed.

N.     Section 1129(a)(13): Retiree Benefit Obligations

47.     I understand that section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code.

48.     I believe this requirement does not apply to the Plan because there are no retiree benefit obligations of the sort described in section 1114 of the Bankruptcy Code.  To the extent applicable, I believe that the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

O.     Section 1129(a)(14)-(16): Not Applicable

49.     I believe that sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply because the Debtor: (i) is not an individual or subject to any domestic support obligations; and (ii) is a moneyed, business, or commercial corporation.

13

P.   Section 1129(b): The Plan is Fair and Equitable to, and Does Not Unfairly Discriminate Against, Rejecting Classes

50.   I understand the Court can cramdown an impaired class of creditors and equity security holders under section 1129(b) if all the requirements of section 1129(a), except section 1129(a)(8), are met and the plan does not "unfairly discriminate" and is "fair and equitable" with respect to each impaired claims or interests that has not accepted the plan.

51.   I believe the Plan satisfies the cramdown requirements.   In particular, the Plan does not unfairly discriminate against Classes 6 (Insider Claims), 7 (Subordinated Claims) and 8 (Interests), which are deemed to reject the Plan, because there is a reasonable basis for separately classifying those Claims and Interests based on the different facts that give rise to these Claims and Interests. .   In addition, section 1129(a)(10) permits the separate classification of, for example, the Insider Claims because their votes would not have counted in determining whether the Impaired Claims in Class 5(b) have accepted the Plan, and the Class 5(a) Claims are dissimilar from the Claims in Classes 6, 7 and 8.

52.   I also believe the Plan is fair and equitable as to the Impaired Classes deemed to reject the Plan because (a) the value of the Property does not exceed the total amount of NBK's claims and therefore these classes would not be entitled to any distributions based on the value of the Debtor and (b) no claim or interest junior to the claims or interests in Classes 6, 7 and 8 receive any recovery under the Plan.

R.   Section 1129(d): Avoidance of Taxes and Securities Laws

53.   I understand that section 1129(d) prohibits the Court from confirming "a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."

14

54.     As described above, the principal purpose of the plan is to maximize value through a court-approved, public auction process and distribute value to creditors as set forth in the Plan. Further, the Plan does not seek to avoid taxes (Article II.C of the Plan provides for the full payment of Allowed Priority Tax Claims) or section 5 of the Securities Act (as no securities are being issued under the Plan).  I am not aware of any tax obligation of the Estate that will be avoided if the Plan is confirmed.

S.      Waiver of Stay of Confirmation Order

55.     I understand that Bankruptcy Rules 3020(e) effectively stays an order confirming a plan for 14 days, unless otherwise ordered by the Court.

56.     I believe that the Court should modify the stay, to the extent applicable, and make the Confirmation Order effective immediately upon entry for the following reasons.  First, the entry of the Confirmation Order will enable the Chapter 11 Trustee to effectuate the sale of the Property contemplated in the Plan, with the Successful Bidder knowing that the terms of the Plan have otherwise been approved.  Second, immediate entry and effect of the Confirmation Order will permit the sale to close and the Plan to go effective promptly.  I understand that the auction is scheduled for the day after the confirmation hearing.  Third, permitting the Plan to go effective as promptly as possible will minimize additional administrative and professional costs associated with being in chapter 11.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States of America, that the foregoing statements are true and correct.

Dated: June 14, 2024                    /s/ *Michael C. Carter*
                                        Michael C. Carter
                                        Vice President

## Exhibit A

National Bank of Kuwait 2023 Annual Report





Annual Report
**2023**

**Empowering Tomorrow:**
Navigating a Digitized and
Sustainable Future



HH Sheikh

## Mishal Al-Ahmad Al-Jaber Al-Sabah

Emir of the State of Kuwait

# NBK at a Glance

At NBK, our purpose is to create enduring value and trust for our customers, shareholders, and the communities we serve. Through the integration of sustainability, the prioritization of digital transformation, and a strong belief in the power of our people, we embark on a journey of empowerment. Committed to excellence, transparency, and ESG principles, we aim to positively impact our customers, shareholders, and communities, thus shaping a future where financial success and sustainability go hand in hand. Our commitment to empowering tomorrow is the cornerstone of our endeavors as we navigate the dynamic landscape of digitization and sustainability.

## Operational Performance and Profitability



**4**
Continents

**8,049**
Global Employees

**1.38%**
NPL Ratio

**15.0%**
Return on Average Equity

**122.8**
USD Billion Total Assets

**17.3%**
Capital Adequacy Ratio

**Total Assets** (USD million)
108,416 — 2021
118,462 — 2022
122,787 — 2023

**Loans, Advances and Islamic Financing** (USD million)
64,295 — 2021
68,454 — 2022
72,636 — 2023

**Total Equity** (USD million)
10,835 — 2021
11,195 — 2022
12,015 — 2023

**Customer Deposits** (USD million)
59,596 — 2021
65,780 — 2022
71,553 — 2023

**Net Profit Attributable to Shareholders** (USD million)
1,181 — 2021
1,660 — 2022
1,828 — 2023

**Net Operating Income** (USD million)
2,933 — 2021
3,292 — 2022
3,804 — 2023

# About NBK

Established in the heart of Kuwait City in 1952, the National Bank of Kuwait S.A.K.P. ('NBK' or the 'Bank') stands as the cornerstone of the nation's financial landscape. As the first shareholding company in Kuwait and the Gulf Cooperation Council ('GCC'), NBK has been a steadfast pioneer, establishing itself as the country's longest-serving local bank. With over 70 years of unwavering commitment, NBK has evolved into Kuwait's preeminent financial institution, extending its influence far beyond national borders to captivate regional and global markets. Through a successful digital transformation journey, NBK has seamlessly blended tradition with innovation, earning acclaim and trust among stakeholders. Today, the Bank boasts a network of more than 140 branches spread across 13 countries, spanning 4 continents.

Established by a group of leading Kuwaiti merchants, NBK has retained its core shareholder base since inception. Its shares have been listed on the Kuwait Stock Exchange since 1984, with a single shareholder (the Public Institution for Social Security) owning more than 5% of the share capital (6.0% as of 31 December 2023). NBK's market capitalization as of 31 December 2023 was USD 23.1 billion.

Renowned for its seasoned and stable management, NBK pursues a clear strategy aimed at strengthening its core business while expanding into new segments and markets. The Bank has consistently achieved remarkable profitability, resulting in robust shareholder returns. This success is underpinned by a portfolio of high-quality assets and a robust level of capitalization.

NBK prides itself in being a comprehensive financial partner, offering a diverse range of products and services. Catering to individuals, corporates, and financial institutions alike, NBK has solidified its position as Kuwait's leading conventional banking Group in terms of assets, customer deposits, and customer loans and advances, *all the while Empowering Tomorrow and Navigating a Digitized and Sustainable Future.*

## Main Business Segments

Consumer Banking

Corporate Banking

NBK Wealth

Islamic Banking (through subsidiary Boubyan Bank)

### Vision
The trusted bank of choice, building on our core values, people and expertise

### Mission
- To deliver world class products and the highest service quality to our customers
- To attract, develop and retain the best banking talent in the region
- To support the communities in which we operate
- To adhere to our core values of passion, integrity, conservatism and knowledge
- By doing so, we believe that we will be able to achieve consistently superior returns to our shareholders

### Values
- Passion
- Integrity
- Conservatism
- Knowledge

# Contents

**1** Strategic Review

| | |
|---|---|
| 04 | Empowering Tomorrow: Navigating a Digitized and Sustainable Future |
| 06 | Chairman's Statement |
| 10 | Year in Review |
| 11 | Institutional Strength |
| 12 | Vice Chairman & Group CEO's Statement |
| 16 | Market Outlook |
| 20 | Our Business Model |
| 22 | Strategy |
| 24 | Digitization at the Core |
| 26 | Operational Review |
| 28 | Group CFO's Review |
| 30 | Key Performance Indicators |
| 32 | Risk Management |
| 34 | Group Human Resources |
| 36 | ESG |

**2** Governance

| | |
|---|---|
| 44 | Board of Directors |
| 48 | Executive Management |
| 54 | Corporate Governance Framework |
| 57 | Board of Directors and Committee Meetings |
| 58 | Effective Implementation of the Corporate Governance Framework |
| 63 | Remuneration Policy |
| 64 | Internal Control Adequacy Report |
| 65 | Internal Control Review by External Party |
| 66 | Ethics and Professional Conduct |
| 67 | Stakeholders' Rights |
| 68 | Group Risk Management and Group Compliance and Governance |

**3** Financial Statements

| | |
|---|---|
| 112 | Board of Directors' Report |
| 114 | Independent Auditor's Report |
| 119 | Consolidated Statement of Income |
| 120 | Consolidated Statement of Comprehensive Income |
| 121 | Consolidated Statement of Financial Position |
| 122 | Consolidated Statement of Cash Flows |
| 123 | Consolidated Statement of Changes in Equity |
| 125 | Notes to the Consolidated Financial Statements |



# Strategic Review

For over seven decades, we have been dedicated to nurturing the success of our stakeholders in Kuwait, the broader region, and globally, empowering them to thrive and flourish. Our journey is one of unwavering commitment to sustainability, digital transformation, and the paramount importance of people.

# Empowering Tomorrow: Navigating a Digitized and Sustainable Future

Our journey is one of unwavering commitment to sustainability, digital transformation, and the paramount importance of people. Through strategic initiatives and forward-thinking practices, we have navigated a path that integrates sustainability, embraces the transformative power of digital innovation, and places people at the heart of our endeavors. We are responsible stewards and we recognize that the value we create today and the plans we lay for tomorrow should contribute to a legacy that endures.

Our 2023 Annual Report reflects a journey marked by sustainable growth, technological advancement, and a profound dedication to the well-being and empowerment of individuals as we aspire to leave an indelible mark, a legacy of positive influence and lasting value.

For over seven decades, we have been dedicated to nurturing the success of our stakeholders in Kuwait, the broader region, and globally, empowering them to thrive and flourish. In 2023, we strategically invested our time and resources to unlock unprecedented opportunities for individuals and businesses alike, aligning with our resolute commitment to serve their best interests.

As we recount our achievements, challenges, and aspirations, we invite you to join us in shaping a future where sustainability, digital excellence, and the well-being of people converge to deliver value, empower individuals, and create a lasting positive impact for today, tomorrow, and the future.

*Empowering tomorrow is when*
**We Listen to Our Customers**

Central to our strategy is fostering meaningful conversations with our clients, establishing the groundwork for enduring relationships built on trust. Our responsive support services ensure that clients receive seamless assistance anytime, anywhere, reaffirming our commitment to their financial well-being and developing a lasting, trusted relationship. Embracing a customer-centric philosophy, we assimilated valuable feedback from our clients, ensuring an intuitive and personalized interface across all interactions.

## Launched the First Digital Bank in Kuwait - "Weyay"

*Empowering tomorrow is when*
**We Engage with Our People**

At NBK, we are continuously engaging with our employees in shaping our journey of excellence; it is embedded in our mission and is our comprehensive commitment to their well-being and professional growth.

Across the Group, we maintain an ongoing dialogue with our workforce, attentively listening to their needs, allowing us to proactively address their aspirations and provide valuable support throughout their individual journeys within the Bank, ensuring that NBK remains the preferred employer of choice.

## Achieved Employee Sustainable Engagement score of 84%

*Empowering tomorrow is when*
**We Support National Initiatives**

NBK is committed to supporting the Kuwait National Development Plan – Vision 2035 initiative to promote environmental, social, and economic prosperity, in line with the country's net zero pledge. In this context, NBK committed to achieve carbon neutrality by 2060, and we pride ourselves with being the only institution in Kuwait to have a carbon neutrality pledge. As part of this commitment, we have set interim goals to reduce our gross operational emissions by 25% by 2025 and are actively exploring innovative research and development technologies to magnify our reliance on renewable energy beyond 2025. We have been reporting our ESG practices in line with Kuwait's National Development Plan since 2016 as part of our commitment to support Kuwait's sustainability plans and ambitions as a leading financial service provider in Kuwait and the region.

## Community Contributions: KD 28 million in 2023

*Empowering tomorrow is when*
**We Invest in Our Communities**

At NBK, we are deeply committed to fostering positive change and nurturing the well-being of the communities we serve. Our overarching objective is to enhance our social impact and steadfastly prioritize ongoing, substantial investments in community development. Our community investment initiatives are strategically aligned with key focus areas, including optimizing customer service and advocacy, promoting financial inclusion, enhancing accessibility and literacy, and ensuring customer protection, as well as data privacy and security.

In this context, NBK launched the "Bankee" financial literacy program in Kuwait with the aim to increase financial literacy and inclusion among school students at a young age, equipping them with the right skills and knowledge to recognize the value of the resources at the reach of their hands.

## Bankee Initiative: 15,130 students - boarded from 30 schools

*Empowering tomorrow is when*
**We Protect the Environment**

As a Group, we continue to champion environmental sustainability in our unwavering dedication to minimizing our carbon footprint. The LEED Gold Certification awarded to NBK's HQ in 2022, symbolizes our strides towards a greener future, recognizing our achievements and serving as a catalyst propelling us into the forefront of sustainable practices. In 2023 and beyond, we are poised to leverage our LEED Gold Certification as a cornerstone for further environmental leadership and innovation. Building on this achievement, our strategy involves continuous improvement and the implementation of cutting-edge sustainable practices.

Within our efforts to lead responsible practices, NBK joined the United Nations Global Compact (UNGC) in February 2023, committed to adopt all ten principles in the areas of human rights, labor, the environment, and anti-corruption. Our endorsement to the UNGC reaffirms our catalyst role in driving Kuwait's sustainable economic development.

## Joined the United Nations Global Compact (UNGC)

*Empowering tomorrow is when*
**We Cultivate a Unique Culture**

In our collective pursuit of fostering a workplace culture grounded in the principles that define NBK, our unique "I Am NBK Principles" program aimed at recognizing and nurturing outstanding behavior among employees stands as a testament to our dedication. This distinctive initiative not only serves as a powerful means of acknowledging and understanding our core values, but also plays a pivotal role in instilling a sense of purpose and unity within our workforce.

"I Am NBK Principles" program distinguishes itself with unparalleled uniqueness within Kuwait's Banking sector. Its innovation lies in its structure and in the genuine esteem it commands from our valued employees as the intrinsic worth of this initiative extends far beyond routine recognition efforts; cultivating an environment where individuals are not only acknowledged for their contributions, but are also inspired by the overarching principles of NBK.

*Empowering tomorrow is when*
**We Foster Financial Growth**

NBK is a leading provider of corporate banking products and services that cater to various business needs. We have a long history of transforming landscapes and empowering corporates to achieve their aspirations. We believe that empowerment is more than just numbers; it is also about supporting economic growth and providing financial resources for businesses to thrive. We are dedicated to fostering innovation and success in the corporate sector and the economy. We deliver customized financial solutions that are perfectly suited to meet diverse organizational requirements.

## Fostering the growth of our mid-sized corporate clients

**I AM NBK Principles**


Empathy


Excellence


Accessibility & Availability


Communication


Consistency


Integrity


Teamwork


Trust



# Chairman's Statement



## Hamad Mohamed Al-Bahar
**Chairman**



"Empowering Tomorrow: Navigating a Digitized and Sustainable Future", marks our dedication to fostering innovation, cultivating environmental stewardship, and embracing technological advancements.

By strategically diversifying our portfolio and services, we mitigate risks and capitalize on emerging opportunities, demonstrating our commitment to adaptability and long-term stability.

**Dear Shareholders, Investors and Partners,**
On behalf of the Board of Directors, it is with great pleasure that I present to you the National Bank of Kuwait's 2023 Annual Report and audited financial statements for the year ended December 31, 2023.

As I reflect on the past year, I am filled with pride and gratitude for the remarkable journey we have undertaken together, one defined not only by financial accomplishments but, more importantly, by the values that shape our identity and the commitment to ESG principles that underscore our impact on Kuwait and the world.

"Empowering Tomorrow: Navigating a Digitized and Sustainable Future", marks our dedication to fostering innovation, cultivating environmental stewardship, and embracing technological advancements that will shape a resilient and equitable world for generations to come. We strive to harness the power of digital transformation and sustainability initiatives, working hand in hand with communities, businesses, and individuals to build a brighter and more inclusive future.

2023 was a year of challenges underpinned by local and regional regulatory tightening and political volatility in Kuwait and in the world more broadly, in addition to a slowing but still prevailing global inflation. However, our strategy demonstrated our resilience, our commitment to our customers and our promise for a trusted banking relationship. NBK managed to do well and to deliver on its promises to stakeholders. Our concerted efforts yielded in significant improvements across all key ratios compared to the previous year and demonstrated the potential and resilience of our strategy established years ago. NBK's role

as a trusted institution solidifies our position as a safe haven for investors, depositors, wealth management clientele, individuals, and corporates.

**Innovation and Diversification at the Core**
This year was underscored by the launch of NBK Wealth, consolidating private banking and asset management businesses under one leadership. This transformational journey was based on the adoption of innovation as the core of our value proposition through a holistic client-centric approach. Many successes have been pinned since then, adding to our portfolio of achievements and "firsts" in Kuwait and beyond, widely recognized by prominent awards and ratings. More importantly, the prevailing success of our institution can be primarily ascribed to the tactical diversification approach we adopt at our core. By strategically diversifying our portfolio and services across different geographies, we mitigate risks and capitalize on emerging opportunities, demonstrating our commitment to adaptability and long-term stability.

**Digital Transformation**
Building on this foundation, our relentless focus on digital transformation has borne fruit. The successful digitization of our Bank and the seamless transition of our valued customers to digital banking platforms reflect our dedication to staying ahead of the curve. We take pride in our pioneering role in launching Weyay, the first digital bank in Kuwait, a testament to our commitment to trendsetting in the market since we embarked on this journey a few years ago. Our digital banking strategy has proven instrumental in customer acquisition, particularly while tapping into the tech-savvy and the youth segments, positioning us as the bank of tomorrow.

**People Power**
Throughout 2023, we continued our investment in our greatest asset, our people. Our team comprises experienced, skilled, and motivated professionals who have steered our bank in the right direction, contributing significantly to our ongoing success. Recognizing the pivotal role our workforce plays, we remain deeply engaged with every function, fostering cohesive synergies both locally and internationally across the Group. Their dedication and expertise drive our daily operations and form the bedrock of our strategic initiatives, ensuring sustained growth and resilience in an ever-evolving financial landscape.

**National and Ethical Excellence**
Consistently, our support to national prosperity remains prime within the country's strategic Vision 2035 framework, the Kuwait National Development Plan (KNDP), and beyond. Our continuous fulfillment of our national duty serves as a catalyst for national development. We maintained our strong relationships with regulators both in and outside Kuwait, working hand in hand with them to improve the banking and business environment. We have successfully navigated challenges in our international presence, strengthening our footprint in the 13 countries where we operate through strategic moves on both conventional and Islamic banking fronts. Our continuous expansion efforts focus on maximizing our presence and customer base across our growth markets in the MENA region while concurrently building a global network that facilitates our customers' trade, investment, and broader banking requirements.

## 35%
Total recommended cash dividends to be distributed to shareholders in 2023

Our governance framework is a dynamic and proactive system that fosters transparency, accountability, and ethical conduct at every level.

Looking ahead to 2024, our expansion targets Kuwait as the main market, with strategic moves into the GCC. We plan to strengthen our footprint in existing markets through strategic investments, and we eagerly anticipate government led business activity that will spur growth in the domestic banking market. We aim to implement our successful digital banking value proposition in other markets, with a keen eye on the MENA region.

I am proud to confirm once again our unwavering commitment to the highest standards of ethics and corporate governance. Our governance framework is a dynamic and proactive system that fosters transparency, accountability, and ethical conduct at every level. The Board, in collaboration with our dedicated leadership team, ensures that strategic decisions align with our core values and serve the best interests of our shareholders.

NBK held its 2022 Annual General Meeting (AGM) on 18 March 2023, with a quorum of 71.47%. The AGM approved the Board of Directors' recommendation to distribute 25% cash dividends to shareholders for the second half of the financial year (25 fils per share; bringing total cash dividends for the year to 35 fils per share) in addition to 5% bonus shares (5 shares for every 100 shares owned).

Moreover, the Board of Directors recommended the distribution of 25 fils per share for the second half of 2023, bringing the total cash dividend distribution for the year 2023 to 35 fils per share, in addition to 5% bonus shares. That brings the cash payout ratio for 2023 to 50% of the profits attributable. This step demonstrates NBK's solid capital adequacy, confidence in its financial position, and ability to generate profits.



NBK's commitment extends beyond financial success, with a dedicated focus on responsible banking, fostering economic prosperity, and contributing to sustainable development.

**We are Resilient for Tomorrow and Beyond,**

The year 2023 witnessed NBK's unwavering dedication to Environmental, Social, and Governance (ESG) principles, building on the momentum gained after a landmark year in 2022. Recognizing the global imperative for sustainable growth, NBK made significant strides in ESG, earning recognition and solidifying its position as a responsible corporate entity.

In 2022, NBK's Executive Management approved the Group's new ESG Strategy and key ESG strategic initiatives; while in 2023, we finalized the Bank's ESG Governance Framework that outlines a comprehensive governance structure with specialized committees to drive ESG Strategy implementation across the Bank by assigning each ESG strategic pillar to a member of the Executive Management as key owners. It ensures utmost levels of accountability and commitment are maintained to support the Bank in achieving its ESG-related KPIs and ambitions, defining clear deliverables and milestones, and establishing accountability with the Board's oversight to achieve our ambitions and targets.

In line with the ESG Strategy, we crafted a comprehensive 3-year roadmap, outlining key targets and commitments in areas where the Bank holds the greatest potential. This strategic framework aims to drive a sustainable and equitable transition to a low-carbon economy, delivering a positive social impact on people and communities. Our ESG Governance Structure is based on the four pillars of NBK's evolved ESG Strategy Framework and focuses on promoting economic prosperity and

serving as a model for sustainable development. The four pillars of our ESG Strategy are: Governance for Resilience, Responsible Banking, Capitalizing on Our Capabilities, and Investing in Our Communities.

ESG has always been a key element in our strategic focus across the years. Our new ESG Strategy draws a clear pathway forward by integrating ESG into the Group's business strategy and shifting our approach to a pro-active, stakeholder driven stance.

Looking ahead, we acknowledge the prevailing uncertainties in the landscape. The challenges tied to political tensions and economic issues will undoubtedly test the resilience of the banking sector, challenging its capacity to support and safeguard customers. However, I assure you that our focus will be sharper, our resolve stronger, and our ambitions higher and I maintain confidence that our strategic vision and commitment to being a purpose-driven business will help us navigate these challenges and fortify the long-term future of the Group, yielding benefits for all our stakeholders.

We will embark on the next phase of our journey together, with knowledge and a sense of purpose, driven by our values and culture.

Thank you for your continued trust and partnership

**Acknowledgments**

On behalf of the Board, I would like to extend my sincere gratitude to all our stakeholders for their continued support. I would also like to thank my fellow directors and our executive management for their dedication and invaluable contributions bringing our mission to success in 2023.  To our customers, we highly value your continued trust and confidence in NBK, and we are steadfast in our commitment to providing you with a valuable relationship that goes beyond bank offerings. A special acknowledgment goes to our devoted team; your dedication and tireless efforts are the backbone of our success. On a final note, thanks are also due to the Central Bank of Kuwait and the Capital Markets Authority for their persistent efforts in advancing the banking sector. To our valued shareholders, thank you for your enduring support as we strive to solidify NBK's leadership in the Kuwaiti banking sector.

# Year in Review

## January

- NBK becomes the First Financial Institution in Kuwait to Align with the State's Pledge to become Carbon Neutral by 2060
- NBK Embraces Environmental Transparency by Disclosing through CDP
- NBK Introduced New Designs to All Its Cards
- NBK Donates KD 13 million for NBK Hospital Expansion

## February

- NBK Joins the United Nations Global Compact
- NBK Donates KD 1 Million to Support KRCS' Relief of Quake-affected in Syria and Turkey
- NBK Launches Its New Mobile Banking Application
- NBK is the First Bank in Kuwait to Introduce SWIFT g4C Service
- NBK Contributes KD 3 Million for the Development of Shuwaikh Waterfront

## March

- NBK Banque Privée Suisse Relocates to a New Headquarters in Geneva
- NBK's AGM approved distribution of 25% cash dividends for 2H22 and 5% bonus shares
- NBK Recognized With Visa's "Excellence in Product Design Award"
- NBK provides Multi-currency Cash Delivery Service for its customers

## April

- NBK unveiled one-of-a-kind Commercial Credit Cards for Corporate Customers

## May

- NBK Launches the New "Plus" Package with Exceptional Benefits for retail customers
- NBK Partners with Visa to Launch 'She's Next' Program for the First Time in Kuwait
- NBK Provides Cash Withdrawal through Digital Wallet

## June

- NBK Launches the Eighth Cohort of Its "High-Fliers" Program
- NBK organized Blood Donation Campaign for its staff

## July

- NBK Launches Enhanced IVR Services
- NBK Publishes its Annual Sustainability Report 2022
- SmartWealth by NBK Launches Its Investment Services on the NBK Mobile Banking Application

## August

- NBK Academy Celebrates the Graduation of Wave 28
- NBK Enables Complaint Submission via NBK Mobile Banking Application
- NBK Supports the Kuwait Dive Team Project To Protect Coral Reefs

## September

- NBK Launches "NBK Tech Academy"
- NBK Launches "Credit Administration and Credit Operations Certification"
- NBK Opens Its New Branches at Al Khiran Hybrid Outlet Mall and at The Warehouse Mall in Subahiya

## October

- NBK Officially Launches «Bankee» in Cooperation with MoE and «Nazaha»
- NBK Attends the Annual Meetings of IMF and the World Bank Group
- NBK and PT Kilang Pertamina Internasional Sign Strategic MOU at ADIPEC 2023

## November

- NBK Organizes a Training for Financial Crime Unit Officers
- NBK Recognized by Mastercard for "Driving E-Commerce Tokenization for Seamless Checkout"
- NBK Hosts CreditLens Workshop for Kuwaiti Bankers
- NBK Organizes "Collective Executive Development Program" in Cooperation with INSEAD Business School
- New Innovative Features Introduced to NBK Mobile Banking Application

## December

- NBK Completely Revamps "Moody's Credit Curriculum – Foundation Level" Program
- NBK Partners with Qatar Airways and British Airways to Launch NBK Avios Visa Signature Card
- NBK inks a financing facility to fund P-1 of The Avenues Al Khobar
- NBK Hosts a Media Awareness Workshop on Sustainability and Climate Change

# Institutional Strength

## Credit Ratings

NBK is a robust financial institution, as demonstrated by the trust that its customers and shareholders have placed in it, as well as its long-term credit ratings.

| Rating agency | Long-term rating | Standalone rating | Outlook |
| --- | --- | --- | --- |
| Moody's | A1 | a3 | Stable |
| STANDARD &POOR'S | A | a- | Stable |
| FitchRatings | A+ | a- | Stable |

## Awards and Accolades



- Best SME Bank Award - Kuwait 2023
- Best Private Bank for Sustainable Investing - ME 2023
- Best Foreign exchange Provider - Kuwait 2023
- Best Foreign exchange Provider - ME 2023
- Best Bank in Kuwait 2023
- Best Trade Finance - Kuwait 2023
- Best Bank for Cash Management in Kuwait 2023
- Top Innovations in Finance in Kuwait 2023 – Mobile Banking / Apps
- Best Financial Innovation Lab in Kuwait 2023 – NBK Group Digital Office
- Best Consumer Digital Bank in Kuwait 2023
- Best Online Product Offerings - Kuwait 2023
- Best Bill Payment and Presentment - Kuwait 2023
- Best User Experience (UX) Design - Kuwait 2023
- Best Mobile Banking App - Kuwait 2023
- Best in Social Media Marketing and Services - Kuwait 2023
- Best Innovation and Transformation - Kuwait 2023
- Best Product Offerings - Middle East 2023
- Best Mobile Banking App - Middle East 2023
- Best Innovation and Transformation - Middle East 2023
- Best Consumer Digital Bank - Middle East 2023
- Best Innovation and Transformation - Global 2023

- Best Bank for Corporate Responsibility in the Middle East 2023 (Euromoney)
- Best Bank in Kuwait 2023 (Euromoney)
- Best Bank for CSR in Kuwait 2023 (Euromoney)
- Euromoney Cash Management survey 2023- Kuwait (Euromoney)
- Best Retail Bank - Kuwait 2023 (MEED)
- Best Youth Programme Initiative 2023 (MEED)
- Excellence in Service: Priority Banking 2023 (MEED)
- Best Initiative for Women in Business 2023 (MEED)
- Best Implementation of Diversity & Inclusion Initiatives 2023 (MEED)
- Best Trade Finance 2023 - Kuwait (GTR)
- Bankee Program - Bronze (Qorus)
- SME Bank of the year - Silver (Qorus)
- Digital payments - Bronze (Qorus)
- self service branches - Gold (Qorus)
- Excellence in Diversity & Inclusion - Bronze (SHRM)



NBK's rating at 'BBB' per the MSCI audit



Constituent of the FTSE4Good Index Series



Number 1 Banking Brand in Kuwait



"C" Score for 2023 for both the Climate Change and Forests Categories



# Vice Chairman & Group CEO's Statement



Isam J. Al-Sager
**Vice Chairman &
Group Chief Executive Officer**

In 2023, NBK delivered exceptional results as it leveraged its geographical diversification, digital advancement, and strong financial position.

Rigorous compliance with local and international regulations is not only a legal requirement, but a fundamental commitment to ethical business practices.

2023 marked a year of positive progress and sustained stability for the Group, with our financial indicators demonstrating strong performance.

**Dear Shareholders, Investors and Partners,**

I am pleased to share with you that 2023 marked a year of positive progress and sustained stability for the Group, with our financial indicators demonstrating strong performance. Our local and international businesses have adeptly driven the Bank forward, creating value for our shareholders and reinforcing our Group financial strength.

Total assets as at 31 December 2023 reached KD 37.7 billion, growing by 3.7% year-on-year. The growth was mainly attributed to healthy growth levels in volumes across various business lines. Attributable shareholders' equity reached KD 3.7 billion, while profits attributable amounted to KD 560.6 million. NBK ROAA is sound and healthy at 1.53% in 2023, compared to 1.48% in 2022. The payout ratio for the year remained stable at 50% of net profits, resulting in total cash dividends of 35 fils per share; an explicit indicator of confidence in the capital health of NBK and its commitment to reward and maximize the interest of shareholders. Meanwhile, customer deposits ended the year at KD 21.9 billion, increasing by 8.8% over 2022, our net loan portfolio witnessed a growth of 6.1% to reach KD 22.3 billion.

By the end of 2023, our NPL/gross loans ratio reached 1.38%, and our NPL coverage ratio was 271%, affirming NBK's success with its proactive risk management approach over the years. In 2023, NBK delivered exceptional results as it leveraged its geographical diversification, digital advancement, and strong financial position, strengthening our revenue streams while continuing to benefit from our prudent policies over the years in the form of solid asset quality and strong capitalization; with NBK's market capitalization at KD 7.1 billion as of 31 December 2023.

**Market Outlook**

In 2023, Kuwait faced challenges similar to the rest of the world, including high and persistent inflation, higher interest rate cycle and supply chain disruptions leading to slower global economic activity. However, the year also presented opportunities captured in sustained high oil prices, resilient consumer spending, increased project market activity, positive employment and population growth, gains in the refining sector, and a less aggressive approach to monetary policy tightening, contributing to Kuwait's macroeconomic experience.

The aggressive interest rate hikes in regional and major economies resulted in significant improvement in the financial performance of the banking sector in the last two years. NBK benefitted from rising interest rates given its large base of less-interest-sensitive Current Account Saving Account (CASA) balances, which contributed to the increase of the Bank's net interest margin.

**Managing Interest Rate Risks**

Consequently, management of interest rate risk was a major focus during this year backed by the **Group Treasury's** strategy to optimize the Bank's ability to benefit from rising interest rates over the past year. By anticipating and promptly responding to these market dynamics, we aim to uphold the resilience and stability of our financial position with agility and foresight. As we approach the end of the monetary policy tightening cycle, our Group Treasury is taking the necessary actions to position the Bank for next year based on the latest interest rate outlook.

**Robust Compliance and Risk Management**

In parallel, our dedication to transparency, compliance, and risk management remains unwavering. As a cornerstone of our corporate ethos, transparency is embedded in our communication channels, ensuring that our stakeholders are well-informed about our operations, financial health, and strategic initiatives. Rigorous compliance with local and international regulations is not only a legal requirement, but a fundamental commitment to ethical business practices. Our robust risk management framework proactively identifies, assesses, and mitigates potential risks, safeguarding the interests of our clients, shareholders, and the broader financial community.

**Customer-Centricity**

Following our relationship-centric model, we stand by our clients, particularly during challenging periods, solidifying our identity as true banking partners rather than mere transaction-focused service providers. In 2023, the **Corporate Banking Group** introduced a pioneering innovation tailored to the specific needs of its clientele by unveiling a suite of commercial cards, first-of-its-kind offering in Kuwait crafted to empower clients with enhanced control over their business expenditures and incorporate a range of distinctive features unmatched by any other card product available in Kuwait.

### Network Collaboration

Our core business segments are significant constituents to the growth of NBK's net profits. At the Consumer Banking Group front, NBK ranks among top performers across all categories of products, including loans, cards, and liabilities, with a market share of more than 30% in each product category.

We continue to lead with Weyay, Kuwait's first Digital bank, expanding its scope to ink a partnership with Mastercard to be its exclusive cards scheme provider. This strategy aligns seamlessly with the demographics of our customer base, predominantly composed of Kuwaiti Youth, with more than 80% under the age of 30.

For our International Banking Group (IBG), the overall pipeline of loan approvals grew significantly in 2023 to drive balance sheet growth and revenues. One of the most significant achievements was the drive behind sustainable lending. Cross border network transactions continue to grow in 2023 where teams from different locations have engaged to service NBK's clients with a seamless approach. This networking collaboration has further enhanced our relationship-driven approach.

> NBK's digital roadmap has been developed as a living strategy, continuously evolving and transforming while our commitment to digital transformation investment is unwavering.

Boubyan Bank continues to endorse our competitive advantage in the local market as the only banking group with access to conventional and Islamic banking. The Bank is well positioned to continue delivering growth and to contribute positively to the Group's profitability and further solidify our financial position. It is strengthening its Islamic banking franchise in the MENA region and beyond while focusing on digital transformation to achieve its aspiration to become one of the top Islamic banks in the world; offering innovative digital products and services to its customers.

Our continuous investment in our wealth management business is aimed at driving growth as NBK Wealth continues to leverage its competitive edge of proven capabilities in tailored products, cutting-edge technology, and quality customer service to provide a seamless cross-border experience for its clients.

NBK Wealth operating model focuses on cementing its value proposition, developing and expanding on its human capital and capabilities, and providing solution-based services, including advisory services, to increase our local, regional, and international clients' share of wallet. It provides a comprehensive suite of solutions to produce solid and sustainable long-term investment returns through a customized strategy; further strengthening our value proposition of providing holistic solutions and delivering the best wealth management experience to our clients.

In 2023, NBK Wealth's in-house regional portfolios outperformed their respective benchmarks across various strategies, and similarly, fixed income strategies also outperformed their respective benchmarks. In parallel, and given the global macroeconomic environment, innovative investment solutions were developed in line with the risk profiling of clients, designed to cater to client requirements and enhance diversification; these solutions include the Islamic Real Estate Financing Fund and the Infrastructure Investment Fund that allow clients to hedge against inflation while generating returns. NBK Wealth also launched new Sharia-compliant investment solutions and ESG equivalent investment solutions; and in collaboration with our strategic partner JP Morgan Asset Management (JPMAM), we developed Hedge Fund and Private Equity secondaries solution and are expected to be available to NBK Wealth clients in 2024.

### Digital Transformation Roadmap

NBK's digital roadmap has been developed as a living strategy that is continuously evolving and transforming while our commitment to digital transformation investment is unwavering and continuous. We are dedicated to transcending traditional thinking, persistently striving to maintain our position as the foremost innovator in this field, not only in Kuwait but across our locations.

Looking ahead, NBK's strategic priorities and digital transformation goals for the coming year will be focused on harnessing smart technologies for smart banking. Additionally, through embedded finance, NBK will meet the customers wherever they need to be, seeking new opportunities in the global digital landscape; ensuring NBK is at the forefront of innovation in Kuwait and the region.

### Our People

In 2023, our Group HR function exerted unwavering commitment in the continuous development of our people, closing the year with 147,701 local and 36,764 international training hours delivered, along with the launching of several academic, motivational, and cultural initiatives. This multifaceted approach aimed not only to enhance their professional skills but also to nurture a holistic growth mindset, fostering a workplace culture

that values learning, innovation, and inclusivity. As a result, our people are equipped not just with technical expertise but also with the adaptability and resilience needed to thrive in a rapidly evolving professional landscape.

Throughout 2023, several departments played a vital role in our success with multiple contributions focusing on award-winning innovative solutions as we garnered prestigious awards across various fields.

### Our ESG Culture

Our ongoing commitment to ESG reached new heights this year. Across our banking strategy and business model, we have pursued ESG as one of the key elements in our strategic focus, and took vital steps to turn it into a transformational force within NBK. Our ESG Strategy evolved from a six-pillar approach to four interrelated pillars designed to reinforce our position as a trusted leader in the emerging business environments of the future.

The year 2023 recorded a KD 28 million investment in community contributions across various sectors including healthcare, education, youth, and women empowerment initiatives. This was further strengthened by joining the United Nations Global Compact (UNGC) in February 2023, whereby we committed to adopt all ten principles in the areas of human rights, labor, the environment, and anti-corruption. Our endorsement to the UNGC reaffirms our role to lead responsible practices that drive Kuwait's sustainable economic development and hence are strategically aligning all our initiatives with the UN Sustainable Development Goals (SDGs).

As part of our commitment to achieve carbon neutrality by 2060, in line with Kuwait's net-zero ambition, we have set interim goals to reduce our gross operational emissions by 25% by 2025 and are actively exploring innovative research and development technologies to magnify our reliance on renewable energy beyond 2025. In conjunction with this commitment, we developed our Sustainable Financing Framework, which provides us with the roadmap for growing our sustainable assets and helps us to support our societies in transitioning to a sustainable and equitable economy.

In the workplace, NBK remains dedicated to fostering and prioritizing equal opportunities and championing diversity, equity, and inclusion through strategic initiatives, reinforcing our commitment to talent development and organizational resilience.

As we chart our course into the future, our focus on integrating ESG practices in our operations will be steadfast, emphasizing responsible decision-making and scoring on both sides of the balance sheet. With an overarching goal to empower stakeholders, drive positive societal impact, and deliver superior returns to shareholders, we remain dedicated to our mission. This commitment is fortified by a resilient governance and risk culture, ensuring that strategic decisions align with the Bank's core values and contribute to a sustainable and responsible future.

### Dear Stakeholders,

Today, we find ourselves at a pivotal juncture, poised on the cusp of new opportunities and challenges. Our resilient strategy and our proven business model will remain our guiding light for creating and delivering value to our stakeholders, empowering them for tomorrow while steering a Digitized and Sustainable Future. We remain committed to sustaining revenue growth responsibly, strategically investing in our future, catalyzing positive change in transition finance, introducing cutting-edge products and services, advancing our digital capabilities, promoting inclusive community development, and taking a prominent role in making a meaningful impact in economic growth in Kuwait and the region.

In the pages that follow, you will discover the tangible outcomes of our efforts over the past year. From financial milestones to strategic initiatives, each section of this report unveils our progress and achievement and reflects the spirit that propels us forward, a spirit rooted in a vision that extends far beyond the immediate horizon.

> Our resilient strategy and our proven business model will remain our guiding light for creating and delivering value to our stakeholders, empowering them for tomorrow while steering a Digitized and Sustainable Future.

# Market Outlook

**3.1%**
Global GDP Growth Estimated for 2023 (IMF)

**USD 82**
Average Oil Price in 2023 (ICE Brent/bbl)

### Geopolitical Impact

Against the backdrop of a fluid, uncertain global landscape in 2023, marked by significant geopolitical shifts and tensions, Kuwait was indirectly affected by the unfolding narratives of the ongoing Ukraine-Russia war and the conflict in Gaza. These external events cast a distinctive shadow on the geopolitical and economic landscape, shaping the context within which Kuwait navigated its own challenges and opportunities.

The Ukraine-Russia war entered its second year in 2023, with the ramifications of the conflict for the global economy most visible through the energy channel. Europe and the US led the international response to the conflict, curtailing imports of Russian natural gas, crude and petroleum products, and, in concert with their G-7 partners, imposed a price cap on these exports in the global market. Together with OPEC+ supply management, this led to higher price premiums for medium sour barrels such as Kuwait Export Crude over benchmark light sweet crudes such as Brent. The outbreak of hostilities in Gaza and the retaliation by Houthi militias on Western shipping in the Red Sea also raised oil's risk premium, though

expectations of a price spike did not materialize, with markets comforted by ample OPEC+ spare production capacity. The risk of conflict escalation nevertheless remains high, while in parallel, potentially stricter enforcement of US sanctions on Iran could lead to some supply curtailment and eventually higher prices.

### Global Economic Policies and Trends

The global economy was subject to headwinds in 2023 from tighter monetary policy, unequal growth amongst advanced economies, an underwhelming post-Covid rebound in China and heightened geopolitical risk stemming from the conflicts in Ukraine and Gaza. US economic growth surprised in its robustness amid a relatively tight labor market and solid consumer spending with inflation coming down but remaining above the Fed's 2% target. European economies, meanwhile, were close to recession as high consumer prices and borrowing costs combined with weak external demand amid fallout from the Russia-Ukraine conflict and subdued Chinese growth. With inflation well off its peaks across advanced economies, central banks seemed to be shifting towards interest rate cuts from the second half of 2024, as 2023 drew to a close.

### Economic Outlook of Neighboring Countries

GCC economies are expected to grow at a slower pace in 2023-24, as oil production is cut in line with OPEC+ policy (with Saudi Arabia taking on the lion's share of output cuts), and as the global macroeconomic backdrop softens. According to the IMF's Regional Economic Outlook of October 2023, GCC GDP growth is expected at 1.5% in 2023 before accelerating to 3.7% in 2024, with non-oil activity moderating to 4.3% and 4.0% in 2023 and 2024, respectively.

Nevertheless, demand will continue to be strong, supported by rising government spending that focuses on domestic investment, economic diversification-targeting structural reforms and FDI-enhancing measures. Saudi Arabia and the UAE have led the way in this regard. Non-oil growth in Saudi is estimated at 4.9% in 2023 and 4.4% in 2024. Despite the successful economic diversification drive, a sharp weakening in oil prices continues to be the main downside risk. Kuwait could see some benefit from strong growth in neighboring economies, though as an oil-based economy, direct trade linkages are not very large.

### Kuwait's Economic Indicators and Trends

Kuwait's non-oil GDP growth was estimated at 2.8% y/y as of Q3 2023 according to official data, while its overall growth was -3.7%, negatively affected by OPEC+ mandated oil output cuts. The performance of the non-oil sector in Kuwait slowed

following its post-pandemic, consumption-led surge even while government fiscal policy has been supportive. The government announced a record deficit of KD6.8 billion for its FY23/24 budget, inflated by one-off spending items related to accrued subsidy and salary payments owed from previous years. Growth in consumer spending and bank credit slowed to single digit rates in 2023, while real estate sales activity declined amid elevated residential property valuations and costs of borrowing. Recent readings suggest that 2024 could see a turnaround in the fortunes of the sector, helped by expectations of lower interest rates and government supply-side initiatives.

Inflation trended lower by 2023's close to 3.4% y/y, having been range bound at 3.7% for most of the year and influenced by the slowdown in consumer spending. Project market activity, meanwhile, posted its best year since 2017 in the value of contracts awarded. Also, the downstream oil sector was boosted by the completion and ramping up of the Al-Zour refinery.

Meanwhile, the monetary environment tightened in 2023, as the Central Bank of Kuwait loosely tracked the US Fed in hiking domestic interest rates. The key CBK discount rate ended the year at 4.25%, having risen a cumulative 275 bps since March 2022—just over half of the Fed's 525 bps increase over the same period. 2024 should see the Fed begin to loosen monetary policy.



**International Oil Price (ICE Brent USD/bbl)**

Source: Refinitiv



**GCC Real GDP Growth (% y/y)**

Non-oil — Headline Oil

Source: IMF Regional Economic Outlook (October 2023); *annual average



**Kuwait Real GDP Growth (% y/y)**

Oil — Total Non-oil*

Source: Official sources; Note: 2023 data is preliminary; *includes refining

**Kuwait Key Economic Indicators**

|  | Units | 2021 | 2022 | 2023 | 2024f |
|---|---|---|---|---|---|
| Nominal GDP | $ bn | 142 | 181 | 165 | 164 |
| Real GDP | % y/y | 1.1 | 7.8 | -0.7 | -0.2 |
| Budget Balance (FY) | % of GDP | -10.2 | 11.5 | -6.7 | -6.3 |
| Current Acc. Balance | % of GDP | 26.4 | 34.5 | 26.5 | 17.6 |
| Inflation (avg.) | % y/y | 3.4 | 4.0 | 3.6 | 2.5 |
| Crude Production (avg.) | mb/d | 2.4 | 2.7 | 2.6 | 2.5 |
| Oil Price (KEC) | $/bbl | 70.5 | 101.2 | 84.3 | 82.0 |

Source: Official sources, NBK forecasts

**Facts & Figures:**

- **GDP:** GDP contracted by 3.7% y/y in Q3 2023 according to preliminary estimates published by the Kuwait Central Statistical Bureau . This was largely a reflection of oil sector output declines (-9.0% y/y), in-line with Kuwait's participation in OPEC+ production cuts. The non-oil sector performed better, with growth accelerating to 2.8% y/y. Total GDP growth is forecast at -0.7% for 2023 as a whole, at best.
- **Consumer spending:** Growth has slowed since 2021 to +8.3% y/y in 2023.
- **Real estate sales:** Activity declined 22% in 2023, with cumulative sales of KD2.8 billion.

- **Domestic credit growth:** Slowed in 2023, from 7.7% y/y at the start of the year to 1.7% by December, on the back of easing demand for both household (+1.5%) and business credit (+0.9%).
- **Consumer price inflation:** Trended lower by December's close to 3.4% y/y and a year-average of 3.6%.
- **The value of awarded projects:** Saw an almost three-fold increase on 2022's level to KD 2.5 billion. The transport, power & water and construction sectors accounted for the bulk of the awards.
- **Kuwaiti employment:** Grew by 2.9% y/y as of end-June 2023, significantly outpaced by expatriate employment growth of 14% y/y over the same period. The Kuwaiti employment rate ranged lower slightly to 94.2% from 94.8% at the June 2022 reading.

**Kuwait Foreign Investment and Government's 4-Year Action Plan**
Kuwait has trailed its GCC peers in attracting foreign investments (FDI), despite having positive fundamentals including a strong banking and financial sector and a steady macroeconomy. Annual FDI inflows in 2022 were USD 758 million (0.6% of GDP), according to UNCTAD's World Investment Report 2023, with the annual average over the last 10 years at about USD 558 million. The stock of direct investments in Kuwait stood at USD 15 billion in H1 2023, compared to USD 27 billion in Qatar, USD 35 billion in Bahrain and USD 50 billion in Oman. Bureaucratic hurdles, restrictive policies in the large oil sector and policymaking uncertainty have been cited as challenges.

**Kuwait's Banking Sector**
Kuwaiti banks continued to post solid results in 2023, with a majority recording double-digit growth in net profits in H1 2023. Banks' profitability indicators (Return on Equity, Return on Assets) mostly increased in H1 2023, a continuation of the trend seen since 2021. Asset quality remained generally good, with the cost of risk lower for most banks in 1H2023 than in the same period in 2022, even after falling sharply across the board in 2021 and 2022. Capital Adequacy continued to be solid, standing at 18.4% as of June 2023, well above the minimum requirement of 13%. However, domestic loan growth was weak in 2023, expanding by 1.7% in the year-through December against a backdrop of higher interest rates and following very strong growth in 2022.

**Investments in Energy Sector**
Investments are ongoing in the energy sector, with Kuwait Petroleum Corporation (KPC) pushing ahead with its sustainability plan to expand non-fossil fuel, renewable energy sources to a level that would satisfy 15% of the country's entire energy requirements by 2030. Moreover, KPC unveiled at its Strategic Directions 2040 and Energy Transition 2050 conference a roadmap to achieve carbon neutrality by 2050, in line with similar plans pursued by GCC neighbors. To that end, KPC will look to spend about USD 110 billion on top of the USD 300 billion already allocated for the oil sector to help drive upstream capacity gains in the 2040 strategy.

**Kuwait's National Vision 2035**
Under the auspices of the Kuwait Vision 2035 document, a four-year economic plan was published in mid-2023 and later updated that detailed initiatives to be implemented by 2027 to help guide policy. The plan is based on six pillars: public finance stability; economic sector development; job opportunities and capacity building; sustainable welfare and human capital development; productive government; and sustainable economic development enablers. The program's goals include: improving liquidity and expenditure management; developing the housing, tourism, transport, logistics, technology, financial services and renewable energy sectors—through strong PPP engagement; creation of a northern economic zone; raising the productivity of state employees while promoting private sector employment; creation of a better-educated and knowledge-based society; and the strengthening of governance and institutional capacities.



**Credit and Debit Cards Transactions (local)**

Source: Central Bank of Kuwait (CBK)



**Private Credit Growth (% y/y)**

Source: Central Bank of Kuwait



**Fiscal Balance (fiscal year)**

Source: Kuwait Ministry of Finance, NBK estimates



**Real Estate Sales**

Source: Ministry of Justice



**Consumer Price Inflation (% y/y)**

Source: Central Statistical Bureau

Improving the business landscape and attracting FDI are part of the government's 4-year action plan. The potential establishment of the "Ciyada" domestic investment vehicle could be significant in spurring new inflows. The plan also focuses on privatization to change the government's role from a major player in the market to supervision, unlocking more opportunities for the private sector. These reforms require the availability of funding for the private sector, which presents financing opportunities for banks. The pick-up in projects activity in 2023 and potentially in 2024 as well bode well for bank business and the broader economy.

# Our Business Model

## We use our key strength...

**A Leading Customer Base Franchise** spanning across continents.

**A Dynamic Appetite for Challenge** beyond conventional boundaries.

**Digital Leadership and Growth** for a transformative journey.

**A Commitment to Disciplined Compliance** with proactive risk management.

**A Committed and Value-Driven Workforce,** the backbone of our business.

**A Proactive Sustainability Focus** for a better tomorrow.

At the core of our ethos lies a commitment to integrity, innovation, and the relentless pursuit of excellence, all underpinned by a profound dedication to entertaining a trusted relationship with our stakeholders.

Our business model is a testament to our unwavering commitment to maintaining trust while continually creating tangible and lasting value for all stakeholders involved.

# Crafted to Sustain Trust and Create Value

## To create value through...

**Catering to the diverse needs of retail,** corporate and High-Net-Worth individuals. Through a strategic commitment to digital transformation, we are redefining the banking experience, for our clients.

**Extending our reach beyond borders,** establishing a challenging footprint and cultivating a regional and international clientele within the dynamic agile banking industry.

**Contributing to the landscape of global trade flows,** playing a pivotal role in bridging capital and trade flows between MENA and the rest of the world.

**Building a distinguished Private Banking and Asset Management franchise** to serve a regional customer base with tailored financial solutions across geographies.

## For our stakeholders...

**Our Client Base:** Delivering innovative financial products and personalized services.

**Our People:** Fostering a culture of innovation and transforming our workforce into highly valued assets.

**Our Shareholders:** Delivering consistent returns and ensuring long-term value creation through sustained growth strategies.

**Our Regulators and Governments:** Upholding responsible practices with a commitment to robust governance practices and full compliance with regulatory requirements

**Our Communities:** Enabling positive change within communities through initiatives that support social and sustainable economic development.

# Strategy

 **Digital Transformation**

 **ESG Transition**

## Defend and Grow Leadership Position in Kuwait

 **Corporate Banking**

The Bank aims to (i) remain the primary banker for the leading local companies whilst continuing to be active in the mid-market sector;(ii) remain the bank of choice for foreign companies and continuing to serve at least 75% of those companies and (iii) maintain its current market share in trade finance (over 30%).

To achieve the above, NBK will expand its coverage and broaden the range of products and services offered.

**Consumer Banking**

NBK intends to maintain its focus on the profitable affluent and mass affluent segments while continuing to build a future-safe franchise by investing in youth segments (such as first jobbers and Shabab).

Through the above, the Bank aims to maintain its leadership position, maintain its focus on delivery of superior customer service experience and achieve the lowest cost of funds among Kuwaiti banks.

## Geographical, Product and Service Diversification

 **Build Regional Powerhouse in Wealth Management**

NBK aims to continue to provide a unique proposition to high net worth clients by bringing its frontline and investment arm together as one team and complementing its superior customer service with an increasingly wider range of investment products.

Leveraging its strong trustworthy brand and geographic reach, the Bank aims to bridge capital flows between Kuwait and the rest of the world.

NBK aims to replicate its success in wealth management in Kuwait in other GCC markets and build a pan-regional franchise with regional origination and international asset allocation capabilities.

**Expand Regional Presence**

The Bank's geographic diversification strategy is to leverage its fundamental strengths and capabilities, including its international reach and strong regional relationships, to build a regional platform and support growth in key markets.

NBK focuses on markets with long-term potential through a combination of high growth economies, sound demographic trends and opportunities aligned with the Bank's competitive advantages.

**Establish an Islamic Franchise**

The Bank's strategy, in relation to its Islamic subsidiary, is to differentiate it from other domestic Islamic banks through a clear focus on high net worth and affluent clients and large and mid-market corporate customers.

# Digitization at the Core

NBK stands at the forefront of digital innovation, fostering a transformative banking experience that revolves around the genuine needs and aspirations of its customers. Rooted in a profound commitment to customer-centricity, NBK has reshaped the lives of its customers through a meticulously crafted suite of digital services and products.

The launch of the new NBK Mobile Banking Applicationlication exemplifies this dedication, offering a personalized and intuitive platform that resonates with the daily rhythms of customers. From a redesigned holistic dashboard to personalized greetings and enhanced financial control, every feature is a testament to NBK's understanding of what its customers desire. This customer-focused approach has not only garnered widespread acclaim but has also resulted in tangible benefits for users – reduced clicks for accessing services, increased mobile usage, and a satisfaction rate exceeding 90%.

## Highlights

| | | | |
|---|---|---|---|
| Recorded more than 50 million transactions through NBK's Mobile Banking Application.<br><br>19% YOY growth in mobile banking transactions in 2023. | As of end December 2023, total active customers executing their banking transactions digitally across all segments reached around 500k customers. | Over 90% satisfaction rate post-facelift for the New NBK Mobile Banking Application. | NBK's Mobile E-KYC service launched, allowing customers to update their personal information through their daily banking channel. |
| Awarded "Best Mobile Banking Application" in the Middle East and "Best Consumer Digital Bank in Kuwait" by Global Finance. | Group Digital Office named "Best Financial Innovation Lab in Kuwait 2023", for the third year in a row by Global Finance. | NBK Mobile Banking app positioned as the most dominant channel for daily banking needs. | NBK actively seeks collaboration with participants of the Central Bank of Kuwait's Wolooj Fintech sandbox, as well as the upcoming Open Banking initiative to foster new opportunities for unity between banks and Fintechs. |

## 2023 Product Highlights

| | | | |
|---|---|---|---|
| **New Mobile Banking Application**<br>The new NBK Mobile Banking Application is an innovative value proposition for our customers. The app elevates NBK's digital offerings to new heights in our journey to empower customers through digitization. | **Payment Products**<br>Expanding the payment functionalities of the New NBK Mobile Banking Application including the new Avios card, enrichment to NBK QuickPay, NBK Flexipay and a digitized prepaid card proposition. | **Digital Investment Engagement in the NBK Mobile Banking Application**<br>Launched Digital Investment Engagement in the NBK Mobile App in collaboration with SmartWealth by NBK Capital to provide NBK mobile customers with integrated banking and investment services. | **Customer 360**<br>C360 is a multi-phase project that provides a state-of-the-art enhanced Customer Relationship Management (CRM); delivering a holistic view of our relations with our corporate clients, further enhancing our relationship management. |

## Key Milestones and Achievements in 2023

In 2023, NBK made significant strides in its digital transformation journey with the successful launch of the New NBK Mobile Banking Application. This innovative app was designed with a mobile-first approach, prioritizing user experience and customer-centricity.

*Main Highlights:*

- A holistic dashboard providing a comprehensive view of all products
- Intuitive navigation and quick access buttons to perform transactions faster
- Enhanced card management for greater financial control
- A personalized experience with greetings and birthday messages
- New design system to achieve state-of-the art customer experience

The new Application transforms how customers engage with their daily banking needs, boasting a highly efficient and user-friendly interface that guarantees an enhanced and enriched experience.

*Positive Customer Engagement:*

- Upward trend in mobile usage
- Increased customer satisfaction rates
- Notable boost in new product sales and cross-selling

NBK Mobile Banking Application became the most significant channel for usage and transactions and the top-rated mobile banking app in Kuwait, reflecting the success of the Bank's digital strategy.

*Digital Advancements:*

As part of our commitment to digital advancements, we continually serve our customers by providing frequent updates to the mobile app; augmenting the digital experience for customers. This year, NBK has launched over 30 new features in tandem with the new application.

- NBK is continually promoting the convenience of customers through digitization, and it was achieved this year with the launch of a new E-KYC service allowing customers to update their information directly in the app, adding transfer receipts to the NBK app, as well as automating the investments of NBK funds
- Focused enhancement of cards and payments means, with the release of several features to enhance the customer experience, namely viewing card details, temporary blocking, and reporting lost or stolen cards; as well as flexible payment options through Flexipay

- When determining the critical next steps after the launch of the New NBK Mobile Banking Application, enhancements to QuickPay were a clear priority. Customers may now pay for NBK QuickPay links directly through the NBK Mobile Banking Application, debiting directly from their selected account. Additionally, customers may generate a NBK QuickPay using a QR code through the app as well
- Digital Products for customers are also evolving, and NBK has launched the Avios card, which allows customers to earn both British Airways and Qatar Airways miles. This card is available fully digitally without any need for a branch visit.
- NBK is always exploring innovative ways to boost the customer value proposition by engaging with local and global players in the Fintech space, to deliver new experiences for customers in the field of personal finance management, wearable technology and Artificial Intelligence based solutions
- A unified user experience across all digital channels with plans to apply a similar customer-centric approach to NBK Online Banking and ATM

**A Journey through Design Thinking and Agile Methodologies**
To enhance customer experience and streamline operations, NBK adopted a Design Thinking process, ensuring the identification of customer needs and pain points and securing the proper steps are taken to address them. This customer-centric approach was coupled with Agile methodologies driving purpose-driven User Experience design to ensure that digital platforms align with the Bank's values and a customer-centric approach in all aspects of the organization.

**Driving Customer Engagement**
NBK's mobile adoption experienced significant growth, with the introduction of the new NBK Mobile Banking Application contributing to increased penetration rates and active usage. Key customer segments witnessed a substantial surge in activation, establishing the app as the go-to for daily banking. The app now dominates daily banking with a high self-service transaction ratio.

**A Trailblazing Journey in Talent Development and Innovation**
NBK has taken comprehensive steps to enhance internal digital capabilities, recognizing the pivotal role of its workforce in the digital transformation journey.

- Internal digital capabilities were boosted through the establishment of mobile squads using Agile methodologies aligning platforms with customer demands, regulatory changes, and improved digital offerings
- The NBK Tech Academy reinforces digital talent, fostering expertise in STEM roles through a curated management training program. The cultivation of a digital community within the Bank promotes a vibrant digital force and drives engagement with content and events for ongoing innovation

# Operational Review

Our journey has been marked by pioneering initiatives, making us a trailblazer in the country with numerous "firsts" to our credit and client loyalty reflecting the trust placed in our institution. As we delve into the intricacies of our operations, it is evident that the collective efforts of our talented workforce contribute significantly to our success, reinforcing NBK's position as a beacon of reliability and progress in the financial industry.

**Commitment to Creating Value**
At the core of our operations are key pillars that define our commitment to excellence.

- Unwavering adherence to regulatory frameworks, ensuring transparency and compliance in all facets of our endeavors.
- Customer centricity is embedded in our approach, prioritizing the satisfaction and needs of our clients.
- Premium placed on our people, fostering a supportive and inclusive environment that empowers our team.
- Sustainability considerations guide our decisions, reflecting our dedication to responsible business practices.
- Embracing innovation and technology, recognizing their transformative power to enhance efficiency and elevate the overall experience for our customers and stakeholders.

**Consumer Banking Group**
Customer behaviors are evolving, marking a growing appetite for digital channels and a remarkable surge in digital literacy and expectations. At NBK's Consumer Banking Group, we recognize this transformation and are proactively adapting to meet the changing needs of our clients.

In 2023, our efforts focused on:

- Upgrading NBK Mobile Banking Application with more than 30 enhancements on both UI/UX tailored to customer needs with personalization features.
- Anchoring our leadership as the first bank to launch Apple Pay in Kuwait.
- Launching the new NBK Cards Designs and eco-friendly prepaid card promoting transparency.
- Leveraging value proposition for Weyay: increase its market share in the youth segment to reach more than 30% and partnership with MasterCard to be its exclusive cards scheme provider.
- Repositioning of Jawhara account: attracting funds from non-NBK customers and enhancing Shabab segment offerings.
- Introducing cards for SMEs with corporate supporting needs
- Signing partnerships with third-parties to provide customers with first-time services, i.e introducing special offers for Kuwaiti Retirees with the Public Institution for Social Security.
- Expanding the strong value proposition for premium segment by partnering with top brands injecting the segment with lifestyle exclusivity.
- Upgrading our solution center systems with in-app chat allowing customers to chat directly from within the application.

**Mobile Banking Highlights 2023:**
- 13% rise in the number of registered users
- Usage has increased by 34%
- Financial transaction volume has grown by 43%

In 2024, a continued emphasis will be placed on customer-centric strategies, technological advancements, and pioneering initiatives that will further solidify NBK's position as a trusted financial partner, setting new benchmarks in Kuwait's banking industry.

**NBK Wealth**
In 2023, NBK Wealth concluded the transformation plan of consolidating NBK's private banking and asset management businesses under one leadership and identity. The transformation plan was focused on client-centricity, as the division currently provides SHNWI/UHNWI/HNWI and institutional accounts with a holistic and client-centric offering including all private banking products as well as investment solutions, leveraging on the decades-long trusted relationships with clients and aiming at meeting their ever-changing needs.

In 2023, our efforts focused on:

- **Advisory solutions:** Client-specific and tailor-made wealth, portfolio investment, real estate planning, and advisory services, including using holistic multi-asset strategies.
- **Product solutions:** Access to a unique platform covering a wide array of investment vehicles across liquid and illiquid solutions, including leasing and Islamic leasing products, regional and global mutual funds, fixed income and money market funds, and infrastructure funds.
- **Booking centers solutions:** Expanded booking centers with optional relationship management coverage model.
- **Banking services:** Differentiated propositions to HNWIs for core banking products such as loans, deposits, and credit cards.

In 2024, NBK Wealth will continue to leverage its collaboration with third parties to provide NBK Wealth' customers with a wider array of alternative investment solutions including multi-strategies, infrastructure funds, hedge funds, as well as private equity secondaries. Moreover, our efforts will be geared towards integrating ESG components into our offerings and selection process for clients with an ESG preference, reflecting our commitment to sustainable investment practices.

**International Banking Group**
The International Banking Group (IBG) maintained its proactive approach in managing the loan portfolio as well as its long-standing international strategy that requires the group to focus predominantly on selectively growing with Investment Grade counterparties and Government Related Entities.

In 2023, our efforts focused on:
Consolidating returns and leveraging existing strengths, leading to a net growth of over USD 2 billion in assets globally, particularly within NBK's current footprint while maintaining healthy cost-to-income ratio. A notable achievement was the emphasis on sustainable lending, becoming the leading contributor within the Group in anchoring sustainability in its global business.

The International Banking Group's cross-border transactions expanded as teams from different locations collaborated to serve NBK's clients, fostering a seamless NBK approach and promoting a relationship-driven model.

Two locations underwent transformation to become regional hubs in Europe and Asia, expanding NBK's presence and establishing the Bank as a trusted brand. In serving international retail clients, IBG has implemented country-specific strategies to expand consumer products and services within NBK's footprint. In Egypt and Bahrain, the focus was on improving transactional banking services, particularly in cards and accounts. NBK introduced new co-branded cards and interest-bearing current accounts in Egypt, along with expanding credit card availability across the platform. Across International Corporate and Commercial Real Estate activities, the emphasis in the current year was on enhancing synergies across the network to elevate the level of services provided to NBK customers.

In 2024, we will be gearing our actions towards:
- Growing NBK's footprint across NBK's key regional markets in Saudi Arabia and the UAE, with a continued focus on Government Related Entities and Top-Tier Corporates.
- Expanding strategically across the European Union, particularly in corporate lending, trade finance, Commercial Real Estate, and residential mortgages.
- Enhancing the Group's footprint in Asia through its regional hub in Singapore.
- Diversifying the Group's Commercial Real Estate portfolio.
- Integrating ESG into credit management processes.
- Undertaking digital and technology investments across the network.

**Treasury**
At the forefront of NBK's strategic initiatives, Group Treasury plays a pivotal role in orchestrating collaborative efforts across various business and control units. A standout accomplishment in 2023 was leading the pivotal project to transition USD assets and liabilities from LIBOR to alternative rates, such as SOFR. This transition encompassed the successful migration of all USD bilateral contracts and derivatives transactions, with ongoing collaboration with other banks for the remaining syndication contracts.

In 2023, our efforts focused on:
Actively supporting the implementation of a new Funds Transfer Pricing (FTP) policy and framework at NBKI, geared towards refining the pricing of interest rate and liquidity risks. This progressive policy aims to improve the pricing of interest rate and liquidity risks and enhance the management of the balance sheet by driving the proper behavior. In addition, managing interest rate risk was also a major 2023 focus in parallel to liquidity management, especially amid the substantial policy tightening since 2022 and the recent rise in geopolitical tensions in the region.

In 2024, strategic priorities will focus on leveraging the recently acquired technology solutions to broaden product offerings and services to a wide range of clients in Kuwait and international locations by expanding the list of hedging solutions and investment products offered to clients with diversification efforts on the liquidity and funding front. Additionally, efforts will be invested in further leveraging the recent technological acquisitions and expanding the benefits of these state-of-the-art solutions to more international locations, and rolling out the new FTP framework to additional overseas locations.

**Corporate Banking Group**
The Corporate Banking Group pursued its strategic objectives with a primary focus on defending and growing NBK's strong market position as the Bank of choice for corporates in Kuwait. It capitalized on the business opportunities from existing clientele and attracted new clients through exceptional customer service and a robust capital base.

In 2023, our efforts focused on:

- Introducing a pioneering suite of commercial cards, first-of-its-kind offering in Kuwait, empowering clients with enhanced control over their business expenditures.
- Rolling out new services designed to simplify the digital and physical submission of documentation for corporate clients, resulting in a significant reduction in processing times.
- Fostering the growth of our mid-sized corporate clients.
- Investing in digitizing service delivery channels, focusing on enhancing existing IT platforms and actively promoting client adoption and utilization of digital solutions.
- Increasing uptake of corporate online banking services (WOLC) as a result of simplifying customer journeys, robust security measures, and improved online user experience.
- Preserving the high quality of asset portfolio with vigilant management of credit risk.
- Monitoring and assessing the performance and effectiveness of corporate clients' interactions, enabling us to make continuous enhancements to our offerings.
- Integrating ESG Scoring into corporate clients' credit assessments and creditworthiness evaluations, reinforcing the importance of governance in business practices.

In 2024, core objectives and strategic priorities remain steadfast: as the Corporate Banking Group is committed to maintain a strong market position by proactively identifying and seizing opportunities for growth and continuing to support clients as they navigate this evolving economic landscape.

# Group CFO's Review

*As we reflect on the financial landscape of the year, we are happy to report that 2023 was another remarkable year, marked in many ways by elevated levels of global uncertainty and geo-political challenges. However, NBK Group has navigated the year with a strategic vision guided by our core principles and backed by our unwavering dedication to sound financial practices, prudent risk management, and innovative strategies that enabled us to withstand the turbulence and emerge stronger and more resilient with a steadfast commitment to financial excellence both locally and through our international network.*

**KD 560.6**
million Net Profit
in 2023

**17.3%**
Capital Adequacy
Ratio as of
31 December 2023

**Robust Strategy**
In navigating the economic challenges and market dynamics during the year, NBK Group has upheld its resilient business model, leveraging a diversification strategy, healthy balance sheet, conservative risk management practices, and strong capitalization. Our focus on enhancing digital products and services through platforms like Weyay has fortified our prospects for future growth. Additionally, we have capitalized on opportunities in key growth markets, particularly in the GCC, with a special emphasis on commercial banking and wealth management initiatives.

**2023 Business Performance**
The Group recorded a net profit of KD 560.6 million (USD 1.8 billion) in 2023, a 10.1% year-on-year increase from KD 509.1 million (USD 1.7 billion) in 2022, driven by a solid operational performance. This strong operating performance was driven by higher net interest income, increased fee income, and growth in business volumes, particularly in loans and investment securities, reflecting the strength of the Group's portfolio, which provides for revenue diversification and cost management strategies.

Likewise, our net operating income mix continues to show healthy trends and is driven by core banking activities. Net operating income stood at KD 1.2 billion, up by 15.6% from KD 1.0 billion in 2022; supported by a higher net interest income as well as stable non-interest income. International Banking contributed 23.7% of Group's net operating income, while Islamic banking operations and NBK Wealth contributed 19.2% and 9.6% respectively.

Net interest income at KD 905.1 million was boosted by higher interest rates and improved margins while benefitting from higher volumes of loans and investment securities across geographies. Net interest income for the year accounted for 77.6% of the net operating income and grew by 19.8% compared to 2022. On the

other hand, non-interest income at KD 261.6 million represented 22.4% of net operating income, benefitting from strong fees and commission income and higher net investment income. The Group's fee income reflected growth in underlying transaction volumes across business lines and operating locations.

The Group's increased activity levels across the network and continued investments in key businesses, digital technologies, processes and human capital, resulted in total operating expenses of KD 426.5 million, reflecting a year-on-year growth of 10.4%. The Group's cost to income ratio stood lower at 36.6% compared to 38.2% in 2022, reflecting our commitment to operational efficiency. Operating surplus thus grew by 18.7% year-on-year to reach KD 740.3 million.

The Group remains committed to its conservative approach in managing credit exposures and historically has reacted proactively by setting aside precautionary general provisions. In 2023, total provisions and impairments increased year on year to KD 103.1 million from KD 45.4 million in 2022 which had benefitted from significant amount of provision recoveries.

**Healthy Balance Sheet**
As of the end of December 2023, total assets grew by 3.7% year-on-year to reach KD 37.7 billion, whereas loans and advances stood at KD 22.3 billion, up by 6.1% year-on-year on increased volumes achieved in both conventional and Islamic customer segments, in Kuwait and overseas. Investment securities reflected a strong growth during the year to reach KD 6.9 billion.

Customer deposits surged by 8.8% to reach KD 21.9 billion, with the overall funding mix remaining stable and favorable to the Group. The growth in our business volumes across different segments and geographies reflect the strength of NBK's brand and reputation. In the meantime, we continue to place a strong emphasis on the quality

of our assets and have been able to consistently maintain healthy asset quality metrics. By the end of 2023, our NPL to gross loans ratio reached 1.38%, and our NPL coverage ratio was 271%, affirming NBK's success with its proactive and conservative risk management practices over the years.

**Financial Operations and Governance**
NBK Group remained committed to compliance with regulatory requirements and industry standards, ensuring transparency and accountability in our financial operations. We fostered transparency through regular investor communications, discussions with rating agencies, and the publication of important financial reports and sustainability disclosures.

**Future Outlook**
As we look ahead with optimism and determination, NBK Group remains focused on delivering strong profitability and sustainable growth. Despite potential challenges in the financial landscape, including geopolitical tensions and macroeconomic uncertainties, we are cautiously optimistic of an overall stable operating environment in 2024. We stand ready to embrace the challenges and opportunities that lie ahead. With a focus on continued innovation and digitization, we are poised to lead in an ever-changing financial environment. With our history of resilience and adaptability, we are well-positioned to overcome any challenges and capitalize on opportunities for continued success as we remain committed to upholding our legacy of trust and leadership in providing secure financial services for a sustainable future.



2023 Op. Income by Business Line (%)

Consumer 20%
Corporate 14%
NBK Wealth 10%
Islamic 19%
Int'l Bkg 24%
Others 13%

| Key ratios (%) | **2023** | 2022 | 2021 |
|---|---|---|---|
| Return on Average Assets | **1.53** | 1.48 | 1.15 |
| Return on Average Equity | **15.0** | 14.3 | 10.2 |
| Net Interest Margin | **2.59** | 2.30 | 2.21 |
| Non-interest income as % of total income | **22.4** | 25.1 | 25.6 |
| Cost to Income | **36.6** | 38.2 | 39.2 |
| NPL Ratio | **1.38** | 1.42 | 1.04 |
| Loan Loss Coverage Ratio | **271** | 267 | 300 |
| Common Equity Tier 1 Capital Adequacy Ratio | **13.0** | 12.9 | 13.3 |
| Tier 1 Ratio | **15.0** | 15.0 | 15.7 |
| Capital Adequacy Ratio | **17.3** | 17.4 | 18.1 |



2023 Net Profit by Business Line (%)

Consumer 18%
Corporate 25%
NBK Wealth 11%
Islamic 13%
Int'l Bkg 23%
Others 10%



2023 Total Assets by Business Line (%)

Consumer 13%
Corporate 14%
NBK Wealth 3%
Islamic 22%
Int'l Bkg 43%
Others 5%

# Key Performance Indicators

The delivery of NBK's strategy is measured against Key Performance Indicators (KPIs), which enable management and the Board to monitor progress towards strategic goals.

The KPIs are categorized as 'financial' and 'non-financial'. The table summarizes our overarching KPIs and provides an overview of performance against them in 2023.

| | Dimension | KPIs | Objectives | Performance 2023 |
|---|---|---|---|---|
| **Financial** | Profitability | Return on Assets | • Gradually improve to 1.5% by 2025 | 🟩 |
| | | Return on Equity | • Gradually improve to low/mid teens by 2025 | 🟩 |
| | | Cost-to-Income Ratio | • Maintain and closely manage below 40% | 🟩 |
| | Growth | Core Asset Growth | • Achieve mid/high single digit growth rate | 🟩 |
| | Resilience | % of FX, fees and commissions to total income | • Maintain ~ 22% | 🟩 |
| | | % of Operating Surplus from international business | • Gradually improve to ~30% by 2025 (excluding any potential inorganic uplift) | 🟩 |
| **Non-financial\*** | Customer Perception | Brand Awareness | • Maintain NBK's image as the leading bank in Kuwait | 🟩 |
| | | Brand Power among youth | • Maintain NBK's Brand Power in Kuwait and among Kuwaiti Youth | 🟩 |
| | Market Perception | Ratings assigned by credit agencies | • Maintain NBK's high LT credit rating | 🟩 |
| | | Ratings and scores assigned by external ESG raters | • Gradually improve ESG ratings and scores | 🟩 |
| | Maintaining Leadership in Kuwait | Market share in salaried Kuwaitis of NBK Kuwait | • Defend market share | 🟩 |
| | | Market share in corporate assets of NBK Kuwait | • Defend market share | 🟩 |
| | Employee Perception | Employee Engagement Survey | • Maintain NBK's status as a preferred employer in Kuwait | 🟩 |

**Note:** The objectives for the Bank's KPIs assume the execution of the Government of Kuwait's development plans towards the long-term goals defined in New Kuwait 2035. They also depend on gradual improvements in the political and economic stability of the MENA region over time, provisions returning to pre-financial crisis levels and no major acquisitions.

\*Non financial Indicators progress is based on third Party assessments and Data.



# Risk Management

Risk management serves as a solid foundation for the Group's resilience while seamlessly pairing with our dedication to creating future value for the Group's stakeholders. Through a balanced approach, best-in-class practices, and strict compliance with local, regional, and international regulatory frameworks, the Group Risk Management (GRM) ensures for identifying and assessing key risks, measuring the levels of Bank's risk exposure, monitoring exposure levels in light of the risk appetite on regular basis and following up and evaluating decisions relating to credit, market, operational, IT and emerging risks.

### Risk Governance
The Board and the BRCC provide overall risk management direction and oversight. NBK has meticulously established a robust Governance structure across the entire Group, acknowledging the nuanced distinctions among standalone subsidiaries. To fortify risk management and internal controls, the Group has embraced the industry-standard three-line-of-defense model, ensuring a comprehensive approach to risk mitigation and regulatory compliance through key activities across the entire organization.

### First Line of Defense: Business Owners
Identifying and capturing key risk indicators, spanning credit, market, IT & Operational, and emerging risks like ESG and Climate risks. The Group Risk Management (GRM) and the first line of defense collaboratively set policies, including risk appetites, defining individual and portfolio-level risk thresholds.

### Second Line of Defense: The Group Risk Management (GRM)
Setting up Risk Appetites (RA) and risk adjusted profitability measures for the business at transaction level to control the quality of the portfolio and following up and evaluating decisions relating to new and existing deals, impairments & provisioning and other relevant credit, market, operational, IT and other emerging risks (i.e. ESG and Climate risk) of the Group.

### Third Line of Defense: Internal Audit
Internal Audit is the third line of defense, is independent of the first line, second line and enterprise support functions of the Group. The Internal Audit provides independent, objective, reliable, and timely assurance to the Board, its Audit Committee, Group senior management and regulators over the effectiveness of governance, risk management and controls that mitigate current and evolving risks and enhance the control within the Group.

### Key Activities 2023
**Activity 1:**
Reviewing market rates changes on frequent measures particularly on Interest Rate ("IR") risk across the balance sheet items in order to translate results into measurable actions. This approach helps in taking tangible and measurable actions and aligning with effective risk management and strategic decision-making, allowing the Group to navigate and respond to changes and fluctuations in interest rate environments more adeptly.

**Activity 2:**
Performing periodic assessment of customer vulnerability towards debt services ability and significant increase in credit risk (SIC). It is a proactive and periodic evaluation of customers to rate/evaluate their financial position and identify any signs of upside credit risk.

**Activity 3:**
Factoring macro-economic indicators and assessing their significance against cost of risk estimations including IFRS9 ECL. By incorporating such, the Group aims at enhancing the accuracy of its provisioning policy towards expected credit losses and its alignment with regulatory requirements in addition to accounting standards.

**Activity 4:**
Proactively managing the liquidity position of the Bank to ensure its compliance with regulatory limits and in parallel with the Bank's risk and growth appetite.

### Credit Risk
Maintaining stability and capital conservation within a very volatile market.

**Risk Mitigation:**
- Performing periodic assessment of customer vulnerability towards debt services ability and significant increase in credit risk (SIC).
- Monitoring of marginal client and setting additional requirements (credit strengthening criteria's such as guarantees and collateralizations) for any limit increase within marginal clients or identified trouble sectors
- Continuously scrutinizing the credit rating process with various levels of maker and checker processes.

**Risk Framework:**
Adopting a comprehensive and resilient approach to assessing and mitigating credit risks throughout the lending process. Using an internal rating grade to maintain consistency and homogeneity of the portfolio.

**Outlook:**
While the business banking landscape remains challenged by economic, climate and geo-political risks, GRM will focus on building a strategy that supports the growth aspiration of the Group while maintaining a desired risk reward profile.

**Trend:**
Towards the end of 2023, the global economy was hit by a number of major incidents:
- While most economic indicators are improving, and the major Central Banks' monetary policy tightening is approaching to an end in 2024, recession fears in advanced economies are downgraded. However, the escalation of geopolitics and supply chain disruptions remain a core concern that may impact overall growth and credit portfolio.
- While the Bank's business will remain intact in emerging markets including Egypt and the Group is continuously monitoring emerging market environments and country specific ratings. Time to time, the Group controls the credit quality and tighten the foreign currencies (Fx) limits in emerging markets.
- The JN.1 variant with concerning properties likely to impact the epidemiological situation; if the trend continues, this may impact the overall global market and credit shocks to specific sectors.

**Risk Ownership Accountability:** GRM, Investment functions, credit functions, lending functions.
**Link to Strategy Pillar:** Improve profitability
**Link to KPI:** Financial KPIs

### Market Risk
Sensitivity of balance sheet against interest rates and the financial assets price volatilities

**Risk Mitigation:**
- Taking frequent measures on Interest Rate ("IR") shocks across the balance sheet accounts and translating results into measurable actions.
- Identifying market risks inherent in financial claims and loans, FX exposure, trading and investment activities.
- Adopting a conservative risk approach.
- Hedging positions to contaminate market risk; particularly, Interest Rate risk.

**Risk Framework:**
Adopting a resilient approach consisting of sound governance, sharp identification and quantification, constant monitoring, as well as timely reporting.

**Outlook:**
The anticipated interest rate and price volatilities for 2024 remaining on the high, NBK Group will adopt a conservative approach away from any speculative position. It will maintain stability, capital conservation while applying a conservative price risk across its traded and non-traded business.

**Trend:**
- 2023 witnessed a continuation of policy tightening by major central banks including the Central Bank of Kuwait. However, it is strongly believed that interest rates have reached a peak and are expected to normalize in 2024.
- Market expectation of the speed of rate cuts, especially in the US, is volatile and will depend on economic movements.
- Fixed Income instruments are hedged, thus, interest rate movements have limited impact on the Group profitability and equity. The Group would then monitor the interest outlook and manage the balance sheet to benefit from lower rates, while maintaining a comfortable liquidity position.
- Global interest rates movements coupled with the presidential election in the US could increase volatility in FX market.

**Risk Ownership Accountability:** GRM, Investment functions, credit functions, lending functions.
**Link to Strategy Pillar:** Improve profitability
**Link to KPI:** Financial KPIs

### Operational and Technology Risk
The emerging operational risk, cybersecurity risks, and other Technology-related risks.

**Risk Mitigation:**
- Implementing an Integrated Risk Management system that facilitates the maintenance of a comprehensive risk register, an approval framework to deal with residual risk treatment plans, reporting of risk indicators and operational incidents, and maintenance of business continuity impact assessments and plans.
- Reviewing in full the Group's Operational and Technology Risk policy reflecting the emerging impact of fraud risk, cybersecurity, the Bank's digitalization strategy, and threats from geo-political tensions.
- Continuously enhancing risk posture through the introduction of additional controls to layer up the defense against potential fraud and cyber threats, in addition to performing proactive risk assessments to identify potential residual risks and remediation of issues on a timely basis.

**Risk Framework:**
Adopting an industry standard risk framework with multiple layers of defense for prevention, detection, response, and recovery including policies and procedures, awareness and training for staff and customers, and the implementation of a continuous process for cybersecurity posture validation, including regular phishing simulation for assessing staff cyber security awareness.

**Outlook:**
The ongoing digitalization of services in the Financial Sector and the launch of new digital services have witnessed a change in risk profile. While Cybersecurity risks are the most common risks, there has been a noticeable increase in other risks, namely Third-Party Risks and Social Engineering attacks on the banking sector; while NBK's risk management program is continuously enhanced to address the emerging risks in the environment.

**Trend:**
- Cyber Security risks continue to evolve and be an important risk factor. The Bank has been continuously improving its cyber security risk measures.
- To address the risks, NBK has rolled out comprehensive awareness campaigns and training programs targeting its customers and employees while enhancing its technology controls to address these risks for the customers and ensure the related losses continue to be negligible.
- Post Covid 19, third party risks have been a critical factor across the globe and all sectors, the recent geopolitical conflicts have further elevated the risk of third-party risks. NBK has a established robust third-party risk management program to ensure that supplier disruptions do not impact continuity of services.

**Risk Ownership Accountability:** GRM, Operational & Technology Risk Management (ORM), Information Security, Operations, Digital functions and Business.
**Link to Strategy Pillar:** Defend the Leadership at the Core
**Link to KPI:** Financial KPIs

# Group Human Resources

**At NBK, we recognize that our success is intricately tied to the growth and well-being of our people and we take great pride in highlighting our commitment to nurturing and empowering our invaluable human capital.**

*In 2023, our efforts focused on*

**Employee Learning and Development Programs**
At the heart of our commitment to workforce development, we have meticulously designed and implemented targeted training initiatives, workshops, and educational programs aimed at elevating the skills and competencies of our employees. Central to this effort is our strategic training needs analysis process, which takes a proactive approach in identifying future shifts in our business strategy. By focusing on the reskilling and upskilling of our workforce, we ensure that our employees are well-equipped to navigate the evolving landscape of our industry.

**Professional Growth Opportunities**
In our ongoing commitment to the growth and success of our valued workforce, we have established a comprehensive framework that prioritizes career advancement, mentorship, and diverse opportunities for professional development within our organization. This multifaceted approach is designed to empower employees to chart their career paths, fostering an environment where they can thrive and contribute meaningfully. Various leadership development programs were implemented: RISE, a women's development program, High Fliers program designed for young talents, the Collective Executive Development program, a unique program targeting NBK Executives, the Middle Management Program, targeting newly recruited and promoted middle managers covering the essentials of management, and the first Tech Academy focused on top talent with technology skills.

**Talent Acquisition**
Talent Acquisition at NBK has strategically embedded sustainable practices within its recruitment processes.

We have embraced virtual interviews to significantly reduce travel and car usage among our candidates, aligning with our environmental sustainability goals. Moreover, our utilization of digital platforms for recruitment activities not only minimizes our carbon footprint but also streamlines the hiring process for efficiency and effectiveness.

In our quest to enhance social objectives, we actively engage with the community through career fairs and collaborations, focusing on building robust talent pipelines, offering internships and support programs for university students and candidates with disabilities. This approach not only facilitates their integration into corporate life but also underscores our commitment to inclusion and diversity.

To ensure ethical hiring practices, we adhere to strict governance frameworks, including fair labor standards and the provision of ability and work psychometric tests to all candidates,

guaranteeing a transparent and unbiased recruitment process. Our policies are rigorously designed to combat discrimination and promote a culture of equality and fairness across all hiring activities.

Furthermore, to continuously improve the recruitment experience, we launched initiatives aimed at enriching both the employee and hiring manager's journey. These efforts are focused on the ongoing development of our current application, hiring, and onboarding processes, ensuring they remain sustainable and inclusive.

Through these comprehensive strategies and initiatives, we have managed to create a sustainable employee experience that not only meets our current needs but also sets a solid foundation for future growth and development in alignment with our ESG commitments.

**Diversity and Inclusion Initiatives**
The Bank actively promotes gender diversity and inclusion by offering equal opportunities for career advancement and professional growth to all employees, regardless of gender. To support women in their careers, NBK provides mentorship programs, leadership training, and networking opportunities. Through these initiatives, NBK aims to create a supportive and inclusive workplace where women can thrive and reach their full potential.

**Employee Wellbeing Programs**
To ensure employee wellbeing, NBK offers comprehensive wellness programs, including health check-ups, fitness initiatives, and stress management workshops. A healthy work-life balance is promoted by providing flexible working hours and encouraging employees to utilize vacation and personal time off. By prioritizing employee well-being, NBK demonstrates its commitment to the holistic development and happiness of its workforce.

**Technology and Innovation Training**
As an HR function responsible for the Group workforce, we are at the forefront of embracing technology as a catalyst for organizational success; we have hence undertaken a strategic initiative to ensure our workforce is not only technologically adept but also at the cutting edge of innovation working towards a successful digital future. This involves the implementation of enhanced training programs that specifically target digitalization across various fields. Moreover, our commitment extends to the development of an online learning platform, accessible internationally, which serves to standardize the learning experience and foster innovation through continuous learning.

NBK Tech Academy, a groundbreaking initiative that evolved from the success of our NBK Academy offers specialized programs addressing the demand for specialized skills including Python, data visualization, open banking, digital partnerships, codifications, programming, and more. By realigning our focus to embrace these essential technological competencies, we are not only preparing our workforce for the challenges of the digital era but also positioning NBK as a leader in technological innovation within the banking industry.

**Employee Engagement and Communication**
Within our strategies employed to foster open communication, collaboration, and a positive work culture among employees. NBK conducted its third 'Your Voice Matters' survey for the employees to have a chance at expressing what it's like to work at NBK. This year, our international colleagues joined us for the second time and our colleagues from NBK Wealth for the first time to give us a full view of 'Your Voice Matters' as a global bank. We partnered with the same third party organization, Willis Towers Watson, to help design, implement and analyze the survey to ensure utmost confidentiality. We achieved an impressive response rate of 86%, significantly higher than the global average response rate of 65 – 75% and on par with the global high performance response rate of 85%. We achieved a Group-Wide Sustainable Engagement score of 84%, 1% higher than 2021 and 7% above the Financial Services industry benchmark, with our main strengths being Learning & Development, Image and Reputation, and Employee Well-Being.

*In 2024,*
We are strategically focused on cultivating a robust "Learning Culture" across the organization, leveraging automation and digital learning to enrich our EVP. Recognizing the ever-evolving landscape of talent acquisition and retention, we are committed to addressing these challenges with confidence. Our approach includes refining onboarding processes, ensuring a seamless integration for new talents into our dynamic environment.

Simultaneously, our emphasis on leadership development endeavors to nurture and empower our existing workforce, providing them with the tools and knowledge needed to thrive in a constantly changing business landscape.

By fostering a culture that values continuous learning and development, we aim not only to attract key talents but also to retain and empower our existing team, thereby fortifying NBK's position as an employer of choice in the industry.

**Our Employee Value Proposition (EVP)**
The EVP is the experience offered by NBK to its employees in return for their skills, experience, and commitment to the Bank. It is what NBK provides to attract, engage, and retain the right talent.

Our people are at the heart of our organization and will determine NBK's success. This is why it is crucial to have a clear view of the type of organizational culture and kind of people the Bank needs. To attract, engage, and retain the right talent, NBK recognizes the need to present an authentic and differentiated EVP and develop a clear employer identity.

The EVP preserves what is valued by NBK Employees and reflects a forward-looking vision of NBK's Employee Experience, which is in line with the changing realities and the evolution and future growth of our organization.

NBK's vision, mission, and values coupled with the Bank's strategy and leadership commitment form the grounds for building the foundations of an agile EVP. Our employees' voices are placed at the center of developing our EVP to ensure their essential needs, expectations, and aspirations are captured in a way that aligns with our mission and helps us attract, retain, and engage the right people. Summarized into three pillars:

1. **"Our Success Story"**, You are part of an incredibly powerful brand and legacy. Together, we continue our journey of success.
2. **"Professional Excellence"**, You work with outstanding professionals, who uphold high standards and encourage you to achieve ambitious goals.
3. **"Accelerated Learning"**, You continuously learn in a culture that drives personal growth and truly values long-term learning.

The EVP pillars are grounded by the Bank's employee experience. They are considered the most important aspects of working at NBK as experienced by our employees by portraying the current state and desired future. Addressing the improvements required to fully deliver on every aspect of all EVP pillars, NBK has defined a two-year action plan based on prioritizing the areas where it has the most potential and is able to achieve the greatest impact. NBK is committed to focus on these areas that matter most to our employees to further improve our employee experience in line with global standards and leading industry practices.


Number of Global Employees: 8,049
Gender Repartition:  Male (56%);
                     Female (44%);
28.8% Females in managerial positions


Nationalities Employed: 39
Nationalization Rate:76.7%


Science, Technology, Engineering, and Math (STEM) employees: 263 with 27.8% of women in STEM positions.


Training Hours Given:  147,701 (locally)
                       36,764 (internationally)

# ESG

**We Aim for Better, Today, Tomorrow and Beyond**
At NBK, we have a duty to embrace sustainable practices and drive positive environmental, social, and governance (ESG) outcomes. In recognizing the profound impact businesses have on the world, we are committed to integrating responsible and ethical considerations into our operations. Through transparent reporting and accountability, we aim to enhance our stakeholders' trust and contribute to the long-term well-being of both society and the environment.

**NBK's Strategic Roadmap for Sustainable Impact**
The initial approval and endorsement of the ESG Strategy by Management occurred in late 2022, officially setting sail into the promising journey of 2023. Our ESG Strategy aligns with NBK's overarching goal of supporting customers, contributing to economic development, and positively impacting the communities in which we operate. Each pillar has a distinct

ambition and mission, contributing to the Bank's broader ESG objectives. A 3-year roadmap was developed, outlining key targets and commitments in areas with the greatest potential.

*Our ESG Strategy prioritizes four interrelated key pillars:*

**Pillar 1: Governance for Resilience:** Our commitment to transparency and accountability.

**Pillar 2: Responsible Banking:** Our dedication to conducting business sustainably.

**Pillar 3: Capitalizing on Our Capabilities:** Our commitment to developing an agile organizational architecture.

**Pillar 4: Investing in Our Communities:** Our pledge to achieving positive and measurable impact.

**NBK Group ESG Strategy Framework**



## External Engagement and Recognition

**ESG Ratings**



**NBK's rating at 'BBB' per the MSCI audit**



Constituent of the FTSE4Good Index Series



**"C" score for 2023 for both the Climate Change and Forests Categories**



**Listed on Refinitiv AFE Low Carbon Select Index in the Middle East and North Africa (MENA)**



**NBK is at medium risk (27.4) of experiencing material financial impacts from ESG factors**



NBK obtained LEED v2009 for New Construction Gold-certified status from U.S. Green Building Council (USGBC)

**National and Global Frameworks**



Boursa Kuwait ESG Reporting Guidelines



New Kuwait Vision 2035



Global Reporting Initiative (GRI) Standards



UN Sustainable Development Goals (UN SDGs)



GHG Protocol



UN Global Compact (UNGC)



Sustainability Accounting Standards Board (SASB)

## Pillar 1: Governance for Resilience

Our strong governance framework is built on accountability, trust and our values and is fundamental to our long-term organizational success. We have a robust set of policies, internal controls, and management processes to ensure our business operates responsibly and ethically.

*In 2023, we*

- Received Board approval to the Group ESG Strategy, establishing formal mandate for implementation across the Group
- Formally integrated ESG-related metrics into the Board of Directors' and Executive Management responsibilities, charters, oversight, and affairs
- Finalized and approved ESG Governance Structure and Framework that assigns ESG responsibility across members of the Executive Management

- Established management-level Sustainability & Climate Change Committee headed by the Vice Chairman & GCEO and with direct oversight from the Board of Directors
- Established five Sustainability Sub-Committees, assigning members of the Executive Management with ESG roles within their relevant areas
- Joined the UNGC as part of the Bank's efforts to enhance its international alignment and stakeholder engagement
- Initiated a pre-assessment to align with the recommendations of the Taskforce for Climate-related Financial Disclosures (TCFD). To that end, provided capacity building workshops for key stakeholders across the Bank responsible for the implementation of TCFD

**Climate Risk Management**
NBK is committed to developing economic, environmental, and social risk resilience across the Group while setting an effective and robust ESG governance structure in Kuwait and beyond.

#### NBK Kuwait

- Integrated ESG risks into the Board's and Executive Management responsibilities and oversight
- Empowered the role of Board Risk and Compliance Committee in managing climate-related risks and opportunities
- Established a management-level ESG Governance and Risk Committee, chaired by Deputy Group CEO
- Accounted for climate change risks in the Pillar II Assessment presented in the ICAAP regulatory report
- Institutionalized alignment with the recommendations of Taskforce on Climate-related Financial Disclosures (TCFD). In the process of developing a bank-wide Environmental & Social Risk Management (ESRM) Framework
- Introduced ESG scoring into corporate clients' credit assessments and creditworthiness evaluations

#### NBK International Subsidiaries

**NBK - International London**
- In compliance with the Bank of England's Supervisory Statement (SS3/19) for managing financial risks from climate change, NBK-I established appropriate policies and processes to manage climate-change risks

**NBK Singapore**
- In response to the regulatory guidelines issued by Monetary Authority of Singapore (MAS) on the "effective governance, robust risk management, and meaningful disclosure of environmentally-related risks", NBK Singapore developed an Environmental Risk Management Framework

**NBK - Egypt**
In line with Central Bank of Egypt (CBE) Guiding Principles for Sustainable Finance issued in 2022:
- Incorporated sustainable financing principles within the Bank's credit and investment policies
- Effective August 2023, engaged with an accredited environmental expert by Egypt's Ministry of Environment to assess the environmental risks of large corporate projects

## Pillar 2: Responsible Banking

Our unwavering commitment to fostering economic, social, and environmental progress is rooted in our business ethos. We conduct our business responsibly as a strategic imperative for sustainable development and actively engage with clients to encourage the adoption of sustainable practices.

**Transition to Low Carbon Economy**

Our commitment unfolds in several key principles:

- **Responsible Procurement:** Committed to fully integrate ESG across our supply chain
- **Decarbonization:** Committed to developing formal systems to assess and manage ESG-related risks and opportunities in financing activities and operations
- **Portfolio Alignment:** Committed to USD 10 billion of Sustainable Assets by 2030. As of 31 December 2023, the Bank has around USD 3.5 billion Sustainable Assets
- **Sustainable Finance:** Committed to developing innovative sustainable finance value propositions for our clients and to strategically support their transition plans
- **Net Zero:** Committed to achieve Carbon Neutrality by 2060 and established interim targets to reduce gross operational emissions by 25% by 2025

**NBK Sustainable Financing Framework Key Facts**

- Launched in 2022
- Developed in line with the International Capital Markets Association (ICMA) principles
- Second Party Opinion (SPO) received from Standard & Poor's, confirming its alignment with the ICMA principles
- **Objective**: Designed to support and further NBK's ambition to integrate critical ESG issues into its business, culture, and operations, thereby advancing the transition to a sustainable and low carbon economy and contributing to achieving Kuwait's sustainable development agenda under the New Kuwait Vision 2035
- **Approach**: The Sustainable Financing Framework defines the criteria for NBK to develop both Green Financing Instruments for projects in renewable energy, green building, and the like, and Social Financing Instruments for projects in areas such as healthcare, education, affordable housing, and employment generation

*In 2023, we*

- Aligned GHG emissions with the GHG Protocol Global Framework
- Approved the installation of solar panels as a renewable source of energy in 24 of our local branches by 2025
- Installed Building Energy Management System (BEMS) in 22 of NBK's local branches to monitor, control, and optimize the Bank's energy and water consumption
- In 2022, reduced both total electricity consumption and electricity intensity by 11%, saving more than 6.4 million kWh
- In 2022, reduced both total water consumption and water intensity by 9%, saving more than 3.5 million Imperial Gallons (IG) of water
- Recycled 99.25 metric tons of paper. Over the past two years recycled a total of 226.35 metric tons of paper
- Committed to responsible and sustainable procurement through embedding ESG risks into vendor sourcing and management
- Reviewed and updated the Bank's Procurement policies to embed ESG-related principles in its vendor sourcing and management processes
- Ensured all our outsourcing contracts operate under Kuwaiti Labor Law
- Committed to environmental finance through our Sustainable Financing Framework
- Expanded our consumer banking offerings to Eco-friendly EV Loans and Eco-friendly Housing Loans

## Pillar 3: Capitalizing on Our Capabilities

Our ambition is to drive sustainable business growth achieved through organizational resilience. At the core of our bank's growth and prosperity lies our invaluable team, the driving force behind our accomplishments and our culture and practices that enable bank-wide ESG transformation.

*In 2023, we*

- Diversity and inclusion in the workplace: Women in workforce 44%, women in management 28.8%
- Provided key Sustainability Champions across the Bank with a Global Reporting Initiative (GRI) Standards training program
- Launched a Group-wide specialized training module focused on essential sustainability concepts
- NBK Kuwait employees received 147,701 training hours. Also, provided 3,313 training hours on ESG-related topics with focus on Sustainability Awareness, Sustainable Finance, and Climate Risk Management

- Launched employee engagement survey "Your Voice Matters" 2023, providing employees with the opportunity to share their opinions and feedback on how to make NBK an even better place to work
- Developed a formal grievance policy to help address employee concerns in a constructive and fair manner, published on the Group website
- Launched a new mobile banking experience for NBK customers themed "Tailored for You", to provide them with the latest and most advanced digital services

**Our Employee Value Proposition**
Our Employee Value Proposition (EVP) extends beyond traditional benefits and remuneration where it embodies a commitment to fostering a workplace where individual growth and collective success converge. At NBK, we recognize and value the unique contributions of each team member, providing opportunities for professional development, a dynamic work environment, and a culture that encourages innovation.

**We Promote Health, Safety, and Wellbeing**
Our commitment to employee health and wellbeing through various targeted initiatives and enhanced policies. Our focus on health, safety, and wellbeing goes beyond industry norms to ensure primary care for employees, aligning with international standards and regulations.

Wellbeing Initiatives:

- NBK Clinic: Operated and managed through a partnership with Wara Hospital to provide employees with specialized on-site medical support
- Organized regular visits for specialized doctors to NBK Clinic throughout the year
- Awareness Campaigns:
  - Mental health – work life balance knowledge bites from specialized practitioners
  - Breast Cancer: A month dedicated to awareness and on-site screening available to female employees
  - World Diabetes
  - Movember
- Introduced paternity leave - fathers are entitled to 3 days of paternity leave

**We Foster Learning and Development**
We proactively undertake the responsibility of upskilling our employees, preparing them to navigate the challenges posed by dynamic market landscapes and evolving industry demands. This forward-thinking investment not only empowers our workforce to excel in the face of challenges but also positions our organization at the forefront of innovation and competitiveness.

**Leadership Development Programs Initiatives:**

- **RISE:** Designed for women's development
- **High Flyers Program:** Designed for young talents
- **Collective Executive Development Program:** Designed for NBK Executives
- **Middle Management Program:** Targets middle managers and newly promoted managers covering the essentials of management
- **NBK Academy:** Established in 2008 to provide upskilling training for fresh Kuwaiti graduates to prepare them for their lifetime career
- **NBK Tech Academy:** Focused on technology skill sets
- **GRI Certified Training:** Addressed to key Sustainability Champions across the bank
- **Data Mindset Curriculum:** Launched to provide employees with a basic understanding of the data requirements in the Banking sector
- **Specialized Trainings:** Developed various interventions to cater for specialist functions and business needs i.e., Operations, Compliance, Legal, Audit, Risk Management, and Sustainability
- **Off-site Trainings:** Top talents attended leadership and executive leadership development programs with various top tier universities and training providers such as INSEAD, Harvard Business School, Franklyn Covey, and more

**We Enhance Employee Satisfaction and Growth**

The Performance Management system at NBK stands as a beacon for employee development, aligning individual goals seamlessly with organizational objectives. The introduction of self-individual reviews and surveys for candidates and hiring managers enhances transparency and reflects our steadfast commitment to fostering the holistic growth of each and every employee within NBK.

**Employee Satisfaction and Growth Initiatives:**

- "Your Voice Matters" 2023: Launched the Employee Engagement Survey to measure the extent to which employees feel valued, involved, and invested in NBK's mission and its success. This survey is conducted every two years
- In 2023, NBK Group achieved an impressive response rate of 86% with a positive Sustainable Engagement score of 84%, 1% higher than our previous survey in 2021 and 7% higher than the Global Financial Services industry average

**We Champion Diversity, Equity, and Inclusion**

At NBK, we take immense pride in being the employer of choice that champions equal opportunities for all. In 2023, NBK committed to increase women in management to 35% by 2035. This commitment is evident in significant policy updates and shifts, changes in the annual ticket policy and sustained efforts aimed at enhancing the representation of women in leadership positions, reinforcing our commitment to fostering an inclusive and equitable workplace.

Our unwavering commitment to fostering inclusivity is set to reach new heights with the development and launch of a comprehensive Diversity, Equity, and Inclusion (DEI) strategy in 2024.

**The HR Landscape at NBK**



Number of Global Employees: 8,049
Gender Repartition:   Male (56%);
                      Female (44%);
28.8% females in managerial positions



Science, Technology, Engineering, and Math (STEM) employees: 263 with 27.8% of women in STEM positions



Nationalities employed: 39
Nationalization rate:76.7%



Training hours given:  147,701 (locally)
                       36,764 (internationally)

**Prominent Recognitions**
Awarded by MEED International Magazine

| Best Initiative for Women in Business | Best Implementation of Diversity & Inclusion Initiatives |
| --- | --- |

**Digitalization at the Core**

In line with NBK's ESG Strategy pillar of 'Capitalizing on Our Capabilities' and its commitment to "establish a digital and agile work environment", and driven by the Group's Digital Transformation Strategy, developing innovative digital solutions is key for the seamless integration between NBK's core business strategy and its ESG Strategy.

*In 2023, we*

- Recorded more than 50 million transactions through NBK Mobile Banking Application; a YOY growth of 19% in 2023
- Total active customers executing their banking transactions digitally, including mobile and online banking was around 500k
- Integrated the SmartWealth investment service within the NBK Mobile Banking Application, which allows NBK customers to invest in global markets through a quick and simplified process

**Prominent Recognitions**
Awarded by Global Finance

| Group Digital Office named "Best Financial Innovation Labs 2023" | Named "Best Innovation and Transformation – 2023" Globally and in the Middle East |
| --- | --- |

## Pillar 4: Investing in Our Communities

Our commitment is to uphold our strong legacy of maximizing the social impact of our businesses and operations while creating shared value in the communities where we operate. Our efforts are focused on providing optimal customer service and advocacy, increasing financial inclusion, accessibility and literacy, and ensuring customer protection and data privacy and security.

| Focus Areas | Key Community Partners |
| --- | --- |
| - Women Empowerment<br>- Healthcare & Wellbeing<br>- Youth & Education<br>- Fostering Workplace<br>- Caring for the Environment<br>- Community Outreach | - Lothan Youth Achievement Center (LOYAC)<br>- Creative Confidence<br>- Kuwait Red Crescent Society (KRCS)<br>- Kuwait Association for the Care of Children in Hospital (KACCH)<br>- Bayt Abdullah Children's Hospice (BACCH)<br>- Center 21 for Special Needs |

*In 2023, we*

- Partnered with Visa on 'She's Next' initiative, a global advocacy program that supports women-owned small businesses
- Officially launched the 'Bankee' financial literacy program in public and private schools, with 15,130 students and around 3,000 teachers participating
- Actively involved in the Central Bank of Kuwait's "Let's Be Aware" campaign, focusing on raising awareness on critical financial and data security matters
- NBK organized a Media Awareness Workshop on Sustainability and Climate Change, the first-of-its-kind in Kuwait
- Signed an agreement with Kuwait Municipal for the development and beautification of Shuwaikh Beach Waterfront spanning an area of 1.7 km, in line with sustainable design principles

- Launched new designs for all our cards with customer-tailored features, including design themes especially for the visually impaired
- Renewed its sponsorship of the Kuwait Dive Team (KDT) for the second year in a row, with the aim of rehabilitating and protecting Kuwait's marine environment and ecosystem. In 2023, removed 150 tons of plastic, discarded fishing nets, and shipwreck from Kuwait's bays and coasts, an eight-fold increase from 2022
- Recorded zero incidents of data leaks or breaches

**Promoting and Nurturing Local Talent**

- Continued efforts to support and nurture local talent. As of 31 December 2023, Nationalization rate was 76.7%
- Launched NBK Tech Academy, first of its kind training program, focused on upskilling young local talent on digital and data technologies
- In 2023, launched NBK Academy Wave 27 and Wave 28 with a total of 37 candidates

**Making a Positive Impact on Our Communities**

- KD 28 million total community investments, a 22% increase from 2022
- KD 20 million SME lending, a 12% increase from 2022
- Maintained ISO 27001 Certification and is compliant with Central Bank of Kuwait (CBK) Cybersecurity Framework

**Prominent Recognitions**
Awarded by Euromoney

| Awarded "Best Bank for Corporate Responsibility in the Middle East 2023" |
| --- |

## Moving Forward

As a responsible and sustainable financial institution, we leverage our business not only to foster economic growth but also to promote positive change. For the future and beyond, we are capitalizing on our leading role to influence and drive acceleration of ESG integration by enhancing our international alignment with prominent sustainability frameworks and standards. Given the widespread exposure to climate change concerns, promoting sustainable finance, and fully integrating ESG and climate risk into core financial strategies hold the utmost importance for the GCC to build economic resilience and adapt and mitigate the effects of climate change.

*In 2024, we will*

- Focus on climate risk management through the development of a bank-wide Environmental and Social Risk Management (ESRM) Framework and integration of climate risks and opportunities in related processes
- Increase stakeholder engagement and international alignment by engaging with and joining sustainability frameworks and industry-led initiatives
- Grow our sustainable finance value proposition and focus on the decarbonization of our portfolio in line with our carbon neutrality commitment



# Governance

NBK is aligned with international best practice in Corporate Governance.
It is the responsibility of the Board of Directors and its Committees to ensure that regulatory, compliance and ethical standards are upheld across the Bank and its subsidiaries.

# Board of Directors



### Mr. Hamad Mohamed Al-Bahar
**Chairman**

Mr. Al-Bahar has been a Board Member of NBK since 2005 and Chairman of the Board since March 2022. He is Chairman of Board Corporate Governance Committee and the Board Credit Committee.

Mr. Al-Bahar sat on the Board of the Kuwait Investment Company from 1981 to 1991, where he served as Chairman and Managing Director. He also served as Managing Director of the Bank of Bahrain and Kuwait. He has extensive experience in Investment Banking and Asset Management, in addition to internal controls.

Mr. Al-Bahar holds a Bachelor of Arts degree in Economics from Alexandria University, Egypt.



### Mr. Isam Jassim Al-Sager
**Vice Chairman and Group Chief Executive Officer**

Mr. Al-Sager joined the Bank in 1978 and was appointed as GCEO in March 2014. He joined the Board in March 2022 where he was elected as Vice Chairman. He had previously served as Deputy Group Chief Executive Officer since 2010. He is a member of the Board Credit Committee.

Mr. Al-Sager serves as the Chairman or member of several of the group's management committees. He is Chairman of the board of NBK (International) PLC and serves on the board of directors of Watani Wealth Management (Kingdom of Saudi Arabia). Mr. Al-Sager is a board member of MasterCard. He was the Chairman of National Bank of Kuwait – Egypt until May 2019 and a Vice Chairman of the Turkish Bank and Board member of Watani Holding and NBK Trustees (Jersey) Limited. Mr. Al-Sager enjoys an extensive banking experience at NBK and has played a major role in turning the Bank into a leading regional institution with a wide international presence.

Mr. Al-Sager holds a Bachelor of Science degree in Business Administration from California State Polytechnic University, United States.



### Mr. Yacoub Yousef Al-Fulaij
**Board Member**

Mr. Al-Fulaij has been a Board Member of NBK since 1998 and was General Manager at the Bank from 1983 to 1998. He is also a member of the Board Credit Committee and Board Corporate Governance Committee. Mr. Al-Fulaij has broad experience of banking activities, including Risk Management and Internal Controls.

Mr. Al-Fulaij holds a Bachelor of Arts degree in Business Administration from the University of Miami, USA.



### Mr. Muthana Mohamed Ahmed Al-Hamad
**Board Member**

Mr. Al-Hamad has been a Board Member of NBK since 2007. He is also a member of the Board Nomination and Remuneration, the Board Audit, the Board Risk and Compliance Committee and the Board Corporate Governance Committee. Additionally, Mr. Al-Hamad is the Vice-Chairman of Alwatyah United Real Estate Company and was Chairman of Future Communication Company International from 2005 to 2014. He was previously a Board Member of the Arab European Company for Financial Management (AREF) from 1987 to 1993, and served on the Board of the Commercial Bank of Kuwait from 1993 to 1997, as well as the United Bank of Kuwait (London) from 1996 to 1997. He has considerable experience in Finance and Business Economics.

Mr. Al-Hamad holds a Bachelor of Arts degree in Economic and Political Science from Kuwait University.



### Mr. Haitham Sulaiman Hamoud Al-Khaled
**Board Member**

Mr. Al-Khaled has been a Board Member of NBK since 2010. He is also a member of the Board Audit Committee, Board Risk & Compliance Committee and the Board Nomination and Remuneration Committee.

Mr. Al-Khaled has been a Board Member of Al Shall Investments Holding Co. since 2005 and Al Arjan International Real Estate Company since 2010, where he has been Chairman since 2014.

Mr. Al-Khaled is also a Board member of Rasameel Investments Co. since 2016 and Kuwait Insurance Co. since 2019 and at ACICO Industries Co. since 2021.

Mr. Al-Khaled previously held the following positions at the leading telecom operator, Zain: Chief Business Development Officer, Chief Executive Officer for the Middle East and Chief Strategy and Business Planning Officer, amongst other responsibilities. He has extensive experience in strategic planning, investments, mergers and acquisitions, corporate governance and internal controls.

Mr. Al-Khaled holds a Bachelor of Science degree in Electronic Engineering from Kuwait University.



### Mr. Emad Mohamed Al-Bahar
**Board Member**

Mr. Al-Bahar joined NBK as a Board Member in August 2014, following the passing away of the former Chairman, Mr. Mohamed Abdul Rahman Al-Bahar. He is also a member of the Board Nomination and Remuneration Committee and the Board Credit Committee.

Mr. Al-Bahar is the Chairman of Dar Labit Holding since 2015 and a Member of the Executive Board of Al-Bahar Group, one of the oldest trading conglomerates in Kuwait and the Middle East. In addition to his role on the Executive Board and in the strategic decision-making team at Al-Bahar, he is a Board Member of Al Ahlia Insurance Company Kuwait since 1999 and the Vice-Chairman since 2017 and served on the Board of the Gulf Bank from 1992 to 1994.

Mr. Al-Bahar holds a Bachelor's degree in management from the American University in Washington DC, USA.

# Board of Directors (continued)



### Mrs. Huda Mohammad S. Al-Refaei
**Board Member**

Mrs. Al-Refaei has been a Board member since March 2022. She is a member of the Board Risk and Compliance Committee and the Board Corporate Governance Committee.

Mrs. Al-Refaei worked as a risk management officer at the Bank from 1999 to 2003. She served as a board member of Posta Plus Company from 2008 to 2012 and as a senior lawyer at Abdullah Al-Refaei Legal Consultancy & Law Firm from 2009 to 2019.

Mrs. Al-Refaei holds a Bachelor's degree in Industrial and Systems Engineering from Kuwait University, Kuwait and a Bachelor of Law degree from Cairo University, Egypt.



### Dr. Robert Maroun Eid
**Independent Board Member**

Dr. Eid has been an Independent Board member since March 2021. He is the Chairman of the Board Risk and Compliance Committee. He is also a member of the Board Audit Committee.

Dr. Eid has served as a Managing Director & Chief Executive Officer of the Arab National Bank in Saudi Arabia from 2005 till January 2021. He also spent over 22 years with the National Bank of Kuwait as head of International Banking Group in addition to serving as a Managing Director & Chief Executive Officer of the National Bank of Kuwait (International) PLC from 1998 till 2005. He has nearly four decades of international experience in banking.

Dr. Eid holds a PhD in Money & Banking from Sorbonne University, France.



### Dr. Nasser Saidi
**Independent Board Member**

Dr. Saidi has been an independent Board member since March 2021. He is a member of the Board Audit Committee.

Dr. Saidi was the Minister of Economy and Trade and Minister of Industry of Lebanon between 1998 and 2000. He was the first Vice-Governor of the Central Bank of Lebanon for two successive mandates, from 1993 to 2003.

He is the former Chief Economist and Head of External Relations of Dubai International Financial Centre and Executive Director of the Hawkamah-Institute for Corporate Governance. He is the Founder and Chair of the MENA Clean Energy Business Council.

Dr. Saidi holds a PhD and a MA in Economics from the University of Rochester in the USA, a M.Sc. from University College, London University, United Kingdom and a BA from the American University of Beirut, Lebanon.



### Mr. Abdulwahab Ahmad Al-Bader
**Independent Board Member**

Mr. Al-Bader has been an Independent Board member since March 2022. He is the Chairman of the Board Nomination and Remuneration Committee and a member of the Board Corporate Governance Committee.

Mr. Al-Bader held a number of senior positions at Kuwait Fund for Arab Economic Development from 1977 to 2021, with the most recent being the General Manager from 2005 to 2021. He was also the alternate governor for the State of Kuwait to the OPEC Fund for International Development from 1981 to 1986, governor from 1986 to 2014 and Chairman of the governing board from 2014 to 2021. He has also been a director of various entities.

Mr. Al-Bader holds a Bachelor of Arts degree from Whittier College, USA.



### Mr. Farouk Ali Akbar Bastaki
**Independent Board Member**

Mr. Bastaki has been an Independent Board member since March 2022. He is the Chairman of the Board Audit Committee and a member of the Board Risk and Compliance Committee.

Mr. Bastaki has been an Independent Board Member of Mabanee Co. since March 2022. He held a number of senior positions including member of the Board of Directors and Managing Director of the Kuwait Investment Authority, Chairman of the Board of St. Martins Property Group (London) and Chairman of the Board of Directors of National Technology Enterprises Company. Mr. Bastaki previously served as board member of Gulf Bank and Board member of the Kuwait Fund for Economic Development in addition to a membership in Fosterlane (USA). He has extensive experience for more than 33 years in finance, alternative investments and real estate investments locally and internationally. He also has deep knowledge in internal audit, risk management, governance, compliance and anti-money laundering.

Mr. Bastaki holds a Bachelor's degree in Industrial Engineering from University of Miami, USA.

# Executive Management



## Mr. Isam Jassim Al-Sager
**(Vice Chairman & Group Chief Executive Officer)**

Mr. Al-Sager joined the Bank in 1978 and was appointed as Vice Chairman & GCEO in March 2022. He had previously served as Group Chief Executive Officer since 2014. He is a member of the Board Credit Committee. Mr. Al Sager serves as the Chairman or member of several group's management Committees.

Mr. Al-Sager is the Chairman of the Board of NBK (International) PLC and serves on the Board of Directors of Watani Wealth Management (KSA). Mr Al-Sager is a Board member of MasterCard. He was the Chairman of National Bank of Kuwait – Egypt, Vice Chairman of The Turkish Bank and Board member of Watani Holding and NBK Trustees (Jersey) Limited.

Mr Al-Sager enjoys an extensive banking experience at NBK and has played a major role in turning the Bank into a leading national institution with a wide international presence.

Mr. Al-Sager holds a Bachelor of Science Degree in Business Administration from California State Polytechnic University, USA.



## Mrs. Shaikha Khaled Al-Bahar
**(Deputy Group Chief Executive Officer)**

Mrs. Al-Bahar has been the Deputy Group Chief Executive Officer since March 2014. She is a member of various Management Committees. She is the Chairperson of NBK Egypt, NBK France and NBK Lebanon. Mrs. Al-Bahar serves on the Board of NBK (International) PLC, United Kingdom, NBK Global Asset Management Limited and Turkish Bank. Mrs. Al-Bahar has experience in project finance, advisory services, bond issues, Build/Operate/ Transfer financing and Initial Public Offerings. She holds a Bachelor of Science degree in International Marketing from Kuwait University, and has attended specialized programs at Harvard Business School, Stanford University, Wharton School and Duke University (USA).



## Mr. Salah Yousef Al-Fulaij
**(Chief Executive Officer – Kuwait)**

Mr. Al-Fulaij joined NBK in 1985 and has been the Chief Executive Officer – Kuwait since 2015. He is a member of various Management Committees. Mr. Al-Fulaij serves on the board of NBK France and NBK Capital. He was the Chief Executive Officer of NBK Capital from 2008 to 2014, and previously Group General Manager of Treasury and Investments Services. Mr. Al-Fulaij is a graduate of the University of Miami, where he received his Bachelor's Degree in Industrial Engineering and his MBA in Business Management. He has participated in a number of executive programs at Harvard Business School, Stanford Graduate School of Business, and Duke University (USA).



## Mr. Sulaiman Barrak Al-Marzouq
**(Deputy Chief Executive Officer – Kuwait)**

Mr. Al-Marzouq joined NBK in 2002 and now he is the Deputy Chief Executive Officer – Kuwait since 2017. He moved to the Central Bank of Kuwait from 2012 to 2015, where he headed the Department of Foreign Operations, before moving back to NBK as Group Treasurer. Mr. Al-Marzouq serves on the board of NBK Egypt, NBK Capital and Hayat Investment Company. He is a member of various Management Committees. He has extensive experience in Investment and Wealth Management, in addition to experience in Treasury and Banking Operations. He has served as a Board Member for several banks and companies in Kuwait. Mr. Al-Marzouq holds a bachelor's degree in Economics from Portland State University, USA.

# Executive Management (continued)



### Faisal Abdulatif Al-Hamad
**(CEO of NBK Wealth)**

Mr. Al-Hamad has been the CEO of NBK Wealth Management since April 2021. He serves as the Chairperson of NBK Capital, in addition to serving as a board member on several other NBK Group entities, and a member of various Management Committees. Prior to that, Mr. Al-Hamad was the CEO of NBK Capital and held several senior positions there since joining in 2007. Mr. Al-Hamad has previously held several senior positions in leading organizations, including General Manager at Agility Kuwait and Associate Director at Wellington Management International in the UK. Mr. Al-Hamad holds an MBA from Harvard Business School and a Bachelor's Degree from the University of Chicago.



### Mr. Omar Bouhadiba
**(CEO International Banking Group)**

Mr. Omar Bouhadiba joined NBK in November 2020 as CEO of International Banking Group. Mr. Bouhadiba serves on the Board of NBK (International) PLC, United Kingdom , NBK Egypt and NBK France. He has an extensive experience in corporate and investment banking, with Bank of America, Mashreq Bank, NBK, Arab Bank plc and most recently with Barwa Bank as Senior Advisor to the Board of Directors and International Bank of Qatar as Chief Executive Officer. Mr. Bouhadiba holds a Master's Degree in Business Administration (MBA) in Finance from the Wharton School of Finance of the University of Pennsylvania (USA).



### Mr. Emad Al-Ablani
**(General Manager – Group Human Resources)**

Mr. Al-Ablani joined NBK in March 2003 and was appointed as General Manager – Group Human Resources in 2014. He is also a member of various Management Committees. Former appointments at NBK include Deputy General Manager, Head of Human Resources – Kuwait and Assistant General Manager – Recruitment & HR Operations. He has an extensive experience in Human Resources. Mr. Al-Ablani holds an Executive Master's degree in Business Administration (EMBA), from the American University of Beirut (Lebanon) and a Bachelor of Arts Degree in Educational Psychology from Kuwait University.



### Mr. Mohammed  Al Othman
**(Chief Executive Officer of Consumer & Digital Banking for the Group)**

Mr. Mohammed Al Othman joined NBK Group in 2006 and has been Chief Executive Officer of Consumer & Digital Banking for the Group since May 2023. Prior to that he was Head of Consumer Banking Group since April 2018. He is also a member of various Management Committees. Mr. Al Othman is the Chairman of the Shared Electronic Banking Services Company (K-Net) and a member since 2014. Mr. Al Othman has extensive expertise in retail banking, Digital Banking, personal banking, payment services and banking products. Mr. Al-Othman holds a Bachelor's Degree in Philosophy from Kuwait University and has attended several training programs at Harvard Business School, Columbia Business School and Insead.



### Mr. Sujit Ronghe
**(Group Chief Financial Officer)**

Mr. Ronghe joined the Bank in 2002 and was appointed as Group Chief Financial Officer from June 2022. He has been the Group Financial Controller since 2012. Prior to joining the Bank, Mr. Ronghe worked as a Senior Auditor at a Big4 accounting firm in Kuwait. He has extensive experience in finance and banking. Mr. Ronghe is a member of the Institute of Chartered Accountants of India and a graduate of the Institute of Cost Accountants of India. He also holds a Bachelor of Commerce Degree from the University of Pune, India.



### Mr. Ahmed Bourisly
**(General Manager - Corporate Banking Group)**

Mr. Bourisly joined NBK in 1998 and has been General Manager, Domestic Corporate Banking at NBK since June 2019. He served on the Board of NBK Capital until January 2015. He serves on the Board of Boubyan Takaful. He is also a member of various Management and Credit Committees. Mr. Bourisly has extensive experience in all areas of Credit and Corporate Banking Management. He holds a Bachelor's Degree in Business Administration with a concentration in Marketing from University of the Pacific, CA. He attended numerous training courses and seminars at Harvard University (USA) and INSEAD, France.

# Executive Management (continued)



### Mr. Pradeep Handa
**(General Manager - Foreign Corporate, Oil and Trade  Finance Group)**

Mr. Handa joined NBK in 1980 and has been General Manager - Foreign Corporate, Oil and Trade Finance Group since 2012. He is also a member of various Management Committees. Former appointments at NBK include Assistant General Manager, Executive Manager and Senior Manager at Corporate Banking Group - Kuwait. He has an extensive experience in handling Foreign Corporate Banking and Oil and Trade Finance matters. Mr. Handa holds a Master's Degree from the University of Delhi, India.



### Mr. Mohammed Al Kharafi
**(Chief Operating Officer- Head of Operations and Information Technology for the Group)**

Mr. Mohammed Al Kharafi joined the Group in 2001 and has been Chief Operating Officer - Head of Operations and Information Technology for the Group since May 2023. He serves also as a member of various Management Committees. Prior to that, he held several leadership positions in Operations and Consumer Banking Group. He served on the board of the Credit Information Network Company (Ci- Net). He has extensive experience in retail banking, Digital banking; Intelligent Automation, Technology and operations. Mr. Mohammed Al Kharafi has a Bachelor's Degree in Business Administration from the Arab Open University. He has participated in a number of Executive Education Programs at Harvard Business School, Chicago Booth School of Business, Stanford, Columbia Business School, Insead and American University of Beirut.



### Mr. Jad Zakhour
**(General Manager – Head of Treasury Group)**

Mr. Zakhour joined the Group in 2006 and has been Head of Treasury Group since Jan 2020. He was previously the Deputy Group Treasurer since August 2014. He is also a member of various management committees. Mr. Zakhour has extensive experience in treasury, investment and wealth management. Mr. Zakhour holds a Bachelor's Degree in Civil Engineering from Homs University and a Master's Degree in Business Administration in Finance from American University of Beirut. He is a Certified Financial Risk Manager (FRM). Mr. Zakhour has participated in a number of Executive Programs at Harvard Business School and INSEAD.



# Corporate Governance Framework

National Bank of Kuwait Group is aligned with the best international Corporate Governance practices and risk management, to protect stakeholders' rights. During 2023, the Group adhered to all the provisions and determinants of CBK instructions regarding the Corporate Governance rules and standards for Kuwaiti banks, issued in September 2019, as well as the regulatory instructions related to governance in Kuwait and those issued by other countries in which the Group's entities operate.

Represented by the effective supervisory role of the Board of Directors and the Executive Management, the Group focused on improving the Corporate Governance and compliance culture across all of its entities, where the Corporate Governance Framework is constantly developed to establish sound and effective corporate values. This is achieved through a set of policies, procedures and standards adopted by the Group, which are periodically updated to be in line with the best applicable and relevant international practices.

The Group recognizes the importance of applying the principles and standards of good governance; It follows professional and ethical standards in all kinds of deals, and ensures disclosure and transparency of information that is accurate and timely. This contributes to the development of the Group's working efficiency and enhances the confidence of shareholders, related parties and stakeholders in the Group's performance, as well as the banking sector in Kuwait.

During 2023, the Group achieved a number of key accomplishments in the effective implementation of the Corporate Governance Framework. These are as follows:

- Reviewed and updated the governance policies and charters according to the regulatory instructions in Kuwait and the instructions issued by the regulatory authorities in countries where the Group operates
- Developed and implemented best practices in Governance compliance, regulatory risks, Foreign Account Tax Compliance Act (FATCA), Anti Money Laundering / Combating Financing of Terrorism, Anti-financial crimes, Information Technology and Cybersecurity Risks.
- Conducted an independent review and assessed the efficiency of implementing Corporate Governance at NBK subsidiaries, by monitoring and supporting the governance units at these subsidiaries, which manage the affairs of the Board of Directors and their Committees.

- Developed and continually improved the Corporate Governance reporting systems between entities of the Group.
- Fulfilled the Capital Markets Authority requirements of the Corporate Governance regulations for NBK Capital and Watani Financial Brokerage Company.

## The Board and Committees' composition and duties

NBK Group's Board of Directors is composed of eleven (11) members (one (1) executive member, six (6) non-executive members and four (4) independent members) representing the shareholders. The Board members are elected and appointed by the General Assembly of the Bank, for three (3) years. The Board aims to strengthen the long-term success of the Group and to deliver sustainable value to shareholders.

The Board's structure is generally characterized by having the appropriate number of members, diversity of professional experience, educational qualifications and broad knowledge of the banking and business sectors. Board members collectively hold experience and knowledge in the areas of accounting, finance, economics, strategic planning, corporate governance, internal control and risk management, in addition to outstanding experience in the local and regional business environment. The Group's balanced and non-complex Board structure facilitates the process of exchange of information on an accurate and timely basis between different Group entities. This has been accomplished by establishing direct communication channels across the Group, which promote the principle of disclosure and transparency regarding Group operations. Moreover, the structure maintains the supervisory role assigned to the Board, and effectively contributes to fulfilling the Board's responsibilities. To comply with the supervisory regulations issued by CBK, in addition to the Group's effort to effectively implement the Corporate Governance Framework, the Group formed an appropriate number of Committees that are aligned with the size of the Group, the nature and complexity of its activities, and the geographical distribution of the Group's entities. The Board of Directors formed five sub-committees to enhance the Board's effectiveness in overseeing important Group operations.

The Corporate Governance Framework of the Group is illustrated as follows:



## Group's Board of directors Sub-Committee

| Corporate Governance Committee | Nomination and Remuneration Committee | Risk and Compliance Committee | Audit Committee | Credit Committee |
|---|---|---|---|---|
| 1. Mr. Hamad Mohamed Al-Bahar (Board and Committee Chairman) 2. Mr. Yacoub Yousef Al-Fulaij 3. Mr. Muthana Mohamed Al-Hamad 4. Mrs. Huda Mohammad S. Al-Rifai 5. Mr. Abdulwahab Ahmad H. Al-Bader | 1. Mr. Abdulwahab Ahmad H. Al-Bader (Independent Board member and Committee chairman) 2. Mr. Muthana Mohamed Al-Hamad 3. Mr. Haitham Sulaiman Al-Khaled 4. Mr. Emad Mohamed Al Bahar | 1. Dr. Robert Maroun Eid (Independent Board member and Committee Chairman) 2. Mr. Muthana Mohamed Al-Hamad 3. Mr. Haitham Sulaiman Al-Khaled 4. Mrs. Huda Mohammad S. Al-Rifai 5. Mr. Farouq Ali Akbar A. Bastiki | 1. Mr. Farouq Ali Akbar A. Bastiki (Independent Board member and Committee Chairman) 2. Mr. Muthana Mohamed Al-Hamad 3. Mr. Haitham Sulaiman Al-Khaled 4. Dr. Robert Maroun Eid 5. Dr. Nasser Amin Saidi | 1. Mr. Hamad Mohamed Al-Bahar (Board and Committee Chairman) 2. Mr. Yacoub Yousef Al-Fulaij 3. Mr. Emad Mohamed Al Bahar 4. Mr. Isam Jasem A. Al-Sager (Board Vice - Chairman and Group Chief Executive Officer) |
| **Committee's mission:** Assist the Board in overseeing the implementation of the Group's Corporate Governance. The Committee is also responsible for monitoring the implementation progress of the policies and procedures pertaining to governance. | **Committee's mission:** Assist the Board in carrying out the Nomination and Remuneration responsibilities pertaining to the Board of Directors and Executive Management. The Committee also supports the Board in reviewing and enhancing Board structure and development of the caliber of the Board Members. It also assists the Board in setting up the Group's remuneration framework and ensures effective implementation in accordance with Group remuneration policy. | **Committee's mission:** Assists the Board in carrying out its responsibilities with respect to the Group's risk management and Group Compliance & Governance functions by evaluating and monitoring the risk governance framework, risk appetite, risk strategy and capital planning. In addition to its role of overseeing the adequacy of regulatory compliance and enhancing compliance culture across the Group. | **Committee's mission:** Assists the Board in a supervisory role regarding the efficiency and independence of the internal and external audit operations for the Group. Also oversees the preparation of the periodic financial statements and other regulatory reports. | **Committee's mission:** Responsible for reviewing the quality and performance of the Group's credit portfolio. The Board has authorized the Committee to approve credit facilities that exceed the authorization granted to Senior Management, in accordance with the Credit Policy and the approved authority matrix of the Group in accordance with the related regulatory instruction. |

# Board of Directors and Committee Meetings

The Board of Directors held ten (10) meetings during 2023. Minutes of all meetings have been documented and are included in the Bank's records.

The below table shows names of the Board of Directors, their memberships in Board Sub-Committees and number of meetings that reached fourty nine (49) meetings, in addition to the number of meetings attended by each member during the year.

| Board of Directors Members | Committee Membership | Board of Directors | Corporate Governance | Nomination & Remuneration | Risk & Compliance | Audit | Credit |
|---|---|---|---|---|---|---|---|
| Mr. Hamad Mohammed Al-Bahar *(Non-Executive member)* | • Chairman of Board of Directors  • Chairman of Corporate Governance Committee  • Chairman of Credit Committee | 9 | 2 | | | | 16 |
| Mr. Isam Jasem A. Al-Sager *(Executive member)* | • Vice-Chairman and Group Chief Executive Officer  • Member of Credit Committee | 10 | | | | | 22 |
| Mr. Yacoub Yousef Al-Fulaij *(Non-Executive member)* | • Member of Corporate Governance Committee  • Member of Credit Committee | 7 | 1 | | | | 17 |
| Mr. Muthana Mohamed Al-Hamad *(Non-Executive member)* | • Member of Corporate Governance Committee  • Member of Nomination and Remuneration Committee  • Member of Credit Committee  • Member of Risk and Compliance Committee | 10 | 2 | 3 | 8 | 10 | |
| Mr. Haitham Sulaiman Al-Khaled *(Non-Executive member)* | • Member of Risk and Compliance Committee  • Member of Audit Committee  • Member of Nomination and Remuneration Committee | 9 | | 2 | 8 | 10 | |
| Mr. Emad Mohamed Al Bahar *(Non-Executive member)* | • Member of Nomination and Remuneration Committee  • Member of Credit Committee | 8 | | 3 | | | 18 |
| Mrs. Huda Mohammad S. Al-Rifai *(Non-Executive member)* | • Member of Risk and Compliance Committee  • Member of Corporate Governance Committee | 10 | 1 | | 8 | | |
| Dr. Robert Maroun Eid *(Independent member)* | • Chairman of Risk &Compliance Committee  • Member of Audit Committee | 10 | | | 8 | 10 | |
| Dr. Nasser Amin Saidi *(Independent member)* | • Member of Audit Committee | 9 | | | | 10 | |
| Mr. Abdulwahab Ahmad H. Al-Bader *(Independent member)* | • Chairman of Nomination and Remuneration Committee  • Member of Corporate Governance Committee | 10 | 2 | 3 | | | |
| Mr. Farouq Ali Akbar A. Bastaki *(Independent member)* | • Chairman of Audit Committee  • Member of Risk and Compliance Committee | 10 | | | 7 | 10 | |
| **Total number of meetings** | | **10** | **2** | **3** | **8** | **10** | **23** |

Meetings held by the Board of Directors and its Committees during 2023 were in compliance with Central Bank of Kuwait governance rules and standards, and the Board and Committees' charters in terms of the number of meetings, periodicity, the quorum, and the topics reviewed and discussed by members.

# Effective Implementation of the Corporate Governance Framework

## General overview:

The Group Board of Directors permanently and continuously strives to achieve the best interest of the Bank's shareholders through effective oversight and monitoring of the work of the Executive Management, ensuring the implementation of the Bank's strategy and objectives, and confirming that performance is in accordance with the Bank's plans. During the year, the Board of Directors reviewed and developed the Group's strategy and risk appetite, including all future plans of subsidiaries and overseas branches. The Board of Directors gives particular importance to the implementation of governance at Group level, by creating a culture of corporate values among the Bank's entire staff. This is achieved through constant efforts to achieve the Bank's strategic objectives, improving Key Performance Indicators, and compliance with laws and regulations, especially the rules of Corporate Governance. In addition, the Board adopts a set of policies, charters, systems, mechanisms, reports and procedures which the Group has effectively and integrally applied, relying on the philosophy of the Group in the implementation of Corporate Governance as a culture and working principle, and not only as supervisory instructions and legislative regulations.
The followings are the most important achievements of the Board of Directors and its Committees during 2023:

## Board of Directors' Key Achievements

The Board of Directors met ten (10) times during the year and the followings key duties were accomplished:

- Approved the Budget for the year 2023, the Interim Financial Information, the audited balance sheet, profit & loss account of the Bank and dividends for the financial year ended on 31/12/2022.
- Discussed the risk appetite and its impact on the Group›s strategy.
- Reviewed the results of the Internal Capital Adequacy Assessment Process ("ICAAP"), financial stress testing as per the regulatory requirement of Basel (3).
- Discussed and approved general and specific provisions for the local and international loan portfolio.
- Approved the update of financial authority matrix for the GCEO, the DGCEO, the CEO-Kuwait , his Deputy and Head of wealth management..
- Reviewed the Board of Directors' structures within subsidiaries, on an ongoing basis, ensuring their compliance with the regulatory requirements and the general policy of the Group›s governance framework.
- Followed the progress of the Group's operations, through regular meetings with Execu-tive Management and discussed the results of the Group's business through periodic reports prepared by the Financial Group, which clarifies the most important financial indicators of the Bank›s budget and profits according to geographical distribution of branches and foreign subsidiaries.
- Reviewed and evaluated the effectiveness of the Board and its Committees, in addition to conducting individual self-assessments of the Board and Committee members.
- Reviewed the remuneration framework, the mechanism of linking rewards to perfor-mance the level of risk exposure and updated the remuneration policy at Group level.
- Oversaw the implementation of the Corporate Governance Framework at Group level and ensured compliance with local regulations in the countries the Group operates in, which are in line with the Group's Corporate Governance Framework.
- Reviewed, developed and approved the policies related to Corporate Governance and charters of the Board of Directors and its committees at the Group level in order to be commensurate with regulations issued from Supervisory Authorities, the Group's organizational structure, and to keep up with applicable international and leading Corporate Governance practices.
- Conducted self-assessment on Corporate Governance implementation at Group level and identified the areas that need to be developed.

- Reviewed the results of the annual independent evaluation of the Corporate Governance Framework conducted by Group Internal Audit, which highlighted the areas of the Framework that require improvement.
- Reviewed the results of the annual independent evaluation of the Internal Control Review for the Corporate Governance Framework, conducted by the external auditors
- Supervised the Corporate Governance offices and units in the Bank's subsidiaries, followed up their progress through periodic reports presented to the Board Corporate Governance Committee for review and discussion, and subsequently to the Board of Directors.
- Approved Bank's representatives in Subsidiaries, Associate Companies, External Committees and others
- Reviewed the results of bank's compliance level with Capital Markets Authority instructions concerning the adequacy of information technology systems related to Custodian activity that was and conducted by independent external auditor.
- Reviewed the updated regulations, legislations and provisions related to Bank's activities issued by Central Bank of Kuwait, Capital Markets Authority and other regulatory authorities in the countries in which Bank's subsidiaries and branches operates.
- Approved cash dividend distribution of 25%  (twenty five per cent) of the nominal value of the share (twenty five fils per share)
- Approved the increase of NBK issued and paid up capital by 5% (five per cent) as bonus shares.
- Approved semi-Annual Cash dividends distributions at the rate of 10% of the nominal value of the share.
- Periodically reviewed and updated Bank's organizational structure.
- Approved the training plan for the year 2024 for the Board members, which covered special topics regarding Anti Financial Crime, Risk Management, Corporate Governance, Audit, Sustainability and Artificial Intelligence.
- Reviewed the agenda of Bank's General Assembly meeting, which convened on 18/3/2023.
- Approved the merger of WFBC and NBK Capital investment to become one Company under the name of NBK Capital investment.
- Approved strategy and framework of  Sustainability .

## Board Committees' Key Achievements

**Corporate Governance Committee**

The Committee met twice during the year and the following key duties were performed:

- Reviewed the implementation of Corporate Governance of NBK Group and its subsidiaries and overseas branches, while providing continuous support to subsidiaries.
- Reviewed the Board and its sub-Committee's charters according to supervisory regulations issued in this regard and made recommendations to the Board of Directors.
- Reviewed and discussed the results of the internal audit report on the annual evaluation of the Corporate Governance Framework, and the level of compliance with regulators.
- Reviewed and discussed the report and the results of the evaluation of internal control systems, and the adequacy of implementing the rules of corporate governance at Group level.
- Reviewed and updated Corporate Governance policies, in line with regulatory instructions, leading practices, and made recommendations to the Board for approval.
- Reviewed the related parties' transactions report, the conflict of interest report, the whis-tleblowing cases, and discussed the effectiveness of the existing mechanisms.
- Supervised the progress of Corporate Governance implementation at Group level.
- Reviewed and discussed the annual compliance report on the adequacy of the Corporate Governance implementation at Group level.
- Reviewed the disclosures related to Corporate Governance, which are presented in the Group annual report.
- Reviewed the new instructions issued by the regulatory authorities in the countries where our subsidiaries are located and the procedures taken to comply with these instructions.
- Reviewed Semi-annual Assessment of the risks associated with the group's structure.



## Nomination and Remuneration Committee

The Committee met three (3) times during the year and the following key duties were performed:

- Supervised the process of the annual assessment of the Board of Directors' perfor-mance for the Board, its committees, and the self-assessment of each member of the Board of Directors for the year 2022.
- Reviewed the proposed training plan for the year 2024 for the Board members, which covered special topics regarding Anti Financial Crime, Corporate Governance, Risk Man-agement, Audit, Sustainability and Artificial Intelligence, and made recommendations to the Board of Directors.
- Reviewed the Internal Audit report on Corporate Governance and the independent evaluation conducted on the Bank's Remuneration framework.
- Reviewed the remuneration policy and presented it for approval to the Board of Directors.
- Reviewed and approved the rewards and incentives for 2023 based on the key perfor-mance indicators and key risk indicators, and discussed claw back cases for 2023 and made recommendations to the Board.
- Reviewed the links between remuneration and the Group's long-term objectives.
- Reviewed and discussed the succession plan prepared by Group Human Resources and recommended it to the Board for approval.
- Reviewed and discussed the phantom shares plan for key personnel, and made recommendations to the Board of Directors.
- Reviewed and discussed the latest developments in the banking industry, the related reports in this regard, and the latest related regulatory requirements.
- Reviewed the disclosures related to Remunerations presented in the Group annual report of 2023.
- Reviewed the committee's charter and made recommendations to Board of Directors.
- Reviewed last updates  regarding BOD membership in Bank's subsidiaries
- Assured the independency of Group Risk Management, Group Compliance & Governance and Group Internal Audit.

## Audit Committee

The Committee met ten (10) times during the year and the following key duties were performed:

- Reviewed and approved the Group's internal audit annual plan for 2023 based on the risk assessment and audit priorities. Also reviewed the updated internal audit policy and procedures and presented them to the Board for approval.
- Coordinated with external auditors and reviewed the interim and annual financial statements of the Group, and dividends distribution and submitted recommendations to the Board of Directors.
- Reviewed and discussed the periodical Internal Audit reports and the attached reports.
- Reviewed and discussed Group internal audit summary and considered what has been achieved in the internal audit plan, in comparison to performance during the previous year
- Reviewed and approved the scope of the external auditor's plan related to Internal Con-trol Review and discussed the results of the report.
- Reviewed the Committee charter and submitted recommendations to the Board of Directors.
- Reviewed the efficiency and independence of the internal audit function, infrastructure and the overall annual assessment of the function's performance with the Group Chief Internal Auditor.
- Discussed internal control aspects related to information technology systems and infor-mation security.
- Provided recommendations related to the external auditors' fees, with respect to the services provided.
- Discussed external audit results related to Group internal audit.
- Reviewed and discussed the internal audit reports for Kuwait, overseas branches and subsidiaries.
- Approved Key performance indicators for Group Chief Internal Auditor

## Risk and Compliance Committee

The Committee met eight (8) times during the year and following key duties were performed:

- Reviewed and discussed the strategy and challenges of Risk Management, the set of peri-odic risk management reports at Group level and the key risk indicators
- Reviewed a report on the most important activities and achievements of the Group Risk Management of 2023 and the planned work in 2024.
- Reviewed and discussed the periodic market risk report, Internal Capital Adequacy As-sessment Process ("ICAAP"), liquidity ratios, the stress testing scenarios and the methods with which they dealt at Group level.
- Reviewed and discussed the risk limit ratios, compared the ratios to the Group's approved risk appetite and the exposure levels of countries in which the Group operates, and discussed those ratios and the changes compared to previous periods and credit concentrations for companies , countries and sectors.
- Reviewed updates on overall economic situations and their impact at the Group level
- Reviewed the reports of operational risk, market risk and compliance risk and compliance plan at Group level.
- Reviewed updates regarding AML awareness training to NBK staff.
- Reviewed periodic reports on the information security governance, information systems risks, the results of the internal control systems report on regulatory compliance, anti-fraud , anti-money laundering and financing of terrorism, anti-Financial Crime and compli-ance with regulatory requirements of the Foreign Account Tax Compliance Act -FATCA, at Group level.
- Reviewed and approved Anti-Financial Crime (AFC) Policies and Procedures, AML/CFT Poli-cy, AML Risk Assessment and Anti-Fraud Policy & Procedures, and presented them to the Board for approval.
- Reviewed regulatory compliance remarks at Group and subsidiaries level, through self-evaluation results as well as field visits and review processes.
- Evaluated the Group Chief Risk Officer and Group Chief Compliance & Governance Officer annual performance and determined their remunerations.
- Reviewed and approved the amended Organizational Structures of Group Risk Manage-ment  and Group Compliance & Governance and made recommendation to Board for approval.
- Reviewed and approved Group Risk Management and Group Compliance and Governance's policies and procedures to be presented to the Board for approval.
- Reviewed  Compliance Plan for the year 2023 for NBK-Kuwait,
- Reviewed Board Risk & Compliance Committee Charter to be presented to the Board for approval.
- Reviewed Group Cybersecurity progress report and its Key Performance Indicators (KPI) for NBK Kuwait and its overseas Branches and subsidiaries, Bank's procedures regarding Cyber-security Risk of Virtual Private Networks (VPN).
- Reviewed a report on the most important activities and achievements of the Group Compliance and Governance for 2023 and the planned work in 2024.
- Reviewed Group Compliance & Governance reports regarding regulatory parties' instructions, local and international regulatory compliance, importance correspondences with Central bank of Kuwait, disclosures to Capital Markets Authority and Boursa Kuwait Compa-ny and updates regarding compliance and governance for local and overseas subsidiaries and overseas branches.
- Approved charter, Framework and establishment of Anti-Fraud Governance Committee, and submitted recommendations to the Board of Directors.

## Credit Committee

The Committee met twenty three( 23) times during the year and the following key duties were performed:

- Reviewed and approved credit proposals within the authority matrix delegated by the Board of Directors.
- Coordinated with the Board Risk Committee to discuss credit risk limits.

# Remuneration Policy and Framework

## Board of Directors Self-Assessment Framework

Annually and under the supervision of the Board of Directors, Board Nomination and Remuneration Committee evaluates the effectiveness of Board members and their participation, whether individually or collectively. This includes an assessment of the

Board Committees through the self-assessment methodology, which has been designed and developed to evaluate the effectiveness of each Board member, and determine the aspects of development required, and the necessary training for members.

The following table illustrates the criteria on which the evaluation is based and that are included in the self-evaluation forms:



Composition and qualifications

Attendance and participation

Adequacy and Effectiveness of Meetings, minutes and resolutions

Means of communication and reporting mechanism

Oversight role of the Board and Committees

Based on the evaluation results, the Committee presented its report to the Board that reviewed and approved.

NBK's remuneration policy is in line with the strategic objectives of the Group, and in particular is designed to attract, retain and motivate high-caliber, professional, skilled and knowledgeable employees, at the same time as promoting sound and sustained profitability and effective risk management.

The Group's financial remuneration framework has been linked with its long-term and short-term performance objectives. The Board-approved Group strategy is transformed into Key Performance Indicators (KPIs) and remuneration is determined based on the achievement of these KPIs towards the overall Group strategy; these include financial and non-financial criteria and (where appropriate) Key Risk Indicators (KRIs).

For the purpose of granting remuneration, the Group has differentiated its staff categories, between "material risk-takers," and Financial and Risk Control functions.

Remuneration for material risk-takers has been linked with the risk limits, which were cascaded as per the approved risk appetite. The Key Performance Indicators for the Financial and Risk Control functions are based on the objectives of the control function itself. Any claw-back to be applied is based on the performance standard of the function.

The Group operates a "total reward" philosophy, considering all components of financial remuneration. The key components are:

- Fixed remuneration (salaries, benefits, etc.)
- Variable remuneration (performance-based remuneration) which includes cash bonus and equity shares (as per Phantom Shares Plan)

The Group ensures there is a suitable balance between fixed and variable remuneration to allow for the possibility of reducing

remuneration in the case of adverse financial performance.

The Group remuneration deferment policy ensures an appropriate portion of the variable remuneration of senior employees (including those deemed to have a material impact on the risk profile of the organization) is deferred. The deferment of variable remuneration applies to the Deferred Cash Bonus and Phantom Shares Plan.

The Group applies a deferment approach of up to three years and final vesting of these variable components is subject to continuing employment and the absence of risk materialization. Claw-back applies on the non-vested portions in case risk materializes. The claw-back mechanism is applicable on the Deferred Cash Bonus and Phantom Shares Plan.

The Group's remuneration process is governed by the Board Nomination and Remuneration Committee with the ultimate decisions and responsibilities falling to the Board of Directors.

**Remuneration disclosures**
Board of Directors' members (Executive member, Non-Executive members and Independent members) receive remuneration amounting to KD 70 thousand each (total KD 770 thousand) for their services in Bank's Board membership. Board of Director's remuneration is subject to approval of shareholders at the Annual General meeting.

The five senior Executives who received the highest remuneration packages in addition to the Group Chief Financial Officer (GCFO, Group Chief Internal Auditor (GCIA) and Group Chief Risk Officer (GCRO) received a compensation aggregating KD 11,025 thousand for the year ended December 2023

The following table details the remuneration paid (KD) to staff categories:

| Employee Categories | Number of Employees | Fixed Remuneration | Cash | Phantom Shares Plan | Deferred | Other Performance Incentives | Total |
|---|---|---|---|---|---|---|---|
| | | | Variable Remuneration | | | | KD '000 |
| Senior Management | 44 | 7,564 | 10,848 | 1,949 | - | 335 | 20,696 |
| Material Risk Takers | 47 | 7,039 | 10,132 | 1,777 | - | 867 | 19,815 |
| Financial and Risk Control | 19 | 1,862 | 795 | 425 | 4 | - | 3,086 |

## For disclosure purposes

- Senior Management: includes all staff above and equivalent to the position of Deputy General Manager for all business units, excluding Financial and Risk Control functions
- Material Risk-Takers: includes Group Chief Executive Officer and his deputy, Chief Executive Officer (Kuwait) and his

deputy, and the heads of business functions and their deputies
- Financial & Risk Control Functions: includes heads of Control functions (Financial Control, Risk Management and Compliance, Internal Audit and Anti-Money Laundering and Combating Financing Terrorism Unit), and their deputies.



# Internal Control Adequacy Report

## Board statement on adequacy of internal control systems

The Board strives consistently to ensure the adequacy and efficiency of the control systems required to protect the Group's operations, whilst ensuring compliance with such internal controls and establishing that those controls provide the necessary protection for the Group against risks from within or outside the Group. The Board ensures an effective internal control systems and Risk Management and Compliance functions are in place with sufficient authority, independence, resources and access to the business lines. The Board regards the Internal Audit function and external audit activities as integral parts of key control tools for independent review of information reported by Executive Management to the Board.

The Board Audit Committee is responsible for the oversight of the Group's internal control framework along with the selection and rotation of external auditors in compliance with regulatory requirements.

The Board has been provided with the results of assessments on the existing internal control systems from Risk Management and Compliance, Internal Audit and an independent external party. The Board believes that the existing internal control systems adopted and used at NBK Group are satisfactory and adequate.

## Review of the internal control systems by an independent third party

An Internal Control Review (ICR) of NBK is conducted annually by an external audit firm in accordance with CBK requirements. The ICR examines accounting and other records, and evaluates the internal control systems with regard, but not limited, to Corporate Governance, Financial Control, Consumer Banking, Corporate and Private Banking, International Banking Group, Treasury, Risk Management, Human Resources, Administration, Internal Audit, Anti-Money Laundering and Counter terrorism Financing, Legal Affairs Engineering, impairment Compliance and Regulatory Reporting.

A summary of the ICR report for the year ended 31 December 2022 was presented to the Board of Directors during 2023. The report did not highlight any significant issues.

# Internal Control Review by External Party

Private and confidential
The Board of Directors
National Bank of Kuwait S.A.K.
State of Kuwait
22 June 2023

## Report on Accounting and Other Records and Internal Control Systems

In accordance with our letter of engagement dated 28 February 2023, we have examined the accounting and other records and internal control systems of National Bank of Kuwait S.A.K.P ("the Bank" or "NBK"), its branches in Kingdom of Bahrain, Kingdom of Saudi Arabia and United Arab Emirates ("UAE") and its subsidiaries National Bank of Kuwait (Lebanon) SAL., National Bank of Kuwait – Egypt S.A.E. ("NBK – Egypt"),, National Bank of Kuwait France SA, and National Bank of Kuwait (International) PLC (together referred to as "the Group"), which were in existence during the year ended 31 December 2022. We covered the following areas of the Group

- Corporate Governance;
- Risk Management;
- Anti-Money Laundering
- Consumer Banking
- Corporate and Private Banking
- Treasury;
- Group Investment
- Human Resources;
- Central Processing & Fund Transfer;
- Financial Control;
- Regulatory Compliance;
- Administration;
- Internal Audit;
- Operations & Information Technology;
- Legal;
- Customer Complaints;
- Financial Securities (limited to Kuwait only);
- Investors Relations & Corporate Communications;
- Confidentiality of Customer Information;
- Anti-Fraud, Bribery and Corruption;
- Engineering
- International Banking; and
- Impairment Compliance and Regulatory Reporting.

Our examination has been carried out with regard to the requirements contained in the manual of general directives concerning Internal Control reviews issued by the Central Bank of Kuwait ("the CBK") on 14 November 1996, CBK instructions dated 20 June 2012 concerning Corporate Governance rules and systems at Kuwaiti Banks and its subsequent amendments dated 10 September 2019, CBK instruction dated 14 May 2019 concerning Combating Money Laundering Operations and Financing of Terrorism, CBK instruction dated 9 February 2012 on maintenance of confidential information and international standards on assurance engagement 3000. The New York, Singapore and Shanghai branches of National Bank of Kuwait SAKP, NBK Banque Privée (Suisse) S.A., Watani

Investment Company K.S.C.C. and Watani Financial Brokerage Company K.S.C.C are subject to evaluation of internal controls and annual supervision by the respective local regulators. A summary of the respective internal control reports is provided in Appendix IV of this report.As Board of Directors of National Bank of Kuwait, you are responsible for establishing and maintaining adequate accounting and other records and internal control systems, taking into consideration the expected benefits and relative costs of establishing such systems. The objective is to provide reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, that banking risks are properly monitored and evaluated, that transactions are executed in accordance with established authorization procedures and are recorded properly, and to enable you to conduct the business in a prudent manner.

Because of inherent limitations in any accounting and internal control system, errors or irregularities may nevertheless occur and not be detected. Also, projection of any evaluation of the systems to future periods is subject to the risk that management information and control procedures may become inadequate because of changes in conditions or that the degree of compliance with those procedures may deteriorate.In our opinion, having regard to the nature and size of the group's operations, during the year ended 31 December 2022, the accounting and other records and internal controls systems, in the areas examined by us, were established and maintained satisfactorily in accordance with the requirements of the Manual of General Directives concerning Internal Control Reviews issued by the Central Bank of Kuwait on 14 November 1996, CBK instructions dated 20 June 2012 concerning Corporate Governance Rules and Systems at Kuwaiti Banks and its subsequent amendments dated 10 September 2019 and the CBK instructions dated 14 May 2019 concerning Combating Money Laundering Operations and Financing of Terrorism, and CBK instruction dated 9 February 2012 on maintenance of confidential information and data related to the customer information with the exception of the matters set out in the report.

Furthermore, the Bank has established a process of regular follow-up on reported exceptions to ensure that corrective actions are being taken to rectify the control weaknesses and gaps identified during the course of the Internal Control Review.

**R. Rasheed M. Al-QenaeLicense No. 130
Of KPMG Al-Qenae & PartnersMember firm of KPMG International**

# Ethics and Professional Conduct

**Values and ethics**

NBK Group continues to apply Corporate Governance values as fundamental principles and an integral part of the culture of the Group. During the year, the Group worked on a number of initiatives that will strengthen the commitment to the values of Corporate Governance and raise the level of awareness of those values at all levels of the Group and related bodies.

NBK Group is committed to achieving the highest levels of governance and has established those values within a number of pillars, which emerged through a set of policies and procedures set forth as follows:

**Ethics code**

The ethics code is considered one of the most important components of the Corporate Governance framework and is promoted through the code of conduct, which is adopted by the Board of Directors and Executive Management in daily interactions with employees, customers and all of the Group's stakeholders.

This code is subject to periodic review, to keep it up to date with all the latest developments and enhancements in the areas of governance and control of professional conduct. The Board of Directors also oversees the efficient implementation of the charter through the audit and internal control functions, to identify and remedy any gaps.

**Conflict of interest**

The Group ensures that in all stages of banking procedures for its customers, it treats all customers fairly, equally and honestly, to achieve the maximum level of transparency and objectivity, through applying a conflict of interest policy. The Group, under the supervision of the Board, has reviewed the Related Parties Transactions Policy, which is compatible with the nature of the Group's business regulatory updates in the markets in which it operates. In addition, it has adopted a set of organized procedural models for cases of disclosure of potential conflicts of interest and a mechanism to deal with them.

Potential cases of conflicts of interests and related parties transactions are subject to independent review by Group Internal Audit.

**Confidentiality**

The Board, Executive Management and employees ensure that the Group maintains the confidentiality of information relating to its stakeholders, in accordance with the rules and regulations issued by the Central Bank of Kuwait and other regulatory bodies.

During 2023, the Group continued to apply measures to maintain the confidentiality of information in accordance with policies and procedures and internal control systems, which require the preservation of confidentiality.

**Whistleblowing policy**

The Group has adopted a whistleblowing policy that encourages openness and trust among its employees. This helps employees report any complaint, whether relating to bad behavior or illegal or unprofessional actions. The complaint is directly made to the Chairman of the Board and the information received remains confidential and, if necessary, saved anonymously, to provide protection to the employee. This mechanism is subject to review by Group Internal Audit.

# Stakeholder's Rights

The Group has continued to implement a well-defined process in managing transparency, communication and open dialogue with its stakeholders. These measures include the protocols, which will be followed in communicating with stakeholders and the degree of information which can be disclosed.

## Shareholders

NBK Group promotes and maintains an open and transparent channel of communication with its shareholders, which enables them to understand Group business, its financial condition, and operating performance and trends. The Group has also developed a section on its website that provides detailed reports to shareholders on Corporate Governance and other important information relating to the disclosure of financial and non-financial information.

The Public Institution for Social Security owns 6% of NBK Capital as of 31st December 2023.

## Investor Relations

NBK Group promotes open and transparent dialogue with both its institutional and private investors. The Investor Relations function serves as the primary contact with shareholders, investors and financial analysts. The Investor Relations function publishes information for investors and stakeholders on a regular basis, through its website as well as other media.

## Customers

The Group has ensured, since inception that it has established professional and behavioral rules, and provides qualified staff who can optimally serve customers. In addition, the Group continuously ensures that it follows regulatory instructions and is a pioneer in international practices in customer service and protection. NBK has taken the necessary steps to implement the terms of the consumer protection instructions recently issued by the Central Bank of Kuwait, by reviewing and updating a policy approved by the Board to enhance the understanding of transparency and disclosure in banking transactions provided by the Bank.

## Employees

The Group protects and abides by the rights provided to employees, which include, but are not limited to, the following:

- Transparent remuneration and compensation structure
- A transparent working environment
- Contributing to employee talent-management schemes
- Access to the whistleblowing policy

## Community (Corporate Social Responsibility)

The Group has maintained its progress in projects relating to Corporate Social Responsibility, to foster a sustainable economic and social environment in the community, and regards this as a priority for the Group.  The Group discloses its relevant social activities on its website and in the form of a separate "Sustainability Report 2023", published as an independent report.

# Group Risk Management and Group Compliance and Governance

Group risk Management and Group Compliance and Governance are a key component of banks' second line of defense, for monitoring and reporting risks-related practices and managing compliance risks. They function with direct reporting to Board Risk and Compliance Committee, that responsible for identifying and assessing key risks, measuring the levels of Bank's risk exposure, monitoring exposure levels in light of the risk appetite, non-compliance risk with applicable laws and regulations, determining capital requirements on a regular basis following up and evaluating decisions relating to certain risks.

## Group Risk Management

NBK Group's risk management framework is integral to its operations and culture and it seeks to manage risk in a structured, systematic manner through a global risk policy, which embeds comprehensive risk management into the organizational structure, risk measurement and monitoring processes. Ultimate responsibility for setting out risk appetite and effective management of risk rests with the Board. This is managed through the Board Risk and Compliance Committee (the "BRCC") and the Group Executive Committee (the "EC"). These committees

ensure that risk-taking authority and policies are effectively communicated from the Board to the relevant business units. The Group's risk management, compliance management and internal audit functions assist executive management in controlling and actively managing the Group's overall risk profile.

The key features of the Group's comprehensive risk management policy are:

- The Board provides overall risk management direction and oversight;
- The Group's risk appetite is reviewed by the BRCC and ultimately approved by the Board;
- Risk management focused on compliance with applicable laws, regulations and internal policies is intrinsically embedded in the Group's process and is a core competency of all its employees;
- The Group manages its credit, market, liquidity and operational risks in a coordinated manner within the organization; and
- The Group internal audit provides independent validation of the adequacy and effectiveness of the risk management framework on a Group level.

The Group Risk Management, which headed by the Group Chief Risk Officer ("GCRO"), reports directly to the BRCC and is responsible for:

- identifying and assessing the key risks faced by the Group;
- measuring the Group's exposure to those risks;
- monitoring this exposure in light of the Group's risk appetite, as approved by the Board;
- determining the Group's corresponding capital needs on an ongoing basis;
- monitoring and assessing major decisions related to risk-taking; and
- Following up and evaluating decisions related to certain risks.

The risk management function assists senior management in controlling and actively managing the Group's overall risks and risk profile. The function also ensures that:

- The Group's overall business strategy is consistent with the risk appetite approved by the Board of Directors and allocated by the EC;
- Risk policies, procedures and methodologies are consistent with the Group's risk appetite;
- Appropriate risk management architecture and systems are developed and implemented; and
- Risks and limits of the portfolio are monitored throughout the Group, including at appropriate "regional" levels.

NBK Group and Group Risk Management regularly assess the adequacy and effectiveness of the risk management framework in light of the changing risk environment.

## Group Compliance and Governance

The Group Compliance and Governance is a part of NBK Group's culture of complying and operating in accordance to regulatory and legislative frameworks, where Group Compliance and Governance attempts to enhance sound practices and ensure that Bank does not violate any requirements set by legislators and regulatory Bodies in either Kuwait or other countries where Group operates.

The Compliance and Governance function is a key component of the Bank's second line of defense for managing compliance risks, the Group supervises and participates in placing internal procedures in conformity with regulations. Its main role is to support the Bank and its Management in managing the compliance risks, embedding and improving the compliance arrangements in all levels and structures of the Bank, in order to ensure that the bank operates with integrity and adheres to applicable laws, regulations and internal policies.

The key features of the Group's comprehensive policy of managing compliance risks and embedding sound governance principles are:

- The Board provides overall guidance to implement compliance culture and sound corporate governance principles across the bank;
- The Group's compliance and governance policies and procedures are reviewed by the Board Risk and Compliance Committee and ultimately approved by the Board;
- Comprehensive reports concerning level of compliance and associated risks are presented to Board and Board Risk and Compliance committee;
- The Group coordinated and work with Bank's Management under the supervision of Board of directors.; and
- The Group internal audit provides independent validation of the adequacy and effectiveness of the Group Compliance and Governance framework on a Group-wide basis.

## Group Risk Management structure

The structure of the Risk Management function consists of the following departments:



# Group Compliance and Governance Structure

The structure of the Group Compliance & Governance consists of the following departments:



Group Compliance and Governance headed by Group Chief Compliance and Governance Officer ("GCC&GO") and reports directly to the Board Risk and Compliance Committee ("BRCC").

Group Compliance and Governance has the following objectives and responsibilities:

- Identify, assess, monitor and report on the compliance risks faced by NBK Group.
- Review the compliance risk processes that are in place to anticipate and effectively manage the impact of regulatory change on the Group's operations.
- Ensure NBK Group and each subsidiary and branch in every jurisdiction of operation abides by all relevant laws and regulations applicable to each of them.

- Assess/Review the implementation of compliance procedures needed to verify compliance with the laws, regulations, procedures and directives issued by Central Bank of Kuwait, Capital Markets Authority and relevant Regulatory Bodies.
- Ensure the Bank's compliance with the regulations related to Anti-Financial Crime and the Foreign Account Tax Compliance Act (FATCA), Common Reporting Standard (CRS) and other similar applicable regulations.
- Ensure sound Corporate Governance implementation across the Group.

## I.   Capital Adequacy

Capital adequacy, financial leverage and the use of various levels of Regulatory Capital are monitored regularly by the Group's Management and are also governed by guidelines of the Basel Committee on Banking Supervision as adopted by the Central Bank of Kuwait (CBK) for licensed banks in Kuwait.

The CBK's Basel III framework consists of three pillars:

- Pillar 1 provides a framework for measuring capital requirements for credit, operational and market risk under the "Standardised Approach";
- Pillar 2 relates to the supervisory review process and emphasises the importance of the Internal Capital Adequacy Assessment Process (ICAAP) performed by banks; and
- Pillar 3 aims to complement the capital adequacy requirements under Pillar 1 and Pillar 2 by requiring banks to provide a consistent and understandable disclosure framework which facilitates comparison, thus enhancing the safety and soundness of the banking industry in Kuwait.

The Basel III minimum requirements for capital are underpinned by a leverage ratio that serves as a backstop to the risk-based capital measures. There are also buffer requirements in the form of a capital conservation buffer, a countercyclical capital buffer, and an additional surcharge for banks designated as domestic systemically- important.

A key objective of National Bank of Kuwait S.A.K.P. (the "Bank") and its subsidiaries (collectively the "Group") is to maximise shareholders' value with optimal levels of risk, whilst maintaining a strong capital base to support the development of its business and comply with externally-imposed capital requirements.

### 1.   Regulatory Scope of Consolidation

The core activities of the Group are retail, corporate and private banking, investment banking, and asset wealth management & brokerage services. For further details on the Group's activities, please refer to note 3 of the Group's consolidated financial statements.

The consolidated financial statements and capital adequacy regulatory reports of the Group have been prepared and consolidated on a consistent basis, save as otherwise disclosed. For additional information on the basis of preparation and basis of consolidation please refer to notes 2.1 and 2.3 of the Group's consolidated financial statement for the year ended 31st December 2023.

The principal operating subsidiaries of the Group are presented in note 24 of the Group's consolidated financial statements. All subsidiaries have been fully consolidated under the regulatory scope of consolidation for Regulatory Capital calculations (refer note 29 of the Group's consolidated financial statements for consolidation treatment for the Islamic Banking subsidiaries of the Group).

Significant investments (as defined) in Banking, Financial and Insurance entities which are outside the scope of regulatory consolidation are required to be subject to the threshold treatment prescribed under the CBK Basel III rules and are risk-weighted and/or deducted against equity.

- All the significant investments in Banking and Financial entities classified as Associates of the Group's consolidated financial statements have been subject to the applicable threshold treatment and risk-weighted as prescribed.
- Other significant investments in Banking and Financial entities classified as equities have been subject to the applicable threshold treatment and risk-weighted as prescribed.

'Minority' Investments in Banking, Financial and Insurance entities classified as equities have been subject to the applicable threshold treatment and risk-weighted as required.

### 2.   Capital structure

The Group's Regulatory Capital comprises:

a)  Common Equity Tier 1 (CET1) capital which is considered as the core measure of the Group's financial strength and includes share capital, share premium, eligible reserves, retained earnings and eligible non-controlling  interests (net of Regulatory adjustments),

b)  Additional Tier 1 (AT1) capital which consists of Perpetual Tier 1 Capital Securities classified as Equity (note 21 of the Group's consolidated financial statements), eligible portion of AT1 instruments issued by subsidiaries and held by third parties and certain additional eligible portion of non-controlling interests, and

c)  Tier 2 (T2) capital which consists of Subordinated Tier 2 Bonds classified as Debt (note 17 of the Group's consolidated financial statements), the allowed portions of general provisions and certain additional eligible non-controlling interests.

The Bank's share capital as at 31 December 2023 comprised 7,929,945,620 issued and fully-paid-up equity shares (2022: 7,552,329,162)

The Regulatory Capital in KD Thousands for the Group is detailed below:

### Table 1

| Regulatory Capital | 31 December 2023 | 31 December 2022 |
| --- | --- | --- |
| Common Equity Tier 1 | 3,442,577 | 3,170,120 |
| Additional Tier 1 Capital | 531,776 | 527,411 |
| Tier 1 Capital | 3,974,353 | 3,697,531 |
| Tier 2 Capital | 597,889 | 573,564 |
| Total Regulatory Capital | 4,572,242 | 4,271,095 |

### 3.    Capital Adequacy Ratio

The Group ensures adherence to CBK's requirements on Group-wide and stand-alone Capital Adequacy by regular monitoring. The Group's capital forecasting process ensures pro-active actions, and plans to ensure a sufficient capital buffer above minimum levels are in place at all times. This process is supported by the use of proprietary capital-planning methodology which takes into consideration Regulatory Capital requirements, rating agency views, stress-testing and bottom-up views of business plans. These views then cascade into considerations on what capital level is required.

In addition each banking subsidiary of the Group is directly regulated by its local banking supervisor which sets and monitors its capital adequacy requirements as per the jurisdiction's requirements and ensures its compliance therewith.

In response to the Corona Virus Disease pandemic crisis, the CBK implemented various measures targeted at reinforcing the banking sector including revising the Capital Conservation Buffer

requirements of 2.5% of risk-weighted assets in the form of CET1 minimum capital requirement to:

1.  Nil from 1st April 2020 to 31st December 2021.
2.  1% from 1st January 2022 to 31st December 2022.
3.  Full 2.5% from 1st January 2023 onwards.

Pursuant to the consumer loan deferment program of 2020, the CBK has allowed, as part of Corona Virus Disease ("COVID-19") support measures, the modification loss on deferment of loan instalments of KD 130,499 thousand charged directly to Retained Earnings in June 2020, to be deferred and deducted from Regulatory Capital equally over 4 years starting 2021, i.e., KD 32,625 thousand per year. The remaining deferred amount to be deducted from Regulatory Capital as of 31 December 2023 is KD 32,625 thousand.

The Minimum Capital requirements (MCR) and associated levels of Regulatory Capital expressed as a percentage of risk-weighted assets for NBK Group are:

### Table 2

| Regulatory Capital Levels | 31 December 2023 | 31 December 2022 |
| --- | --- | --- |
| Common Equity Tier 1 | 7.0% | 7.0% |
| Capital Conservation Buffer* | 2.5% | 1% |
| Domestic Systemically-Important Bank (D-SIB) Buffer | 2.0% | 2.0% |
| Common Equity Tier 1 (including Buffers) | 11.5% | 10.0% |
| Additional Tier 1 Capital | 1.5% | 1.5% |
| Tier 1 Capital | 13.0% | 11.5% |
| Tier 2 Capital | 2.0% | 2.0% |
| Total Regulatory Capital | 15.0% | 13.5% |

* CET1 Capital Conservation Buffer that was reduced CBK due to Corona Virus Disease has been reinstated fully from 1st January 2023.

The Group, having been designated as a Domestic Systemically-Important Bank (D-SIB), is required to maintain an additional minimum capital of 2%. Countercyclical Capital Buffer has not been required for the period ended 31 December 2023 in the MCR (nor at 2022).

The Capital Adequacy Ratios for the Group at consolidated level are as follows:

### Table 3

| | CET1 | Tier1 | Total |
| --- | --- | --- | --- |
| Group for 31 December 2023 | 13.0% | 15.0% | 17.3% |
| Group for 31st December 2022 | 12.9% | 15.0% | 17.4% |

The Capital Ratios of the banking subsidiaries based on their latest submissions (filed or approved, as applicable, under their respective jurisdictions and regimes) were as follows:

### Table 4

| | 31 December 2023 | | |
| --- | --- | --- | --- |
| | CET1 | Tier1 | Total |
| NBK (International) plc [United Kingdom] | 19.70% | 19.70% | 19.70% |
| National Bank of Kuwait France SA [France] | 26.69% | 26.69% | 26.69% |
| NBK (Lebanon) S.A.L. [Lebanon] | 3.65% | 4.88% | 5.06% |
| NBK Banque Privee (Suisse) S.A. [Switzerland] | 35.90% | 52.05% | 52.05% |
| Boubyan Bank K.S.C.P. [Kuwait] | 14.27% | 16.72% | 17.97% |
| Credit Bank of Iraq S.A. [Iraq] | 95.74% | 95.74% | 95.78% |
| NBK Egypt S.A.E. [Egypt] | 13.82% | 17.19% | 19.23% |

| | 31 December 2022 | | |
| --- | --- | --- | --- |
| | CET1 | Tier1 | Total |
| NBK (International) plc [United Kingdom] | 21.26% | 21.26% | 21.26% |
| National Bank of Kuwait France SA [France] | 55.53% | 55.53% | 55.53% |
| NBK (Lebanon) S.A.L. [Lebanon] | 31.15% | 43.07% | 43.21% |
| NBK Banque Privee (Suisse) S.A. [Switzerland] | 38.93% | 56.43% | 56.43% |
| Boubyan Bank K.S.C.P. [Kuwait] | 15.22% | 18.19% | 19.44% |
| Credit Bank of Iraq S.A. [Iraq] | 12.00% | 486.00% | 492.00% |
| NBK Egypt S.A.E. [Egypt] | 14.99% | 17.50% | 19.95% |

All the banking subsidiaries within the Group are in compliance with the minimum capital requirements as applicable under their respective jurisdictions and have not reported any capital

deficiencies. In general, the restrictions on transfer of funds or Regulatory Capital within the Group are related to constraints that are imposed on entities by local regulators or tax constraints.

#### 4. Profile of risk-weighted assets and capital charge

The Group's risk-weighted capital requirements for credit, market and operational risks are shown below. The calculations include Boubyan Bank K.S.C.P., an Islamic Banking subsidiary. For purposes of determining risk-weighted assets and capital required, exposures and assets at Boubyan Bank K.S.C.P. and its consolidated banking subsidiary are risk-weighted, and capital charge is calculated, in accordance with CBK regulations applicable to banks providing banking services compliant with Codes of Islamic Sharia'a. Those figures are then added to corresponding figures pertaining to all the rest of the Group, identical with the treatment in relevant reports submitted to CBK. The Capital charge in section 4.1, 4.2 and 4.3 below represent the minimum requirement for Kuwait Banking sector at 13 % (2022: 11.5% and excluding D-SIB Buffer of 2% for NBK Group).

##### 4.1. Credit risk:

The total capital charge in respect of credit risk as at 31 December 2023 was KD 3,141,101 thousand (2022: KD 2,586,984 thousand) as detailed below:

| Table 5 | | | | | | KD 000s |
|---|---|---|---|---|---|---|
| | **31 December 2023** | | | 31 December 2022 | | |
| | **Gross credit exposure** | **Risk-weighted assets** | **Capital charge** | Gross credit exposure | Risk-weighted assets | Capital charge |
| Cash | 184,832 | - | - | 244,199 | - | - |
| Claims on sovereigns | 7,774,130 | 1,096,919 | 142,599 | 8,253,189 | 1,029,571 | 118,401 |
| Claims on International Organisations | 153,308 | - | - | 122,546 | - | - |
| Claims on public sector entities | 1,675,668 | 351,726 | 45,724 | 1,595,886 | 262,947 | 30,239 |
| Claims on multilateral development banks | 248,550 | 35,420 | 4,605 | 92,728 | 24,513 | 2,819 |
| Claims on banks | 5,738,584 | 1,619,110 | 210,484 | 5,903,570 | 1,654,057 | 190,217 |
| Claims on corporates | 18,209,980 | 13,438,284 | 1,746,977 | 16,352,030 | 11,929,297 | 1,371,869 |
| Regulatory retail exposure | 7,648,318 | 6,663,678 | 866,278 | 7,592,958 | 6,644,931 | 764,167 |
| Past due exposures | 161,944 | 134,775 | 17,521 | 151,717 | 126,463 | 14,543 |
| Other exposures | 1,385,833 | 822,407 | 106,913 | 1,249,508 | 823,736 | 94,729 |
| **Total** | **43,181,117** | **24,162,319** | **3,141,101** | 41,558,331 | 22,495,515 | 2,586,984 |

"Other exposures" above includes an amount of KD 351,313 thousand negative (2022: KD 405,862 thousand negative) representing that amount of general provision in excess of a maximum of 1.25% of Credit risk-weighted assets which is allowed in arriving at Tier 2 capital.

The Group's figures relating to exposures and risk-weighted assets have been classified to provide a meaningful representation of the standard portfolio asset classes.

##### 4.2. Market risk:

The total capital charge at 13% (2022: 11.5%) in respect of market risk was KD 55,171 thousand (2022: KD 46,205 thousand) as detailed below:

| Table 6 | | KD 000's |
|---|---|---|
| | **31 December 2023** | 31st December 2022 |
| Interest rate risk | 1,403 | 1,186 |
| Foreign exchange risk | 53,768 | 45,019 |
| **Total** | **55,171** | 46,205 |

##### 4.3. Operational risk:

The total capital charge at 13% (2022: 11.5%) in respect of operational risk was KD 244,784 thousand (2022: KD 192,528 thousand). This capital charge was computed by categorising the Group's activities into 8 business lines (as defined in the CBK Basel III framework) and multiplying the business line's three-year average gross income by a pre-defined beta factor.

##### 4.4. Domestic Systemically-Important Bank (D-SIB):

The additional capital requirement in respect of the Group having been designated as a Domestic Systemically-Important Bank (D-SIB) of 2% as at 31 December 2023 amounts to KD 529,393 thousand (2022: KD 491,429 thousand).

## II. Risk management

In common with other financial institutions, risk, including credit risk, market risk, liquidity risk, Information Technology (IT), operational and environmental, social and governance (ESG) risks, is inherent in the Group's activities. The complexity in the Group's business operations and diversity of geographical locations require efficient and timely identification, measurement, aggregation and management of risks and efficient allocation of capital towards achieving the ultimate objective of protecting the Group's asset values and income streams in order to protect the interests of its shareholders and external fund providers, increase shareholder value and achieve a return on equity that is commensurate with the risks assumed. Management of these inherent risks is critical to ensuring the Group's financial soundness and profitability.

The Group's risk management framework is integral to its operations and culture and it seeks to manage risk in a structured, systematic manner through a global risk policy, which embeds comprehensive risk management into the organisational structure, risk measurement and monitoring processes.

Ultimate responsibility for setting out risk appetite and effective management of risks rests with the Board of Directors. This is managed through the Board Risk & Compliance Committee (the "BRCC") and the Group Executive Committee (the "EC"), which ensure that risk-taking authority and policies are effectively communicated from the Board to the appropriate business units. The Group risk management, Group compliance and Governance , and Group internal audit functions assist Executive Management in controlling and actively managing the Group's overall risk profile.

The key features of the Group's comprehensive risk management policy are:

- the Board provides overall risk management direction and oversight;
- the Group's risk appetite is reviewed by the BRCC and ultimately approved by the Board;
- risk management is embedded in the Group as an intrinsic process and is a core competency of all its employees;
- the Group manages its credit, market, liquidity, IT and operational risk in a co-ordinated manner within the organisation; and
- the Group's internal audit function reports to the Board Audit Committee (the "BAC") and provides independent validation of the business units' compliance with risk policies and procedures and the adequacy and effectiveness of the risk management framework on a Group-wide basis.

The function also ensures that:

- The Group's overall business strategy is consistent with its risk appetite approved by the Board and allocated by the Executive Committee.
- Risk policies, procedures and methodologies are consistent with the Group's risk appetite.
- Appropriate risk management architecture and systems are developed and implemented; and
- Risks and limits of the portfolio are monitored throughout the Group, including at appropriate "regional" levels.

The Group regularly assesses the adequacy and effectiveness of its risk management framework in light of the changing risk environment.

## 1. Risk Management Strategy

The key elements of the Board-approved risk strategy are:

- maintaining stability and business continuity during stress situations;
- ensuring effective and adequate compliance with Regulatory Capital requirements and internal capital targets in keeping with the Group's strategy;
- developing the Group's IT infrastructure and using modern methods to raise the professional level and levels of experience of human resources;
- effective risk planning through an appropriate risk appetite; and
- performing stress tests consistently to assess the impact on the Group's capital requirements, capital base and liquidity position.

## 2. Risk Appetite

The Group's risk appetite defines the maximum limit of risk that the Group is willing to accept in relevant business categories in order to achieve an optimal balance of risk and return which will enable the achievement of its strategic objectives. Any risk which breaches the Group's stated risk appetite must be mitigated as a matter of priority to within acceptable levels.

- The risk appetite is annually reviewed and presented by the BRCC to the Board for final approval. This ensures the risk appetite statements are consistent with the Group's strategy and business environment. Through the risk appetite statements, the Board communicates to Management the acceptable level of risk for the Group, determined in a manner which meets the objectives of shareholders, depositors and regulators. This ensures Risk Appetite remains aligned to the Group's strategic objectives, expectations of Regulators and stakeholders including clients, investors, and financial markets, and remains fit for purpose.
- The Group risk management and Group Compliance & Governance functions aim to identify early warnings of risk limit and risk appetite breaches, and are responsible for notifying them to the BRCC and the Board.

## 3. Scope and nature of risk reporting tools

The Group's risk management framework enables the Group to identify, assess, limit and monitor risks using a comprehensive range of quantitative and qualitative tools. Some of these tools are common to a number of risk categories, while others are tailored to the particular features of specific risk categories and enable generation of information such as:

- Credit risk in commercial and consumer lending and other asset exposures, such as collateral coverage ratio, limit utilisation, past-due alerts, etc.
- Quantification of the susceptibility of the market value of single positions or portfolios to changes in market parameters (commonly referred to as sensitivity analysis).
- Quantification of exposure to losses due to extreme movements in market prices or rates.

The Group augments its overall framework for governance and capital planning and management by undertaking an ICAAP, which includes "scenario testing" at periodic, regular intervals. Amongst the key objectives of the ICAAP is to quantify potential inherent risks which the Group faces not covered under Pillar 1. In line with the guidelines from the Basel Committee and CBK, key principles of the Group's ICAAP include:

- Responsibilities of the Board and Senior Management.
- Sound capital management.
- Comprehensive assessment of Pillar II risks, e.g., Credit (sector, name, and geographic concentration), residual credit risk, residual market risk, Interest Rate Risk in Banking Book (IRRBB), , Liquidity, Legal, Reputational, Strategic Risk, Climate Risk and other specific risks which are not covered in Pillar I, etc.
- Monitoring and reporting.
- Control and review of the process.

## 4. Risk management processes

Through the Group's risk management framework, transactions and outstanding risk exposures are quantified and compared against authorised limits, whereas non-quantifiable risks are monitored against policy guidelines and key risk and control indicators. Any discrepancies, excesses or deviations are escalated to Management for appropriate action.

The key risks assumed by the Group in its daily operations are outlined below:

### 4.1. Credit risk

Credit risk is defined as the likelihood that a customer or counterparty is unable to meet the contracted financial obligations resulting in a default situation and/or financial loss. These risks arise in the Group's normal course of business.

#### 4.1.1. Credit risk management strategy

The approach to credit risk management is based on the foundation to preserve the independence and integrity of the credit risk assessment, management and reporting processes, combined with clear policies, limits and approval structures which guide the day-to-day initiation and management of the Group's credit risk exposure. This approach comprises credit limits which are established for all customers after a careful assessment of their creditworthiness.

Standing procedures, outlined in the Group's Credit Policies and Manuals, require that all credit proposals be subjected to detailed screening by the domestic or international credit risk management divisions prior to submission to the appropriate credit committee. Whenever necessary, credit facilities are secured by acceptable forms of collateral to mitigate the related credit risks. The Board of Directors defines the Group's credit risk management strategy and ratifies significant credit risk policies approved by the Group's Executive Committee to ensure alignment of the Group's exposure with its risk appetite.

### 4.1.2. Credit risk management structure

Senior management implements the Board of Directors' credit risk strategy and develops policies and procedures for identifying, assessing, monitoring, and controlling credit risk.

The Group's Executive Committee, chaired by the Group Chief Executive Officer (GCEO) and comprising senior executives from the business divisions, meets regularly to review significant credit policies and the Group's corporate and consumer credit portfolios and advises the Board appropriately.

All significant credit policies and amendments to policies are reviewed and approved annually by the Executive Committee and ratified by the Board. Within this framework, limits and approval authorities are exercised by the officers delegated with defined approval authorities.

In compliance with CBK regulations, lending to individual Board Members and related parties is fully secured and monitored by the Senior Credit Committee and the Board Credit Committee (BCC). Furthermore, facilities granted to them are made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with unrelated parties. All such facilities are approved by the Board of Directors in line with the relative authorities from the Shareholders' General Assembly.

Country limits are determined based on the outlook of economic and political factors, along with the review of reports from recognised and creditable market sources and application of local business and market knowledge. Significant country-limit exposures are subject to periodic approval by the Board of Directors or the Board Credit Committee.

### 4.1.3. Key features of corporate credit risk management

- Corporate credit facilities are granted based on detailed credit risk assessments which consider the purpose of the facility and source of repayment, prevailing and potential macro-economic factors, industry trends and the customer's positioning within its industry peer-group.
- Internal credit-rating models are regularly reviewed by the independent Model validation team (under Group Compliance & Governance) in co-ordination with Group Risk Management (GRM), line management and the Executive Committee and continually enhanced in line with industry credit risk management "best practices".

All new proposals, along with reviews of material changes to existing credit facilities, are reviewed and approved by the appropriate credit committee.

The Group has the following hierarchy of credit committees at the Head Office Level:

- Board Credit Committee (BCC), which consists of four Board Members and approves all facilities exceeding the mandate of the other committees;
- Senior Credit Committee (SCC), which consists of the, GCEO, the Deputy GCEO, the CEO Kuwait, the Chief Credit Officer, the Head of Corporate Banking and a number of senior executives in Corporate Banking and is responsible

for reviewing, approving or recommending domestic credit proposals that exceed the Management Credit Committee's competence as well as those concerning 'criticised' accounts [which, as part of the Group's overall credit quality monitoring processes, are accounts which, although neither classified as 'past due' nor 'past due and impaired', have experienced difficulties which may cause them to become categorised as 'irregular' accounts (being accounts which are either classified as 'past due' or 'past due and impaired')];

- Management Credit Committee (MCC), which consists of the Head of Corporate Banking, the Deputy Head of Corporate Banking, the Head of Retail Credit Risk Management and a number of senior executives in Corporate Banking and is responsible for reviewing, approving or recommending domestic credit proposals, except those concerning 'criticised' accounts and those that exceed the Management Credit Committee's competence, which are escalated to the Senior Credit Committee;

- Senior International Credit Committee (SICC), which consists of the, GCEO, the Deputy GCEO and the Group Chief Risk Officer (GCRO) and is responsible for reviewing, approving or recommending all credit proposals originating from the Group's international offices that exceed the Management International Credit Committee's mandate as well as those concerning 'criticised' accounts; and

- Management International Credit Committee (MICC), which consists of the Head of Group Risk Management , the Chief Credit Officer, the CEO International Banking Group and certain Senior members of the International Banking Group and International Credit Risk Management and is responsible for reviewing, approving or recommending all credit proposals originating from the Group's international offices except those concerning 'criticised' accounts, which are escalated to the Senior International Credit Committee.

The credit committees have a set of approval authorities in place as delegated by the Board and which vary by reference to the type of counterparty (for example, sovereign, financial institution and corporate), the counterparty rating (investment grade or speculative) and whether the facility is secured or non-cash, among other factors. Specific approval authorities exist for fully-secured facilities as well as Watch List and 'Criticised' accounts.

In addition, the Group's international offices have their own hierarchy of credit committees.

Credit facility administration is undertaken by a segregated function to ensure proper execution of all credit approvals and maintenance of documentation, and proactive control over maturities, expiry of limits, collateral valuation and contractual covenants.

### 4.1.4 Key features of consumer credit risk management

The Group's consumer portfolio credit risks are managed through an independent unit, which is part of the GRM function and works with the consumer banking business. The consumer risk strategy aims to support portfolio growth within acceptable risk appetite thresholds and advises the Consumer Banking Group with prudent lending policies based on portfolio performance. Consumer Credit Risk Management assesses the external environment and focuses on growth for selected segments and

proactively monitors the portfolio. They are aligned with key concepts of risk management, namely governance, control and measurement and reporting.

Consumer Credit Risk is managed through a framework which sets out policies and procedures covering the measurement and management of credit risk. There is a clear segregation of duties between transaction originators in the businesses and approvers. Within this framework, all credit exposure limits are approved within a defined credit approval authority framework. Policies and procedures specific to each business/product line are approved by the Executive Committee and sanctioned policies are ratified by the Board. Credit loss recognition process/quantification is handled by Consumer Risk Management Unit, within GRM, independent of the business.

### 4.1.5   Credit review procedures and loan classification
*Corporate and SMEs*
The Group's policy is to assess the credit risk in commercial banking through a risk-rating process which provides transparency and consistency to enable comparison between obligors. The Group uses an industry-standard risk-rating tool to make these assessments. Under this risk-rating framework, the obligors are rated based on financial and business assessments.

The risk-rating process derives obligor risk-ratings ("**ORRs**") and facility risk-ratings ("**FRRs**"). The rating methodology focuses on factors such as operating performance, liquidity, debt service and capital structure. The ratio analysis includes the assessment of each ratio's trend across multiple periods, in terms of both rate change and the volatility of the trend. It also compares the value of the ratio for the most-recent period with the values of the comparable peer group. Qualitative assessments of the operations, liquidity and capital structure are also included in the assessment. The Group has implemented risk-rating models for commercial, real estate, high-net-worth individuals and project finance facilities. The Group also has an agreed framework for FRRs. While the ORR does not take into consideration factors such as the availability of collateral and support, the FRR is a measure of the quality of the credit exposure based on the expected loss in the event of default after considering collateral and support. The availability of eligible collateral or support substantially reduces the extent of the loss in the event of default and such risk mitigating factors are reflected in the FRR.

In cases where the risk-rating tool is not applicable, the Bank assigns a rating based on an internal assessment which is mapped to the relevant external rating scale.

The Group classifies its exposure in accordance with the North American Industry Classification System Code in addition to the classification based on purpose codes as defined by the CBK. This additional classification helps to improve the accuracy of ORRs through peer group analysis in respect of performance and financial indicators and also allows the Group to classify its portfolio into sub-segments which facilitate analysis and improve the management of concentrations.

Credit facilities to Corporates and SMEs are structured across various products and maturities and are subject to review at least

annually. Semi-annual "short-form" reviews are also performed subject to certain additional criteria.

*Financial institutions*
The Group's policy is to assess the credit risk in facilities granted to financial institutions by utilizing data from external credit agencies. Such data are then complemented by the bilateral transaction history with the relevant financial institution and existing and potential relationship with the Group. The resulting credit facilities are structured across various products and maturities and are subject to review at least annually.

*Consumer lending*
The independence of the risk management function helps to balance appropriate near-term and longer-term objectives. Consumer lending criteria incorporate CBK regulatory guidelines and Group policies related to consumer credit facilities, such as debt-to-income ratio, minimum qualifying income and limits on advances by product type. Additional inputs utilized include applicant characteristics obtained from credit bureaus, particularly the Kuwait credit bureau, to assist in assessing an applicant's ability to repay and the probability of default.

Consumer Credit Risk Management proactively monitors portfolios considering the external environment, analyzing growth in selected segments and, as per risk strategy, aims to support portfolio growth within acceptable risk appetite thresholds.

Consumer credit risk is monitored with three lines of defence.

| First Line - | The Business owns and manages risks and controls (including the identification and assessment of risk and controls) in adherence to credit policies governing the business and across the value chain in line with risk appetite. |
| Second Line - | The Consumer Credit Risk Management function develops and maintains the risk management framework which enables the business to manage the risk and control environment within the Board-approved risk appetite. |
| Third Line - | Group Internal Audit independently tests, verifies and evaluates controls for effective credit risk management and the implementation of policies and procedures. |

### 4.1.6.   Group credit risk monitoring and portfolio management
The Group has a portfolio risk-rating process through which the overall portfolio quality is assessed at regular intervals and analyzed for credit committees. In addition, a RAROC (Risk-Adjusted Return on Capital) model is in use to guide business lines and Management in pricing credit facilities granted to corporate clients. The RAROC model is based on the premise that pricing should be aligned with the risk embedded in the proposal.

The Group's credit exposures are regularly reviewed and monitored through a system of triggers and early-warning signals aimed at detecting adverse symptoms which could result in a deterioration of credit quality. The triggers and early-warning

systems along with market intelligence, facility utilization and collateral valuation updates are included in the regular review of the credit facilities to enable timely corrective action by Management. These reviews are performed on a semi-annual, annual and ad-hoc basis as required. The results of the monitoring process are reflected in the internal rating.

The total portfolio credit risk is monitored on an ongoing basis with formal monthly and quarterly reporting to ensure senior management awareness of shifts in credit quality and portfolio performance along with changing external factors such as economic and business cycles.

Cross-border exposures are monitored by the central credit risk management function against specific limits set for this purpose.

Consumer credit risk reporting also includes a detailed dashboard for consumer and small-business lending, covering the entire credit life-cycle, including delinquency monitoring such as ageing and migration and loss recognition.

### 4.1.7.   Group credit risk mitigation strategy
Portfolio diversification is a cornerstone of the Group's credit risk mitigation strategy which is implemented through customer, industry and geographical limit structures.

In accordance with CBK regulations, the Group limits its credit concentration per group of related entities to 15.0 per cent. of the Bank's Regulatory Capital. This does not apply to government and quasi-government entities, agencies and departments in the GCC countries that do not work on a commercial basis and subject to CBK approval, or to banks. The Group also measures its concentration levels across sectors, geographies and products to ensure and enhance the portfolio oversight and diversification.

Credit risk mitigants such as collateral and guarantees from third parties are effective mitigating factors within the Group's portfolio and collateral quality is continuously monitored and assessed. Risk transfer in the form of syndications, risk participation arrangements with other banks and sale of loans are common practices to manage the Group's exposures.

### 4.1.8   Management of credit collateral and valuation
The main types of collateral accepted by the Group include:

• cash collateral;
• quoted shares and units in collective investment schemes;
• bank guarantees;
• commercial and residential real estate; and
• eligible debt instruments (principally sovereign and bank obligors).

The custody and daily "mark to market" (revaluation) of financial collateral, inclusive of shares, are performed independent of the business units. Real estate collateral except private residences is valued on an annual basis.

In accordance with the Group's credit policies, banks and creditworthy companies and individuals with high net worth are accepted as guarantor counterparties, subject to credit risk assessment. However, in accordance with the CBK Basel III framework, only cash collateral, guarantees from banks with defined high credit-quality ratings, quoted shares, eligible debt instruments and units in collective investment schemes are recognised as risk mitigation for capital adequacy purposes.

The Group's credit exposures were covered by the following eligible financial collateral and guarantees:

| Table 7 | KD 000s | | | | | |
|---|---|---|---|---|---|---|
| | **31 December 2023** | | | 31 December 2022 | | |
| | **Gross credit exposure** | **Eligible Credit Risk Mitigation** | **Eligible guarantees** | Gross credit exposure | Eligible Credit Risk Mitigation | Eligible guarantees |
| Cash | **184,832** | **-** | **-** | 244,199 | - | - |
| Claims on sovereigns | **7,774,130** | **77,155** | **-** | 8,253,189 | 504 | - |
| Claims on International Organisations | **153,308** | **-** | **-** | 122,546 | - | - |
| Claims on public sector entities | **1,675,638** | **-** | **-** | 1,595,886 | 377 | - |
| Claims on multilateral development banks | **248,550** | **-** | **-** | 92,728 | - | - |
| Claims on banks | **5,738,584** | **53,327** | **1,324,512*** | 5,903,570 | 81,711 | 1,288,950 * |
| Claims on corporates | **18,209,980** | **1,345,188** | **-** | 16,352,030 | 1,428,506 | - |
| Regulatory retail exposure | **7,648,318** | **173,145** | **-** | 7,592,958 | 177,676 | - |
| Past due exposures | **161,944** | **5,057** | **-** | 151,717 | 5,899 | - |
| Other exposures | **1,385,833** | **-** | **-** | 1,249,508 | - | - |
| **Total** | **43,181,117** | **1,653,872** | **1,324,512** | 41,558,331 | 1,694,673 | 1,288,950 |

* "Memorandum" item where banks act as "guarantors"

#### 4.1.9. Gross, average and net credit exposures

The Group's gross credit exposures, average credit exposures and the former adjusted for credit conversion and credit risk mitigation factors, respectively, are detailed below:

| Table 8: | KD 000s | | | | | |
|---|---|---|---|---|---|---|
| | **31 December 2023** | | | 31 December 2022 | | |
| | **Gross credit exposure** | **Funded exposure** | **Unfunded exposure** | Gross credit exposure | Funded exposure | Unfunded exposure |
| Cash | 184,832 | 184,832 | - | 244,199 | 244,199 | - |
| Claims on sovereigns | 7,774,130 | 7,762,498 | 11,632 | 8,253,189 | 8,241,066 | 12,123 |
| Claims on International Organisations | 153,308 | 153,308 | - | 122,546 | 122,546 | - |
| Claims on public sector entities | 1,675,638 | 1,566,677 | 108,961 | 1,595,886 | 1,538,660 | 57,226 |
| Claims on multilateral development banks | 248,550 | 248,550 | - | 92,728 | 92,728 | - |
| Claims on banks | 5,738,584 | 4,003,076 | 1,735,508 | 5,903,570 | 4,065,179 | 1,838,391 |
| Claims on corporates | 18,209,980 | 14,600,321 | 3,609,659 | 16,352,030 | 12,949,529 | 3,402,501 |
| Regulatory retail exposure | 7,648,318 | 7,586,987 | 61,331 | 7,592,958 | 7,533,398 | 59,560 |
| Past due exposures | 161,944 | 160,335 | 1,609 | 151,717 | 150,217 | 1,500 |
| Other exposures | 1,385,833 | 1,385,833 | - | 1,249,508 | 1,249,508 | - |
| **Total** | **43,181,117** | **37,652,417** | **5,528,700** | **41,558,331** | **36,187,030** | **5,371,301** |

| Table 9: | KD 000s | | | | | |
|---|---|---|---|---|---|---|
| Average Credit Exposures* | **31 December 2023** | | | 31 December 2022 | | |
| | **Average credit exposure** | **Funded exposure** | **Unfunded exposure** | Average credit exposure | Funded exposure | Unfunded exposure |
| Cash | 193,912 | 193,912 | - | 251,295 | 251,295 | - |
| Claims on sovereigns | 7,274,160 | 7,259,055 | 15,105 | 7,547,386 | 7,528,388 | 18,998 |
| Claims on International Organisations | 153,335 | 153,335 | - | 120,901 | 120,901 | - |
| Claims on public sector entities | 1,644,549 | 1,574,834 | 69,715 | 1,615,425 | 1,567,262 | 48,164 |
| Claims on multilateral development banks | 173,893 | 173,893 | - | 70,031 | 70,031 | - |
| Claims on banks | 6,068,253 | 4,262,590 | 1,805,663 | 5,782,341 | 3,922,344 | 1,859,997 |
| Claims on corporates | 17,441,121 | 13,926,788 | 3,514,333 | 15,643,401 | 12,423,042 | 3,220,359 |
| Regulatory retail exposure | 7,604,472 | 7,544,301 | 60,171 | 7,408,367 | 7,351,287 | 57,080 |
| Past due exposures | 208,155 | 206,546 | 1,609 | 125,148 | 123,396 | 1,752 |
| Other exposures | 1,366,939 | 1,226,227 | 140,712 | 1,181,813 | 1,181,813 | - |
| **Total** | **42,128,789** | **36,521,481** | **5,607,308** | **39,746,108** | **34,539,759** | **5,206,350** |

*Based on average of four quarter-end balances

| Table 10: | KD 000s | | | | | |
|---|---|---|---|---|---|---|
| **Net Credit Exposures** | **31 December 2023** | | | 31 December 2022 | | |
| | **Net credit exposure** | **Funded exposure** | **Unfunded exposure** | Net credit exposure | Funded exposure | Unfunded exposure |
| Cash | 184,832 | 184,832 | - | 244,199 | 244,199 | - |
| Claims on sovereigns | 7,692,969 | 7,685,811 | 7,158 | 8,247,188 | 8,241,066 | 6,122 |
| Claims on International Organizations | 153,308 | 153,308 | - | 122,546 | 122,546 | - |
| Claims on public sector entities | 1,659,185 | 1,566,677 | 92,508 | 1,579,037 | 1,538,660 | 40,377 |
| Claims on multilateral development banks | 248,550 | 248,550 | - | 92,728 | 92,728 | - |
| Claims on banks | 4,912,191 | 4,077,353 | 834,838 | 4,981,631 | 4,141,232 | 840,399 |
| Claims on corporates | 15,285,571 | 13,460,017 | 1,825,554 | 13,421,656 | 11,719,276 | 1,702,380 |
| Regulatory retail exposure | 7,443,375 | 7,431,099 | 12,276 | 7,384,908 | 7,372,130 | 12,778 |
| Past due exposures | 156,083 | 155,278 | 805 | 145,068 | 144,318 | 750 |
| Other exposures | 1,385,833 | 1,385,833 | - | 1,283,126 | 1,283,126 | - |
| Total | 39,121,897 | 36,348,758 | 2,773,139 | 37,502,087 | 34,899,281 | 2,602,806 |

As at 31 December 2023, 41 % (2022: 42%) of the Group's net credit risk exposure was rated by External Credit Assessment Institutions (ECAIs) recognised for the purpose, as detailed below:

| Table 11: | KD 000s | | | | | |
|---|---|---|---|---|---|---|
| **Net Credit Exposures** | **31 December 2023** | | | 31 December 2022 | | |
| | **Net credit exposure** | **Rated exposure** | **Unrated exposure** | Net credit exposure | Rated exposure | Unrated exposure |
| Cash | 184,832 | - | 184,832 | 244,199 | - | 244,199 |
| Claims on sovereigns | 7,692,969 | 7,692,969 | - | 8,247,188 | 8,247,188 | - |
| Claims on International Organizations | 153,308 | - | 153,308 | 122,546 | - | 122,546 |
| Claims on public sector entities | 1,659,185 | 254,029 | 1,405,156 | 1,579,037 | 121,046 | 1,457,991 |
| Claims on multilateral development banks | 248,550 | 248,550 | - | 92,728 | 92,728 | - |
| Claims on banks | 4,912,191 | 4,872,643 | 39,548 | 4,981,631 | 4,943,006 | 38,625 |
| Claims on corporates | 15,285,571 | 3,099,397 | 12,186,174 | 13,421,656 | 2,359,811 | 11,061,845 |
| Regulatory retail exposure | 7,443,375 | - | 7,443,375 | 7,384,908 | - | 7,384,908 |
| Past due exposures | 156,083 | - | 156,083 | 145,068 | - | 145,068 |
| Other exposures | 1,385,833 | - | 1,385,833 | 1,283,126 | - | 1,283,126 |
| **Total** | **39,121,897** | **16,167,588** | **22,954,309** | **37,502,087** | **15,763,779** | **21,738,308** |

The Group uses external ratings (where available) from recognised and creditable market sources to supplement internal ratings during the process of determining credit limits. Public issue instruments without external ratings are risk-weighted at 100% for capital adequacy purposes.

The geographical distribution of the gross credit exposure before taking into consideration credit enhancements is as detailed below:

| Table 12 | | | | | KD 000's | |
|---|---|---|---|---|---|---|
| 31 December 2023 | Middle East and North Africa | North America | UK & Europe | Asia | Others | Total |
| Cash | 163,386 | 2,082 | 19,364 | - | - | 184,832 |
| Claims on sovereigns | 6,295,699 | 1,090,340 | 273,806 | 114,285 | - | 7,774,130 |
| Claims on International Organizations | - | - | - | 153,308 | - | 153,308 |
| Claims on public sector entities | 1,659,199 | - | 15,919 | 520 | - | 1,675,638 |
| Claims on multilateral development banks | 234,614 | 7,684 | 6,252 | - | - | 248,550 |
| Claims on banks | 3,128,757 | 254,745 | 1,265,293 | 1,075,242 | 14,547 | 5,738,584 |
| Claims on corporates | 12,410,504 | 873,299 | 2,671,620 | 1,796,842 | 457,715 | 18,209,980 |
| Regulatory retail exposure | 7,632,780 | 612 | 7,587 | 3,262 | 4,077 | 7,648,318 |
| Past due exposures | 111,874 | 35,328 | 14,742 | - | - | 161,944 |
| Other exposures | 979,172 | 151,257 | 190,950 | 9,261 | 55,193 | 1,385,833 |
| Total | 32,615,985 | 2,415,347 | 4,465,533 | 3,152,720 | 531,532 | 43,181,117 |

| | | | | | KD 000's | |
|---|---|---|---|---|---|---|
| 31 December 2022 | Middle East and North Africa | North America | UK & Europe | Asia | Others | Total |
| Cash | 163,267 | 423 | 80,508 | - | - | 244,198 |
| Claims on sovereigns | 5,494,542 | 2,415,330 | 226,148 | 117,168 | - | 8,253,188 |
| Claims on International Organizations | - | - | - | 122,546 | - | 122,546 |
| Claims on public sector entities | 1,574,547 | - | 20,846 | 493 | - | 1,595,886 |
| Claims on multilateral development banks | 92,728 | - | - | - | - | 92,728 |
| Claims on banks | 3,344,384 | 403,371 | 1,195,749 | 900,720 | 59,346 | 5,903,570 |
| Claims on corporates | 11,212,159 | 837,998 | 2,374,270 | 1,486,802 | 440,805 | 16,352,034 |
| Regulatory retail exposure | 7,578,526 | 1,452 | 6,338 | 2,645 | 3,997 | 7,592,958 |
| Past due exposures | 93,462 | 6,249 | 52,005 | - | - | 151,716 |
| Other exposures | 886,943 | 97,502 | 167,967 | 7,611 | 89,484 | 1,249,507 |
| Total | 30,440,558 | 3,762,325 | 4,123,831 | 2,637,985 | 593,632 | 41,558,331 |

The Group's gross credit exposure by residual contractual maturity is as detailed below:

| Table 13 | | | KD 000's | |
|---|---|---|---|---|
| 31 December 2023 | Up to 3 months | 3 to 12 months | Over 1 year | Total |
| Cash | 184,832 | - | - | 184,832 |
| Claims on sovereigns | 4,576,933 | 876,419 | 2,320,778 | 7,774,130 |
| Claims on International Organizations | 101,232 | 52,076 | - | 153,308 |
| Claims on public sector entities | 479,601 | 135,171 | 1,060,866 | 1,675,638 |
| Claims on multilateral development banks | 103,701 | 3,136 | 141,713 | 248,550 |
| Claims on banks | 2,696,721 | 990,081 | 2,051,782 | 5,738,584 |
| Claims on corporates | 5,615,478 | 3,206,072 | 9,388,430 | 18,209,980 |
| Regulatory retail exposure | 225,458 | 511,377 | 6,911,483 | 7,648,318 |
| Past due exposures | 109,025 | - | 52,919 | 161,944 |
| Other exposures | 253,888 | 47,729 | 1,084,216 | 1,385,833 |
| Total | 14,346,869 | 5,822,061 | 23,012,187 | 43,181,117 |

| | | | KD 000's | |
|---|---|---|---|---|
| 31 December 2022 | Up to 3 months | 3 to 12 months | Over 1 year | Total |
| Cash | 244,184 | 15 | - | 244,199 |
| Claims on sovereigns | 5,000,220 | 936,625 | 2,316,344 | 8,253,189 |
| Claims on International Organizations | 100,780 | 21,766 | - | 122,546 |
| Claims on public sector entities | 510,295 | 127,631 | 957,960 | 1,595,886 |
| Claims on multilateral development banks | 70,526 | - | 22,202 | 92,728 |
| Claims on banks | 2,831,727 | 849,127 | 2,222,716 | 5,903,570 |
| Claims on corporates | 5,672,644 | 2,739,703 | 7,939,683 | 16,352,030 |
| Regulatory retail exposure | 205,825 | 545,307 | 6,841,826 | 7,592,958 |
| Past due exposures | 151,717 | - | - | 151,717 |
| Other exposures | 280,926 | 50,065 | 918,517 | 1,249,508 |
| Total | 15,068,844 | 5,270,239 | 21,219,248 | 41,558,331 |

### 4.1.10. Impairment Expected Credit Loss and/or Provisions

*Policy since 1 January 2018*

**Impairment of financial assets other than credit facilities**
The Group recognises Expected Credit Losses (ECL) under IFRS 9 on:

- investment in debt securities measured at amortised cost or fair value through other comprehensive income; and
- balances and deposits with banks.

Equity investments are not subject to Expected Credit Losses. The ECL on financial assets other than credit facilities as at 31 December 2023 amounted to KD 72,707 thousand. (2022: KD 72,709 thousand)

**Impairment of credit facilities**
Credit facilities granted by the Group consist of:

- loans and advances, Islamic financing to customers including credit commitments;
- letters of credit and financial guarantee contracts including credit commitments

Impairment on credit facilities is recognised in the consolidated statement of financial position at an amount equal to the higher of:

(i) ECL under IFRS 9 according to the CBK guidelines dated 25th December 2018;

The Group in estimating ECL on credit facilities has taken into consideration the following key parameters based on inputs from CBK:

- a floor for estimating probability of default ("PD") for specific portfolios;
- eligible collateral with haircuts for determining loss given default ("LGD") and a floor LGD;deemed maturity for exposures in Stage 2;
- a credit conversion factor ("CCF") on utilised and un-utilised portions for cash and non-cash facilities;
- a days-past-due backstop, and a rating notch downgrade for stage movement for specific portfolios; and
- a stage 2 observation period prior to curing.

Refer Notes of the Group's consolidated financial statement for further details on ECL. and

(ii) the provisions required by the CBK instructions of December 1996 since amended in 2007.

Credit facilities are classified as past-due when a payment has not been received on its contractual payment date, or if the facility is in excess of pre-approved limits.

A credit facility is considered as past-due and impaired if the interest or profit or a principal instalment is past due for more than 90 days, and as impaired if the carrying amount of the facility is greater than its estimated recoverable value.

Past-due and past-due and impaired facilities are managed and monitored as "irregular" facilities and are classified into the following four categories, which are then used to guide the provisioning process:

- Watchlist, irregular for a period up to and including 90 days (no specific provision required);
- Substandard, irregular for a period from and including 91 days and up to and including 180 days (20 per cent. specific provision required);
- Doubtful, irregular for a period from and including 181 days and up to and including 365 days (50 per cent. specific provision required); and
- Bad, irregular for a period exceeding 365 days (100 per cent. specific provision required).

The Group may also include a credit facility in one of the above categories based on Management's judgement of a customer's financial and/or non-financial circumstances.

The Group impaired loan portfolio as at 31 December 2023 was KD 318,386 thousand (2022: KD 310,046 thousand) against which a specific provision of KD 159,150 thousand (2022: 159,870 thousand) has been made, as detailed below:

| Table 14 | KD 000's | | |
|---|---|---|---|
| **31 December 2023** | **Past due and impaired financing** | **Related Specific provision** | **Specific provision recovered (written off), net of exchange rate movement** |
| Claims on corporates | 179,233 | 70,402 | (21,903) |
| Regulatory retail exposure | 139,153 | 88,748 | (25,797) |
| **Total** | **318,386** | **159,150** | **(47,700)** |

| | KD 000's | | |
|---|---|---|---|
| 31 December 2022 | Past due and impaired financing | Related Specific provision | Specific provision recovered (written off), net of exchange rate movement |
| Claims on corporates | 182,056 | 69,407 | 214,231 |
| Regulatory retail exposure | 127,990 | 90,463 | (12,734) |
| Total | 310,046 | 159,870 | 201,497 |

The geographical distribution of "past-due and impaired" financing and the related specific provision are as follows:

| Table 15 | | | KD 000's | | | |
|---|---|---|---|---|---|---|
| **31 December 2023** | **Middle East and North Africa** | **North America** | **UK & Europe** | **Asia** | **Others** | **Total** |
| Past due and impaired financing | 248,040 | 55,457 | 14,889 | - | - | 318,386 |
| Specific provision | 138,874 | 20,129 | 147 | - | - | 159,150 |

| | | | KD 000's | | | |
|---|---|---|---|---|---|---|
| 31 December 2022 | Middle East and North Africa | North America | UK & Europe | Asia | Others | Total |
| Past due and impaired financing | 238,987 | 15,367 | 55,692 | - | - | 310,046 |
| Specific provision | 147,100 | 9,118 | 3,652 | - | - | 159,870 |

In accordance with CBK regulations, minimum general provisions of 1% for cash facilities and 0.5% for non-cash facilities, respectively, are made on all applicable credit facilities (net of certain restricted categories of collateral) which are not subject to specific provisioning.

The adequacy of provisions is regularly evaluated and monitored by the Provision Committee.

The Group's total provision as at 31 December 2023 was KD 903,390 thousand (2022: 868,285 thousand) inclusive of a general provision of KD 729,148 thousand (2023: KD 691,088 thousand) as detailed below:

| Table 16 | KD 000's | |
|---|---|---|
| | **31 December 2023** | 31 December 2022 |
| Claims on sovereigns | 3,689 | 3,863 |
| Claims on public sector entities | 9,037 | 12,360 |
| Claims on banks | 5,009 | 4,951 |
| Claims on corporates | 627,383 | 572,770 |
| Regulatory retail exposure | 84,030 | 97,144 |
| **Total** | **729,148** | 691,088 |

The total general provision above includes KD 31,568 thousand (2022: KD 31,068 thousand) relating to "non-cash" facilities in accordance with CBK regulations.

The geographical distribution of the general provision on "cash" facilities is as follows:

| Table 17 | KD 000's | | | | | |
|---|---|---|---|---|---|---|
| | **Middle East and North Africa** | **North America** | **UK & Europe** | **Asia** | **Others** | **Total** |
| **31 December 2023** | **650,045** | **6,752** | **29,970** | **6,464** | **4,349** | **697,580** |
| 31 December 2022 | 616,404 | 7,076 | 28,155 | 4,617 | 3,768 | 660,020 |

The analysis of specific and general provisions is further detailed in note 13 of the Group's consolidated financial statements.

The provisions for credit facilities as at 31 December 2023 was KD 903,390 thousand (2022 : KD 868,285 thousand) computed pursuant to the CBK instructions of December 1996 since amended, are higher than the IFRS 9 ECL for credit facilities as at 31 December 2023 which was KD 615,659 thousand (2022 : KD 577,435 thousand).

### 4.2. Market risk
Market risk is defined as the potential loss in value of financial instruments or contracts or portfolio of instruments caused by adverse movements in market variables such as interest rates, foreign exchange rates, equity prices, volatility, spreads etc.

The Group identifies market risk inherent in its financial claims and loans, FX exposure, trading and investment activities, and defines market risk management strategy through the following:

- Implementation of Market Risk Management Framework
- Well-defined processes and strong and effective controls
- Recognition of Market Risk as inherent to Bank's Business Model and Macro-Economic Environment.

- Clear segregation of "front", "back" and 'middle' office duties.
- Bank's approach to accept, limit and increase Market Risks
- Regular and effective monitoring and reporting of exposures and risk measures
- Regular monitoring of market prices and valuation of financial instruments
- Defined set of internal limits and regular reporting on the adherence to those limits
- Regular independent review of internal controls and limits
- Implementation of adequate infrastructure

#### 4.2.1. Market-risk management framework
The Bank's Market Risk Management Framework consists of Governance, Identification & Measurement, Management & Limit Setting as well as Reporting/ Management information.

The Board of Directors (BoD) is ultimately responsible for determining and setting the amount of Market Risk that the Bank is exposed to as a result of executing its business strategy through Bank's Risk Appetite. The market risk management framework governs the Group's trading and non-trading related market risk activities. The General Manager of the Treasury Group and General Managers in Overseas locations are responsible for managing trading activities. The management of market risk inherent within the Group's non-trading activities is the primary responsibility of the Group Asset and Liability Executive Committee (ALEC), supported by the regional Asset and Liability Committees.

Group Asset and Liability Management (ALM) Unit is responsible for supervising the management of Market Risk process. All activities giving rise to market risk are conducted within a structure of approved credit and position limits. Group Market Risk Management independently measures, monitors and reports on Bank's market risk exposures.

#### 4.2.2. Monitoring of non-trading market risk in the banking book
The Group's key non-trading market risk is the sensitivity of its net interest income to movements in interest rates.

The interest rate risk in the "Banking Book" is managed through amongst others a "re-pricing gap" limit structure which is supplemented by periodic analysis of scenarios (instantaneous parallel shift of +/-5 bps and +/-10bps in the yield curve) to capture the sensitivity of the exposure to interest rate changes.

The analysis of scenarios shows the impact in the banking book as follows:

| Table 18 | KD 000's | | | |
|---|---|---|---|---|
| | **+ 5bp** | **-5bp** | **+10bp** | **-10bp** |
| **31 December 2023** | **3,307** | **(3,307)** | **6,614** | **(6,614)** |
| 31 December 2022 | 3,359 | (3,359) | 6,717 | (6,717) |

Included in the assumptions above are that interest rates move by the same percentage irrespective of maturity, that all positions run to maturity and that no management corrective action is taken to mitigate the impact of interest rate risk. In addition to interest rate risk, the Group is also exposed to market risk as a result of changes in the "fair value" of its strategic equity and investment positions held without any intention of liquidation.

#### 4.2.3. Monitoring of "market" risk from "trading" activities
The Group's Risk Management function independently monitors the regional and global trading market risk exposure using Value-at-Risk ("**VaR**") methodology to derive quantitative measures specifically for market risk under normal market conditions. This enables the Group to apply a constant and uniform measure across all of its trading activities and facilitates comparisons of market risk estimates, both over time and against daily trading results.

The VaR is supplemented with stress-testing (a stressed VaR) to quantify market risk under extreme stress scenarios based on observed historical worst-case and in-house developed scenarios. VaR computation allows for diversification benefits at the Group level. Furthermore, the Group recognizes and mitigates the correlation of other risks and processes in its market risk monitoring process.

In addition to VaR, the Group uses a structure of foreign exchange and interest rate limits to manage and control its market risk associated with trading activities. The Group's market risk is also assessed under stressed conditions using the same framework. Computations are based on stressed historical data.

#### 4.2.4 Equity price risk
Equity price risk is the risk that the fair values of equities will fluctuate as a result of changes in the level of equity indices or the value of individual shares. Equity price risk arises from the change in fair value of equity investments. The Group manages equity price risk through diversification of investments in terms of geographic distribution and industry concentration.

The CBK has set a maximum limit of 50 per cent. of a bank's Regulatory Capital for investment in funds and equities, excluding in subsidiaries.

The analysis of the Group's total equity investment portfolio is as follows:

| Table 19 | KD 000's | |
|---|---|---|
| | **31 December 2023** | 31 December 2022 |
| Total Equity Investment | 75,754 | 68,720 |
| Of which Quoted Investments (%) | 55% | 48% |
| | | |
| Net gains or (loss) of FVPL classified instruments recognised in Profit & Loss Statement during the period | 3,219 | (2,738) |
| Net gains or (loss) of FVOCI classified instruments recognized in Balance-sheet as at period-end | (1,250) | (1,851) |
| | | |
| Capital requirement of Equity investment portfolio categorized as: | | |
| Fair value through Other Comprehensive Income (FVOCI) | 6,151 | 5,020 |
| Fair value through P&L (FVPL) | 6,078 | 4,977 |

All revaluation gains or losses during the year relating to equity investments were recorded in the consolidated statement of financial position. For additional details of the accounting policies related to the valuation of equity holdings, refer to notes 2.15 and 2.16 of the Group's consolidated financial statements.

### 4.2.5 Currency Risk
The Group is exposed to transactional foreign currency risk to the extent that there is a mismatch between the currencies in which transactions are denominated and the respective functional currency of the Group companies and ultimately upon translation to the Base Currency of the Group.

The currency exposures are monitored on a regular basis and compared against approved risk appetite.

### 4.2.6 Managing Interest rate benchmark reform and associated risks

*Overview*
A fundamental reform of major interest rate benchmarks is being undertaken globally, including the replacement of some interbank offered rates (IBORs) with alternative nearly risk-free rates (referred to as 'IBOR' reform). The Group has been closely monitoring the market and the output from the various industry working groups managing the transition to new benchmark interest rates.

The key risks for the Group arising from the transition are Conduct risk, Pricing risk, Interest rate basis risk, Accounting, Litigation and Operational risk.

**Progress on transition**

*Non-Derivatives*
The Group has completed the transition of its non-USD IBOR linked contracts to risk-free/ alternative rates, through amendments to fall back clauses as well as agreeing with the client/ counterparty on the alternative rate. The Group has transitioned significant majority of its USD linked contracts to "Risk-Free Rates" (RFRs). For remaining contracts which are mainly syndicated contracts, discussions are currently in progress with the counterparties to complete the transition. For contracts whose transition is not completed, the Group will continue with the 'synthetic' LIBOR benchmark published by the ICE Benchmark Administration until 30-Sep-2024.

*Derivatives*
The Group has completed the transition of all USD and non-USD linked derivatives as per ISDA Fallbacks Protocol.

*Hedge Accounting*
Refer to note 2.21 of the financial statements.

### 4.2.7. Counterparty Credit Risk
The Group enters into financial instruments that are traded over the counter mainly for hedging purpose with various counterparties. In most cases, industry-standard documentation is used which gives the Group the protection in situation where the Group's Counterparty is in default. The Group also enters into Interest Rate Swaps, which are cleared on an exchange and provide daily margin in the form of cash at the exchange.

Counterparty Credit Exposure arises from the risk that counterparties are unable to meet their payment obligations under certain financial contracts such as derivatives.

The Group Risk Management function independently monitors counterparty credit risk exposures arising from its derivatives transactions using the concept of Potential Future Exposure (PFE). The PFE is defined as the maximum expected credit exposures over a specified horizon at a particular confidence level. As such, the risk exposure is an upper bound of possible exposures at the selected confidence level and not the maximum risk exposure possible.

In response to the various regulations, including the European Market Infrastructure Regulations (EMIR), the Bank has, with the approval of the CBK, established NBK GDM (Caymans) Limited to deal in financial derivatives products, which allows the Bank to continue dealing with highly-rated counterparties on derivative transactions with netting arrangements in place and removes the risk that the Bank may be required to post "margin" collateral on an asymmetric basis. The Bank has also set in place policies and procedures to ensure compliance with EMIR regulations, i.e., to clear OTC derivatives through Central Counterparties (CCP).

*Wrong-Way Risk (WWR)*
WWR arises when there is adverse (positive) correlation between a client's credit-worthiness (probability of default) and the Group's credit exposure to that client.

NBK does not enter into derivatives whose valuations depend on the credit quality of the counterparty and hence wrong-way risk is not a factor of risk for the Bank.

#### 4.2.7.1 Assignment of credit limits for Counterparty Credit Exposures
Counterparty credit risk exposure arises from the risk that counterparties are unable to meet their payment obligations

under derivative contracts. The allocation of credit limits for derivatives market counterparties is provided by the Bank's Institutional Banking Division taking into consideration counterparty credit profile, historical financial performance, geographical location, legal jurisdiction and other relevant factors. The credit limits are reviewed on an annual basis and credit exposure is regularly monitored and reported for all derivatives' counterparties.

#### 4.2.7.2 Policies for securing collateral and credit reserves
Credit risk from derivatives is mitigated where possible through netting agreements whereby derivative assets and liabilities with the same counterparty can be offset. The Group uses ISDA master agreement as the preferred agreement for documenting OTC derivatives. In order to reduce its counterparty risk, the Group selectively enters into ISDA Credit Support Annex (CSA) collateral agreements. In line with these standards, the Group generally accepts only cash as collateral. It also has policies and procedures for reviewing the legal enforceability of credit support documents in accordance with applicable rules. Credit risk is reduced through the process of daily margining with relevant market-counterparties. Daily margining is performed with the help of Treasury system as well as through the use of collateral service agent. Daily valuations for qualified derivatives are compared to those reported by the market-counterparties and any disagreements are directly resolved between the parties. The Group uses an internal model to estimate PFE, which includes the mitigating effects of netting and collateral in valuing over-the-counter contracts.

*Additional collateral requirements due to credit rating downgrade*
The Group has no provisions in its agreements with market counterparties where a downgrade in its credit rating will have an impact on the collateral amount to be posted.

#### 4.2.7.3 General Disclosure for Counterparty Credit Risk

| Table 20 | KD 000s | |
|---|---|---|
| **Derivative Contracts** | **31 December 2023** | 31 December 2022 |
| **Gross Positive fair value** | 290,685 | 325,986 |
| Counterparty netting benefit | (20,150) | (16,251) |
| Netted current credit exposure | 270,535 | 309,735 |
| Cash collateral (held by NBK) | 247,132 | 297,916 |
| **Net exposure (after netting and collateral)** | 23,403 | 11,818 |

#### 4.2.7.4 Exposure-at-Default Methodology
As per the regulatory requirements, the Bank calculates counterparty credit exposure as per the Current Exposure Method (CEM) for its exposure to derivatives counterparties.

In addition, the Bank calculates counterparty credit exposure

using the Potential Future Exposure (PFE) measure. The Bank applies 'historical' simulation approach (at 99% confidence level) by projecting the potential values of relevant risk factors across the transactions' horizon, and then re-valuing derivatives transactions and counterparty credit exposures according to the projected risk factor.

Both the CEM and PFE methods incorporate the effects of legally enforceable netting and collateral agreements when estimating counterparty exposure.

| Table 21 | KD 000s | |
|---|---|---|
| | **31 December 2023** | 31 December 2022 |
| Counterparty Credit Risk (CEM method) for derivatives' counterparties | 152,255 | 113,276 |
| Counterparty Credit Risk (PFE method) for derivatives' counterparties | 354,028 | 387,775 |

**4.2.8    Notional value of credit derivatives transactions**
NBK has no exposure to credit derivatives.

**4.3    Operational risk**
Operational risks are governed at Group level through a Board-approved Group Operational Risk Management policy and framework which defines the roles and responsibilities of the Board & BRCC, the EC, Business and Operational Teams, Group Operational & Technology Risk Management function [ORM] and the Group Internal Audit function [GIA] for managing, monitoring and reporting operational risks. The key components of the Board-approved framework are:

- comprehensive, documented policies, procedures and controls which reflect CBK and Basel III guidelines for internal controls and sound practices for managing and supervising operational risks in banks;
- risk and control self-assessments conducted by business line management in coordination with and supported by ORM;
- quarterly key risk indicator submission and validation to identify risk trends and develop mitigating actions;
- operational incident, loss reporting and investigation of causes and failed controls;

ORM has implemented an Integrated Risk Management system that facilitates the maintenance of a comprehensive Risk Register, approval framework for plans to deal with residual risk treatment plans, reporting of risk indicators and operational incidents and maintenance of business continuity impact assessments and plans.

ORM works closely with all of the Group's business lines to raise awareness of operational risk. In addition to the risk opinions and constant support provided by the operational risk management function through daily activities, operational risk awareness is achieved through a comprehensive training programme developed and delivered by the operational risk management function to the various business units. The aim of this training programme is to cultivate strategic relationships with business line management and to encourage open communication and ownership of risk issues.

Risk and control self-assessments are regularly conducted by the Business and Operational teams in order to identify the residual risks, control gaps and take relevant risk treatment measures in consultation with ORM.

Key risks across business and support units are identified and monitored on a quarterly basis using various key risk indicators developed with the business units in line with the Group's risk appetite. The capture and reporting of operational risk incidents and losses are established as a firm process across all business and support units. Close co-ordination with business units and the GIA enables ORM to track operational incidents and losses and to propose mitigating actions for business units to follow in order to address control weaknesses.

In addition, a comprehensive Business Continuity, Crisis Management and Disaster Recovery management programme designed to cope with business disruptions and major disasters has been implemented and is regularly tested.

Material Operational risks are periodically reviewed with relevant members of Executive Management and reported to the EC and BRCC to ensure comprehensive oversight.

**4.4    Liquidity risk**
Liquidity risk is defined as the inability to generate sufficient financial resources to meet all obligations and commitments as they fall due, or the ability only to secure them at excessive cost. It is the policy of the Group to maintain adequate liquidity at all times, in all geographical locations.

The Group's liquidity management is guided by its internal liquidity policy, which is reviewed annually and approved by the Board. The EC assigns responsibilities and ensures the Group has sufficient resources to carry out liquidity risk management work in an independent and effective manner. The primary responsibilities for the management of liquidity are with the ALEC, regional asset and liability committees, the Group Treasurer and local Treasurers. Day-to-day cash-flows and liquidity management are handled by the 'local' treasury teams at Group Head Office and the Group's international locations. The longer-term liquidity and funding profile of the Group is monitored and managed by Group Treasury under the guidance of the ALEC.

The Group's liquidity policy specifies the main goals, roles and responsibilities, processes and procedures for managing the Group's liquidity risk. It also encompasses the Group's contingency funding plan, which is intended to provide a framework for effective responses to any potential liquidity crisis, whether triggered by Bank-specific or by systemic liquidity shortages.

The Bank's liquidity risk strategy is centred on maintaining an adequate liquidity position at all times, primarily by means of an acceptable maturity mismatch profile, relying on more 'stable' deposits and maintaining an adequate stock of High-Quality Liquid Assets (HQLAs) at all times. Further, the Bank's liquidity objectives are:

- to ensure strategies are in conformity with the regulatory requirements of the CBK and the requirements of the local regulators in other jurisdictions where the Group operates;
- to ensure the use of proper tools in ascertaining liquidity risk;
- continuously to seek sources of stable customer funds and to keep its funding costs as low as possible;
- to limit its dependence on the use of short-term inter-bank funding;
- to leverage its strong position, reputation and credit strength in order to secure long-term funding, such as customer deposits, institutional deposits, government deposits and debt issuance at a competitive cost;
- to ensure the Bank's ability to generate or obtain cash or its equivalent in a timely and cost-efficient manner so that the Bank can meet its obligations;
- to maintain market confidence; and
- to ensure profitable business opportunities can be pursued without liquidating assets at undesirable times, or raising additional unsecured funding on an unreasonable scale or timescale.

The liquidity and funding management process includes:

- self-imposed and regulatory liquidity ratios, including ratios in accordance with Basel III principles;
- maintaining a diverse range of funding sources with adequate back-up facilities;
- monitoring depositor concentration in order to avoid undue reliance on individual large depositors and ensure a satisfactory overall funding mix; and
- liquidity stress tests to make sure the Group can survive liquidity squeezes under different stress scenarios.

The Bank monitors and reports various internal and regulatory liquidity metrics in order to manage and comply with liquidity risk on an on-going basis. Specifically, since 1st June 2016, the Bank is monitoring and reporting Liquidity Coverage Ratio (LCR) in line with CBK instructions. Refer to the Liquidity Coverage Ratio disclosures available on the Bank's website of the Bank for Governance framework, Funding Strategy and LCR ratio results and analysis.

In accordance with the Basel III framework, as implemented by the CBK, the Group also manages its liquidity through compliance with the Net Stable Funding Ratio (NSFR). Starting from 1 January 2018, the Bank has been monitoring and reporting its NSFR in line with CBK instructions. Refer to the NSFR related disclosures available on the Bank's website on a quarterly basis.

**4.5    Reputation and fiduciary risk**
Reputation risk is defined as the current and prospective impact on earnings and capital arising from negative public opinion which will affect the ability to establish new relationships or services or to continue servicing existing relationships.

Management of reputation risk is an inherent feature of the Group's corporate culture which is embedded as an integral part of the internal control systems. Besides identification and management of risks, the internal control system also incorporates as an ethos the maintenance of business practices of the highest quality towards its customers, shareholders, regulators, general public and fiduciary and non-fiduciary clients.

Through its policies and practices, NBK ensures proper screening of clients' risk profiles and performance expectations is conducted prior to making investment products or services available to them. Furthermore, once a product or service is sold, appropriate risk and performance projections are clearly communicated, and funds placed under management are treated with due care and professionalism.

During the year, Assets under Management at the Group increased by 16.2 % (2022: 6.4%) to reach KD 6,600 million on 31 December 2023 (2022: KD 5,682 million).

## III    Composition of Capital

**1.    Composition of Regulatory Capital**

For regulatory purposes, the capital base is divided into:
i.    Common Equity Tier 1
ii.    Tier 1 Capital
iii.    Tier 2 Capital

Common Equity Tier 1 Capital comprises shareholders' equity, retained earnings, eligible reserves and related eligible non-controlling interests. The book values of Goodwill and Intangibles are deducted along with other regulatory adjustments.

Tier 1 Capital consists of Common Equity Tier 1 Capital and Additional Tier 1 Capital which includes eligible portions of non-controlling interests.

Total Regulatory Capital includes Tier 1 Capital and Tier 2 Capital which consists of the allowed portions of general provisions and certain additional eligible non-controlling interests.

The below table summarises the composition of capital and ratios:

| Table 22 | KD 000's | |
|---|---|---|
| | 31 December 2023 | 31 December 2022 |
| **Common Equity Tier 1 capital** | **3,442,577** | 3,170,120 |
| **Tier 1 capital** | **3,974,353** | 3,697,531 |
| **Total capital** | **4,572,242** | 4,271,095 |
| **Total risk-weighted assets** | **26,469,664** | 24,571,452 |
| **Capital ratios and buffers** | | |
| Common Equity Tier 1 (as percentage of risk-weighted assets) | **13.0%** | 12.9% |
| Tier 1 (as percentage of risk-weighted assets) | **15.0%** | 15.0% |
| Total capital (as percentage of risk-weighted assets) | **17.3%** | 17.4% |
| **National minima** | | |
| Common Equity Tier 1 minimum ratio including Capital Conservation Buffer* | **9.5%** | 8.0% |
| Tier 1 minimum ratio | **11.0%** | 9.5% |
| Total capital minimum ratio excluding Countercyclical and D-SIB buffers | **13.0%** | 11.5% |
| **NBK Group minima** | | |
| Common Equity Tier 1 minimum ratio including Capital Conservation Buffer and Domestic Systemically-Important Bank Buffer* | **11.5%** | 10.0% |
| Tier 1 minimum ratio | **13.0%** | 11.5% |
| Total capital minimum ratio excluding Countercyclical Buffer | **15.0%** | 13.5% |

* CET1 Capital Conservation Buffer of 2.5% for 31st December 2019 has been reduced to nil by CBK from 1st April 2020 until 31 December 2022 due to Corona Virus Disease. December 2021 due to Corona Virus Disease.

A detailed breakdown of the Group's Regulatory Capital position under the Common Disclosures template as stipulated under the Pillar 3 section of the CBK Basel III Capital Adequacy framework is presented in Table 31 available in the Appendices Section.

**2.    Reconciliation requirements**
The basis for the scope of consolidation for accounting and regulatory purposes is consistent for the Group. In order to provide a full reconciliation of all Regulatory Capital elements to the balance sheet in the audited financial statements, a three-step approach has been mandated under the Pillar 3 disclosures section of the CBK Basel III framework.

Table 23 provides the comparison (Step1) of the balance sheet published in the consolidated financial statement and the balance sheet under the regulatory scope of consolidation. Lines have been expanded and referenced with letters (Step 2) to display the relevant items of the Regulatory Capital.

| Table 23: Steps 1 and 2 of Reconciliation requirements | KD 000s | | |
|---|---|---|---|
| Item | Balance sheet as in published financial statements | Under regulatory scope of consolidation | Reference |
| | 31-Dec-23 | 31-Dec-23 | |
| **Assets** | | | |
| Cash and short-term funds | 4,384,700 | 4,384,700 | |
| Central Bank of Kuwait bonds | 856,815 | 856,815 | |
| Kuwait Government treasury bonds | 194,111 | 194,111 | |
| Deposits with banks | 1,318,121 | 1,318,121 | |
| Loans, advances and Islamic financing to customers | 22,281,004 | 22,281,004 | |
| *of which General Provisions(netted above) capped for Tier 2 inclusion* | 306,421 | 306,421 | a |
| Investment securities | 6,884,821 | 6,884,821 | |
| Investment in associates | - | - | |
| Land, premises and equipment | 506,812 | 506,812 | |
| Goodwill and other intangible assets | 508,416 | 508,416 | |
| *of which goodwill deducted from CET1 Capital* | 337,181 | 337,181 | b |
| *of which other intangibles deducted from CET1 Capital* | 171,235 | 171,235 | c |
| Other assets | 730,191 | 730,191 | |
| **Total assets** | **37,664,991** | **37,664,991** | |
| **Liabilities** | | | |
| Due to banks and other financial institutions | 7,689,431 | 7,689,431 | |
| Customers deposits | 21,948,957 | 21,948,957 | |
| Certificates of deposit issued | 822,899 | 822,899 | |
| Other borrowed funds | 1,331,006 | 1,331,006 | |
| *Amount recognized in Tier 2 capital* | 241,702 | 241,702 | d |
| Other liabilities | 966,123 | 966,123 | |
| **Total liabilities** | **32,758,416** | **32,758,416** | |

**Table 23: Steps 1 and 2 of Reconciliation requirements** (continued) — KD 000s

| Item | Balance sheet as in published financial statements 31-Dec-23 | Under regulatory scope of consolidation 31-Dec-23 | Reference |
|---|---|---|---|
| **Shareholders' Equity** | | | |
| Share capital | 792,995 | 792,995 | e |
| Proposed bonus shares | 39,649 | 39,649 | p |
| Statutory reserve | 396,499 | 396,499 | f |
| Share premium account | 803,028 | 803,028 | g |
| Treasury shares | - | - | |
| Treasury shares reserve | 34,961 | 34,961 | h |
| Other Reserves | 1,816,640 | 1,816,640 | |
| *of which Retained Earnings eligible as CET1 Capital* | 1,750,695 | 1,750,695 | i |
| *Retail Loans deferment Loss* | 32,625 | 32,625 | j |
| *of which Proposed Dividend* | 198,249 | 198,249 | |
| *of which Others eligible as CET1 Capital* | (132,304) | (132,304) | k |
| **Equity attributable to shareholders of the Bank** | 3,883,772 | 3,883,772 | |
| Perpetual Tier 1 Capital Securities | 439,032 | 439,032 | |
| *of which used for Regulatory Capital* | 439,032 | 439,032 | l |
| Non-controlling interests | 572,926 | 572,926 | |
| *of which Limited Recognition eligible as CET1 Capital* | 205,626 | 205,626 | m |
| *of which Limited Recognition eligible as AT1 Capital* | 88,379 | 88,379 | n |
| *of which Limited Recognition eligible as Tier 2 Capital* | 46,942 | 46,942 | o |
| **Total equity** | 4,906,575 | 4,906,575 | |
| **Total liabilities and equity** | 37,664,991 | 37,664,991 | |

Table 24 provides the relevant lines under 'Table 31: Composition of Regulatory Capital' with cross references to the letters in Table 23, thereby reconciling (Step 3) the components of Regulatory Capital to the published balance sheet.

**Table 24: Step 3 of Reconciliation requirements** — KD 000s

| Relevant Row Number in Common Disclosure Template | Common Equity Tier 1 capital: instruments and reserves | Component of Regulatory Capital | Source based on reference letters of the balance sheet from step 2 |
|---|---|---|---|
| 1 | Directly issued qualifying common share capital plus related stock surplus | 792,995 | e |
| 2 | Retained earnings | 1,750,695 | i |
| 3 | Accumulated other comprehensive income (and other reserves) | 1,174,458 | f+g+h+k+j+p |
| 5 | Common share capital issued by subsidiaries and held by third parties (minority interest) | 232,846 | m |
| 6 | Common Equity Tier 1 capital before regulatory adjustments | 3,950,993 | |
| | **Common Equity Tier 1 capital : regulatory adjustments** | | |
| 8 | Goodwill | (337,181) | b |
| 9 | Other intangibles other than mortgage-servicing rights (net of related tax liability) | (171,235) | c |
| 16 | Investments in own shares (if not already netted off paid-in capital on reported balance sheet) | | |
| 28 | Total regulatory adjustments to Common Equity Tier 1 | (508,416) | |
| 29 | Common Equity Tier 1 capital (CET1) | 3,442,577 | |
| | **Additional Tier 1 capital : instruments** | | |
| 30 | Directly issued qualifying Additional Tier 1 instruments plus related stock surplus | 439,032 | l |
| 31 | of which: classified as equity under applicable accounting standards | 439,032 | |
| 34 | Additional Tier 1 instruments (and CET1 instruments not included in row 5) issued by subsidiaries and held by third parties (amount allowed in group AT1) | 92,744 | n |
| 36 | Additional Tier 1 capital before regulatory adjustments | 531,776 | |
| | **Additional Tier 1 capital : regulatory adjustments** | | |
| 44 | Additional Tier 1 capital (AT1) | 531,776 | |
| 45 | Tier 1 capital (T1 = CET1 + AT1) | 3,974,353 | |
| | **Tier 2 capital : instruments and provisions** | | |
| 46 | Directly issued qualifying Tier 2 instruments plus related stock surplus | 241,702 | d |
| 48 | Tier 2 instruments (and CET1 and AT1 instruments not included in rows 5 or 34) issued by subsidiaries and held by third parties (amount allowed in group Tier 2) | 49,766 | o |
| 50 | General Provisions included in Tier 2 Capital | 306,421 | a |
| 51 | Tier 2 before regulatory adjustments | 597,889 | |
| | **Tier 2 capital: regulatory adjustments** | | |
| 58 | Tier 2 capital (T2) | 597,889 | |
| 59 | Total capital (TC = T1 + T2) | 4,572,242 | |

## IV. Leverage

### 1. Leverage Ratio

In October 2015, CBK issued the regulations on the 'Leverage Ratio' introduced by the Basel Committee as part of the regulatory reforms package. This transparent and non-risk based metric supplements the Capital ratio to act as a backstop measure to limit excessive build-up of on- and off-balance sheet exposures.

The Leverage Ratio is a separate, additional requirement from the risk-based capital requirement. It is defined as the 'capital' measure divided by the 'exposure' measure. The capital measure is made up of Tier 1 capital. The exposure measure is a sum of on-balance sheet assets, derivative exposure, securities finance transactions and off-balance sheet exposures.

The Group is in compliance with the requirements stipulated by CBK for the Leverage Ratio set at a minimum of 3%.

The Leverage Ratio for the Group at consolidated level is:

| Table 25 | | |
|---|---|---|
| | 31 December 2023 | 31 December 2022 |
| Tier 1 Capital (KD 000s) | 3,974,353 | 3,697,531 |
| Total Exposures (KD 000s) | 40,989,808 | 39,373,804 |
| Leverage Ratio | 9.7% | 9.4% |

### 2. Leverage Ratio Exposures

The below Table provides the details of the Total Exposures for Leverage Ratio:

| Table 26 | KD 000's | |
|---|---|---|
| Total Exposures | 31 December 2023 | 31 December 2022 |
| On-balance sheet exposures | 37,156,575 | 35,803,427 |
| Derivative exposures | 382,864 | 336,204 |
| Off-balance sheet items | 3,450,369 | 3,234,173 |
| Total exposures | 40,989,808 | 39,373,804 |

Table 32 in Appendices Section provides details of the Leverage Ratio in the format stipulated for public disclosure under the Pillar 3 framework.

### 3. Reconciliation

Table 27 provides the reconciliation of the balance sheet assets from the published financial statement with total exposure amount in the calculation of the Leverage Ratio.

Summary comparison of accounting assets vs Leverage Ratio exposure measure

| Table 27 | | KD 000's | |
|---|---|---|---|
| | Item | 31 December 2023 | 31 December 2022 |
| 1 | Total consolidated assets as per published financial statements | 37,664,991 | 36,338,363 |
| 2 | Adjustment for investments in banking, financial, insurance or commercial entities that are consolidated for accounting purposes but outside the scope of regulatory consolidation | - | - |
| 3 | Adjustment for fiduciary assets recognized on the balance sheet pursuant to the operative accounting framework but excluded from the Leverage Ratio exposure measure | - | - |
| 4 | Adjustments for derivative financial instruments | 382,864 | 336,204 |
| 5 | Adjustment for securities financing transactions (ie repos and similar secured lending) | - | - |
| 6 | Adjustment for off-balance sheet items (ie conversion to credit equivalent amounts of off-balance sheet exposures) | 3,450,369 | 3,234,173 |
| 7 | Other adjustments | (508,416) | (534,936) |
| 8 | Leverage Ratio exposure | 40,989,808 | 36,165,918 |

## V. Remuneration Disclosures

### Qualitative Information

### 1. Board of Directors, Board Nomination and Remuneration Committee

NBK Group's remuneration framework is under the supervision of the Board of Directors. As per the Group's policies and charters, the Board is responsible to review and approve the Remuneration Policy and oversee the implementation of the remuneration framework.

The Board Nomination and Remuneration Committee (BNRC) comprises four members (3 Non-Executive Board members and 1 Independent Board member). The committee is chaired by the Independent Board member.

The main objective of the Committee is to carry out the nomination and remuneration responsibilities. In terms of remuneration mandates, the Committee supports the Board in setting up the Group's remuneration framework and ensures effective implementation in accordance with the Group's Remuneration Policy and Corporate Governance Code.

The key responsibilities of the Committee are summarised below:
a. Develop the Remuneration Policy in co-ordination with Executive Management and Group Human Resources and submit the same to the Board for approval. The Board is responsible for monitoring the implementation of the policy.
b. Review the Remuneration Policy in co-ordination with Group Risk Management at least on an annual basis or at the request of the Board, and provide the Board with policy amendments or update suggestions.
c. Evaluate the sufficiency and effectiveness of the Remuneration Policy on a periodic basis to ensure the achievement of its declared objectives.

d. Ensure that Independent Board members will not be paid any salary or financial amount, with the exception of the remuneration paid to them for their membership in the Board, or the dividend paid to them as a shareholder or the interests received or due on their deposits or investments from the ordinary business activities of the Bank.
e. Make recommendations to the Board regarding the level and components of the remuneration of the Group CEO and his deputies, taking into consideration the total remuneration including salaries, bonuses and other incentives.
f. Give recommendations to the Board regarding the nomination for Board membership pursuant to the approved policies and in line with the CBK's instructions setting out nomination rules for Board membership.
g. Ensure that all provisions and requirements related to the independence of Independent Board members are fulfilled and satisfied by new candidates to Board membership, and raise recommendations to the Board in this regard.
h. Assess the skills and competencies required to fulfil the Board's duties, specifically to the issues related to the strategic objectives of the Group.
i. Ensure Board's composition satisfy diversification requirements in terms of skills, capabilities, competencies, experience, culture, gender and age.
j. Identify Board members qualified to fill vacancies on any Committee of the Board, and recommend to the Board the appointment of the identified person(s) to the relevant committee.
k. Ensure the alignment of environmental and social goals to executive pay and align executives to the long-term focus of the organization.

During the year 2023 the Committee reviewed and updated the Remuneration Policy, Succession Planning Manual and its internal Charter.

## 2. Remuneration Policy

NBK Group Remuneration Policy is developed and implemented at the Group level and covers NBK subsidiaries and foreign branches.

NBK Group has a clear Remuneration Policy, instructions and processes, ensuring a sound remuneration framework throughout the organisation. It supports the Group's ability to recruit and retain the right talents and competences and motivate high-calibre, skilled and knowledgeable employees, thereby ensuring sound risk management and sustained profitability.
The Policy aims to support the Group to operate a "total reward" philosophy taking account of all components of financial remuneration.

Group Policy aims to reward success, not failure, and attempts to align employees' remuneration with its risk framework and risk appetite and is designed to reward competitively the achievement of long-term sustainable performance, attract and motivate the very best persons who are committed to a long-term career with the Bank, and who will perform their role in the long-term interests of its shareholders.

In case any provisions of the Remuneration Policy document deviate from any of the local statutory or regulatory requirements, the local statutory and regulatory requirements will take precedence over the provisions of the Remuneration Policy. The Remuneration Policy defines three major categories for remuneration treatment, governance and disclosures.

### First Category: Senior Management

This category includes all employees at the level of Deputy General Manager (DGM) and higher (excluding risk management and control functions).

The number of persons in this category as of 31 December 2023 is 44 (2022: 41).

### Second Category: Material Risk-Takers

This category includes the Group CEO, his deputy, CEO Kuwait, his deputy and the heads of business functions and their deputies (Deputy General Manager and higher are included in Senior Management category). The Group's core business units are:

- Global Wealth Management
- Corporate Banking Group
- Treasury Group
- Consumer Banking Group
- Private Banking Group
- Foreign Corporate and Trade Finance Banking
- International Banking Group

The number of persons in this category as of 31 December 2023 is 47 (2022: 43).

### Third Category: Risk management and Control Functions

This category includes the following functional heads, and their deputies.

- Group Financial Control
- Group Risk Management
- Group Compliance & Governance
- Group Internal Audit
- Anti-Money Laundering Unit

The number of persons in this category as of 31 December 2023 is 19 (2022:19).

## 3. Remuneration Structure and Components

The Group's financial remuneration framework has been linked with long-term and short-term performance objectives. The Board-approved Group Strategy is transformed into Key Performance Indicators (KPIs) and remuneration is determined based on the achievement of those KPIs towards the overall Group strategy [including financial and non-financial criteria and Key Risk Indicators (KRIs), as appropriate].

The Group has two main remuneration components:

- Fixed remuneration:

The purpose of the fixed pay is to attract and retain employees by paying market-competitive remuneration for the role, skills and experience required for the business.

Fixed remuneration includes:

1. Salaries
2. Benefits
3. Other cash allowances

These payments are fixed and do not vary with performance.

- Variable Remuneration (performance-based remuneration):

The purpose of the variable remuneration is to drive and reward performance based on annual financial and non-financial measures consistent with shareholder interests and adherence to NBK values. Variable remuneration includes:

1. Cash bonus.
2. Deferred Cash Bonus
3. Equity shares as per Phantom Shares Plan*
4. Other

These payments are not fixed and are linked to performance.

The "other" remuneration represents performance incentives for certain business units upon achieving certain stated business targets.

The Group ensures there is a prudent balance between fixed and variable remuneration to allow for the possibility of reducing remuneration, in cases of adverse financial performance.

The Cash Bonus, Deferred Cash Bonus and Phantom Shares Plan components of the variable remuneration pool are availed selectively to certain Eligible Employees.

*Phantom Shares: are notional shares which are neither issued shares nor part of the Bank's Capital. The Phantom Shares cannot be sold or circulated. Its value shall be equal to the sale price of the Bank's shares in the Stock Exchange on a certain date, and according to which the Cash Remuneration for Eligible Employees shall be calculated according to this Plan.

In case of high risk exposures, the Group would try to minimise the percentage of variable remuneration, especially for the Senior Management and Material Risk-Takers.

## 4. Risk-Based Remuneration Approach

NBK considers its Group risk profile when determining its annual remuneration pool; the risk profile includes the key risks to which the Group is exposed, such as strategic, credit, market, liquidity, and operation risk. The policy ensures adequate linkage between the performance and risk materialisation, loss incurrence and risk appetite of the Group.

The overall variable remuneration pool is determined using a multi-year performance assessment which takes account of relevant risk metrics. The metrics used to determine the pool are linked with performance and key risk indicators; the key risk indicators are designed and customised for each core business function and they are in line with the Group's overall risk strategy.
During the year key risk indicators (KRIs) remain linked to the overall remuneration pool without significant change from last year's KRIs.

The Group Risk Management and Group Compliance and Governance functions are independent and report to the Board Risk and Compliance Committee. The Heads of Group Risk Management and Group Compliance and Governance are assessed by the Board Risk and Compliance Committee on an annual basis. The total remuneration for each of these positions is determined and approved by the Board Risk and Compliance Committee as a fully independent party.

## 5. An Overview on the Key Performance Indicators

The overall strategy of the Group is set and approved by the Board and translated into KPIs. These are then documented and communicated to ensure the alignment of management activities to the strategy applied by Senior Management. These KPIs are monitored and reported to the Board on a regular basis.
Examples of Group-level KPIs:

- Return on Assets
- Return on Equity
- Cost-income ratio
- Capital Adequacy
- Capital Adequacy Ratio
- Non-performing Assets (NPA)

Remuneration is determined based on the achievement of KPIs towards the overall Group strategy. These include financial and non-financial criteria and Key Risk Indicators (KRIs) at Group level. The annual remuneration pool for this year was approved by the Board of Directors after review and discussion with the Board Nomination and Remuneration Committee. The percentage approved for remuneration was determined based on the Group-level KPIs mentioned above.

Remuneration parameters for core units (revenue-generating functions) are determined based on the stated KPIs into which risk limits are cascaded. Remuneration for other business units, such as support functions (excluding risk and control functions), is based only on stated KPIs.

The KPIs for the risk management and control functions are based on the objectives of the control function itself. They form

an objective base distinct from the business performance base.

The performance appraisal form for each position identifies the quantitative weights of individual KPIs; the final scoring of the appraisal is linked with a quantitative formula to determine fixed remuneration (salary increments) and variable remuneration (annual bonus).

Since the overall remuneration pool of the Group is linked to Group performance (Group Net Profit), the Group adjusts the remuneration percentages in case of weak performance and business recessions.

## 6. Remuneration Adjustments

The annual remuneration amount (fixed and variable) is reviewed by the Board Nomination and Remuneration Committee and is then subject to review and approval by the Board of Directors. The Group remuneration deferment policy ensures an appropriate portion of the variable remuneration of senior employees (including those deemed to have a material impact on the risk profile of the organisation) is deferred. The deferment of variable remuneration applies to the Deferred Cash Bonus and Phantom Shares Plan.

The Group applies a deferment approach of up to three years and final vesting of these variable components is subject to continuing employment and the absence of risk materialisation. Claw-back applies on the non-vested portions in case risk materialises. The claw-back mechanism is applicable to the Deferred Cash Bonus and Phantom Shares Plan.

This deferred variable remuneration is governed as follows:

- Deferred over a period of three (3) years to align with the long-term performance of the Group.
- Subject to Clawback in the event of established fraud, misleading information or exceeding the approved risk limits. Control Functions personnel are subject to Clawback for 1 year and other positions are subject to Clawback for three (3) years.

### Quantitative Information

1. During the year, the Board Nomination and Remuneration Committee met three times. Board of Directors members (Executive Board member, Non-Executive Board members and the Independent Board members) received remuneration amounting to KD 770 thousand each (total of KD 770 thousand) for their services as Board members. Board of Directors' remuneration is subject to the approval of shareholders at the Annual General Meeting.
2. The number of persons (Senior Management and Material Risk-Takers) eligible for variable remuneration is 65 persons and they represent 2.93% of the overall NBK total staff number eligible for variable remuneration for 2023
3. The total number of persons (Senior Management and Material Risk-Takers) is 65 persons. Their total remuneration for 2023 is KD 23,356 thousand.
4. The number of employees who received sign-on awards during the year is Nil.
5. The total amount of end-of-service benefit paid during 2023 is KD 37 thousand, this is related to 1 person (Senior Management and Material Risk-Takers).

**Senior Management:**

**Table 28**

| Total salaries & remuneration granted during reported period | Unrestricted (KD 000s) | Deferred (KD 000s) |
|---|---|---|
| **Fixed remuneration:** | | |
| -    Cash | 7,564 | Nil |
| **Variable remuneration:** | | |
| -    Cash | 10,848 | Nil |
| -    Phantom Shares | Nil | 1,949 |
| -    Others (Note 1) | 335 | Nil |

**Material Risk-Takers:**

**Table 29**

| Total salaries & remuneration granted during reported period | Unrestricted (KD 000s) | Deferred (KD 000s) |
|---|---|---|
| **Fixed remuneration:** | | |
| -    Cash | 7,039 | Nil |
| **Variable remuneration:** | | |
| -    Cash | 10,132 | |
| -    Phantom Shares | Nil | 1,777 |
| -    Others (Note 1) | 867 | Nil |

**Financial and Risk Control:**

**Table 30**

| Total salaries & remuneration granted during reported period | Unrestricted (KD 000s) | Deferred (KD 000s) |
|---|---|---|
| **Fixed remuneration:** | | |
| -    Cash | 1,862 | Nil |
| **Variable remuneration:** | | |
| -    Cash | 795 | 4 |
| -    Phantom Shares | Nil | 425 |
| -    Others (Note 1) | Nil | Nil |

Note 1: This consists of other performance incentives

**Total remuneration paid as per employee categories**

**Table 31**

| Employees Category | Number of employees in this category | Grand Total Remuneration Fixed and Variable granted during the reported period (KD 000s) |
|---|---|---|
| Senior Management | 44 | 20,696 |
| Material Risk-Takers | 47 | 19,815 |
| Financial and Risk Control | 19 | 3,086 |

# VI.  Appendices

## 1.  Regulatory Capital Composition: Common Disclosure Template

**Table 32**

| Row Number | | KD 000s |
|---|---|---|
| | **Common Equity Tier 1 capital: instruments and reserves** | |
| 1 | Directly issued qualifying common share capital plus related stock surplus | 792,995 |
| 2 | Retained earnings | 1,750,695 |
| 3 | Accumulated other comprehensive income (and other reserves) | 1,174,458 |
| 4 | Directly issued capital subject to phase out from CET1 (only applicable to non-joint stock companies) | - |
| 5 | Common share capital issued by subsidiaries and held by third parties (minority interest) | 232,846 |
| 6 | Common Equity Tier 1 capital before regulatory adjustments | 3,950,993 |
| | **Common Equity Tier 1 capital : regulatory adjustments** | |
| 7 | Prudential valuation adjustments | - |
| 8 | Goodwill (net of related tax liability) | (337,181) |
| 9 | Other intangibles other than mortgage-servicing rights (net of related tax liability) | (171,235) |
| 10 | Deferred tax assets that rely on future profitability excluding those arising from temporary differences (net of related tax liability) | - |
| 11 | Cash flow hedge reserve | - |
| 12 | Shortfall of provisions to expected losses(based on the Internal Models Approach, if applied) | - |
| 13 | Securitisation gain on sale | - |
| 14 | Gains and losses due to changes in own credit risk on fair valued liabilities | - |
| 15 | Defined benefit pension fund net assets | - |
| 16 | Investments in own shares (if not already netted off paid-in capital on reported balance sheet) | - |
| 17 | Reciprocal cross holdings in common equity of banks, Fis, and insurance entities | - |
| 18 | Investments in the capital of banking, financial and insurance entities that are outside the scope of regulatory consolidation, net of eligible short positions (amount above 10% threshold) | - |
| 19 | Significant investments in the common stock of banking, financial and insurance entities that are outside the scope of regulatory consolidation, net of eligible short positions , where the bank does not own more than 10% of the issued share capital(amount above 10% threshold of bank's CET1 capital) | - |
| 20 | Mortgage servicing rights (amount above 10% threshold of bank's CET1 capital) | - |
| 21 | Deferred tax assets arising from temporary differences (amount above 10% threshold, net of related tax liability) | - |
| 22 | Amount exceeding the 15% threshold | - |
| 23 | of which: significant investments in the common stock of financials | - |
| 24 | of which: mortgage servicing rights | - |
| 25 | of which: deferred tax assets arising from temporary differences | - |
| 26 | National specific regulatory adjustments | - |

| Row Number | | KD 000s |
|---|---|---|
| 27 | Regulatory adjustments applied to Common Equity Tier 1 due to insufficient Additional Tier 1 and Tier 2 to cover deductions | - |
| 28 | Total regulatory adjustments to Common Equity Tier 1 | (508,416) |
| 29 | Common Equity Tier 1 capital (CET1) | 3,442,577 |
| | **Additional Tier 1 capital : instruments** | |
| 30 | Directly issued qualifying Additional Tier 1 instruments plus related stock surplus | 439,032 |
| 31 | of which: classified as equity under applicable accounting standards | 439,032 |
| 32 | of which: classified as liabilities under applicable accounting standards | - |
| 33 | Directly issued capital instruments subject to phase out from Additional Tier 1 | - |
| 34 | Additional Tier 1 instruments (and CET1 instruments not included in row 5) issued by subsidiaries and held by third parties (amount allowed in group AT1) | 92,744 |
| 35 | of which: instruments issued by subsidiaries subject to phase out | - |
| 36 | Additional Tier 1 capital before regulatory adjustments | 531,776 |
| | **Additional Tier 1 capital : regulatory adjustments** | |
| 37 | Investments in own Additional Tier 1 instruments | - |
| 38 | Reciprocal cross holdings in Additional Tier 1 instruments | - |
| 39 | Investments in the capital of banking, financial and insurance entities that are outside the scope of regulatory consolidation, net of eligible short positions , where the bank does not own more than 10% of the issued common share capital of the entity (amount above 10% threshold) | - |
| 40 | Significant investments in the capital of banking, financial and insurance entities that are outside the scope of regulatory consolidation( net of eligible short positions) | - |
| 41 | National specific regulatory adjustments | - |
| 42 | Regulatory adjustments applied to Additional Tier 1 due to insufficient Tier 2 to cover deductions | - |
| 43 | Total regulatory adjustments to Additional Tier 1 capital | - |
| 44 | Additional Tier 1 capital (AT1) | 531,776 |
| 45 | Tier 1 capital (T1 = CET1 + AT1) | 3,974,353 |
| | **Tier 2 capital : instruments and provisions** | |
| 46 | Directly issued qualifying Tier 2 instruments plus related stock surplus | 241,702 |
| 47 | Directly issued capital instruments subject to phase out from Tier 2 | - |
| 48 | Tier 2 instruments (and CET1 and AT1 instruments not included in rows 5 or 34) issued by subsidiaries and held by third parties (amount allowed in group Tier 2) | 49,766 |
| 49 | of which: instruments issued by subsidiaries subject to phase out | - |
| 50 | General Provisions included in Tier 2 Capital | 306,421 |
| 51 | Tier 2 capital before regulatory adjustments | 597,889 |
| | **Tier 2 capital: regulatory adjustments** | |
| 52 | Investments in own Tier 2 instruments | - |
| 53 | Reciprocal cross holdings in Tier 2 instruments | - |
| 54 | Investments in the capital of banking, financial and insurance entities that are outside the scope of regulatory consolidation, net of eligible short positions , where the bank does not own more than 10% of the issued common share capital of the entity(amount above 10% threshold) | - |
| 55 | Significant investments in the capital of banking, financial and insurance entities that are outside the scope of regulatory consolidation, net of eligible short positions | - |

| Row Number | | KD 000s |
|---|---|---|
| 56 | National specific regulatory adjustments | |
| 57 | Total regulatory adjustments to Tier 2 capital | |
| 58 | Tier 2 capital (T2) | 597,889 |
| 59 | Total capital (TC = T1 + T2) | 4,572,242 |
| 60 | Total risk-weighted assets | 26,469,664 |
| | **Capital ratios and buffers** | |
| 61 | Common Equity Tier 1 (as percentage of risk-weighted assets) | 13.0% |
| 62 | Tier 1 (as percentage of risk-weighted assets) | 15.0% |
| 63 | Total capital (as percentage of risk-weighted assets) | 17.3% |
| 64 | Institution specific buffer requirement (minimum CET1 requirement plus (a)capital conservation buffer plus (b)countercyclical buffer requirements plus (c)DSIB buffer requirement expressed as a percentage of risk-weighted assets) | 9.0% |
| 65 | of which: (a) capital conservation buffer requirement | |
| 66 | of which: (b) bank specific countercyclical buffer requirement | - |
| 67 | of which: (c) DSIB buffer requirement | 2.0% |
| 68 | Common Equity Tier 1 available to meet buffers (as percentage of risk-weighted assets) | 6.0% |
| | **National minima** | |
| 69 | Common Equity Tier 1 minimum ratio including Capital Conservation Buffer | 7.0% |
| 70 | Tier 1 minimum ratio | 8.5% |
| 71 | Total capital minimum ratio excluding Counter-cyclical and D-SIB buffers | 10.5% |
| | **Amounts below the thresholds for deduction(before risk weighting)** | |
| 72 | Non-significant investments in the capital of other financials | 31,401 |
| 73 | Significant investments in the common stock of financial entities | 5,903 |
| 74 | Mortgage servicing rights (net of related tax liability) | - |
| 75 | Deferred tax assets arising from temporary differences (net of related tax liability) | - |
| | **Applicable caps on the inclusion of provisions in Tier 2** | |
| 76 | Provisions eligible for inclusion in Tier 2 in respect of exposures subject to standardised approach (prior to application of cap) | 729,345 |
| 77 | Cap on inclusion of allowances in Tier 2 under standardised approach | 306,421 |
| 78 | Provisions eligible for inclusion in Tier 2 in respect of exposures subject to internal ratings- based approach (prior to application of cap) | - |
| 79 | Cap on inclusion of allowances in Tier 2 under internal ratings-based approach | - |

## 2. Regulatory Capital: Main Features Template

The Bank's share capital as at 31 December 2023 comprised issued and fully-paid-up equity shares (note 19 of the Group's consolidated financial statements), and is eligible as Common Equity Tier 1 Capital at Group and Solo level.

In addition, the following instruments qualify as eligible Regulatory Capital

| | | NBK Tier 1 Limited | NBK Tier 1 Financing (2) Limited | National Bank of Kuwait S.A.K.P. | NBK Tier 2 Limited |
|---|---|---|---|---|---|
| 1 | **Issuer** | NBK Tier 1 Limited | NBK Tier 1 Financing (2) Limited | National Bank of Kuwait S.A.K.P. | NBK Tier 2 Limited |
| 2 | **Unique identifier** | XS2306962841 | XS2010037922 | | XS2252513713 / 225251371 |
| 3 | **Governing law(s) of the instrument** | English law (other than the Issuer subordination provisions which are governed by the laws of the Dubai International Financial Centre) | English Law; except for Status of Capital Securities and Subordination which are governed by laws of Dubai International Financial Centre. | Laws of the State of Kuwait | English Law; except for Status of Capital Securities and Subordination which are governed by laws of Dubai International Financial Centre. |
| | *Regulatory treatment* | | | | |
| 4 | Type of Capital | Additional Tier 1 | Additional Tier 1 | Tier 2 | Tier 2 |
| 5 | Eligible at solo/ group / group & solo | Group and Solo | Group and Solo | Group and Solo | Group and Solo |
| 6 | Instrument type | Capital Securities by Issuer Irrevocably guaranteed by National Bank of Kuwait S.A.K.P. on Subordinated basis | Capital Securities by Issuer Irrevocably guaranteed by National Bank of Kuwait S.A.K.P. on Subordinated basis | Subordinated Debt | Subordinated Debt |
| 7 | Amount recognised in Regulatory Capital | USD 700,000,000 (KD 211,295,000) | USD 750,000,000 (KD 227,737,500) | KD 150,000,000/- | USD 300,000,000/- |
| 8 | Par value of instrument | USD 1,000/- | USD 1,000/- | KD 50,000/- | USD 1,000/- |
| 9 | Accounting classification | Shareholders' equity | Shareholders' equity | Liability-Amortised Cost | Liability-Amortised Cost |
| 10 | Original date of issuance | 24th February 2021 | 27th November 2019 | 18th November 2020 | 24th November'2020 |
| 11 | Perpetual or dated | Perpetual | Perpetual | Dated | Dated |
| 12 | Original maturity date | No maturity | No maturity | 18th November 2030 | 24th November'2030 |
| 13 | Issuer call subject to prior supervisory approval | Yes | Yes | Yes | Yes |
| 14 | Optional call date, contingent call dates and redemption amount | Optional Call date: Six months prior to the First Reset Date : 24th February 2027, outstanding principal together with interest accrued (in whole) | Optional Call date: Any date three months prior to 27 November 2025; Capital Event or Tax Event Call; Redemption amount in case of redemption date before First Reset Date: 101% of Principal; and in case of redemption date after First Reset Date at 100% Principal plus Accrued Interest | Optional Call date: 18 November 2025 or any Interest Payment hereafter; Capital Event or Taxation Reasons Principal (in whole or in part) plus Accrued Interest | Optional Call date: 25 November 2025 or any Interest Payment Date thereafter; Capital Event or Taxation Reasons; Principal (in whole but not in part) plus Accrued Interest |

| 15 | Subsequent call dates, if applicable | Semi-Annually | Semi-Annually | Semi-Annually | Semi-Annually |
|----|----|----|----|----|----|
| | ***Coupons / dividends*** | | | | |
| 16 | Fixed or floating dividend /coupon | Fixed for first 6-year period; thereafter reset every year to a new rate to be the aggregate of the margin and the interpolated 6-year US Treasury rate. | Fixed for first 6-year period; thereafter reset every 6 years to a new fixed rate equal to the 6-year US Treasury rate plus margin | Fixed Tranche: Fixed for first 5 years and reset thereafter to a new fixed rate for subsequent period. Floating Tranche: Floating rate determined semi-annually subject to a cap. | Fixed for first 5- year period, thereafter reset to prevailing 5-year US Treasury rate plus margin. |
| 17 | Coupon rate and any related index | 3.625% p.a. Fixed-Rate up to (but excluding), 24th February'2027, there-after reset every 6 years to a new rate equal to the interpolated 6-year US Treasury rate plus 2.875% margin | 4.500% p.a. Fixed-Rate up to (but excluding) 27 November 2025; thereafter reset every 6 years to a new fixed rate equal to the then 6-year USD Treasury rate plus 2.832% p.a. margin | Fixed Tranche: 4.75% p.a. Fixed for 5 years and reset thereafter to a new fixed rate of the then CBK Discount Rate plus 3.25% p.a. for subsequent period. Floating Tranche: CBK Discount Rate plus 3.00% determined semi-annually subject to a cap of prevailing Fixed Interest Rate plus 1% | 2.50% p.a. Fixed rate for first 5-year period, thereafter reset to 210.8 bps over the prevailing 5-year US Treasury rate. |
| 18 | Existence of a dividend stopper | Yes | Yes | No | No |
| 19 | Fully discretionary, partially discretionary or mandatory | Payment of Interest may be cancelled at the sole-discretion of the Issuer and the Guarantor. Mandatory cancellation upon: -Insufficient Distributable Funds on a consolidated basis -Breach of any applicable capital requirements -Regulatory requirement to cancel | Payment of Interest may be cancelled at the sole-discretion of the Issuer and the Guarantor. Mandatory cancellation upon: -Insufficient Distributable Funds on a consolidated basis -Breach of any applicable capital requirements -Regulatory requirement to cancel | Payment of Interest is Mandatory. | Payment of Interest is Mandatory. |
| 20 | Existence of step-up or other incentive to redeem | No | No | No | No |
| 21 | Non-cumulative or cumulative | Non-cumulative | Non-cumulative | Not Applicable | Not Applicable |
| 22 | **Convertible or non-convertible** | **Non-convertible** | **Non-convertible** | **Non-convertible** | **Non-convertible** |
| 23 | If convertible, conversion trigger (s) | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 24 | If convertible, fully or partially | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 25 | If convertible, conversion rate | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 26 | If convertible, mandatory or optional conversion | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 27 | If convertible, specify instrument type convertible into | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 28 | If convertible, specify issuer of instrument it converts into | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 29 | **Write-down feature** | **Yes** | **Yes** | **Yes** | **Yes** |
| 30 | If write-down, write-down trigger(s) | Determination by Regulator on grounds of non-viability or an immediate injection of capital is required, by way of emergency intervention to remain viable. | Determination by Regulator on grounds of non-viability or an immediate injection of capital is required, by way of emergency intervention to remain viable. | Determination by Regulator on grounds of non-viability or an immediate injection of capital is required, by way of emergency intervention to remain viable. | Determination by Regulator on grounds of non-viability or an immediate injection of capital is required, by way of emergency intervention to remain viable. |
| 31 | If write-down, full or partial | Can be partial or full | Can be partial or full | Can be partial or full | Can be partial or full |
| 32 | If write-down, permanent or temporary | Permanent | Permanent | Permanent | Permanent |
| 33 | If temporary write-down, description of write-up mechanism | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| 34 | Position in subordination hierarchy in liquidation (specify instrument type immediately senior to instrument) | Senior only to Ordinary Equity shares; i.e. qualifying CET1 instruments | Senior only to Ordinary Equity shares; i.e. qualifying CET1 instruments | Senior only to Ordinary Equity shares and qualifying Tier 1 instruments | Senior only to Ordinary Equity shares and qualifying Tier 1 instruments |
| 35 | Non-compliant transitioned features | No | No | No | No |
| 36 | If yes, specify non-compliant features | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

### 3. Leverage Ratio: Common Disclosure Template

**Table 33**

| | Item | KD 000s |
|---|---|---|
| | **On-balance sheet exposures** | |
| 1 | On-balance sheet items (excluding derivatives and SFTs, but including collateral) | 37,664,991 |
| 2 | (Asset amounts deducted in determining Basel III Tier 1 capital) | (508,416) |
| 3 | **Total on-balance sheet exposures (excluding derivatives and SFTs) (sum of lines 1 and 2)** | **37,156,575** |
| 4 | Replacement cost associated with all derivatives transactions (ie net of eligible cash variation margin) | 96,330 |
| 5 | Add-on amounts for PFE associated with all derivatives transactions | 286,533 |
| 6 | Gross-up for derivatives collateral provided where deducted from the balance sheet assets pursuant to the operative accounting framework | - |
| 7 | (Deductions of receivables assets for cash variation margin provided in derivatives transactions) | - |
| 8 | (Exempted CCP leg of client-cleared trade exposures) | - |
| 9 | Adjusted effective notional amount of written credit derivatives | - |
| 10 | (Adjusted effective notional offsets and add-on deductions for written credit derivatives) | - |
| 11 | **Total derivative exposures (sum of lines 4 to 10)** | **382,864** |
| 12 | Gross SFT assets (with no recognition of netting), after adjusting for sales accounting transactions | - |
| 13 | (Netted amounts of cash payables and cash receivables of gross SFT assets) | - |
| 14 | CCR exposure for SFT assets | - |
| 15 | Agent transaction exposures | - |
| 16 | **Total securities financing transaction exposures (sum of lines 12 to 15)** | **-** |
| | **Other off-balance sheet exposures** | |
| 17 | Off-balance sheet exposure at gross notional amount | 13,368,755 |
| 18 | (Adjustments for conversion to credit equivalent amounts) | (9,918,386) |
| 19 | **Off-balance sheet items (sum of lines 17 and 18)** | **3,450,369** |
| 20 | **Tier 1 capital** | **3,974,353** |
| 21 | Total exposures (sum of lines 3, 11, 16 and 19) | 40,989,808 |
| 22 | **Basel III leverage ratio** | **9.7%** |

### 4. Glossary Of Terms

| Term | Definition |
|---|---|
| Additional Tier 1 Capital | Additional Tier 1 Capital is a Basel III defined concept and consists of high quality capital. It essentially includes providing a permanent and unrestricted commitment of funds, is freely available to absorb losses at the point of non-viability, ranks behind the claims of depositors and other more senior creditors in the event of a wind-up, and provides for fully discretionary capital distributions. |
| Basel III | Refers to the "Capital Adequacy Ratio-Basel III for conventional banks" regulations issued by Central Bank of Kuwait Circular number 2/RB, RBA/A336/2015 dated 24 June 2015 |
| Capital Conservation Buffer | A capital conservation buffer of 2.5% (Nil from 1st April 2020 to 31st December 2021) (expressed as a percentage of risk-weighted assets) has been subsumed in the Minimum Common Equity Tier 1 Capital requirement level. |
| Countercyclical Buffer | A countercyclical buffer requirement that varies from 0% to 2.5% which, when triggered as a requirement at the discretion of Central Bank of Kuwait, is required to be met from Common Equity Tier 1 capital. |
| Common Equity Tier 1 Capital | Common Equity Tier 1 Capital is the highest quality of capital available reflecting the permanent and unrestricted commitment of funds that are freely available to absorb losses. It essentially includes ordinary share capital, retained earnings and reserves less prescribed deductions. |
| Domestic Systemically-Important Bank Buffer | A Domestic Systemically-Important Bank Buffer that varies from 0.5% to 2% required to be met in the form of Common Equity Tier 1 Capital which will be determined at the level of each bank identified as systemically important by Central Bank of Kuwait on an annual basis. |
| ECAI | An External Credit Assessment Institution (ECAI) as recognised by Central Bank of Kuwait from time to time for the purposes of the assigning risk-weights to obligors under the Standardised Approach. |
| Leverage Ratio | Calculated in accordance with the requirements of CBK Circular number 2/BS/342/2014 dated 21 October 2014. Leverage ratio is defined as the "capital" measure (being Tier 1 capital) divided by the "exposure" measure (being the sum of on-balance sheet assets, derivative exposures and off-balance sheet exposures). |
| Liquidity Coverage Ratio (LCR) | Calculated in accordance with the requirements of CBK Circular number 2/RB/345/2014 dated 23 December 2014. The ratio is calculated by taking a financial institution's stock of high quality liquid assets ("HQLAs") – which include low-risk, highly marketable asset classes, designed to provide significant sources of liquidity in such a stress scenario – and dividing it by its projected net cash outflows over the immediately following 30-day period. |
| Net-Stable Funding Ratio (NSFR) | Calculated in accordance with the requirements of CBK Circular number 2/BS/356/2015 dated 25 October 2015 from 2018. The NSFR is defined as the amount of available stable funding ("**ASF**") relative to the amount of required stable funding ("RSF"). ASF is defined as the portion of capital and liabilities expected to be reliable over the time horizon considered by the NSFR, which extends to one year. RSF is defined as the portion of assets and off-balance sheet exposures expected to be funded on an ongoing basis over a one-year horizon. The amount of the stable funding required of a specific institution is a function of the liquidity characteristics and residual maturities of the various assets held by that institution as well as those of its off-balance sheet exposures. |
| Significant Investments | Significant Investments in capital of banking, financial and insurance entities are those where the bank owns more than 10% of the issued common share capital of the issuing entity or where the entity is an affiliate of the bank. |
| Tier 2 Capital | Tier 2 Capital consists of eligible capital instruments that provide an unrestricted commitment of funds for a defined period that is available to absorb losses at the point of non-viability, subordinated to claims of depositors in the event of wind-up. Limited recognition of general provisions held against future, presently-unidentifiable losses are eligible for inclusion in Tier 2 Capital. |



# Financial Statements

The objective of our strategy is to achieve consistently superior returns for shareholders. The strategy is built on 3 cornerstones that guide the priorities we set for our business units and internal functions. They are to defend our leadership in core businesses, to grow outside the core, and to improve profitability.

# Board of Directors' Report

The Directors have pleasure in presenting their report together with the audited consolidated financial statements of National Bank of Kuwait S.A.K.P. (the "Bank") and its subsidiaries (collectively the "Group") for the year ended 31 December 2023.

## 2023 Financial Performance

The Group has delivered strong financial results for the year 2023, notwithstanding challenges arising from macroeconomic and geopolitical situations, while benefitting from increase in benchmark interest rates, business activities and volume growth.

The Group reported net profit attributable to shareholders of the Bank of KD 560.6 million compared to KD 509.1 million for 2022, an increase of 10.1%. Operating profit amounted to KD 740.3 million compared to KD 623.6 million in 2022, an increase of 18.7%.

Net interest income and net income from Islamic financing totaled KD 905.1 million (2022: KD 755.8 million). Net fees and commissions increased to KD 196.6 million (2022: KD 181.8 million). Net investment income was KD 27.5 million in 2023 (2022: KD 15.7 million). Net gains from dealing in foreign currencies decreased to KD 36.1 million in 2023 (2022: KD 55.4 million).

Total operating expenses were KD 426.5 million (2022: KD 386.1 million). The cost to income ratio for 2023 was 36.6% (2022: 38.2%).

The provision charge for credit losses and impairment losses were KD 103.1 million (2022: KD 45.4 million).

The return on average equity was 15% (2022: 14.3%).

## 2023 Balance Sheet

Total assets of the Group grew to KD 37,665.0 million from KD 36,338.4 million at the end of 2022, an increase of 3.7%. Loans, advances, and Islamic financing to customers grew by KD 1,282.6 million to KD 22,281.0 million, an increase of 6.1%. Investment securities grew by KD 1,250.1 million to KD 6,884.8 million, an increase of 22.2%.

Customer deposits grew to KD 21,949.0 million from KD 20,178.1 million at the end of 2022, an increase of 8.8%. The Group benefits from a loyal Kuwaiti customer base whose deposits remain a continuing source of stable funding. Due to banks were KD 3,963.8 million (2022: KD 4,018.0 million) and Deposits from other financial institutions were KD 3,725.6 million (2022: KD 3,740.9 million). Certificates of deposits issued were KD 822.9 million (2022: KD 1,801.6 million) and other borrowed funds were KD 1,331.0 million (2022: KD 1,243.6 million).

The Group maintained a strong liquidity position with cash, short term funds, Central Bank of Kuwait bonds and Kuwait Government treasury bonds amounting to KD 5,435.6 million at the year-end. Deposits with banks were KD 1,318.1 million at the year end. The Group has continued to maintain Basel III liquidity ratios well in excess of minimum requirements.

The Group's general provisions in respect of on-balance sheet credit facilities were KD 697.6 million at the year-end (2022: KD 660.0 million), whilst specific provisions were KD 165.3 million at the year-end (2022: KD 167.9 million). The Group operates a conservative credit policy with a balanced diversification across all business sectors and geographical areas. Loan collateral profiles and values are continually monitored to ensure that optimum protection is afforded to the Group at all times.

Cash and non-cash credit facilities provided by the Bank to Board Members or Executive Officers and their related parties were KD 72.6 million at the year-end against collateral of KD 153.1 million. Deposits of Board Members or Executive Officers and their related parties were KD 36.9 million. Proposed remuneration to Directors of the Bank was KD 770 thousand.

## Equity

Total equity attributable to the shareholders of the Bank after deducting the proposed cash dividend of KD 198.2 million was KD 3,685.5 million (2022: KD 3,434.2 million).

The Basel III capital adequacy ratio was 17.3% at the year-end (2022: 17.4%) as compared to the CBK prescribed regulatory minimum of 15% (2022: 13.5%). The leverage ratio was 9.7% at the year-end (2022: 9.4%) as compared to the CBK prescribed regulatory minimum of 3%.

## Capital Market Authority Requirements

The necessary measures were taken to ensure compliance with Law No (7) of 2010, and subsequent Executive By-Laws relating to the Establishment of the Capital Market Authority and Organization of Securities Activities.

The Bank maintains a record for reporting the Bank's shares owned by the Insider Persons (or their dependent children) to the Capital Market Authority and Boursa Kuwait Company.

## Bonus Shares, Dividends and Proposed Appropriations

Net profit for the year was principally allocated as follows:
1. KD 277.5 million to the dividend account for the distribution of a cash dividend. Proposed final dividend of KD 198.2 million (25 fils per share) subject to the approval of shareholders at the annual general meeting (proposed dividend - 25 fils in 2022). An interim cash dividend of KD 79.3 million (10 fils per share) was paid during 2023 (10 fils per share in 2022).
2. KD 39.6 million to the share capital account to cover the issuance of bonus shares equal to 5% of share capital at the end of 2023 (5% for 2022) (equivalent to 396,497,281 shares with a nominal value of 100 fils per share) subject to the approval of shareholders at the annual general meeting.
3. KD 18.9 million to the statutory reserve account to make the statutory reserve in excess of 50% of share capital.
4. KD 21.9 million to interest and profit payment towards perpetual Tier 1 Capital Securities and perpetual Tier 1 Sukuk.
5. KD 202.7 million to retained earnings.

## Financial highlights

| KD million | 2023 | 2022 | 2021 |
|---|---|---|---|
| Total assets | 37,665.0 | 36,338.4 | 33,256.6 |
| Loans, advances and Islamic financing to customers | 22,281.0 | 20,998.4 | 19,722.5 |
| Customer deposits | 21,949.0 | 20,178.1 | 18,281.0 |
| Net operating income | 1,166.8 | 1,009.7 | 899.8 |
| Profit attributable to shareholders of the Bank | 560.6 | 509.1 | 362.2 |

# Independent Auditors' Report to The Shareholders of National Bank of Kuwait S.A.K.P.

## Report on the Audit of the Consolidated Financial Statements

### Opinion

We have audited the consolidated financial statements of National Bank of Kuwait S.A.K.P. (the "Bank") and its subsidiaries (together, "the Group"), which comprise the consolidated statement of financial position as at 31 December 2023, and the consolidated statement of income, consolidated statement of comprehensive income, consolidated statement of changes in equity and consolidated statement of cash flows for the year then ended, and notes to the consolidated financial statements, including material accounting policies.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Group as at 31 December 2023, and its consolidated financial performance and its consolidated cash flows for the year then ended in accordance with International Financial Reporting Standards ("IFRSs"), as adopted by Central Bank of Kuwait ("CBK") for use by the State of Kuwait.

### Basis for Opinion

We conducted our audit in accordance with International Standards on Auditing (ISAs). Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Consolidated Financial Statements section of our report. We are independent of the Group in accordance with the International Ethics Standards Board for Accountants' International Code of Ethics for Professional Accountants (including International Independence Standards) (IESBA Code), and we have fulfilled our other ethical responsibilities in accordance with the IESBA Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Key Audit Matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current year. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. For each key audit matter below, our description of how our audit addressed the matter is provided in that context.

We have identified the following key audit matters:

### a)  Credit losses on loans, advances and Islamic financing to customers

The recognition of credit losses on loans, advances and Islamic financing ("credit facilities") to customers is the higher of Expected Credit Loss ("ECL") under International Financial Reporting Standard 9: Financial Instruments ("IFRS 9"), determined in accordance with the CBK guidelines, and the provision required by the CBK rules on classification of credit facilities and calculation of their provision (the "CBK rules") as disclosed in the accounting policies and in Note 13 to the consolidated financial statements.

Recognition of ECL under IFRS 9, determined in accordance with CBK guidelines, is a complex accounting policy, which requires considerable judgement in its implementation. ECL is dependent on management's judgement in assessing significant increase in credit risk and classification of credit facilities into various stages, determining when a default has occurred, development of models for assessing the probability of default of customers and estimating cash flows from recovery procedures or realisation of collateral.

Recognition of specific provision on impaired facility under the CBK rules is based on the instructions by CBK on the minimum provision to be recognized together with any additional provision to be recognised based on management estimate of expected cash flows related to that credit facility.

Due to the significance of credit facilities and the related estimation uncertainty and judgement in the impairment calculation, this was considered as a key audit matter. This is further heightened by the high degree of estimation uncertainty due to the current inflationary pressure and high interest rate environment.

Our audit procedures included assessing the design and implementation of controls over the inputs and assumptions used by the Group in developing the models, its governance and review controls performed by the management in determining the adequacy of credit losses.

With respect to the ECL based on IFRS 9, determined in accordance with the CBK guidelines, we have selected samples of credit facilities outstanding as at the reporting date, which included rescheduled credit facilities, and evaluated the Group's determination of significant increase in credit risk and the resultant basis for classification of the credit facilities into various stages. We involved our specialists to review the Probability of Default ("PD"), Loss Given Default ("LGD") and Exposure at Default ("EAD") and the overlays considered by management in view of the ongoing economic impacts, in order to determine ECL taking into consideration CBK guidelines. For a sample of credit facilities, we have evaluated the Group's staging criteria and computation of ECL including the eligibility and value of collateral considered in the ECL models used by the Group. We have also evaluated the various inputs and assumptions used by the Group's management to determine ECL.

Further, for the CBK rules provision requirements, we have assessed the criteria for determining whether there is a requirement to calculate any credit loss in accordance with the related regulations and, if required, it has been computed accordingly. For the samples selected, which included rescheduled credit facilities, we have verified whether all impairment events have been identified by the Group's management. For the selected samples which also included impaired credit facilities, we have assessed the valuation of collateral and checked the resultant provision calculations.

### b)  Impairment of goodwill in Egypt

The Group had a goodwill with carrying value of KD 20,174 thousand in respect of its component in Egypt which is fully impaired as at 31 December 2023. The impairment tests of goodwill performed by management in the component of Egypt are significant to our audit because the assessment of the recoverable amount of goodwill under the value-in-use basis is complex and requires considerable judgments on part of management, especially due to the current inflationary pressure and high interest rate environment. Estimates of future cash flows are based on management's views of variables such as the growth in the banking sector, economic conditions such as the economic growth and expected inflation rates and yield. Therefore, we identified the impairment testing of goodwill in the component of Egypt as a key audit matter.

As part of our audit procedures,  where "value in use" is the basis to compute the recoverable value we obtained management's impairment calculations and tested the reasonableness of key assumptions, including profit forecasts and the selection of growth rates and discount rates. We also involved our valuation specialists and challenged  management to substantiate the assumptions, including the comparison of relevant assumptions to industry benchmarks and economic forecasts. We tested the integrity of supporting calculations and corroborated certain information with third party sources. We agreed the underlying cash flows to approved budgets and assessed growth rates and discount rates by comparison with third party information, the Group's cost of capital and relevant risk factors. Future cash flow assumptions were also assessed through comparison to current trading performance against budget and forecasts, considering the historical accuracy of budgeting and forecasting and the understanding of the reasons for growth profiles used. We further evaluated management's sensitivity analysis to ascertain the impact of reasonably possible changes to key assumptions. We also assessed the controls over the impairment process to determine if they had been appropriately designed and implemented.

We also assessed the adequacy of the Group's disclosures regarding those assumptions, which are disclosed in Note 15 to the consolidated financial statements, against the requirements of IFRSs.

# Independent Auditors' Report to The Shareholders of
# National Bank of Kuwait S.A.K.P. (continued)

**Other Information included in the Group's 2023 Annual Report**

Management is responsible for the other information. Other information consists of the information included in the Group's 2023 Annual Report, other than the consolidated financial statements and our auditors' report thereon. We obtained the report of the Bank's Board of Directors prior to the date of our auditors' report, and we expect to obtain the remaining sections of the Group's Annual Report for the year ended 31 December 2023 after the date of our auditors' report.

Our opinion on the consolidated financial statements does not cover the other information and we do not express any form of assurance or conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information identified above and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained during the audit, or otherwise appears to be materially misstated. If, based on the work we have performed on the other information that we obtained prior to the date of this auditors' report, we conclude that there is a material misstatement of other information; we are required to report that fact. We have nothing to report in this regard.

**Responsibilities of Management and Those Charged with Governance for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRSs as adopted by CBK for use by the State of Kuwait, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Group's financial reporting process.

**Auditors' Responsibilities for the Audit of the Consolidated Financial Statements**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the internal control.
- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by the management.
- Conclude on the appropriateness of management's use of the going concern basis of accounting and based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditors' report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditors' report. However, future events or conditions may cause the Group to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.
- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the group audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, actions taken to eliminate threats or safeguards applied.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current year and are therefore the key audit matters. We describe these matters in our auditors' report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

**Report on Other Legal and Regulatory Requirements**

Furthermore, in our opinion proper books of account have been kept by the Bank and the consolidated financial statements, together with the contents of the report of the Bank's Board of Directors relating to these consolidated financial statements, are in accordance therewith. We further report that we obtained all the information and explanations that we required for the purpose of our audit and that the consolidated financial statements incorporate all information that is required by the Capital Adequacy Regulations and Financial Leverage Ratio Regulations issued by the Central Bank of Kuwait ("CBK") as stipulated in CBK Circular Nos. 2/RB, RBA/336/2014 dated 24 June 2014 and its amendments, and 2/BS/342/2014 dated 21 October 2014, and its amendments, respectively, the Companies Law No. 1 of 2016, as amended, and its executive regulations, as amended, or by the Bank's Memorandum of Incorporation and Articles of Association, as amended, that an inventory was duly carried out and that, to the best of our knowledge and belief, no violations of the Capital Adequacy Regulations and Financial Leverage Ratio Regulations issued by the CBK as stipulated in CBK Circular Nos. 2/RB, RBA/336/2014 dated 24 June 2014 and its amendments, and 2/BS/342/2014 dated 21 October 2014, and its amendments, respectively, the Companies Law No. 1 of 2016, as amended, and its executive regulations, as amended, or of the Bank's Memorandum of Incorporation and Articles of Association, as amended, have occurred during the year ended 31 December 2023 that might have had a material effect on the business of the Bank or on its financial position.

We further report that, during the course of our audit, we have not become aware of any violations of the provisions of Law No. 32 of 1968, as amended, concerning currency, the CBK and the organisation of banking business, and its related regulations during the year ended 31 December 2023 that might have had a material effect on the business of the Bank or on its financial position.

**ABDULKARIM AL SAMDAN**
LICENCE NO. 208 A
EY
AL-AIBAN, AL-OSAIMI & PARTNERS

31 January 2024
Kuwait

**BADER A. AL-WAZZAN**
LICENCE NO. 62 A
DELOITTE & TOUCHE
AL WAZZAN & CO.

Case 23-34815   Document 5214-1   Filed in TXSB on 06/16/24   Page 122 of 231

# Consolidated Statement of Income

For the year ended 31 December 2023

### Consolidated Financial Statements

| | |
|---|---|
| Consolidated Statement of Income | 119 |
| Consolidated Statement of Comprehensive Income | 120 |
| Consolidated Statement of Financial Position | 121 |
| Consolidated Statement of Cash Flows | 122 |
| Consolidated Statement of Changes in Equity | 123 |

### Notes To The Consolidated Financial Statements

| | | |
|---|---|---|
| 1 | Incorporation and Registration | 125 |
| 2 | Material Accounting Policies | 125 |
| 3 | Segmental Analysis | 141 |
| 4 | Interest Income | 143 |
| 5 | Interest Expense | 144 |
| 6 | Net Fees and Commissions | 144 |
| 7 | Net Investment Income | 144 |
| 8 | Provision charge for credit losses and impairment losses | 145 |
| 9 | Taxation | 145 |
| 10 | Earnings per Share | 146 |
| 11 | Cash and Short Term Funds | 146 |
| 12 | Deposits with Banks | 146 |
| 13 | Loans, Advances and Islamic Financing to Customers | 147 |
| 14 | Financial Investments | 153 |
| 15 | Goodwill and Other Intangible Assets | 157 |
| 16 | Other Assets | 159 |
| 17 | Other Borrowed Funds | 159 |
| 18 | Other Liabilities | 161 |
| 19 | Share Capital and Reserves | 162 |
| 20 | Dividend | 165 |
| 21 | Perpetual Tier 1 Capital Securities | 165 |
| 22 | Share Based Payment | 166 |
| 23 | Fair Value of Financial Instruments | 166 |
| 24 | Subsidiaries | 169 |
| 25 | Commitments and Contingent Liabilities | 171 |
| 26 | Derivative Financial Instruments and Hedge Accounting | 171 |
| 27 | Related Party Transactions | 173 |
| 28 | Risk Management | 174 |
| 29 | Capital | 187 |
| 30 | Funds Under Management | 188 |
| 31 | Changes in Reference Rates (IBOR) | 188 |

| | Notes | 2023 KD 000's | 2022 KD 000's | 2023 USD 000's | 2022 USD 000's |
|---|---|---|---|---|---|
| Interest income | 4 | 1,632,748 | 947,589 | 5,322,732 | 3,089,125 |
| Interest expense | 5 | 908,154 | 363,821 | 2,960,567 | 1,186,051 |
| **Net interest income** | | **724,594** | **583,768** | **2,362,165** | **1,903,074** |
| | | | | | |
| Murabaha and other Islamic financing income | | 402,482 | 287,558 | 1,312,085 | 937,435 |
| Finance cost and Distribution to depositors | | 221,939 | 115,487 | 723,518 | 376,486 |
| **Net income from Islamic financing** | | **180,543** | **172,071** | **588,567** | **560,949** |
| **Net interest income and net income from Islamic financing** | | **905,137** | **755,839** | **2,950,732** | **2,464,023** |
| Net fees and commissions | 6 | 196,606 | 181,778 | 640,932 | 592,593 |
| Net investment income | 7 | 27,466 | 15,736 | 89,539 | 51,299 |
| Net gains from dealing in foreign currencies | | 36,123 | 55,379 | 117,760 | 180,535 |
| Other operating income | | 1,435 | 1,009 | 4,678 | 3,289 |
| **Non-interest income** | | **261,630** | **253,902** | **852,909** | **827,716** |
| **Net operating income** | | **1,166,767** | **1,009,741** | **3,803,641** | **3,291,739** |
| Staff expenses | | 233,156 | 220,125 | 760,085 | 717,604 |
| Other administrative expenses | | 147,342 | 125,430 | 480,332 | 408,900 |
| Depreciation of premises and equipment | | 44,314 | 38,922 | 144,463 | 126,885 |
| Amortisation of intangible assets | 15 | 1,647 | 1,647 | 5,369 | 5,369 |
| **Operating expenses** | | **426,459** | **386,124** | **1,390,249** | **1,258,758** |
| **Operating profit before provision for credit losses and impairment losses** | | **740,308** | **623,617** | **2,413,392** | **2,032,981** |
| Provision charge for credit losses and impairment losses | 8 | 103,068 | 45,363 | 336,000 | 147,882 |
| **Operating profit before taxation and directors' remuneration** | | **637,240** | **578,254** | **2,077,392** | **1,885,099** |
| Taxation | 9 | 48,097 | 47,422 | 156,795 | 154,595 |
| Directors' remuneration | 27 | 770 | 770 | 2,511 | 2,511 |
| **Profit for the year** | | **588,373** | **530,062** | **1,918,086** | **1,727,993** |
| Attributable to: | | | | | |
| Shareholders of the Bank | | 560,620 | 509,085 | 1,827,612 | 1,659,609 |
| Non-controlling interests | | 27,753 | 20,977 | 90,474 | 68,384 |
| | | 588,373 | 530,062 | 1,918,086 | 1,727,993 |
| **Basic earnings per share attributable to shareholders of the Bank** | 10 | 68 fils | 61 fils | 22 Cents | 20 Cents |

The attached notes 1 to 31 form part of these consolidated financial statements.



# Consolidated Statement of Comprehensive Income

For the year ended 31 December 2023

| | Note | 2023 KD 000's | 2022 KD 000's | 2023 USD 000's | 2022 USD 000's |
|---|---|---|---|---|---|
| **Profit for the year** | | **588,373** | 530,062 | **1,918,086** | 1,727,993 |
| Other comprehensive income: | | | | | |
| Investment in debt securities measured at FVOCI: | | | | | |
| Net change in fair value | | **4,506** | 3,158 | **14,689** | 10,295 |
| Net transfer to consolidated statement of income | | **376** | 5,129 | **1,226** | 16,720 |
| | | **4,882** | 8,287 | **15,915** | 27,015 |
| Exchange differences on translation of foreign operations | | **(13,699)** | (125,273) | **(44,658)** | (408,387) |
| **Other comprehensive loss for the year reclassifiable to consolidated statement of income in subsequent years** | | **(8,817)** | (116,986) | **(28,743)** | (381,372) |
| Net gain (loss) on investments in equity instruments designated at FVOCI | | **601** | (4,446) | **1,959** | (14,494) |
| Actuarial gain in respect of defined benefit plans | 18 | **3,969** | 8,252 | **12,939** | 26,901 |
| **Other comprehensive income for the year not reclassifiable to consolidated statement of income in subsequent years** | | **4,570** | 3,806 | **14,898** | 12,407 |
| **Other comprehensive loss for the year** | | **(4,247)** | (113,180) | **(13,845)** | (368,965) |
| **Total comprehensive income for the year** | | **584,126** | 416,882 | **1,904,241** | 1,359,028 |
| Attributable to: | | | | | |
| Shareholders of the Bank | | **553,485** | 398,266 | **1,804,352** | 1,298,341 |
| Non-controlling interests | | **30,641** | 18,616 | **99,889** | 60,687 |
| | | **584,126** | 416,882 | **1,904,241** | 1,359,028 |

# Consolidated Statement of Financial Position

As at 31 December 2023

| | Note | 2023 KD 000's | 2022 KD 000's | 2023 USD 000's | 2022 USD 000's |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and short term funds | 11 | **4,384,700** | 5,323,452 | **14,294,050** | 17,354,367 |
| Central Bank of Kuwait bonds | 14 | **856,815** | 881,241 | **2,793,203** | 2,872,831 |
| Kuwait Government treasury bonds | 14 | **194,111** | 211,629 | **632,799** | 689,906 |
| Deposits with banks | 12 | **1,318,121** | 1,490,286 | **4,297,053** | 4,858,308 |
| Loans, advances and Islamic financing to customers | 13 | **22,281,004** | 20,998,416 | **72,635,710** | 68,454,494 |
| Investment securities | 14 | **6,884,821** | 5,634,672 | **22,444,404** | 18,368,939 |
| Land, premises and equipment | | **506,812** | 474,724 | **1,652,199** | 1,547,593 |
| Goodwill and other intangible assets | 15 | **508,416** | 534,936 | **1,657,428** | 1,743,883 |
| Other assets | 16 | **730,191** | 789,007 | **2,380,411** | 2,572,150 |
| **Total assets** | | **37,664,991** | 36,338,363 | **122,787,257** | 118,462,471 |
| **Liabilities** | | | | | |
| Due to banks | | **3,963,802** | 4,017,979 | **12,921,930** | 13,098,546 |
| Deposits from other financial institutions | | **3,725,629** | 3,740,877 | **12,145,490** | 12,195,198 |
| Customer deposits | | **21,948,957** | 20,178,062 | **71,553,242** | 65,780,153 |
| Certificates of deposit issued | | **822,899** | 1,801,623 | **2,682,637** | 5,873,262 |
| Other borrowed funds | 17 | **1,331,006** | 1,243,563 | **4,339,058** | 4,053,995 |
| Other liabilities | 18 | **966,123** | 721,313 | **3,149,545** | 2,351,469 |
| **Total liabilities** | | **32,758,416** | 31,703,417 | **106,791,902** | 103,352,623 |
| **Equity** | | | | | |
| Share capital | 19 | **792,995** | 755,233 | **2,585,151** | 2,462,047 |
| Proposed bonus shares | 20 | **39,649** | 37,762 | **129,255** | 123,104 |
| Statutory reserve | 19 | **396,499** | 377,618 | **1,292,580** | 1,231,029 |
| Share premium account | 19 | **803,028** | 803,028 | **2,617,858** | 2,617,858 |
| Treasury share reserve | 19 | **34,961** | 34,961 | **113,972** | 113,972 |
| Other reserves | 19 | **1,816,640** | 1,614,386 | **5,922,217** | 5,262,872 |
| Equity attributable to shareholders of the Bank | | **3,883,772** | 3,622,988 | **12,661,033** | 11,810,882 |
| Perpetual Tier 1 Capital Securities | 21 | **439,032** | 439,032 | **1,431,237** | 1,431,237 |
| Non-controlling interests | 24 | **583,771** | 572,926 | **1,903,085** | 1,867,729 |
| **Total equity** | | **4,906,575** | 4,634,946 | **15,995,355** | 15,109,848 |
| **Total liabilities and equity** | | **37,664,991** | 36,338,363 | **122,787,257** | 118,462,471 |

**Hamad Mohamed Al-Bahar**
Chairman

**Isam J. Al Sager**
Vice Chairman and Group Chief Executive Officer

The attached notes 1 to 31 form part of these consolidated financial statements.

The attached notes 1 to 31 form part of these consolidated financial statements.



# Consolidated Statement of Cash Flows

For the year ended 31 December 2023

| | Note | 2023 KD 000's | 2022 KD 000's | 2023 USD 000's | 2022 USD 000's |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Profit for the year | | 588,373 | 530,062 | 1,918,086 | 1,727,993 |
| Adjustments for: | | | | | |
| Net investment income | 7 | (27,466) | (15,736) | (89,539) | (51,299) |
| Depreciation of premises and equipment | | 44,314 | 38,922 | 144,464 | 126,885 |
| Amortisation of intangible assets | 15 | 1,647 | 1,647 | 5,369 | 5,369 |
| Provision charge for credit losses and impairment losses | 8 | 103,068 | 45,363 | 336,000 | 147,883 |
| Taxation | 9 | 48,097 | 47,422 | 156,795 | 154,595 |
| Cash flows from operating activities before changes in operating assets and liabilities | | 758,033 | 647,680 | 2,471,175 | 2,111,426 |
| Changes in operating assets and liabilities: | | | | | |
| Central Bank of Kuwait bonds | | 24,426 | (51,187) | 79,628 | (166,869) |
| Kuwait Government treasury bonds | | 20,138 | 188,596 | 65,650 | 614,820 |
| Deposits with banks | | 174,677 | (612,423) | 569,444 | (1,996,489) |
| Loans, advances and Islamic financing to customers | | (1,354,615) | (1,528,359) | (4,416,023) | (4,982,426) |
| Other assets | | 46,773 | (122,294) | 152,479 | (398,676) |
| Due to banks | | (54,117) | (79,345) | (176,616) | (258,663) |
| Deposits from other financial institutions | | (15,248) | 605,672 | (49,708) | 1,974,481 |
| Customer deposits | | 1,770,895 | 2,254,665 | 5,773,089 | 7,350,171 |
| Certificates of deposit issued | | (978,724) | 462,269 | (3,190,624) | 1,506,989 |
| Other liabilities | | 178,390 | 90,925 | 581,548 | 296,414 |
| Tax paid | | (39,587) | (33,856) | (129,053) | (110,370) |
| Net cash from operating activities | | 530,981 | 1,822,343 | 1,730,989 | 5,940,808 |
| **Investing activities** | | | | | |
| Purchase of investment securities | | (3,633,073) | (4,131,965) | (11,843,759) | (13,470,139) |
| Proceeds from sale/redemption of investment securities | | 2,480,036 | 2,871,878 | 8,084,877 | 9,362,275 |
| Dividend income | 7 | 2,570 | 2,272 | 8,378 | 7,407 |
| Proceeds from sale of a foreign branch | | - | 25,597 | - | 83,446 |
| Proceeds from sale of land, premises and equipment | | 1,817 | 2,732 | 5,923 | 8,906 |
| Purchase of land, premises and equipment | | (56,260) | (61,505) | (183,406) | (200,505) |
| Change in holding in subsidiaries | | (11,884) | (7,889) | (38,741) | (25,718) |
| Purchase of investment properties | | (38,494) | (22,964) | (125,490) | (74,699) |
| Proceeds from sale of investment properties | | 1,281 | 12,625 | 4,176 | 41,157 |
| Net cash used in investing activities | | (1,254,007) | (1,309,169) | (4,088,042) | (4,267,870) |
| **Financing activities** | | | | | |
| Proceeds from issue of unsecured sukuk by a subsidiary | | - | 152,225 | - | 496,251 |
| Redemption of Global Medium term notes | | - | (229,238) | - | (747,312) |
| Proceeds from capital increase in a subsidiary | | - | 80,238 | - | 261,575 |
| Interest paid on Perpetual Tier 1 Capital Securities | | (18,224) | (18,119) | (59,410) | (59,068) |
| Profit distribution on Perpetual Tier 1 Sukuk by a subsidiary | | (6,079) | (6,068) | (19,818) | (19,782) |
| Net movement in other medium and short term borrowing | | 86,290 | 47,335 | 281,304 | 154,311 |
| Dividends paid | | (268,107) | (291,304) | (874,025) | (949,645) |
| Dividends paid by subsidiaries to non-controlling interests | | (9,606) | (6,782) | (31,315) | (22,109) |
| Net cash used in financing activities | | (215,726) | (271,713) | (703,264) | (885,779) |
| **(Decrease) increase in cash and short term funds** | | (938,752) | 241,461 | (3,060,317) | 787,159 |
| Cash and short term funds at the beginning of the year | | 5,323,452 | 5,081,991 | 17,354,367 | 16,567,208 |
| **Cash and short term funds at the end of the year** | 11 | 4,384,700 | 5,323,452 | 14,294,050 | 17,354,367 |

The attached notes 1 to 31 form part of these consolidated financial statements.

# Consolidated Statement of Changes in Equity

For the year ended 31 December 2023

KD 000's

| | Equity attributable to shareholders of the Bank | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Share capital | Proposed bonus shares | Statutory reserve | Share premium account | Treasury share reserve | Other reserves (Note 19a) | Total | Perpetual Tier 1 Capital Securities | Total | Non-controlling interests | Total equity |
| Balance as at 1 January 2023 | 755,233 | 37,762 | 377,618 | 803,028 | 34,961 | 1,614,386 | 3,622,988 | 439,032 | 4,062,020 | 572,926 | 4,634,946 |
| Profit for the year | - | - | - | - | - | 560,620 | 560,620 | - | 560,620 | 27,753 | 588,373 |
| Other comprehensive (loss) income | - | - | - | - | - | (7,135) | (7,135) | - | (7,135) | 2,888 | (4,247) |
| **Total comprehensive income** | - | - | - | - | - | 553,485 | 553,485 | - | 553,485 | 30,641 | 584,126 |
| Transfer to statutory reserve (Note 19a) | - | - | 18,881 | - | - | (18,881) | - | - | - | - | - |
| Issue of bonus shares (Note 19a) | 37,762 | (37,762) | - | - | - | - | - | - | - | - | - |
| Final cash dividend paid (2022) | - | - | - | - | - | (188,808) | (188,808) | - | (188,808) | - | (188,808) |
| Interim cash dividend paid – 10 fils per share (Note 20) | - | - | - | - | - | (79,299) | (79,299) | - | (79,299) | - | (79,299) |
| Proposed bonus shares (Note 20) | - | 39,649 | - | - | - | (39,649) | - | - | - | - | - |
| Interest paid on perpetual Tier 1 Capital Securities | - | - | - | - | - | (18,224) | (18,224) | - | (18,224) | - | (18,224) |
| Profit distribution on Perpetual Tier 1 Sukuk by a subsidiary | - | - | - | - | - | (3,664) | (3,664) | - | (3,664) | (2,415) | (6,079) |
| Change in holding in subsidiaries | - | - | - | - | - | (3,906) | (3,906) | - | (3,906) | (7,978) | (11,884) |
| Dividend paid to non-controlling interests by subsidiaries | - | - | - | - | - | - | - | - | - | (9,606) | (9,606) |
| Other movements | - | - | - | - | - | 1,200 | 1,200 | - | 1,200 | 203 | 1,403 |
| **At 31 December 2023** | 792,995 | 39,649 | 396,499 | 803,028 | 34,961 | 1,816,640 | 3,883,772 | 439,032 | 4,322,804 | 583,771 | 4,906,575 |

The attached notes 1 to 31 form part of these consolidated financial statements.

# Consolidated Statement of Changes in Equity

For the year ended 31 December 2023

| | Equity attributable to shareholders of the Bank | | | | | | | | | | KD 000's |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Share capital | Proposed bonus shares | Statutory reserve | Share premium account | Treasury share reserve | Other reserves (Note 19e) | Total | Perpetual Tier 1 Capital Securities | Total | Non-controlling interests | Total equity |
| Balance as at 1 January 2022 | 719,269 | 35,964 | 359,637 | 803,028 | 34,961 | 1,586,708 | 3,539,567 | 439,032 | 3,978,599 | 488,518 | 4,467,117 |
| Profit for the year | - | - | - | - | - | 509,085 | 509,085 | - | 509,085 | 20,977 | 530,062 |
| Other comprehensive loss | - | - | - | - | - | (110,819) | (110,819) | - | (110,819) | (2,361) | (113,180) |
| Total comprehensive income | - | - | - | - | - | 398,266 | 398,266 | - | 398,266 | 18,616 | 416,882 |
| Transfer to statutory reserve (Note 19b) | - | - | 17,981 | - | - | (17,981) | - | - | - | - | - |
| Issue of bonus shares (Note 19a) | 35,964 | (35,964) | - | - | - | - | - | - | - | - | - |
| Cash dividend paid (2021) | - | - | - | - | - | (215,781) | (215,781) | - | (215,781) | - | (215,781) |
| Interim cash dividend paid -10 fils per share (Note 20) | - | - | - | - | - | (75,523) | (75,523) | - | (75,523) | - | (75,523) |
| Proposed bonus shares (Note 20) | - | 37,762 | - | - | - | (37,762) | - | - | - | - | - |
| Interest paid on perpetual Tier 1 Capital Securities | - | - | - | - | - | (18,119) | (18,119) | - | (18,119) | - | (18,119) |
| Profit distribution on Perpetual Tier 1 Sukuk by a subsidiary | - | - | - | - | - | (3,642) | (3,642) | - | (3,642) | (2,426) | (6,068) |
| Change in holding in subsidiaries | - | - | - | - | - | (2,557) | (2,557) | - | (2,557) | (5,332) | (7,889) |
| Capital increase in a subsidiary | - | - | - | - | - | - | - | - | - | 80,238 | 80,238 |
| Dividend paid to non-controlling interests by subsidiaries | - | - | - | - | - | - | - | - | - | (6,782) | (6,782) |
| Other movements | - | - | - | - | - | 777 | 777 | - | 777 | 94 | 871 |
| At 31 December 2022 | 755,233 | 37,762 | 377,618 | 803,028 | 34,961 | 1,614,386 | 3,622,988 | 439,032 | 4,062,020 | 572,926 | 4,634,946 |

The attached notes 1 to 31 form part of these consolidated financial statements.

# Notes to the Consolidated Financial Statements

31 December 2023

## 1 INCORPORATION AND REGISTRATION

The consolidated financial statements of National Bank of Kuwait S.A.K.P. (the "Bank") and its subsidiaries (collectively the "Group") for the year ended 31 December 2023 were authorised for issue in accordance with a resolution of the directors on 15 January 2024. The Annual General Meeting of the shareholders has the power to amend these consolidated financial statements after issuance. The Bank is a public shareholding company incorporated in Kuwait in 1952 and is registered as a bank (commercial registration number - 8490) with the Central Bank of Kuwait. The Bank's registered office is at Al Shuhada Street, P.O. Box 95, Safat 13001, Kuwait. The principal activities of the Bank are described in Note 3.

## 2 MATERIAL ACCOUNTING POLICIES

### 2.1 Basis of preparation

The consolidated financial statements have been prepared in accordance with the regulations for financial services institutions as issued by the Central Bank of Kuwait (CBK) in the State of Kuwait. These regulations require banks and other financial institutions regulated by CBK to adopt the International Financial Reporting Standards ("IFRS") with an amendment for measuring the expected credit loss ("ECL") on credit facilities at the higher of ECL computed under IFRS 9 – 'Financial Instruments' in accordance to the CBK guidelines or the provisions as required by CBK instructions along with its consequent impact on related disclosures.

The above framework is hereinafter referred to as 'IFRS as adopted by CBK for use in the State of Kuwait'.

The consolidated financial statements are prepared under the historical cost convention except for the measurement at fair value of derivatives, investment securities measured at fair value and investment properties. In addition and as more fully described below, assets and liabilities that are hedged in fair value hedging relationships are carried at fair value to the extent of the risk being hedged.

### 2.2 Changes in material accounting policies

**New and amended standards and interpretations**

The Group applied the following amendments effective from 1 January 2023:

**International Tax Reform – Pillar Two Model Rules (Amendments to IAS 12)**

The IASB amended the scope of IAS 12 to clarify that the Standard applies to income taxes arising from tax law enacted or substantively enacted to implement the Pillar Two model rules published by the OECD, including tax law that implements qualified domestic minimum top-up taxes described in those rules. The amendments introduce a temporary exception to the accounting requirements for deferred taxes in IAS 12, so that an entity would neither recognise nor disclose information about deferred tax assets and liabilities related to Pillar Two income taxes. In periods in which Pillar Two legislation is enacted or substantively enacted but not yet in effect, an entity shall disclose known or reasonably estimable information that helps users of financial statements understand the entity's exposure to Pillar Two income taxes arising from that legislation. Refer note 9 for further information.

**Disclosure of Accounting Policies (Amendments to IAS 1 and IFRS Practise Statement 2)**

The amendments require the disclosure of 'material', rather than 'significant', accounting policies. The amendments also provide guidance on the application of materiality to disclosure of accounting policies, assisting entities to provide useful, entity-specific accounting policy information that users need to understand other information in the financial statements.

The amendments have an impact on the Group's disclosures of accounting policies, but not on the measurement, recognition or presentation of any items in the Group's consolidated financial statements.

**IFRS 17 Insurance Contracts**

IFRS 17 Insurance Contracts (IFRS 17) is effective for reporting periods beginning on or after 1 January 2023. IFRS 17 applies to all types of insurance contracts (i.e., life, non-life, direct insurance and re-insurance), regardless of the type of entities that issue them, as well as to certain guarantees and financial instruments with discretionary participation features. Limited scope exceptions apply.

The Group has not identified contracts that result in the transfer of significant insurance risk, and therefore it has concluded that IFRS 17 does not have a material impact on the financial statements for the year ended 31 December 2023.



# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2 MATERIAL ACCOUNTING POLICIES** (continued)
**2.2 Changes in material accounting policies** (continued)
**New and amended standards and interpretations** (continued)

Other amendments to IFRSs which are effective for annual accounting period starting from 1 January 2023 did not have any material impact on the accounting policies, financial position or performance of the Group.

**Standards issued but not yet effective**
The new and amended standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's consolidated financial statements are disclosed below.

General requirements for disclosure of sustainability-related financial information (IFRS S1) and Climate-related disclosures (IFRS S2) – 1 January 2024

In June 2023 the International Sustainability Standards Board (ISSB) issued its first two IFRS Sustainability Disclosure Standards, IFRS S1 General Requirements for Disclosure of Sustainability-related Financial Information and IFRS S2 Climate-related Disclosures. IFRS S1 includes the core framework for the disclosure of material information about sustainability-related risks and opportunities across a Group's value chain. IFRS S2 is the first thematic standard issued that sets out requirements for entities to disclose information about climate-related risks and opportunities. The standard requires an entity to disclose information about climate-related risks and opportunities that could reasonably be expected to affect the entity's cash flows, its access to finance or cost of capital over the short, medium or long term.

Lack of Exchangeability (Amendments to IAS 21) – 1 January 2025

The amendments to IAS 21 specify how to assess whether a currency is exchangeable and how to determine the exchange rate when it is not. Applying the amendments, a currency is not exchangeable into the other currency if an entity can only obtain no more than an insignificant amount of the other currency at the measurement date for a specified purpose. When a currency is not exchangeable at the measurement date, an entity is required to estimate the spot exchange rate as the rate that would have applied to an orderly exchange transaction at the measurement date between market participants under prevailing economic conditions. In that case, an entity is required to disclose information that enables users of its financial statements to evaluate how the currency's lack of exchangeability affects, or is expected to affect, the entity's financial performance, financial position and cash flows.

The Group is currently evaluating the impact of these amendments. The Group will adopt it when the amendments become effective.

**2.3 Basis of consolidation**
The consolidated financial statements comprise the financial statements of the Bank as at 31 December each year and its subsidiaries as at the same date or a date not earlier than three months from 31 December. The financial statements of subsidiaries and associates are prepared using consistent accounting policies and are adjusted, where necessary, to bring the accounting policies in line with those of the Group. All intercompany balances and transactions, including unrealised profits arising from intra-group transactions have been eliminated on consolidation.

*a.   Subsidiaries*
Subsidiaries are all entities over which the Bank has control. The control is achieved when the Bank is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. The Group re-assesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control. Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group loses control of the subsidiary. Refer Note 24 for the list of major subsidiaries, their principal businesses and the Group's effective holding.

*b.   Non-controlling interest*
Interest in the equity of subsidiaries not attributable to the Group is reported as non-controlling interest in the consolidated statement of financial position. Non-controlling interest in the acquiree is measured at the proportionate share in the recognised amounts of the acquiree's identifiable net assets. Losses are allocated to the non-controlling interest even if they exceed the non-controlling interest's

**2 MATERIAL ACCOUNTING POLICIES** (continued)
**2.3 Basis of consolidation** (continued)
*b.   Non-controlling interest* (continued)

share of equity in the subsidiary. Transactions with non-controlling interests are treated as transactions with equity owners of the Group. Gains or losses on changes in non-controlling interests without loss of control are recorded in equity.

*c.   Associates*
Associates are all entities over which the Group has significant influence but not control, generally accompanying a shareholding of between 20% and 50% of the voting rights. Investment in an associate is initially recognised at cost and subsequently accounted for by the equity method of accounting. The Group's investment in associates includes goodwill identified on acquisition. The Group's share of its associates' post-acquisition profits or losses is recognised in the consolidated statement of income, and its share of post-acquisition movements in other comprehensive income is recognised in other comprehensive income. The cumulative post-acquisition movements are adjusted against the carrying amount of the investment.

The Group determines at each reporting date whether there is any objective evidence that the investment in the associate is impaired. If this is the case, the Group calculates the amount of impairment as the difference between the recoverable amount of the associate and its carrying value and recognises the amount in the consolidated statement of income. Upon loss of significant influence over the associate, the Group measures and recognises any retained investment at its fair value. Gain or loss on this transaction is computed by comparing the carrying amount of the associate at the time of loss of significant influence with the aggregate of fair value of the retained investment and proceeds from disposal. This is recognised in the consolidated statement of income.

**2.4 Foreign currencies**
The consolidated financial statements are presented in Kuwaiti Dinars (thousand) which is also the Bank's functional currency.

*a.   Translation of foreign currency transactions*
Transactions in foreign currencies are initially recorded in the functional currency rate of exchange ruling at the date of the transaction. Monetary assets and monetary liabilities in foreign currencies (other than monetary items that form part of the net investment in a foreign operation) are translated into functional currency at rates of exchange prevailing at the reporting date. Any gains or losses are taken to the consolidated statement of income. Exchange differences arising on monetary items that form part of the net investment in a foreign operation are determined using closing rates and recognised in other comprehensive income and presented in the foreign currency translation reserve in equity. When a foreign operation is disposed of, the cumulative amount in foreign currency translation reserve relating to that foreign operation is recognised in the consolidated statement of income. Goodwill, intangible assets and any fair value adjustments to the carrying value of assets and liabilities are recorded at the functional currency of the foreign operation and are translated to the presentation currency at the rate of exchange prevailing at the reporting date. All resulting exchange differences are recognised in other comprehensive income and accumulated in foreign currency translation reserve within equity.

Translation gains or losses on non-monetary items are recognised in other comprehensive income when non-monetary items are measured at fair value through other comprehensive income. Translation gains or losses on non-monetary items measured at fair value through profit or loss are recognised in consolidated statement of income.

*b.   Translation of financial statements of foreign entities*
The results and financial position of all the Group entities that have a functional currency different from the presentation currency are translated to presentation currency as follows:

The assets and liabilities are translated at rates of exchange ruling at the reporting date.  Income and expense items are translated at average exchange rates for the year. All resulting exchange differences are recognised in other comprehensive income and accumulated in foreign currency translation reserve within equity and duly recognised in the consolidated statement of income on disposal of the foreign operation.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2 MATERIAL ACCOUNTING POLICIES** (continued)

### 2.5 Interest income and expenses
Interest income and expense for all interest-bearing financial instruments are recognised within 'interest income' and 'interest expense' in the consolidated statement of income using the effective interest method. The effective interest method is a method of calculating the amortised cost of a financial asset or a financial liability and of allocating the interest income or interest expense over the relevant period.

The effective interest rate is the rate that exactly discounts estimated future cash payments or receipts through the expected life of the financial instrument or, when appropriate, a shorter period to the net carrying amount of the financial asset or financial liability. Fees which are considered as an integral part of the effective yield of a financial asset are recognised using effective yield method. Once a financial asset or a group of similar financial assets has been written down as a result of an impairment loss, interest income is recognised using the rate of interest used to discount the future cash flows for the purpose of measuring the impairment loss.

### 2.6 Murabaha and other Islamic financing income
Income from Murabaha, Wakala and Leased assets is recognized on a pattern reflecting a constant periodic return on the outstanding net investment.

### 2.7 Fees and commissions income
Fees and commission income are recognised when the Group satisfies the performance obligation by transferring the promised service to customers. At inception of the contract, the Group determines whether it satisfies the performance obligation over a period of time or at a point in time. Fees income earned from services provided over a period of time is recognised over the period of service. Fees and commissions arising from providing a transaction service are recognised at a point in time on completion of the underlying transaction. Portfolio and other management advisory and service fees are recognised based on the applicable service contracts, usually on a time-apportioned basis. Asset management fees related to investment funds are recognised over the period in which the service is provided. The same principle is applied for wealth management and custody services that are continuously provided over an extended period of time.

### 2.8 Dividend income
Dividend income is recognised when the right to receive payment is established.

### 2.9 Impairment of financial assets
The Group computes Expected Credit Losses (ECL) on the following financial instruments that are not measured at fair value through profit or loss:

- loans and advances, Islamic financing to customers including credit commitments
- letters of credit and financial guarantee contracts including commitments
- investment in debt securities measured at amortised cost or FVOCI
- balances and deposits with banks

Equity investments are not subject to ECL.

**Impairment of credit facilities**
Credit facilities granted by the Group consists of loans and advances, Islamic financing to customers, letters of credit and financial guarantee contracts and commitments to grant credit facilities. Impairment on credit facilities shall be recognised in the consolidated statement of financial position at an amount equal to the higher of ECL under IFRS 9 according to the CBK guidelines, or the provisions required by the CBK instructions.

**Impairment of financial assets other than credit facilities**
The Group recognises ECL on investment in debt securities measured at amortised cost or FVOCI and on balances and deposits with banks.

**2 MATERIAL ACCOUNTING POLICIES** (continued)
**2.9 Impairment of financial assets** (continued)

**Expected Credit Losses**
The Group applies a three-stage approach to measure the expected credit loss as follows:

**Stage 1: 12 month ECL**
The Group measures loss allowances at an amount equal to 12-month ECL on financial assets where there has not been significant increase in credit risk since their initial recognition or on exposures that are determined to have a low credit risk at the reporting date. The Group considers a financial asset to have low credit risk when its credit risk rating is equivalent to the globally understood definition of 'investment grade'.

**Stage 2: Lifetime ECL – not credit impaired**
The Group measures loss allowances at an amount equal to lifetime ECL on financial assets where there has been a significant increase in credit risk since initial recognition but are not credit impaired.

**Stage 3: Lifetime ECL – credit impaired**
The Group measures loss allowances at an amount equal to lifetime ECL on financial assets that are determined to be credit impaired based on objective evidence of impairment.

Life time ECL is the ECL that result from all possible default events over the expected life of a financial instrument. The 12 month ECL is the portion of lifetime expected credit loss that result from default events that are possible within the 12 months after the reporting date. Both lifetime ECLs and 12 month ECLs are calculated either on an individual basis or on a collective basis depending on the nature of the underlying portfolio of financial instruments.

*Determining the stage of Expected Credit Loss*
At each reporting date, the Group assesses whether there has been significant increase in credit risk since initial recognition by comparing the risk of default occurring over the remaining expected life from the reporting date with the risk of default at the date of initial recognition. The quantitative criteria used to determine a significant increase in credit risk is a series of relative and absolute thresholds. All financial assets that are 30 days past due are generally deemed to have significant increase in credit risk since initial recognition and migrated to stage 2 even if other criteria do not indicate a significant increase in credit risk unless this is rebutted.

At each reporting date, the Group also assesses whether a financial asset or group of financial assets is credit-impaired. The Group considers a financial asset to be credit impaired when one or more events that have a detrimental impact on the estimated future cash flows of the financial asset have occurred or when contractual payments are 90 days past due. All credit-impaired financial assets are classified as stage 3 for ECL measurement purposes. Evidence of credit impairment includes observable data about the following:

- Significant financial difficulty of the borrower or issuer
- A breach of contract such as default or past due event
- The lender having granted to the borrower a concession, that the lender would otherwise not consider, for economic or contractual reasons relating to the borrower's financial difficulty
- The disappearance of an active market for a security because of financial difficulties
- Purchase of a financial asset at a deep discount that reflects the incurred credit loss

At the reporting date, if the credit risk of a financial asset or group of financial assets has not increased significantly since initial recognition or not become credit impaired, these financial assets are classified as stage 1.

*Measurement of ECLs*
ECL is probability weighted estimates of credit losses and are measured as the present value of all cash shortfalls discounted at the effective interest rate of the financial instrument. Cash shortfall represents the difference between cash flows due to the Group in accordance with the contract and the cash flows that the Group expects to receive. The key elements in the measurement of ECL include probability of default (PD), loss given default (LGD) and exposure at default (EAD). The Group estimates these elements using appropriate credit risk models taking into consideration the internal and external credit ratings of the assets, nature and value of collaterals, forward-looking macroeconomic scenarios, etc.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2 MATERIAL ACCOUNTING POLICIES** (continued)
**2.9 Impairment of financial assets** (continued)
**Expected Credit Losses** (continued)

*Incorporation of forward-looking information*
The Group considers key economic variables that are expected to have an impact on the credit risk and the ECL in order to incorporate forward-looking information into the ECL models. These primarily reflect reasonable and supportable forecasts of the future macro-economic conditions. The consideration of such factors increases the degree of judgment in determination of ECL. The management reviews the methodologies and assumptions including any forecasts of future economic conditions on regular basis.

*Modification of loans and Islamic financing to customers*
Under certain circumstances, the Group seeks to restructure loans, advances and Islamic financing to customers rather than taking possession of collateral. This may involve extending the payment arrangements, reduction in the amount of principal or interest and the agreement of new loan or financing conditions. If the modifications are substantial, such a facility is derecognised and a new facility is recognised with substantially different terms and conditions. The facility will have a loss allowance measured based on 12 month ECL except in rare occasions where the new facility is considered to be originated and credit impaired. Management continuously reviews modified loans and Islamic financing to customers to ensure that all criteria are met and that future payments are likely to occur. Management also assesses whether there has been significant increase in credit risk or the facility should be classified in stage 3. When loans, advances and Islamic financing to customers have been modified but not derecognised, any impairment is measured using the original effective interest rate as calculated before the modification of terms.

*Write off*
The gross carrying amount of a financial asset is written off (either partially or in full) when the Group determines that the debtor does not have assets or sources of income that could generate sufficient cash flows to repay the amounts. However, financial assets that are written off could still be subject to enforcement activities in order to comply with the Group's procedures for recovery of amounts due.

*Presentation of allowance for ECL in the consolidated statement of financial position*
Loss allowances for ECL are presented as a deduction from the gross carrying amount of the financial assets for financial assets carried at amortised cost. In the case of debt instruments measured at FVOCI, the Group recognises the ECL charge in the consolidated statement of income and a corresponding amount is recognised in other comprehensive income with no reduction in the carrying amount of the financial asset in the consolidated statement of financial position. ECL for loan commitments, letters of credit and financial guarantee contracts are recognised in other liabilities. When the Group is unable to identify the ECL on the undrawn portion of credit commitments separately from drawn portion of commitments, the combined amount of ECL is presented as a deduction from the gross carrying amount of the drawn portion.

**Provisions for credit losses in accordance with CBK instructions**
The Group is required to calculate provisions for credit losses on credit facilities in accordance with the instructions of CBK on the classification of credit facilities and calculation of provisions. Credit facilities are classified as past due when a payment has not been received on its contractual payment date or if the facility is in excess of pre-approved limits. A credit facility is classified as past due and impaired when the interest/profit or a principal instalment is past due for more than 90 days and if the carrying amount of the facility is greater than its estimated recoverable value. Past due but not impaired and past due and impaired loans are managed and monitored as irregular facilities and are classified into the following four categories which are then used to determine the provisions.

| Category | Criteria | Specific provisions |
|---|---|---|
| Watch list | Irregular for a period of up to 90 days | - |
| Substandard | Irregular for a period of 91- 180 days | 20% |
| Doubtful | Irregular for a period of 181- 365 days | 50% |
| Bad | Irregular for a period exceeding 365 days | 100% |

The Group may also include a credit facility in one of the above categories based on management's judgement of a customer's financial and/or non-financial circumstances.

In addition to specific provisions, minimum general provisions of 1% on cash facilities and 0.5% on non-cash facilities are made on all applicable credit facilities (net of certain restricted categories of collateral) which are not subject to specific provisioning.

**2 MATERIAL ACCOUNTING POLICIES** (continued)

**2.10 Impairment of non-financial assets**
Goodwill and intangible assets that have an indefinite useful life are not subject to amortisation and are tested annually for impairment. Other non-financial assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. An impairment loss is recognised in the consolidated statement of income for the amount by which the asset's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of an asset's fair value less costs to sell and value in use. Refer Note 15 Goodwill and other intangible assets for more details on assessment of value in use. If previously recognised impairment losses have decreased, such excess impairment provision is reversed in the consolidated statement of income for non-financial assets other than goodwill.

**2.11 Share based compensation**
*Cash settled share based compensation*
The fair value of the employee services received in exchange for the cash settled share based payment is recognised as an expense, together with a corresponding increase in liability. The fair value of the options determined using the Black Scholes model. The liability is remeasured to fair value at each reporting date up to and including the settlement date, with changes in fair value recognised in the consolidated statement of income.

**2.12 Post-employment benefits**
The Group is liable to make defined contributions to State plans and lump sum payments under defined benefit plans to employees at cessation of employment, in accordance with the laws of the place they are employed. The defined benefit plans are unfunded. The present value of the defined benefit obligation is determined annually by actuarial valuations using the projected unit credit method. An actuarial valuation involves making various assumptions such as determination of the discount rate, future salary increases and mortality rates. These assumptions are reviewed at each reporting date. Current service cost, past service cost and net interest expense on the defined benefit plans are recognised in consolidated statement of income and is included in staff expenses. Any gains or losses on re-measurement of defined benefit plans attributable to changes in actuarial assumptions are recognized in other comprehensive income and is included in Actuarial Valuation reserve.

**2.13 Taxation**
*National Labour Support Tax, Zakat, Contribution to Kuwait Foundation for the Advancement of Sciences*
National Labour Support Tax and Zakat are provided for in accordance with the applicable fiscal laws, rules and regulations. Contribution to Kuwait Foundation for the Advancement of Sciences is provided at 1% of the eligible profits in accordance with the Amiri Decree issued on 12 December 1976.

*Overseas tax*
Income tax payable on taxable profit ('current tax') is recognised as an expense in the period in which the profits arise in accordance with the fiscal regulations of the respective countries in which the Group operates. Deferred tax assets are recognised for deductible temporary differences, carry forward of unused tax credits and unused tax losses, to the extent it is probable that taxable profit will be available to utilise these. Deferred tax liabilities are recognised for taxable temporary differences. Deferred tax assets and liabilities are measured using tax rates and applicable legislation enacted at the reporting date.

**2.14 Recognition of financial assets and financial liabilities**
Financial assets and financial liabilities are recognised when the Group becomes party to contractual provisions of the instrument and are initially measured at fair value. Transaction costs are included only for those financial instruments that are not measured at fair value through statement of income.

**2.15 Classification and measurement of financial assets**
The Group determines the classification of financial assets based on the business model it uses to manage the financial assets and the contractual cash flow characteristics of the financial assets.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2 MATERIAL ACCOUNTING POLICIES** (continued)
**2.15 Classification and measurement of financial assets** (continued)

*Business model assessment*
The Group determines its business model at the level that best reflects how it manages groups of financial assets to achieve its business objective. The Group's business model is not assessed on an instrument by instrument basis but at a higher level of aggregated portfolios and is based on a number of observable factors. The information considered includes:

- The stated policies and objectives for the portfolio and the operation of those policies in practice
- The risks that affect the performance of the business model (and the financial assets held within that business model) and how those risks are managed;
- The frequency, volume and timing of sales in prior periods, the reasons for such sales and its expectations about future sales activity.

The business model assessment is based on reasonably expected scenarios which include taking 'worst case' or 'stress case' scenarios into account. If cash flows after initial recognition are realised in a way that is different from the Group's original expectations, the Group does not change the classification for the remaining financial assets held in that business model, but incorporates such information when assessing newly originated or newly purchased financial assets going forward.

*Assessment of whether contractual cash flows are solely payments of principal and interest (SPPI test)*
The Group assesses the contractual terms of financial assets to identify whether they meet the SPPI test. 'Principal' for the purpose of this test is defined as the fair value of the financial asset at initial recognition and may change over the life of the financial asset. Interest is defined as consideration for time value of money and for the credit risk associated with the principal and for other basic lending risks and costs as well as a profit margin. In assessing whether the contractual cash flows are solely payments of principal and interest, the Group considers whether the financial asset contains a contractual term that could change the timing or amount of contractual cash flows such that it would not meet this condition. The Group considers:

- Contingent events that would change the amount and timing of cash flows;
- Leverage features;
- Prepayment and extension terms;
- Terms that limit the Group's claim to cash flows from specified assets (e.g. non-recourse asset arrangements); and
- Features that modify consideration of the time value of money – e.g. periodical reset of interest rates.

Contractual terms that introduce a more than de minimus exposure to risks or volatility in the contractual cash flows that are unrelated to a basic lending arrangement do not give rise to contractual cash flows that are solely payment of principal and interest. In such cases, the financial asset is measured at fair value through profit or loss.

The Group classifies its financial assets upon initial recognition into the following categories:

- Financial assets carried at amortised cost
- Financial assets carried at fair value through other comprehensive income (FVOCI)
- Financial assets carried at fair value through profit or loss (FVTPL)

*Financial assets carried at amortized cost:*
A financial asset is carried at amortised cost if it meets both of the following conditions:

- it is held within a business model whose objective is to hold assets to collect contractual cash flows ; and
- its contractual terms give rise, on specified dates, to cash flows that are solely payments of principal and interest on the principal amount outstanding

Financial assets carried at amortised cost are subsequently measured at amortised cost using the effective interest method. Interest income, foreign exchange gains and losses and charge for expected credit losses are recognised in the consolidated statement of income. Any gain or loss on de-recognition is recognised in the consolidated statement of income.

**2 MATERIAL ACCOUNTING POLICIES** (continued)
**2.15 Classification and measurement of financial assets** (continued)

*Financial assets carried at fair value through other comprehensive income (FVOCI):*

**(i)    Debt Securities at FVOCI**
A debt security is carried at FVOCI if it meets both of the following conditions:

- it is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and
- its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding

Debt Securities at FVOCI are subsequently measured at fair value. Interest income calculated using the effective interest method, foreign exchange gains and losses and impairment losses are recognised in the consolidated statement of income. Fair value changes which are not part of an effective hedging relationship are recognised in other comprehensive income and presented in the cumulative changes in fair values as part of equity until the asset is derecognized or reclassified. When the financial asset is derecognised, the cumulative gain or loss previously recognised in other comprehensive income is reclassified from equity to the consolidated statement of income.

**(ii)    Equity investments at FVOCI**
Upon initial recognition, the Group makes an irrevocable election to classify some of its equity investments as equity investments at FVOCI if they meet the definition of Equity under IAS 32 Financial Instruments: Presentation and are not held for trading. Such classification is determined on an instrument by instrument basis. Equity investments at FVOCI are subsequently measured at fair value. Changes in fair values including foreign exchange component are recognised in other comprehensive income and presented in the cumulative changes in fair values as part of equity. Cumulative gains and losses previously recognised in other comprehensive income are transferred to retained earnings on de-recognition and are not recognised in the consolidated statement of income. Dividend income on equity investments at FVOCI are recognised in the consolidated statement of income unless they clearly represent a recovery of part of the cost of the investment. Equity investments at FVOCI are not subject to impairment assessment.

*Financial assets carried at fair value through profit or loss:*
Financial assets in this category are those assets which have been either designated by management upon initial recognition or are mandatorily required to be measured at fair value under IFRS 9. Management designates an instrument as FVTPL that otherwise meet the requirements to be measured at amortised cost or at FVOCI only if it eliminates, or significantly reduces, an accounting mismatch that would otherwise arise. Financial assets with contractual cash flows not representing solely payment of principal and interest are mandatorily required to be measured at FVTPL.

Financial assets at FVTPL are subsequently measured at fair value. Changes in fair value are recognised in the consolidated statement of income. Interest income is recognised using the effective interest method. Dividend income from equity investments measured at FVTPL is recognised in the consolidated statement of income when the right to the payment has been established.

The Group's financial assets are classified and measured as follows:

Cash and short term funds
Cash and short term funds consist of cash in hand, current account and money at call with other banks and deposits with banks maturing within seven days. Cash and short term funds are classified and carried at amortised cost using effective interest rate.

Deposits with banks
Deposits with banks are classified and carried at amortised cost using the effective interest method. The carrying values of such assets which are being effectively hedged for changes in fair value are adjusted to the extent of the changes in fair value attributable to the risk being hedged.

Loans and advances to customers
Loans and advances are stated at amortised cost using the effective interest method. The carrying values of such assets which are being effectively hedged for changes in fair value are adjusted to the extent of the changes in fair value attributable to the risk being hedged.

Case 23-34815   Document 52-1   Filed in TXSB on 06/05/24   Page 130 of 231

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2 MATERIAL ACCOUNTING POLICIES** (continued)

**2.15 Classification and measurement of financial assets** (continued)

Islamic financing to customers

Islamic financing to customers are financial assets with fixed or determinable payments that are not quoted in an active market. Major islamic financing products are:

**a.  Murabaha**

Murabaha is an agreement relating to the sale of commodities at cost plus an agreed upon profit margin, whereby the seller informs the buyer of the price at which the deal will be completed and also the amount of profit to be recognized. Murabaha is a financial asset originated by the Group and is stated at amortised cost.

**b.  Wakala**

Wakala is an agreement involving Al-Muwakkil (the Principal) who wishes to appoint Al-Wakil (the Agent) to be his agent with respect to the investment of Al-Muwakkil's fund, in accordance with regulations of the Islamic Sharia'a. Wakala is a financial asset originated by the Group and stated at amortised cost.

**c.  Leased assets - the Group as a lessor**

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating lease. Leased assets are stated at amortised cost using effective profit rate.

Financial investments

Group's financial investments consist of debt securities, equity investments and other investments.

Debt securities are classified as either at amortised cost or at fair value through other comprehensive income based on the business model in which these securities are managed. Debt securities are classified at fair value through profit or loss, if they do not meet SPPI criteria.

Equity investments are generally carried at fair value through profit or loss except for those specific investments for which the Group has made an election to classify at fair value through other comprehensive income.

Other investments are carried at fair value through profit or loss.

**2.16  Fair value measurement**

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date in the principal or, in its absence, in the most advantageous market to which the Group has access at that date under current market conditions regardless of whether that price is directly observable or estimated using another valuation technique.

When available, the Group measures the fair value of an instrument using the quoted price in an active market for that instrument. A market is regarded as active if transactions for the asset or liability take place with sufficient frequency and volume to provide pricing information on an ongoing basis.

If there is no quoted price in an active market, then the Group uses valuation techniques that include the use of valuation models that maximise the use of relevant observable inputs and minimise the use of unobservable inputs. The chosen valuation technique incorporates all of the factors that market participants would take into account in pricing a transaction. The inputs to these models are taken from observable markets where possible, but where this is not feasible, estimation is required in establishing fair values. Judgements and estimates include considerations of liquidity and model inputs related to items such as credit risk (both own and counterparty), funding value adjustments, correlation and volatility.

If an asset or liability measured at fair value has a bid price and an ask price, then the Group measures assets at a bid price and liabilities at an ask price.

Fair values of investment properties are determined by appraisers having an appropriate recognised professional qualification and recent experience in the location and category of the property being valued and also considering the ability to generate economic benefits by using the property in its highest and best use.

**2 MATERIAL ACCOUNTING POLICIES** (continued)

**2.17  Repurchase and resale agreements**

Assets sold with a simultaneous commitment to repurchase at a specified future date at an agreed price (repos) are not derecognised in the consolidated statement of financial position. Amounts received under these agreements are treated as interest bearing liabilities and the difference between the sale and repurchase price treated as interest expense using the effective yield method. Assets purchased with a corresponding commitment to resell at a specified future date at an agreed price (reverse repos) are not recognised in the consolidated statement of financial position. Amounts paid under these agreements are treated as interest earning assets and the difference between the purchase and resale price treated as interest income using the effective yield method.

**2.18  Offsetting of financial assets and liabilities**

Financial assets and financial liabilities are only offset and the net amount reported in the consolidated statement of financial position when there is a legally enforceable right to set off the recognised amounts and the Group intends to either settle on a net basis, or to realise the asset and settle the liability simultaneously.

**2.19  Modification of financial assets and and financial liabilities**

If the terms of a financial asset are modified, the Group evaluates whether the cash flows of the modified asset are substantially different. If the cash flows are substantially different, then the contractual rights to cash flows from the original financial asset are deemed to have expired. In this case, the original financial asset is derecognised and a new financial asset is recognised at fair value.

If the cash flows of the modified asset are not substantially different, then the modification does not result in derecognition of the financial asset. In this case, the Group recalculates the gross carrying amount of the financial asset using the original effective interest rate and recognises the amount arising from adjusting the gross carrying amount as modification gain or loss in the Consolidated Statement of Income.

The Group derecognises a financial liability when its terms are modified and the cash flows of the modified liability are substantially different. In this case, a new financial liability based on the modified terms is recognised at fair value. The difference between the carrying amount of the financial liability extinguished and the new financial liability with modified terms is recognised in the Consolidated Statement of Income.

Interest Rate Benchmark Reform

In the context of IBOR reform, the Group's assessment of whether a change to a financial asset or financial liability is substantial is made after applying the practical expedient introduced by Interest Rate Benchmark Reform, Amendments to IFRS 9, Phase 2. This practical expedient allows changes to the basis for determining contractual cash flows as a direct result of interest rate benchmark reform to be treated as changes to a floating interest rate to that instrument, if the transition from the IBOR benchmark rate to the alternative RFR takes place on an economically equivalent basis. In such cases, the Group updates the effective interest rate to reflect the change in an interest rate benchmark from IBOR to Risk Free Rate (RFR) without adjusting the carrying amount.

When additional changes are made, which are not economically equivalent, the Group applies accounting policy on accounting for modification of financial assets and financial liabilities.

**2.20  De-recognition of financial assets and and financial liabilities**

Financial assets

A financial asset (or where applicable, a part of a financial asset or part of a group of similar financial assets) is derecognised where:

- the rights to receive cash flows from the asset have expired, or
- the Group retains the right to receive cash flows from the asset, but has assumed an obligation to pay them in full without material delay to a third party under a 'pass through' arrangement, or
- the Group has transferred its rights to receive cash flows from the asset and either (a) has transferred substantially all the risks and rewards of the asset, or (b) has neither transferred nor retained substantially all the risks and rewards of the asset, but has transferred control of the asset.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2  MATERIAL ACCOUNTING POLICIES** (continued)
**2.20  De-recognition of financial assets and and financial liabilities** (continued)
Financial assets (continued)

When the Group has transferred its rights to receive cash flows from an asset and has neither transferred nor retained substantially all the risks and rewards of the asset nor transferred control of the asset, the asset is recognised to the extent of the Group's continuing involvement in the asset.  Continuing involvement that takes the form of a guarantee over the transferred asset is measured at the lower of the original carrying amount of the asset and the maximum amount of consideration that the Group could be required to repay.

Financial liabilities
A financial liability is derecognised when the obligation under the liability is discharged or cancelled or expired. Where an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as a de-recognition of the original liability and the recognition of a new liability.

**2.21  Derivative financial instruments and hedge accounting**
The Group deals in interest rate swaps to manage its interest rate risk on interest bearing assets and liabilities. Similarly the Group deals in forward foreign exchange contracts for customers and to manage its foreign currency positions and cash flows. All derivative financial instruments of the Group are recorded in the consolidated statement of financial position at fair value. The fair value of a derivative is the equivalent of the unrealised gain or loss from marking to market the derivative using prevailing market rates or internal pricing models. Positive and negative fair values are reported as assets and liabilities respectively and are offset when there is both an intention to settle net and a legal right to offset exists.

For the purposes of hedge accounting, hedges are classified into two categories: (a) fair value hedges which hedge the exposure to changes in the fair value of a recognised asset or liability and (b) cash flow hedges which hedge exposure to variability in cash flows that is either attributable to a particular risk associated with a recognised financial asset or liability or a highly probable forecast transaction.

In relation to fair value hedges which meet the conditions for hedge accounting, any gain or loss from remeasuring the hedging instrument is recognised immediately in the consolidated statement of income. The carrying amounts of hedged items are adjusted for fair value changes attributable to the risk being hedged and the difference is recognised in the consolidated statement of income.

In relation to cash flow hedges which meet the conditions for hedge accounting, the portion of the gain or loss on the hedging instrument that is determined to be an effective hedge is recognised initially in equity and any ineffective portion is recognised in the consolidated statement of income. The gains or losses on cash flow hedges recognised initially in equity are transferred to the consolidated statement of income in the period in which the hedged transaction impacts the consolidated statement of income. Where the hedged transaction results in the recognition of an asset or liability, the associated gains or losses that had initially been recognised in equity are included in the initial measurement of the cost of the related asset or liability. For hedges that do not qualify for hedge accounting, any gains or losses arising from changes in fair value of the hedging instrument are taken directly to the consolidated statement of income.

Hedges of net investment in a foreign operation, including a hedge of a monetary item that is accounted for as part of the net investment, are accounted for in a way similar to cash flow hedges. Gains or losses on the hedging instrument relating to the effective portion of the hedge are recognised as other comprehensive income while any gains or losses relating to the ineffective portion are recognised in the consolidated income statement. On disposal of the foreign operation, the cumulative value of any such gains or losses recorded in equity is transferred to the consolidated income statement.

Hedge accounting is discontinued when the hedging instrument expires or is sold, terminated or exercised, no longer qualifies for hedge accounting or is revoked by the Group.  For cash flow hedges, any cumulative gain or loss on the hedging instrument recognised in equity remains in equity until the forecast transaction occurs.  In the case of fair value hedges of interest bearing financial instruments, any adjustment relating to the hedge is amortised over the remaining term to maturity. Where the hedged transaction is no longer expected to occur, the net cumulative gain or loss recognised in equity is transferred to the consolidated statement of income.

Based on the Amendments to IFRS 7 and IFRS 9 "Interest Rate Benchmark reforms : "Phase 2" issued in August 2020, the Group has availed reliefs that allow the  Group's hedging relationships to continue upon the replacement of an existing interest rate benchmark rate with an RFR. The relief requires the Group to amend hedge designations and hedge documentation. This includes redefining the hedged risk to reference an RFR, redefining the description of the hedging instrument and / or the hedged item to reference the RFR and amending the method for assessing hedge effectiveness. Updates to the hedging documentation must be made by the end of the reporting period in which a replacement takes place.

**2  MATERIAL ACCOUNTING POLICIES** (continued)

**2.22    Trade and settlement date accounting**
All "regular way" purchase and sale of financial assets other than investments in equity instruments are recognised on the settlement date, i.e. the date the asset is delivered to the Group. Investments in equity instruments are recognised on the trade date, i.e. the date that the Group commits to purchase or sell the asset. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame generally established by the regulation or convention in the market place.

**2.23    Investment properties**
Investment properties are properties held either to earn rental income or for capital appreciation or for both, but not for sale in the ordinary course of business, use in the production or supply of goods or services or for administrative purposes. Investment property is measured at cost on initial recognition and subsequently at fair value with any change therein recognised in consolidated statement of income. Cost includes expenditure that is directly attributable to the acquisition of the investment property. Fair values of investment properties are determined by appraisers having an appropriate recognised professional qualification and recent experience in the location and category of the property being valued. Any gain or loss on disposal of an investment property (calculated as the difference between the net proceeds from disposal and the carrying amount of the item) is recognised in consolidated statement of income. When the use of a property changes such that it is reclassified as Land, premises and equipment, its fair value at the date of reclassification becomes its cost for subsequent accounting. The Group presents investment properties in other assets in the consolidated statement of financial position.

**2.24    Land, premises and equipment**
Land and premises comprise mainly branches and offices. All premises and equipment are stated at historical cost less depreciation. Historical cost includes expenditure that is directly attributable to the acquisition of the items.

Projects and work in progress are stated at cost less impairment if any. Costs are those expenses incurred by the Group that are directly attributable to the creation of the asset. When the asset is ready for use, capital work in progress is transferred to the appropriate category and depreciated in accordance with the Group's policies.

Subsequent costs are included in the asset's carrying amount or are recognised as a separate asset, as appropriate, only when it is probable that future economic benefits associated with the item will flow to the Group and the cost of the item can be measured reliably. All other repairs and maintenance are charged to the consolidated statement of income during the period in which they are incurred.

Land is not depreciated. Depreciation is provided on the depreciable amount of other items of premises and equipment on a straight line basis over their estimated useful life. The depreciable amount is the gross carrying value, less the estimated residual value at the end of its useful life. The estimated useful life of premises and equipment are as follows:

| | |
|---|---|
| Building on leasehold land | term of lease (maximum 20 years) |
| Building on freehold land | 50 years |
| IT systems and equipment | 3-10 years |

Residual values and useful lives of assets are reviewed, and adjusted if appropriate, at each reporting date.  The carrying values of land, premises and equipment are reviewed for impairment when events or changes in circumstances indicate that the carrying value may not be recoverable. Gains and losses on disposals are determined by comparing proceeds with the carrying amount. These are included in the consolidated statement of income.

**2.25    Leases**
At inception of a contract, the Group assesses whether the contract is a lease. A contract is a lease if the contract conveys the right to control the use of an identified asset for a period of time in exchange for a consideration. If the contract is identified as a lease, the Group recognises a right-of-use asset and a lease liability at the lease commencement date. The Group elected to use the recognition exemptions for lease contracts that, at the commencement date, have a lease term of 12 months or less and lease contracts for which the underlying asset is of low value.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**2 MATERIAL ACCOUNTING POLICIES** (continued)

**2.25 Leases** (continued)

*Right-of-use assets*

The right-of-use asset is initially measured at cost, which comprises the initial amount of the lease liability adjusted for any lease payments made at or before the commencement date, plus any initial direct costs incurred. The right-of-use asset is subsequently depreciated using the straight-line method over the lease term. In addition, the right-of-use asset is periodically reduced by impairment losses, if any. The Group presents right-of-use assets in 'land, premises and equipment' in the consolidated statement of financial position.

*Lease Liabilities*

The lease liability is initially measured at the present value of the lease payments that are not paid at the commencement date, discounted using the Group's incremental borrowing rate. The lease liability is subsequently measured at amortised cost using the effective interest method. In addition, the carrying amount of lease liabilities is remeasured if there is a modification, a change in the lease term, or a change in the lease payments. The Group presents lease liabilities in 'other liabilities' in the consolidated statement of financial position.

Based on the Amendments to IFRS 16 "Covid-19 Related Rent Concessions" issued in May 2020, the Group has elected not to follow lease modification accounting in respect of Covid-19 related rent concessions obtained from its lessors until 30 June 2023. Instead such rent concessions are accounted in the same way as if they were not a lease modification.

**2.26 Business combinations**

Business combinations are accounted for using the acquisition method of accounting. The cost of an acquisition is measured as the aggregate of the consideration transferred, measured at acquisition date fair value and the amount of any non-controlling interest in the acquiree. Non-controlling interest in the acquiree is measured at the proportionate share in the recognised amounts of the acquiree's identifiable net assets. Other acquisition related costs incurred are expensed and included in other administrative expenses.

If the business combination is achieved in stages, the acquirer's previously held equity interest in the acquiree is remeasured to fair value at the acquisition date and included in cost of acquisition. Any resulting gain or loss is recognised in consolidated statement of income. Identifiable assets acquired and liabilities assumed in a business combination are measured initially at their fair values at the acquisition date. The excess of the cost of acquisition over the fair value of the identifiable net assets acquired is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognised directly in the consolidated statement of income.

**2.27 Goodwill and intangible assets**

**a. Goodwill**

Goodwill acquired in a business combination is initially measured at cost, being the excess of the cost of the acquisition over the net fair value of the identifiable assets and liabilities acquired. Following initial recognition, goodwill is measured at cost less any accumulated impairment losses. Goodwill is reviewed for impairment, annually or more frequently if events or changes in circumstances indicate that the carrying value may be impaired. Goodwill is recorded in the functional currency of the foreign operation and is translated to the presentation currency at the rate of exchange prevailing at the reporting date. When subsidiaries are sold, the difference between the selling price and the net assets plus cumulative translation differences and goodwill is recognised in the consolidated statement of income.

**b. Intangible assets**

Intangible assets comprise separately identifiable intangible items arising from business combinations. An intangible asset is recognised only when its cost can be measured reliably and it is probable that the expected future economic benefit will flow to the Group. Intangible assets are initially measured at cost. The cost of intangible assets acquired in a business combination is their fair value as at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortisation and any accumulated impairment losses. The useful lives of the intangible assets are assessed to be either finite or indefinite. Intangible assets with finite lives are amortised on a straight line basis over the useful economic life of 5 to 15 years and tested for impairment whenever there is an indication that the intangible asset may be impaired. Intangible assets with indefinite useful lives are not amortised but tested for impairment annually or whenever there is an indication that the intangible asset may be impaired. If the carrying value of the intangible asset is more than the recoverable amount, the intangible asset is considered impaired and is written

**2 MATERIAL ACCOUNTING POLICIES** (continued)

**2.27 Goodwill and intangible assets** (continued)

**b. Intangible assets** (continued)

down to its recoverable amount. The excess of carrying value over the recoverable amount is recognised in the consolidated statement of income. Impairment losses on intangible assets recognised in the consolidated statement of income in previous periods are reversed when there is an increase in the recoverable amount.

**2.28 Property acquired on settlement of debt**

Property acquired on settlement of debt is stated at the lower of the related loans and advances and the current fair value of such assets. Gains or losses on disposal and revaluation losses are recognised in the consolidated statement of income.

**2.29 Due to Banks and Financial Institutions, Customer deposits & Certificates of deposit issued**

Due to Banks, Deposits from other Financial Institutions, Customer Deposits & Certificates of deposit issued are stated at amortised cost using effective interest method. The carrying values of such liabilities which are being effectively hedged for changes in fair value are adjusted to the extent of the changes in fair value being hedged.

**2.30 Islamic customer deposits**

Islamic customer deposits comprise of Investment accounts and Non-investment accounts.

*Investment accounts*

Investment accounts may take the form of investment deposits, which are valid for specified periods of time, and are automatically renewable on maturity for the same period, unless the concerned depositors give written notice to the contrary, or take the form of investment saving accounts for unspecified periods. In all cases, investment accounts receive a proportion of the profit, bear a share of loss and are carried at cost plus profit payable.

*Non-investment accounts*

Non-investment accounts represent, in accordance with Islamic Sharia'a, Qard Hasan from depositors to the Group. These accounts are neither entitled to profit nor do they bear any risk of loss, as the Group guarantees to pay the related balance. Investing Qard Hasan is made at the discretion of the Group and the results of such investments are attributable to the shareholders of the Group. Non-investment accounts are carried at cost.

**2.31 Other borrowed funds**

Other borrowed funds includes Tier 2 bonds, Global Medium Term Notes, Global Medium Term Sukuk, Medium and short term borrowings. These are financial liabilities and are initially recognised at their fair value being the issue proceeds net of transaction costs and are subsequently measured at their amortised cost using the effective interest rate method. The carrying values of such liabilities which are being effectively hedged for changes in fair value are adjusted to the extent of the changes in fair value being hedged.

**2.32 Financial guarantees**

In the ordinary course of business, the Group gives financial guarantees, consisting of letters of credit, guarantees and acceptances. Financial guarantees are initially recognised in the consolidated financial statements at fair value, being the premium received, in other liabilities. The premium received is recognised in the consolidated statement of income in 'net fees and commissions' on a straight line basis over the life of the guarantee. The guarantee liability is subsequently carried at initial measurement less amortisation. When a payment under the guarantee is likely to become payable, the present value of the expected net payments less the unamortised premium is charged to the consolidated statement of income.

**2.33 Treasury shares**

The Bank's holding of its own shares are accounted for as treasury shares and are stated at purchase consideration including directly attributable costs. When the treasury shares are sold, gains are credited to a separate account in equity (treasury share reserve) which is non distributable. Any realised losses are charged to the same account to the extent of the credit balance on that account. Any excess losses are charged to retained earnings then to reserves. Gains realised subsequently on the sale of treasury shares are first used to offset any previously recorded losses in the order of reserves, retained earnings and the treasury share reserve amount. No cash dividends are distributed on these shares. The issue of bonus shares increases the number of shares proportionately and reduces the average cost per share without affecting the total cost of treasury shares.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

## 2 MATERIAL ACCOUNTING POLICIES (continued)

### 2.34 Contingent liabilities and contingent assets
Contingent liabilities are not recognized in the consolidated financial statements. They are disclosed in the notes to the consolidated financial statements, unless the possibility of an outflow of resources embodying economic benefits is remote.

Contingent assets are not recognized in the consolidated financial statements but are disclosed when an inflow of economic benefits is probable.

### 2.35 Fiduciary assets
Assets and related deposits held in trust or in a fiduciary capacity are not treated as assets or liabilities of the Group and accordingly are not included in the consolidated statement of financial position.

### 2.36 Significant accounting judgements and estimates
In the process of applying the Group's accounting policies, management has used judgements and made estimates in determining the amounts recognised in the consolidated financial statements. The most significant use of judgements and estimates are as follows:

*Accounting Judgements*
Classification of financial assets
The Group determines the classification of financial assets based on the assessment of the business model within which the assets are held and assessment of whether the contractual terms of the financial asset are solely payments of principal and interest on the principal amount outstanding. Judgments are required in determining the business model at an appropriate level that best reflects an aggregated group or portfolio of assets which are managed together to achieve a particular business objective. The Group also applies judgment to assess if there is a change in business model in circumstances when the assets with in that business model are realised differently than the original expectations. Refer Note 2.15 classification of financial assets for more information.

*Estimation uncertainty and assumptions*
The key assumptions concerning the future and other key sources of estimation uncertainty at the reporting date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

*Expected Credit Losses on financial assets*
The Group estimates Expected Credit Loss (ECL) for all financial assets carried at amortised cost or fair value through other comprehensive income except for equity instruments.

Significant judgements are required in applying the accounting requirements for measuring ECL, such as:

- Determining criteria for significant increase in credit risk
- Choosing appropriate models and assumptions for measurement of ECL
- Establishing the number and relative weightings of forward-looking scenarios for each type of product/market and the associated ECL; and
- Establishing group of similar financial assets for the purpose of measuring ECL.

Information about significant judgements and estimates made by the Group in the above areas is set out in Note 28.1.1.

*Provision for credit losses as per CBK guidelines*
The Group reviews its Loans, advances and Islamic financing to customers on a quarterly basis to assess whether a provision for credit losses should be recorded in the consolidated statement of income. In particular, considerable judgment by management is required in the estimation of the amount and timing of future cash flows when determining the level of provisions required. Such estimates are necessarily based on assumptions about several factors involving varying degrees of judgment and uncertainty, and actual results may differ resulting in future changes to such provisions.

*Impairment of goodwill and intangible assets with indefinite useful life*
The Group determines whether goodwill and intangible assets with indefinite useful life is impaired at least on an annual basis. This requires an estimation of the value in use of the cash-generating units to which the goodwill or intangible assets is allocated. Estimating the value in use requires the Group to make an estimate of the expected future cash flows from the cash-generating unit and also to choose a suitable discount rate in order to calculate the present value of those cash flows.

## 2 MATERIAL ACCOUNTING POLICIES (continued)
### 2.36 Significant accounting judgements and estimates (continued)

*Fair values of assets and liabilities including intangibles*
Considerable judgment by management is required in the estimation of the fair value of the assets including intangibles with definite and indefinite useful life, liabilities and contingent liabilities acquired as a result of business combination.

*Share based payments*
The Group measures the share based payments to employees by reference to the fair value of the relevant equity instruments. Estimating fair value for share based payment transactions requires determination of the most appropriate valuation model. This estimate also requires determination of the most appropriate inputs to the valuation model including the expected life of the share option, volatility and dividend yield and making assumptions about them. The assumptions and models used for estimating fair value for share based payment transactions are disclosed in Note 22.

*Valuation of unquoted financial assets*
Fair value of unquoted financial assets is determined using valuation techniques including the discounted cash flow model. The inputs to these models are taken from observable markets where possible, but where this is not feasible, a degree of judgment is required in establishing fair values. The judgments include considerations of inputs such as liquidity risk, credit risk and volatility. Changes in assumptions about these factors could affect the reported fair value of financial instruments. The determination of the cash flows and discount factors requires significant estimation.

### 2.37 Basis of translation
The United States dollar amounts in the Consolidated Statement of Income, Consolidated Statement of Comprehensive income, Consolidated Statement of Financial Position and Consolidated Statement of Cash Flows represent supplementary information and have been translated at a rate of KD 0.30675 per USD which represents the mid-market rate at 31 December 2023.

## 3 SEGMENTAL ANALYSIS

The Group has six reportable segments as described below. Management treats the operations of these segments separately for the purposes of decision making, resource allocation and performance assessment.

Consumer Banking
Consumer Banking provides a diversified range of products and services to individuals. The range includes consumer loans, credit cards, deposits, foreign exchange and other branch related services.

Corporate Banking
Corporate Banking provides a comprehensive product and service offering to business and corporate customers, including lending, deposits, trade finance, foreign exchange and advisory services.

NBK Wealth
NBK Wealth provides a full range of asset management, custody, brokerage, lending, deposits and other customized and innovative banking services to high net worth individuals and institutional clients across the Group.

Islamic Banking
Islamic banking represents the financial results of Boubyan Bank K.S.C.P., the Islamic banking subsidiary of the Group.

Group Centre
Group Centre includes treasury, investments, and other defined Group activities. Treasury provides a comprehensive range of treasury services and products to its clients, and is also responsible for the Bank's liquidity and market risk management. Group Centre includes any residual in respect of transfer pricing and inter segment allocations.

International Banking
International Banking provides a broad range of products and services including lending, deposits, trade finance etc. to corporate and individual customers at Group's overseas locations.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**3  SEGMENTAL ANALYSIS** (continued)

The following table shows net interest income and net income from Islamic financing, net operating income, profit for the year, total assets and total liabilities information in respect of the Group's business segments:

| 2023 | Consumer Banking | Corporate Banking | NBK Wealth | Islamic Banking | Group Centre | International Banking | Total |
|---|---|---|---|---|---|---|---|
| | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's |
| Net interest income and net income from Islamic financing | 182,745 | 123,688 | 45,919 | 180,543 | 136,760 | 235,482 | 905,137 |
| Net operating income | 237,974 | 162,894 | 112,192 | 224,424 | 152,182 | 277,101 | 1,166,767 |
| Profit for the year | 102,060 | 145,818 | 66,667 | 78,221 | 58,686 | 136,921 | 588,373 |
| Total assets | 5,084,225 | 5,105,296 | 981,443 | 8,404,989 | 1,971,188 | 16,117,850 | 37,664,991 |
| Total liabilities | 4,869,759 | 3,229,839 | 2,169,885 | 7,376,154 | 622,634 | 14,490,145 | 32,758,416 |

| 2022 | Consumer Banking | Corporate Banking | NBK Wealth | Islamic Banking | Group Centre | International Banking | Total |
|---|---|---|---|---|---|---|---|
| | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's |
| Net interest income and net income from Islamic financing | 188,558 | 105,182 | 32,866 | 172,071 | 47,757 | 209,405 | 755,839 |
| Net operating income | 241,910 | 145,443 | 93,800 | 207,528 | 72,688 | 248,372 | 1,009,741 |
| Profit (loss) for the year | 117,750 | 199,544 | 55,199 | 54,273 | (28,465) | 131,761 | 530,062 |
| Total assets | 5,036,519 | 4,933,723 | 997,905 | 7,880,757 | 1,971,281 | 15,518,178 | 36,338,363 |
| Total liabilities | 4,967,315 | 2,459,515 | 2,152,615 | 6,901,058 | 200,551 | 15,022,363 | 31,703,417 |

**3  SEGMENTAL ANALYSIS** (continued)

**Geographic information:**
The following table shows the geographic distribution of the Group's operating income based on the location of the operating entities.

| Net operating income | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Kuwait | 867,692 | 743,128 |
| Other Middle East and North Africa | 182,146 | 173,027 |
| Europe & UK | 69,840 | 55,059 |
| Others | 47,089 | 38,527 |
| | 1,166,767 | 1,009,741 |

The following table shows the geographic distribution of the Group's non-current assets based on the location of the operating entities.

| Non-current assets | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Kuwait | 1,032,503 | 997,294 |
| Other Middle East and North Africa | 46,010 | 40,102 |
| Europe & UK | 14,822 | 9,881 |
| Others | 2,993 | 3,646 |
| | 1,096,328 | 1,050,923 |

Non-current assets consist of land, premises and equipment, goodwill and other intangible assets, investment properties and property acquired on settlement of debts.

**4      INTEREST INCOME**

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Deposits with banks | 233,519 | 90,873 |
| Loans and advances to customers | 979,350 | 629,180 |
| Debt investment securities | 370,889 | 202,916 |
| Kuwait Government treasury bonds and CBK bonds | 48,990 | 24,620 |
| | 1,632,748 | 947,589 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

### 5 INTEREST EXPENSE

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Due to banks | 202,697 | 64,625 |
| Deposits from other financial institutions | 106,991 | 58,846 |
| Customer deposits | 493,049 | 199,930 |
| Certificates of deposit issued | 82,229 | 22,712 |
| Other borrowed funds | 23,188 | 17,708 |
| | 908,154 | 363,821 |

### 6 NET FEES AND COMMISSIONS

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Fees and commissions income | 300,354 | 259,080 |
| Fees and commissions related expenses | (103,748) | (77,302) |
| Net fees and commissions | 196,606 | 181,778 |

Fees and commissions income includes asset management fees of KD 57,732 thousand (2022: KD 52,270 thousand) earned on trust and fiduciary activities where the Group holds or invests assets on behalf of its customers.

### 7 NET INVESTMENT INCOME

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Net realised loss on sale of investments | (239) | (238) |
| Net gains from investments carried at fair value through statement of income | 19,130 | 2,993 |
| Realised gain from disposal of a foreign branch | - | 1,283 |
| Dividend income | 2,570 | 2,272 |
| Share of results of associates | 765 | 786 |
| Other investment income | 5,240 | 8,640 |
| | 27,466 | 15,736 |

### 8 PROVISION CHARGE FOR CREDIT LOSSES AND IMPAIRMENT LOSSES

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Provision charge for credit losses (Note 13) | 81,765 | 5,350 |
| ECL charge for investment in debt securities (Note 14) | 2,501 | 2,991 |
| ECL (release) charge for other financial assets | (2,512) | 3,493 |
| Impairment loss on goodwill (Note 15) | 20,174 | 20,199 |
| Other impairment losses | 1,140 | 13,330 |
| | 103,068 | 45,363 |

### 9 TAXATION

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| National Labour Support Tax | 14,088 | 13,116 |
| Zakat | 6,267 | 5,693 |
| Contribution to Kuwait Foundation for the Advancement of Sciences | 5,911 | 5,557 |
| Overseas tax | 21,831 | 23,056 |
| | 48,097 | 47,422 |

**Pillar 2 Income Taxes**

In 2021, OECD's Inclusive Framework (IF) on Base Erosion and Profit Shifting (BEPS) had agreed to a two-pillar solution in order to address tax challenges arising from digitalization of the economy. Under Pillar 2, multinational entities whose revenue exceeds EUR 750 million are liable to pay corporate income tax at a minimum effective tax rate of 15%.

The jurisdictions in which the Group operates including the State of Kuwait have joined the IF. The Group expects to be liable for the Global Minimum Tax under Pillar 2 of the BEPS regulations starting from the year 2025.

The Group is currently assessing its exposure to the additional income taxes under Pillar 2 regulations. The assessment indicates that a substantial portion of Group's earnings, primarily from Kuwait and Bahrain, will be subject to additional income taxes under Pillar 2 regulations. A reasonable estimate of the additional tax cannot be provided at this stage, as the relevant tax legislation is yet to be introduced in Kuwait and some other jurisdictions.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

## 10 EARNINGS PER SHARE

Basic earnings per share is calculated by dividing the profit for the year attributable to shareholders of the Bank (adjusted for interest and profit paid on Perpetual Tier 1 Capital Securities and Sukuk) by the weighted average number of shares outstanding during the year net of treasury shares. There are no dilutive potential shares that are convertible into shares.

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Profit for the year attributable to shareholders of the Bank | 560,620 | 509,085 |
| Less: Interest paid on Perpetual Tier 1 Capital Securities | (18,224) | (18,119) |
| Less: Profit distribution on Perpetual Tier 1 Sukuk by a subsidiary attributable to shareholders of the Bank | (3,664) | (3,642) |
| | 538,732 | 487,324 |
| Weighted average number of shares outstanding during the year net of treasury shares (thousand) | 7,929,946 | 7,929,946 |
| Basic earnings per share | 68 Fils | 61 fils |

Earnings per share calculations for 2022 have been adjusted to take account of the bonus shares issued in 2023.

## 11 CASH AND SHORT TERM FUNDS

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Cash on hand | 165,937 | 213,598 |
| Current account with other banks | 1,525,474 | 2,925,399 |
| Money at call | 635,106 | 487,281 |
| Balances and deposits with the Central Bank of Kuwait | 1,526,210 | 1,124,507 |
| Deposits and Murabaha with banks maturing within seven days | 560,352 | 601,823 |
| | 4,413,079 | 5,352,608 |
| Expected credit losses | (28,379) | (29,156) |
| | 4,384,700 | 5,323,452 |

## 12 DEPOSITS WITH BANKS

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Deposits with the Central Bank of Kuwait | 115,969 | 97,627 |
| Deposits with other banks | 1,203,256 | 1,395,489 |
| | 1,319,225 | 1,493,116 |
| Expected credit losses | (1,104) | (2,830) |
| | 1,318,121 | 1,490,286 |

## 13 LOANS, ADVANCES AND ISLAMIC FINANCING TO CUSTOMERS

| 2023 | Middle East and North Africa KD 000's | North America KD 000's | Europe & UK KD 000's | Asia KD 000's | Others KD 000's | Total KD 000's |
|---|---|---|---|---|---|---|
| Corporate | 11,807,679 | 606,107 | 1,912,542 | 658,681 | 436,341 | 15,421,350 |
| Retail | 7,718,323 | - | 4,181 | - | - | 7,722,504 |
| Loans, advances and Islamic financing to customers | 19,526,002 | 606,107 | 1,916,723 | 658,681 | 436,341 | 23,143,854 |
| Provision for credit losses | | | | | | (862,850) |
| | | | | | | 22,281,004 |

| 2022 | Middle East and North Africa KD 000's | North America KD 000's | Europe & UK KD 000's | Asia KD 000's | Others KD 000's | Total KD 000's |
|---|---|---|---|---|---|---|
| Corporate | 11,145,896 | 599,238 | 1,638,332 | 455,489 | 378,088 | 14,217,043 |
| Retail | 7,604,694 | - | 4,620 | - | - | 7,609,314 |
| Loans, advances and Islamic financing to customers | 18,750,590 | 599,238 | 1,642,952 | 455,489 | 378,088 | 21,826,357 |
| Provision for credit losses | | | | | | (827,941) |
| | | | | | | 20,998,416 |

In March 2007, the Central Bank of Kuwait issued a circular amending the basis of making general provisions on facilities changing the minimum rate from 2% to 1% for cash facilities and 0.5% for non-cash facilities. The required rates were effective from 1 January 2007 on the net increase in facilities, net of certain restricted categories of collateral, during the reporting period. Pending further directive from the Central Bank of Kuwait, the general provision in excess of 1% for cash facilities and 0.5% for non-cash facilities was retained as general provision.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**13 LOANS, ADVANCES AND ISLAMIC FINANCING TO CUSTOMERS** (continued)

Provisions for credit losses on cash facilities are as follows:

| | Specific | | General | | Total | |
|---|---|---|---|---|---|---|
| | 2023 KD 000's | 2022 KD 000's | 2023 KD 000's | 2022 KD 000's | 2023 KD 000's | 2022 KD 000's |
| Balance at beginning of the year | 167,921 | 123,857 | 660,020 | 509,667 | 827,941 | 633,524 |
| Provided (release) during the year | 45,052 | (157,433) | 36,519 | 151,684 | 81,571 | (5,749) |
| Amounts (written off) recovered net of exchange movements | (47,700) | 201,497 | 1,038 | (1,331) | (46,662) | 200,166 |
| Balance at end of the year | 165,273 | 167,921 | 697,577 | 660,020 | 862,850 | 827,941 |

Further analysis of specific provision based on class of financial asset is given below:

| | Corporate | | Retail | | Total | |
|---|---|---|---|---|---|---|
| | 2023 KD 000's | 2022 KD 000's | 2023 KD 000's | 2022 KD 000's | 2023 KD 000's | 2022 KD 000's |
| Balance at beginning of the year | 72,002 | 42,469 | 95,919 | 81,388 | 167,921 | 123,857 |
| Provided (release) during the year | 12,955 | (184,247) | 32,097 | 26,814 | 45,052 | (157,433) |
| Amounts (written off) recovered net of exchange movements | (21,892) | 213,780 | (25,808) | (12,283) | (47,700) | 201,497 |
| Balance at end of the year | 63,065 | 72,002 | 102,208 | 95,919 | 165,273 | 167,921 |

**13 LOANS, ADVANCES AND ISLAMIC FINANCING TO CUSTOMERS** (continued)

Analysis of total provision charge (release) for credit losses is given below:

| | Specific | | General | | Total | |
|---|---|---|---|---|---|---|
| | 2023 KD 000's | 2022 KD 000's | 2023 KD 000's | 2022 KD 000's | 2023 KD 000's | 2022 KD 000's |
| Cash facilities | 45,052 | (157,433) | 36,519 | 151,684 | 81,571 | (5,749) |
| Non cash facilities | (507) | 10,637 | 701 | 462 | 194 | 11,099 |
| Provision charge (release) for credit losses | 44,545 | (146,796) | 37,220 | 152,146 | 81,765 | 5,350 |

Non-performing loans, advances and Islamic financing to customers and related provisions are as follows:

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Loans, advances and Islamic financing to customers | 318,386 | 310,046 |
| Provisions | 159,150 | 159,870 |

The fair value of collateral that the Group holds relating to loans, advances and Islamic financing to customers individually determined to be non-performing at 31 December 2023 amounts to KD 172,260 thousand (2022: KD 197,822 thousand). The collateral consists of cash, securities, bank guarantees and properties.

The available provision on non-cash facilities of KD 40,540 thousand (2022: KD 40,344 thousand) is included under other liabilities (Note 18). The total provision for cash and non cash credit facilities in accordance with CBK guidelines amounted to KD 903,390 thousand as at 31 December 2023 (31 December 2022: KD 868,285 thousand).

The Expected Credit Losses ("ECL") on credit facilities determined under IFRS 9 in accordance to the CBK guidelines amounted to KD 615,659 thousand as at 31 December 2023 (2022: KD 577,435 thousand). CBK guidelines prescribe certain parameters to determine the ECL on credit facilities such as floors for estimating Probability of Default (PD), eligible collateral with haircuts for determining Loss Given Default (LGD), deemed minimum maturity for Stage 2 exposures, 100% credit conversion factors for utilised cash and non-cash facilities, Stage 3 ECLs at 100% of the defaulted exposure net of eligible collateral after applying applicable haircuts etc.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**13 LOANS, ADVANCES AND ISLAMIC FINANCING TO CUSTOMERS** (continued)

An analysis of the carrying amounts of credit facilities by credit quality, and the corresponding ECL based on the staging criteria under IFRS 9 in accordance to the CBK guidelines is as follows:

| 2023 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| High | 19,239,616 | 780,821 | - | 20,020,437 |
| Standard | 2,099,895 | 705,136 | - | 2,805,031 |
| Impaired | - | - | 318,386 | 318,386 |
| Loans, advances and Islamic financing to customers | 21,339,511 | 1,485,957 | 318,386 | 23,143,854 |
| Contingent liabilities (Note 25) | 3,895,079 | 708,129 | 12,703 | 4,615,911 |
| Commitments (revocable and irrevocable) to extend credit | 8,046,514 | 1,010,524 | 1,175 | 9,058,213 |
| ECL allowance for credit facilities | 195,114 | 174,258 | 246,287 | 615,659 |

| 2022 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| High | 18,187,036 | 862,868 | - | 19,049,904 |
| Standard | 1,509,061 | 957,346 | - | 2,466,407 |
| Impaired | - | - | 310,046 | 310,046 |
| Loans, advances and Islamic financing to customers | 19,696,097 | 1,820,214 | 310,046 | 21,826,357 |
| Contingent liabilities (Note 25) | 3,799,942 | 655,399 | 12,045 | 4,467,386 |
| Commitments (revocable and irrevocable) to extend credit | 7,505,629 | 1,165,237 | 6 | 8,670,872 |
| ECL allowance for credit facilities | 169,351 | 169,228 | 238,856 | 577,435 |

**13 LOANS, ADVANCES AND ISLAMIC FINANCING TO CUSTOMERS** (continued)

Ageing analysis of past due or impaired Loans, advances and Islamic financing to customers:

| | Corporate | | Retail | | Total | |
|---|---|---|---|---|---|---|
| 2023 | Past due and not impaired KD 000's | Impaired KD 000's | Past due and not impaired KD 000's | Impaired KD 000's | Past due and not impaired KD 000's | Impaired KD 000's |
| Up to 30 days | 13,145 | 7,773 | 39,738 | 746 | 52,883 | 8,519 |
| 31 - 60 days | 8,477 | - | 22,172 | 120 | 30,649 | 120 |
| 61 - 90 days | 3,112 | - | 6,148 | 89 | 9,260 | 89 |
| 91-180 days | - | 26,525 | - | 27,681 | - | 54,206 |
| More than 180 days | - | 147,442 | - | 108,010 | - | 255,452 |
| | 24,734 | 181,740 | 68,058 | 136,646 | 92,792 | 318,386 |

| | Corporate | | Retail | | Total | |
|---|---|---|---|---|---|---|
| 2022 | Past due and not impaired KD 000's | Impaired KD 000's | Past due and not impaired KD 000's | Impaired KD 000's | Past due and not impaired KD 000's | Impaired KD 000's |
| Up to 30 days | 96,722 | 12,422 | 31,769 | 23 | 128,491 | 12,445 |
| 31 - 60 days | 2,735 | - | 20,251 | 4 | 22,986 | 4 |
| 61 - 90 days | 4,652 | - | 7,079 | 3 | 11,731 | 3 |
| 91-180 days | - | 47,028 | - | 22,439 | - | 69,467 |
| More than 180 days | - | 124,931 | - | 103,196 | - | 228,127 |
| | 104,109 | 184,381 | 59,099 | 125,665 | 163,208 | 310,046 |

Of the aggregate amount of gross past due or impaired loans, advances and Islamic financing to customers, the fair value of collateral that the Group held as at 31 December 2023 was KD 227,510 thousand (2022: KD 211,212 thousand).

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**13  LOANS, ADVANCES AND ISLAMIC FINANCING TO CUSTOMERS** (continued)

An analysis of the changes in the ECL in relation to credit facilities (cash and non-cash facilities) computed under IFRS 9 in accordance to the CBK guidelines is as follows:

| | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| **ECL allowance as at 1 January 2023** | **169,351** | **169,228** | **238,856** | **577,435** |
| Transfer between stages | | | | |
| Transfer from Stage 1 | (5,100) | 3,435 | 1,665 | - |
| Transfer from Stage 2 | 34,837 | (50,082) | 15,245 | - |
| Transfer from Stage 3 | 12,503 | 1,858 | (14,361) | - |
| Amounts recovered (written off) net of exchange movements | 143 | 232 | (46,958) | (46,583) |
| Net (decrease) increase in ECL for the year | (16,620) | 49,587 | 51,840 | 84,807 |
| **At 31 December 2023** | **195,114** | **174,258** | **246,287** | **615,659** |

| | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| ECL allowance as at 1 January 2022 | 134,762 | 163,737 | 163,296 | 461,795 |
| Transfer between stages | | | | |
| Transfer from Stage 1 | (5,870) | 2,590 | 3,280 | - |
| Transfer from Stage 2 | 24,258 | (39,667) | 15,409 | - |
| Transfer from Stage 3 | 4,132 | 877 | (5,009) | - |
| Amounts (written off) recovered net of exchange movements | (177) | - | 200,878 | 200,701 |
| Net increase(decrease) in ECL for the year | 12,246 | 41,691 | (138,998) | (85,061) |
| At 31 December 2022 | 169,351 | 169,228 | 238,856 | 577,435 |

**14  FINANCIAL INVESTMENTS**

The table below provides the details of the categorisation of financial investments:

| 2023 | Amortised cost KD 000's | Fair value through other comprehensive income KD 000's | Fair value through statement of income KD 000's | Total KD 000's |
|---|---|---|---|---|
| **Investment securities** | | | | |
| Debt securities - Government (Non Kuwait) | 1,073,186 | 2,959,018 | - | 4,032,204 |
| Debt securities - Non Government | - | 2,560,626 | 17,979 | 2,578,605 |
| Equities | - | 40,987 | 34,767 | 75,754 |
| Other investments | - | - | 217,184 | 217,184 |
| | 1,073,186 | 5,560,631 | 269,930 | 6,903,747 |
| Expected credit losses | (18,926) | - | - | (18,926) |
| | 1,054,260 | 5,560,631 | 269,930 | 6,884,821 |
| **Central Bank of Kuwait bonds** | **856,815** | **-** | **-** | **856,815** |
| **Kuwait Government treasury bonds** | **194,111** | **-** | **-** | **194,111** |
| | 2,105,186 | 5,560,631 | 269,930 | 7,935,747 |

| 2022 | Amortised cost KD 000's | Fair value through other comprehensive income KD 000's | Fair value through statement of income KD 000's | Total KD 000's |
|---|---|---|---|---|
| Investment securities | | | | |
| Debt securities - Government (Non Kuwait) | 929,170 | 2,320,660 | - | 3,249,830 |
| Debt securities - Non Government | - | 2,065,075 | 17,671 | 2,082,746 |
| Equities | - | 37,168 | 31,552 | 68,720 |
| Other investments | - | - | 249,938 | 249,938 |
| | 929,170 | 4,422,903 | 299,161 | 5,651,234 |
| Expected credit losses | (16,562) | - | - | (16,562) |
| | 912,608 | 4,422,903 | 299,161 | 5,634,672 |
| Central Bank of Kuwait bonds | 881,241 | - | - | 881,241 |
| Kuwait Government treasury bonds | 211,629 | - | - | 211,629 |
| | 2,005,478 | 4,422,903 | 299,161 | 6,727,542 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**14 FINANCIAL INVESTMENTS** (continued)

The Group has classified certain unquoted equity investments at fair value through other comprehensive income on the basis that these are not held for trading. The dividend received on such investments during 2023 was KD 1,520 thousand (2022: KD 1,426 thousand).

An analysis of the carrying amounts of investments in debt securities, by credit quality, and the corresponding ECL based on the staging criteria under IFRS 9 in accordance with the CBK guidelines is as follows:

| 2023 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| High | 5,167,946 | - | - | 5,167,946 |
| Standard | 1,237,493 | 186,920 | - | 1,424,413 |
| Impaired | - | - | 471 | 471 |
| Investments in debt securities | 6,405,439 | 186,920 | 471 | 6,592,830 |
| ECL allowance for debt securities | 16,691 | 18,228 | 8,305 | 43,224 |

| 2022 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| High | 3,770,532 | - | - | 3,770,532 |
| Standard | 1,355,818 | 188,078 | - | 1,543,896 |
| Impaired | - | - | 477 | 477 |
| Investments in debt securities | 5,126,350 | 188,078 | 477 | 5,314,905 |
| ECL allowance for debt securities | 16,676 | 15,778 | 8,269 | 40,723 |

ECL allowance for investments in debt securities as at 31 December 2023 consists of KD 18,926 thousand (2022: KD 16,562 thousand) in respect of debt securities carried at amortised cost and KD 24,298 thousand (2022: KD 24,161 thousand) in respect of debt securities carried at fair value through other comprehensive income.

Investments in debt securities carried at fair value through statement of income are not subject to Expected Credit Losses. Central Bank of Kuwait bonds and Kuwait Government treasury bonds are also not subject to Expected Credit Losses.

**14 FINANCIAL INVESTMENTS** (continued)

An analysis of changes in the gross carrying amount and the corresponding Expected Credit Losses in relation to Investment in debt securities are as follows:

| 2023 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| Gross carrying amount as at 1 January 2023 | 5,126,350 | 188,078 | 477 | 5,314,905 |
| Assets purchased/(de-recognised) during the year -Net | 1,198,327 | (1,436) | - | 1,196,891 |
| Fair value and exchange movements | 80,762 | 278 | (6) | 81,034 |
| At 31 December 2023 | 6,405,439 | 186,920 | 471 | 6,592,830 |

| 2022 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| Gross carrying amount as at 1 January 2022 | 4,383,442 | 242,127 | 897 | 4,626,466 |
| Assets purchased/(de-recognised) during the year -Net | 1,103,411 | (55,639) | - | 1,047,772 |
| Fair value and exchange movements | (360,503) | 1,590 | (420) | (359,333) |
| At 31 December 2022 | 5,126,350 | 188,078 | 477 | 5,314,905 |

There were no transfers between stage 1, stage 2 and stage 3.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**14 FINANCIAL INVESTMENTS** (continued)

| 2023 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| **ECL allowance as at 1 January 2023** | **16,676** | **15,778** | **8,269** | **40,723** |
| Impact due to purchase/(de-recognition) | 2,939 | (7) | - | 2,932 |
| Re-measurement of ECL | (2,924) | 2,457 | 36 | (431) |
| Net charge to consolidated statement of income | 15 | 2,450 | 36 | 2,501 |
| **At 31 December 2023** | **16,691** | **18,228** | **8,305** | **43,224** |

| 2022 | Stage 1 KD 000's | Stage 2 KD 000's | Stage 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| ECL allowance as at 1 January 2022 | 14,433 | 15,126 | 8,173 | 37,732 |
| Impact due to purchase/(de-recognition) | 4,943 | (195) | - | 4,748 |
| Re-measurement of ECL | (2,700) | 847 | 96 | (1,757) |
| Net charge to consolidated statement of income | 2,243 | 652 | 96 | 2,991 |
| At 31 December 2022 | 16,676 | 15,778 | 8,269 | 40,723 |

**15   GOODWILL AND OTHER INTANGIBLE ASSETS**

| | Goodwill KD 000's | Intangible Assets KD 000's | Total KD 000's |
|---|---|---|---|
| **Cost** | | | |
| At 1 January 2023 | 382,252 | 213,955 | 596,207 |
| Exchange rate adjustments | (8,480) | (2,586) | (11,066) |
| At 31 December 2023 | 373,772 | 211,369 | 585,141 |
| **Accumulated amortisation & impairment** | | | |
| At 1 January 2023 | 20,199 | 41,072 | 61,271 |
| Amortisation charge for the year | - | 1,647 | 1,647 |
| Impairment charge for the year | 20,174 | - | 20,174 |
| Exchange rate adjustments | (3,781) | (2,586) | (6,367) |
| At 31 December 2023 | 36,592 | 40,133 | 76,725 |
| **Net book value** | | | |
| **At 31 December 2023** | **337,180** | **171,236** | **508,416** |

| | Goodwill KD 000's | Intangible Assets KD 000's | Total KD 000's |
|---|---|---|---|
| Cost | | | |
| At 1 January 2022 | 406,734 | 221,194 | 627,928 |
| Exchange rate adjustments | (24,482) | (7,239) | (31,721) |
| At 31 December 2022 | 382,252 | 213,955 | 596,207 |
| Accumulated amortisation & impairment | | | |
| At 1 January 2022 | - | 46,664 | 46,664 |
| Amortisation charge for the year | - | 1,647 | 1,647 |
| Impairment charge for the year | 20,199 | - | 20,199 |
| Exchange rate adjustments | - | (7,239) | (7,239) |
| At 31 December 2022 | 20,199 | 41,072 | 61,271 |
| Net book value | | | |
| At 31 December 2022 | 362,053 | 172,883 | 534,936 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**15  GOODWILL AND OTHER INTANGIBLE ASSETS**  (continued)

Net book value of goodwill as at 31 December 2023 includes KD 334,531 thousand (2022: KD 334,531 thousand) in respect of Boubyan Bank K.S.C.P., KD Nil (2022: KD 25,149 thousand) in respect of National Bank of Kuwait - Egypt S.A.E. and KD 2,649 thousand (2022: KD 2,373 thousand) in respect of Credit Bank of Iraq S.A.

Net book value of intangible assets as at 31 December 2023 includes banking licences and brand amounting to KD 158,623 thousand (2022: KD 158,623 thousand), customer relationships and core deposits amounting to KD 5,903 thousand (2022: KD 7,550 thousand) and brokerage licences amounting to KD 6,710 thousand (2022: KD 6,710 thousand). Intangible assets with indefinite useful life amounts to KD 165,333 thousand (2022: KD 165,333 thousand). Intangible assets with definite useful life amounting to KD 5,903 thousand (2022: KD 7,550 thousand) are amortised over a period of 15 years.

**Impairment testing for goodwill and intangible assets with indefinite useful life**
The carrying value of goodwill and intangible assets with indefinite useful life are tested for impairment on an annual basis (or more frequently if evidence exists that goodwill or intangible assets might be impaired) by estimating the recoverable amount of the cash generating unit (CGU) to which these items are allocated using value-in-use calculations unless fair value based on an active market price is higher than the carrying value of the CGU. The value in use calculations use pre-tax cash flow projections based on financial budgets approved by management over a five years period and a relevant terminal growth rate. These cash flows are then discounted to derive a net present value which is compared to the carrying value. The discount rate used is pre-tax and reflects specific risks relating to the relevant cash generating unit.

Since the fair value less cost of disposal of the Group's holding in Boubyan Bank K.S.C.P. is higher than its carrying value, there is no indication that the associated goodwill or intangible assets with indefinite useful life is impaired. Recoverable amount of other goodwill and other intangible assets with indefinite useful life is calculated using value-in-use method based on following inputs. The goodwill in respect of National Bank of Kuwait - Egypt S.A.E. is allocated to a single CGU which consists of identifiable net assets including intangible assets of National Bank of Kuwait - Egypt S.A.E. A discount rate of 28.6% (2022: 21.5%) and a terminal growth rate of 7% (2022: 7%) are used to estimate the recoverable amount of this cash generating unit. A discount rate of 13% (2022: 13%) and terminal growth rate of 2.4% (2022: 2.6%) are used to estimate the recoverable amount of the brokerage licence in Kuwait. The Group has also performed a sensitivity analysis by varying these input factors by a reasonable margin.

Based on such analysis, the Group has recorded an impairment loss of KD 20,174 thousand (2022: KD 20,199 thousand) relating to the goodwill in respect of National Bank of Kuwait – Egypt S.A.E.

There are no indications that the remaining goodwill or intangible assets with indefinite useful life are impaired.

**16  OTHER ASSETS**

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Interest receivable | 203,757 | 147,900 |
| Positive fair value of derivatives (Note 26) | 310,446 | 355,308 |
| Sundry debtors and other receivables | 51,084 | 58,039 |
| Investment in associates | 2,809 | 3,119 |
| Investment properties | 73,521 | 33,618 |
| Properties acquired on settlement of debts | 7,579 | 7,645 |
| Government grant receivable | - | 139,582 |
| Others | 80,995 | 43,796 |
| | 730,191 | 789,007 |

**17  OTHER BORROWED FUNDS**

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Global Medium Term Notes - USD 1,000,000 thousand | 305,338 | 304,459 |
| Global Medium Term Sukuk - USD 750,000 thousand | 230,063 | 231,947 |
| Global Medium Term Sukuk - USD 500,000 thousand | 146,451 | 144,896 |
| Subordinated Tier 2 bonds - KD 150,000 thousand | 149,800 | 149,638 |
| Subordinated Tier 2 bonds - USD 300,000 thousand | 91,902 | 91,757 |
| Medium and short term borrowing from banks and financial institutions | 407,452 | 320,866 |
| | 1,331,006 | 1,243,563 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**17   OTHER BORROWED FUNDS** (continued)

Global Medium-Term senior unsecured notes of USD 1,000,000 thousand were issued on 15 September 2021, under the Bank's USD 5 billion Global Medium Term Note programme, maturing on 15 September 2027 with first optional redemption date on 15 September 2026. These notes were issued at 99.518 per cent of nominal value and carry a fixed interest rate of 1.625% per annum payable semi-annually in arrears until the first optional redemption date, followed by a floating rate of SOFR + 105 basis points paid quarterly thereafter.

Global Medium-Term senior unsecured Sukuk of USD 750,000 thousand were issued by Boubyan Bank K.S.C.P, a subsidiary of the Group in February 2020, with a tenor of 5 years, issued at par and carry a fixed profit rate of 2.593% per annum, payable semi-annually in arrears.

Global Medium-Term senior unsecured Sukuk of USD 500,000 thousand were issued by Boubyan Bank K.S.C.P, a subsidiary of the Group in March 2022, with a tenor of 5 years, issued at par and carry a fixed profit rate of 3.389% per annum, payable semi-annually in arrears.

Subordinated Tier 2 bonds of KD 150,000 thousand were issued in November 2020 with a tenor of up to 10 years, comprising equal tranches of fixed rate bonds and floating rate bonds.  Fixed rate bonds carry an interest rate of 4.75% per annum for the first five years and will be reset on the fifth year anniversary of date of issuance. Floating-rate bonds carry an interest rate of 3% per annum over the CBK discount rate, reset semi-annually, subject to a maximum of 1% over the prevailing rate for the fixed-rate bonds. These bonds are unsecured and callable in whole or in part at the option of the Bank after 5 years from the date of issuance, subject to certain conditions and regulatory approvals.

Subordinated Tier 2 bonds of USD 300,000 thousand were issued in November 2020 with a tenor of up to 10 years, carry a fixed rate of 2.5% per annum for the first five years and will be reset on the fifth year anniversary of date of issuance. These bonds are unsecured and callable in whole or in part at the option of the Bank after 5 years from the date of issuance, subject to certain conditions and regulatory approvals.

**18   OTHER LIABILITIES**

|  | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Interest payable | 317,428 | 150,414 |
| Income received in advance | 56,362 | 48,740 |
| Taxation | 56,436 | 41,442 |
| Provision on non-cash facilities (Note 13) | 40,540 | 40,344 |
| Accrued expenses | 82,221 | 67,313 |
| Negative fair value of derivatives (Note 26) | 62,752 | 40,761 |
| Post-employment benefit | 53,257 | 54,208 |
| Lease liabilities | 32,972 | 25,728 |
| Others | 264,155 | 252,363 |
|  | 966,123 | 721,313 |

**Post-Employment Benefit**
The present value of defined benefit obligations and the related current and past service cost was determined by actuarial valuations using the projected unit credit method.  The significant inputs used in the actuarial valuation are a discount rate of 5.94% (2022: 5.25%), future salary increases in line with expected consumer price inflation and demographic assumptions of mortality, withdrawal, retirement and disability rates.

The movement in the post-employment benefit was as follows:

|  | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Balance at 1 January | 54,208 | 56,822 |
| Net charge during the year | 9,981 | 11,106 |
| Paid during the year | (6,963) | (5,468) |
| Actuarial gain in respect of defined benefit plans | (3,969) | (8,252) |
| Balance at 31 December | 53,257 | 54,208 |

# Notes to the Consolidated Financial Statements (continued)

31 December 2023

**19    SHARE CAPITAL AND RESERVES**

**a)    Share capital**

The authorised share capital of the Bank comprises 10,000,000,000 (2022: 10,000,000,000) shares of 100 fils each.

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Issued and fully paid in cash: | | |
| 7,929,945,620 (2022: 7,552,329,162) shares of 100 fils each | **792,995** | 755,233 |

Annual General Meeting of the shareholders held on 18 March 2023 approved an increase of KD 37,762 thousand (2022: KD 35,964 thousand) in the issued and fully paid share capital of the Bank by issuing 377,616,458 (2022: 359,634,722) bonus shares representing 5% of the share capital. The issued and fully paid-up share capital increased from KD 7,552,329,162 to KD 7,929,945,620 and the change in share capital was recorded in the commercial register on 20 March 2023.

The movement in ordinary shares in issue during the year was as follows:

| | 2023 | 2022 |
|---|---|---|
| Number of shares in issue as at 1 January | **7,552,329,162** | 7,192,694,440 |
| Bonus issue | **377,616,458** | 359,634,722 |
| Number of shares in issue as at 31 December | **7,929,945,620** | 7,552,329,162 |

**b)    Statutory reserve**

The Board of Directors recommended a transfer of KD 18,881 thousand (2022: KD 17,981 thousand) to the statutory reserve. This is in compliance with the Bank's Articles of Association and the Companies Law, as amended, which require a minimum of 10% of profit for the year attributable to the shareholders of the Bank before KFAS, NLST and Zakat to be transferred to a non-distributable statutory reserve until such time as this reserve exceeds 50% of the Bank's issued capital. Accordingly, the transfer to statutory reserve, which is less than 10% of the profit for the year, is that amount required to make the statutory reserve in excess of 50% of the Bank's issued capital.

Distribution of this reserve is limited to the amount required to enable payment of a dividend of 5% of share capital in years when accumulated profits are not sufficient for the payment of a dividend of that amount.

**c)    Share premium account**

The balance in the share premium account is not available for distribution.

**19   SHARE CAPITAL AND RESERVES** (continued)

**d)    Treasury shares and Treasury share reserve**

The balance in the treasury share reserve account is not available for distribution. Further, an amount equal to the cost of treasury shares is not available for distribution from general reserve throughout the holding period of these treasury shares.

**e)    Other reserves**

| | | | | | | | | KD 000's |
|---|---|---|---|---|---|---|---|---|
| | General reserve | Retained earnings | Foreign currency translation reserve | Cumulative changes in fair values | Share based payment reserve | Actuarial valuation reserve | Proposed cash dividend | Total other reserves |
| **Balance as at 1 January 2023** | **117,058** | **1,550,747** | **(336,789)** | **79,139** | **14,409** | **1,014** | **188,808** | **1,614,386** |
| Profit for the year | - | 560,620 | - | - | - | - | - | 560,620 |
| Other comprehensive (loss) income | - | - | (15,049) | 4,414 | - | 3,500 | - | (7,135) |
| **Total comprehensive income (loss)** | **-** | **560,620** | **(15,049)** | **4,414** | **-** | **3,500** | **-** | **553,485** |
| Transfer to statutory reserve (Note 19b) | - | (18,881) | - | - | - | - | - | (18,881) |
| Final cash dividend paid (2022) | - | - | - | - | - | - | (188,808) | (188,808) |
| Interim cash dividend paid - 10 fils per share (Note 20) | - | (79,299) | - | - | - | - | - | (79,299) |
| Proposed final cash dividend - 25 fils per share (Note 20) | - | (198,249) | - | - | - | - | 198,249 | - |
| Proposed bonus shares (Note 20) | - | (39,649) | - | - | - | - | - | (39,649) |
| Interest paid on perpetual Tier 1 Capital Securities | - | (18,224) | - | - | - | - | - | (18,224) |
| Profit distribution on Perpetual Tier 1 Sukuk by a subsidiary | - | (3,664) | - | - | - | - | - | (3,664) |
| Change in holding in subsidiaries | - | (3,906) | - | - | - | - | - | (3,906) |
| Other movements | - | 1,200 | - | - | - | - | - | 1,200 |
| **At 31 December 2023** | **117,058** | **1,750,695** | **(351,838)** | **83,553** | **14,409** | **4,514** | **198,249** | **1,816,640** |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

## 19  SHARE CAPITAL AND RESERVES (continued)
e) Other reserves (continued)

| | General reserve | Retained earnings | Foreign currency translation reserve | Cumulative changes in fair values | Share based payment reserve | Actuarial valuation reserve | Proposed cash dividend | Total other reserves |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | KD 000's |
| Balance as at 1 January 2022 | 117,058 | 1,385,277 | (214,176) | 74,648 | 14,409 | (6,289) | 215,781 | 1,586,708 |
| Profit for the year | - | 509,085 | - | - | - | - | - | 509,085 |
| Other comprehensive (loss) income | - | - | (122,613) | 4,491 | - | 7,303 | - | (110,819) |
| Total comprehensive income (loss) | - | 509,085 | (122,613) | 4,491 | - | 7,303 | - | 398,266 |
| Transfer to statutory reserve (Note 19b) | - | (17,981) | - | - | - | - | - | (17,981) |
| Cash dividend paid (2021) | - | - | - | - | - | - | (215,781) | (215,781) |
| Interim cash dividend paid - 10 fils per share (Note 20) | - | (75,523) | - | - | - | - | - | (75,523) |
| Proposed final cash dividend - 25 fils per share (Note 20) | - | (188,808) | - | - | - | - | 188,808 | - |
| Proposed bonus shares (Note 20) | - | (37,762) | - | - | - | - | - | (37,762) |
| Interest paid on perpetual Tier 1 Capital Securities | - | (18,119) | - | - | - | - | - | (18,119) |
| Profit distribution on Perpetual Tier 1 Sukuk by a subsidiary | - | (3,642) | - | - | - | - | - | (3,642) |
| Change in holding in subsidiaries | - | (2,557) | - | - | - | - | - | (2,557) |
| Other movements | - | 777 | - | - | - | - | - | 777 |
| At 31 December 2022 | 117,058 | 1,550,747 | (336,789) | 79,139 | 14,409 | 1,014 | 188,808 | 1,614,386 |

The general reserve was created in accordance with Bank's Articles of Association and is freely distributable, except for the amount equivalent to the cost of treasury shares.

The foreign currency translation reserve includes the exchange differences on conversion of results and financial position of all group entities including goodwill, intangible assets and any fair value adjustments to the carrying value of assets and liabilities from their functional currency to the presentation currency.

Actuarial valuation reserve represents the gain (loss) resulting from increase in the present value of defined benefit plans due to changes in actuarial assumptions.

## 20  DIVIDEND

The Board of Directors approved distribution of an interim cash dividend 10 fils per share amounting to KD 79,299 thousand on the outstanding shares as at 30 June 2023 (30 June 2022: KD 75,523 thousand for 10 fils per share), which was paid subsequently.

The Board of Directors recommended distribution of final cash dividend of 25 fils per share (2022: 25 fils per share) and bonus shares of 5% (2022: 5%) on outstanding shares as at 31 December 2023. The final cash dividend and bonus shares, if approved by the Shareholders' Annual General Meeting, shall be payable to the shareholders after obtaining the necessary regulatory approvals.

## 21  PERPETUAL TIER 1 CAPITAL SECURITIES

The Bank issued the following Perpetual Tier 1 Capital Securities (the "Capital Securities"), through wholly owned special-purpose vehicles:

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| USD 700,000 thousand (issued in February 2021 at an interest rate of 3.625% per annum, semi-annually in arrears, until the first reset date in February 2027, redeemable at the option of the Bank in August 2026) | 211,294 | 211,294 |
| USD 750,000 thousand (issued in November 2019 at an interest rate of 4.5% per annum, semi-annually in arrears, until the first reset date in November 2025, redeemable at the option of the Bank  in August 2025) | 227,738 | 227,738 |
| Balance at 31 December | 439,032 | 439,032 |

The above mentioned Capital securities are subordinated, unsecured and are eligible to be classified under equity in accordance with IAS 32: Financial Instruments – Presentation. Payments of interest in respect of the Capital Securities may be cancelled (in whole or in part) at the sole discretion of the Bank on a non-cumulative basis. Any such cancellation is not considered an event of default. Payments of interest are treated as a deduction from equity. The Capital Securities have no maturity date and are callable (in whole but not in part) at par at the option of the Bank on the first call date and on every interest payment date thereafter, subject to certain conditions.

During 2021, Boubyan Bank K.S.C.P issued "Tier 1 Sukuk", through a Sharia's compliant Sukuk arrangement amounting to USD 500,000 thousand, callable in October 2026 and bears an expected profit rate of 3.95% per annum until the first reset date in April 2027, payable semi-annually in arrears.

Tier 1 Sukuk is a perpetual security with no fixed redemption date and constitutes direct, unsecured, subordinated obligations subject to the terms and conditions of the Mudaraba Agreement .Tier 1 Sukuk is eligible to be classified under equity in accordance with IAS 32 : Financial Instruments – Presentation. The Parent Bank did not subscribe to the Tier 1 Sukuk issue and the total amount is included in non-controlling interest in the consolidated statement of financial position.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

## 22  SHARE BASED PAYMENT

The Bank operates a cash-settled share-based compensation plan and granted options to its senior executives. These options vest if the employees remain in service for a period of three years and will be settled by cash payment determined based on the market value of the Bank's equity shares on vesting date.

The fair value of options granted during the year as determined using the Black-Scholes valuation model was KD 0.837 (2022: KD 1.020) as at the end of the year. The significant inputs into the model were a share price of KD 0.894 (2022: KD 1.078) at the measurement date, a standard deviation of expected share price returns of 26.06% (2022: 26.3%), option life disclosed above and annual risk free interest rate of 4.25% (2022: 3.5%). The volatility measured at the standard deviation of expected share price returns is based on statistical analysis of daily share prices over the last three years.

The following table shows the movement in number of share options during the year:

|  | 2023 No. of share options | 2022 No. of share options |
|---|---|---|
| Outstanding at 1 January | 7,575,281 | 7,187,358 |
| Granted during the year | 2,875,178 | 2,835,231 |
| Exercised during the year | (1,974,760) | (2,237,096) |
| Lapsed during the year | (272,837) | (210,212) |
| Outstanding at 31 December | 8,202,862 | 7,575,281 |

The expense accrued on account of share-based compensation plans for the year amounts to KD 1,759 thousand (2022: KD 2,720 thousand) and is included under staff expenses.

## 23  FAIR VALUE OF FINANCIAL INSTRUMENTS

The fair value of financial assets and financial liabilities that are traded in active markets are based on quoted market prices or dealer price quotations. For all other financial instruments the Group determines fair values using valuation techniques.

The Group measures fair values using the following fair value hierarchy, which reflects the significance of the inputs used in making the measurements:

Level 1: quoted (unadjusted) prices in active markets for identical assets or liabilities.

Level 2: inputs other than quoted prices included within Level 1 that are observable either directly (i.e. as prices) or indirectly (i.e. derived from prices). This category includes instruments valued using quoted prices for identical or similar instruments in market that are considered less than active or other valuation techniques in which all significant inputs are observable from market data. Debt securities under this category mainly include sovereign debt instruments in the Middle East & North Africa (MENA) region.

## 23  FAIR VALUE OF FINANCIAL INSTRUMENTS (continued)

Level 3: valuation techniques which use inputs that have a significant effect on the recorded fair value that are not based on observable market data.

Valuation techniques include discounted cash flow models, comparison with similar instruments for which market observable prices exist, recent transaction information and net asset values. Assumptions and inputs used in valuation techniques include risk-free and benchmark interest rates, credit spreads and other premium used in estimating discount rates, bond and equity prices, foreign currency exchange rates and expected price volatilities and correlations. The objective of valuation techniques is to arrive at a fair value measurement that reflects the price that would be received to sell the asset or paid to transfer the liability in an orderly transaction between market participants at the measurement date.

The Group determines whether transfers have occurred between levels in the hierarchy by reassessing categorisation (based on the lowest level input that is significant to the fair value measurement as a whole) at the end of each reporting period. During the year ended 31 December 2023, there were no transfers between level 1, level 2 and level 3.

The following table provides the fair value measurement hierarchy of the Group's financial instruments recorded at fair value:

| 2023 | Level 1 KD 000's | Level 2 KD 000's | Level 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| Debt securities | 5,192,114 | 345,509 | - | 5,537,623 |
| Equities and other investments | 61,356 | 188,570 | 43,012 | 292,938 |
|  | 5,253,470 | 534,079 | 43,012 | 5,830,561 |
| Derivative financial instruments (Note 26) | - | 247,694 | - | 247,694 |

| 2022 | Level 1 KD 000's | Level 2 KD 000's | Level 3 KD 000's | Total KD 000's |
|---|---|---|---|---|
| Debt securities | 4,076,198 | 327,208 | - | 4,403,406 |
| Equities and other investments | 53,251 | 217,361 | 48,046 | 318,658 |
|  | 4,129,449 | 544,569 | 48,046 | 4,722,064 |
| Derivative financial instruments (Note 26) | - | 314,547 | - | 314,547 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**23  FAIR VALUE OF FINANCIAL INSTRUMENTS** (continued)

The table below analyses the movement in level 3 and the income (dividend and realised gain) generated during the year.

| | At 1 January 2023 | Change in fair value | Additions | Sale/ redemption | Exchange rate movements | At 31 December 2023 | Net gains in the consolidated statement of income |
|---|---|---|---|---|---|---|---|
| | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's |
| Equities and other investments | 48,046 | (266) | 849 | (5,705) | 88 | 43,012 | 2,244 |
| | 48,046 | (266) | 849 | (5,705) | 88 | 43,012 | 2,244 |

| | At 1 January 2022 | Change in fair value | Additions | Sale/ redemption | Exchange rate movements | At 31 December 2022 | Net gains in the consolidated statement of income |
|---|---|---|---|---|---|---|---|
| | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's | KD 000's |
| Equities and other investments | 51,464 | (4,410) | 5,278 | (4,364) | 78 | 48,046 | 905 |
| | 51,464 | (4,410) | 5,278 | (4,364) | 78 | 48,046 | 905 |

Equities and other securities included in this category mainly include strategic equity investments and private equity funds which are not traded in an active market. The fair values of these investments are estimated by using valuation techniques that are appropriate in the circumstances. Valuation techniques include discounted cash flow models, observable market information of comparable companies, recent transaction information and net asset values. Significant unobservable inputs used in valuation techniques mainly include discount rate, terminal growth rate, revenue, profit estimates and market multiples such as price to book and price to earnings. Given the diverse nature of these investments, it is not practical to disclose a range of significant unobservable inputs.

Other financial assets and liabilities are carried at amortised cost and the carrying values are not materially different from their fair values as most of these assets and liabilities are of short term maturities or are repriced immediately based on market movement in interest rates. Fair values of remaining financial assets and liabilities carried at amortised cost are estimated mainly using discounted cash flow models incorporating certain assumptions such as credit spreads that are appropriate in the circumstances.

Sensitivity analysis on fair value estimations, by varying input assumptions by a reasonable margin, did not indicate any material impacts on consolidated statement of financial position or consolidated statement of income.

**24  SUBSIDIARIES**

Principal operating subsidiaries:

| Name of entities | Country of incorporation | Principal business | Percentage ownership 2023 | 2022 |
|---|---|---|---|---|
| Boubyan Bank K.S.C.P. | Kuwait | Islamic Banking | 60.4 | 60.1 |
| National Bank of Kuwait - Egypt S.A.E. | Egypt | Banking | 99.1 | 99.1 |
| Watani Investment Company K.S.C.(Closed) | Kuwait | Investment Company | 100.0 | 99.9 |
| National Bank of Kuwait (International) PLC | United Kingdom | Banking | 100.0 | 100.0 |
| National Bank of Kuwait France SA | France | Banking | 100.0 | 100.0 |
| NBK Banque Privée (Suisse) S.A. | Switzerland | Investment Management | 100.0 | 100.0 |
| National Bank of Kuwait (Lebanon) S.A.L. | Lebanon | Banking | 85.5 | 85.5 |
| Credit Bank of Iraq S.A. | Iraq | Banking | 91.0 | 91.0 |
| National Investors Group Holdings Limited | Cayman Islands | Investment Company | 100.0 | 100.0 |
| Watani Wealth Management Company | Saudi Arabia | Investment Management | 100.0 | 100.0 |
| Watani Financial Brokerage Company K.S.C. (Closed) | Kuwait | Brokerage | 100.0 | 98.3 |
| NBK GDM (Caymans) Limited | Cayman Islands | Treasury activities | 100.0 | 100.0 |
| Bank of London and the Middle East (held through Boubyan Bank K.S.C.P.) | United Kingdom | Islamic Banking | 72.1 | 71.5 |

At 31 December 2023, 38.1% (2022: 38.1%) of the Group's interest in National Bank of Kuwait (Lebanon) S.A.L. was held by an intermediate holding company, NBK Holding (Liban) S.A.L.

The Bank also holds voting capital in certain special-purpose entities which have been established to manage funds and fiduciary assets on behalf of the Bank's customers. The Bank does not have a beneficial interest in the underlying assets of these companies. Information about the Group's fund management activities is set out in Note 30.

# Notes to the Consolidated Financial Statements (continued)

31 December 2023

**24  SUBSIDIARIES**  (continued)

Significant non-controlling interest exists in Boubyan Bank K.S.C.P. as follows:

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Accumulated balances of non-controlling interest | 575,626 | 565,000 |
| Profit attributable to non-controlling interest | 27,179 | 20,785 |

Summarized financial information of Boubyan Bank K.S.C.P. is as follows:

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Summarized financial information | | |
| Assets | 8,404,989 | 7,880,757 |
| Liabilities | 7,376,154 | 6,901,058 |
| Net operating income | 218,030 | 201,363 |
| Results for the year | 78,221 | 54,273 |
| Other comprehensive income (loss) for the year | 4,819 | (1,619) |

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Summarized cash flow information | | |
| Operating cash flow | 273,595 | (166,793) |
| Investing cash flow | (336,084) | (180,388) |
| Financing cash flow | (104,200) | 312,313 |

**25     COMMITMENTS AND CONTINGENT LIABILITIES**

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Commitments on behalf of customers for which there are corresponding liabilities by the customers concerned: | | |
| Acceptances | 189,080 | 281,958 |
| Letters of credit | 391,486 | 410,321 |
| Guarantees | 4,035,345 | 3,775,107 |
| | 4,615,911 | 4,467,386 |

Irrevocable commitments to extend credit amount to KD 1,327,508 thousand (2022: KD 1,024,290 thousand). This includes commitments to extend credit which are irrevocable over the life of the facility or are revocable only in response to a material adverse change.

In the normal course of business, the Group has exposure to various indirect credit commitments which, though not reflected in the consolidated statement of financial position, are subject to normal credit standards, financial controls and monitoring procedures.

These credit commitments do not necessarily represent future cash requirements, since many of these commitments will expire or terminate without being funded. Credit losses, if any, may result from exposure to such commitments are not expected to be significant.

The Group has commitments in respect of capital expenditure amounting to KD 85,980 thousand (2022: KD 82,124 thousand).

**26     DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGE ACCOUNTING**

Derivative financial instruments are financial instruments that derive their value by referring to interest rates, foreign exchange rates, index of prices or rates and credit rating or credit index. Notional principal amounts merely represent amounts to which a rate or price is applied to determine the amounts of cash flows to be exchanged and do not represent the potential gain or loss associated with the market or credit risk of such instruments.

Derivative financial instruments are carried at fair value in the consolidated statement of financial position. Positive fair value represents the cost of replacing all transactions with a fair value in the Group's favour had the rights and obligations arising from that instrument been closed in an orderly market transaction at the reporting date. Credit risk in respect of derivative financial instruments is limited to the positive fair value of the instruments. Negative fair value represents the cost to the Group's counter-parties of replacing all their transactions with the Group.

The Group deals in interest rate swaps to manage its interest rate risk on interest-bearing assets and liabilities and to provide interest rate risk management solutions to customers. Similarly the Group deals in forward foreign exchange contracts for customers and to manage its foreign currency positions and cash flows.

Interest rate swaps used to hedge the change in fair value of the Group's financial assets and  liabilities and which qualifies as effective hedging instruments are disclosed as 'held as fair value hedges'. Other interest rate swaps and forward foreign exchange contracts are carried out for customers or used for hedging purpose but do not meet the qualifying criteria for hedge accounting. The risk exposures on account of derivative financial instruments for customers are covered by entering into opposite transactions (back to back) with counterparties or by other risk mitigating transactions.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**26  DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGE ACCOUNTING** (continued)

**Interest rate swaps**
Interest rate swaps are contractual agreements between two counter-parties to exchange interest payments on a defined principal amount for a fixed period of time. In cross currency interest rate swaps, the Group exchanges interest payment in two different currencies on a defined principal amount for a fixed period of time and also exchanges defined principal amounts in two different currencies at inception of the contract and re-exchanges principal amounts on maturity. Profit rate swaps are also included in this category.

**Forward foreign exchange**
Forward foreign exchange contracts are agreements to buy or sell currencies at a specified rate and at a future date.

The fair value of derivative financial instruments included in the financial records, together with their notional amounts is summarised as follows:

| | 2023 | | | 2022 | | |
|---|---|---|---|---|---|---|
| | Positive fair value KD 000's | Negative fair value KD 000's | Notional KD 000's | Positive fair value KD 000's | Negative fair value KD 000's | Notional KD 000's |
| Interest rate swaps (held as fair value hedges) | 282,008 | 43,973 | 5,826,052 | 330,703 | 12,922 | 4,559,283 |
| Interest rate swaps (others) | 891 | 1,753 | 86,318 | 1,259 | 1,270 | 21,441 |
| Forward foreign exchange contracts | 27,547 | 17,026 | 4,112,667 | 23,346 | 26,569 | 4,116,666 |
| | 310,446 | 62,752 | 10,025,037 | 355,308 | 40,761 | 8,697,390 |

Positive fair value is included in other assets (Note 16) and negative fair value is included in other liabilities (Note 18).

The Group's strategy is not to carry interest rate risk for long duration assets. The Group uses interest rate swaps to hedge its exposure to changes in the fair values due to interest rate risk on certain investments in fixed rate debt securities, fixed-rate corporate loans and fixed-rate liabilities issued. Hedge accounting is applied where economic hedge relationships meet the hedge accounting criteria. In fair value hedge relationships, the Group assesses whether the interest rate swaps designated in each hedging relationship is expected to be highly effective in offsetting changes in fair value of the hedged item attributable to interest rate risk using appropriate qualitative and quantitative methods. The Group generally seeks to fully match the critical terms (tenor, notionals, interest rate exposure, currency, interest payments frequency and payment periods) of the hedged item and hedging instrument.

The Group minimises counterparty credit risk in derivative instruments by entering into transactions with high-quality counterparties.

**27  RELATED PARTY TRANSACTIONS**

Related parties comprise board members and executive officers of the Bank, their close family members, companies controlled by them or close family members and associates of the Group. Certain related parties were customers of the Group in the ordinary course of business. Transactions with related parties were made on substantially the same terms, including interest rates and collateral, as those prevailing at the same time for comparable transactions with unrelated parties and did not involve more than a normal amount of risk. Lending to Board Members and their related parties is secured by tangible collateral in accordance with regulations of Central Bank of Kuwait.

Details of the interests of related parties are as follows:

| | Number of Board Members and Executive Officers | | Number of related parties | | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 | 2023 KD 000's | 2022 KD 000's |
| **Board Members and Executive Officers** | | | | | | |
| Loans | 6 | 6 | 22 | 18 | 49,652 | 54,038 |
| Contingent liabilities | 1 | 2 | 7 | 9 | 22,719 | 20,476 |
| Credit cards | 19 | 18 | 28 | 31 | 187 | 178 |
| Deposits | 24 | 24 | 88 | 80 | 36,927 | 52,351 |
| Collateral against credit facilities | 3 | 2 | 14 | 13 | 153,137 | 174,926 |
| Interest and fee income | | | | | 3,005 | 1,817 |
| Interest expense | | | | | 1,205 | 432 |
| Purchase of equipment and other expenses | | | | | 330 | 367 |

Details of compensation to key management personnel are as follows:

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Salaries and other short term benefits | 14,095 | 12,199 |
| Post-employment benefits | 341 | 314 |
| Share based compensation | 656 | 1,050 |
| | 15,092 | 13,563 |

Remuneration to directors of the Bank amounting to KD 770 thousand for the year ended 31 December 2023 (31 December 2022: KD 770 thousand) is in accordance with local regulations and is subject to approval of shareholders at the Annual General Meeting.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

## 28   RISK MANAGEMENT

Risk is inherent in the Group's activities but is managed in a structured, systematic manner through a global risk policy which embeds comprehensive risk management into organisational structure, risk measurement and monitoring processes. The overall risk management direction and oversight are provided by the Board of Directors with the support of the Board Risk and Compliance Committee and the Board Audit Committee. The Group's Risk Management and Internal Audit functions assist Executive Management in controlling and actively managing the Group's overall risk profile.

The Group is exposed to credit risk, liquidity risk, market risk and operational risk.

In accordance with the Central Bank of Kuwait's directives, the Group has implemented a comprehensive system for the measurement and management of risk. This methodology helps in reflecting both the expected loss likely to arise in normal circumstances and unexpected losses, which are an estimate of the ultimate actual loss based on statistical models. Information compiled from all internal business groups are closely examined and analysed to identify and control risks.

Transactions and outstanding risk exposures are quantified and compared against authorised limits, whereas non- quantifiable risks are monitored against policy guidelines and key risk and control indicators. Any discrepancies, excesses or deviation are escalated to management for appropriate action.

As part of its overall risk management, the Group uses interest rate swaps, forward foreign exchange contracts and other instruments to manage exposures resulting from changes in interest rates, foreign exchange, equity risks, credit risks and exposures arising from forecast transactions. Collaterals are used to reduce the Group's credit risks.

The Group's comprehensive risk management framework has specific guidelines that focus on maintaining a diversified portfolio to avoid excessive concentration of risk.

### 28.1   CREDIT RISK

Credit risk is the risk that counterparty will cause a financial loss to the Group by failing to discharge an obligation. Credit risk arises in the Group's normal course of business.

All significant policies relating to credit risks are reviewed and approved by the Board of Directors.

Credit limits are established for all customers after a careful assessment of their creditworthiness. Standing procedures, outlined in the Group's Credit Policy Manual, require that all credit proposals be subjected to detailed screening by the domestic or international credit control divisions pending submission to the appropriate credit committee. Whenever necessary, all loans are secured by acceptable forms of collateral to mitigate the related credit risks.

In accordance with the instructions of the Central Bank of Kuwait dated 18 December 1996, setting out the rules and regulations regarding the classification of credit facilities, the Group has formed an internal committee comprising competent professional staff and having as its purpose the study and evaluation of the existing credit facilities of each customer of the Group. This committee is required to identify any abnormal situations and difficulties associated with a customer's position which might cause the debt to be classified as irregular, and to determine an appropriate provisioning level. The committee, which meets regularly throughout the year, also studies the positions of those customers whose irregular balances exceed 25% of their total debt, in order to determine whether further provisions are required.

The Group further limits risk through diversification of its assets by geography and industry sector.  In addition, all credit facilities are continually monitored based on a periodical review of the credit performance and account rating.

28  RISK MANAGEMENT (continued)
28.1  CREDIT RISK (continued)

### 28.1.1   ASSESSMENT OF EXPECTED CREDIT LOSSES

**Definition of default**
The Group considers a financial asset to be in default and therefore Stage 3 (credit impaired) for ECL calculations when:

- the borrower is unlikely to pay its credit obligations to the Group in full, without recourse by the Group to actions such as realising security (if any is held);
- the borrower is past due more than 90 days on any material credit obligation to the Group; or
- borrower is considered as credit-impaired based on qualitative assessment for internal credit risk Management purposes
- retail facilities from commencement of legal recourse

The Group considers investments and interbank balances as in default when the coupon or principal payment is past due for 1 day. The Group considers externally-rated portfolio with ratings 'D' from S&P and Fitch, and 'C' from Moody's as defaulted.

The Group considers a variety of indicators that may indicate unlikeliness to pay as part of a qualitative assessment of whether a customer is in default. Such indicators include:

- breaches of covenants
- borrower having past due liabilities to public creditors or employees
- borrower is deceased

The Group considers a financial asset to be no longer in default and therefore reclassified out of stage 3, when it no longer meets any of the default criteria. Transfer from Stage 3 to Stage 2/Stage 1 requires a notification to be sent to the Regulator with the proper justification.

**Significant increase in credit risk**
The Group continuously monitors all assets subject to ECLs. In order to determine whether an instrument or a portfolio of instruments is subject to 12 months ECL or life time ECL, the Group assess as whether there has been a significant increase in credit risk since initial recognition. The quantitative criteria used to determine a significant increase in credit risk is a series of relative and absolute thresholds. Financial assets that are 30 days past due are generally deemed to have significant increase in credit risk since initial recognition and migrated to stage 2 even if other criteria do not indicate a significant increase in credit risk unless this is rebutted.

Any stressed credit facility that has been restructured would also be classified in stage 2 unless it qualifies for stage 3 classification. The Group considers a financial asset as 'cured' (i.e., in a lowered distressed state) and therefore reclassified out of stage 2 when it no longer meets the criteria for inclusion in Stage 2. According to the regulatory requirements, for facilities (except for retail facilities) classified under Stage 2, these would require completing a minimum of 1 year, post recovery, of meeting the scheduled payments, to be classified in Stage 1. Transfer from Stage 2 to Stage 1 requires a notification to be sent to the Regulator with the proper justification.

The Group considers a financial instrument with an external rating of "investment grade" as at the reporting date to have low credit risk. In addition to the above quantitative criteria, the Group applies qualitative criteria for the assessment of significant increase in credit risk based on monitoring of certain early warning signals.

**Measurement of ECLs**
ECLs are probability-weighted estimates of credit losses and are measured as the present value of all cash shortfalls discounted at the effective interest rate of the financial instrument. Cash shortfall represents the difference between cash flows due to the Group in accordance with the contract and the cash flows that the Group expects to receive. The key elements in the measurement of ECL include probability of default (PD), loss given default (LGD) and exposure at default (EAD). The Group estimates these elements using appropriate credit risk models taking into consideration the internal and external credit ratings of the assets, nature and value of collaterals, forward-looking macro-economic scenarios, etc.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**28  RISK MANAGEMENT** (continued)
**28.1  CREDIT RISK** (continued)
**28.1. 1  ASSESSMENT OF EXPECTED CREDIT LOSSES** (continued)

The Group calculates ECL on credit facilities classified in stage 3 at 100% of the defaulted exposure net of the value of eligible collaterals after applying applicable haircuts.

The Group in estimating ECL for credit facilities has taken into consideration the following key parameters based on inputs from CBK:

- Floor for estimating PDs for specific portfolios
- Eligible collateral with haircuts for determining LGD and floor for LGD for unsecured facilities.
- Deemed maturity for exposures in Stage 2
- Credit Conversion Factor on utilized and un-utilized portions for cash and non-cash facilities

**Internal and PD estimation process**
In managing its portfolio, the Group utilises ratings and other measures and techniques which seek to take account of all aspects of perceived risk. The Group uses industry-standard rating tools for assessing ratings/scores that are then leveraged for PD estimation process. The tool provides the ability to analyse a business and produces risk ratings at both the obligor and facility levels. The analysis supports the usage of financial factors as well as non-financial subjective factors. The Group also uses external ratings by recognised rating agencies for externally-rated portfolios.

The Probability of Default (PD) is the likelihood that an obligor will default on its obligations in the future. IFRS 9 requires the use of separate PD for a 12-month duration and lifetime duration depending on the stage allocation of the obligor. A PD used for IFRS 9 should reflect the Group's estimate of the future asset quality. The through-the-cycle (TTC) PDs are generated from the rating tool based on the internal/external credit ratings. The Group converts the TTC PDs to point-to-point (PIT) PD term structures using appropriate models and techniques.

The Group assesses the PD for its retail portfolio through behavioural scorecards. The Consumer portfolio is further segmented statistically and risk pools with shared risk characteristics are addressed with different scorecards relevant for each of the risk pool. The segmentation is based on demographic, behavioural and financial variables which distinctly rank order risk. The scorecards were developed using statistical techniques. Executing the scorecard will return an associated PD value for each of the facility. The term structure PDs are then derived using a base PD.

**Exposure at default**
Exposure at default (EAD) represents the amount which the obligor will owe to the Group at the time of default. The Group considers variable exposures that may increase the EAD in addition to the drawn credit line. These exposures arise from undrawn limits and contingent liabilities. Therefore, the exposure will contain both on and off balance sheet values. EAD is estimated taking into consideration the contractual terms such as coupon rates, frequency, reference curves, maturity, pre-payment options, amortization schedule, credit conversion factors, etc. EAD for retail loans incorporate prepayment assumptions whereas, for credit cards portfolio, credit conversion factors are applied to estimate the future drawdowns.

**28  RISK MANAGEMENT** (continued)
**28.1  CREDIT RISK** (continued)
**28.1. 1  ASSESSMENT OF EXPECTED CREDIT LOSSES** (continued)

**Loss given default**
Loss-given-default (LGD) is the magnitude of the likely loss if there is a default. The Group estimates LGD parameters based on the history of recovery rates of claims against defaulted counterparties. The LGD models consider the structure, collateral, seniority of the claim, counterparty industry and recovery costs of any collateral that is integral to the financial asset.

**Incorporation of forward-looking information**
The Group considers various key economic variables which reflect the continuing uncertainties and effect stemming from Covid-19 and other emerging risks, which may be expected to have an impact on credit risk and the ECL, when incorporating forward-looking information into the ECL models. Key economic variables include, but are not limited to, Gross Domestic Product, Equity price index, Oil prices, and Government expenditure. Together, they provide reasonable indications and forecasts of future macro-economic conditions. The consideration of such factors increases the degree of judgment in determination of ECL. The Group employs statistical models which incorporate the effect of macro-economic factors to adjust the historical TTC PDs to arrive at the PiT PDs. The Group considers three scenarios (baseline, upside and downside) and appropriate probability weights are applied to these scenarios to derive a probability-weighted outcome of expected credit loss. Management reviews the methodologies and assumptions including any forecasts of future economic conditions, on a regular basis.

The weighting of the multiple scenarios increased the Group's reported allowance for expected credit losses on financial assets, other than credit facilities, in Stage 1 and Stage 2, relative to the base case scenario, by KD 3,503 thousand (2022: increased by KD 2,689 thousand). If the Group were to use only downside case scenario, allowance for expected credit losses on financial assets other than credit facilities would be KD 13,176 thousand (2022: KD 7,583 thousand) higher than the reported allowance for expected credit losses on financial assets, other than credit facilities, as at 31 December 2023.

The weighting of the multiple scenarios increased the Group's reported allowance for expected credit losses on credit facilities, in Stage 1 and Stage 2, relative to the base case scenario, by KD 11,927 thousand (2022: increased by KD 11,917 thousand). If the Group were to use only downside case scenario, allowance for expected credit losses on credit facilities would be KD 54,644 thousand (2022: KD 32,003 thousand) higher than the reported allowance for expected credit losses on credit facilities as at 31 December 2023.

Actual outcomes may differ as this neither considers the migration of exposures nor incorporates changes which would occur in the portfolio due to risk mitigation actions and other factors.

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**28  RISK MANAGEMENT** (continued)
**28.1  CREDIT RISK** (continued)

**28.1. 2  MAXIMUM EXPOSURE TO CREDIT RISK**

An analysis of loans, advances and Islamic facilities to customers and contingent liabilities before and after taking account of eligible collateral held or other credit enhancements, is as follows:

| | 2023 | | 2022 | |
|---|---|---|---|---|
| | Gross exposure KD 000's | Net exposure KD 000's | Gross exposure KD 000's | Net exposure KD 000's |
| Loans, advances and Islamic financing to customers | 22,281,004 | 15,841,839 | 20,998,416 | 14,845,174 |
| Contingent liabilities | 4,615,911 | 4,430,493 | 4,467,386 | 4,291,810 |

For other financials assets, the gross exposure amounts are equal to net exposure amounts.

**Collateral and other credit enhancements**
The amount, type and valuation of collateral are based on guidelines specified in the risk management framework. The main types of collateral accepted includes real estate, quoted shares, cash collateral and bank guarantees. The revaluation and custody of collaterals are performed independent of the business units.

**28.1. 3  RISK CONCENTRATION OF THE MAXIMUM EXPOSURE TO CREDIT RISK**

Concentrations of credit risk arise from exposure to customers having similar characteristics in terms of the geographic location in which they operate or the industry sector in which they are engaged, such that their ability to discharge contractual obligations may be similarly affected by changes in political, economic or other conditions.

Credit risk can also arise due to a significant concentration of Group's assets to any single counterparty. This risk is managed by diversification of the portfolio. The 20 largest loans, advances and Islamic financing to customers outstanding as a percentage of gross loans, advances and Islamic financing to customers as at 31 December 2023 is 14% (2022: 15%).

**28  RISK MANAGEMENT** (continued)
**28.1  CREDIT RISK** (continued)
**28.1. 3  RISK CONCENTRATION OF THE MAXIMUM EXPOSURE TO CREDIT RISK** (continued)

The Group's financial assets and off-balance sheet items, before taking into account any collateral held or credit enhancements can be analysed by the following geographic regions:

| 2023 Geographic region | Middle East and North Africa KD 000's | North America KD 000's | Europe & UK KD 000's | Asia KD 000's | Others KD 000's | Total KD 000's |
|---|---|---|---|---|---|---|
| Balances and deposits with banks | 3,300,992 | 1,255,953 | 700,504 | 279,435 | - | 5,536,884 |
| Central Bank of Kuwait bonds | 856,815 | - | - | - | - | 856,815 |
| Kuwait Government treasury Bonds | 194,111 | - | - | - | - | 194,111 |
| Loans, advances and Islamic financing to customers | 18,706,076 | 579,586 | 1,911,118 | 652,231 | 431,993 | 22,281,004 |
| Investment securities | 4,783,897 | 51,918 | 420,703 | 1,304,861 | 30,504 | 6,591,883 |
| Other assets | 305,897 | 35,361 | 294,212 | 8,678 | 2,134 | 646,282 |
| | 28,147,788 | 1,922,818 | 3,326,537 | 2,245,205 | 464,631 | 36,106,979 |
| Commitments and contingent liabilities (Note 25) | 3,391,864 | 320,596 | 1,181,022 | 1,008,663 | 41,274 | 5,943,419 |
| | 31,539,652 | 2,243,414 | 4,507,559 | 3,253,868 | 505,905 | 42,050,398 |

| 2022 Geographic region | Middle East and North Africa KD 000's | North America KD 000's | Europe & UK KD 000's | Asia KD 000's | Others KD 000's | Total KD 000's |
|---|---|---|---|---|---|---|
| Balances and deposits with banks | 3,050,068 | 2,704,510 | 676,096 | 169,466 | - | 6,600,140 |
| Central Bank of Kuwait bonds | 881,241 | - | - | - | - | 881,241 |
| Kuwait Government treasury Bonds | 211,629 | - | - | - | - | 211,629 |
| Loans, advances and Islamic financing to customers | 17,971,676 | 583,386 | 1,618,143 | 450,892 | 374,319 | 20,998,416 |
| Investment securities | 3,953,530 | 24,610 | 187,967 | 1,119,462 | 30,445 | 5,316,014 |
| Other assets | 399,866 | 19,933 | 315,336 | 7,539 | 1,951 | 744,625 |
| | 26,468,010 | 3,332,439 | 2,797,542 | 1,747,359 | 406,715 | 34,752,065 |
| Commitments and contingent liabilities (Note 25) | 3,037,221 | 280,380 | 1,173,523 | 996,393 | 4,159 | 5,491,676 |
| | 29,505,231 | 3,612,819 | 3,971,065 | 2,743,752 | 410,874 | 40,243,741 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**28  RISK MANAGEMENT** (continued)
**28.1  CREDIT RISK** (continued)
**28.1.3  RISK CONCENTRATION OF THE MAXIMUM EXPOSURE TO CREDIT RISK** (continued)

The Group's financial assets and off-balance sheet items, before taking into account any collateral held or credit enhancements, can be analysed by the following industry sectors:

| Industry sector | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Trading | 2,206,795 | 2,136,617 |
| Manufacturing | 3,369,644 | 3,290,431 |
| Banks and other financial institutions | 12,929,028 | 12,810,369 |
| Construction | 1,658,949 | 1,594,674 |
| Real Estate | 4,596,994 | 4,229,800 |
| Retail | 7,435,574 | 7,382,170 |
| Government | 3,658,123 | 3,497,046 |
| Others | 6,195,291 | 5,302,634 |
| | 42,050,398 | 40,243,741 |

**28.1.4  CREDIT QUALITY PER CLASS OF FINANCIAL ASSETS**

In managing its portfolio, the Group utilises ratings and other measures and techniques which seek to take account of all aspects of perceived risk. Credit exposures classified as 'High' quality are those where the default risk from the obligor's failure to discharge its obligation is assessed to be low. These include facilities to corporate entities with financial condition, risk indicators and capacity to repay which are considered to be good to excellent. Credit exposures classified as 'Standard' quality comprise all other facilities whose payment performance is fully compliant with contractual conditions and which are not 'impaired'. The default risk on 'Standard' quality is assessed to be higher than that for the exposures classified within the 'High' quality range.

**28  RISK MANAGEMENT** (continued)
**28.1  CREDIT RISK** (continued)
**28.1.4  CREDIT QUALITY PER CLASS OF FINANCIAL ASSETS** (continued)

The table below shows the credit quality by class of financial assets for statement of financial position lines, based on the Group's credit rating system.

| 2023 | High KD 000's | Standard KD 000's | Impaired KD 000's | Total KD 000's |
|---|---|---|---|---|
| Balances and short term deposits with banks | 4,220,354 | - | 26,788 | 4,247,142 |
| Central Bank of Kuwait bonds | 856,815 | - | - | 856,815 |
| Kuwait Government treasury bonds | 194,111 | - | - | 194,111 |
| Deposits with banks | 1,028,972 | 289,946 | 307 | 1,319,225 |
| Loans, advances and Islamic financing to customers | 20,020,437 | 2,805,031 | 318,386 | 23,143,854 |
| Investments in debt securities – Amortized cost | 171,468 | 901,718 | - | 1,073,186 |
| Investments in debt securities – FVOCI | 4,996,478 | 522,695 | 471 | 5,519,644 |
| Investments in debt securities – FVPL | 17,979 | - | - | 17,979 |
| | 31,506,614 | 4,519,390 | 345,952 | 36,371,956 |

| 2022 | High KD 000's | Standard KD 000's | Impaired KD 000's | Total KD 000's |
|---|---|---|---|---|
| Balances and short term deposits with banks | 5,109,486 | - | 29,524 | 5,139,010 |
| Central Bank of Kuwait bonds | 881,241 | - | - | 881,241 |
| Kuwait Government treasury bonds | 211,629 | - | - | 211,629 |
| Deposits with banks | 1,250,912 | 238,262 | 3,942 | 1,493,116 |
| Loans, advances and Islamic financing to customers | 19,049,904 | 2,466,407 | 310,046 | 21,826,357 |
| Investments in debt securities – Amortized cost | 13,860 | 915,310 | - | 929,170 |
| Investments in debt securities – FVOCI | 3,756,672 | 628,586 | 477 | 4,385,735 |
| Investments in debt securities – FVPL | 17,671 | - | - | 17,671 |
| | 30,291,375 | 4,248,565 | 343,989 | 34,883,929 |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**28  RISK MANAGEMENT** (continued)

**28.2  LIQUIDITY RISK**

Liquidity risk is the risk that the Group will be unable to meet its financial liabilities when they fall due. To limit this risk, management has arranged diversified funding sources, manages assets with liquidity in mind and monitors liquidity on a daily basis.

The table below summarises the maturity profile of Group's assets, liabilities and equity based on contractual cash flows and maturity dates. This does not necessarily take account of the effective maturities.

| 2023 | Up to 3 months KD 000's | 3 to 12 months KD 000's | Over 1 year KD 000's | Total KD 000's |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and deposits with banks | 5,520,612 | 182,209 | - | 5,702,821 |
| Central Bank of Kuwait bonds | 472,911 | 383,904 | - | 856,815 |
| Kuwait Government treasury bonds | - | 47,000 | 147,111 | 194,111 |
| Loans, advances and Islamic financing to customers | 6,271,945 | 2,794,350 | 13,214,709 | 22,281,004 |
| Investment securities | 779,059 | 539,776 | 5,565,986 | 6,884,821 |
| Land, premises and equipment | - | - | 506,812 | 506,812 |
| Goodwill and other intangible assets | - | - | 508,416 | 508,416 |
| Other assets | 313,603 | 53,340 | 363,248 | 730,191 |
| | 13,358,130 | 4,000,579 | 20,306,282 | 37,664,991 |
| **Liabilities and equity** | | | | |
| Due to banks | 3,223,281 | 728,464 | 12,057 | 3,963,802 |
| Deposits from other financial institutions | 2,543,653 | 1,167,902 | 14,074 | 3,725,629 |
| Customer deposits | 15,776,574 | 5,493,783 | 678,600 | 21,948,957 |
| Certificates of deposit issued | 637,710 | 185,189 | - | 822,899 |
| Other borrowed funds | - | 153,690 | 1,177,316 | 1,331,006 |
| Other liabilities | 783,894 | 18,927 | 163,302 | 966,123 |
| Share capital and reserves | - | - | 3,685,523 | 3,685,523 |
| Proposed cash dividend | - | 198,249 | - | 198,249 |
| Perpetual Tier 1 Capital Securities | - | - | 439,032 | 439,032 |
| Non-controlling interests | - | - | 583,771 | 583,771 |
| | 22,965,112 | 7,946,204 | 6,753,675 | 37,664,991 |

**28  RISK MANAGEMENT** (continued)
**28.2  LIQUIDITY RISK** (continued)

| 2022 | Up to 3 months KD 000's | 3 to 12 months KD 000's | Over 1 year KD 000's | Total KD 000's |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and deposits with banks | 6,613,969 | 197,600 | 2,169 | 6,813,738 |
| Central Bank of Kuwait bonds | 494,770 | 386,471 | - | 881,241 |
| Kuwait Government treasury bonds | 15,000 | 5,000 | 191,629 | 211,629 |
| Loans, advances and Islamic financing to Customers | 6,173,559 | 2,248,920 | 12,575,937 | 20,998,416 |
| Investment securities | 624,743 | 518,416 | 4,491,513 | 5,634,672 |
| Land, premises and equipment | - | - | 474,724 | 474,724 |
| Goodwill and other intangible assets | - | - | 534,936 | 534,936 |
| Other assets | 367,267 | 47,811 | 373,929 | 789,007 |
| | 14,289,308 | 3,404,218 | 18,644,837 | 36,338,363 |
| **Liabilities and equity** | | | | |
| Due to banks | 3,586,607 | 419,823 | 11,549 | 4,017,979 |
| Deposits from other financial institutions | 2,245,402 | 1,300,885 | 194,590 | 3,740,877 |
| Customer deposits | 14,717,473 | 4,656,934 | 803,655 | 20,178,062 |
| Certificates of deposit issued | 1,426,253 | 375,370 | - | 1,801,623 |
| Other borrowed funds | 39,819 | 76,575 | 1,127,169 | 1,243,563 |
| Other liabilities | 585,794 | 8,840 | 126,679 | 721,313 |
| Share capital and reserves | - | - | 3,434,180 | 3,434,180 |
| Proposed cash dividend | 188,808 | - | - | 188,808 |
| Perpetual Tier 1 Capital Securities | - | - | 439,032 | 439,032 |
| Non-controlling interests | - | - | 572,926 | 572,926 |
| | 22,790,156 | 6,838,427 | 6,709,780 | 36,338,363 |

# Notes to the Consolidated Financial Statements (continued)
## 31 December 2023

**28  RISK MANAGEMENT** (continued)
**28.2  LIQUIDITY RISK** (continued)

The liquidity profile of financial liabilities of the Group summarised below reflects the cash flows including future interest payments over the life of these financial liabilities based on contractual repayment arrangements.

| 2023 | Up to 3 months KD 000's | 3 to 12 months KD 000's | Over 1 year KD 000's | Total KD 000's |
|---|---|---|---|---|
| **Financial Liabilities** | | | | |
| Due to banks | 3,230,779 | 752,183 | 13,212 | 3,996,174 |
| Deposits from other financial institutions | 2,554,144 | 1,198,201 | 15,658 | 3,768,003 |
| Customer deposits | 15,831,255 | 5,658,392 | 763,543 | 22,253,190 |
| Certificates of deposit issued | 642,697 | 190,310 | - | 833,007 |
| Other borrowed funds | 8,540 | 195,681 | 1,291,674 | 1,495,895 |
| | 22,267,415 | 7,994,767 | 2,084,087 | 32,346,269 |
| **Contingent liabilities and commitments** | | | | |
| Contingent liabilities | 1,364,374 | 1,885,643 | 1,365,894 | 4,615,911 |
| Irrevocable commitments | 274,707 | 313,361 | 739,440 | 1,327,508 |
| | 1,639,081 | 2,199,004 | 2,105,334 | 5,943,419 |
| **Derivative financial instruments settled on a gross basis** | | | | |
| Contractual amounts payable | 3,051,777 | 1,056,390 | 309,391 | 4,417,558 |
| Contractual amounts receivable | 3,046,421 | 1,053,861 | 299,513 | 4,399,795 |

| 2022 | Up to 3 months KD 000's | 3 to 12 months KD 000's | Over 1 year KD 000's | Total KD 000's |
|---|---|---|---|---|
| Financial Liabilities | | | | |
| Due to banks | 3,597,177 | 432,031 | 12,526 | 4,041,734 |
| Deposits from other financial institutions | 2,251,298 | 1,321,018 | 207,792 | 3,780,108 |
| Customer deposits | 14,761,211 | 4,771,459 | 882,025 | 20,414,695 |
| Certificates of deposit issued | 1,432,841 | 384,877 | - | 1,817,718 |
| Other borrowed funds | 49,381 | 108,373 | 1,263,374 | 1,421,128 |
| | 22,091,908 | 7,017,758 | 2,365,717 | 31,475,383 |
| Contingent liabilities and commitments | | | | |
| Contingent liabilities | 1,280,110 | 1,685,461 | 1,501,815 | 4,467,386 |
| Irrevocable commitments | 90,996 | 280,629 | 652,665 | 1,024,290 |
| | 1,371,106 | 1,966,090 | 2,154,480 | 5,491,676 |
| Derivative financial instruments settled on a gross basis | | | | |
| Contractual amounts payable | 2,302,538 | 1,626,029 | 349,018 | 4,277,585 |
| Contractual amounts receivable | 2,304,139 | 1,625,124 | 348,507 | 4,277,770 |

**28  RISK MANAGEMENT** (continued)

**28.3    MARKET RISK**

Market risk is the risk that the fair value or future cash flows of financial instruments will fluctuate due to changes in market prices. Market risks arise from open positions in interest rate, currency and equity products, all of which are exposed to general and specific market movements and changes in the level of volatility of market rates or prices such as interest rates, foreign exchange rates and equity prices.

**28.3.1   INTEREST RATE RISK**

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates.

The Group is not excessively exposed to interest rate risk as its assets and liabilities are repriced regularly and most exposures arising on medium-term fixed-rate lending or fixed-rate borrowing are covered by interest rate swaps.  Furthermore, the re-pricing gaps of its assets and liabilities are carefully monitored and controlled through limits pre-established by the Board of Directors and adjusted where necessary, to reflect the changing market conditions.

**Interest rate sensitivity**
Interest rate sensitivity of profit measures the effect of the assumed changes in interest rates on the net interest income for one year, based on the interest-bearing financial assets and financial liabilities held at the year end.  This includes the effect of hedging instruments but excludes loan commitments. The sensitivity on equity is the impact arising from changes in interest rate on fair value of investments in debt securities classified as FVOCI. Sensitivity to interest rate movements will be on a symmetric basis as financial instruments giving rise to non-symmetric movements are not significant.

Based on the Group's financial assets and financial liabilities held at the year end, an assumed 25 basis points increase in interest rate, with all other variables held constant, would impact the Group's profit and equity as follows:

| | | 2023 | | 2022 | |
|---|---|---|---|---|---|
| Currency | Movement in Basis points | Effect on profit KD 000's | Effect on equity KD 000's | Effect on profit KD 000's | Effect on equity KD 000's |
| KWD | +25 | 8,525 | - | 9,138 | - |
| USD | +25 | 5,548 | - | 5,579 | - |
| EUR | +25 | 305 | - | 463 | - |
| GBP | +25 | 788 | - | 621 | - |
| EGP | +25 | 366 | (180) | 169 | (402) |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

**28 RISK MANAGEMENT (continued)**
**28.3 MARKET RISK (continued)**

**28.3.2 FOREIGN EXCHANGE RISK**

Foreign exchange risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in foreign exchange rates.

Foreign exchange risks are controlled through limits pre-established by the Board of Directors on currency position exposures. In general assets are typically funded in the same currency as that of the business being transacted to eliminate exchange exposures. Appropriate segregation of duties exists between the treasury front and back office functions, while compliance with position limits is independently monitored on an ongoing basis.

The table below analyses the effect on profit of an assumed 5% strengthening in value of the currency rate against the Kuwaiti Dinar from levels applicable at the year-end, with all other variables held constant. A negative amount in the table reflects a potential net reduction in profit, whereas a positive amount reflects a net potential increase.

| | | 2023 | 2022 |
|---|---|---|---|
| | | Effect on profit KD 000's | Effect on profit KD 000's |
| Currency | % Change in currency rate | | |
| USD | +5 | (393) | (248) |
| GBP | +5 | (1) | 99 |
| EUR | +5 | 38 | 57 |
| Other | +5 | 108 | (74) |

**28.3.3 EQUITY PRICE RISK**

Equity price risk is the risk that the fair values of equities will fluctuate as a result of changes in the level of equity indices or the value of individual share prices. Equity price risk arises from the change in fair values of equity investments. The Group manages the risk through diversification of investments in terms of geographic distribution and industry concentration. The table below analyses the effect of equity price risk on profit (as a result of change in the fair value of equity investments held as fair value through profit or loss) and on equity (as a result of change in the fair value of equity investments classified as FVOCI) at the year end due to an assumed 5% change in market indices, with all other variables held constant.

| | | 2023 | | 2022 | |
|---|---|---|---|---|---|
| Market indices | % Change in equity price | Effect on profit KD 000's | Effect on equity KD 000's | Effect on profit KD 000's | Effect on equity KD 000's |
| Kuwait stock exchange | +5 | 82 | 32 | 121 | 28 |
| Qatar stock exchange | +5 | 177 | - | 97 | - |
| UAE stock indices | +5 | 366 | - | 342 | - |
| Saudi stock exchange | +5 | 999 | 220 | 883 | 81 |

**28 RISK MANAGEMENT (continued)**

**28.4 OPERATIONAL RISK**

Operational risk is the risk of loss arising from inadequate or failed internal processes, human error, systems failure or from external events. The Group has a set of policies and procedures, which are approved by the Board of Directors and are applied to identify, assess and supervise operational risk in addition to other types of risks relating to the banking and financial activities of the Group. Operational risk is managed by the operational risk function, which ensures compliance with policies and procedures and monitors operational risk as part of overall global risk management.

The Operational Risk function of the Group is in line with the Central Bank of Kuwait instructions dated 14 November 1996, concerning the general guidelines for internal controls and the instructions dated 13 October 2003, regarding the sound practices for managing and supervising operational risks in banks.

**29 CAPITAL**

A key objective of the Group is to maximise shareholders' value with optimal levels of risk, whilst maintaining a strong capital base to support the development of its business and comply with the externally-imposed capital requirements.

The disclosures relating to the capital adequacy regulations issued by Central Bank of Kuwait (CBK) as stipulated in CBK Circular number 2/RB, RBA/A336/2014 dated 24 June 2014 (Basel III) and the Leverage regulations as stipulated in CBK Circular number 2/BS/ 342/2014 dated 21 October 2014 under the Basel Committee framework are included under the 'Risk Management' section of the Annual Report.

Capital adequacy, financial leverage and the use of various levels of regulatory capital are monitored regularly by the Group's management and are, also, governed by guidelines of Basel Committee on Banking Supervision as adopted by the CBK.

The Group's regulatory capital and capital adequacy ratios (Basel III) are shown below:

| | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Risk-Weighted Assets | 26,469,664 | 24,571,451 |
| Total Capital required | 3,970,540 | 3,317,146 |
| Total Capital available | | |
| Common Equity Tier 1 Capital | 3,442,577 | 3,170,120 |
| Additional Tier 1 Capital | 531,776 | 527,411 |
| Tier 1 Capital | 3,974,353 | 3,697,531 |
| Tier 2 Capital | 597,889 | 573,564 |
| Total Capital | 4,572,242 | 4,271,095 |
| Common Equity Tier 1 Capital adequacy ratio | 13.0% | 12.9% |
| Tier 1 Capital adequacy ratio | 15.0% | 15.0% |
| Total Capital adequacy ratio | 17.3% | 17.4% |

# Notes to the Consolidated Financial Statements (continued)
31 December 2023

## 29 CAPITAL (continued)

Total capital requirement as at 31 December 2023 is 15% (31 December 2022:13.5%) including capital conservation buffer of 2.5% (31 December 2022 :1%). The relief on capital conservation buffer allowed by CBK in response to Covid-19 is not available effective from 1 January 2023.

The calculations include Boubyan Bank K.S.C.P., an Islamic Banking subsidiary. For purposes of determining risk-weighted assets and capital required, exposures and assets at Boubyan Bank K.S.C.P. are risk weighted, and capital charge calculated, in accordance with Central Bank of Kuwait regulations applicable to banks providing banking services compliant with Codes of Islamic Sharia'a. Those figures are then added to corresponding figures pertaining to all the rest of the Group, identical with the treatment in relevant reports submitted to the Central Bank of Kuwait.

The Group's financial leverage ratio is calculated in accordance with CBK circular number 2/BS/ 342/2014 dated 21 October 2014 is shown below:

|  | 2023 KD 000's | 2022 KD 000's |
|---|---|---|
| Tier 1 capital | 3,974,353 | 3,697,531 |
| Total exposures | 40,989,808 | 39,373,804 |
| Leverage ratio | 9.7% | 9.4% |

## 30 FUNDS UNDER MANAGEMENT

The Group manages a number of funds, some of which are managed in association with other professional fund managers. The funds have no recourse to the general assets of the Group and the Group has no recourse to the assets of the funds. Accordingly, the assets of these funds are not included in the consolidated statement of financial position. As at 31 December 2023, funds under management were KD 6,600 million (2022: KD 5,682 million).

## 31 CHANGES IN REFERENCE RATES (IBOR)

The Group's exposure to its floating-rate financial assets and liabilities denominated in foreign currencies, is mainly through USD LIBOR. As at 31 December 2023, the Group has transitioned a significant majority of its contracts to "Risk-Free Rates" (RFRs). For the remaining contracts which are mainly syndicated contracts, discussions are currently in progress with the counterparties/customers to complete transition before the next repricing date. For a limited number of contracts whose transition is not expected to be completed by next repricing date, the Group will continue with the 'synthetic' Libor benchmark published by the ICE Benchmark Administration until 30 September 2024.

**Derivatives held for hedging purposes**

The Group has completed the transition of all USD and non-USD linked derivatives as per ISDA Fallbacks protocol.

NATIONAL BANK OF KUWAIT GROUP

CONSOLIDATED FINANCIAL STATEMENTS

31 DECEMBER 2023



# Group Directory

# Local Branches

**HEAD OFFICE**

Al Shuhada Street, Sharq
P.O.Box: 95, Safat
13001 Kuwait
Tel: +965 2229 1111
Fax: +965 2229 1444

**CONSUMER BANKING GROUP**

**Retail Banking**
Ext: 2053

**Domestic Branches**
Ext: 3250

**Direct Sales**
Ext: 5003

**Consumer Lending**
Ext: 3374

**Marketing**
Ext: 3507

**Consumer Credit Collection**
Ext: 2305

**Private Banking Group**
Ext: 2553

**Domestic Corporate Banking**
Ext: 2373

**Foreign Corporate, Oil and Trade Finance Group**
Ext: 2307

**Treasury Group**
Ext: 3567

**Group Risk Management**
Ext: 2321

**Economic Research Group**
Ext: 3136

**Legal Affairs Group**
Ext: 3091

**Human Resources**
Ext: 5162

**International Banking Group**

**Regional Institutional Banking**
Ext: 5328

Please refer to international network for a complete listing

**Operations Group**
Ext: 3354

**Information Technology Group**
Ext: 3797

**Group Financial Control**
Ext: 3009

**Executive Office**
Ext: 2230

**Public Relations**
Ext: 3166

**Media Relations**
Ext: 2789

**Advertising**
Ext: 2665

**Group Internal Audit**
Ext: 5405

Ahmad Al-Jaber
Ahmadi
Airport T1
Airport T4
AIU - Self-service Branch
Al-Rihab
Al-Rumaithiya
Ali Sabah Al-Salem
Andalus
Ardiya
Avenues
Bayan
Boursa
Cinema Salmiya
Dahiyat A. Salem
Daiya
Dasma
Doha
Edge Mall
Eqaila
Fahad Al-Salem
Fahaheel
Fahaheel Sahely
Faiha

Farwaniya
Fintas
Ghazali
Grand Avenues Plaza
Hadiya
Hamra Tower
Hawally
HQ
Jabriya
Jahra
Jahra Commercial
Jleeb Shuyoukh
Kuwait Airways Head Office - Self-service Branch
Kaifa
Khairan Hybrid Outlet Mall
Khairan Square - Self-service Branch
Kheitan
KNPC
KOC
Ministries Complex
Mishref
MTC Headquarters
Mubarak Al Kabeer
Nuzha

PIFSS
Qadsiya
Qortouba
Qurain
Ras Al-Salmiya
Rawda
Riqqa
Saad Al-Abdullah
Sabah Al-Nasser
Sabah Al Salem
Sabahiya
Sabhan
Salmiya Salam Mall
Salwa
Shamiya
Sharq
Shuwaikh
Shuwaikh Medical
Siddiq
Sour
South Surra
Surra
The Warehouse
Yarmouk

**Head Office Tel.: 2229 1111**
**Call Center Tel.: 1801801**

**For More Information About National Bank of Kuwait:**










NBKPage   NBKGroup   NBKGroup   NBKGroup   NBKGroup   National Bank of Kuwait   1801801

# International Branches



**Bahrain**
National Bank of Kuwait SAKP
**Bahrain Branch**
GFH Tower Block 346
Road 4626, Building 1411
P.O. Box 5290, Manama
Kingdom of Bahrain
Tel: +973 17 155 555
Fax: +973 17 104 860

**Saudi Arabia**
National Bank of Kuwait SAKP
**Jeddah Branch**
Al-Khalidiah District
Al-Mukmal Tower
P.O. Box 15385
Jeddah 21444
Saudi Arabia
Tel: +966 2 603 6300
Fax: +966 2 603 6318

**United Arab Emirates**
National Bank of Kuwait SAKP
**Dubai Branch**
Latifa Tower
Sheikh Zayed Road
P.O. Box 9293, Dubai, U.A.E
Tel: +971 4 3161 600
Fax: +971 4 3888 588

**Abu Dhabi Branch**
Sheikh Rashid Bin Saeed Street
(Old Airport Road)
P.O. Box 113567
Abu Dhabi, U.A.E
Tel: +971 2 4199 555
Fax: +971 2 2222 477

**NBK Capital Partners Limited -
DIFC, Dubai**
Precinct Building 3, Office 404
Dubai International Financial
Centre
P.O. Box 506506, Dubai, U.A.E
Tel: +971 4 365 2800
Fax: +971 4 365 2805

**Lebanon**
National Bank of Kuwait
(Lebanon) SAL
**Sanayeh Head Office**
BAC Building, Justinian Street
P.O. Box 11-5727, Riad El-Solh
1107 2200 Beirut, Lebanon
Tel: +9611 759 700
Fax: +9611 747 866

**Bhamdoun Branch**
Tel: +961 5 260 100
Fax: +961 5 260 102

**Iraq**
Credit Bank of Iraq
**Head Office**
Street 9, Building 187
(Elwiya Building)
Sadoun Street District 102
P.O. Box 3420
Baghdad, Iraq
Tel: +964 1 7182198/ 7191944

**Egypt**
National Bank of Kuwait - Egypt
SAE
Plot No. 155, City Center
First Sector 5th settlement
P.O. Box 229
Postal Code 11835
New Cairo, Egypt
Tel: +202 26149300
Fax: +202 2613 5864

**United Kingdom**
National Bank of Kuwait
(International) PLC
**Head Office**
NBK House, 13 George Street,
London, W1U 3QJ, UK
Tel: +44 20 7224 2277

**France**
National Bank of Kuwait France
SA
90 Avenue des
Champs-Elysées
75008 Paris, France
Tel: +33 1 5659 8600
Fax: +33 1 5659 8623

**Singapore**
National Bank of Kuwait SAKP
9 Raffles Place # 44-01
Republic Plaza
Singapore 048619
Tel: +65 6222 5348
Fax: +65 6224 5438

**China**
National Bank of Kuwait SAKP
**Shanghai Branch**
Suite 1501-1502
AZIA Center
1233 Lujiazui Ring Road
Shanghai 200120
China
Tel: +86-21-8036-0800
Fax: +86-21-8036-0801

**United States of America**
National Bank of Kuwait SAKP
**New York Branch**
299 Park Avenue, 17th Floor
New York, NY 10171
USA
Tel: +1 212 303 9800
Fax: +1 212 319 8269

**Kuwait**
Watani Financial
Brokerage Co
Abdullah Al-Ahmed Street
Al-Naqi Building, Office 17
P.O. Box 21350
Safat 13074
Kuwait
Tel: +965 2259 5102
Fax: +965 2224 6979

**NBK Capital**
NBK Headquarters
Al Shuhada Street
Block 6, Sharq
P.O.Box 4950
Safat 13050 Kuwait
Tel: +965 2224 6900
Fax: +965 2224 6905



**National Bank of Kuwait**
(S.A.K.P)

**P.O.Box:** 95 Safat, 13001, Kuwait
**Tel:** +965 22291111
webmaster@nbk.com
**nbk.com**

**Schedule 1**

Classification and Treatment of Claims and Interests

| Class | Claim | Treatment |
|-------|-------|-----------|
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive Cash in an amount equal to the Allowed amount of such Claim or, at the discretion of the Liquidation Trustee, shall be given the property securing its claim in full satisfaction of that claim |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Claim |
| 3 | NBK Tax Claim | The Holder of an Allowed NBK Tax Claim will receive Cash equal to the Allowed amount of such Claim if NBK is not the Purchaser of the Property. However, if NBK is the Purchaser, the Holder of a Claim in Class 3 will not receive a distribution on account of such Claim. |
| 4 | NBK Secured Claim | The Holder of an Allowed NBK Secured Claim will not receive any distribution if NBK is the Purchaser of the Property. If NBK is not the Purchaser, the Holder of such Claim will receive in full and final satisfaction of the NBK Secured Claim: (x) the Remaining Cash and (y) any excess proceeds after payment of the Distribution Account Claims. |
| 5(a) | Trade General Unsecured Claims | Each Holder of an Allowed Trade General Unsecured Claim will receive (x) Cash equal to 70% of the Allowed amount of such Claim, and (y) a *pro-rata* share of the Liquidation Trust Assets. |
| 5(b) | Other General Unsecured Claims | Each Holder of an Allowed Other General Unsecured Claim will receive a *pro-rata* share of the Liquidation Trust Assets; *provided*, *however*, NBK will have an Other General Unsecured Claim equal to 90% of the Allowed amount of the NBK Deficiency Claim as determined by the Successful Bid and in accordance with section 506 of the Bankruptcy Code. |

| 6 | Insider Claims | Each Holder of an Insider Claim will not receive or retain any property under the Plan on account of such Insider Claims. |
| 7 | Subordinated Claims | Each Holder of a Subordinated Claim will not receive or retain any property under the Plan on account of such Subordinated Claims. There are no claims in this class. |
| 8 | Interests | Each Holder of an Interest in the Debtor will not receive or retain any property under the Plan on account of such Interests. |

**Exhibit A**

Summary Chart of Confirmation Objections

| Docket No. | Objecting Party | Summary of Objection | NBK's Response |
|---|---|---|---|
| 401 | 2425 WL | 1. The Exculpation[1] provisions at Article IX(C) of the Plan violate Fifth Circuit law. *See* ¶ 9(a). | 1. NBK has modified the Plan's exculpation provision to address informal comments from the United States Trustee and those modifications address this objection. |
| | | 2. The Plan violates section 1122 by classifying dissimilar claims in a single class. Specifically, Class 6 contains claims of insiders. This class includes the claim of 2425 WL, which is a secured claim and the claims of Ali Choudhri, Jetall Companies, Inc. and Jetall Capital, LLC, which are unsecured claims. *See* ¶ 9(b). | 2. The Plan complies with section 1122. Although Class 6 Insider Claims include unsecured claims, those claims have been asserted by the Debtor's insiders. *See* 11 U.S.C. § 101(31) (defining insider, which includes an "affiliate" of the Debtor). Insider Claims are separately classified because insider votes are not counted in determining whether an impaired class of claims has accepted the Plan. *See* 11 U.S.C. § 1129(a)(10) (requiring at least one impaired class to vote to accept the plan without regard to any insider vote). Further, while the value of the Property will be determined by the auction, 2425 WL's claim against the estate, if allowed (and NBK notes that the Chapter 11 Trustee has objected to the claim) is junior to NBK's loan claim and is therefore unsecured. |
| | | 3. Article IX(E) of the Plan contains broad injunctive language. As drafted, the gatekeeping provision means that no party holding a claim in this case can ever sue NBK for any claim that arose before or during the case without permission from this Court. *See* ¶ 9(e).<br><br>In addition, the Plan includes third-party release and exculpation provisions applicable to non-debtor parties with no opt-out or similar provisions. | 3. The Plan contains injunctive language, but the gate keeper provision does not bar third parties from bringing their claims against NBK. Instead, the Court will (i) determine whether any party seeking to bring a claim against a released party had a "colorable claim" that is not an estate claim, (ii) authorize the party to bring the claim and (iii) adjudicate the claim if the bankruptcy court had jurisdiction over the merit. Importantly, NBK only receives a release from a Claim or Action if it belongs to and is released under the Plan by the Estate (so-called "derivative claims"). In other words, no non-debtor party is releasing its direct and independent claims, if any, against NBK.<br><br>The gate keeper provision is consistent with Fifth Circuit law. *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 439 (5th Cir. 2022) ("Courts have long recognized bankruptcy courts can perform a gatekeeping function" and "[w]e affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."). |

1

| Docket No. | Objecting Party | Summary of Objection | NBK's Response |
|---|---|---|---|
| | | 4. The Plan fails to provide "adequate means for the plan's implementation. *See* ¶ 10. | 4. The Plan provides for adequate means of implementation. In particular, it provides for the sale of the Property under an auction that will be conducted by the Chapter 11 Trustee and provides that the sale proceeds will be used to fund payment of claims under the Plan if NBK is not the Successful Bidder, including NBK's claim for tax liens Mr. Choudhri assigned to NBK. If NBK is the Successful Bidder, NBK will contribute cash to the estate to: (i) pay secured and priority claims in full; (ii) fund the Liquidation Trust created under the Plan; and (iii) pay trade creditors 70% of their allowed claims, as provided for under the Plan. If confirmed, the Plan also will provide NBK with broad releases from the claims which have been asserted by or on behalf of the estate. |
| | | 5. The Plan has not been proposed in good faith because plan and the sales process it encompasses have been proposed for the purpose of allowing NBK to acquire the Debtor's real property by means of a credit bid without any meaningful opportunity for third party bidding. *See* ¶ 10. | 5. The Plan has been proposed in good faith for the reasons explained in section I.F of the argument section of this Memorandum. In addition, it is unknown whether NBK will be the Purchaser. As described by the Chapter 11 Trustee's June 10 status report, at least twenty-four (24) parties have signed non-disclosure agreements to receive information, and at least eight (8) parties have conducted on-site inspections. And even if NBK is the Purchaser, it would be a result of a court-supervised auction of sale of the Property or the Court's determination that NBK's $18,600,000 non-cash credit bid is a qualified bid if there no competing qualified bids. *See* ECF No. 254. |
| | | 6. The Plan does not comply with section 1123(a)(5) because it does not disclose the identity of the Liquidation Trustee. *See* ¶ 11. | 6. The Chapter 11 Trustee will serve as the Liquidation Trustee. |

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement and the Memorandum, as applicable

| Docket No. | Objecting Party | Summary of Objection | NBK's Response |
|---|---|---|---|
| | | 7. The Plan does not satisfy section 1129(a)(8) because Classes 3, 6, 7 and 8 are deemed to reject. *See* ¶ 12. | 7. The Plan satisfies the cram down requirements even though it does not comply with section 1129(a)(8). Because NBK is the plan proponent, it is presumed that the cram down requirements have been satisfied with respect to NBK's Claim in Class 3.<br><br>NBK is not aware of any Subordinated Claims in Class 7. Therefore, cram down is not issue for such claims. |
| | | 8. The Plan unfairly discriminates against Class 6 insider claims (which include unsecured claims) because they will not receive a distribution in contrast to Holders of similar unsecured claims in Class 5(a) and Class 5(b). *See* ¶ 14. | 8. With respect to Holders of Claims and Interests in Class 6 (Insider Claims), their treatment under the Plan is proper. Class 6 includes parties that arguably hold general unsecured claims, which are likely 'out of the money' and not entitled to receive any distribution. In addition, NBK notes that the Chapter 11 Trustee has objected to and sought disallowance of those claims because they lack any factual or legal basis. *See* ECF No. 403. In addition, it is appropriate to separately classify the Insider Claims as the votes of insiders are not considered under section 1129(a)(10).<br><br>With respect to the Holders of Interests in Class 8 (Interests) it does not unfairly discriminate against equity interest holders to classify them separately from the holders of creditor claims because of their different legal nature and the different facts that give rise to the claims of interest holders and creditors. |
| | | 9. The Plan is not fair and equitable because it seeks to release "valuable assets of the estate" that "consists of claims against NBK. *See* ¶ 15. | 9. NBK and the Chapter 11 Trustee have agreed to settle any and all potential issues relating to NBK and the Plan includes a release of the Estate's Claims, Interests and Causes of Action against NBK. |

| Docket No. | Objecting Party | Summary of Objection | NBK's Response |
|---|---|---|---|
| 409 | Debtor | 1. The Debtor's specific objections to the Plan are identical to 2425 WL's objection. *See* ECF No. 409 at 12-17. | 1. *See* NBK's responses to 2425 WL's objection. |
| 454 | CC2 TX, LLC | 1. The Plan fails to provide for contractual interest accruing from the Petition Date through the date of payment on CC2's senior tax lien claim. | 1. The Confirmation Order is revised to provide for the payment of post-petition statutory interest on tax lien claims through the date of payment |

**Exhibit B**

Proposed Confirmation Order

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **GALLERIA 2425 Owner, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |
| | § | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW,
## AND ORDER CONFIRMING CHAPTER 11 PLAN
## OF LIQUIDATION OF THE DEBTOR BY NATIONAL
## BANK OF KUWAIT, S.A.K.P. NEW YORK BRANCH

WHEREAS, among other things:[1]

a.  on December 5, 2023 (the "Petition Date"), Galleria 2425 Owner, LLC (the "Debtor") commenced the above-captioned case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (this "Court") (collectively, the "Chapter 11 Case");

b.  on February 9, 2024, the Court appointed Christopher R. Murray as Chapter 11 trustee of the Debtor's estate, whose appointment became effective on February 13, 2024 (the "Chapter 11 Trustee") [ECF Nos. 116 and 121]. Upon the Chapter 11 Trustee's appointment, the Debtor's exclusive right to file and try to confirm a plan terminated, and any party in interest, including National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), could file and prosecute confirmation of a Chapter 11 plan. *See* 11 U.S.C. § 1121(c)(1);

c.  on April 10, 2024, NBK filed the *Disclosure Statement for Chapter 11 Plan of Liquidation of the Debtor* (the "Disclosure Statement") and the *Chapter 11 Plan of Liquidation of the Debtor by National Bank of Kuwait S.A.K.P., New York Branch* (the "Plan") [ECF Nos. 194 and 195];

d.  on April 10, 2024, NBK filed the *Motion for Entry of Order (I) Conditionally Approving Disclosure Statement; (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (III) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (IV) Approving*

---

[1]  Capitalized terms used but not defined are defined below or have the meanings ascribed to them in the Plan (as amended modified, and supplemented from time to time) [ECF No. 194], attached as Exhibit A. The rules of interpretation set forth in Article I.C of the Plan shall apply to this Confirmation Order.

the Solicitation Procedures, (V) Approving the Combined Hearing Notice, and (VI) Granting Related Relief [ECF No. 196];

e. on May 3, 2023 the Court entered the *Order and Notice Approving Disclosure Statement; Fixing Time for Filing Objections to Confirmation of Plan; and Fixing Time for Hearing on Confirmation of Plan* [ECF No. 276] (the "Confirmation Hearing Order"), which, among other things, scheduled the confirmation hearing on the Plan for June 7, 2024;

f. on May 6, 2024, NBK began to solicit votes on the Plan by distributing the following materials to Holders of Claims in Class 4, Class 5(a) and Class 5(b) (collectively, the "Voting Classes"): (i) the Plan; (ii) the Disclosure Statement; and (iii) the form ballot to vote on the Plan (the "Ballot," and collectively with the Plan and Disclosure Statement, the "Solicitation Package"); Holders of Claims and Interests in Classes 1, 2, 6, 7 and 8 (the "Non-Voting Classes") only received notice of the Confirmation Hearing, advising them of their non-voting status and the deadline to object to the Plan and inviting them to contact counsel for the Chapter 11 Trustee or NBK to obtain more information.

g. on May 6, 2024, NBK also caused the *Notice of Hearing on Confirmation of the Chapter 11 Plan of Liquidation and Related Objection and Briefing Deadlines* (the "Confirmation Hearing Notice"), which provided a summary of the Plan and included the release, exculpation and injunction provisions thereunder, to be served on all Holders of Claims and Interests in the Debtor, the United States Trustee for Region 7 (the "U.S. Trustee"), and certain other parties in interest, in compliance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules"), and the Confirmation Hearing Order;

h. on May 7, 2024, NBK filed the *Unsworn Declaration of Mailing* of the Solicitation Package and Confirmation Hearing Notice [ECF No. 290] (the "First Service Declaration");

i. on May 14, 2024, NBK caused an amended Confirmation Hearing Notice to be served and filed an *Unsworn Declaration of Mailing* [ECF No. 328], primarily notifying parties that the hearing on confirmation was rescheduled to June 17, 2024 (together with the First Service Declaration, the "Service Declarations");

j. on June 5, 2024, the Solicitation Agent filed the *Ballot Summary* [ECF No. 428] (the "Voting Summary") identifying the number of Ballots received by the Voting Deadline and the Class(es) which voted to accept or reject the Plan;

k. on June [●], 2024, NBK filed the *Notice of Filing Plan Supplement to Chapter 11 Plan of Liquidation of the Debtor* [ECF No. [●]] (the "Plan Supplement"), which included: (i) the Liquidation Analysis; (ii) the Schedule of Retained Causes of Action; and (iii) the Liquidation Trust Agreement;

l. on June 13, 2024, NBK filed the *Memorandum of Law in Support of Confirmation of the Chapter 11 Plan of Liquidation of the Debtor, and Omnibus Reply to Objections Thereto* [ECF No. [●]] (the "Confirmation Brief") and the *Declaration of Michael C. Carter in Support of Confirmation of National Bank of Kuwait, S.A.K.P., New York Branch's Chapter 11 Plan of Liquidation of the Debtor* [ECF No. [●]] (the "Carter Declaration"); and

m. on June 13, 2024, NBK filed the *Proposed Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 11 Plan of Liquidation of the Debtor* [ECF No. [●]] (this "Confirmation Order");

n. on June 13, 2024, 2425 WL, LLC filed the *Emergency Motion To Cancel Confirmation Hearing Due To Plan Proponent's Failure To Comply With Confirmation-Related Service Obligations* (the "Cancellation Hearing Motion") [ECF No. 506];

o. on June 13, 2024, the Court entered an order denying the Cancellation Hearing Motion after finding that notice to the Non-Voting Classes was sufficient [ECF No. 507].

AND WHEREAS, this Court has:

a. set June 3, 2024, at 4:00 p.m. (prevailing Central Time) as the deadline for filing objections to confirmation of the Plan;

b. set June 17, 2024, at 9:00 a.m. (prevailing Central Time) as the date and time for the commencement of the hearing to consider Confirmation of the Plan (the "Confirmation Hearing");

c. reviewed the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Brief, the Voting Summary, the Carter Declaration, and all pleadings, exhibits, statements, responses, comments and any testimony regarding Confirmation of the Plan, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Case;

d. held the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and section 1129 of the Bankruptcy Code;

e. heard the statements, arguments, and objections made by counsel in respect of confirmation of the Plan ("Confirmation");

f. considered all testimony, documents, filings, and other evidence admitted at the Confirmation Hearing;

g. taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and argument presented in this Chapter 11 Case and any related adversary proceedings; and

h. overruled any and all objections to Confirmation and all statement and reservations of rights not consensually resolved or withdrawn, unless otherwise indicated herein.

NOW, THEREFORE, the Court concluding that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation has been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and that the legal and factual bases set forth in the documents filed in support of Confirmation and all evidence proffered or adduced by counsel at the Confirmation Hearing establish just cause for the relief granted herein; and upon the record of and representations made at the Confirmation Hearing; and after due deliberation and good cause appearing to confirm the Plan and grant the relief set forth in this Confirmation Order, this Court hereby makes and issues the following findings of fact and conclusions of law, and orders:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.** **Findings and Conclusions**

1. The findings of fact and conclusions set forth herein and on the record of the Confirmation Hearing constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. If any of the following findings of fact constitute conclusions of law, they are adopted as such, and if any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.** **Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a))**

2. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409, and this Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.

Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). This Court has authority to enter a Final Order determining that the Plan complies with the applicable provisions of the Bankruptcy Code and applicable law and should be approved and confirmed.

**C.     Eligibility for Relief**

3.     The Debtor is an entity eligible for relief under section 109 of the Bankruptcy Code.

**D.     Commencement of the Chapter 11 Case**

4.     On the Petition Date, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Chapter 11 Trustee has been managing the Estate since his appointment became effective on February 13, 2024.

**E.     Judicial Notice**

5.     This Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of this Chapter 11 Case maintained by the Clerk of the Court or its duly appointed agent, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered or adduced at, the hearings held before the Court during the pendency of this Chapter 11 Case, including the Confirmation Hearing. Any resolutions of any objections explained on the record at the Confirmation Hearing are incorporated by reference.

**F.     Objections**

6.     All parties have had a fair opportunity to litigate all issues raised, or that might have been raised, in an objection to Confirmation of the Plan and any unresolved objection, statement, or informal objection related to the Plan or Confirmation are hereby overruled as set forth and stated on the record at the Confirmation Hearing on the merits.

**G.**    **Notice of Transmittal of Solicitation Materials; Adequacy of Solicitation Notices**

7.    The transmittal and service of the Solicitation Package and the Notices of Non-Voting Status, the Confirmation Hearing Notice, and other materials distributed by NBK in connection with Confirmation (collectively, the "Confirmation Materials") were (i) appropriate and satisfactory based upon the circumstances of this Chapter 11 Case, (ii) conducted in good faith, and (iii) in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, any other applicable rules, laws, and regulations, and the Confirmation Hearing Order.

8.    As evidenced by the Service Declarations, NBK provided notice of the Disclosure Statement, the Plan, the release, exculpation, and injunction provisions contained in the Plan, the Confirmation Hearing, the Objection Deadline, and any other applicable bar dates described in the Confirmation Hearing Order to all parties in interest in the Chapter 11 Case.

9.    This notice was adequate, appropriate, sufficient, and satisfactory based upon the circumstances of this Chapter 11 Case and in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, 3019, and 3020(b), and the Local Rules.  Because transmittal and service of the materials identified above in paragraph 8 was timely, adequate and sufficient under the facts and circumstances of this Chapter 11 Case, no other or further notice is necessary or required.

**H.**    **Voting**

10.    On June 5, 2024, the Solicitation Agent filed the Voting Summary, which shows that votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

I.     **Good-Faith Solicitation (11 U.S.C. § 1125)**

11.     Based on the record before the Court in this Chapter 11 Case, NBK and each of its respective agents, representatives, members, principals, officers, directors, employees, advisors, and attorneys have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and therefore are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code because they have complied with the applicable provisions of the Confirmation Hearing Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in connection with all of their respective activities arising out of or relating to (i) the execution and implementation of the Plan (as further amended, modified or supplemented), (iii) their participation in this Chapter 11 Case, and (iv) the activities described in section 1125 of the Bankruptcy Code.

J.     **Voting Summary**

12.     Only the Voting Classes were eligible to vote on the Plan.  The Ballot used to solicit votes to accept or reject the Plan from Holders of Claims in the Voting Classes adequately addressed the particular needs of this Chapter 11 Case and were appropriate for Holders of Claims in the Voting Classes to vote to accept or reject the Plan.  According to the Voting Summary, only the Holder of Claims in Class 4 and Class 5(b) voted to accept the Plan in accordance with sections 1124, 1126 and 1129 of the Bankruptcy Code.

13.     The Non-Voting Classes were not eligible to vote on the Plan because they are unimpaired or impaired Classes of Claims that either will be paid in full or receive nothing under the Plan, and are conclusively presumed to have accepted, or deemed to have rejected, the Plan.

K.     **Solicitation**

14.     The solicitation of votes on the Plan was appropriate and satisfactory based upon the circumstances of this Chapter 11 Case and complied with the Confirmation Hearing Order,

the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable law.  As set forth in the Service Declarations, the Solicitation Package was distributed to the Voting Classes.  Under sections 1126(f) and 1126(g) of the Bankruptcy Code, NBK was not required to solicit votes from the Non-Voting Classes, but NBK did provide notice to the Holders of Claims in the Non-Voting Classes advising them of their status and inviting them to contact counsel for the Chapter 11 Trustee or NBK to obtain more information.  No member of a Non-Voting Class requested any information or additional documentation.

**L.    Plan Supplement**

15.    The filing and notice of the Plan Supplement was proper and in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is or shall be required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into, the Plan.  Subject to the terms of the Plan, NBK may alter, amend, update, or modify the Plan Supplement before the Effective Date.

**M.    Burden of Proof**

16.    NBK has met its burden of proving the elements of Section 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard.

**N.    Bankruptcy Rule 3016**

17.    Bankruptcy Rules 3016(a) and (b) are satisfied because the Plan is dated and identifies NBK as the proponent, and the Disclosure Statement has been filed.

**O.    11 U.S.C. § 1129(a)(1)**

18.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

a.    11 U.S.C. § 1122.  The Plan satisfies section 1122 of the Bankruptcy Code because it provides for the separate classification of Claims and Interests,

8

and each Claim and Interest in each Class is substantially similar to other Claims and Interests in such Class. The classification of Claims and Interests under the Plan is fair, reasonable, and appropriate and was not done for any improper purpose. Valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under the Plan. The classification complies with applicable law and applicable provisions of the Bankruptcy Code.

b.  <u>11 U.S.C. §§ 1123(a)(1)-(3)</u>. The Plan satisfies section 1123(a)(1)-(3) of because Article III of the Plan designates eight Classes of Claims and Interests, specifies the Classes of Claims and Interests that are unimpaired, and specifies the treatment of Claims and Interests that are impaired.

c.  <u>11 U.S.C. § 1123(a)(4)</u>. The Plan satisfies section 1123(a)(4) of the Bankruptcy Code because Article III of the Plan provides for the same treatment of all Claims and Interests within each Class.

d.  <u>11 U.S.C. § 1123(a)(5)</u>. The Plan and the various documents and agreements set forth in the Plan Supplement and described in the Plan provide adequate and proper means for the Plan's implementation. Accordingly, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

e.  <u>11 U.S.C. § 1123(a)(6)</u>. Section 1123(a)(6) of the Bankruptcy Code does not apply because no equity securities will be issued under the Plan.

f.  <u>11 U.S.C. § 1123(a)(7)</u>. The Plan satisfies section 1123(a)(7) of the Bankruptcy Code because the Plan Supplement discloses who will serve as the Liquidation Trustee, and the manner and selection of the trustee is consistent with the Bankruptcy Code and the interests of all creditors and with public policy.

g.  <u>11 U.S.C. § 1123(b)</u>. The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and, therefore, are consistent with section 1123(b) of the Bankruptcy Code.

h.  <u>11 U.S.C. § 1123(b)(1)</u>. As contemplated by section 1123(b)(1) of the Bankruptcy Code, pursuant to the Plan, Class 1 and Class 2 are unimpaired, and Classes 3, 4, 5(a), 5(b), 6, 7 and 8 are impaired.

i.  <u>11 U.S.C. § 1123(b)(2)</u>. Article V of the Plan provides for the automatic rejection of certain Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code or the designation for assumption/assignment (and cure) of any Executory Contracts and Unexpired Leases on the Schedule of Contracts/Leases.

     j.        <u>11 U.S.C. §§ 1123(b)(3)(A)-(B)</u>. Pursuant to sections 1123(b)(3)(A)-(B) of the Bankruptcy Code, Article IX.C and D of the Plan provide for the release and exculpation of certain Claims and Causes of Action owned by the Estate. Article VI.K of the Plan transfers the Causes of Action and Avoidance Actions that have not been released into the Liquidation Trust and allows the Liquidation Trustee to commence, pursue and settle the transferred Causes of Action and Avoidance Actions for the benefit of unsecured creditors.

     k.        <u>11 U.S.C. § 1123(b)(5)-(6)</u>. The Plan's other provisions are appropriate and consistent with the Bankruptcy Code, including provisions relating to: (i) distributions to Holder of Claims, (ii) resolution of Disputed Claims and Interests, (iii) allowance of Claims, (iv) releases by the Estate of the Released Parties, (v) exculpation of certain parties, (vii) the injunction of certain Claims and Causes of Action to implement the discharge, release and exculpation provisions, and (viii) retention of this Court's jurisdiction. The Plan therefore satisfies the requirements of sections 1123(b)(5) and (6) of the Bankruptcy Code.

     l.        <u>11 U.S.C. § 1123(d)</u>. Article V of the Plan and this Confirmation Order provide for the cure and assumption or rejection of the Debtor's executory contracts and unexpired leases. If NBK is the Successful Bidder, all executory contracts and unexpired leases will be deemed rejected. If a party other than NBK is the Successful Bidder, that party will determine which executory contracts and unexpired leases will be assumed or rejected.

## P.    <u>11 U.S.C. § 1129(a)(2)</u>

19.    NBK has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128, and Bankruptcy Rules 3016, 3017, and 3018, except as otherwise provided or permitted by orders of the Court, as required by section 1129(a)(2) of the Bankruptcy Code. Specifically:

     a.        NBK is a proper proponent of the Plan because it is a creditor and party in interest, and it proposed the Plan after the Debtor's exclusive period to propose and confirm a plan terminated as a result of the Chapter 11 Trustee's appointment pursuant to section 1121(c) of the Bankruptcy Code; and

     b.        NBK has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Confirmation Hearing Order in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

**Q.**    **11 U.S.C. § 1129(a)(3)**

20.    The Plan has been proposed in good faith by NBK and not by any means forbidden by law.  The Court has examined the totality of the circumstances surrounding the formulation of the Plan and the evidence submitted in connection with the Confirmation Hearing and the Carter Declaration.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Estate and to effectuate a distribution to creditors.  Thus, the Plan has been proposed in good faith, as such term is used in section 1129(a)(3) of the Bankruptcy Code.

**R.**    **11 U.S.C. § 1129(a)(4)**

21.    Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been or will be disclosed to the Court, and any such payment made before Confirmation is reasonable or is subject to the Court's approval as reasonable if it is to be fixed after Confirmation, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.  For avoidance of doubt, except as provided for in the Plan regarding NBK's Allowed Claims in Classes 3, 4 and 5(b), NBK's costs and expenses incurred in connection with this Chapter 11 Case or proposing the Plan will not be paid from the Estate.

**S.**    **11 U.S.C. § 1129(a)(5)**

22.    The Plan satisfies section 1129(a)(5) of the Bankruptcy Code because NBK has disclosed the identity of the Liquidation Trustee (the current Chapter 11 Trustee) who will administer the Liquidation Trust and its assets and is empowered to exercise all rights and powers of the Estate.  On the Effective Date, all current director and officer positions of the Debtor and the Chapter 11 Trustee's position shall be eliminated and the rights, powers, and duties of Chapter 11 Trustee with respect to the Estate shall vest in the Liquidation Trustee.

**T.      11 U.S.C. § 1129(a)(6)**

23.      Section 1129(a)(6) of the Bankruptcy Code does not apply to this Chapter 11 Case.

**U.      11 U.S.C. § 1129(a)(7)**

24.      As set forth in the Liquidation Analysis in the Plan Supplement, each Holder of an Impaired Claim or Interest has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Estate were to liquidate under chapter 7 of the Bankruptcy Code on such date.  Accordingly, the Plan satisfies the "best interest of the creditors" test under section 1129(a)(7) of the Bankruptcy Code.

**V.      11 U.S.C. § 1129(a)(8)**

25.      Section 1129(a)(8) of the Bankruptcy Code is satisfied.  Holders of Claims in Class 1 and Class 2 are unimpaired by the Plan pursuant to section 1124 of the Bankruptcy Code, and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Claim in Class 5(a) voted with respect to the Plan and so Class 5(a) is disregarded for voting purposes under applicable law.  Holders of Claims and Interests in Classes 3, 6, 7 and 8 are impaired and receiving nothing under the Plan; thus, these Classes are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code (together, "Rejecting Classes").  Holder of Claims in Classes 4 and 5(b) are impaired and voted to accept the Plan.

**W.      11 U.S.C. § 1129(a)(9)**

26.      The treatment of Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Other Priority Claims pursuant to Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**X.**   **11 U.S.C. § 1129(a)(10)**

27.    The Plan satisfies section 1129(a)(10) of the Bankruptcy Code because at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, excluding any acceptances of the Plan by an insider.

**Y.**   **11 U.S.C. § 1129(a)(11)**

28.    The information contained in the Plan Supplement, the Confirmation Brief, and the Carter Declaration, together with the testimony proffered and other testimony adduced at the Confirmation Hearing, establish that the Plan is feasible and that the Liquidation Trustee will have sufficient resources to meet post-confirmation obligations under the Plan.  The feasibility standard of section 1129(a)(11) of the Bankruptcy Code is therefore satisfied.

**Z.**   **11 U.S.C. § 1129(a)(12)**

29.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XI.J of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930(a)(6), together with any interest thereon pursuant to 31 U.S.C. § 3717, as applicable, shall be paid under the Plan for each quarter until this Chapter 11 Case is converted, dismissed, or closed, whichever is earlier.

**AA.**   **11 U.S.C. §§ 1129(a)(13)-(16)**

30.    Sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply to this Chapter 11 Case because the Debtor has no employees to which it owes retiree benefits, does not owe domestic support obligations, is not an individual, and is a moneyed, business, or commercial corporation.  *See* ECF No. 72-8 at 22:24-25 ("The Debtor itself does not have employees.").

**BB.**    <u>11 U.S.C. § 1129(b)</u>

31.    Notwithstanding that the Plan meets the requirements for confirmation under section 1129(a), the Plan can be confirmed under section 1129(b) because NBK demonstrated in the Confirmation Brief and at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. Upon Confirmation and the occurrence of the Effective Date, the Plan shall be binding upon the members of all Classes.

**FF.**    <u>11 U.S.C. § 1129(d)</u>

32.    The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933, and there has been no filing by any governmental unit asserting any such attempted avoidance. Therefore, the Plan satisfies section 1129(d) of the Bankruptcy Code.

**GG.**    <u>11 U.S.C. § 1129(e)</u>

33.    Section 1129(e) of the Bankruptcy Code does not apply because this Chapter 11 Case is not a small business case, as that term is defined in the Bankruptcy Code.

**HH.**    <u>Satisfaction of Confirmation Requirements</u>

34.    Based on the foregoing, the Confirmation Brief, the Carter Declaration and all other pleadings and evidence proffered or adduced at and prior to the Confirmation Hearing, the Plan satisfies all applicable plan confirmation requirements set forth in section 1129 of the Bankruptcy Code.

**JJ.**    <u>Retention of Causes of Action and Avoidance Actions</u>

35.    Other than the Actions released under the Plan, on the Effective Date, any Causes of Action and Avoidance Actions belonging to the Estate against any Person or Entity that was not released by the Estate under the Plan shall be retained by the Liquidation Trust. Notwithstanding any provision in the Plan to the contrary, with respect to the Causes of Action

and Avoidance Actions, the Liquidation Trustee shall pursue, settle or release all retained rights of Action, as appropriate, for the benefit of the creditors entitled to receive distributions from the proceeds of such Action under the Plan. In so doing, Liquidation Trustee shall be vested with the full authority of the Estate with respect to all retained rights of action subject to the terms of this provision. The Liquidation Trustee shall be entitled to settle any such rights of Action without further order of the Court, but shall be entitled to seek such authorization in his or her discretion.

**KK.** **Executory Contracts and Unexpired Leases**

36. Notwithstanding any provision in the Plan to the contrary, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtor are deemed rejected as of the Effective Date, unless otherwise designated by the Chapter 11 Trustee in the Schedule of Contracts/Leases; *provided*, *further*, if a party other than NBK is the Successful Bidder, the Chapter 11 Trustee in cooperation with the Purchaser shall have the right to amend the Schedule of Contracts/Leases up to thirty days (30) after the Effective Date or to delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to this Confirmation Order or to add any Executory Contract or Unexpired Lease, thus providing for its assumption and assignment pursuant to this Confirmation Order and the terms of the Purchase Agreement. Pursuant to Article V of the Plan, if the rejection of Executory Contracts and Unexpired Leases give rise to a Claim for rejection damages in accordance with section 502(g) of the Bankruptcy Code, a Proof of Claim must be filed with the Court and served upon the Chapter 11 Trustee or the Liquidation Trustee, as applicable, on or before the date that is thirty (30) calendar days after the Effective Date.

**LL.** **Discharge, Compromise, Settlement, Release Exculpation and Injunction Provisions**

37.     The Court has jurisdiction under 28 U.S.C. § 1334(a) and (b) to approve the discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article IX of the Plan.  Based on the record of this Chapter 11 Case and the evidence proffered or adduced at the Confirmation Hearing, the Court finds that the discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article IX of the Plan are consistent with sections 105(a) and 1123(b) of the Bankruptcy Code and applicable law.  Further, the discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article IX of the Plan are integral components of the Plan.

38.     The discharge, compromises, settlements, releases, exculpation, and injunctions set forth herein and in Article IX of the Plan are approved and authorized in their entirety.

**MM.** **Retention of Jurisdiction**

39.     Except as otherwise provided in the Plan, the Court shall retain jurisdiction over this Chapter 11 Case and all matters arising out of or related to this Chapter 11 Case and the Plan, including the matters set forth in Article X of the Plan.

**NN.** **Waiver of Stay**

40.     Under the circumstances, it is appropriate to waive the 14-day stay imposed by Bankruptcy Rule 3020(e).

## ORDER

**BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

**A.** **Findings of Fact and Conclusions of Law**

41.     The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute this Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.

**B.    Eligibility for Relief**

42.    The Debtor was and is eligible for relief under section 109 of the Bankruptcy Code.

**C.    Confirmation**

43.    The Plan is confirmed under section 1129 of the Bankruptcy Code. The Plan Supplement is incorporated by reference into, and is an integral part of, the Plan and this Confirmation Order, and is authorized and approved. NBK is authorized to implement and consummate the Plan, including taking all actions necessary or appropriate to effectuate the Plan, without further authorization except as may be required by the Plan or this Confirmation Order.

**D.    Objections**

44.    All objections, responses, reservations, statements, and comments to the Plan, other than those resolved, adjourned, or withdrawn with prejudice prior to, or on the record at, the Confirmation Hearing, are overruled on the merits in all respects. All withdrawn objections, if any, are deemed withdrawn with prejudice. All objections to Confirmation not filed and served prior to the deadline for filing objections to the Plan set forth in the Confirmation Hearing Notice, if any, are deemed waived and will not be considered by the Court.

**E.    Binding Effect**

45.    Effective as of entry of this Confirmation Order and subject to the occurrence of the Effective Date, the Plan, the Plan Supplement, and this Confirmation Order shall bind any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not: (a) the Claim or Interest is impaired under the Plan; (b) such Holder has accepted the Plan; (c) such Holder has failed to vote to accept or reject the Plan or voted to reject the Plan; (d) such Holder is

entitled to a distribution under the Plan; (e) such Holder will receive or retain any property or interests in property under the Plan; and (f) such Holder has filed a Proof of Claim in this Chapter 11 Case. The Plan, the Plan Supplement, and this Confirmation Order constitute legal, valid, binding, and authorized obligations of the respective parties and shall be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Documents, and this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## F.     **Plan Classification Controlling**

46.     The terms of the Plan shall govern the classification of Claims and Interests for purposes of distributions to be made thereunder. The classification set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for the purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on NBK or the Chapter 11 Trustee except for voting purposes.

## G.     **Allowance of Claims**

47.     As provided in Article VII of the Plan, no Claim is or shall be deemed Allowed until the later of the Claims Objection Deadline or the expiration of some other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Court, unless otherwise ordered by a Final Order of the Bankruptcy Court or Allowed pursuant to the Plan.

**H.**     **Effective Date**

48.     Except as otherwise provided herein, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Estate, the Liquidation Trust, and any and all Holders of Claims against or Interests in the Debtor (irrespective of whether their Claims or Interests are presumed to have accepted or deemed to have rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

**I.**     **Distributions**

49.     All distributions pursuant to the Plan shall be made in accordance with Article VII of the Plan, and such methods of distribution are approved.  The Distribution Agent shall have no duty or obligation to make distributions to any Holder of an Allowed Claim unless and until such Holder executes and delivers, in a form acceptable to the Distribution Agent, any and all documents applicable to such distributions in accordance with Article VI of the Plan.

**J.**     **Retained Assets**

50.     Pursuant to Article VI of the Plan, except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b)(3), any claims, Causes of Action, defenses and counterclaims that the Debtor may hold against any Person, shall vest in the Liquidation Trust, and the Liquidation Trustee shall retain and may exclusively enforce any and all such claims, causes of action, defenses and counterclaims.

**K.**     **Treatment of Executory Contracts and Unexpired Leases**

51.     Notwithstanding any provision in the Plan to the contrary, all Executory Contracts and Unexpired Leases are deemed rejected unless (i) described in the Plan as to be assumed in connection with Confirmation, (ii) identified on the Schedule of Contracts/Leases, (iii) subject to a motion by the Chapter 11 Trustee to assume (or assume and assign) as of the Effective Date, and (iv) entered into in connection with the Plan.  Entry of this Confirmation Order shall constitute a Court order approving the rejection of such executory contracts or unexpired leases, as applicable.

**L.**     **Exemption From Transfer Taxes**

52.     To the fullest extent applicable and permitted by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making of delivery of an instrument of transfer, provided under the Plan, from the Estate to NBK or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax or governmental assessment. The appropriate federal, state or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the instruments or other documents as set forth in the Plan without the payment of any such tax or governmental assessment.

**M.**     **Filing and Recording**

53.     This Confirmation Order is, and shall be, binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

54.     Each and every foreign, federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, advisable, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions under the Plan.

**N.     Tax Withholding**

55.     In accordance with the provisions of the Plan and subject to Article VII.G of the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms the Distribution Agent believes is reasonable and appropriate.

**O.     Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests and Controversies**

56.     Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or this Confirmation Order, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been

21

distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest voted to accept or reject the Plan.

57.     This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and all actions taken to effectuate the Plan, including by any agent, shall be given the same effect as if such actions were performed under the applicable nonbankruptcy laws that govern the documents under which such agent was appointed.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019 and without any further notice to or action, order, or approval of the Court, after the Effective Date, the Liquidation Trustee may compromise and settle Claims against, and Interests in, the Debtor and its Estate and Causes of Action against other Entities.

**P.      Releases, Injunction, Exculpation and Related Provisions Under the Plan**

58.     Except to the extent modified by this Confirmation Order, the releases, injunctions, exculpations, and related provisions in Article IX of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order of this Court or any other party.

59.     The injunction provision in Article IX.E of the Plan will be immediately effective on the Effective Date and is (i) within the jurisdiction of this Court; (ii) necessary to preserve and

22

enforce the exculpation provision in Article IX.C of the Plan, the Estate Release in Article IX.D of the Plan, and the compromises and settlements implemented under the Plan; and (iii) are narrowly tailored to achieve these purposes. Notwithstanding any provision in the Plan, including Article IX.C of the Plan and the definition of Exculpated Party contained in Article I.A.39 of the Plan, "Exculpated Parties" shall mean only the Chapter 11 Trustee and any Related Parties of the Chapter 11 Trustee.

**Q.    Post-Confirmation Notice**

60.    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) days after the Effective Date, NBK shall cause a notice of Confirmation and occurrence of the Effective Date, substantially in the form attached as <u>Exhibit B</u> (the "<u>Notice of Confirmation and Effective Date</u>") to be served on all parties served with the Confirmation Hearing Notice by email or U.S. first-class mail, postage prepaid. The Notice of Confirmation and Effective Date will have the effect of an order of the Court, will constitute sufficient notice of entry of this Confirmation Order and occurrence of the Effective Date to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

**R.    Cancellation of Interests**

61.    Pursuant to Article III of the Plan, on the Effective Date, all Interests shall be deemed automatically cancelled and extinguished.

**S.    Distribution Record Date**

62.    The record date for purposes of making distributions under the Plan on account of Allowed Claims shall be the Confirmation Date or such other date as is announced by the Chapter 11 Trustee, the Liquidation Trustee or another designated party in a Final Order.

**T.**     **Ad Valorem Taxes**

63.     Notwithstanding any provision in the Plan to the contrary, on the Effective Date, any claim held by a governmental unit and Caz Creek TX, LLC for *ad valorem* taxes shall be paid statutory interest accruing from the Petition Date until such taxes are paid in full; *provided*, that any and all *ad valorem* statutory tax liens held by a governmental unit and Caz Creek TX, LLC, whether for prepetition or postpetition tax years, shall be retained until the *ad valorem* taxes are paid in full.

**U.**     **Post-Confirmation Sale of Property**

64.     Notwithstanding any provision in the Plan to the contrary, the Bankruptcy Court will consider approval of the sale of the Property post-confirmation and for the sake of a clean record, will enter a separate Final Order with respect to the sale at that time.

**V.**     **Effect of Confirmation Order and Other Orders**

65.     Unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in this Chapter 11 Case.

**W.**     **Inconsistency**

66.     In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in the Plan Supplement or in this Confirmation Order).  In the event of any inconsistency between any of the Plan, Plan Supplement, or the Disclosure Statement on the one hand, and this Confirmation Order on the other hand, this Confirmation Order shall control.

**X.** **Injunctions and Automatic Stay**

67.     Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on this Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order), shall remain in full force and effect through and including the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**Y.** **Authorization to Consummate**

68.     NBK and to the extent required the Chapter 11 Trustee are authorized to consummate the Plan and finalize and implement the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to consummation set forth in Article VIII of the Plan.

**Z.** **Substantial Consummation**

69.     On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**AA.** **Severability**

70.     Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions are mutually dependent and non-severable.  This Confirmation Order constitutes a judicial determination and hereby provides that each term and provision of the Plan are: (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without NBK's consent; and (iii) non-severable and mutually dependent.

**BB.** **Effect of Non-Occurrence of Effective Date**

71.     If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or this Confirmation Order shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtor; (ii) prejudice in any manner the rights of NBK, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by NBK, any Holders of Claims or Interests, or any other Entity in any respect.

**CC.** **Chapter 11 Trustee's Actions Post-Confirmation Through the Effective Date**

72.     Until the Effective Date, the Chapter 11 Trustee shall continue to manage the estate, subject to the Court's oversight as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Confirmation Order and any order of the Court that is in full force and effect.

**DD.** **Reports**

73.     After the Effective Date, the Chater 11 Trustee has no obligation to file with this Court or serve on any parties reports that the Estate was obligated to file under the Bankruptcy Code or a prior order of the Court, including monthly operating reports (except for any periods for which a monthly operating report was not filed before the Confirmation Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided*, *however*, that the Chapter 11 Trustee shall continue to comply with the U.S. Trustee's quarterly reporting requirements.

**EE.** **Conditions to Effective Date**

74.     The Plan shall not become effective unless and until the conditions in Article VIII.B of the Plan have been satisfied or waived pursuant to Article VIII.C of the Plan.

**FF.**     **Waiver of Stay**

75.     Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e) and 6004(h)), this Confirmation Order is effective immediately and not subject to any stay, sufficient cause having been shown.

**GG.**     **Modification of Plan Supplement**

76.     Subject to the terms of the Plan and this Confirmation Order, NBK is authorized to modify and amend the Plan Supplement through and including the Effective Date, and to take all actions necessary and appropriate to effectuate the transactions contemplated therein.

**HH.**     **Post-Confirmation Modification of the Plan**

77.     Subject to the terms of the Plan and this Confirmation Order, NBK is authorized to amend or modify the Plan at any time prior to the substantial consummation of the Plan without further order of this Court, but only in accordance with section 1127 of the Bankruptcy Code and Article XI.H of the Plan.

**II.**     **No Waiver/References to and Omissions of Plan Provisions**

78.     References to articles, sections, documents and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, document or provision nor constitute a waiver thereof, an such article, section, document or provision shall have the same validity, binding effect, and enforceability as every other article, section, document, or provision of the Plan, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**JJ.**     <u>**Reservation of Rights**</u>

79.     The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by NBK with respect to the Plan shall not be deemed to be an admission or waiver of any rights of NBK, the Chapter 11 Trustee, the Liquidation Trustee, or any other Person with respect to Claims against and Interests in the Debtor.

**KK.**     <u>**Final Order**</u>

80. The provisions of Federal Rule of Civil Procedure 62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order. The period in which an appeal with respect to this Confirmation Order must be filed shall commence immediately upon the entry of this Confirmation Order.

**LL.**     <u>**Retention of Jurisdiction**</u>

81. Notwithstanding the entry of this Confirmation Order, from and after the Effective Date, this Court shall retain exclusive jurisdiction over this Chapter 11 Case and all matters arising under, arising out of, or related to, this Chapter 11 Case, including all matters listed in Article XI of the Plan or addressed by this Confirmation Order, as well as for the purposes set forth in section 1142 of the Bankruptcy Code, to the fullest extent legally permissible.

Dated: June __, 2024
       Houston, Texas

                     _____
                     HONORABLE JEFFREY P. NORMAN
                     UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

Chapter 11 Plan of Liquidation of the Debtor
by National Bank of Kuwait, S.A.K.P., New York Branch

[ECF NO. 194]

THE SOLICITATION MATERIALS ACCOMPANYING THE PLAN OF LIQUIDATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). NBK EXPECTS TO SEEK AN ORDER OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF LIQUIDATION PURSUANT TO 11 U.S.C. § 1129.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **GALLERIA 2425 Owner, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |
| | § | |

---

**CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR BY**
**NATIONAL BANK OF KUWAIT S.A.K.P., NEW YORK BRANCH**

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Phone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

*Counsel for National Bank of Kuwait, S.A.K.P., New York Branch*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Andrew M. Troop
Federal Bar No. MA547179
Patrick E. Fitzmaurice (admitted *pro hac vice*)
Kwame O. Akuffo (admitted *pro hac vice*)
31 West 52nd Street
New York, NY 10019
Phone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

# INTRODUCTION

National Bank of Kuwait, S.A.K.P., New York Branch, proposes this Chapter 11 Plan of Liquidation pursuant to the provisions of the United States Bankruptcy Code for the resolution of Debtor's outstanding Claims and Interests. All Holders of Claims and Interests are encouraged to read the Plan and any exhibits or supplements attached hereto, or filed by NBK in conjunction with the Plan, in their entirety before voting to accept or reject the Plan.

As set forth more fully below, the Plan proposes that the Debtor's Property be sold through a public auction run by the Chapter 11 Trustee. Pursuant to the Purchase Agreement, NBK has agreed to purchase the Property through a credit bid in the amount of $18,600,000, subject to any higher and better offers that may be received; NBK reserves the right to increase its credit bid.

In general, the Plan provides that if NBK is the Successful Bidder, NBK will make a Cash contribution to the Estate in an amount sufficient to (i) satisfy in full Other Secured Claims and Other Priority Claims; (ii) pay 70% of the Trade General Unsecured Claims in Cash on or after the Effective Date; and (iii) fund the Liquidation Trust. If NBK is not the Successful Bidder, then the Plan provides that the foregoing sums will be paid out of the third-party Purchase Price with the balance being paid to NBK on account of its secured claim against the Debtor.

Capitalized terms not defined in this Introduction shall have the meanings ascribed to them in Article I of the Plan.

PLEASE READ THE PLAN CAREFULLY WITH RESPECT TO HOW YOUR RIGHTS MAY BE AFFECTED.

# ARTICLE I
## DEFINITIONS AND CONSTRUCTION OF TERMS

### A. Defined Terms

1.    *Action* means Causes of Action and Avoidance Actions.

2.    *Administrative Claim* means any Claim constituting a cost or expense of administration of the Chapter 11 Case under Bankruptcy Code section 503(b) and that is entitled to priority under Bankruptcy Code section 507(a), including, inter alia, any actual and necessary expenses of preserving the estate, and all fees and charges assessed against the bankruptcy estate under Chapter 123 of Title 28, United States Code.

3.    *Affiliate* has the meaning set forth in Bankruptcy Code section 101(2).

4.    *Allowed* means any Claim or Interest: (a) that has been listed in the Debtor's Schedules as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed or with respect to which no objection has been filed; (b) expressly allowed (i) by a stipulation with the Chapter 11 Trustee executed before the Confirmation Date and approved by the Court regarding the amount and nature of such Claim, (ii) by a stipulation with the Liquidation Trustee executed after the Confirmation Date and, if necessary, approved by the Court regarding the amount and nature of such Claim or (iii) in any contract or other agreement

2

entered into or assumed in connection with the Plan; (c) related to a rejected executory contract or unexpired lease that is (i) not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) expressly allowed by a Final Order or pursuant to the Plan.

5.      ***Allowed Claim*** means a Claim that is Allowed.

6.      ***Auction*** means the sale of the Property that was held in accordance with the Sale and Bid Procedures.

7.      ***Avoidance Actions*** means any and all Causes of Action which a trustee, debtor in possession, the Estate or other appropriate party in interest may assert under Bankruptcy Code sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 (other than those which are released or dismissed as part of and pursuant to the Plan) or under other similar or related state or federal statutes or common law, including fraudulent conveyance laws.

8.      ***Bankruptcy Code*** means Title 11 of the United States Code, as amended from time to time.

9.      ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended from time to time and made applicable to the Chapter 11 Case.

10.      ***Broker*** means JLL or other broker engaged by the Chapter 11 Trustee to market the Property.

11.      ***Business Day*** means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

12.      ***Cash*** means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

13.      ***Cash Contribution*** means the Cash contribution set forth in Article VI(C).

14.      ***Cause of Action*** means any and all actions, Claims, rights, defenses, third party claims, damages, executions, demands, crossclaims, counterclaims, suits, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, including, but not limited to, the Avoidance Actions.

15.      ***Chapter 11 Case*** means the chapter 11 case filed by the Debtor on the Petition Date.

16.      ***Chapter 11 Trustee*** means Christopher R. Murray, solely in his capacity as such.

17.      ***Claim*** has the meaning set forth in Bankruptcy Code section 101(5).

18.      ***Claims Objection Deadline*** means the deadline for objecting to filed Proofs of Claims or scheduled claims, which shall be the sixtieth (60) day following the later of (a) the

Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, as the same may be extended by time to time in accordance with Article VII(D).

19. **Claimant** means the Holder of a Claim.

20. **Class** means a category of Holders of Claims or Interests as classified in the Plan.

21. **Confirmation Date** means the date on which the Court enters the Confirmation Order.

22. **Confirmation Hearing** means the hearing at which the Court will consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

23. **Confirmation Order** means the order of the Court confirming the Plan.

24. **Court** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or in the event such court ceases to exercise jurisdiction over the Chapter 11 Case, such court as may have jurisdiction with respect to the liquidation of Debtor under Chapter 11 of the Bankruptcy Code.

25. **Cure Costs** means the payment of Cash by the Purchaser necessary to cure a default of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(b).

26. **Debtor** means Galleria 2425 Owner, LLC.

27. **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest: (a) has been withdrawn by agreement of the Debtor and the Holder thereof; (b) has been withdrawn by the Holder thereof; (c) has been disallowed by Final Order; or (d) specified in a provision of the Plan not to be Allowed.

28. **Disallowed Claim** means a Claim, or any portion thereof, that is Disallowed.

29. **Disclosure Statement** means the disclosure statement for the Plan, as the Disclosure Statement may be amended, supplemented or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and applicable law.

30. **Disputed** means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

31. **Disputed Claim** means a Claim, or any portion thereof, that is Disputed. Under the Plan, a Claim that has been neither Allowed nor Disallowed shall be considered a Disputed Claim.

32. **Distribution** means a distribution of Cash from the Liquidation Trustee on account of an Allowed Claim.

33. **Distribution Account Claims** has the meaning set forth in Article VI(E).

34. ***Distribution Agent*** means the Liquidation Trustee who shall make Distributions and transfers in accordance with the Plan.

35. ***Effective Date*** means the first Business Day following the date on which all conditions to consummation set forth in Article VIII(B) have been satisfied or waived pursuant to Article VIII(C).

36. ***Entity*** has the meaning set forth in Bankruptcy Code section 101(15).

37. ***Estate*** means the estate of the Debtor as defined in section 541 of the Bankruptcy Code.

38. ***Estate Assets*** means all legal or equitable interests as defined in Bankruptcy Code section 541 or the Plan belonging to the Estate.

39. ***Exculpated Party*** means: (a) the Chapter 11 Trustee; (b) NBK; (c) the Liquidation Trustee; (d) the Distribution Agent; (e) the Purchaser; (f) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (g) each Related Party of each Entity in clause (a) through this clause (g).

40. ***Final Decree*** means the decree contemplated under Bankruptcy Rule 3022.

41. ***Final Order*** means an order or judgment of the Court as entered on the docket in the Chapter 11 Case, or other court of competent jurisdiction, the operation or effect of which has not been stayed, reversed or amended, and as to which order or judgment (or any reversal, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order, shall not cause an order not to be a Final Order.

42. ***General Unsecured Claim*** means an Unsecured Claim which is not entitled to priority under the Bankruptcy Code, including the NBK Deficiency Claim.

43. ***Holder*** means a Person or an Entity holding a Claim against or an Interest in the Debtor.

44. ***Impaired*** means, with respect to a Claim or Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

45. ***Insider*** has the meaning set forth in section 101(31) of the Bankruptcy Code.

46. ***Insider Claims*** means Claims that are held by Insiders. For the avoidance of doubt, the Insider Claims include the following:

| Reference | Claimant | C, D, UL | Est. Claim |
|-----------|----------|----------|------------|
| POC No. 7 | 2425 WL, LLC | - | $22,968,231.58 |
| POC No. 21 | Ali Choudhri | - | $4,176,657.46 |
| POC No. 22 | Ali Choudhri | - | $1,844,500.45 |
| POC No. 20 | Jetall Companies Inc. | | $3,180,223.30 |
| POC No. 23 | Jetall Capital, LLC | - | $1,699,750.00 |
| | | TOTAL: | $33,869,362.79 |

47.  **Interest** means any equity security (as defined in Bankruptcy Code section 101(16)) of Debtor, including, *inter alia*, any rights arising from the issued and outstanding membership interest or the right to purchase membership interest in Debtor.

48.  **JLL** means Jones Lang LaSalle.

49.  **Lien** has the meaning set forth in Bankruptcy Code section 101(37), and, with respect to any asset, includes, *inter alia*, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

50.  **Liquidation Trust** means the trust established under Article VI.

51.  **Liquidation Trust Agreement** means the agreement to be executed among the Liquidation Trustee and the Chapter 11 Trustee establishing the Liquidation Trust.

52.  **Liquidation Trust Assets** means any and all assets of the Liquidation Trust.

53.  **Liquidation Trust Fund** means the Remaining Cash transferred to the Liquidation Trust and any other proceeds of the Liquidation Trust Assets.

54.  **Liquidation Trustee** means the trustee of the Liquidation Trust.

55.  **NBK** means National Bank of Kuwait, S.A.K.P., a banking corporation organized under the laws of Kuwait, acting through its New York branch.

56.  **NBK Deficiency Claim** means the Claim of NBK set forth in Article III(B)(g).

57.  **NBK Tax Claim** means the Claim of NBK in the aggregate amount of $1,696,384.85 for tax liens imposed against the Property for years 2019 and 2020 pursuant to the Texas Property Tax Code, which liens have been assigned to NBK under that certain confidential settlement agreement, dated August 22, 2022.

58.  **Objection Deadline** means the deadline to object to any of: (a) the proposed Cure Costs set forth in the Schedule of Contracts/Leases; (b) the proposed assumption and assignment of any executory contract or unexpired lease; and (c) the proposed sale of the Property pursuant to

the Sale and Bid Procedures. The Objection Deadline shall be set forth in the notice of Auction (as defined in the Sale and Bid Procedures Final Order).

59. **_Other Priority Claim_** means any Claim against the Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, excluding Administrative Claims, Professional Fee Claims, Priority Tax Claims or any Claim asserted by an Insider, Affiliate of the Debtor or Related Party to the Debtor.

60. **_Other Secured Claim_** means any Secured Claim against the Debtor, including a Claim of a governmental unit for the payment of _ad valorem_ real property taxes that is secured by property of the Estate. For avoidance of doubt, Other Secured Claim does not include the NBK Secured Claim or any Secured Claim asserted by an Insider.

61. **_Other General Unsecured Claim_** means any Unsecured Claim against the Debtor that is not a Trade General Unsecured Claim, an Insider Claim, or a Subordinated Claim.

62. **_Person_** has the meaning set forth in section 101(41) of the Bankruptcy Code.

63. **_Petition Date_** means December 5, 2023, the date of filing of the Chapter 11 Case.

64. **_Plan_** means this Chapter 11 Plan of Liquidation with respect to the Debtor, as amended, modified, or supplemented from time to time, together with all addenda, exhibits, schedules, supplements or other attachments.

65. **_Plan Supplement_** means any supplement to this Plan that is filed with the Court prior to the Confirmation Hearing.

66. **_Purchaser_** means the buyer of the Property under the Purchase Agreement.

67. **_Purchase Agreement_** means that certain Asset Purchase Agreement dated as of April 10, 2024, as it may be modified or amended, by and among the Chapter 11 Trustee, as seller, and NBK, as stalking horse bidder or other buyer, which provides for the sale of the Property, and any schedules, exhibits or other documents attached thereto or contemplated thereby, in each case as amended from time to time in accordance with their terms.

68. **_Purchase Price_** has the meaning given to it in the Purchase Agreement.

69. **_Priority Claim_** means any Claim entitled to priority in payment pursuant to Bankruptcy Code section 507(a), excluding Administrative Claims or Priority Tax Claims.

70. **_Priority Tax Claim_** means any Claim entitled to priority in payment pursuant to Bankruptcy Code sections 502(i) and 507(a)(8).

71. **_Property_** means that certain real property located at 2425 West Loop South, Houston, Texas 77027.

72. **_Pro-Rata Share_** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

73. **Professional** means any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code sections 327, 328 or 1103 or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code section 503(b)(4).

74. **Professional Fee Claim** means a Claim by a Professional seeking an award by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Bankruptcy Code sections 330 or 331.

75. **Proof of Claim** means a proof of Claim filed against the Debtor.

76. **Quarterly Fees** means fees payable to the U.S. Trustee.

77. **Related Party** means with respect to a Person, that Person's current and former, direct or indirect, directors, members, managers, officers, control persons, equity holders, partners, participants, managed accounts or funds, fund advisors or managers, investment managers, management companies, affiliates, predecessors, successors, assigns, subsidiaries, principals, employees, agents, trustees, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors, but does not include the Chapter 11 Trustee or Professionals employed by the Chapter 11 Trustee.

78. **Released Parties** means (a) the Chapter 11 Trustee; (b) NBK; (c) the Liquidation Trustee, and (d) each Related Party of each Entity in clause (a) through this clause (d). For avoidance of doubt, the Debtor, its current and former equity holders and their Affiliates and Related Parties are not Released Parties.

79. **Releasing Parties** means, collectively, and in each case solely in their capacity as such, each of the Released Parties.

80. **Remaining Cash** means the Cash transferred to the Liquidation Trust in accordance with Article VI(E).

81. **Sale** means the sale of the Property under the Sale and Bid Procedures.

82. **Sale and Bid Procedures** means the Final Order setting forth the requirements of a qualifying bidder and the manner in which bidding will occur at the Auction.

83. **Schedules** means, collectively, the (a) schedules of assets and liabilities and (b) statements of financial affairs filed pursuant to section 521 of the Bankruptcy Code filed at docket number 70 in the Chapter 11 Case.

84. **Schedule of Contracts/Leases** means the schedule of executory contracts and unexpired leases assumed by the Debtor and to be assigned to the Purchaser in connection with the Purchase Agreement, which schedule shall be an attachment to the Purchase Agreement.

85. **Secured Claim** means: (a) any Claim that is secured by a Lien on property in which the Estate has an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under Bankruptcy Code section 553, to

the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a); and (b) any Claim which is Allowed under the Plan as a Secured Claim.

86.     ***Subordinated Claims*** means any Claim that is not a Class 1, 2, 3, 4, 5 or 6 Claim/that is the Other Secured Claims, Priority Claims, the NBK Tax Claim, NBK Secured Claim, Trade General Unsecured Claims and Other General Unsecured Claims.

87.     ***Successful Bid*** means the offer accepted for the Property in accordance with the Sale and Bid Procedures.

88.     ***Successful Bidder*** means the Qualifying Bidder who makes the Successful Bid.

89.     ***Trade General Unsecured Claims*** means any Claim against the Debtor for goods and repair, maintenance, and utility services provided to the Debtor prior to the Petition Date by a party other than the Debtor, an Affiliate of the Debtor, or a Related Party to the Debtor.  For the avoidance of doubt, the Trade General Unsecured Claims include the following (subject to being Allowed pursuant to the procedures set forth in this Plan):

| Reference | Claimant | C, D, UL | Est. Claim |
|---|---|---|---|
| Sch. 3.2 | ADT | - | $1,487.00 |
| Sch. 3.4 | Ash Automated Control Systems, LLC | - | $1,548.31 |
| Sch. 3.5 | CFI Mechanical | - | $668.44 |
| POC No. 8 | Cirro Electric | - | $62,405.41 |
| Sch. 3.7 | City of Houston Water | - | $6,126.00 |
| Sch. 3.8 | CNA Insurance Co. | - | $0.00 |
| Sch. 3.9 | Comcast | - | $300.00 |
| Sch. 3.10 | Datawatch Systems | - | $22,900.00 |
| Sch. 3.11 | Environmental Coalition Inc. | D, UL | $800.00 |
| Sch. 3.12 | Ferguson Facilities Supplies | - | $2,001.00 |
| Sch. 3.13 | Firetron | - | $30,000.00 |
| Sch. 3.14 | First Insurance Funding | - | $5,507.36 |
| Sch. 3.17 | HNB Construction | D, UL | $84,853.00 |
| Sch. 3.19 | Kings 111 Emergency Communications | - | $315.00 |
| Sch. 3.21 | Logix Fiber Networks | - | $323.42 |
| Sch. 3.22 | Mueller Water Treatment | - | $950.00 |
| Sch. 3.23 | Nationwide Security | - | $32,549.70 |
| Sch. 3.25 | Smart Office Solutions | - | $1,877.00 |
| Sch. 3.26 | T&R Mechanical | - | $4,216.34 |

9

| Sch. 3.27 | TKE (TK Elevator Corporation) | - | $76,935.00 |
| Sch. 3.28 | Waste Management | - | $456.00 |
| Sch. 3.29 | Zindler Cleaning Service Co. | - | $4,221.00 |
| | | TOTAL: | $340,439.98 |

90. **_Transferred Actions_** means all Actions of the Estate other than Causes of Action and Avoidance Actions released, enjoined or exculpated under the Plan. All such Transferred Actions will be transferred to the Liquidation Trust on the Effective Date.

91. **_Unclaimed Property_** means any distribution of Cash or any other property made to the Holder of an Allowed Claim pursuant to the Plan that is returned to the Debtor, the Distribution Agent, or the Liquidation Trustee as undeliverable and no appropriate forwarding address is received prior to the date on which the Final Decree is entered in the Chapter 11 Case.

92. **_Unimpaired_** means a Claim that is not Impaired within the meaning of Bankruptcy Code section 1124.

93. **_Unsecured Claim_** means a Claim that is not a Secured Claim, other than Administrative Claims, Other Secured Claims, Priority Tax Claims, and Professional Fee Claims.

94. **_U.S. Trustee_** means the United States Trustee for Region 7.

**B.** **Exhibits and Schedules.** All exhibits and schedules to the Plan are incorporated into and are a part of the Plan.

**C.** **Rules of Interpretation and Construction.** For purposes of the Plan, (a) any reference in the Plan to an existing document or exhibit filed or to be filed means that document or exhibit as it may have been or may be amended, modified, or supplemented; (b) unless otherwise specified, all references in the Plan to sections, articles, and exhibits are references to sections, articles, or exhibits to the Plan; (c) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety and not to any particular portion of the Plan; (d) captions and headings contained in the Plan are inserted for convenience and reference only, and are not intended to be part of or to affect the interpretation of the Plan; (e) wherever appropriate from the context, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and neutral gender; and (f) the rules of construction outlined in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply to the Plan. In addition, unless otherwise indicated herein, (i) all references to dollars are to United States dollars and (ii) all amounts set forth in the Plan, including, inter alia, with respect to shares, dollar amounts and percentages, shall be subject to rounding and other immaterial changes.

**ARTICLE II**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

**A.** **Allowed Administrative Claims.** Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, the Holders of Allowed Administrative

Claims will receive Cash equal to the unpaid portion of such Allowed Administrative Claim on the later of the (a) the Effective Date, (b) the date on which said Entity becomes a holder of such Allowed Administrative Claim, or (c) such date as such Entity may agree to with the Chapter 11 Trustee or Liquidation Trustee; *provided*, *however*, that Administrative Claims representing liabilities incurred in the ordinary course of business by the Estate or liabilities arising under other obligations incurred by the Estate whether or not incurred in the ordinary course of business, shall be paid by the Estate in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such transactions.

 **B.** **Administrative Claims Bar Date.** Notwithstanding Bankruptcy Code section 503(a), any person seeking payment of an asserted Administrative Claim under Bankruptcy Code section 503, other than a governmental unit seeking payment of an expense under sections 503(b)(1)(B) or (C), that was incurred on or before the Effective Date but which has not been paid as of the Effective Date, shall be required to file an application for the allowance of final payment of said claim on or before forty-five (45) calendar days after the Effective Date, and any such claim not filed by that date shall be forever barred and discharged. The provisions of this Article II shall apply to any Professional applying for the allowance and payment of a Professional Fee Claim.

 **C.** **Allowed Priority Tax Claims.** Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the Chapter 11 Trustee or Liquidation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim will, in full and final satisfaction of that portion of its Allowed Priority Tax Claim that is due and payable on the Effective Date, either (i) receive Cash equal to the amount of such Allowed Claim on or after the Effective Date or (ii) otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

 Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with Bankruptcy Code section 1122. A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### A. Summary of Classification

 Below is a summary of the classification of Claims against and Interests in the Debtor:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | NBK Tax Claim | Impaired | Deemed to Reject |
| 4 | NBK Secured Claim | Impaired | Entitled to Vote |
| 5(a) | Trade General Unsecured Claims | Impaired | Entitled to Vote |
| 5(b) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Insider Claims | Impaired | Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Interests | Impaired | Deemed to Reject |

**B. Treatment of Classes of Claims and Interests**

    **a.**    **Unclassified Claims.** Administrative Claims and Priority Tax Claims are treated in accordance with Article II and Bankruptcy Code sections 1129(a)(9)(A) and 1129(a)(9)(C), respectively. Such Claims are Unimpaired under the Plan and, in accordance with section 1123(a)(1) of the Bankruptcy Code, are not designated as Classes of Claims for purposes of this Plan or sections 1123, 1124, 1126 and 1129 of the Bankruptcy Code.

    **b.**    **Class 1: Other Secured Claims.** On or after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to the Allowed amount of such Claim or, at the discretion of the Liquidation Trustee, shall be given the property securing its claim in full satisfaction of that claim.

    **c.**    **Class 2: Other Priority Claims.** On or after the Effective Date, each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to the Allowed amount of such Claim.

    **d.**    **Class 3: NBK Tax Claim.** The NBK Tax Claim shall be Allowed in an amount equal to $1,696,384.85. If NBK is not the Purchaser of the Property, on or after the Effective Date, NBK shall receive Cash in an amount equal to the Allowed amount of the NBK Tax Claim. NBK shall not receive a distribution on account of the NBK Tax Claim if it is the Purchaser of the Property.

    **e.**    **Class 4: NBK Secured Claim.** The NBK Secured Claim shall be Allowed in an amount equal to: (a) $18,600,000 (which is the appraised value of the Property according to the most recent appraisal obtained by NBK); or (b) any other amount established at the Auction as determined by the Successful Bid. If NBK is not the Purchaser of the Property, on or after the Effective Date, NBK shall receive in full and final satisfaction of the NBK Secured Claim: (x) the Remaining Cash and (y) any excess proceeds after payment of the Distribution Account Claims. NBK shall not receive a distribution on account of the NBK Secured Claim if it is the Purchaser of the Property

    **f.**    **Class 5(a): Trade General Unsecured Claims.** Each Holder of a Trade General Unsecured Claim shall receive in full and final satisfaction of such Claim (x) Cash equal to 70% of the Allowed amount of such Claim, and (y) a *Pro-Rata* Share of the Liquidation Trust Assets.

    **g.**    **Class 5(b): Other General Unsecured Claims.** Each Holder of an Other General Unsecured Claim shall receive in full and final satisfaction of such Claim, a *Pro-Rata* Share of the Liquidation Trust Assets; *provided*, *however*, NBK shall be deemed to have an Other General Unsecured Claim equal to 90% of the Allowed amount of the NBK Deficiency Claim as determined by the Successful Bid and in accordance with section 506 of the Bankruptcy Code. The NBK Deficiency Claim shall not be subject to objection, disallowance, offset, reduction or subordination.

    **h.**    **Class 6: Insider Claims.** On the Effective Date, all Insider Claims shall be canceled and extinguished. Holders of Class 6 Insider Claims shall not receive or retain any property under the Plan on account of such Claims.

**i.      Class 7: Subordinated Claims.** On the Effective Date, all Subordinated Claims shall be canceled and extinguished, and Holders of such Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims against the Debtor.

**j.      Class 8: Interests.** On the Effective Date, all Interests in the Debtor shall be canceled and extinguished, and holders of such Interests shall not receive or retain any property under the Plan on account of such Interests in the Debtor.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan, and therefore are conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.

**B.      Impaired Classes of Claims Entitled to Vote.** Holders of Claims in Classes 4, 5(a) and 5(b) are Impaired and are entitled to vote to accept or reject the Plan.

**C.      Classes Deemed to Reject the Plan.** Holders of Claims in Classes 3, 6 and 7 and Holders of Interests in Class 8 are not entitled to receive or retain any property under the Plan. Under Bankruptcy Code section 1126(g), Holders of Claims in Classes 6 and 7, and Holders of Interests in Class 8 are deemed to reject the Plan, and therefore their votes will not be solicited.

**D.      Acceptance of Impaired Class.** Pursuant to Bankruptcy Code section 1126(c), an Impaired Class of Claims shall have accepted the Plan if it is accepted by Holders of at least two-thirds (2/3) in dollar amount and one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

**E.      Cramdown.** If all applicable requirements for confirmation of this Plan are met as set forth in Bankruptcy Code section 1129(a)(1) through (16) except subsection (a)(8) thereof, NBK intends to request confirmation of this Plan in accordance with Bankruptcy Code section 1129(b), notwithstanding the failure to satisfy the requirements of section 1129(a)(8).

## ARTICLE V
## EXECUTORY CONTRACTS AND LEASES

**A.      Executory Contracts and Unexpired Leases.** Except as otherwise provided herein, on the Effective Date, each executory contract and unexpired lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease: (i) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, (ii) is identified on the Schedule of Contracts/Leases; (iii) is subject to a motion filed by the Chapter 11 Trustee to assume (or assume and assign) such unexpired lease or executory contract as of the Effective Date; or (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; *provided*, *however*, that NBK as plan proponent in cooperation with the Purchaser shall have the right to amend the Schedule of Contracts/Leases up to thirty days (30) after the Effective Date or by any other means approved by the Court or to

delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant to this Article V or to add any executory contract or unexpired lease, thus providing for its assumption and assignment pursuant to this Article V and the terms of the Purchase Agreement. Such rejection or assumption and assignment shall be effective upon the filing and serving of a final version of the Schedule of Contracts/Leases, which final Contract/Lease Schedule shall be filed and served no later than thirty days (30) after the Effective Date.

       **B.**    **Assumption of Executory Contracts and Unexpired Leases.** Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code section 365(a), of the assumption of the executory contracts and unexpired leases assumed as of the Effective Date.

       **C.**    **Rejection Claims.** If the rejection of an executory contract or unexpired lease pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or any property to be distributed under the Plan, unless a proof of claim is filed with the Court and served upon the Trustee or the Liquidation Trustee, as applicable, on or before the date that is thirty (30) calendar days after the Effective Date.

       **D.**    **Cure of Defaults for Assumed Contracts and Leases.** The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Purchase Agreement, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases filed by the Objection Deadline, if any, shall be governed by the terms and conditions of the Sale and Bid Procedures Final Order and other orders of the Court. All such Cure Costs shall be satisfied by the Purchaser.

## ARTICLE VI
## MEANS OF IMPLEMENTATION OF THE PLAN

       **A.**    **Sale of Property.** The Confirmation Order shall authorize the consummation of the Sale pursuant to Bankruptcy Code sections 363, 365, 1123(a)(5), 1123(b)(4), 1129(b)(2)(A), 1141(c) and 1146(a) under the terms and conditions of the Purchase Agreement free and clear of any Claims, Liens, Interests, encumbrances, executory contracts or unexpired leases of real or personal property other than Assumed Liabilities or Contracts as defined in the Purchase Agreement. Any Sale conducted via the Auction shall be conducted in accordance with applicable orders of the Court, including, without limitation, the Sale and Bid Procedures (prior to entry of the Confirmation Order). Upon Confirmation, the Chapter 11 Trustee shall be authorized and directed to take any action necessary to consummate the Sale.

       **B.**    **Management of Property.** Upon entry of the Confirmation Order, JLL shall continue to manage the Property and pay any expenses associated with the Property until such time as the Sale is consummated pursuant to the Purchase Agreement.

       **C.**    **Cash Contribution.** If NBK is the Successful Bidder, on or after the Effective Date, NBK shall contribute Cash to the Estate in the amounts necessary for the following (the "**Cash Contribution**"): (i) payment of the Distribution Account Claims in full; (ii) initial funding

of the Liquidation Trust in the amount of $150,000.00; and (iii) payment of $238,307.99 to Trade General Unsecured Claims, as provided for in Article III(B)(f).

**D.      Dissolution of Debtor.** The Debtor shall be dissolved effective upon filing a certificate of dissolution (or its equivalent) with the secretary of state or similar official jurisdiction of organization of the Debtor after the Effective Date. Any such certificates shall be executed for Debtor by the Liquidation Trustee. On the Effective Date, each of the managers and any other officers or directors of the Debtor shall be deemed to have resigned from all of their respective positions. No separate vote or authorization shall be required to cause or show the authority for the Debtor to be dissolved.

**E.      Distribution Account.** A Distribution Account shall be established to receive any proceeds of the Sale and/or Cash Contribution.  If NBK is not the Purchaser of the Property, on or after the Effective Date, the Distribution Agent shall receive the proceeds of the Sale and: (a) make distributions from the Distribution Account to Holders of Allowed Administrative Claims (including any commission for the Broker), Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, the NBK Tax Claim, and the NBK Secured Claim in accordance with the Plan (collectively, the "**Distribution Account Claims**"); and (b) transfer the Remaining Cash to the Liquidation Trust; *provided*, *however*, if NBK is the Purchaser of the Property, the Distribution Agent shall receive the Cash Contribution and make distributions to all other Holders of the Distribution Account Claims, except the Holder of the NBK Tax Claim. The Liquidation Trustee shall be authorized to hold and control a Distribution Account for the purpose of administering and resolving Disputed Administrative Claims and distributing Cash to Holders of Administrative Claims if and when they become Allowed after the Administrative Claims bar date approved by the Court.

**F.      Liquidation Trust.** Except as otherwise provided for herein, the Liquidation Trust shall be established on the Effective Date and shall on or after the Effective Date receive: (a) the Liquidation Trust Fund; (b) the Transferred Actions; and (c) any other assets conveyed to the Liquidation Trust under the Plan, all of which assets shall vest in the Liquidation Trust on the Effective Date free and clear of all Claims, encumbrances and Interests in accordance with section 1141 of the Bankruptcy Code. The Liquidation Trust shall be the representative of the Estate pursuant to section 1123(b)(3) of the Bankruptcy Code.

**G.      Liquidation Trustee Powers and Duties.** The Liquidation Trustee shall administer the Liquidation Trust and its assets in accordance with this Plan and the Liquidation Trust Agreement, and shall be responsible for, among other things, as Distribution Agent, making distributions required under this Plan.  From and after the Effective Date and continuing through the date of entry of a Final Decree, the Liquidation Trustee shall: (a) have and be entitled to exercise all rights and powers of the Debtor and the Estate, including but not limited to those provided for in the Bankruptcy Code, including section 1107 thereof; (b) possess all rights and powers granted in the Liquidation Trust Agreement, including the authority to direct the affairs of, and dissolve, the Debtor (and all bylaws, articles or certificates of incorporation, and related corporate documents are deemed amended by this Plan to permit and authorize such appointment); (c) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Court or other courts,

(ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Court; (d) have the authority to act as and for the Debtor in all adversary proceedings and contested matters pending in the Court and in all actions and proceedings pending elsewhere; (e) have the power to prosecute, compromise and settle the Transferred Actions; (f) have the right to object to Claims; (g) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Court; and (h) borrow money for such purposes as financing the costs of prosecuting the Transferred Actions, on terms and conditions it deems appropriate, upon Court approval after notice and hearing. Professionals and personnel retained or employed by the Liquidation Trust or the Liquidation Trustee need not be disinterested as that term is defined in the Bankruptcy Code.

      **H.**    **Dissolution of Liquidation Trust.**   The Liquidation Trust shall be discharged or dissolved as set forth in the Liquidation Trust Agreement.

      **I.**    **Application of Sale Proceeds and Powers of Purchaser.**   In accordance with the Plan and the Purchase Agreement, the Purchaser or the Chapter 11 Trustee, as applicable, shall, among other things: (a) deliver the proceeds of the Sale to the Distribution Agent to (i) satisfy Allowed Distribution Account Claims and (ii) fund the Liquidation Trust; (b) satisfy all costs to cure and provide adequate assurance of performance with respect to all executory contracts and unexpired leases assumed and assigned to Purchaser; and (c) direct the distribution of the Remaining Cash, if necessary.

      **J.**    **Transfer of Excluded Assets.** On the Effective Date, the Debtor or Chapter 11 Trustee, as applicable, shall transfer to the Liquidation Trust for Holders of Claims in Classes 4, 5(a) and 5(b), the Transferred Actions and those Excluded Assets (as defined in the Purchase Agreement) not otherwise provided in the Plan.

      **K.**    **Causes of Action and Avoidance Actions.** Other than Causes of Action and Avoidance Actions released, enjoined or exculpated under Article IX, all Causes of Action and Avoidance Actions shall automatically be transferred to and become property of the Liquidation Trust. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Liquidation Trustee (as a representative of the Estate) will have the right to retain, enforce and prosecute such Transferred Actions against any Person, Entity, Affiliate or Insider of the Debtor, that arose before the Effective Date. The Debtor shall provide to the Liquidation Trustee copies of all its books and records as may be necessary, in the Liquidation Trustee's reasonable discretion, to identify, analyze and prosecute such Transferred Actions.

<div align="center">

**ARTICLE VII**
**CLAIMS AND DISTRIBUTIONS**

</div>

      **A.**    **Distribution Agent.** On the Effective Date, the Liquidation Trustee shall serve as Distribution Agent for all Distributions required under the Plan.

**B.    Time and Manner of Distributions.** Except as set forth herein or ordered by the Court, on the Effective Date, the Liquidation Trustee shall establish deposit and reserve accounts for the Holders of Allowed Claims to make payments to such Holders in accordance with this Plan. All Distributions to be made or otherwise reserved pursuant to this Plan shall be held by the Liquidation Trust in trust in such accounts for Holders of Allowed Claims entitled to receive Distributions.

**C.    Delivery of Distributions.** Distributions to be made to Holders of Allowed Claims shall be made at (a) the address of each Holder as set forth in the Schedules filed with the Court unless superseded by the address set forth on proof(s) of Claim filed by such Holder, or (b) the last known address of such Holder if no proof of Claim is filed and if the Chapter 11 Trustee or the Liquidation Trustee has been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Liquidation Trust may, in its discretion, make such efforts to determine the current address of the Holder of the Claim or Interest with respect to which the Distribution was made as the Liquidation Trust deems appropriate, but no Distribution to any Holder shall be made unless and until the Liquidation Trust has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest. Amounts in respect of any undeliverable Distributions made through or by the Liquidation Trust shall be returned and held in trust by, the Liquidation Trust until such Distributions are claimed or are deemed to be Unclaimed Property under section 347(b) of the Bankruptcy Code or otherwise distributed as set forth herein.

**D.    Claims Objection.** The Liquidation Trustee shall file, prosecute, litigate, settle or withdraw objections to any Claim. Objections to claims shall be filed by the Claims Objection Deadline unless extended by the Court or agreement with the holder of a Claim. No party in interest, including the Debtor, shall have the authority to file, prosecute, litigate, settle or withdraw objections to any Claim.

**E.    Claims Estimation.** The Liquidation Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c); *provided*, *however*, that the Court shall determine (a) whether such Disputed Claim is subject to estimation pursuant to Bankruptcy Code section 502(c) and (b) the timing and procedures for such estimation proceedings, if any.

**F.    Disputed Claims Reserves.** On and after the Effective Date, the Liquidation Trustee may establish and maintain reserves for all Disputed Claims. For purposes of establishing a reserve, Cash will be set aside in the applicable deposit account equal to the amount that would have been distributed to the Holders of Disputed Claims in such Class had their Disputed Claims been deemed Allowed Claims on the Effective Date, or such other amount as may be approved by the Court upon motion of the Liquidation Trustee. If any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor shall be distributed by the Liquidation Trustee to the Claimant. The balance of such Cash, if any, remaining after all Disputed Claims have been resolved, shall be distributed by the Liquidation Trustee to Holders of Allowed Claims in Classes 4, 5(a) and 5(b) on account of their *Pro-Rata* Share of such amount. No Distributions shall be made with respect to a Claim that is a Disputed Claim pending resolution of the dispute by Final Order.

G. **Withholding Taxes.** Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions hereunder. All Persons holding Claims shall have an affirmative duty and be required to provide any information necessary to effect the withholding of such taxes, including its federal tax identification number or social security number.

H. **Setoffs.** Except as otherwise provided for herein, the Liquidation Trustee may, but shall not be required to, set off against any Claim and the Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or its Estate may have against the Holder of such Claim, but neither the failure to do so nor the allowance of a Claim hereunder shall constitute a waiver or release by the Debtor, the Liquidation Trustee or the Estate of any Claim they may have against such Creditor; *provided* that such right of setoff shall be subject to this Article VII and in no event shall the Debtor or the Liquidation Trustee set off, or be permitted to set off, against any Claims Allowed under this Plan.

I. **Unclaimed Distributions.** All property distributed on account of Claims must be claimed prior to the date on which the Court enters the Final Decree. All Unclaimed Property will be retained by and will vest in the Liquidation Trust for distribution to Holders of Allowed Claims in Classes 4, 5(a) and 5(b). Pursuant to section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Article VII(I) will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtor, the Distribution Agent, the Liquidation Trustee, NBK, or the Purchaser, or their respective assets.

J. **De Minimis Distribution.** No Cash payment of less than twenty-five ($25.00) dollars shall be made to any Holder of an Allowed Claim on account of such Allowed Claim.

K. **Satisfaction of Claims**. Except as otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

L. **No Fractional Distributions.** Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Property pursuant to Article VII(I).

## ARTICLE VIII
## CONDITIONS TO CONSUMMATION OF THE PLAN

A. **Confirmation Order.** The Confirmation Order shall not be entered until the Court enters an order approving the Sale of the Property in accordance with the Sale and Bid Procedures, and the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, if any, shall have been filed.

**B.** **Conditions to the Effective Date.** The Plan shall not be consummated, and the Effective Date shall not occur, until the following conditions have occurred or been waived (if waivable):

**a.** the Confirmation Order shall have been entered and shall not be stayed, vacated, or otherwise rendered ineffective by order of a court of competent jurisdiction;

**b.** all conditions precedent under the Purchase Agreement shall have been satisfied;

**c.** the transactions contemplated in the Purchase Agreement shall have been consummated;

**d.** the Liquidation Trustee shall have been appointed, the Liquidation Trust Agreement shall have been executed, and the Liquidation Trust shall have received the Liquidation Trust Fund; and

**e.** no order of a court shall have been entered and shall remain in effect restraining NBK from consummating the Plan, or if it is the Successful Bidder, taking title to the Property directly or through a designee.

**C.** **Waiver of Conditions.** Each of the conditions set forth in Article VIII(B) may be waived at any time by the Successful Bidder, without notice, leave or order of the Court or any further action other than proceeding to confirm or consummate the Plan. The Successful Bidder's failure to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**D.** **Effect of Failure of Conditions; Order Denying Confirmation.** If one or more of the conditions specified in Article VIII(B) have not been satisfied (or waived) or if the Allowed NBK Secured Claim has not been paid in full where NBK is not the Successful Bidder, upon notification submitted by the Chapter 11 Trustee to the Court: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) Estate Assets shall revest in the Estate, and (d) all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (e) the Purchase Agreement shall become null and void; and (f) the Estate's obligations with respect to the Claims and Interests shall be as if the Confirmation Order had not been entered.

**ARTICLE IX**
**EFFECT OF CONFIRMATION**

**A.** **Discharge.** Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge Claims against the Debtor.

**B.** **Compromise and Settlement of Claims and Interests**. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan, including the settlement of all Claims, Interests, or controversies among the Debtor, the Estate and NBK, shall constitute an integrated and global good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have

19

with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Court's integrated and global approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that such compromise or settlement is in the best interest of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and is within the range of reasonableness. Subject to the provisions of this Plan governing distributions, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**C.**      **Exculpation.** **Except as otherwise provided in the Plan, to the maximum extent permitted by the Bankruptcy Code and applicable law, no Exculpated Party shall have or incur any liability to any Person, including, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating this Plan, the Purchase Agreement, or the property to be distributed under this Plan, including all activities leading to the promulgation and Confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtor or this Chapter 11 Case; *provided*, *however*, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.**

**D.**      **Estate Releases.** **Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and this Estate will be deemed to have forever released, waived and discharged the Released Parties from any and all Actions, Claims, obligations, suits, judgments, damages, demands, debts, rights, and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtor, taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, or the Plan. This release does not release any Action, Claim, obligation, suit, judgment, damages, demands, debts, rights, and liabilities of a Released Party arising under or pursuant to the Plan or Purchase Agreement, and the contracts, instruments, releases and other agreements delivered in connection with the Plan or Purchase Agreement, which may be enforced only by the Chapter 11 Trustee, NBK, the Purchaser, the Distribution Agent or the Liquidation Agent, as applicable.**

**E.**      **Injunction.** **Except as otherwise provided herein, on the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person (excluding the Liquidation Trustee) that has held, currently holds or may hold a Claim,**

Action or liability that is released pursuant to Article IX(D) from enforcing or attempting to enforce any such Claim, Action or liability against any Released Party or any of their respective Property; *provided*, *further*, that no Person who has held, holds, or may hold Claims, Interests, or Action may commence or pursue a Claim or Action, as applicable, of any kind in any way related to the Debtor against any Released Party that arose before the Petition Date or arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the Debtor's business, the administration of the Liquidation Trust, or the transactions in furtherance of the foregoing without the Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party that such person has standing and is otherwise entitled to assert such claim or cause of action and (ii) specifically authorizing such Releasing Party to bring such claim or cause of action against any such Released Party.

   **F.**  <u>Duration of Injunctions and Stays</u>.  Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Court, all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under Bankruptcy Code section 362 shall remain in full force and effect subject to Bankruptcy Code Section 362(c).

<div align="center">

**ARTICLE X**
**<u>RETENTION OF JURISDICTION</u>**

</div>

   The Court shall retain jurisdiction of all matters arising under, or related to, these proceedings, including, but not limited to:

   **a.** ensuring that the Plan is carried out;

   **b.** considering any modification of the Plan under Bankruptcy Code section 1127;

   **c.** hearing and determining all controversies, suits, and disputes that may arise in connection with the interpretation of the Plan;

   **d.** hearing and determining all objections to claims, controversies, suits, and disputes that may be pending as of or initiated after the Effective Date;

   **e.** hearing and determining all claims, controversies, suits, and disputes against the Debtor or that may arise in connection with the interpretation of the Plan;

   **f.** hearing and determining all requests for compensation and/or reimbursement of expenses that may be made for fees/expenses incurred before the Effective Date;

   **g.** enforcing any Final Order, the Confirmation Order, the Final Decree, and all injunctions contained in those orders;

   **h.** entering an order concluding and terminating this Chapter 11 Case;

     **i.**   correcting any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order;

     **j.**   determining all questions and disputes regarding title to the Property and any other assets of Debtor;

     **k.**   enter a Final Decree in the Chapter 11 Case according to Bankruptcy Rule 3022;

     **l.**   enforcing the provisions set forth in the Plan, the Confirmation Order, any Final Decree, and any Final Order that provides for the adjudication of any issue by the Court; and

     **m.**   entering and implementing such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

     **A.**   **Additional Documents/Execution of Documents Generally.** On or before substantial consummation of the Plan, the Chapter 11 Trustee or NBK shall issue, execute, deliver, and file with the Court or record any agreements and other documents consistent with, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan. The Chapter 11 Trustee has the authority, and the Confirmation Order shall constitute conclusive authority, of the Chapter 11 Trustee to act for, and in the name of the Debtor, and any document executed by the Chapter 11 Trustee in connection with the Plan or Sale shall be accepted by any recording office and shall be recorded and published on receipt.

     **B.**   **Binding Effect.** This Plan shall be binding upon and inure to the benefit of the Debtor, NBK, the Estate, the Liquidation Trustee, the Liquidation Trust, the Distribution Agent, the Purchaser, any Holder of any Claim or Interest treated herein or any Person named or referred to in the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

     **C.**   **Entire Agreement.** The Plan (and all exhibits thereto and the Plan Supplement) sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents. The Debtor shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

     **D.**   **Final Order.** Except as otherwise provided in the Plan, any requirement in the Plan for a Final Order may be waived: (a) by the Purchaser, in its sole discretion, provided, however, that in the event the Debtor determines in good faith that any such waiver would constitute a breach of the Chapter 11 Trustee's fiduciary duties, NBK may seek to prevent any such waiver by seeking an order of the Court on an expedited basis; or (b) after the Effective Date, by the Liquidation

Trustee upon written notice to the Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

**E.** **Governing Law.** Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed and construed and enforced in accordance with the laws of the State of New York.

**F.** **No Admissions or Waivers.** Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission or waiver by the Debtor with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

**G.** **Notices**. Any notice required or permitted to be provided under this Plan to the Debtor, or any request for information with respect to the Plan, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

| Chapter 11 Trustee | Counsel to Chapter 11 Trustee |
| --- | --- |
| Christopher R. Murray<br>**Jones Murray LLP**<br>602 Sawyer Street, Suite 400<br>Houston, TX 77007 | R. J. Shannon<br>Kyung S. Lee<br>**Shannon & Lee LLP**<br>2100 Travis Street, Suite 1525<br>Houston, TX 77002 |
| **NBK** | **Counsel to NBK** |
| Marwan Isbaih<br>Michael C. Carter<br>**National Bank of Kuwait,**<br>**S.A.K.P., New York Branch**<br>299 Park Avenue<br>New York, NY 10171 | **Pillsbury Winthrop Shaw Pittman LLP**<br>Charles C. Conrad<br>Ryan Steinbrunner<br>609 Main Street Suite 2000<br>Houston, TX 77002<br>-----------------------<br>Andrew M. Troop<br>Patrick E. Fitzmaurice<br>Kwame O. Akuffo<br>31 West 52nd Street<br>New York, NY 10019 |

**H.** **Plan Modification.** NBK may amend or modify the Plan in accordance with Bankruptcy Code section 1127 or as permitted at any time prior to the Confirmation Date.

**I.** **Post-Confirmation Operating Reports.** The Liquidation Trustee shall file quarterly operating reports as required by the U.S. Trustee until such time as a Final Decree or other order is entered under section 350(a) of the Bankruptcy Code closing the Chapter 11 Case.

**J.** **Quarterly Fees.** Quarterly Fees due shall be paid on or after the Effective Date.

**K.** **Severability.** Should the Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Interest, such

provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which such provision is illegal. Unless otherwise determined by the Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

     **L.**    **Section 1146 Exemption.** To the fullest extent permitted under Bankruptcy Code section 1146(a), the execution, delivery or recording of an instrument of transfer under the Plan, or the revesting, transfer or sale of any real or other property of or to the Debtor shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.

     **M.**    **Solicitation.** NBK (and each of its respective Affiliates, officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and Professionals) has, and upon Confirmation of the Plan, shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

     **N.**    **Withdrawal of the Plan.** NBK shall reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice the rights of the Debtor or any Person in any further proceedings involving the Debtor.

     NBK requests Confirmation of the Plan under section 1129(a) or section 1129(b) of the Bankruptcy Code.

Dated: April 10, 2024

                         **NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**

                         By: _____

                         Name: Michael C. Carter
                         Title: Vice President

**Exhibit B**

Notice of Confirmation and Effective Date

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | § |
| | §    **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § |
| | §    **Chapter 11** |
| Debtor. | § |
| | § |

### NOTICE OF CONFIRMATION AND EFFECTIVE DATE OF
### CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR BY
### NATIONAL BANK OF KUWAIT S.A.K.P., NEW YORK BRANCH

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

1.      **Entry of Confirmation Order**. On June [●], 2024, the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") entered an order [ECF No. [●]] (the "Confirmation Order") confirming the National Bank of Kuwait S.A.K.P., New York Branch's ("NBK") *Chapter 11 Plan of Liqudiation of the Debtor by National Bank of Kuwait, S.AK.P., New York Branch* [ECF No. [●]] attached as Exhibit A to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified or supplemented, the "Plan") in the chapter 11 case of the above-captioned debtor (the "Debtor").

2.      **Effective Date of the Plan**. The Effective Date of the Plan was [●] **[●], 2024**.

3.      **Substantial Consummation of Plan**. NBK gives notice that the Plan has been substantially consummated.

4.      **Release, Exculpation, and Injunction**. Pursuant to the Confirmation Order, the release, injunction, and exculpation provisions in the Article IX of the Plan are now in full force and effect.

5.      **Administrative Claim Bar Date**. As provided for in Article II.B of the Plan and in the Confirmation Order, all requests for payment of an Administrative Claim must be filed with the Bankruptcy Court and served on NBK, the Chapter 11 Trustee, the Liquidation Trustee and the U.S. Trustee no later than [●] [●], 2024 (the date that is 45 days after the Effective Date).

6.      **Deadline to File Professional Fee Claims**. As provided for in the Article II.B of the Plan and in the Confirmation Order, all final applications for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on NBK, the Liquidation Trustee, and the U.S. Trustee no later than 4:00 p.m. (prevailing Central Time) on [●] [●], 2024 (the date that is 45 days after the Effective Date), unless otherwise ordered by the Bankruptcy Court or such later date is agreed to by the Liquidation Trustee.

7.      **Deadline to File Rejection Damages Claims**.  Except as set forth in Article V of the Plan, [all Executory Contracts and Unexpired Leases that <u>are not</u> listed in the Schedule of Contracts and Leases attached to [●] [ECF No. [●]] have been rejected as of the Effective Date. As provided for in Article [●] of the Plan and in the Confirmation Order, unless otherwise provided by a Bankruptcy Court order, any proofs of claim asserting rejection damages claims pursuant to the Plan must be filed within [●].

8.      **Inquiries by Interested Parties**.  Copies of all pleadings (including the Confirmation Order, to which the Plan is attached as <u>Exhibit A</u>) may be examined for a fee via PACER by visiting http://ecf.txsb.uscourts.gov, or for free at during regular business hours at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of Texas, Bob Casey United States Courthouse, 515 Rusk, Houston, TX 77002.

DATED: [●] [●], 2024                    **PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Draft*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-    *and*   -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

**IN RE GALLERIA 2425 OWNER, LLC, CASE NO. 23-34815**
**SERVICE LIST (a/o June 7, 2024)**

**Debtor:**
Galleria 2425 Owner, LLC
1001 West Loop South Ste 700
Houston, TX 77027

**Debtor's Counsel:**
Reese W. Baker
Baker & Associates
950 Echo Lane Ste 300
Houston, TX 77024

James Q. Pope
The Pope Law Firm
616 Savoy Drive Ste 1125
Houston, TX 77036

**U.S. Trustee:**
Office of United States Trustee
Attn: Jana Smith Whitworth
515 Rusk Street Suite 3516
Houston, TX 77002

**Chapter 11 Trustee:**
Christopher R. Murray
602 Sawyer Street Ste 400
Houston, TX 77007

**Chapter 11 Trustee's Counsel:**
R. J. Shannon
Shannon & Lee LLP
2100 Travis Street Ste 1525
Houston, TX 77002

**Governmental Entities:**
Harris County Tax Assessor
P O Box 4622
Houston, TX 77210

Harris County, et al.
P O Box 2928
Houston, TX 77252-2928

**Twenty Largest Creditors:**
Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070

Cirro Electric
P O Box 60004
Dallas, TX 75266

City of Houston
P O Box 1560
Houston, TX 77251-1560

City of Houston Water Department
P O Box 1560
Houston, TX 77251-1560

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814

Firetron
10101A Stafford Centre Dr.
Stafford, TX 77477

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

Gulfstream Legal Group
1300 Texas Street
Houston, TX 77002
(*Returned to Sender / Unable to Forward*)

Gulfstream Legal Group
720 N Post Oak Rd Ste 355
Houston, TX 77024

Hayward PLLC
10501 N Central Expy Ste 106
Dallas, TX 75231-2203

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362

Houston Community College System
c/o Tara Grundemeier
Linebarger, Groggan, Blair & Sampson
P O Box 3064
Houston, TX 77253-3064

Houston Independent School District
P O Box 4668
Houston, TX 77210
(*Returned to Sender / Unable to Forward*)

Lexitas
P O Box 734298 Dept 2012
Dallas, TX 75373

Nationwide Security
2425 W Loop South Ste 300
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

Nichamoff Law Firm
2444 Times Blvd Ste 270
Houston, TX 77005

T&R Mechanical
21710 White Oak Drive
Conroe, TX 77306-8848

TKE
3100 Interstate North Cir SE 500
Atlanta, GA 30339

Zindler Cleaning Service Co.
2450 Fondren Ste 113
Houston, TX 77063

**Other Creditors / Interest Holders:**
2425 WL, LLC
60 West 2nd Street
Freeport, NY 11746

ADT
P O Box 382109
Pittsburgh, PA 15251

Ali Choudhri
1001 West Loop South 700
Houston, TX 77027

Ash Automated Control Systems, LLC
P O Box 1113
Fulshear, TX 77441

CFI Mechanical, Inc.
6109 Brittmoore Rd
Houston, TX 77041

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Comcast
P O Box 60533
City of Industry, CA 91716

Environmental Coalition Inc.
P O Box 1568
Stafford, TX 77497

Ferguson Facilities Supplies
P O Box 200184
San Antonio, TX 78220

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kings 111 Emergency Communications
751 Canyon Drive Suite 100
Coppell, TX 75019

Logix Fiber Networks
P O Box 734120
Dallas, TX 75373

4884-0395-8725.v1

Mueller Water Treatment
1500 Sherwood Forest Dr
Houston, TX 77043

Smart Office Solutions
6623 Theall Road
Houston, TX 77066-1213
(*Returned to Sender / Unable to Forward*)

Waste Management
P O Box 660345
Dallas, TX 75266

Metwall Design Solutions LLC
10931 Day Road
Houston, TX 77043-4901

US Retailers LLC d/b/a Cirro Energy
Attn: Bankruptcy Department
P O Box 3606
Houston, TX 77253-3606

Naissance Galleria, LLC
c/o Law Office of Nima Taherian
701 N Post Oak Rd Ste 216
Houston, TX 77024

H.N.B. Construction, LLC
c/o Malcolm D. Dishongh
P O Box 2347
Humble, TX 77347-2347

CC2 TX, LLC
14800 Landmark Blvd Ste 400
Dallas, TX 75254

MacGeorge Law Firm
2921 E 17th St Bldg D Ste 6
Austin, TX 78702
(*Returned to Sender / Unable to Forward*)

MacGeorge Law Firm
701 Tillery Street Ste 12
Austin, TX 78702

**Executory Contract Counterparties:**

2425 West Loop LLC dba Metwall Design
Solutions LLC
2425 West Loop South Ste 800
Houston, TX 77027-4214
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
13498 Pond Springs Rd
Austin, TX 78729-442
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
700 Lavaca Street Ste 1401
Austin, TX 78701
(*Returned to Sender / Unable to Forward*)

Bankable Equities
2425 West Loop South Ste 600
Houston, TX 77027-4203

Boho Lounge
2425 West Loop South Ste 100
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Eyebrows 4UTX LLC
2425 West Loop South Ste 340b
Houston, TX 77027-4205

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

G3 Global Services LLC
2425 West Loop South Ste 310
Houston, TX 77027-4208

Galloworks
2425 West Loop South Ste 400
Houston, TX 77027-4205

3

4884-0395-8725.v1

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kudrath Enterprises PLLC
2425 West Loop South Ste 350
Houston, TX 77027-4208

Nationwide Investigations & Security Inc.
2425 West Loop South Ste 300
Houston, TX 77027-4207
(*Returned to Sender / Unable to Forward*)

Shah Sloan LLC
2425 West Loop South Ste 501, 503 and 523
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 900
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 350
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

SprintCom Inc.
2425 West Loop South, Rooftop
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

St. Christopher Holdings GP LLC
2425 West Loop South Ste 700
Houston, TX 77027-4205

UL Therapy
2425 West Loop South Ste 315
Houston, TX 77027-4211

Uptown Cosmetic and Implant Dentistry
2425 West Loop South Ste 333
Houston, TX 77027-4211

**Parties Requesting Notice:**

Jeannie Lee Andressen
Tara Grundemeier
Linebarger Goggan Blair & Sampson LLP
P O Box 3064
Houston, TX 77253-3064
*Counsel for City of Houston, Houston Community College System, and Houston ISD*

Rodney Lee Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
*Counsel for Rodney Drinnon*

Susan Fuertes
Harris County Attorney's Office
P O Box 2928
Houston, TX 77252-2928
*Counsel for Harris County, Attn: Property Tax Division*

James Robert MacNaughton
Porter & Powers PLLC
5900 Memorial Drive Ste 305
Houston, TX 77027
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter & Powers PLLC
1776 Yorktown St Ste 300
Houston, TX 77056
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter Firm, PLLC
2221 S. Voss Road, Suite 200
Houston, TX 77057
*Counsel for 2425 West Loop, LLC*

4

Stephen Wayne Sather
Mark E. Smith
Barron Newburger, P.C.
7320 N Mopac Expy Ste 400
Austin, TX 78731
*Counsel for 2425 WL, LLC*

Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Ste 850
Dallas, TX 75251
*Counsel for CC2 TX, LLC*

Broocks Wilson
Kean Miller LLP
711 Louisiana Suite 1800
Houston, TX 77002
*Counsel for Sonder USA Inc.*

Ali Choudhri
2425 West Loop South 11th Floor
Houston, TX 77027

4884-0395-8725.v1