**THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | Case No. 23-34815 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MOTION TO COMPLY WITH THE GATEKEEPING PROVISIONS OF THE
CONFIRMED CHAPTER 11 PLAN**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.
IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT
THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE
MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND
SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE
YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON
YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE
GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY
BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE
MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST
ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE
COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE
THE MOTION AT THE HEARING.**

**THERE WILL BE A HEARING ON THIS MOTION ON DECEMBER 18, 2024
AT 11:00 AM IN COURTROOM 403 AT 515 RUSK ST., HOUSTON, TEXAS
77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR RESPECTIVE
ATTORNEYS.**

**To the Honorable Court:**

Ali Choudhri[1] hereby files this motion to comply with the gatekeeping provisions of the confirmed Chapter 11 Plan (Dkt. No. 566) (the "Plan") and would respectfully show as follows:

1.      When the National Bank of Kuwait, S.A.K.B., New York Branch ("NBK" or the "Bank") proposed a plan of reorganization in this case (Dkt. No. 194), the Bank snuck several provisions into its proposed plan that exist solely for its own benefit. The Bank included itself among the "Exculpated Parties" that enjoy the Plan's exculpation provision, and among the "Released Parties" covered by the Plan's third-party release, even though the Bank is not a debtor in bankruptcy and has no connection to the Debtor, Galleria 2425 WL Owner, LLC or the bankruptcy estate other than as a lender. (*See* Plan arts. I(A)(39) & (78); *id.* IX(C) & (D)) The Bank also granted itself the benefit of the Plan's gatekeeping provision, requiring parties to *any* litigation against the Bank bearing a relationship to this bankruptcy—pending in any court, anywhere—to receive approval from this Court before that litigation can continue. And the parties must obtain that approval according to a procedure and standards appearing nowhere in the Bankruptcy Code or the rules of state or federal procedure requiring them to demonstrate those claims

---

[1] Naissance Galleria, LLC has also raised claims against the Bank, but as the result of an injunction entered in state court which is presently on appeal, Choudhri is not currently permitted to take action on Naissance's behalf. *See* Appellant's Opening Br. at 12, *Naissance Galleria, LLC v. Zaheer*, No. 01-23-00727-CV (Tex. App. Dec. 18, 2023) For that reason, Choudhri is filing this motion solely on his own behalf but provides information on the claims brought by Naissance Galleria, LLC for informational purposes. And because of the factually intertwined nature of the claims asserted by Choudhri and Naissance, the Court should give Naissance's claims the same treatment as Choudhri's for purposes of satisfying the gatekeeping provision.

are "colorable." No legitimate bankruptcy purpose is furthered by extending this gatekeeping provision to the Bank. And the litigation subjected to the gatekeeping provision has no connection to, or effect on, the Debtor, the estate, or the Plan's consummation. Instead, extending the gatekeeping provision to the Bank is simply the Bank's reward for proposing the plan that the Court approved, a plan that already richly rewards the Bank with the right to credit bid on the valuable asset at the center of this bankruptcy—at a foreclosure sale the Bank itself arranged.

2.    The Bank now demands that the Court enforce the terms of the Plan's gatekeeping provision and invites the Court to dismiss claims against the Bank in the following three pending cases (the "Challenged Litigation"):

> *Naissance Galleria, LLC v. Zaheer, et al.*, Cause No. 2023-43755, pending in the 80th District Court of Harris County, Texas;
>
> *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009, pending in this Court; and
>
> *Choudhri v. NBK and Zaheer*, Adversary Case No. 23-03263, pending in this Court.

(*See* Dkt. No. 758 at 2-3; Dkt. No. 771)

3.    But the Court should reject the Bank's invitation. Gatekeeper provisions certainly have their uses. And the Plan's gatekeeping provision may have some legitimate use in protecting the Trustee in this case. But the Bank's demand to invoke that protection for itself is a bridge too far. This Court's gatekeeping services are not a party favor that the Bank can obtain simply by participating in the bankruptcy. Nor are they a convenience

whereby the Bank can shed liabilities simply because it would like to be rid of them. The only legitimate purposes for a gatekeeping order include protecting the Debtor, the estate, and the implementation of a bankruptcy plan. None of those purposes are served here. Allowing the Bank to make use of the Plan's gatekeeping provision would therefore contravene longstanding precedent, exceed the confines of the Bankruptcy Code, and violate fundamental limits on bankruptcy courts' jurisdiction. Accordingly, the Plaintiffs should not be forced to satisfy the Plan's gatekeeping provision before proceeding.

