# **<u>EXHIBIT 15</u>**



Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street  |  New York, NY 10019-6131  |  tel 212.858.1000  |  fax 212.858.1500

Andrew M. Troop
tel: +1.212.858.1660
andrew.troop@pillsburylaw.com

November 26, 2024

*Via FedEx*
2425 WL, LLC
2425 West Loop South, 11th Floor
Houston, TX 77027

*Via FedEx*
2425 WL, LLC
60 West 2nd Street
Freeport, NY 11746

Re**:**    **Release of Lien; Sale Order dated July 8, 2024, Docket No. 608 in Case No. 23-34815-JPN**

To Whom It May Concern:

Pursuant to the final, unstayed and not-appealed Sale Order dated July 8, 2024, Docket No. 608 in Case No. 23-34815-JPN in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Sale Order**" – copy attached), certain real property located at 2425 West Loop South, Houston, Texas, as more particularly described in the Sale Order (the "**Property**"), was conveyed to Houston 2425 Galleria, LLC free and clear of all liens, claims, encumbrances and interests, including that certain Deed of Trust recorded as Instrument No.: RP-2021-258619 in the Official Public Records of Harris County, Texas (the "**DOT**"), held by 2425 WL, LLC.

To memorialize the release of the DOT pursuant to the Sale Order, a Release of Lien is attached hereto as <u>Exhibit A</u> for your immediate signature (and notary acknowledgment). Please sign this document in wet ink, have it notarized, and return the original document using the enclosed return envelope for receipt no later than November 29, 2024.

All rights are reserved if you do not return the executed Release of Lien property executed by November 29, 2024.

Very truly yours,

*/s/ Andrew M. Troop*

Andrew M. Troop

www.pillsburylaw.com

2425 WL, LLC
November 26, 2024
Page 2


Enclosures
cc:
H. Gray Burks, IV
950 Echo Lane Ste 300
Houston, TX 77024
hgburksiv@gmail.com

Joseph Carl Cecere, II
Cecere PC
6035 McCommas Blvd
Dallas, TX 75206
ccecere@cecerepc.com

Jack Rose
Law Offices of Jack J Rose PLLC
2001 Palmer Ave Ste 104
Larchmont, NY 10538
jrose@jrlpllc.com

Stephen Wayne Sather
Barron Newburger, PC
7320 N Mopac Expy Ste 400
Austin, TX 78731
ssather@bn-lawyers.com

Mark Edwin Smith
Barron Newburger, PC
7320 N Mopac Expy Ste 400
Austin, TX 78731
msmith@bn-lawyers.com

David Neal Stern
Barron Newburger, PC
7320 N Mopac Expy Ste 400
Austin, TX 78731
dstern@bn-lawyers.com

2425 WL LLC
c/o Ali Choudhri
ali@jetallcompanies.com
ali@jetallcapital.com

Charles C. Conrad [firm]
Adam J. Weaver [firm]

**<u>Exhibit A</u>**

Release of Lien

[See Attached]

<u>AFTER RECORDING RETURN TO:</u>

Attn: Charles Conrad
Pillsbury Winthrop Shaw Pittman LLP
609 Main Street, Suite 2000
Houston, TX 77002

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU
MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS
INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR
SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

<b>RELEASE OF LIEN</b>

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | |
| | § | **KNOW ALL MEN BY THESE PRESENTS:** |
| **COUNTY OF HARRIS** | § | |

**WHEREAS, 2425 WL, LLC** (the "**Lienholder**"), is the asserted holder of certain alleged beneficiary rights under that certain Deed of Trust recorded as Instrument No.: RP-2021-258619 in the Official Public Records of Harris County, Texas (the "**Lien**").

**WHEREAS,** pursuant to that certain Sale Order dated July 8, 2024, Docket No. 608 in Case No. 23-34815-JPN in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Sale Order**"), certain real property located at 2425 West Loop South, Houston, Texas, more particularly described on <u>Exhibit A</u> attached hereto (the "**Property**"), was conveyed to Houston 2425 Galleria, LLC free and clear of all liens, claims, encumbrances and interests, including, without limitation, the Lien.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed and to memorialize the release of the Lien pursuant to the Sale Order, the undersigned, has this day, and does by these presents hereby RELEASE, DISCHARGE, AND QUITCLAIM, all the right, title, interest, and estate in and to the Property which the undersigned has or may be entitled to by virtue of the Lien, and does hereby declare the same to be fully released and discharged therefrom.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Release has been executed on the date set forth in the Acknowledgement below.

**2425 WL, LLC**

By: _____

Name:

Title:

STATE OF TEXAS       )

                                 )  ss.:

COUNTY OF _____  )

On the _____ day of _____ in the year _____ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Notary Public

EXHIBIT A

Property

**Tract 1: Fee Tract**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO HE 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**Tract 2: Easement Tract; 20-Foot Non-Exclusive Roadway and Pedestrian Easement**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT 1;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 PEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**Tract 3: Easement Tract; 20-Foot Non-Exclusive Roadway and Pedestrian Easement**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED PILED IN HCCF NO. 0041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED RY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT I, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EAST ERLY NORTH 87 DEGREE S 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

**Tract 4: Easement Tract; 28-Foot Roadway and Pedestrian Easement**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1. CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND ROUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN Tl-IE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY

R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

**Tract 5: Easement Tract; 5-Foot Storm Sewer Easement**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

**Sale Order dated July 8, 2024, Docket No. 608 in Case No. 23-34815-JPN in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division**

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
July 08, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GALLERIA 2425 OWNER, LLC, | ) |  |
|  | ) | Case No. 23-34815 |
| Debtor. | ) |  |
|  | ) |  |

**ORDER (A) APPROVING ASSET PURCHASE AGREEMENT BETWEEN THE TRUSTEE AND QB LOOP PROPERTY LP; (B) APPROVING THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (C) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES; (D) DETERMINING THE AMOUNTS NECESSARY TO CURE SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (E) GRANTING RELATED RELIEF**

(Relating to ECF Nos. 188, 254, 266, 561)

The Court having considered the *Chapter 11 Trustee's Motion for Entry of an Order: (I) Approving Procedures for the Sale of the Property Free and Clear of All Liens, Claims and Encumbrances; (II) Scheduling an Auction; (III) Authorizing Entry into the Stalking Horse Purchase Agreement; (IV) Approving Assumption and Assignment Procedures; (V) Approving Form of Notice; and (VI) Granting Related Relief* [ECF No. 188] (the "Motion"),[1] filed by Christopher R. Murray, the chapter 11 trustee (the "Trustee") in the above-captioned case (the "Chapter 11 Case"), seeking, among other related relief, (i) approval of a procedures (the "Bid Procedures") for the conduct of a competitive auction (the "Auction") of property of the Debtor's estate free and clear of all liens, claims, interests, and encumbrances, except for assumed liabilities expressly retained by a successful bidder after the Auction, (ii) authorizing and approving the assumption and assignment of proposed assumed executory contracts and unexpired leases subject

---

[1] Capitalized terms used but not described in this Order have the meanings ascribed to them in the Motion.

to the procedures set forth therein (the "Assumption and Assignment Procedures"), and (iii) setting a hearing regarding a sale pursuant to such Auction and procedures; and the Court having entered this Court's prior order, dated April 5, 2024 [ECF No. 254] (the "Bid Procedures Order"), and QB Loop Property LP, a Texas limited partnership (the "Buyer") having submitted the highest or otherwise best bid for the property located at 2425 West Loop South, Houston, Texas (the "Property") and related assets, as reflected in the Asset Purchase Agreement (as defined below); and a hearing having been held on July 8, 2024 (the "Sale Hearing") to consider approval of the Asset Purchase Agreement and the transaction with the Buyer (the "Sale Transaction"); and the Court having considered (i) the Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of July 2, 2024, by and between the Buyer and the Trustee (the "Asset Purchase Agreement"), a copy of which is attached hereto as **Exhibit A**, whereby the Trustee has agreed, subject to Court approval, among other things, to sell the property indicated therein (the "Purchased Assets") to the Buyer, including, without limitation, the Designated Assigned Contracts (as defined herein) that will be assumed and assigned to the Buyer on the terms and conditions set forth in the Asset Purchase Agreement and set forth herein, and (iii) the record of all proceedings in the Chapter 11 Case; and it appearing that due and sufficient notice of the Motion, the Asset Purchase Agreement, the Bid Procedures Order, and the form of this order (the "Sale Order") have been provided; and, except as otherwise provided for herein, all objections to the Sale Transaction having been withdrawn, resolved, or overruled; and, after due deliberation and for the reasons set forth on the record of the Sale Hearing, it appearing that the relief granted herein is in the best interests of the Debtor's estate; and good and sufficient cause appearing therefor;

**IT HEREBY IS FOUND AND DETERMINED THAT**:

A.        **Fed. R. Bankr. P. 7052**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.

B.        **Jurisdiction and Venue**. This Court has jurisdiction over the Motion, the Sale Transaction, and over the property of the Debtor's bankruptcy estate, including the Purchased Assets, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the General Order 2012-6 of the U.S. District Court for Southern District of Texas. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and other legal predicates for the relief sought in the Motion and granted herein include sections 105, 362, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9008, and 9014.

C.        **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. In the absence of a stay pending appeal, the Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after entry of this Sale Order, subject to the provisions of the Asset Purchase Agreement, and

shall not be subject to any applicable stay, including any stay under Bankruptcy Rules 6004(h) and 6006(d).

D.     **Notice and Opportunity to Object**. As evidenced by the certificates of service on file with the Court, due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Motion, the Sale Hearing, the Sale Transaction, the Asset Purchase Agreement, the potential assumption and assignment of the Potential Assigned Contracts (as defined below) and proposed Cure Amounts, and the identification or means of identification of the particular Designated Assigned Contracts (as defined below) has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bid Procedures Order.

E.     **Property of Estate**. The Purchased Assets to be sold and assigned by the Trustee to the Buyer pursuant to the Asset Purchase Agreement are property of the Debtor's estate and title thereto is vested in the Debtor's estate.

F.     **Marketing Process**. (i) The Trustee and his advisors engaged in a marketing and sale process pursuant to the Bid Procedures Order and the Bid Procedures that was sufficient under the circumstances; (ii) the Trustee and his advisors conducted a fair and open sale process; (iii) the sale process and the Bid Procedures were non-collusive and duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets; and (iv) the process conducted by the Trustee pursuant to the Bid Procedures Order and the Bid Procedures was reasonably calculated to obtain the highest or otherwise best value for the Purchased Assets obtainable under the circumstances.

G.     **Auction**. The Auction occurred on June 21, 2024, in accordance with the Bid Procedures Order.   The Auction was properly conducted in a manner designed to result in the

highest or otherwise best offer for the Purchased Assets. At the Auction, the Trustee agreed in an exercise of his business judgment, in consultation with his professionals and advisors, to enter and consummate the Asset Purchase Agreement. At the conclusion of the Auction, the Trustee announced that he had determined that the offer submitted by the Buyer was the highest and best offer, and that the Buyer was the Successful Bidder in accordance with the Bid Procedures Order.

H. **Corporate Authority**. Subject to this Order, the Trustee will have all necessary power and authority to (i) execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, (ii) consummate the Sale Transaction, and (iii) execute any document necessary or appropriate to effectuate the Sale Transaction. No consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Trustee to consummate the Sale Transaction on behalf of the Debtor's bankruptcy estate.

I. **Business Justification**. The Trustee has demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Asset Purchase Agreement and the other agreements, documents, and instruments deliverable thereunder, pursuant to section 363(b) of the Bankruptcy Code.

J. **Highest and Otherwise Best Offer**. Pursuant to the Asset Purchase Agreement, the Buyer has offered to purchase the Purchased Assets in exchange for (i) $27,250,000 in cash and (ii) the assumption of all Assumed Liabilities. The consideration to be provided by the Buyer pursuant to the Asset Purchase Agreement: (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Purchased Assets received at the Auction; and (iii) constitutes reasonably equivalent value and fair consideration for the Purchased Assets. No other person, entity, or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Buyer. The Trustee's determination that the Asset Purchase

5

Agreement constitutes the highest and best offer likely obtainable for the Purchased Assets was a valid, sound, and reasonable exercise of the Trustee's business judgment consistent with his fiduciary duties. The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable under the circumstances. The Asset Purchase Agreement was not entered into by the Buyer or the Trustee for the purpose of, nor does it have the effect of, hindering, delaying, or defrauding any creditor of the Debtor under any of the foregoing federal or state laws or any other applicable laws.