4.      But even if the Court did stretch its gatekeeping powers to protect the Bank, there should be no doubt that each of the cases among the Challenged Litigation satisfies the gatekeeping provision's requirements. This Court has already declined to exercise jurisdiction over one of these cases—finding that it would not "affect assets of the bankruptcy estate"—and the Court should not revisit that decision to exercise jurisdiction over that case now. (Order, Adv. No. 23-03259 (Bankr. S.D. Tex. Jan. 11, 2024) [Dkt No. 24]) All three cases concern a core set of operative facts regarding uncontroversial lender-liability claims that are colorable under any standard, which is why no *other* court has dismissed them. This Court should not be the first. The Challenged Litigation should be permitted to proceed.

## BACKGROUND

5.      The plan of reorganization that the Bank proposed (Dkt. No. 194) and the Court confirmed (Dkt. No. 566) contains several provisions that protect the Bank and other non-debtors from claims against other non-debtors. The Plan's "Exculpation" provision covers specified "Exculpated Parties," which are defined to include the Bank (Plan art.

I(A)(39)), protecting them from liability arising from conduct relating to the bankruptcy itself, including such actions as "filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating" the Plan, the Purchase Agreement, or the property to be distributed under the Plan (*id*. art. IX(C)).

6.      The Plan's "Estate Releases" covers certain "Released Parties," which are also defined to include the Bank (Plan, art. I(A)(78)), granting them protection from claims by "the Debtor" or the "Estate" concerning "the money borrowed by the Debtor" (*id*. art. IX(D).

7.      By their terms, neither of these provisions apply to the Challenged Claims. While the Bank is both an Exculpated Party and a Released Party, neither of the Plaintiffs in those cases, Ali Choudhri and Naissance Galleria, LLC (*see* Dkt. 758 at 2) qualify as "the Debtor" or part of the "Estate." Ali is the "Debtor's principal." (*Id*.) And Naissance is provided mezzanine financing for the Debtors' purchase of the property at issue. So the Plan's Estate Release provision does not apply to these claims. The Exculpation provision does not apply either, because these claims arose before the bankruptcy and therefore do not concern any Released Party's conduct during the bankruptcy.

8.      Yet oddly, the Plan's gatekeeper provision provides protection that is broader than both the Estate Releases and Exculpation provisions. That gatekeeping provision pertains to any "Person who has held, holds, or may hold Claims" that are "in any way *related* to the Debtor," so long as they are brought "against any Released *Party*"—even if the claims themselves are not released under the Estate Releases. (Plan, Art. IX(E)) And

the gatekeeper provision does not merely apply to claims challenging conduct occurring *during* the bankruptcy but covers claims that "arose *before* the Petition Date." (*Id.*) For these claims, the parties must seek "notice and a hearing" wherein the parties must demonstrate to the Court that the claims asserted are valid before they can proceed. (Plan, Art. IX(E)) And to demonstrate the validity of that claim, the party must demonstrate that the claim is "colorable" and that the party "has standing and is otherwise entitled to assert" it. (*Id.*)

9.      The gatekeeper provision therefore purports to convey to the Bankruptcy Court the authority to approve, control, adjudicate, and ultimately terminate claims in pending litigation—including cases pending in other courts—merely because that litigation is "related to the Debtor," according to a test and a procedure appearing nowhere in the Code or the federal rules. It allows the Bank to make use of this power to have the Court dismiss claims that are not even released under the Plan. And the Bank now invokes this provision to have the Court terminate all the Plaintiffs' litigation against the Bank—even when the courts where that litigation is pending would allow that litigation to proceed, and even where the litigation at issue would not have any effect on the bankruptcy estate itself. That is not something the Court can do—nor is it something the Court *should* do.

**ARGUMENT**

**I.      The Bank cannot invoke the Plan's gatekeeping provision to dismiss any of the claims against the Bank in the Challenged Litigation.**

10.     The Court should not dismiss any of the claims asserted against the Bank in the Challenged Litigation because none of those claims can properly be subject to the Plan's gatekeeping provision. So the Plaintiffs are not required to obtain the Court's

approval before pursuing them. And even if the Plaintiffs are required to obtain the Court's gatekeeping approval to proceed on these claims, Plaintiffs can readily make the showing required to obtain that approval, because Plaintiffs' claims are grounded in theories of lender liability personal to them that have long been recognized under Texas law. That makes them colorable by any standard.