K.    **Good Faith Purchaser**. The Asset Purchase Agreement and the Sale Transaction were proposed, negotiated, and entered into by and among the Trustee and the Buyer without collusion or fraud, in good faith, and at arm's length. The Buyer is a good faith purchaser within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to the full protection of that provision with respect to the Asset Purchase Agreement, the Sale Transaction, each term of the Asset Purchase Agreement (and any ancillary documents executed in connection therewith) and each term of this Sale Order. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and the Buyer would not consummate the Sale Transaction without such protections. There has been no showing that the Trustee or the Buyer have engaged in any action or inaction that would cause or permit the Asset Purchase Agreement or the Sale Transaction to be avoided or any costs or damages to be imposed under Bankruptcy Code section 363(n). Neither the Buyer, nor any of its affiliates, members, controlling partners, officers, directors, principals, or shareholders is an "insider" of the Debtor as that term is defined in Bankruptcy Code section 101(31). No common identity of directors, managers, controlling partners, shareholders, or members exists between the Debtor and the Buyer.

L.        **Validity of the Transfer**. As of the closing of the Sale Transaction (the "Closing"), the transfer of Purchased Assets to the Buyer will be a legal, valid, and effective transfer of such Purchased Assets, and will vest the Buyer with all right, title, and interest of the Debtor and the Debtor's estate in and to the Purchased Assets, free and clear of all liens, claims, encumbrances, and other interests. The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, sections 105(a), 363(b), 363(f), 363(h), 365(f), and 365(m), and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

M.        **Legal, Valid, and Binding Transfer**. The Asset Purchase Agreement is a valid and binding contract between the Trustee, on behalf of the Debtor's bankruptcy estate, and the Buyer and shall be enforceable pursuant to its terms. The Asset Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Trustee, any successor trustee appointed, the Debtor, 2425 WL LLC, and Ali Choudhri, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

N.        **Free and Clear**. The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction if the transfer of the Purchased Assets to the Buyer and the assumption and assignment of the Designated Assigned Contracts to the Buyer were not free and clear of all liens, claims, encumbrances and other interests, as provided for herein, or if the Buyer would, or in the future could, be liable for any such claims. Subject to the provisions of this Sale Order and except as may be specifically provided in the Asset Purchase Agreement or this Sale Order, the Trustee's sale of the Purchased Assets shall be free and clear of any and all interests, including all liens, claims, and encumbrances, because, in each case, one or

7

more of the standards set forth in sections 363(f)(1) through (5) of the Bankruptcy Code have been satisfied. Each entity with an interest, including any lien, claim, or encumbrance, in the Purchased Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the extent that they did not object; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such lien, claim, interest, or encumbrance; or (iii) otherwise falls within the provisions of Bankruptcy Code section 363(f). Except to the extent expressly set forth in the Asset Purchase Agreement, this Sale Order is and shall be effective on the date of the Closing (the "Closing Date") as a determination that all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged, and terminated, in each case to the fullest extent permitted by law, and that the conveyances described herein have been effected; *provided that* such liens, claims, encumbrances, and other interests shall attach to the proceeds of the Sale Transaction in the order of their priority, with the same validity, force, and effect which they now have against the Purchased Assets. Except to the extent expressly set forth in the Asset Purchase Agreement, the Buyer shall not be responsible for any liens, claims, encumbrances, and other interests, including any derivative, successor, transferee, or vicarious liability as a result of the transactions authorized herein, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Debtor's business or administration of the bankruptcy estate prior to the Closing or by reason of the transactions contemplated by this Sale Order on account of the Sale Transaction. Upon the Closing Date, all persons having liens of any kind or nature whatsoever against the Purchased Assets arising prior to the Closing Date shall be forever barred, estopped, and permanently enjoined from pursuing or

asserting such liens against the Buyer or any of its respective assets, property, affiliates, successors, assigns, or the Purchased Assets.

O.     **Not a *Sub Rosa* Plan**. The Asset Purchase Agreement and Sale Transaction do not constitute an impermissible *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Asset Purchase Agreement and the Sale Transaction neither impermissibly restructure the rights of the Debtor's creditors nor impermissibly dictate a liquidating plan for the Debtor.

P.     **No Successor, Derivative, or Similar Liability**. The Buyer (i) is not, and shall not be, considered a successor in interest to the Debtor, (ii) has not, *de facto* or otherwise, merged or consolidated with or into the Debtor, (iii) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (iv) is not holding itself out to the public as a continuation of the Debtor. There is no continuity or common identity between the Buyer, any of its affiliates, and the Debtor. The sale and transfer of the Purchased Assets to the Buyer, including the assumption by the Trustee and assignment, transfer, and/or sale to the Buyer and the Buyer's occupation and use of the Purchased Assets will not subject the Buyer to any liability (including any successor liability) with respect to the operation of any of the Debtor's business before Closing or by reason of such transfer, except that, upon the Closing, the Buyer shall become liable for the applicable Assumed Liabilities. Buyer shall have no obligations with respect to any liabilities of the Debtor or the Debtor's estate arising out of or related to the Purchased Assets, except as expressly provided in the Asset Purchase Agreement. The Sale Transaction contemplated under the Asset Purchase Agreement does not amount to a consolidation, merger or de facto merger of the Buyer and the Debtor and/or the Debtor's estate. The Buyer would not have acquired the Purchased Assets if it were liable for claims based upon "successor liability" theories.

Q.	**Cure Amounts**. As evidenced by the certificates of service filed with this Court, and in accordance with the provisions of the Bid Procedures Order, the Trustee has served notice upon each non-Debtor counterparty to contracts and leases the Trustee potentially would assume and assign (the "Potential Assigned Contracts") the procedures for determining issues surrounding the assumption and assignment of the Potential Assigned Contracts (the "Notice of Assumption and Assignment Procedures") and the proposed Cure Amounts upon each non-Debtor counterparty to the Contracts and Leases (the "Contract & Cure Schedule"). The service of the Notice of Assumption and Assignment Procedures and Contract & Cure Schedule was timely, good, sufficient, and appropriate under the circumstances and no other or further notice need be given with respect to the Cure Amounts for the assumption and assignment of the Potential Assigned Contracts. All non-debtor parties to the Potential Assigned Contracts have had a reasonable opportunity to object both to the Cure Amounts listed on the Contract & Cure Schedule and to the assumption and assignment of the Potential Assigned Contracts to the Buyer.

R.	**Assumption and Assignment of Assigned Contracts**. The assumption and assignment of the Potential Assigned Contracts designated by the Buyer (including those designated after the entry of this Sale Order, the "Designated Assigned Contracts") is an integral element of the Asset Purchase Agreement, is in the best interests of the Debtor's estate, and represents the reasonable exercise of the Trustee's sound business judgment. No defaults exist in the Debtor or Trustee's performance under the Designated Assigned Contracts as of the date of this Sale Order other than the failure to pay the applicable Cure Amounts, as may be required, or such defaults that are not required to be cured. In addition, the Buyer has provided adequate assurance of its ability to perform its obligations under each of the Assigned Contracts within the meaning of section 365 of the Bankruptcy Code. The assumption and assignment of the Designated

10

Assigned Contracts, subject to the conditions in the Asset Purchase Agreement, is integral to the Asset Purchase Agreement, is in the best interests of the Debtor's estate and creditors, and represents the valid and reasonable exercise of the Trustee's sound business judgment. Specifically, the assumption and assignment of the Designated Assigned Contracts (i) is necessary to sell the Purchased Assets to the Buyer, (ii) limits the losses suffered by counterparties to the Designated Assigned Contracts, and (iii) maximizes value for all of the stakeholders in the Chapter 11 Case by limiting the amount of claims against the Debtor's estate that would otherwise arise from the rejection of the Designated Assigned Contracts or sale free and clear of such interests. The Trustee has met all applicable requirements of section 365(b) of the Bankruptcy Code and the Bid Procedures Order and all other requirements and conditions under the Bankruptcy Code for the assumption and assignment to the Buyer of the Designated Assigned Contracts. Therefore, the Designated Assigned Contracts may be assumed by the Trustee and assigned to the Buyer. The assumption and assignment of each Designated Assigned Contract is approved notwithstanding any provisions in such Designated Assigned Contract or other restrictions prohibiting its assignment or transfer.

S.  **Prompt Consummation**.  The Sale Transaction must be approved and consummated promptly in order to maximize value for the Debtor's estate. Time is of the essence in consummating the Sale Transaction. The Trustee has demonstrated compelling circumstances and good and sufficient cause for the immediate approval and consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Assigned Contracts. Accordingly, there is sufficient cause to waive the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Sale Order.

T.     **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and herein establish just cause for the relief granted herein.

U.     **Necessity of Sale Order**. The Buyer would not consummate the transactions without all of the relief provided for in this Sale Order.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.     The Motion is **GRANTED** as set forth herein.

2.     Any objections, responses, or reservations of rights filed or asserted in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein, settled, or waived as announced to the Court on the record at the Sale Hearing, are hereby overruled on the merits in their entirety.

**Approval of the Asset Purchase Agreement**

3.     The Asset Purchase Agreement with the Buyer, including all of its terms and conditions, all schedules and exhibits, all ancillary documents, and all transactions contemplated therein, including, without limitation, the Sale Transaction, and the assumption and assignment of the Designated Assigned Contracts, are hereby approved in all respects.

4.     Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Trustee is authorized and empowered to (i) execute, deliver, perform under, consummate, and implement the Asset Purchase Agreement and the Sale Transaction together with all additional documents as may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction, (ii) take any and all actions as he deems necessary, appropriate, or advisable for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and the Sale Transaction, including, without limitation, any and all actions reasonably requested by the Buyer that are consistent with this Sale Order, the Asset Purchase

Agreement, and the Sale Transaction, and (iii) pay, without further order of this Court, whether before, at or after the Closing Date, any expenses or costs that are required or reasonably contemplated to be paid by the Trustee in order to consummate the transactions contemplated by the Asset Purchase Agreement or perform the obligations under the Asset Purchase Agreement.

**<u>Transfer of the Purchased Assets Free and Clear</u>**

5.        Pursuant to sections 105(a), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing of the Sale Transaction: (i) the transfer of the Purchased Assets to the Buyer pursuant to the Asset Purchase Agreement shall constitute a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest in and to the Purchased Assets; and (ii) the Purchased Assets shall be transferred to the Buyer free and clear of any and all interests, including all liens, claims, and encumbrances, except those specifically assumed by the Buyer pursuant to the Asset Purchase Agreement, with any such liens, claims, encumbrances, and other interests of which the Purchased Assets are sold free and clear to attach to the proceeds of the Sale Transaction, in the order of their priority, with the same validity, force, and effect which they had against the Purchased Assets prior to the entry of this Sale Order and the Closing, subject to any rights, claims, and defenses the Debtor, its estate, and all interested parties may possess with respect thereto; and all persons are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, against the Buyer or the Purchased Assets with respect to any such liens, claims, encumbrances, and other interests. Accordingly, the Buyer shall not have any derivative, successor, transferee, or vicarious liability as a result of the transactions authorized herein, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing or by reason of the transactions contemplated by this Sale Order.

6.        In accordance with the Asset Purchase Agreement, any property tax debt or ad valorem tax debt assessed with respect to the Purchased Assets for the taxable period that begins prior to the Closing Date and ends after the Closing Date shall be prorated between the Debtor's estate and the Buyer based on the number of full days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur on or after the Closing Date, on the other hand.  As set forth above, the Buyer shall not have any liability for the property tax debt or ad valorem tax debt accrued prior to the Closing Date.