      **A.**    **Bankruptcy courts' gatekeeping powers can only be invoked to protect trustees and other court-appointees—not private parties serving in no official bankruptcy capacity like the Bank.**

    11.    The first problem with the Bank's invocation of the Court's gatekeeping authority is that the Bank's demand exceeds the limited authority that bankruptcy courts possess to approve, control, adjudicate, or terminate claims in pending litigation. There is nothing in the Bankruptcy Code that conveys such gatekeeping power to bankruptcy courts. Instead, that power is derived from the century-old Supreme Court case, *Barton v. Barbour*, 104 U.S. 126 (1881). "Under the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of the bankruptcy court before initiating [or maintaining] an action in district court *when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity*.'" *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added)). The *Barton* doctrine was created to "prevent trustees from being subject to legal proceedings that interfere with their ability to administer the estate." *In re Cir. City Stores, Inc.*, 557 B.R. 443, 447 (Bankr. E.D. Va. 2016); *see also generally* COLLIER ON BANKRUPTCY ¶ 10.01 (16th ed. 2023) (citing and discussing cases). The doctrine therefore

serves to protect trustees and other bankruptcy-court appointees from vexatious and harassing litigation that could drain the estate and hamper bankruptcy plan implementation.

12.     There are several reasons why the Bank cannot legitimately invoke the *Barton* doctrine to have the Court terminate any claims against the Bank in the Challenged Litigation. For one thing, because the *Barton* doctrine exists only to protect trustees and other bankruptcy-court appointees, it cannot be invoked by private parties like the Bank that are not serving in any official court-appointed capacity. Indeed, in *Highland Capital*, the Fifth Circuit refused to "extend gatekeeping protections to non-debtors," including Highland's interim CEO. *Matter of Highland Cap.*, 48 F.4th at 435–39 (vacating gatekeeping provision "as to all parties *except* Highland Capital, the Committee and its members, and the Independent Directors for conduct within the scope of their duties"). And the Fifth Circuit's only recent opinion that actually applies the *Barton* doctrine did so in the context of a trustee, not a private corporation with no official bankruptcy role. *See In re Foster*, No. 22-10310, 2023 WL 20872, at *5–*6 (5th Cir. Jan. 3, 2023). For this reason alone, the Bank is not entitled to invoke the Bankruptcy Court's gatekeeping authority.

13.     Furthermore, not only are *Barton*'s gatekeeping protections reserved for actors appointed to serve in official bankruptcy capacities, they only protect those actors for actions taken within the scope of their "official duties."[2] But the Bank has no official

---

[2] *In re Ondova Ltd. Co.,* 914 F.3d 990, 993 (5th Cir. 2019); *see also In re Christensen*, 598 B.R. 658, 665 (Bankr. D. Utah 2019); *Phoenician Mediterranean Villa, LLC v. Swope (In re J & S Props., LLC)*, 545 B.R. 91, 105 (Bankr. W.D. Pa. 2015). A typical example is litigation against a receiver who seizes or otherwise attempts to administer property that is not receivership property,

duties in implementing the Plan or overseeing the Debtor's dissolution. The foreclosure sale at the center of the bankruptcy will be conducted and overseen by the Liquidation Trustee. (*See* Plan, art. VI(A)) The only duties that the Plan specifically assigns to the Bank are purely ministerial. And the only substantive right that the Plan provides to the Bank is the completely voluntary (and unofficial) right to credit bid the amount of its debt at the foreclosure sale for its own private benefit, which comes with a contractual promise to pay certain junior claims if its bid is successful. (*See* Plan, Introduction) The Challenged Litigation does not contest the Bank's exercise of any of these powers, rights, or responsibilities conveyed under the Plan. That litigation pertains only to the Bank's pre-bankruptcy conduct that arose long before the Plan was ever proposed. For this additional reason, *Barton* does not apply.