7.        On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a legal, valid, binding, and effective, full, and complete general assignment, conveyance, and transfer of the interests of the Debtor and the Debtor's estate in the Purchased Assets, warranty deed and/or a bill of sale transferring good and marketable title in and to the Purchased Assets.

8.        The Trustee is authorized to execute any documents or instruments on behalf of the Debtor necessary or appropriate to effectuate the Sale Transaction contemplated by this Sale Order.

9.        This Sale Order is and shall be effective as a determination that all liens, claims, encumbrances, and other interests (other than those expressly assumed by the Buyer or permitted to survive under the Asset Purchase Agreement), attributable to any period ending on or before the Closing Date, shall be and are, without further action by any person or entity, unconditionally released, discharged, and terminated with respect to the Purchased Assets as of the Closing Date, except as may otherwise be set forth in the Asset Purchase Agreement or this Sale Order. The provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests shall be self-executing, and

notwithstanding the failure of the Debtor, the Trustee, the Buyer, or any other party to execute, file, or obtain releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof, all liens, claims, encumbrances, and other interests (other than those expressly assumed by the Buyer or permitted to survive under the Asset Purchase Agreement) on or against the Purchased Assets, if any, shall be deemed released, discharged, and terminated.

10.     All persons (and their respective successors and assigns) including all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trade creditors, and any other creditors or parties-in-interest who may or do hold claims against the Debtor, the Purchased Assets, the Debtor's business, and/or the Debtor's estate, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such claims against the Buyer, its affiliates, successors, assigns, its property, or the Purchased Assets, including taking any of the following actions with respect to any such claims: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against the Buyer, its affiliates, successors, assigns, assets (including the Purchased Assets), or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, its affiliates, successors, assigns, assets (including the Purchased Assets), or properties; (iii) creating, perfecting, or enforcing any claim against the Buyer, its affiliates, successors, assigns, assets (including the Purchased Assets), or properties; (iv) asserting a claim as a setoff, recoupment, or right of subrogation against any obligation due to the Buyer, its affiliates, or its successors or assigns; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the

agreements or actions contemplated or taken in respect thereof. Following the Closing, no holder of any lien, claim, encumbrance, or other interest shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such lien, claim, encumbrance, or other interest or based on any action the Debtor, Trustee, or Buyer may take prior to the Closing.

11.     Except as otherwise provided herein or in the Asset Purchase Agreement, on the Closing Date, the Trustee, the Debtor, and the Debtor's creditors are authorized to execute such documents and instruments and to take all other actions as may be reasonably necessary to document and effectuate the release of their liens, claims, encumbrances, and other interests in the Purchased Assets (other than those expressly assumed by the Buyer or permitted to survive under the Asset Purchase Agreement), if any, as such liens, claims, encumbrances, and other interests, may have been recorded or may otherwise exist. If any such creditor fails to execute any such documents or instruments or take any such actions, the Buyer is authorized to execute such documents and instruments and to take such actions on behalf of the creditor so as to document the release of such liens, claims, encumbrances, and other interests.

12.     To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor (to the extent of the Debtor's right, title and interest therein) with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer with respect to the Purchased Assets as of the Closing Date.

13.     No governmental unit (as defined in Bankruptcy Code section 101(27)) or any representative thereof may deny, revoke, suspend or refuse to renew any right, license, copyright, patent, trademark, or other permission or similar grant relating to the operation of the Purchased

16

Assets on account of the filing or pendency of the Chapter 11 Case or the consummation of the Sale Transaction to the extent that any such action by a governmental unit or any representative thereof would violate Bankruptcy Code section 525.

## Good Faith; Arm's-Length Sale

14.     The consideration provided by the Buyer under the Asset Purchase Agreement constitutes reasonably equivalent value, fair consideration, and fair value for the Purchased Assets under the Asset Purchase Agreement under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. Neither the Trustee nor the Buyer has engaged in any conduct that would cause or permit the Asset Purchase Agreement or the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  The Asset Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor under the Bankruptcy Code, or any other applicable laws.  Neither the Trustee nor the Buyer has entered into the Asset Purchase Agreement or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

15.     The Asset Purchase Agreement and the Sale Transaction are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Asset Purchase Agreement and the Sale Transaction shall not affect the validity of the sale of the Purchased Assets to the Buyer, unless this Sale Order is duly stayed pending such appeal. The Buyer is a good faith Buyer of the Purchased Assets and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

**Assumption and Assignment Procedures**

16.     Pursuant to sections 105(a), 363, and 365, of the Bankruptcy Code, the Trustee is authorized to assume the Designated Assigned Contracts (if any) designated for assumption and assignment in accordance with the Asset Purchase Agreement, pay or cause to be paid the Cure Amount for the Designated Assigned Contracts from the proceeds of the Sale Transaction, and assign the Designated Assigned Contracts to the Buyer, free and clear of all claims, liens, encumbrances, and other interests of any kind or nature whatsoever, *provided that* any contracts with RGN-MCA7387, RGN-MCA7386, 2425 West Loop, LLC, Jetall Companies, Inc. and/or Dayhome River Oaks, LLC shall not be assumed or assigned absent further order of the Court, and notwithstanding the language contained herein, all of the rights of RGN-MCA7387, RGN-MCA7386, and 2425 West Loop, LLC are reserved. The Buyer may designate additional Designated Assigned Contracts or remove any Designated Assigned Contracts up to thirty (30) days after the Closing in cooperation (a) with the Trustee if the Closing occurs prior to the effective date of a plan of reorganization or liquidation and (b) the plan proponent if the Closing occurs on or after the effective date of a plan of reorganization or liquidation. A final schedule of the Designated Assigned Contracts (the "Final Schedule of Contracts/Leases") shall be filed with the Court no later than thirty (30) days after the Closing.

17.     Subject to and conditioned upon the closing of the Sale Transaction, and subject to the designation rights and procedures contained in this Sale Order, the Bid Procedures Order, the Asset Purchase Agreement, and any confirmed plan of reorganization or liquidation, the Trustee shall pay the undisputed portion of the Cure Amounts for the Designated Assigned Contracts within three (3) business days of the filing of the Final Schedule of Contracts/Leases from the proceeds of the Sale Transaction in the amounts determined pursuant to the Assumption and Assignment Procedures, without the need for further order of the Court.

18.     The Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of section 365 of the Bankruptcy Code.

19.     The Designated Assigned Contracts, consistent with the provisions contained herein, shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Designated Assigned Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, effective upon the Closing and the Trustee and the Debtor's estate shall be relieved from any post-Closing liability with respect to the Designated Assigned Contracts after such assignment to the Buyer. No sections or provisions of any Designed Assigned Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor counterparty to the Designated Assigned Contracts shall have any force or effect with respect to the Sale Transaction and assignments authorized by this Sale Order. Such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer, the Trustee, or the Debtor's estate as a result of the assumption or assignment of Designated Assigned Contracts, the Sale Transaction, or the commencement of this Chapter 11 Case. No Designated Assigned Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto, as a result of the transactions contemplated by the Asset Purchase Agreement.

20.     All defaults or other obligations of the Debtor or the Debtor's estate under the Designated Assigned Contracts arising or accruing prior to the Closing (without giving effect to

any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured, upon payment of the Cure Amount for the Designated Assigned Contracts, and in no event shall the Buyer, the Trustee, the Debtor, or the Debtor's estate have any liability whatsoever under any Designated Assigned Contract arising from or related to the time period prior to the Closing Date. The non-debtor counterparties to the Designated Assigned Contracts are forever barred and permanently enjoined from asserting against the Trustee, the Debtor, the Debtor's estate, the Buyer, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other claim or obligation under the Designated Assigned Contracts arising or incurred prior to the Closing, other than the Cure Amounts for the Designated Assigned Contracts. The Cure Amounts shall not be subject to further dispute or audit, including, without limitation, any audit based on performance prior to the Closing Date, irrespective of whether such Designated Assigned Contract contains an audit clause. After the payment of the applicable Cure Amounts, none of the Debtor, the Debtor's estate, the Trustee, or the Buyer shall have any further liabilities to the counterparties to the Designated Assigned Contracts other than the Buyer's obligations under the Designated Assigned Contracts that accrue and become due and payable on or after the Closing Date.

21.     In the event of a dispute pending as of the Closing regarding the assumption and assignment or cure of any Designated Assigned Contract, any applicable cure payments with respect to such Designated Assigned Contract shall be made following the entry of an order resolving any such dispute (or upon the consensual resolution of such dispute as may be agreed by the Trustee and such non-Debtor counterparty).

22. The failure of the Debtor, Trustee, or the Buyer to enforce, at any time, one or more terms or conditions of any Designated Assigned Contract shall not be a waiver of such terms or conditions or of the right of the Debtor, the Trustee, or the Buyer, as the case may be, to enforce every term and condition of the Designated Assigned Contracts. The validity of the assumption and assignment of the Designated Assigned Contracts to the Buyer shall not be affected by any existing dispute between the Debtor or the Trustee and any non-debtor counterparty to such Designated Assigned Contract. Any party that may have had the right to consent to the assignment of any Designated Assigned Contract is deemed to have consented for the purposes of section 365 of the Bankruptcy Code and otherwise if such party failed to file a timely objection to the assumption and assignment of such Designated Assigned Contract.

23. To the extent a non-debtor counterparty to a Potential Assigned Contract failed to timely object to the Cure Amount, (i) such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time, and (ii) such counterparty shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and if designated by the Buyer for assumption and assignment, the Buyer shall enjoy all of the Debtor's rights and benefits under each such Designated Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

**Ipso Facto Clauses Ineffective**

24. Except as otherwise specifically provided for by order of this Court, the Designated Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, including all rights of the Buyer as the assignee of the Designated Assigned Contracts, notwithstanding any provision in any such

Designated Assigned Contracts (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. There shall be no, and all non-Debtor parties to any Designated Assigned Contract are forever barred and permanently enjoined from raising or asserting against the Debtor, the Debtor's estate, or the Buyer any defaults, breaches, claims, pecuniary losses, rent accelerations, escalations, assignment fees, increases, or any other fees charged to the Buyer, the Debtor, or the Debtor's estate as a result of the assumption or assignment of the Designated Assigned Contracts.

25.     Except as otherwise specifically provided for by order of this Court, upon the Trustee's assignment of the Designated Assigned Contracts to the Buyer, no default shall exist under any Designated Assigned Contracts, and no counterparty to any Designated Assigned Contracts shall be permitted to declare a default by the Debtor, the Trustee, or the Buyer, or otherwise take action against the Buyer, as a result of the Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Designated Assigned Contracts. Any provision in a Designated Assigned Contract that prohibits or conditions the assignment of such Assumed Contract in accordance with the Asset Purchase Agreement (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, set off, recoup, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect, but only in connection with the assignment of such Designated Assigned Contract in connection with the sale to the Buyer approved by this Sale Order. The failure of the Debtor, Trustee, or the Buyer to enforce at any time one or more terms or conditions of any Designated Assigned Contract shall not be a waiver of such terms or

conditions, or of the Trustee's and the Buyer's rights to enforce every term and condition of the Designated Assigned Contract.

### No Successor Liability

26.     The Buyer has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of successor liability of the Buyer to the greatest extent allowed by applicable law and neither the Buyer nor any of its affiliates shall be deemed to: (a) be a legal successor, or otherwise deemed to be a successor, to the Debtor under any theory of law or equity; (b) have, de facto or otherwise, merged with or into the Debtor or its estate; (c) have a common identity or a continuity of enterprise with the Debtor; or (d) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtor or any business, enterprise, or operation of the Debtor.  Upon the Closing, to the maximum extent available under applicable law, Buyer's acquisition of the Purchased Assets owned by the Debtor shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of Closing (other than, to the extent applicable, any Assumed Liabilities). The operations of the Buyer and its affiliates shall not be deemed a continuation of the Debtor's business as a result of the acquisition of the Purchased Assets.

27.     Neither the purchase of the Purchased Assets by the Buyer nor the fact that the Buyer is using any of the Purchased Assets previously operated by the Debtor will cause the Buyer to be deemed a successor in any respect to the Debtor's businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements

under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine.