14.     Indeed, the only reason the Plan contains gatekeeping protections for the Bank is that the Bank *proposed* the Plan—and thus snuck that protection into the Plan for itself, demanding it as a condition to undertaking its minimal responsibilities in implementing the Plan. And the Bank did not seek this protection to benefit the estate, but simply to allow it to escape litigation it would rather not face. That is not a legitimate use of *Barton* gatekeeping powers. The Fifth Circuit has held that even when private parties face "exposure" to truly "vexatious" and frivolous litigation, bankruptcy courts are not empowered to use gatekeeping powers to halt it. *See Highland Capital Mgmt.*, 48 F.4th at

---

but actually belongs to a third party. *See In re DMW Marine, LLC*, 509 B.R. 497, 506 (Bankr. E.D. Pa. 2014) (citations omitted).

430, 440 n.19. And as explained below—the Challenged Litigation is neither vexatious nor frivolous.

**B.    Bankruptcy courts' gatekeeping powers have been significantly constrained by the Supreme Court's decision in *Purdue Pharma*.**

15.    In any event, whatever gatekeeping powers bankruptcy courts possess have been significantly constrained by the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024) ("*Purdue Pharma*"), which held that "[t]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants." *Id*. A bankruptcy court's exercise of its gatekeeping authority to dismiss litigation against non-debtors is the functional equivalent of the non-consensual releases outlawed by *Purdue Pharma*—especially when used to dismiss litigation pending in other courts. Both involve exercises of authority to control, adjudicate, and ultimately terminate claims in litigation without consent, and without consideration—and *Purdue Pharma* confirms that this something that bankruptcy courts are not empowered to do.

16.    For all these reasons, allowing the Bank to terminate the Challenged Litigation would exceed the Court's legitimate authority to impose gatekeeping conditions under *Barton*. If the Bank wants to halt this litigation, it can do so through established procedural mechanisms in the Challenged Litigation.

**C.    The Court would exceed its jurisdiction by dismissing the Challenged Litigation.**

17.    The Court would also exceed its jurisdiction by using the gatekeeping powers

provided under the Plan to adjudicate and dismiss the Challenged Litigation. The Bank seeks only to dismiss litigation against itself, and dismissing that litigation affects only the Bank—having no conceivable effect on the Debtor or the estate. Indeed, on January 11, 2024, this Court remanded one of the proceedings among the Challenged Litigation— Cause No. 2023-43755—back to the 80th District Court of Harris County because it determined that "all the causes of action constitute claims rooted in Texas state law," "there are no bankruptcy issues or claims in the state court litigation," and "there has been no showing that the remand would affect assets of the bankruptcy estate." (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The same is true of the other cases in the Challenged Litigation—because, as the Bank insists, these cases all share the same "basic facts and claims." (Dkt. No. 758 at 4) But that shared lack of connection to the estate deprives the Court of jurisdiction to resolve any of these cases through its gatekeeping powers.

18.     As the Fifth Circuit recognized in *Highland Capital*, the question of whether a claim may be resolved by a bankruptcy court through exercise of gatekeeping powers under *Barton* is entirely separate from the question of whether the Court has *jurisdiction* to resolve that litigation. 48 F.4d at 439 (holding, after approving of a gatekeeping provision to protect certain court-appointed officials, that "the bankruptcy court, faced with pre-approval of a claim" on remand, would still have "to determine whether it had subject matter jurisdiction over that claim in the first instance."). That makes sense, because the mere fact that the Plan contains a gatekeeping provision does not confer jurisdiction to resolve claims under that gatekeeping power: "[P]arties cannot confer subject matter

jurisdiction on federal courts," including through a bankruptcy plan. *Randall & Blake Inc. v. Evans*, 196 F.3d 579 (5th Cir. 1999).

19.     Instead, "[j]urisdiction for bankruptcy cases is rooted in the provisions of 28 U.S.C. § 1334." *Matter of Walker*, 51 F.3d 562, 568 (5th Cir. 1995) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (U.S.1995) (stating that "[t]he jurisdiction of the bankruptcy courts ... is grounded in and limited by statute")). And a "third-party action" between two non-debtors "does not create 'related to' jurisdiction" under section 1334 "when the asset in question is not property of the estate and the dispute has no effect on the estate." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 (5th Cir. 1995). Accordingly, because the claims against the Bank asserted in the Challenged Litigation do not have any effect on the estate, the Court lacks jurisdiction to hear them—much less dismiss them.

20.     It does not matter that the Plan's gatekeeper provision requires that the dispute must be "related to the Debtor" to fall within its scope. (Plan, art. IX(E)). Mere "shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy." *In re Zale Corp.*, 62 F.3d at 753. Accordingly, a mere factual interrelationship between the Challenged Litigation and the arguments asserted in the bankruptcy does not convey jurisdiction to the Court to resolve that litigation.