## Backup Bidder

28.     If the Buyer fails to timely close the Sale Transaction pursuant to the Asset Purchase Agreement as the result of Buyer's default thereunder, the Trustee is authorized to sell the Assets to the National Bank of Kuwait, S.A.K.P., New York Branch (the "Backup Bidder") for a credit bid amount totaling $27,000,000 and otherwise under the terms of Stalking Horse Agreement and the Chapter 11 Plan of Liquidation of the Debtor by National Bank of Kuwait S.A.K.P., New York Branch [ECF No. 194] (the "Plan"), as modified by the confirmation order [ECF No. 566] (the "Confirmation Order") entered by the Court.

29.     The terms of this Sale Order shall apply in all respects to any sale of the Assets to the Backup Bidder as if the Backup Bidder were the Buyer, except that, notwithstanding anything to the contrary in this Sale Order, (a) the payments to holders of allowed claims shall be made as set out in the Plan and Confirmation Order and (b) the Plan and Confirmation Order shall control in the event of any inconsistency between this Sale Order and the Plan or Confirmation Order.

## Partial Disbursement of Proceeds

30.     Within ten (10) days of the Closing of the Sale Transaction to the Successful Bidder pursuant to this Order, the Trustee is authorized and directed to make from the cash proceeds of the Sale Transaction (collectively, the "Directed Payoff Amounts" *(a)* any payments ordered by the Court, including without limitation any order on the Application for Reimbursement of Fees and Expenses Pursuant to 11 U.S.C. § 506(b) and Federal Rule of Bankruptcy Procedure 2016(a) [ECF No. 575] filed by CC2 TX, LLC, and *(b)* the following payments:

| Creditor/Claimant | Claim No. | Amount July 2024 | Amount August 2024 |
|---|---|---|---|
| City of Houston | 1 | $424,633.58 | $427,856.20 |
| Houston I.S.D. | 2 | $781,803.68 | $787,656.62 |
| Houston Comm. Coll. System | 3 | $83,884.08 | $427,856.20 |
| Harris County Taxing Authorities | 4 | $581,890.09 | $587,709.00 |
| CC2 TX, LLC | 12 | $930,176.52 + $325.07 per diem | $937,978.20 + $325.07 per diem |
| National Bank of Kuwait, S.A.K.P., New York Branch | 13 | $1,696,384.85 | $1,696,384.85 |

Payments to creditors as a Directed Payoff Amount shall not (x) limit the rights of any creditor to receive the full amount due under applicable law or (y) preclude any party from pursuing claims against a creditor receiving a Directed Payoff Amount, including any claims of Ali Choudhri against the National Bank of Kuwait.

31.     Subject to the agreement of the National Bank of Kuwait, S.A.K.P., New York Branch, the Trustee is authorized but not directed to pay documented additional amounts necessary to satisfy the secured claims of the creditors receiving the Directed Payoff Amounts, other than the National Bank of Kuwait, comprising interest accrual and costs and expenses incurred prior to Closing that are not reflected in the Directed Payoff Amounts (the "Authorized Payoff Amounts"). The Authorized Payoff Amounts shall include, subject to the agreement of the National Bank of Kuwait, S.A.K.P., late fees of CC2 TX, LLC in the amount of $479.76 per month from the Petition Date.

32.     For the avoidance of doubt, the Trustee may make the Directed Payoff Amounts and Authorized Payoff Amounts simultaneously or contemporaneously with the Closing.

### Injunction Regarding Actions by Insiders Absent Leave of the Court

33.     The Debtor, Mr. Choudhri, any entity owned or controlled directly or indirectly by Mr. Choudhri, and any entity to which Mr. Choudhri is an insider as defined in Bankruptcy

Code section 101(31) are barred and estopped from pursuing or asserting any lawsuit or other action against the Buyer, the Trustee, or the forgoing's professionals involving the Sale Transaction, the Auction, or the sale process with respect to the Purchased Assets without first obtaining leave of this Court.

### **Other Related Relief**

34. All persons that are in possession of some or all of the Purchased Assets as of or after the Closing are hereby directed to surrender possession of such Purchased Assets to the Buyer as of the Closing or at such time thereafter as the Buyer may request. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Trustee to transfer the Purchased Assets to the Buyer. The Trustee agrees to exercise commercially reasonable efforts to assist the Buyer in assuring that all persons that are presently, or on the date of the Closing may be, in possession of some or all of the Purchased Assets in which the Debtor's estate holds an interest will surrender possession of the Purchased Assets either to (i) the Trustee before the Closing Date, or (ii) the Buyer on or after the date of the Closing.

35. This Sale Order is and shall be binding upon and shall govern acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests (other than those expressly assumed by the Buyer or permitted to survive under the Asset Purchase Agreement) (all such entities being referred to as the "Recording Officers"). All Recording Officers are authorized to strike recorded liens, claims, interests, and encumbrances

against the Purchased Assets recorded prior to the date of this Sale Order unless the Asset Purchase Agreement expressly provides that the Buyer is acquiring the Purchased Assets subject to such liens, claims, encumbrances, and other interests. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record, and this Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. If any person or entity which has filed statements or other documents or agreements evidencing liens on, or other interests in, all or any portion of the Purchased Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of all liens, claims, encumbrances, or other interests which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Trustee and Buyer are hereby authorized, on behalf of the Debtor, the Debtor's estate, and each of the Debtor's creditors, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets, or take such other appropriate action, including seeking relief in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such liens, claims, encumbrances, or other interests with respect to the Purchased Assets. Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets, is hereby authorized and directed to

accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement and approved by this Sale Order.

36.     Following the Closing, no holder of any liens, claims, encumbrances, or other interests with respect to the Purchased Assets (other than those expressly assumed by the Buyer or permitted to survive under the Asset Purchase Agreement) or other party in interest may interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such liens, claims, encumbrances, or other interests, or any actions that the Debtor or the Trustee may take in the Chapter 11 Case, and no party may take any action to prevent, interfere with, or otherwise enjoin consummation of the Sale Transaction.

37.     No "bulk sales," "bulk transfer" or similar laws (including those relating to taxes) of any state or other jurisdiction shall apply in any way to the transactions authorized herein, including the Asset Purchase Agreement and the Sale Transaction.

38.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or any other related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

39.     This Sale Order shall be binding in all respects upon the Debtor's estate, all claimants and creditors, all holders of equity interests in the Debtor, any holders of liens, claims, encumbrances, or other interests against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtor, the Buyer and its affiliates, successors, and assigns, the Trustee, and any subsequently appointed estate representative or other fiduciary in the Chapter 11 Case. The Asset Purchase Agreement, the Sale Transaction, and this Sale Order shall be enforceable against and binding upon, and shall not be

subject to rejection or avoidance by, any chapter 7 or successor chapter 11 trustee appointed in the Chapter 11 Case. To the extent that anything contained in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Case or any order confirming any plan of reorganization (or liquidation) or any other order entered in these Chapter 11 Case conflicts with or derogates from the provisions of this Sale Order, this Sale Order shall control.

40.     The Asset Purchase Agreement and any related agreements, documents, or other instruments contemplated thereby may be waived, modified, amended, or supplemented by the Trustee and the Buyer in a writing signed by such parties without further order of the Court; *provided that* any such waiver, modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

41.     The failure to include specifically any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

42.     To the extent of any inconsistency between the provisions of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith shall govern, in that order.

43.     Notwithstanding the provisions of Bankruptcy Rule 6004(h) and 6006(d) or any other applicable provision of the Bankruptcy Code or the Bankruptcy Rules that may stay the effectiveness of this Sale Order, this Sale Order shall be effective and enforceable immediately and shall not be stayed.

44. The Trustee is authorized to take all actions necessary to effectuate the relief granted in this Sale Order.

45. Without further approval of this Court, the Trustee and Buyer are authorized to execute and deliver, and perform under, one or more amendments, waivers, consents or other modifications to and under the Asset Purchase Agreement and ancillary documents, in each case, in such form as the Trustee and Buyer may agree; provided that such amendment, waiver, consent, or modification does not materially modify, in a manner adverse to the Debtor's estate, the terms of the Asset Purchase Agreement.

46. This Court retains jurisdiction and power to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the Sale Transaction, and the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith and the transactions contemplated thereby.

Signed: July 08, 2024

_____
Jeffrey P. Norman
United States Bankruptcy Judge

Proposed Order Submitted By:

/s/R. J. Shannon
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
SHANNON & LEE LLP
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Facsimile: (833) 714-5770
Email: klee@shannonleellp.com
       rshannon@shannonleellp.com

Counsel to Christopher R. Murray, Chapter 11 Trustee

<u>**EXHIBIT A**</u>

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JULY 2, 2024, BETWEEN**

**Christopher R. Murray, in his capacity as the duly appointed Chapter 11 Trustee of Galleria 2425 Owner, LLC, as Seller**

**AND**

**QB Loop Property LP, a Texas limited partnership**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of July 2, 2024 (the "**Effective Date**") by and between Christopher R. Murray in his capacity as the duly appointed Chapter 11 Trustee of Galleria 2425 Owner, LLC, a Delaware limited liability company (the "**Seller**" or the "**Chapter 11 Trustee**") and QB Loop Property LP, a Texas limited partnership ( "**Buyer**" together with Seller, the "**Parties**" and each a "**Party**").

A.     **WHEREAS**, on December 5, 2023 (the "**Petition Date**"), the Galleria 2425 Owner, LLC (the "**Debtor**") filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), initiating Case No. 23-34815 (JPN) (the "**Chapter 11 Case**").

B.     **WHEREAS**, the Real Property and Personal Property are property of the bankruptcy estate pursuant to 11 U.S.C. § 541 (the "**Bankruptcy Estate**").

C.     **WHEREAS**, on February 9, 2024, the Bankruptcy Court entered an order appointing Christopher R. Murray as trustee of the Chapter 11 Case.

D.     **WHEREAS**, the Chapter 11 Trustee is the sole representative of the Bankruptcy Estate.

E.     **WHEREAS**, after the Petition Date, the Chapter 11 Trustee sought authorization from the Bankruptcy Court for approval of his entry into this Agreement and certain other matters pertaining to the sale of the Real Property.

F.     **WHEREAS**, notwithstanding any provisions herein to the contrary, Seller and Buyer both acknowledge and agree that this Agreement is subject to the Bankruptcy Court's final authorization and approval, and upon such terms as the parties have agreed and as authorized by the Bankruptcy Court, Seller desires to sell the Real Property, and Buyer desires to purchase the Real Property and assume certain liabilities of the Bankruptcy Estate, in a sale pursuant to sections 105(a), 363, 1123 and/or 1129 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.     ***Terms and Incorporation of Definitions***. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bid Procedures. Except as otherwise specifically provided herein, the following terms shall have the meanings specified below.

2.  ***Affiliate(s)*** as to any Person means any Persons (x) directly or indirectly controlling, controlled by or under common control with any of the foregoing or (y) as to which any of the foregoing act as trustee or beneficiary. For purposes of this definition, "control" of a person shall mean the power, direct or indirect, to direct or cause the management and policies of such person, whether by ownership of voting securities, by contract or otherwise.

3.  ***Assigned Contracts*** has the meaning set forth in Article II.

4.  ***Auction*** has the meaning set forth in the Sale and Bid Procedures.

5.  ***Bankruptcy Contingencies*** means the occurrence of each of the following: (a) the Sale and Bid Procedures Order shall have become a Final Order, (b) the Sale Order shall become a Final Order, and (c) the Confirmation Order shall become a Final Order.

6.  ***Business Day*** means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

7.  ***Broker*** means Hilco Real Estate, LLC or other real estate broker employed by the Chapter 11 Trustee in the Chapter 11 Case.

8.  ***Broker Compensation*** means the compensation earned by the Broker by a sale pursuant to this Agreement and any attendant expenses.

9.  ***Cash Consideration*** means the cash paid by the Buyer at closing.

10. ***Closing*** has the meaning set forth in Article V.

11. ***Closing Date*** has the meaning set forth in Article V.

12. ***Confirmation Order*** means an order confirming a plan of reorganization in the Chapter 11 Case that implements or incorporates by reference the transaction provided for by this Agreement.