21.     The Bankruptcy Court therefore lacks the power to require the Plaintiffs to comply with the gatekeeping orders to maintain that litigation, and the Plaintiffs in the Challenged Litigation are not required to obtain this Court's permission before maintaining it. *See Tufts v. Hay*, 977 F.3d 1204, 1210-11 (11th Cir. 2020) ("Thus, under the

'conceivable effects' test for section 1334(b), the Bankruptcy Court did not have jurisdiction to consider Tufts's action, and Tufts counsel were not required to obtain leave from that court before filing this action in the District Court.").

## II.   The claims raised against the Bank satisfy the Plan's gatekeeping provision because they raise colorable lender-liability claims that the Plaintiffs have standing to pursue.

22.    Yet even if the Plaintiffs' claims against the Bank in the Challenged Litigation may be properly subjected to the Plan's gatekeeping provision, those claims satisfy the gatekeeping provision's standard for obtaining this Court's permission to maintain those claims.

23.    The remaining two actions include claims against the Bank, but these claims easily satisfy the gatekeeping provision's low threshold for maintaining a claim. Two of these cases originated in state court, and one was remanded in January. (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The final case is an adversary proceeding that the Debtor filed in this court in conjunction with its original bankruptcy. *See* **Exhibit 1** (Original Complaint, No. 23-06009 (Bankr. S.D. Tex. Sept. 19, 2023) [Dkt. No. 1]) And the claims raised against the Bank in both cases are "colorable."

24.    The term "colorable" is not defined in the Plan or in the gatekeeping provision, but it nevertheless invokes the exceptionally low standard for determining whether a defendant has been fraudulently joined to avoid diversity jurisdiction. *See Overholt v. Purina Animal Nutrition LLC*, Case No. 1:14-CV-1216, 2015 WL 1631855, at *2 (W.D. Mich. Apr. 13, 2015) ("Under the fraudulent joinder rule, courts may disregard the citizenship of parties against whom there is no 'colorable' cause of action."). This

standard is "similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss." *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012). And even under a Rule 12(b)(6) analysis, the standard that courts apply is decidedly lenient and plaintiff-friendly, requiring a court to evaluate the sufficiency of plaintiff's complaint by accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted). The Court must resolve all disputed questions of fact and ambiguities in the controlling state law in favor of the non-removing party. *Coyne*, 183 F.3d at 493. And to be "colorable," a claim need not meet "the stricter 12(b)(6) pleadings under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Overholt*, 2015 WL 1631855, at *7-8.

25.    Plaintiffs' remaining claims against the Bank readily meet this lenient standard. The cases concern a common core of operative facts underlying all three cases in the Challenged Litigation relating to the Bank's efforts to foreclose on the Debtor's property so it could obtain that property for itself. *See* The Bank loaned the Debtor over $50 million to purchase the property (Dkt. No. 565 at 4), but throughout the life of the loan, the Bank made it progressively more difficult for the Debtor to pay that loan back. As Plaintiffs have alleged in the state court proceedings, the Bank inserted itself directly into the Debtor's business operations, interfering with those business operations in numerous unjustified ways. **Exhibit 2** (Plaintiff's Sixth Amended Petition, No, 2023-22748 (Harris County Dist. Ct. Dec. 18, 2023). And the pleadings in Case No. 23-6009, the adversary proceeding which remains pending in this Court, contains similar allegations of

interference by the Bank. (Ex. 1, ¶¶9-21)

26.    For example, the Bank thwarted the Debtor's efforts on at least *five* different occasions to sell interests in the building that would have cleared the Bank's debt—often through strategic declarations of defaults or foreclosure postings designed to discourage prospective buyers. (*See* Ex. 2, ¶¶ 22, 31- 33) The Bank likewise refused to approve or ignored at least *nine* different offers to lease space in the building, thereby preventing the Debtor from raising funds to pay off the loan, eventually forcing the Debtor to bring suit. (*Id*. ¶¶23, 27)

27.    After the parties settled their litigation through a Confidential Settlement Agreement (Dkt. No. 403-4) hat reduced the principal amount due under the loan, Plaintiff alleged that the Bank improperly disclosed the terms of the Confidential Settlement Agreement in direct violation of its express confidentiality obligations by disclosing the new loan balance to potential purchasers of the property, thereby revealing the Debtor's financial struggles, improperly impacting these prospective buyers' evaluation of the property's market value, "chill[ing] the market" for the property, and converting these potential buyers who would have negotiated a sale with the Debtor into potential purchasers of the Bank's note. (*See* Ex. 2, ¶¶28-29, 63-64)