13. ***Cure Costs*** means, to the extent applicable, all Assumed Liabilities that must be paid and obligations that must be satisfied under Sections 365 of the Bankruptcy Code, in connection with the assumption by Seller and assignment to Buyer of any Assigned Contract. For the avoidance of doubt, notwithstanding anything provided herein to the contrary, no provision herein shall be construed as an admission or wavier as to the amount of any potential cure amount, or as a representation that any assumption, rejection, or assignment within the meaning of Section 365 of the Bankruptcy Code has occurred; such assumptions, rejections, or assignments shall be addressed by order of the Bankruptcy Court accordingly, to the extent applicable.

14. ***Deed*** means the Special Warranty Deed attached hereto as **Exhibit B**.

15. ***Environmental Audit*** means an environmental audit, review or testing of the Real Property performed any third party or consultant engaged by Buyer to conduct such study.

16.     *Environmental Law* means any law, statute, ordinance or regulation pertaining to health, industrial hygiene or the environment, including, without limitation, CERCLA (Comprehensive Environmental Response, Compensation and Liability Act of 1980) and RCRA (Resources Conservation and Recovery Act of 1976).

17.     *Exhibits* means the following, each of which is attached hereto and incorporated herein by this reference:

> Exhibit A - Legal Description
> Exhibit B - Form of Deed
> Exhibit C - FIRPTA Affidavit
> Exhibit D - Bill of Sale
> Exhibit E - Assignment and Assumption
> Exhibit F - Schedule of Assigned Contracts

18.     *Final Order* means an order or judgment of the Court as entered on the docket in the Chapter 11 Case, or other court of competent jurisdiction, the operation or effect of which has not been stayed, reversed or amended, and as to which order or judgment (or any reversal, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order, shall not cause an order not to be a Final Order.

19.     *FIRPTA Affidavit* means the Transferor's Certificate of Non-Foreign Status set forth on **Exhibit C** attached hereto.

20.     *Governmental Authority* means any federal, state, or local government, governmental authority, or regulatory or administrative authority or any court, tribunal, or judicial body having jurisdiction, including the Bankruptcy Court.

21.     *Hazardous Substance* means any substance, material or waste which is or becomes designated, classified or regulated as being "toxic" or "hazardous" or a "pollutant" or which is or becomes similarly designated, classified or regulated under any Environmental Law.

22.     *Improvements* means all improvements, buildings, fixtures, and structures, if any, owned by Seller and situated on the Real Property, including, without limitation, all apparatus, equipment and appliances used in connection with the operation or occupancy of the Real Property, such as heating and air conditioning systems and facilities used to provide any utility, refrigeration, ventilation, garbage disposal, or other services on the Real Property.

23.     *Knowledge of Seller* means the actual knowledge of the Chapter 11 Trustee or his counsel in the Chapter 11 Case.

24.     *Law(s)* means all applicable federal, state and local statutes, ordinances and codes, including the Bankruptcy Code.

3

25. **_Leases_** means all leases, lease amendments, lease guaranties, work letter agreements, subleases, assignments, licenses, concessions and similar agreements granting a real property interest to any Person for the use or occupancy of any portion of the Real Property or the Improvements.

26. **_Liability_** means any liability, debt, loss, damage, fine, judgment, penalty, or obligation of any kind or nature, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

27. **_Permits_** means all building permits, certificates of occupancy, and other certificates, permits, licenses and approvals pertaining to the Real Property.

28. **_Person_** means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

29. **_Personal Property_** means (i) the equipment, furniture, and other tangible personal property, if any, that are actually owned by Seller, located on the Real Property and used in the operation of the Real Property, (ii) any insurance policies insuring the Real Property and/or Personal Property owned by Seller or the Debtor, and (iii) any claim or cause of action related to any such insurance policy against any insurance company that has insured the Real Property and/or Personal Property.

30. **_Plan_** means the Chapter 11 Plan of Liquidation of the Debtor filed by the National Bank of Kuwait, S.A.K.P., New York Branch, dated as of April 10, 2024, as such Plan may be amended, supplemented or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules, together with all addenda, exhibits, schedules, supplements or other attachments thereto.

31. **_Property_** means, collectively, the (i) Real Property, (ii) Improvements, (iii) Personal Property, (iv) Leases, (v) Service Contracts, and (vi) Permits.

32. **_Purchase Price_** has the meaning set forth in Article III.

33. **_Real Property_** means that certain real property located in Harris County, State of Texas and more particularly described in **Exhibit A** attached hereto.

34. **_Sale_** has the meaning set forth in the Sale and Bid Procedures.

35. **_Sale and Bid Procedures_** means the Sale and Bid Procedures approved by the Bankruptcy Court and attached as Exhibit 1 to the Sale and Bid Procedures Order.

36. **_Sale Procedures Motion_** means the Chapter 11 Trustee's motion for entry of an order from the Bankruptcy Court seeking (i) approval of the Sale and Bid Procedures for the sale of the Real Property; (ii) scheduling the Auction; (iii) approving assumption and assignment procedures; (iv) approving the form of notice; and (v) granting related relief.

37. **_Sale and Bid Procedures Order_** means an order of the Bankruptcy Court granting the Sale and Bid Procedures Motion and approving the Sale and Bid Procedures.

38.     **Sale Order** means an order by the Bankruptcy Court authorizing the sale of the Property to the Buyer free and clear of all liens, claims and encumbrances that are not Assumed Liabilities under sections 363(b) and (f) of the Bankruptcy Code and finding that the Buyer is a good faith purchaser of the Property entitled to the protections of section 363(m) of the Bankruptcy Code. The Sale Order will be a standalone order and will not be dependent on the entry of any confirmation order in the Chapter 11 Case.

39.     **Service Contracts** means all service contracts and other contracts, agreements or instruments relating to the operation of the Property including equipment leases and those set forth on **Exhibit F** attached hereto.

40.     **Tax Lien Claims** means claims secured by ad valorem tax liens under Chapter 32 of the Texas Tax Code, other than any such claims held by the Buyer.

41.     **Title Company** means Fidelity National Title Insurance Company, 1900 West Loop South, Suite 100, Houston, Texas 77027, Attn: Ms. Debbie Barela or the entity selected by the Buyer and Seller to perform the role of title company under this Agreement.

# ARTICLE II
## PURCHASE AND SALE

1.     **Purchased Assets.** Upon the terms and subject to the conditions of this Agreement, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all claims, liens, encumbrances to the extent allowed by Sections 105(a), 363, 1123 and/or 1129 of the Bankruptcy Code, all of Seller's right, title and interest in and to:

(a)     the Real Property;

(b)     all Personal Property;

(c)     all Improvements;

(d)     all Permits that may be assigned by Seller to Buyer;

(e)     to the extent assignable and transferrable and to the extent of any interest of Seller therein, all site plans, architectural renderings, plans and specifications, engineering plans, as-built drawings, floor plans, and other similar plans or diagrams, if any, which relate to the Real Property; and

(f)     all rights and interests of Seller in and to the Service Contracts and Leases to which Seller is a party in support or furtherance of the operation of the Real Property indicated by the Buyer (collectively, the "**Assigned Contracts**," and each an "**Assigned Contract**"). The items set for in (a)-(f) above, collectively, the "**Purchased Assets.**"

2.     **Retained Assets.** The Purchased Assets shall not include any Service Contracts and Leases that are not Assigned Contracts (collectively, the "**Excluded Assets**").

3.     **Allocation of Liabilities**. Upon the terms and subject to the conditions of this Agreement, Buyer shall assume and agree to pay, perform and discharge only the Liabilities under

the Assigned Contracts, that pertain to the time period after Closing (collectively, the "**Assumed Liabilities**"). Other than the Assumed Liabilities, Buyer will not assume, expressly disclaims, and will not otherwise be responsible for any other Liabilities of Seller. For the avoidance of doubt, (a) Buyer shall be responsible for any Liabilities newly arising out of the ownership, operation and use of the Purchased Assets by Buyer after the Closing, and (b) Seller shall be responsible for any Liabilities arising out of the ownership, operation and use of the Real Property on or prior to the Closing that are not an Assumed Liability.

4. **Designation of Assigned Contracts**. The Buyer will provide the Trustee with a schedule of all Assigned Contracts on or before June 30, 2024.

## ARTICLE III
## PURCHASE PRICE AND DEPOSITS

1. **Amount**. The total consideration to be paid by Buyer to Seller for the Property (such amount the "Purchase Price") is:

(a) $26,250,000.00;

(b) $1,000,000.00 earmarked for the allowed chapter 11 administrative claims of the Seller's and Debtor's professionals in the Chapter 11 Case;[1] and

(c) the Assumed Liabilities assumed by the Buyer at Closing pursuant to Article II(3) of this Agreement.

2. **Allocation**. The Purchase Price shall be allocated among the various Purchased Assets in accordance with Section 1060 of the IRC and the applicable Treasury Regulations promulgated thereunder.

3. **Deposit**. The Buyer has deposited or will deposit $2,725,000.00 with Chicago Title and Trust Company (the "Deposit"), which Deposit shall be applied towards the Purchase Price at Closing. Prior to Closing, the Buyer and Seller shall direct Chicago Title and Trust Company to transfer the deposit to the Title Company.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

1. **Seller.** As of the Effective Date and the Closing, Seller represents and warrants to Buyer that Seller:

(a) has received no written notice of any pending or threatened condemnation or eminent domain proceedings or zoning change proceedings that would affect any party of the Real Property;

(b) other than as is set forth in this Agreement, Seller has not entered into any contracts for the sale of, and to the Knowledge of Seller, no person or entity has any option, right

---

[1] To the extent the allowed chapter 11 administrative claims of the Seller's and Debtor's professionals in the Chapter 11 Case are less than $1,000,000.00, the remaining amount shall be added to the $26,250,000.00 portion of the purchase price.

6

of first refusal, right of first offer, or any other rights to purchase, all or any portion of the Real Property;

(c)    to the Knowledge of Seller, there is no land use or zoning action or proceeding, or general or special assessment action or proceeding, or condemnation or eminent domain action or proceeding pending or threatened with respect to the Real Property;

(d)    since the date of Seller's appointment as the Chapter 11 Trustee for the Debtor, Seller has received no written notice that Hazardous Substances are now or have been used or stored on or within any portion of the Real Property except those substances which are or have been used or stored on the Real Property in the normal course of use and operation of the Real Property or the conduct of business by the tenants thereof and in compliance with all applicable Environmental Laws;

(e)    since the date of Seller's appointment as the Chapter 11 Trustee for the Debtor, Seller has received no written notice of federal, state or local enforcement, clean-up, removal, remedial or other governmental or regulatory actions under any Environmental Law instituted or completed affecting the Real Property;

(f)    since the date of Seller's appointment as the Chapter 11 Trustee for the Debtor, Seller has received no written notice of a claim made by any third party against Seller relating to any Hazardous Substances on or within the Real Property Seller shall not make any material alterations to the Property without Buyer's consent, which shall not be unreasonably withheld or delayed.

4.    **Joint Representations and Warranties**. In addition to any express agreements of the Parties contained herein and, subject to the occurrence of the Bankruptcy Contingencies, the Parties jointly represent and warrant to each other that:

(a)    each Party has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate this transaction;

(b)    all requisite action has been taken by each Party in connection with the entering into of this Agreement, the instruments referenced herein, and the consummation of this transaction;

(c)    no further consent of any partner, shareholder, creditor, investor, judicial or administrative body, Governmental Authority or other party is required in connection with entering into this Agreement;

(d)    the individuals executing this Agreement and the instruments referenced herein on behalf of each Party have the legal power, right, and actual authority to bind each Party to the terms and conditions of those documents;

(e)    this Agreement and such other documents now or hereafter to be executed and delivered by either Party under this Agreement, when executed and delivered, and subject to the satisfaction of the Bankruptcy Contingencies, will each constitute the legal, valid and binding obligations of the relevant Party enforceable against such Party in accordance with its terms; and

7

(f)   except for the Broker, neither Party has dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of either Party in connection with the transaction contemplated by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction contemplated in this Agreement.