28.    The Bank also actively attempted to wrest control of the Debtor and its property from Choudhri by interfering with Choudhri's control of Naissance. The Bank worked in league with Azeema Zaheer, Choudhri's ex-girlfriend, who acted as his agent in running Naissance until Ali exercised his right to take over control of the company from her. (*See* Ex. 2, ¶¶ 36-46) And these efforts by the Bank and Zaheer were all part of a larger

effort by Choudhri's disgruntled business partner, Osama Abdullatif, to seize Choudhri's business interests by brute force and fraud. Abdullatif has arranged to have hard drives seized from Choudhri's companies (**Exhibit 3** at 1 [Declaration of Quanell X Farrakhan No. 1]) He has also even arranged for Choudhri to be accused of a murder-for-hire plot to kill Abdullatif himself, which authorities dismissed as "a hoax." (*Id.*; *see also* **Exhibit 4** [Quanell X Farrakhan Aff. No. 2]) And Omar Khawaja, an attorney and close business associate of Abdullatif, admits to representing Abdullatif and Zaheer in furtherance of Abdullatif's avowed goal of seizing all of Choudhri's business interests through litigation—under their theory: "If [Ali] own[s] it, we own it." (**Exhibit 5** [Deposition of Omar Khawaja] at 23: 30: 17-21; 163:8-165:2; 194:3-6)

29.    Plaintiffs supported these allegations with voluminous documentary evidence, including examples of lease proposals that were rejected or ignored and elicit communications between Bank representatives and Zaheer. (*See* Ex. 2, pp. 6-7, 8, 9) Indeed, Plaintiffs produced a key document in their pleadings in which the Bank encouraged Zaheer to "stay on" until the Bank could find a "suitable replacement for her," even after Choudhri had exercised his right to regain control over the company, thereby demonstrating the Bank's intentional efforts to interfere with Choudhri's management of Naissance. (*See* Dkt. No. 88-29 at 1-2) The operative pleadings in these actions raise numerous claims against the Bank, including breach of contract, tortious interference, fraud, business disparagement, breach of the duty of good faith and fair dealing, unjust enrichment, and conspiracy. *See* Ex. 2, ¶¶ 62, 104)

30.    The Plaintiffs have also alleged how the Debtor, Naissance, and Choudhri all

16

experienced independent injuries from the Bank's conduct: While the Debtor was deprived of its right to survive and thrive as an ongoing business, Naissance and Choudhri suffered their own loss of a significant asset. And this establishes that Naissance and Choudhri each have standing to pursue claims against the Bank independently.

31.     While the facts alleged in the Challenged Litigation paint an extraordinary factual picture, they nevertheless present classic lender liability claims that have long been recognized under Texas law. Such lender-liability claims frequently involve both breach-of-contract *and* tort claims. *See Williams v. National Mortg. Co.*, 903 S.W.2d 398, 404 (Tex. Ct. App. 1995); *Jones v. First Nat'l Bank of Anson*, 846 S.W.2d 107, 109 (Tex. Ct. App. 1992, no writ) (concerning causes of action for breach of duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, conversion, estoppel, and violations of the Deceptive Trade Practices Act); *Lamar Sav. Ass'n v. White*, 731 S.W.2d 715, 717-18 (Tex. Ct. App. 1987) (causes of action for breach of contract, breach of fiduciary duty, usury, duress, estoppel, and tortious interference).

32.     And courts have found such lender-liability claims to be viable under factual circumstances that are virtually identical to those at issue in this case. Texas courts have found that lenders can be held liable for wrongful defaults and wrongful acceleration. *See, e.g.*, *Rey v. Acosta*, 860 S.W.2d 654 (Tex. Ct. App. 1993); *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Ct. App. 1980). Courts also routinely permit lenders to be held liable in the