## ARTICLE V
## CLOSING

1.   **Closing**. The closing (the "**Closing**") of the Sale shall occur remotely via the electronic exchange of documents and signature pages on or within three (3) Business Days after the conditions set forth in Article VI are satisfied or, if legally permissible, are waived (other than those conditions that by their nature are to be satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver) (or such other date as the Parties may agree in writing), or at such other time or place as Buyer and Seller may agree.  The date on which the Closing occurs is referred to as the ("**Closing Date**"), which shall be on or before August 8, 2024 (the "**Outside Closing Date**").

2.   **Title Insurance**. At the Closing, the Title Company shall agree to issue to Buyer an ALTA Owners Title Insurance Policy (2006) with coverage in an amount equal to the Purchase Price showing title to the Real Property and Improvements vested in Buyer subject only to the Permitted Exceptions and the standard printed exceptions, exclusions and conditions in the policy of title insurance (the "**Title Policy**"). Buyer shall pay the premium for the Title Policy and, if the Closing does not occur, costs related to the issuance of the title commitment. If Buyer elects to obtain any additional endorsements or an extended coverage policy, any additional premiums or costs for the extended coverage policy and endorsements shall be at Buyer's sole cost and expense.

3.   **Recording**.  At the Closing, Seller shall promptly undertake all of the following: (a) cause the Deed to be recorded with the Harris County Clerk's Office, Real Property, in the State of Texas and obtain conformed copies thereof for distribution to Buyer and Seller; and (b) direct the Title Company to issue the Title Policy to Buyer.

## ARTICLE VI
## CLOSING CONDITIONS

1.   **Title Transfer**. At the Closing, fee simple title to the Real Property and the Improvements shall be conveyed to Buyer by Seller by Deed, subject only to the following ("**Permitted Exceptions**"):

(a)   a lien for real property taxes and assessments, water charges, sewer assessments and each other lien or encumbrance of an indefinite or unascertainable amount not then delinquent;

(b)   matters of title described in the preliminary title report;

(c)   matters affecting the condition of title to the Property created by or with the written consent of Buyer;

(d)   any matters which would be shown by an inspection or a survey of the Property; and

(e)     rights of parties in possession.

2.     The Parties agree that Seller makes no express or implied warranties regarding the condition of title to the Property, and Buyer shall rely on the Title Policy for protection against any title defects.

3.     **Seller Deliveries to Buyer at Closing**. On or prior to the Closing Date, Seller shall deliver or cause to be delivered through the Title Company to Buyer:

(a)     the Deed duly executed and acknowledged by Seller and in recordable form conveying the Real Property and Improvements to Buyer;

(b)     the FIRPTA Affidavit duly executed by Seller;

(c)     the Bill of Sale duly executed by Seller;

(d)     the Assignment and Assumption Agreement executed by Seller;

(e)     possession of the Property to Buyer upon the Closing, subject to the right of parties in possession, if any; and

(f)     to the extent reasonably practicable, all books and records included in the Purchased Assets.

4.     **Buyer Deliveries to Seller at Closing**. On or prior to the Closing Date, Buyer shall deliver or cause to be delivered through the Title Company to Seller:

(a)     the Purchase Price in immediately available funds via wire transfer to a bank account specified by Seller to the Buyer and the Title Company;

(b)     the Bill of Sale duly executed by Buyer; and

(c)     the Assignment and Assumption Agreement executed by Buyer.

5.     **Conditions Precedent**.

(a)     **Seller**.  The Closing and Seller's obligations with respect to this transaction are subject to the following conditions precedent: (a) the satisfaction of each of the Bankruptcy Contingencies, (b) Buyer's delivery to Seller on or before the Closing Date of the items described in Article VI(4), (c)  Buyer shall have performed and complied with all material agreements and covenants to be performed by Buyer hereunder, and Seller shall not have notified Buyer in writing of any breach and such breach has not been remedied within three (3) days thereafter, and (d) Buyer's representations, warranties and covenants set forth in this Agreement shall be true and correct as of the Closing Date.

(b)     **Buyer**.  The Closing and Buyer's obligations with respect to this transaction are subject to the following conditions precedent: (a) the satisfaction of each of the Bankruptcy Contingencies, (b) Seller's delivery to Buyer on or before the Closing Date of the items described

in Article VI(3), (c) Seller shall have obtained (with the reasonable assistance of Buyer) a Final Order authorizing Seller's assumption of the Assigned Contracts and the assignment of same to Buyer, to the extent not otherwise included within the Sale Order, (d) Seller shall have performed and complied with all material agreements and covenants to be performed by Seller hereunder, and Buyer shall not have notified Seller in writing of any breach and such breach has not been remedied within three (3) days thereafter, (e) Seller's representations and warranties set forth in this Agreement shall be true and correct as of the Closing Date, and (f) the Title Company shall have provided an irrevocable commitment to issue the Title Policy.

(c) **All Parties**. The obligation of each Party to consummate the Sale on the Closing Date is subject to the fulfillment of the following conditions: (a) the Bankruptcy Court shall have entered the Sale and Bid Procedures Order; (b) the Bankruptcy Court shall have entered the Sale Order and such order has become a Final Order; and (c) there shall not be in effect any Law restraining, enjoining, or prohibiting the consummation of the Sale; provided that, notwithstanding anything to the contrary in this Article VI(5), the Buyer, and only the Buyer, may waive the obligation that any order entered by the Bankruptcy Court become a Final Order as a condition to Closing.

6. **Frustration**. No Party may rely on the failure of any condition set forth in Article VI (3) and (4) as the case may be, to be satisfied to excuse such party's obligation to effect the Closing if such failure was caused by such Party's breach of this Agreement.

## ARTICLE VII
## COVENANTS

Between the Effective Date and the Closing Date, Seller:

(a) shall not enter into any new contract or other agreement relating to the Property without Buyer's written consent;

(b) shall refrain from committing any waste upon the Real Property;

(c) shall keep all insurance policies covering or relating to the Real Property in full force and effect;

(d) shall not encumber the Real Property or sell or transfer any interest or option in the Real Property other than in accordance with the Sale and Bid Procedures Order;

(e) shall not sell, assign, or otherwise transfer any development rights in the Real Property other than in accordance with the Sale and Bid Procedures Order;

(f) shall not submit any application relating to zoning, rezoning or other land use matter for the Real Property without Buyer's written consent; and

(g) shall not apply for any new permit, license or certificate relating to the Real Property without Buyer's written consent.

(h)      absent written consent of Buyer, shall not convey any interest in the Property and shall not subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters after the date of this Agreement, except as may be provided for in this Agreement, which shall not be eliminated or removed prior to the Closing Date;

(i)      shall maintain the Property in substantially the same condition as at the Effective Date, ordinary wear and tear excepted; and

(j)      shall (i) keep and perform all of the obligations to be performed by Seller under any Leases or Service Contracts, (ii) not enter into any contract or agreement providing for the provision of goods or services to or with respect to the Property or the operation thereof unless such contracts or agreements can be terminated upon not more than thirty (30) days' notice and without payment of penalty, and (iii) not enter into any new Leases for any portion of the Property or extend the terms of any existing Leases without Buyer's written consent, which consent shall not be unreasonably withheld or delayed.

## ARTICLE VIII
## BANKRUPTCY PROVISIONS

1.      **Bankruptcy Court Approval**.  Seller and Buyer acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to the Bankruptcy Court's approval. Seller and Buyer acknowledge that (a) each must comply with the Sale and Bid Procedures and Sale and Bid Procedures Order, and (b) Buyer must provide adequate assurance of its future performance within the meaning of section 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts. Seller agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Buyer's representatives available to testify before the Bankruptcy Court.

## ARTICLE IX
## PRORATIONS

Prorations shall be made as of the Closing Date as if Buyer were in title for the entire Closing Date, and the following shall be prorated and adjusted between Seller and Buyer:

(a)      **Utilities**. Buyer shall notify the utility companies that all utility bills for the period commencing on the Closing Date are to be sent to Buyer. In addition to the Purchase Price, Buyer shall pay to Seller an amount equal to the total of all utility deposits held by utility companies and Seller shall assign to Buyer all of Seller's right, title and interest in any such utility deposits; *provided*, *however*, Seller reserves the right to receive a return of such utility deposits and in such event, Buyer shall arrange for substitute deposits with the utility companies as may be required. If following the Closing Date either Buyer or Seller receives a bill for utilities or other services provided to the Property for the period on which the Closing Date occurred, then Buyer and Seller shall equitably prorate the bill.

(b)      **Rental Income**. Uncollected rent shall not be prorated at Closing. Buyer

11

shall have the right to collect delinquent rent.

(c) **Service Contracts**. If after the Closing Date, either Seller or Buyer receives a bill for services provided under the Service Contracts for the period after which the Closing Date occurred, Buyer shall be responsible for such bill.

(d) **Other Transaction Costs**. All other fees, costs and expenses not expressly addressed in this Article IX or elsewhere in this Agreement shall be allocated between Seller and Buyer in accordance with applicable local custom for similar transactions.

(e) **Tenant Deposits**. The amount of all cash security and any other cash tenant deposits actually held by Seller, and any interest due thereon (if required by law or contract to be earned thereon) and not already applied to tenant obligations under the Leases, if any, shall be credited to Buyer. Buyer will indemnify, defend, and hold Seller harmless from and against all demands and claims made by tenants with respect to any security deposits transferred or credited to Buyer at Closing and will reimburse Seller for all attorneys' fees incurred or that may be incurred as a result of any such claims or demands.

(f) **Method of Proration**. All prorations shall be made as of the Closing Date based on a 365-day year.

## ARTICLE X
## COSTS AND EXPENSES

Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own costs and expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries, independent accountants, and any mortgage brokers) incurred in connection with this Agreement and any transaction contemplated hereby. All other normal costs and expenses shall be allocated between Buyer and Seller in accordance with the customary practice in the county in which the Real Property is located, provided that Buyer shall pay: (i) all premiums for the Title Policy, any additional cost of an extended coverage title policy and the cost of any endorsements required by Buyer; and document recording charges.

## ARTICLE XI
## "AS IS"

EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE IV ("**SELLER'S WARRANTIES**"), TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THIS SALE IS MADE AND WILL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS OR IMPLIED) BY SELLER. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER AGREES TO ACCEPT THE PROPERTY ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, AND WITHOUT ANY REPRESENTATION OR WARRANTY RELATING TO THE PROPERTY, ALL OF WHICH SELLER HEREBY DISCLAIMS EXCEPT FOR SELLER'S WARRANTIES. NONE OF SELLER OR ANY OF ITS SHAREHOLDERS, MEMBERS, PARTNERS, TRUSTEES, DIRECTORS, OFFICERS, MANAGERS, EMPLOYEES, AGENTS (INCLUDING BROKER) OR REPRESENTATIVES, NOR ANY PERSON PURPORTING TO REPRESENT ANY OF THE FOREGOING, HAVE MADE ANY REPRESENTATION, WARRANTY, GUARANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO THE PROPERTY OR ANY

PORTION THEREOF, WRITTEN OR ORAL, EXPRESS OR IMPLIED, ARISING BY OPERATION OF LAW OR OTHERWISE.

EXCEPT FOR SELLER'S WARRANTIES, NO WARRANTY OR REPRESENTATION IS MADE BY SELLER RELATED TO THE PROPERTY OF ANY KIND, INCLUDING WITHOUT LIMITATION ANY WARRANTY AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, HABITABILITY, DESIGN, QUALITY, CONDITION, OPERATION OR INCOME, COMPLIANCE WITH DRAWINGS OR SPECIFICATIONS, ABSENCE OF DEFECTS, ABSENCE OF HAZARDOUS OR TOXIC, ABSENCE OF FAULTS, FLOODING, OR COMPLIANCE WITH LAWS AND REGULATIONS (INCLUDING LAWS AND REGULATIONS RELATING TO HEALTH, SAFETY, AND THE ENVIRONMENT). SPECIFICALLY, BUT WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY EXPRESSLY DISCLAIMS THE IMPLIED WARRANTY OF HABITABILITY. BUYER ACKNOWLEDGES THAT IT HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC USE, COMPLIANCE, AND LEGAL CONDITION OF THE PROPERTY AND THAT, EXCEPT FOR SELLER'S WARRANTIES, BUYER IS NOT NOW RELYING, AND WILL NOT LATER RELY, UPON ANY REPRESENTATIONS AND WARRANTIES MADE BY SELLER OR ANYONE ACTING OR CLAIMING TO ACT, BY, THROUGH OR UNDER OR ON SELLER'S BEHALF CONCERNING THE PROPERTY.