context of improper refusals to approve leases.[3] And courts have even allowed borrowers to maintain claims that banks have conspired with others to interfere with their borrowers' businesses. *See, e.g.*, *State Nat'l Bank v. Farah Mfg. Co*., 678 S.W.2d 661 (Tex. Ct. App. 1984). Indeed, the Bankruptcy Court for the Northern District of Texas recently found a lender liable under factual circumstances that are equally extreme to this case. *See Bailey Tool & Mfg. Co.*, *et al. v. Republic Bus. Credit (In re Bailey Tool & Mfg. Co.)*, Adv. No. 16-03025-SGJ (Bankr. N.D. Tex. December 23, 2021) (holding lender liable under numerous theories for, among other things, taking aggressive action to protect its interests, impacting the company's liquidity, and communicating in secret with the company's customers to have them pay the bank instead of the company). These cases demonstrate that the legal theories that Plaintiffs have asserted are well-founded in Texas law, and the allegations, while extraordinary, are hardly implausible. And that is why no court has ever dismissed them. That makes them colorable.

33.     And while, during plan confirmation, the Court concluded that these claims were "implausible" and "not viable" (Dkt. No. 565 at 17), Plaintiffs respectfully submit that these determinations should not be the Court's final word on the matter. During plan confirmation, the Plaintiffs were not permitted to present, and the Court was not permitted to hear, a full airing of the evidence to support the Plaintiffs' claims. It heard a mere summary. But even in that limited summary, the Court heard testimony from two of the

---

[3] *See, e.g*., Metropolitan Corporate Counsel, *Liability Awaits the Unwary: Lenders and Leasing Decisions* (Dec. 13, 2004), https://bit.ly/4e6fGe7.

state's most respected attorneys, Tom Phillips, former Chief Justice of the Texas Supreme Court, and Jerry Alexander, both of whom felt the claims were so strong that they were both willing to take the case on contingency. (*See* Dkt. No. 570) While the Court discounted that testimony because the lawyers explained only that the Debtor "had claims" but never "explained how or why these claims arose," those questions are answered by the operative pleadings in the pending litigation, which provide extensive factual detail and evidence regarding the origin and basis for these claims. (Dkt. No. 565 at 17)

34.     The Court made barely any mention of the factual or legal merits of those claims. Instead, the Court simply found the claims incredible, questioning why the Debtor had "never been able" to pay the note, determining that it was unlikely likely that the Bank had "breached" the Settlement Agreement first, excusing the Debtor's own failure to pay, and challenging Choudhri's credibility as a witness. (Dkt. No. 565 at 17) But the first of these holdings ignore the Plaintiffs' factual allegations—which the Court must accept as true—that the Bank interfered with the Debtor's ability to pay the note. And the latter two should not weigh in the balance in determining whether Plaintiffs' claims against the Bank are "colorable," which requires examining solely the allegations pleaded and setting aside questions of witness credibility. Indeed, the fact that two well-respected Texas attorneys are willing to pursue the litigation on a contingency basis provides ample evidence that the claims are in fact "colorable."

35.     Finally, while the Court expressed concern about the motivations behind these various pieces of litigation, concluding that they were primarily meant "to postpone a real estate foreclosure" (Dkt. No. 565 at 16), those concerns are unfounded. Lender

liability claims are frequently asserted in efforts to halt foreclosure. *See, e.g.*, *Williams*, 903 S.W.2d at 404; *Jones*, 846 S.W.2d at 109. And the factual context in which those claims arose does not undercut their viability.

CONCLUSION

For these reasons, Ali Choudhri respectfully requests that this Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan be granted, and that none of the claims in the challenged litigation should be dismissed.

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
State Bar No. 13268300
(admitted pro hac vice)
**Cecere PC**
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for 2425 WL, LLC and Ali Choudhri*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 30, 2024, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service, and via US mail, including to each of the parties listed below.

| | |
|---|---|
| Matías J. Adrogué | Omar Khawaja |
| Leila M. El-Hakam | Law Offices of Omar Khawaja, PLLC |
| Matías J. Adrogué PLLC | 177 Richmond Ave, |
| 1629 West Alabama Street | Ste 1065 |
| Houston, TX 77006 | Houston, TX 77056 |
| service@mjalawyer.com | omar@attorneyomar.com |

*Putative Counsel for Naissance Galleria, LLC*                    *Putative Counsel for Naissance Galleria, LLC*

Rodney Drinnon
McCathern
Houston 2000 West Loop South
  Ste 1850
Houston, TX 77027
rdrinnon@mccathernlaw.com

*Counsel for Azeemeh Zaheer*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com

*Counsel for Azeemeh Zaheer*

*/s/ J. Carl Cecere*

**J. Carl Cecere**