The provisions of this <u>Article XI</u> shall survive indefinitely and closing or termination of this Agreement and shall not be merged into the closing documents.

## ARTICLE XII
## <u>CONDEMNATION</u>

Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced or has been threatened before the Closing Date, and risk of loss to the Property due to fire, flood or any other cause before the Closing Date, shall remain with Seller. If before the Closing Date the Property or any portion thereof shall be materially damaged, or if the Property or any material portion thereof shall be subjected to a <u>bona fide</u> threat of condemnation with respect to the taking by eminent domain or condemnation, then Buyer may terminate this Agreement by written notice to Seller given within five (5) days after Seller notifies Buyer of the damage or taking. If the Closing Date is within the aforesaid 5-day period, then the Closing Date shall be extended to the next Business Day following the end of said 5-day period. If no such election is made, and in any if the damage after a casualty is not material or if a non-material portion of the Property is subject to a taking, this Agreement shall remain in full force and effect and the purchase contemplated herein, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment except as contemplated in this paragraph. If the Property was subject to a taking, at Closing Seller shall assign, transfer and set over to Buyer all of the right, title and interest of Seller in and to any awards that have been or that may thereafter be made for any taking. If the Property was damaged, at Closing Seller shall reduce the Purchase Price by the value reasonably estimated by Seller to repair or restore the damaged portion of the Improvements, less any sums expended by Seller to make emergency repairs to the Improvements or the Property or otherwise protect the physical condition of the Improvements or the Property. In either case, this transaction shall close pursuant to the terms of this Agreement. For the purposes of this paragraph,

the phrases "material damage" and "materially damaged" mean damage up to a maximum aggregate amount of $500,000.00.

## ARTICLE XIV
## TERMINATION

1.    **Termination**.    Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall terminate and the Closing shall not occur if:

(a)    either Party is in material breach or default of its covenants or obligations under this Agreement, which breach or default is not caused by a default by Seller or Buyer, as to which Seller or Buyer has provided written notice to either Party and such Party has not remedied such breach within ten (10) Business Days thereafter;

(b)    Seller has not satisfied any one or more of the conditions precedent set forth in Article VI(3) at or prior to the Outside Closing Date;

(c)    Buyer has not satisfied any one or more of the conditions precedent set forth in Article VI(4) at or prior to the Outside Closing Date;

(d)    if the Bankruptcy Court declines to enter the Sale Order;

(e)    by mutual written consent of Seller and Buyer;

(f)    the Bankruptcy Court enters a Final Order dismissing the Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code;

(g)    a Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Final Order was requested, encouraged, or supported by Seller; or

(h)    Buyer is not the Successful Bidder (as defined in the Sale and Bid Procedures) at the Auction and Seller sells the Property pursuant to an agreement with the Successful Bidder (an "**Alternative Transaction**").

2.    **Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article XIV, (a) this Agreement shall immediately become void and of no force or effect, except for this Article XIV which shall survive termination of this Agreement, (b) the transactions contemplated by this Agreement shall be abandoned without further action by any Party, (c) if this Agreement is terminated by Buyer because of Seller's breach or default or is terminated for any reason other than Buyer's breach or default, then and in that event, the entire Deposit shall be returned promptly to Buyer, but in any event within five (5) days after the termination of this Agreement, (d) if this Agreement is terminated by Seller because of Buyer's breach or default which breach or default has not been caused by a default by Seller and has not been cured within the time period specified in Article XIV.I (a), then and in that event, the entire Deposit shall be retained by or disbursed to Seller as liquidated damages for Buyer's breach or default of this Agreement, and (e) all rights and obligations of the Parties hereunder (except for this Article XIV) shall terminate without any liability of any Party to any other Party or their Affiliates.

14

# ARTICLE XV
## MISCELLANEOUS

1.     **Assignment.** This Agreement binds and benefits the Parties and their respective successors and assigns. Neither Party may assign this Agreement nor any right or obligation hereunder without the prior written consent of the other Party; *provided*, *however*, that Buyer may assign this Agreement to an affiliate or any entity that controls, is controlled by or is under common control with Buyer without Seller's prior consent. Any such assignment by either Party shall not relieve the assignor of any obligation under this Agreement without the written consent of the other Party to this Agreement and the assignee shall also be bound by the obligations of the assignor pursuant to this Agreement.

2.     **Counterparts.** This Agreement may be executed in counterparts, by either an original signature or signature transmitted by facsimile transmission or other similar process and each copy so executed shall be deemed to be an original and all copies so executed shall constitute one and the same agreement.

3.     **Severability.** If any term or provision of this Agreement shall be deemed to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby, and each remaining term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

5.     **Waivers; Survival**. No waiver of any breach of any covenant or provision contained herein shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision contained herein. No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act except those of the waiving Party, which shall be extended by a period of time equal to the period of the delay. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate.

6.     **Successors and Assigns**. This Agreement is binding upon and inures to the benefit of the permitted successors and assigns of the Parties hereto.

7.     **Entire Agreement**. This Agreement, including all Exhibits attached hereto, constitutes the entire contract between the Parties hereto with respect to the subject matter hereof and may not be modified except by an instrument in writing signed by the Party to be charged. Seller and Buyer shall cooperate to create mutually acceptable Exhibits in place of all Exhibits that are not attached hereto as of the Effective Date.

8.     **Time of Essence**. Seller and Buyer acknowledge and agree that time is strictly of the essence with respect to each and every term, condition, obligation and provision hereof.

9.     **Construction**. The Parties acknowledge and agree that this Agreement is the result of arms-length negotiations and shall not be construed for or against any Party by virtue of

draftsmanship. Unless the context requires otherwise, (a) the words "include," "including" and variations thereof mean without limitation; (b) the words "hereof," "hereby," "herein," "hereunder" and similar terms refer to this Agreement as a whole and not any particular section or article in which such words appear; (c) words in the singular include the plural, and words in the plural include the singular; (d) a term defined as one part of speech (such as a noun) shall have a corresponding meaning when used as another part of speech (such as a verb); and (e) currency amounts referenced herein are in U.S. Dollars.

10.    **Governing Law; Jurisdiction**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by the laws of the State of Texas without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Texas applicable hereto. Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such proceeding; *provided*, *however*, that, if the Chapter 11 Case is closed, all proceedings arising out of or relating to this Agreement shall be heard first by the Bankruptcy Court, but if the Bankruptcy Court determines that it lacks subject matter jurisdiction or abstains or otherwise declines to exercise its jurisdiction, then in any other state or federal court of competent jurisdiction situated in Harris County, Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such proceeding. The Parties consent to service of process by first class mail at the addresses listed in Article XV(14) or any other manner permitted by law.

11.    **Waiver of Jury Trial**.  THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT OR IN TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER, OR THEIR REPRESENTATIVES IN NEGOTIATION OR PERFORMANCE HEREOF.

12.    **Integration; Binding Effect; No Third-Party Beneficiaries**. This Agreement constitutes the entire Agreement among the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments and writings. All Exhibits called for by this Agreement and delivered to the Parties shall be considered a part hereof with the same force and effect as if the same had been specifically set forth in this Agreement. This Agreement is solely for the benefit of Buyer and Seller, and their respective successors and permitted assigns. This Agreement shall not be deemed to confer upon or give to any third party, including any past or present directors, officers, employees, or agents of Seller, any remedy, claim, cause of action or other right.

13.    **No Recordation**. Buyer agrees not to record a memorandum or other document relating to this Agreement without the prior written consent of Seller.

14.    **Notices**.  All notices, requests, demands, and other communications to be given under this Agreement shall be in writing and delivered in person, or sent by (i) electronic mail, (ii)

certified mail, postage prepaid, or (iii) nationally recognized overnight courier with a reliable tracking service and properly addressed as follows:

Seller:

> Chapter 11 Trustee c/o Galleria 2425 Owner, LLC
> Jones Murray LLP
> 602 Sawyer Street, Suite 400
> Houston, TX 77007
> Attn.: Christopher R. Murray
> Email: christopher.murray@jonesmurray.com
>
> With a copy to:
>
> Shannon & Lee LLP
> 2100 Travis Street, Suite 1525
> Houston, TX 77002
> Attn.: R. J. Shannon; Kyung S. Lee
> Email: rshannon@shannonleellp.com; klee@shannonleellp.com

Buyer:

> QB Loop Property LP
> c/o QB Loop Property GP, LLC
> 1535 West Loop South, Suite 100
> Houston, Texas 77027
> Attn: Anwar-i-Qadeer
> Email: qadeer@qadeerlaw.com
>
> With a copy to:
>
> Locke Lord LLP
> 600 Travis Street, Suite 2800
> Houston, Texas 77002
> Attn: Simon R. Mayer
> Phone: 713-226-1507
> Facsimile: 713-229-2675
> Email: simon.mayer@lockelord.com

15. **Environmental Notices**. From the Effective Date through the Closing Date, Seller shall promptly notify Buyer if to the Knowledge of Seller there are any threatened or pending investigations by any governmental agency under any law, regulation or ordinance pertaining to any Hazardous Substance.

16. **Further Assurances**. From the Effective Date until the Closing or termination of this Agreement, Seller and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction contemplated in this Agreement, including, without limitation, (a) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority, including, without limitation, the Bankruptcy Court, or other Person under this Agreement or applicable law, and (b) effecting all registrations and filings required under this Agreement or applicable law. After the Closing, Seller and Buyer shall use

commercially reasonable efforts (at no cost or expense to such Party, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement. This Article XV(16) shall survive the Closing.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date.

**"SELLER"**

Christopher R. Murray as the Chapter 11
Trustee of Galleria 2425 Owner, LLC

By: _____
Name: Christopher R. Murray
Title:   Chapter 11 Trustee

**"BUYER"**

QB Loop Property LP
By Its General Partner:
QB Loop Property GP LLC

By: _____
Name: Anwar-i-Qadeer
Title:   Manager

[Signature Page to Asset Purchase Agreement]

# EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

**Tract 1: Fee Tract**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP UY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF' NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS :

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A OEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG TI IE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET} NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND TI-IE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

A-1

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE OR LESS.

**Tract 2: Easement Tract; 20-Foot Non-Exclusive Roadway and Pedestrian Easement**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT 1;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 PEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**Tract 3: Easement Tract; 20-Foot Non-Exclusive Roadway and Pedestrian Easement**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED PILED IN HCCF NO. 0041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED RY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT I, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EAST ERLY NORTH 87 DEGREE S 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A l/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

A-3

**Tract 4: Easement Tract; 28-Foot Roadway and Pedestrian Easement**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1. CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND ROUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN Tl-IE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

**Tract 5: Easement Tract; 5-Foot Storm Sewer Easement**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

**EXHIBIT B**

FORM OF DEED

AFTER RECORDING RETURN TO:

_____

_____

_____

   NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF HARRIS | § | |

   That GALLERIA 2425 OWNER, LLC, a Delaware limited liability company ("Grantor"), by and through Christopher R. Murray, the chapter 11 trustee appointed in Case No. 23-34815-JPN in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to it paid by QB LOOP PROPERTY LP, a Texas limited partnership ("Grantee"), the receipt and sufficiency of which are hereby acknowledged and confessed by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee the tracts of land lying and being situated in Harris County, Texas, as more particularly described on Exhibit "1" attached hereto and incorporated herein for all purposes (the "Land"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "Improvements"), and (b) all of Grantor's right, title and interest in and to the appurtenances pertaining to the Land (hereinafter collectively referred to as the "Appurtenant Property"), including, but not limited to, all right, title and interest of Grantor in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any. The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "Property".

   This conveyance is made and accepted free and clear of all liens, claims, encumbrances, and interests pursuant to that certain "Sale Order" dated _____, 2024, and entered as Docket No. _____ in Case No. 23-34815-JPN in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division, and is subject to the exceptions set forth on Exhibit "2", attached

B-1

hereto and made a part hereof for all purposes (the "<u>Permitted Exceptions</u>").

TO HAVE AND TO HOLD THE PROPERTY, together with all and singular the rights and appurtenances belonging in any way to the Property, subject to the provisions stated herein, to Grantee, Grantee's successors and assigns forever, and Grantor binds itself and its legal representatives and successors TO WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against every person lawfully claiming or to claim all or any part of the Property by, through, or under Grantor, but not otherwise.

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT: (i) GRANTEE HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PROPERTY, (ii) OTHER THAN AS EXPRESSLY SET OUT HEREIN OR IN THAT CERTAIN ASSET PURCHASE AGREEMENT DATED <u>JUNE __</u>, 2024, BY AND BETWEEN GRANTOR AND GRANTEE ("<u>PURCHASE AGREEMENT</u>"), GRANTEE IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS OF GRANTOR OR ITS AGENTS, (iii) GRANTEE IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND INSPECTION AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY GRANTOR, GRANTOR'S ENGINEERS, OR THE BROKERS IN DETERMINING WHETHER TO PURCHASE THE PROPERTY, (iv) CERTAIN INFORMATION PROVIDED BY GRANTOR TO GRANTEE WITH RESPECT TO THE PROPERTY HAS BEEN OBTAINED FROM A VARIETY OF SOURCES AND THAT GRANTOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION, (v) GRANTEE IS FULLY AND COMPLETELY SATISFIED THAT THE PROPERTY IS SATISFACTORY IN ALL RESPECTS FOR GRANTEE'S INTENDED USE AND (vi) GRANTEE HAS NO RECOURSE WHATSOEVER AGAINST GRANTOR OR THE BROKER IN CONNECTION WITH THE PROPERTY OTHER THAN FOR ANY VIOLATIONS AS TO THE WARRANTIES AND COVENANTS OF GRANTOR CONTAINED HEREIN OR IN THE PURCHASE AGREEMENT.**

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT: (i) EXCEPT FOR THE SPECIAL WARRANTY SET OUT HEREIN OR THE EXPRESS REPRESENTATIONS SET OUT IN THE PURCHASE AGREEMENT, GRANTOR HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING BUT NOT LIMITED TO: (A) THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY CONDUCT THEREON IN THE FUTURE; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING, BUT NOT LIMITED TO, ANY STATE OR FEDERAL ENVIRONMENTAL LAW, RULE OR REGULATION; (E)THE HABITABILITY, MERCHANTABILITY, OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; OR (F) ANY OTHER MATTER**

WITH RESPECT TO THE PROPERTY (COLLECTIVELY, THE "DISCLAIMED MATTERS"). GRANTEE HEREBY WAIVES ANY SUCH OTHER REPRESENTATION, WARRANTY, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES.

AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT EXCEPT FOR THE SPECIAL WARRANTY CONTAINED HEREIN OR AS EXPRESSLY SET OUT IN THE PURCHASE AGREEMENT, GRANTOR IS CONVEYING THE PROPERTY TO GRANTEE "AS IS", "WHERE IS", AND WITH ALL FAULTS AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE GRANTOR.

WITHOUT IN ANY WAY LIMITING ANY PROVISION OF THE FOREGOING, GRANTEE SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST GRANTOR AND GRANTOR'S PARTNERS, OFFICERS AND AGENTS WITH RESPECT TO (i) THE DISCLAIMED MATTERS, (ii) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (iii) THE PAST, PRESENT OR FUTURE CONDITION OR COMPLIANCE OF THE PROPERTY WITH REGARD TO ANY ENVIRONMENTAL PROTECTION, POLLUTION CONTROL OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980 (HEREIN CALLED "CERCLA"), AND (iv) ANY OTHER STATE OF FACTS THAT EXISTS WITH RESPECT TO THE PROPERTY; PROVIDED, HOWEVER, THE FOREGOING WAIVER, RELEASE AND DISCHARGE DOES NOT WAIVE, RELEASE, OR DISCHARGE ANY CLAIM GRANTEE MAY HAVE AGAINST GRANTOR UNDER THE SPECIAL WARRANTY SET FORTH IN THIS DEED OR FOR BREACH OF THE EXPRESS REPRESENTATIONS (DURING THE PERIOD FOR WHICH SUCH EXPRESS REPRESENTATIONS SURVIVE) SET FORTH IN THE PURCHASE AGREEMENT.

Current ad valorem taxes, assessments and fees relating to or pertaining to the Property, having been prorated to the date hereof, the payment thereof is hereby assumed by Grantee.

The mailing address of Grantee is set forth below:

QB Loop Property LP
1535 West Loop South, Suite 100
Houston, Texas 77028
Attn: Mr. Anwar-i-Qadeer

[Signatures Appear on the Following Page]

IN WITNESS WHEREOF, Grantor has caused this Deed to be executed on this _____ day of _____, 2024.

GRANTOR:

GALLERIA 2425 OWNER, LLC,
a Delaware limited liability company

By: _____
Christopher R. Murray
Chapter 11 Trustee

STATE OF TEXAS          §
                        §
COUNTY OF _____     §

The foregoing was acknowledged before me on the _____ day of _____, 2024, by CHRISTOPHER R. MURRAY, Chapter 11 Trustee of Galleria 2425 Owner, LLC, a Delaware limited liability company, on behalf of such company in such capacity.

_____
Notary Public, State of Texas

B-5

EXHIBIT "1"

LEGAL DESCRIPTION


[To Be Inserted]

EXHIBIT "2"

PERMITTED EXCEPTIONS

[To Be Inserted]

**EXHIBIT C**

SELLER'S FIRPTA AFFIDAVIT - CERTIFICATION OF NON-FOREIGN STATUS

      Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Christopher R. Murray in his capacity as the duly appointed Chapter 11 Trustee of Galleria 2425 Owner, LLC, a Delaware limited liability company ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust and foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor's U.S. employer identification number (EIN) is [●]; and

3.      Transferor's office address is:

           [●]
           [●]
           [●]

      Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

      Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign the document on behalf of the Transferor.

           Christopher R. Murray, in his capacity as the
           Chapter 11 Trustee of Galleria 2425 Owner, LLC

           By: _____
           Name: Christopher R. Murray
           Title:  Chapter 11 Trustee

## EXHIBIT D

<u>BILL OF SALE</u>

For good and valuable consideration, the receipt of which is hereby acknowledged, Christopher R. Murray in his capacity as the duly appointed Chapter 11 Trustee of Galleria 2425 Owner, LLC, a Delaware limited liability company ("**<u>Seller</u>**"), does hereby sell, transfer, and convey to QB Loop Property LP, a Texas limited partnership ("**<u>Buyer</u>**"): all Personal Property as such term is defined in that certain Asset Purchase Agreement, dated _____, 2024, between the Seller and Buyer, including all personal property of Seller, if any, located on and used in connection with the operation of the improvements on the real property located at 2425 West Loop South, Houston, Texas 77027, as more particularly described on Exhibit A attached hereto.

Buyer accepts such personal property in its "AS-IS," "WHERE-IS" condition and "WITH ALL FAULTS". Seller specifically disclaims all express or implied warranties regarding the existence or condition of, or title to, such personal property, including without limitation the implied warranties of merchantability and suitability for a particular purpose.

This Bill of Sale may be signed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same document. A signed copy or facsimile of this Bill of Sale shall have the same force and effect as that of an original.

Date: _____, 2024

| **SELLER** | **BUYER** |
|---|---|
| Christopher R. Murray as the Chapter 11 Trustee of Galleria 2425 Owner, LLC | QB loop Property LP<br>By Its General Partner:<br>QB Loop Property GP LLC |
| By: _____ | By: _____ |
| Name: Christopher Murray | Name: Anwar-i-Qadeer |
| Title:  Chapter 11 Trustee | Title:   Manager |

D-1

EXHIBIT A TO BILL OF SALE

<u>Personal Property</u>

[To Be Inserted]

## EXHIBIT E

### ASSIGNMENT AND ASSUMPTION

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Christopher R. Murray in his capacity as the duly appointed Chapter 11 Trustee of Galleria 2425 Owner, LLC, a Delaware limited liability company (herein referred to as "**Assignor**"), hereby assigns, transfers and conveys to QB Loop Property LP, a Texas limited liability company (herein referred to as "**Assignee**"), all leases (the "**Leases**") described on Schedule 1 attached and all contracts (the "**Contracts**") described on Schedule 2, and the permits (the "Permits") described on Schedule 3 attached affecting that certain real property in the City of Houston, Harris County, State of Texas (the "**Property**"), commonly known as 2425 West Loop South, Houston, Texas 77027 and more particularly described in <u>Exhibit A</u> attached hereto.

Assignee hereby assumes and agrees to keep, perform and fulfill all of Assignor's obligations under the Leases and under the Contracts which are required to be kept, performed and fulfilled by Assignor thereunder, effective from and after the date on which a deed of the Property from Assignor to Assignee is delivered (the "**Closing Date**").

The covenants and warranties contained herein shall survive the closing of the purchase and sale of the Property to which this Assignment relates, and such covenants and warranties shall not be deemed merged in the deed delivered by Assignor to Assignee.

This Assignment And Assumption shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns. This Assignment And Assumption may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same document. A copy of facsimile of this Assignment And Assumption shall have the same force and effect as that of an original.

IN WITNESS WHEREOF, the undersigned have executed the within instrument as of _____, 2024.

ASSIGNOR:

Christopher R. Murray as the Chapter 11 Trustee of Galleria 2425 Owner, LLC,


By: _____
Name: Christopher R. Murray
Title: Chapter 11 Trustee

E-1

ASSIGNEE:

QB Loop Property LP
By Its General Partner:
QB Loop Property GP LLC


By: _____
Name: Anwar-i-Qadeer
Its:    Manager

E-2

EXHIBIT A TO ASSIGNMENT AND ASSUMPTION

<u>LEGAL DESCRIPTION OF PROPERTY</u>

[To Be Inserted]

## EXHIBIT E – SCHEDULE 1

### LEASES

| No. | Counterparty | Lease Description |
|-----|--------------|-------------------|
| 1 | Bankable Equity, LLC | Commercial Lease |
| 2 | Boho Lounge | Commercial Lease |
| 3 | Eyebrows 4UTX, LLC | Commercial Lease |
| 4 | G3 Global Services, LLC fka G3 Visas & Passports | Commercial Lease |
| 5 | Galloworks LP | Commercial Lease (4th Floor) |
| 6 | Galloworks LP | Commercial Lease (4th Floor) |
| 7 | Immigration Processing Services | Commercial Lease |
| 8 | Kudrath Enterprises, PLLC | Commercial Lease |
| 9 | Nationwide Investigations & Security, Inc. | Commercial Lease |
| 10 | Nichamoff Operating Company, LLC | Commercial Lease |
| 11 | Shah Sloan LLC | Commercial Lease |
| 12 | SIBS International Inc. | Commercial Lease |
| 13 | SprintCom, Inc. | Telecom Lease |
| 14 | St Christopher Holdings, Ltd. | Commercial Lease |
| 15 | St Christopher Holdings GP LLC | Commercial Lease |
| 16 | Texas Ultherapy, LLC | Commercial Lease |
| 17 | Uptown Cosmetic and Implant Dentistry & Dr. Robert Velasco, DDS | Commercial Lease |
| 18 | VFS Global Services | Commercial Lease |

## EXHIBIT E – SCHEDULE 2

<u>CONTRACTS</u>

| No. | Counterparty | Contract Description |
|-----|--------------|---------------------|
| 1 | CNA Insurance Company | Business Property Insurance |

**EXHIBIT E – SCHEDULE 3**

PERMITS

| No. | Counterparty | Permit Description |
|-----|--------------|--------------------|
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |
|     |              |                    |