EXHIBIT 3

## LEASE AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Definitions and Basic Provisions | 1 |
| 2. | Lease of Premises; Parking Privileges | 2 |
| 3. | Services by Landlord | 2 |
| 4. | Additional Rents | 3 |
| 5. | Payments and Performance | 7 |
| 6. | Installation of Improvements; ADA Compliance | 8 |
| 7. | Completion of Improvements and Commencement of Rent | 8 |
| 8. | Limited Right to Calculate Rentable Space; Subsequent Liquidation. | 8 |
| 9. | Repairs and Reentry | 9 |
| 10. | Alterations and Additions by Tenant | 9 |
| 11. | Entry for Repairs and Inspection | 9 |
| 12. | Mechanic's Liens | 10 |
| 13. | Tenant's Use | 10 |
| 14. | Laws and Regulations; Rules of the Building | 10 |
| 15. | Indemnity, Liability and Loss or Damage | 11 |
| 16. | No Subrogation; Insurance | 11 |
| 17. | Fire and Casualty | 11 |
| 18. | Condemnation | 12 |
| 19. | Termination Right | 12 |
| 20. | Assignment and Subletting | 12 |
| 21. | Holding Over | 13 |
| 22. | Abandoned Property | 14 |
| 23. | Taxes | 14 |
| 24. | Transfer of Landlord's Rights | 14 |
| 25. | Default | 14 |
| 26. | Security Deposit | 17 |
| 27. | Landlord's Lien and Security Interest | 17 |
| 28. | Remedies | 17 |
| 29. | Joint and Several Liability | 17 |
| 30. | Constructive Eviction | 18 |
| 31. | Building Name | 18 |
| 32. | Subordination and Attornment; Notice to Mortgagee | 18 |
| 33. | Lease Certificates; Financial Statements | 18 |
| 34. | Limitation of Landlord Liability | 19 |
| 35. | Consents | 19 |
| 36. | Notices | 19 |
| 37. | Brokerage | 19 |
| 38. | Force Majeure | 19 |
| 39. | No Third Party Beneficiary | 20 |
| 40. | Severability | 20 |
| 41. | Binding Effect | 20 |
| 42 | Applicable Law; Consent to Jurisdiction | 20 |
| 43. | Entire Agreement; No Warranties | 20 |
| 44. | NO IMPLIED REPRESENTATIONS | 20 |
| 45. | Effective Date | 21 |

Exhibits

Exhibit A:      Legal Description of the Total Tract
Exhibit B:      Floor Plan(s) of the Premises
Exhibit C:      Parking Privileges
Exhibit D:      Leasehold Improvements Agreement
Exhibit E:      Building Rules and Regulations
Exhibit F:      Janitorial Specifications

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is entered into by the Landlord and Tenant hereinafter named.

1.  **Definitions and Basic Provisions.** The terms defined below shall have the respective meanings stated when used elsewhere in this Lease, and such terms and the following basic provisions constitute an integral part of this Lease:

(a)  "Landlord": 2425 West Loop, LP

(b)  "Tenant":  Jetall Companies, Inc.

(c)  "Premises": certain space in a building owned by Landlord (the "Building") located at 2425 W Loop , Houston, Texas, on a tract of land (the "Land") situated in the City of Houston, Harris County, Texas, described on Exhibit A attached hereto and made a part hereof for all purposes. The Premises are to be located on the 8th floor(s) of the Building, Suite 805, as shown on the floor plan(s) attached hereto as Exhibit B and made a part hereof for all purposes.  Subject to Paragraph 9 below, the parties hereby agree that for purposes of this Lease the Premises contains approximately 10,153 square feet of Rentable Space (as defined below), and that there are approximately 283,680 square feet of Rentable Space in the Building.

(d)  "Lease Term": a period one hundred and twenty (120) months, commencing on August 1, 2015 (the "Commencement Date"), subject to the possibility of extension as explained in Paragraph 8 below.

(e)  "Base Rental": Base Rentals will be payable as follows:

| From | | To | Annual Rate per SF | | # Months | | Monthly Rental Income | | Total Periodic Revue |
|---|---|---|---|---|---|---|---|---|---|
| 08/01/15 | | 11/30/15 | $0.00 | | 4 | | $0.00 | | $0.00 |
| 12/01/15 | | 07/31/16 | $24.00 | | 8 | | $20,306.00 | | $162,448.00 |
| 08/01/16 | | 07/31/17 | $24.50 | | 12 | | $20,729.04 | | $248,748.50 |
| 08/01/17 | | 07/31/18 | $25.00 | | 12 | | $21,152.08 | | $253,825.00 |
| 08/01/18 | | 07/31/19 | $25.50 | | 12 | | $21,575.13 | | $258,901.50 |
| 08/01/19 | | 07/31/20 | $26.00 | | 12 | | $21,998.17 | | $263,978.00 |
| 08/01/20 | | 07/31/21 | $26.50 | | 12 | | $22,421.21 | | $269,054.50 |
| 08/01/21 | | 07/31/22 | $27.00 | | 12 | | $22,844.25 | | $274,131.00 |
| 08/01/22 | | 07/31/23 | $27.50 | | 12 | | $23,267.29 | | $279,207.50 |
| 08/01/23 | | 07/31/24 | $28.00 | | 12 | | $23,690.33 | | $284,284.00 |
| 08/01/24 | | 07/31/25 | $28.50 | | 12 | | $24,113.38 | | $289,360.50 |

Tenant agrees to pay all Rent  to Landlord at the following address: 2500 W Loop South Suite 255 Houston, TX 77027 (or at such other place as Landlord may designate from time to time in writing) in monthly installments, in advance and without demand on the first day of each calendar month during and throughout the Lease Term.

(f)  "Prepaid Rental": $0.00 representing payment of Base Rental for the first month to be paid on the date of execution of this Lease.

(g)  "Security Deposit": $0.00, to be paid on the date of the execution of this Lease, and held by Landlord pursuant to the provisions of Paragraph 27 of this Lease.

(h)  "Sole Permitted Use": General office use, consistent with a reputable office building and subject to Paragraph 14 and other relevant provisions of this Lease.

(i)  "Additional Rents": Defined in Section 4, shall be due with base rent on the 1st of every month. Additional rent is estimated at $9.26 annually per square foot.

1

Tenant's Initials      Landlord's Initials

(j)    **"Leasing Agent(s)":** Jetall Companies (representing Landlord and Tenant)

(k)    **"Property Manager":** Jetall Companies, Inc., Houston, Texas, subject to change by Landlord upon written notice to Tenant.

(l)    **"Rentable Space":** The total area attributable to a leased premises within the Building, i.e., being deemed by the parties to be appropriate for purposes of determining the Base Rental, the Allowance, rental adjustments, etc. under this Lease, with such total attributed area being determined by (a) using the American National Standard method for measuring Rentable Area in office buildings, as described in the pamphlet entitled ◻Standard Method for Measuring Floor Area in Office Buildings◻, published by the Building Owners and Managers Association International (ANSI/BOMA Z65.1-1996), and then (b) adjusting the floor-by-floor results thus achieved by the factor being used by Landlord to more uniformly allocate to the tenants in the Building the first floor lobby, the elevator lobbies and the other common areas of the Building.

(m)    **"Normal Business Hours":** 7:00 a.m. until 6:00 p.m. on weekdays (except holidays, as defined below), and from 8:00 a.m. until 1:00 p.m. on Saturdays (except holidays). For purposes of this Lease, holidays are deemed to mean the following:

| | |
|---|---|
| January 1st | New Years Day |
| Last Monday in May | Memorial Day |
| July 4th | Independence Day |
| First Monday in September | Labor Day |
| Fourth Thursday in November | |
| plus Friday following | Thanksgiving Holidays |
| December 25th | Christmas Day |

2.    **Lease of Premises; Parking Privileges.**

(a)    In consideration of the obligation of Tenant to pay rent as provided in this Lease, and in further consideration of the other terms, covenants and conditions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises for the Lease Term specified herein, all upon and subject to the terms and conditions set forth in this Lease. Landlord hereby covenants that Tenant, upon paying rent as herein reserved, and performing all covenants and agreements contained in this Lease on the part of Tenant, shall have quiet and peaceful possession of the Premises.

(b)    In addition, at all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord hereby agrees to make parking privileges available to Tenant, as explained on, and governed by, Exhibit C attached to this Lease. In this regard, Tenant acknowledges that in order for Landlord to be able to comply with parking allotments for all tenants in the Building, Tenant must assure that the aggregate of all parking utilized by Tenant, its owners, officers, employees, agents and invitees, does not exceed the parking allotment for Tenant as specified in Exhibit C.

3.    **Services by Landlord.** At all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord shall furnish the following services to the Premises, all of such services to be at Landlord's cost and expense except as specifically provided to the contrary elsewhere in this Lease:

(a)    Cold and warm water at those points of supply provided for general use of tenants in the Building.

(b)    Heated and refrigerated air conditioning in season during Normal Business Hours and at such temperatures and in such amounts as are reasonably considered by Landlord to be standard and as is consistent in quality and quantity as furnished in other comparable quality office buildings in the vicinity of the Building. Such services at all other times and on Sundays and holidays shall be furnished only at the request of Tenant, who shall bear the entire cost thereof. Whenever machines or equipment that generate abnormal heat and affect the temperature otherwise maintained by the air conditioning system are used in the Premises, Landlord shall have the right

2

| Tenant's | Landlord's |
|---|---|
| Initials | Initials |

to install supplemental air conditioning units in the Premises; and the cost thereof, including the cost of installation, operation, use and maintenance, shall be paid by Tenant to Landlord promptly on demand.

(c)     Elevator service in common with other tenants for ingress and egress from the Premises, provided that Landlord may reasonably limit the number of elevators to be in operation at times other than Normal Business Hours.

(d)     Janitorial cleaning services as may, in the reasonable judgment of Landlord, be required in the normal operation of the Building (but no less frequently than five times per week).

(e)     Electric current in the manner and to the extent reasonably deemed by Landlord to be standard for office use.
The failure to any extent to furnish or any stoppage of these defined utilities and services resulting from any cause whatsoever shall not render Landlord liable in any respect for damages to either person, property or business, nor be construed as an eviction of Tenant, nor entitle Tenant to any abatement of rent, nor relieve Tenant from fulfillment of any covenant or agreement contained herein. Should any malfunction of the Building improvements or facilities occur for any reason, Landlord shall use reasonable diligence to repair same promptly. Tenant shall have no claim for rebate or abatement of rent or damages on account of such malfunction or of any interruptions in service occasioned thereby or resulting therefrom; provided, however, that if any interruption or cessation of service continues for thirty (30) consecutive days after written notice from Tenant to Landlord (and to any mortgagee of Landlord of whom Tenant has received written notice, designating a specific address for notice to such mortgagee), identifying the problem with reasonable specificity and being labeled "URGENT/IMMEDIATE ACTION REQUIRED" in all capital letters, and if such interruption or cessation after the 30-day cure period causes the Premises to be untenantable in the reasonable judgment of Tenant, then notwithstanding any provision of this Lease to the contrary, Tenant's Base Rental and Tenant's share of Operating Expenses under this Lease will abate as of the thirty-first (31st) day and continue abated until the service is resumed.

4.     **Additional Rent**. All Operating Costs (As defined below) of every kind and nature paid or incurred by Landlord (including without limitation, Reasonable reserves) in operating, managing, accounting in connection with equipping, controlling, decorating, lighting, repairing, replacing, enhancing and maintaining the Property (including, without limitation, all costs and expenses incident to maintaining and repairing as reasonably required to maintain the property in the same condition as existed when originally completed) shall be prorated and Tenant shall share therein in the manner provided in this Section A. Operating costs shall likewise include( but shall not be limited to) Taxes (as defined Below) and Insurance Premiums (as defined below) for liability, property, workers Compensation, employers liability and other casualty and/or risk insurance maintained by landlord in connection with the property (including all such insurance with respect to parking facilities and for the entire property): The term "Additional Rent" means Tenants share of Operating Costs and all other sums, fees or charges (other than Base Rent) due  payable by Tenant to Landlord pursuant to this Lease.

A.     Tenants Share of Operating Costs shall be computed by multiplying the Landlords estimate of Operating Costs for the then-existing Operating Year (as defined below) by the Tenant's Share, as provided in Section 1 above, and shall be paid by Tenant in advance in monthly installments on the first (1st) day of each calendar month, based upon Landlord's reasonable estimates of the Operating Costs as set forth in periodic statements during the Term 9Such periodic intervals to be determined by Landlord). On or before April 1st of each Operating Year, Landlord shall provide to tenant a detailed report of the Actual Operating Costs, (including but not limited to Insurance premiums and Taxes paid by Landlord during the preceding Operating Year (the "Operating Statement"), together with reasonable documentation supporting such Operating Costs. In the event the aggregate of Tenant's installments during the Operating Year shall be less than or more than the amount of actual charges due from the Tenant, such deficiencies or overpayments shall be paid to Landlord or credited to the next installments of Base Rent due from the Tenant, as applicable, within thirty (30) days after demand therefore.

B.     Definitions

3

| Tenant's | Landlord's |
|----------|-----------|
| Initials | Initials |

1.  The term "Taxes" means all taxes, impositions, assessments and all other governmental charges, if any, which are levied, assessed or imposed upon or become due and payable in connection with, or lien upon, the Property, or the operation thereof, (excepting federal and State taxes on income) including taxes levied by present or future taxing authorities and all taxes of whatsoever nature that are imposed in substitution for, or inl lieu of, any of the taxes, impositions, assessments, or other charges included in this definition of Taxes and including without limitation, any tax on rents, franchise tax or other tax levied against Landlord or the Premises, in lieu of the whole or any part of any taxes or assessments levied, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed or impose on Landlord or the Premises a capital levy or other tax directly on the rents received there from and/or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be included within the term "Taxes" for the purpose hereof. The foregoing sentence shall be construed to specifically include in the definition of "Taxes" for all purposes under this lease franchise taxes, margin taxes and any other taxes assessed against Landlord pursuant to Chapter 171 of the Texas Code, as same may be hereafter modified or amended, or any new legislation enacted hereafter. However, Taxes exclude the portion, if any, of ad valorem taxes against the Premises that is paid by tenants as a separate charge.

2.  The term "Insurance Premiums" as used in this Lease means the total annual insurance premiums which accrue on all property insurance, boiler insurance, commercial general and excess liability insurance, rental interruption insurance and other insurance which, from time to time, may at Landlords election be carried by Landlord with respect to the Property during any applicable Operating Year (or portion thereof) occurring during the term of this Lease: provided however, in the event that during any such Operating Year all or any part of such coverage is written under a "blanket policy" or otherwise in such manner that Landlord was not charged a specific insurance premium applicable solely to the Property, then in such event, the amount considered to be the insurance premiums with respect to such coverage for such Operating Year shall be determined in good faith by Landlords Insurance Agent. If the insurance policies maintained by the Landlord with respect to the Property contain any nature of deductible feature (and Landlord agrees that (i) the aggregate amount of the deductibles shall not exceed $100,000, and (ii) the amount of the deductibles shall be disclosed to Tenant upon Tenant's written request therefore), the Tenant, in the event of a loss, shall pay to Landlord within ten(10) days following receipt from landlord's obligations to repair or restore the Property. Alternately, Landlord may include such deductibles in Operating Costs, in which event Landlord shall assess tenant for Tenant's Share thereof in connection with Landlord's delivery of the Operating Statement as provided above. Insurance Premiums shall also include costs to settle insurance claims or otherwise recover insurance proceeds.

3.  The term "Operating Costs" means the aggregate of all expenses paid or incurred by or on behalf of Landlord, whether structural, non-structural, foreseen or unforeseen, relating to the ownership, maintenance, repair, management and operation of the Property and any sidewalks or any other areas related to the Property which Landlord has a repair or maintenance obligation, determined on an accrual basis in accordance with generally accepted industry accounting standards, including, but not limited to the following:

    (a)  Wages and salaries of all employees engaged in the operation and maintenance of the Property, including taxes, insurance and benefits relating thereto.

    (b)  Costs of all supplies and materials used in the operation, maintenance, repair and management of the Property:

    (c)  Costs of water, sewage. Power, heating, lighting, air-conditioning, ventilating, and other utilities furnished with the cooperation of the Property (excluding any costs billed to specific tenants)

    (d)  Costs of all maintenance and service agreements for the Property, including but not limited to, security service, alarm service, window cleaning service, janitorial servise, landscape service, pest control and elevator service:

4

Tenant's          Landlord's
Initials          Initials

(e)  Costs of all insurance carried by the Landlord relating to the Property, including but not limited to, property insurance, rental interruption insurance and commercial general and excess liability insurance applicable to the Property and the Landlord's insurance deductibles, at Landlord's option as provided above:

(f)  Costs of repairs and maintenance of the parking facilities and landscaping of the Property

(g)  Management Fees

(h)  All net expenses properly allocable to an Operating Year (hereinafter defined) for any capital improvement or structural repair incurred to reduce or limit increases in Operating Costs, or required by Landlord's insurance carrier or by any change in the laws, rules, regulations or orders of any governmental or quasi-governmental authority having jurisdiction or expenses resulting from normal repair and maintenance, which expenses shall be repaid in equal monthly installments together with interest at applicable rates or the operational savings payback period: and

(i)  Legal expenses incurred with respect to the Property which relate directly to the operation of the Property and which benefit all of the tenants of the building generally, such as legal proceedings to abate offensive activities or uses or reduce property taxes, but excluding legal expenses related to the collection of rent or the sale, leasing or financing of the Property.

4.  Expressly excluded from the definition of the term Operating Costs are:

(a)  Cost for which Landlord actually receives reimbursement by insurance, condemnation awards, warranties or otherwise.

(b)  Expenses incurred in leasing or procuring new tenants, including advertising and marketing expenses or leasing commissions paid to the agent of Landlord or other brokers;

(c)  Cost of renovating, decorating or constructing space for Tenant or other tenants or, except for those cost set forth in Section 6B (3) (h) above, renovating vacant space.

(d)  Income, capital stock, estate, inheritance, franchise or other taxes payable by Landlord unless the same shall have been levied as a substitute for or supplement of real estate taxes pursuant to the definition of Taxes;

(e)  Depreciation of Landlord's personal property of the Building;

(f)  Interest on debt or amortization payments on any mortgage or deed of trust, rental under any ground or underlying lease or similar rental under any other superior lease or sublease;

(g)  Dividends paid by Landlord;

(h)  The cost incurred to remove or otherwise abate asbestos or asbestos-containing materials from the Building;

(i)  Attorney's fees, costs and disbursements and other expenses incurred in connection with negotiations for leases with tenants, other occupants, or prospective tenants or other occupants of the Building and similar costs incurred in connection with leasing disputes between Landlord and tenants, other occupants, or prospective tenants or other occupants of the Building;

(j)  Except as provided in Section 6B (3)(h) depreciation and amortization, or cost of a capital nature (including, without limitation, additions, improvements, alterations,  ·

5

Tenant's        Landlord's
Initials        Initials

replacements and repairs to the extent such are of capital nature);

(k) Landlord's cost of services or utilities which are not standard for the Building and which are not available to Tenant without specific charge therefore, but which are provided to another tenant or occupant is specifically charged by Landlord (irrespective of whether Landlord actually receives payment therefor)[or Landlord would have the right to charge such other tenants or occupants], or for which Tenant or any other tenant or occupants pays third parties;

(l) Subject to the other provisions of the Lease, Cost [limited to penalties (including late payment), fines and associated legal expenses] incurred by Landlord due to the violation by Landlord of the terms and conditions of this Lease or of the leases of other tenants in the Building, or applicable federal, state and local governmental laws, codes and regulations as same shall pertain to the Building and the parking garage. Notwithstanding the foregoing, interest or penalties incurred in connection with assessments or taxes which are reasonably contested by Landlord shall be included in Operating Costs;

(m) Except for the management fee and other fees to Landlord specifically provided in this lease, overhead and profit increments paid to affiliates of Landlord for services on or to the Property in excess of competitive costs for such services if they were rendered by non-affiliated persons or entities of similar skill, competence and experience;

(n) Costs of Landlord's general overhead, and general administrative and accounting expenses not directly related to or allocable to the Building (individual, partnership or corporate, as the case may be);

(o) Any compensation paid to clerks, attendants or other persons in commercial concessions (such as snack bar) if any, operated by Landlord for Landlords economic benefit;

(p) All terms and services for which Tenant specifically reimburses Landlord (other than the actual Operating Costs) or which Tenant pays third persons;

(q) Penalties for late payments of Taxes;

(r) Costs directly resulting from the gross negligence or willful misconduct od Landlord and/or contractors

(s) Ad valorem taxes allocable to the leasehold improvements of other tenants or occupants in the building, provided that such tax statements or other documentation specify the name(s) and addresses of said other tenants or occupants;

(t) Rentals and other related expenses, if any incurred in leasing air-conditioning systems, elevators or other equipment ordinarily considered to be a capital nature, except equipment that is used in providing janitorial services and that is not affixed to the building or is used in an emergency or temporary basis;

(u) Costs or expenses for sculpture, paintings or other works of art totaling in excess of $15000 during the initial Term, including, but not limited to, costs incurred with respect to the purchase, ownership, leasing, showing, promotion, securing, insuring, repairing and/or maintenance of the same;

(v) Contributions to Operating Costs

(w) Contributions to charitable organizations;

(x) Costs incurred in removing the property of former tenants and/or occupants of the Building

(y) Consulting costs and expenses incurred by Landlord except to the extent that same are

6

| Tenant's | Landlord's |
|----------|-----------|
| Initials | Initials |

Incurred in an effort by Landlord to reduce or minimize Operating Costs or to the extent that they relate to the Improvement of the management or operation of the Building;

(z) Costs or fees relating to the defense of Landlord's title to or interest in the Building or the Property, or any part thereof; and

(aa) Any other expense which according to industry standards would not be considered to be a maintenance or operating expense of the Building, unless expressly provided otherwise herein;

5. The term "Operating Year" means any calendar year ending December 31st after the Commencement Date occurs.

6. Tenant, at Tenant's expense may audit the Operating Statement under the following conditions:

(a) Tenant provides notice of its intent to audit within ninety (90) days after Tenant's receipt of the Operating Statement;

(b) The audit is performed by a Certified Public Accounting Firm acceptable to both Landlord and Tenant that has not been retained on a contingency basis or other basis where its compensation relates to the cost savings to tenant. Prior to the audit, such auditor and Tenant shall sign and deliver to Landlord a confidentiality agreement in form acceptable to each Landlord, Tenant and such Auditor (each being reasonable in connection therewith);

(c) The audit is commenced not sooner than thirty (30) days and not later than sixty (60) days after the receipt by Landlord of Tenants notice of intent to audit;

(d) The audit must be conducted during normal business hours, at the location where Landlord maintains its books and records, and must conclude within thirty (30) days after it commences;

(e) The audit is limited to the Operating Year in question and records of prior years shall not be produced for review by the auditor;

(f) No event of default shall exist which remains uncured;

(g) Tenant shall have paid prior to or contemporaneous with the notice of intent to audit, Tenant's Share of the Operating Costs as calculated by Landlord for the Operating Year in question and the estimated Operating Costs payments for the Operating Year during which the audit occurs; and

(h) Tenant's auditor shall produce a detailed report addresses to both Landlord and Tenant with its calculated conclusions.

5. **Payments and Performance.** Tenant agrees to pay all rents, additional rents and sums provided to be paid by Tenant pursuant to this Lease at the times and in the manner herein provided, without any setoff, deduction or counterclaim whatsoever. Should this Lease commence on a day other than the first day of a calendar month or terminate on a day other than the last day of a calendar month, the rent for such partial month shall be proportionately reduced. The Base Rental for the first partial month, if any, shall be payable at the beginning of said period or as Prepaid Rental. The obligation of Tenant to pay rentals is an independent covenant, and no act or circumstance whatsoever, whether such act or circumstance constitutes a breach of covenant by Landlord or not, shall release Tenant from the obligation to pay rentals. Time is of the essence in the performance of all of Tenant's obligations hereunder. In the event any rental is not received within ten (10) days after Tenant receives notice of such late payment, provided that Landlord shall not be obligated to provide Tenant with a notice and cure period with respect to the Tenant's failure to timely pay Base Rental more than two (2) times during any calendar year, but Tenant shall still be entitled to receive the benefit of the five (5) day grace period for the remainder of such calendar year, but there will be no requirement of written from Landlord to Tenant of such default, or if any rental payment is by check which is returned for insufficient funds, then in addition to the past due amount Tenant shall pay to

7

Tenant's        Landlord's
Initials        Initials

Landlord a late charge in an amount equal to five percent (5%) of the rental then due, in order to compensate Landlord for its administrative and other overhead expenses. Any such late charge shall be payable on demand as additional rental. In addition, if rental is paid by a check which is returned for insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, in such event Tenant shall also pay to Landlord not only the late charge specified above in this Paragraph 6 (i.e., if and to the extent that such dishonored check causes the rental to become past due by more than ten days), but also an additional fee of $250.00 to compensate Landlord for its expense and effort in connection with the dishonored check. After the first check is returned for insufficient funds, Tenant shall be required to provide all future payments via cashier's check, money order, or Electronic Fund Transfer at Landlord's discretion.

6. **Installation of Improvements; ADA Compliance.** All improvements to be installed in the Premises at the commencement of this Lease shall be installed as specified in the Leasehold Improvements Agreement attached hereto as Exhibit D and made a part hereof. Landlord will assure that the "Required Improvements" (hereafter defined) comply with the Americans With Disabilities Act of 1990, as amended, and all related state and local laws (collectively, the "ADA"); and Landlord agrees that the remainder of the Building, other than the Premises, and including any common areas or other improvements made to the Premises by Landlord, without regard to the special needs of the Tenant's employees, shall be in compliance with the ADA (also taking into account the fact that the Building was constructed before the effective date of the ADA). Tenant shall be responsible for causing its business operations within the Premises to comply with the ADA.

7. **Completion of Improvements and Commencement of Rent.** If the Premises are not ready for occupancy by Tenant on the Commencement Date of this Lease, the obligations of Landlord and Tenant shall nevertheless continue in full force and effect, including the obligation of Tenant to commence paying rent on the Commencement Date stated in Paragraph 1(d); provided, however, that if the Premises are not ready for occupancy for any reason other than Tenant's Delay (as defined in Exhibit D), then the rent shall abate and not commence until the date the leasehold improvements to the Premises are substantially complete. Any abatement of rent shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of the Premises not being ready for occupancy by Tenant on the Commencement Date. Notwithstanding the foregoing, if Tenant, with Landlord's consent, occupies the Premises after substantial completion of Tenant's leasehold improvements but prior to the beginning of the Lease Term set forth herein, all of the terms and provisions of this Lease shall be in full force and effect from the commencement of such occupancy and the Lease Term shall commence on the date on which Tenant first occupies the Premises and shall expire the same period of months thereafter as shown in Paragraph 1(d); no change shall occur in the length of the Lease Term.

8. **Limited Right to Calculate Rentable Space; Subsequent Liquidation.** (a) Landlord and Tenant agree that at any time within sixty (60) days after the Commencement Date of this Lease, either party may, at its sole expense, employ a licensed architect to calculate the Rentable Space of the Premises and/or of the Building. If the architect performing any such services should issue a written statement within ninety (90) days after the date of this Lease, which indicates that the Rentable Space specified for either the Premises or the Building should be modified (a "Modification Statement"), and if the other party to this Lease agrees with such Modification Statement, then Landlord and Tenant shall execute a written Amendment to Lease confirming the mutually agreed information and the appropriate rental adjustment which results from the corrected information (e.g., increasing or decreasing the Base Rental proportionate with the increase or decrease in the Rentable Space). If the architect performing any such services should issue a Modification Statement within ninety (90) days after the Commencement Date of this Lease, and if the other party to this Lease does not agree with such Modification Statement, then the other party may, at its sole expense, within sixty (60) days after the date of the Modification Statement, employ a licensed architect to review and respond to the Modification Statement (the "Response").

If the two architects fail to reach agreement within thirty (30) days after the date of the Response, then they shall select a third licensed architect (either by agreement between the two architects or, if they fail to agree on the third architect, by requesting that the Dallas chapter of the American Institute of Architects provide the third architect), with the fees of the third architect to be shared

8

Tenant's
Initials

Landlord's
Initials

equally by Landlord and Tenant. Upon agreement between the two architects selected by the parties, or upon the final decision of the third architect, Landlord and Tenant shall execute a written Amendment to Lease confirming the final determination and, if necessary, the appropriate rental adjustment.

(b)     Notwithstanding anything contained in this Lease to the contrary, both Landlord and Tenant acknowledge and confirm their mutual desire to have all financial obligations under this Lease fixed and liquidated as soon as possible so that they can account for and plan such obligations with greater certainty. Accordingly, the parties agree that if neither party employs a licensed architect to perform any of the above-listed services within sixty (60) days after the Commencement Date of this Lease, or if no Modification Statement is delivered within ninety (90) days after the Commencement Date of this Lease, then the provisions of Paragraph 9(a) shall be null and void and of no further force or effect; and in such event (i) so that both parties to this Lease can be assured that they will not have to expend monies for professional fees regarding Rentable Space determinations after the deadlines established in Paragraph 9(a), they hereby agree that the Rentable Space for the Premises and for the Building, as specified in Paragraph 1(c) above, shall conclusively be deemed to be applicable to this Lease; and (ii) so that both parties to this Lease can be assured as to their financial obligations after the deadlines established in Paragraph 9(a), they further agree that Base Rental, the Allowance, rental adjustments and all other aspects of this Lease which are based in whole or in part upon Rentable Space shall be deemed to be final and no longer subject to adjustment based upon inaccuracies and/or errors, if any, in the Rentable Space determinations specified in Paragraph 1(c).

9..     <u>Repairs and Reentry</u>. Tenant will, at Tenant's own cost and expense, maintain and keep the Premises and any alterations and additions thereto in sound condition and good repair, ordinary wear and tear excepted, and shall pay for the repair of any damage or injury done to the Building or any part thereof by Tenant or Tenant's agents, employees and invitees; provided, however, that Tenant shall make no repairs to the Premises without the prior written consent of Landlord. The performance by Tenant of its obligation to maintain and make repairs shall be conducted only by contractors approved by Landlord after plans and specifications have been approved by Landlord. Tenant will not commit or allow any waste or damage to be committed on any portion of the Premises, and upon the termination of this Lease by lapse of time or otherwise, Tenant shall deliver up the Premises to Landlord in as good condition as at date of possession, ordinary wear and tear excepted. Upon such termination of this Lease, Landlord shall have the right to reenter and resume possession of the Premises. Notwithstanding the foregoing provisions of this Paragraph 10, any repairs to the Premises or the Building that are necessitated because of any damage caused by fire or other casualty shall be governed by the provisions of Paragraph 18 below. Landlord shall be responsible for maintenance to the exterior, structural and common areas of the Building.

10.     <u>Alterations and Additions by Tenant</u>. Tenant shall make no alterations in or additions to the Premises without the prior written consent of Landlord which shall not be unreasonably withheld; and all alterations, additions, and improvements made to or fixtures or improvements placed in or upon the Premises by either party (except only moveable trade fixtures of Tenant) shall be deemed a part of the Building and the property of the Landlord at the time they are placed in or upon the Premises, and they shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, unless Landlord shall elect otherwise, whether such termination shall occur by the lapse of time or otherwise. In the event Landlord shall elect that certain alterations, additions and improvements made by Tenant in the Premises shall be removed by Tenant, Tenant shall remove them and Tenant shall restore the Premises to its original condition, at Tenant's own cost and expense, prior to the termination of the Lease Term. Alterations and additions to the Premises will be performed by Landlord at Tenant's cost and expense.

11.     <u>Entry for Repairs and Inspection</u>. Landlord and its agents and representatives shall have the right to enter into and upon any and all parts of the Premises at all reasonable hours and with reasonable prior notice when possible (or, in any emergency, at any hour) to inspect same or clean or make repairs or alterations or additions as Landlord may deem necessary, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof. During the period of

9

180 days prior to the expiration date of this Lease, Landlord and Landlord's agents may exhibit the Premises to prospective tenants at reasonable hours and upon prior notice to Tenant.

12. **Mechanic's Liens.** Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber the title of Landlord in and to the Premises or the Building or any part thereof; and if any mechanic's or materialman's lien is filed or claimed against the Premises or Building or any part thereof in connection with any work performed, materials furnished or obligation incurred by or at the request of Tenant, Tenant will indemnify, defend and hold Landlord harmless from any claims, losses or liabilities arising out of any liens filed or claimed against the Premises or building or any part thereof, by, through or under Tenant, except to the extent that Tenant bonds around such liens in accordance with the provisions of the Texas Property Code or causes such liens to be released . If the lien is not released of record or bonded around as provide above and default in payment thereof shall continue for twenty (20) days after written notice thereof from Landlord to Tenant, Landlord shall have the right and privilege at Landlord's option of paying the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses and interest, shall be repaid to Landlord immediately on demand therefor as additional rent.

13. **Tenant's Use.** Tenant will be solely responsible for obtaining all necessary certificates (e.g., Certificate of Occupancy) and licenses necessary for Tenant's occupancy of the Premises and conducting its business therein. Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use or for any purpose which is unlawful or which, in the good faith judgment of Landlord, is disreputable or which is hazardous due to risk of fire, explosion or other casualty. Tenant will not permit occupancy or use of the Premises by more than four (4) persons per 1,000 square feet of Rentable Space of the Premises; nor will Tenant permit anything to be done which will in any way (i) increase the rate of fire and casualty insurance on the Building or its contents, (ii) tend to lower the first-class character of the Building, (iii) create unreasonable elevator loads or otherwise interfere with standard building operations, or (iv) affect the structural integrity or design capabilities of the Building or any portion thereof (e.g., a floor being occupied by Tenant). In the event that, by reason of any act or conduct or business of Tenant, there shall be any increase in the rate of insurance on the Building or its contents created by Tenant's acts or conduct or business, then Tenant hereby agrees to pay Landlord the amount of such increase on demand. Tenant will conduct its business, and control its agents, employees, and invitees in such a manner as not to create any nuisance or interfere with, annoy or disturb other tenants or Landlord in the management of the Building.

14. **Laws and Regulations; Rules of the Building.** (a) Tenant at its sole expense will maintain the Premises in a clean and healthful condition and will comply with all laws, ordinances, orders, rules and regulations of any governmental authority having jurisdiction over the use, conditions or occupancy of the Premises. Without limiting the generality of the foregoing, Tenant shall comply strictly and in all respects with the requirements of all Hazardous Waste Laws and shall indemnify, defend and hold Landlord harmless from and against any liability, costs or expenses that may arise on account of the release, discharge, storage, disposal, treatment, processing or other handling or discovery of any Hazardous Substance within the Premises, or the discharge, release, disposal, storage, treatment, processing or other handling of any Hazardous Substance by Tenant, its employees, agents, contractors, or invitees anywhere on the Land or within the Building, or off site. As used herein, **"Hazardous Substance"** means any substance, material or matter that may give rise to liability under any Hazardous Waste Laws, including (but not limited to) medical waste and petroleum products or petroleum wastes. **"Hazardous Waste Laws"** shall mean any local, state or federal laws, rules, ordinances, regulations, and policy and guidance statements by the Environmental Agencies, either in existence as of the date hereof, or enacted, promulgated or issued after the date of this Lease, that concern the management, control, discharge, treatment, containment or removal of substances or materials that are or may become a threat to public health or the environment. To the best of Landlord's knowledge, Landlord represents and warrants that the Premises are free from Hazardous Substances as of the commencement of this Lease, to the extent that any Hazardous Substance is in violation of Hazardous Waste laws.

(b) Tenant and Tenant's agents, employees, and invitees will comply fully with all Rules and Regulations of the Building which are attached hereto as <u>Exhibit E</u> and made a part hereof as

10

though fully set out herein. As more particularly provided therein, Landlord shall at all times have the right to change such rules and regulations or to amend them in such reasonable manner as may be deemed advisable for the safety, protection, care and cleanliness of the Building and appurtenances and for preservation of good order therein, all of which rules and regulations, changes and amendments will be forwarded to Tenant in writing and shall be complied with and observed by Tenant; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

15.. **Indemnity, Liability and Loss or Damage.** By moving into the Premises or taking possession thereof, Tenant accepts the Premises as suitable for the purposes for which they are leased and accepts the Building and each and every appurtenance thereof, and waives any and all defects therein (with the exception of latent defects of which Tenant gives Landlord written notice within one year after the Commencement Date). Landlord shall not be liable to Tenant or Tenant's agents, employees, guests, invitees or any person claiming by, through or under Tenant for any injury to person, loss of or damage to property, or for loss of or damage to Tenant's business, occasioned by or through the acts or omissions of Landlord, or by any cause whatsoever except Landlord's negligence or willful wrongdoing. Unless arising solely from or out of Landlord's negligence or willful wrongdoing, Landlord shall not be liable for, and Tenant shall indemnify, defend and hold Landlord harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of the Premises or any part thereof, or occasioned wholly or in part by any action or omission of Tenant, its agents, contractors, employees, invitees or licensees. If Landlord shall, without fault on its part, be made a party to any action commenced by or against Tenant, Tenant shall indemnify, defend and hold Landlord harmless therefrom and shall pay all costs, expenses, and reasonable attorney's fees to Landlord incurred in connection therewith. Unless arising solely from Landlord's negligence or willful wrongdoing, Tenant shall not be liable for, and Landlord shall indemnify, defend and hold Tenant harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of the sole negligence or willful wrongdoing any action or omission of Landlord, its agents, contractors, employees, invitees, or licensees.

16. **No Subrogation; Insurance.** (a) Tenant hereby waives any cause of action it might have against Landlord on account of any loss or damage that is insured against under any insurance policy that covers the Premises, Tenant's fixtures, personal property, leasehold improvements or business and which names Tenant as a party insured. Landlord hereby waives any cause of action it might have against Tenant because of any loss or damage that is insured against under any insurance policy that covers the Building or any property of Landlord used in connection with the Building and which names Landlord as a party insured; provided, however, that Tenant shall remain liable to Landlord for the amount of the "deductible" applicable to Landlord's insurance coverage, not to exceed $10,000. This provision is cumulative of Paragraph 16.

(b) Tenant shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense, insuring Tenant and Landlord against liability for injury to or death of a person or persons, occasioned by or arising out of or in connection with the use or occupancy of the Premises, the limits of such policy or policies to be in an amount not less than $1,000,000.00 with respect to injuries to or death of any one person and in an amount of not less than $1,000,000.00 with respect to any one accident or disaster, and shall furnish evidence satisfactory to Landlord of the maintenance of such insurance. Tenant shall obtain a written obligation on the part of each insurance company to endeavor to notify Landlord at least 10 days notice to prior to cancellation of such insurance. It is recommended that Tenant carry fire and extended coverage insurance on its personal property, as Landlord shall in no event be required to rebuild, repair or replace any part of the furniture, equipment, fixtures and other improvements which may have been placed by Tenant on or within the Premises.

17. **Fire and Casualty.** (a) If the Premises are damaged by fire or other casualty and if such damage is not susceptible of repair within 180 days (as estimated, as soon as reasonably practicable after the occurrence of such damage, by an architect of recognized good reputation selected by Landlord), then in such event this Lease, at the option of Landlord exercised by giving written notice thereof to Tenant within 30 days after receipt of a certificate of the architect so selected,

11

shall terminate as of the date of such loss, and Tenant shall pay the rent hereunder apportioned to the time of such loss and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

(b)     If the damage described above is susceptible of repair within 180 days, or if the damage is not susceptible of repair within 180 days but Landlord fails to exercise its option to terminate this Lease, Landlord shall enter and make the necessary repairs without affecting this Lease, but the rent hereunder shall be reduced or abated as shall be equitable, in the good faith judgment of Landlord, until such repairs are made, unless such damage has been so slight that Tenant's occupancy of the Premises is not materially interfered with, in which case the rent hereunder shall not be abated or reduced. Notwithstanding the foregoing, Landlord shall have the option to terminate this Lease and shall not be obligated to repair the Premises or the Building if the damage is not covered by insurance or if Landlord's mortgagee applies any portion of the insurance proceeds to the unpaid balance of its loan.

(c)     In the event the Building is so badly damaged or injured by fire or other casualty, even though the Premises may not be affected, that Landlord decides, within 90 days after such destruction, not to rebuild or repair the Building (such decision being vested exclusively in the discretion of Landlord), then in such event Landlord shall so notify Tenant in writing and this Lease shall terminate as of the date of Landlord's written notice to Tenant effecting its decision not to rebuild, and the Tenant shall pay rent hereunder apportioned to the date of such notice (subject to subparagraph (b) immediately above) and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

(d)     Notwithstanding the foregoing provisions of this Paragraph 18, Tenant agrees that if the Premises or any other portion of the Building is damaged by fire or other casualty resulting from the fault or negligence of Tenant or any of its agents, employees, or invitees, then there shall be no abatement of rent before or during the repair of such damage.

18.     **Condemnation.** If all of the Premises, or so much thereof as would materially interfere with Tenant's use of the remainder, shall be taken or condemned for any public use or purpose by right of eminent domain, with or without litigation, or be transferred by agreement in connection with or in lieu of or under threat of condemnation, then the term of this Lease and the leasehold estate created hereby shall terminate as of the date title shall vest in the condemnor or transferee. If only a portion of the Building, but not the Premises, is taken or condemned or transferred as aforesaid, Landlord shall have the option to terminate this Lease effective as of the date title shall vest in the condemnor or transferee. Landlord shall receive the entire award from any taking or condemnation (or the entire compensation paid because of any transfer by agreement), and Tenant shall have no claim thereto.

19.     **Termination Right.** Tenant shall have the right to terminate this Lease with 60-days prior written notice to Landlord starting in month sixty-one (61) of the Lease Term. If exercised, Tenant shall pay a termination penalty equal to Landlord's unamortized Tenant Improvement and Leasing Commissions at an annual percentage rate of seven percent (7%) straight amortization.

20.     **Assignment and Subletting.** (a) In the event that Tenant desires to assign or mortgage this Lease or sublet all or any part of the Premises (with the term "sublet" being deemed, for purposes of this Paragraph 21, to include Tenant's grant of a license, concession or other right of occupancy of any portion of the Premises), Tenant shall notify Landlord in writing (a "Proposal Notice") and shall state in the Proposal Notice the name of the proposed assignee, mortgagee or sublessee and the terms of the proposed assignment, mortgage or sublease. In the Proposal Notice Tenant shall also provide financial information and state the nature and character of the business of the proposed assignee, mortgage or sublessee. Notwithstanding such Proposal Notice to Landlord, Tenant shall not assign or mortgage this Lease or any right hereunder or interest herein, and Tenant shall not sublet the Premises in whole or in part or grant any license, concession or other right of occupancy of any portion of the Premises, without the prior written consent of Landlord (which, subject to subsections (b) and (c) below, shall not be unreasonably withheld). Any such assignment, mortgage or subletting without Landlord's consent shall be void and shall, at the sole option of the Landlord, be deemed a breach of this Lease. Notwithstanding

12

any assignment, mortgage or subletting consented to by Landlord, Tenant and each assignee shall at all times remain fully responsible and liable for the payment of the rent herein specified and for compliance with all of Tenant's other covenants and obligations under this Lease. No consent to any assignment or mortgage of this Lease or any subletting of the Premises shall constitute a waiver of the provisions of this paragraph except as to the specific instance covered thereby. If Tenant is a corporation or partnership, an assignment prohibited by this Paragraph 21 shall be deemed to include one or more sales or transfers, by operation of law or otherwise, or creation of new stock or partnership interests, by which a majority of the voting shares of the corporation or interests in the partnership shall be vested in a party or parties who are not owners of a majority of the voting shares or partnership interests of Tenant as of the date hereof; provided, however, that the foregoing provisions of this sentence shall not be applicable if Tenant's stock is listed on a recognized security exchange. Any transfer by operation of law shall also constitute an assignment prohibited by this Paragraph 21. Unless Landlord's withholding of consent is attributable primarily to a malicious intent to injure Tenant (i.e., as opposed to a difference of opinion between Landlord and Tenant), Landlord shall not be liable to Tenant for wrongfully withholding its consent to an assignment or subletting under this Lease and Tenant's sole remedy on account thereof shall be to enforce specific performance of Landlord's obligation to consent.

(b)     Landlord and Tenant hereby agree that the granting of consent by Landlord (i.e., if such consent is granted) shall, at a minimum, be preconditioned upon the fulfillment of the following requirements of Landlord, as well as any other reasonable requirements of Landlord:

(1)     Landlord shall be entitled to review Tenant's Proposal Notice for at least ten (10) days after receiving same from Tenant;

(2)     Tenant shall remain primarily liable under this Lease and shall guaranty the Lease if Landlord so requests;

(3)     Any proposed assignee or sublessee shall assume, in a written instrument acceptable to Landlord, all of the obligations of Tenant hereunder;

(4)     No use shall be employed in connection with the Premises other than the Sole Permitted Use set forth in this Lease;

(5)     The Premises shall remain intact and shall not be altered in any manner whatsoever unless Tenant and the prospective assignee or sublessee shall pay the entire cost thereof, and Landlord's prior written approval is obtained pursuant to Paragraph 10 above;

(6)     The tangible net worth of the proposed subtenant/assignee must be reasonably sufficient for the obligations under this Lease;

(7)     Any use of the Premises permitted hereunder by the proposed sublessee/assignee must not (i) violate or create any potential violation of any laws, nor (ii) violate any other agreements affecting the Premises, the Building or Landlord, nor (iii) increase by more than 5% the density of employees and/or other persons using the Premises from the density maintained by Tenant;

(8)     The proposed subtenant/assignee will not create traffic congestion or an unreasonable burden on existing parking or elevators;

(9)     Tenant shall pay any and all reasonable attorney's fees or other costs associated with Landlord's review and approval of a prospective assignee or sublessee, not to exceed $1,000.00;

(10)    No assignment or sublease shall be to a person or entity with whom Landlord is then negotiating, has negotiated with within the previous six months or currently is a tenant within the Building.

13

(c)     In the event of a sublease approved by Landlord where the monthly rental per square foot of space subleased which is payable by any sublessee to Tenant (including any bonuses or any other consideration paid directly or indirectly by the sublessee to Tenant) exceeds the monthly rental per square foot for the same space payable for the same month by Tenant to Landlord, Tenant shall be obligated to pay the amount of such excess to Landlord as additional rent hereunder within twenty (20) days after it is received by Tenant from the sublessee. In the event of an assignment approved by Landlord where Tenant receives any consideration from an assignee other than the assumption by the assignee of Tenant's obligations hereunder, Tenant shall be obligated to pay the amount of such consideration to Landlord as additional rent hereunder within twenty (20) days after the date it is received by Tenant. Landlord, at Landlord's option, may elect to require that rental payable by any sublessee be paid directly to Landlord and offset Tenant's rent obligations accordingly.

(d)     Notwithstanding the foregoing, the provisions of Sections 21(a)-(c) will not apply to an assignment or sublease to a parent, subsidiary, affiliate, entity under common ownership or successor in interest arising out of or resulting from a merger or the sale of substantially all of the stock or assets of Tenant. Under such circumstances, Tenant will only be obligated to notify Landlord of such assignment or sublease and deliver a copy of the assignment or sublease, if applicable, to Landlord.

21..    **Holding Over.** Should Tenant continue to hold the Premises after this Lease terminates, whether by lapse of time or otherwise, such holding over shall, unless otherwise agreed to by Landlord in writing, constitute and be construed as a tenancy at will at a daily rental equal to one-thirtieth (1/30) of an amount equal to 125% of the amount of the monthly rental payable during the last month prior to the termination of this Lease, and upon and subject to all of the other terms and provisions set forth herein except any right to renew this Lease. This provision shall not be construed, however, as permission by Landlord for Tenant to hold over.

22.     **Abandoned Property.** All personal property of Tenant remaining in the Premises after the expiration of the Lease Term or after the abandonment of the Premises by Tenant may be treated by Landlord as having been abandoned by Tenant, and Landlord shall have the right to remove such personal property from the Premises without any obligation to deliver such personal property to Tenant and without any liability to Tenant whatsoever, it being agreed that Tenant shall have no right to reclaim such property. Landlord shall have no duty to notify Tenant that Landlord may dispose of Tenant's property. Tenant shall be presumed conclusively to have abandoned the Premises if the amount of Tenant's property removed or being removed by Tenant from the Premises is substantial enough to indicate a probable intent to abandon the Premises, and such removal is not within the normal course of Tenant's business, or if Tenant removes or is removing any material amount of Tenant's personal property from the Premises at a time when Tenant is in default in the payment of rental due hereunder and such removal is not within the normal course of Tenant's business. Nothing contained in this paragraph shall prejudice or impair Landlord's rights as a lienholder and secured party under Paragraph 28 hereof, and the rights granted to Landlord under this paragraph shall be cumulative of its rights as a lienholder and secured party.

23.     **Taxes.** (a) Tenant shall be liable for all taxes levied or assessed against all personal property, furniture and fixtures placed by Tenant, or on Tenant's behalf, in the Premises. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, and Landlord elects to pay the taxes based on such increase, Tenant shall pay Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

(b)     Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and absolute right to contest taxes levied against the Premises and the Building (other than taxes levied directly against Tenant's personal property within the Premises). Accordingly, Tenant, to the maximum extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 of the Texas Property Tax Code, as such section may be amended and/or supplemented from time to time). Additionally, Tenant, to the maximum extent permitted

14

Tenant's     Landlord's
Initials     Initials

by law, hereby assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 and 42.015 of the Texas Property Tex Code, as such sections may be amended and/or supplemented from time to time). To the maximum extent permitted by law, Tenant agrees that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord.

24.     **Transfer of Landlord's Rights.** In the event Landlord transfers its interest in the Building, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of the Landlord for the performance of such obligations.

25.     **Default.** (a) The following events shall be deemed to be events of default by Tenant under this Lease: (i) Tenant shall fail to pay any rental or other sums payable by Tenant hereunder as and when such rental or other sums become due and payable and any such failure shall continue for a period of ten (10) days after written notice from Landlord to Tenant (provided, however, that if in any calendar year Landlord has given at least two written notices of rental defaults to Tenant, then for the remainder of that particular calendar year the grace period shall be reduced to five days and there shall be no requirement of written notice from Landlord to Tenant); (ii) Tenant shall fail to comply with any other provision, condition or covenant of this Lease and any such failure shall continue for a period of twenty (20) days after Landlord gives written notice thereof to Tenant; (iii) Tenant shall abandon, vacate or fail to physically occupy any substantial portion of the Premises; (iv) any petition shall be filed by or against Tenant or any guarantor of Tenant's obligations under this Lease pursuant to any section or chapter of the present federal Bankruptcy Act or under any future federal Bankruptcy Act or under any similar law or statute of the United States or any state thereof, or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed under any section or chapter of the present federal bankruptcy act or under any future federal bankruptcy act or under any similar law or statute of the United States or any state thereof; (v) Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent or make a transfer in fraud of creditors; (vi) Tenant or any guarantor of this Lease shall make an assignment for the benefit of creditors; or (vii) a receiver or trustee shall be appointed for Tenant or any of the assets of Tenant.

(b)     Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following **without any further notice or demand**, in addition to and not in limitation of any other remedy permitted by law or by this Lease:

(1)     If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may enforce, by all legal suits and other means, its rights hereunder, including the collection of Base Rental and any other sums payable by Tenant hereunder, without reentering or resuming possession of Premises and without terminating this Lease.

(2)     If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may do whatever Tenant is obligated to do by the provisions of this Lease; and to the extent that Landlord deems it necessary or otherwise appropriate for Landlord to enter the Premises, Landlord may enter the Premises, by force if necessary (but only if and to the extent permitted by law), in order to accomplish this purpose. Tenant hereby waives any and all claims for damages caused by Landlord's actions pursuant to this subparagraph (b)(2), and Tenant also agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in thus effecting compliance with this Lease on behalf of Tenant.

(3)     If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution of any claims for damages therefor, and Landlord may relet the Premises for the account of Tenant. Tenant shall pay to Landlord all arrearages of Base Rental and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Lease Term the installments of Base Rental and other sums due hereunder, less such part, if any, that Landlord shall have been able to collect from a new tenant upon reletting. In this regard the parties further agree that although Landlord shall use its reasonable efforts to relet the Premises after Tenant

15

has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 26(b)(3) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in the final two sentences of Paragraph 26(b)(5) below and Landlord shall have the right at any time to demand final settlement as provided therein.

(4)   If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may enter upon the Premises by use of a duplicate key, a master key, an electronic pass card, a locksmith's entry procedures or any other means not involving personal confrontation, and change, alter or modify the door locks on all entry doors of the Premises, thereby excluding Tenant and its agents, employees, representatives and invitees, from the Premises. In such event Landlord shall not be obligated to place any written notice on the Premises explaining Landlord's action; moreover, Landlord shall not be required to provide the new key (if any) to Tenant until and unless all rental defaults of Tenant have been fully cured.

(5)   If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may without notice and without prejudice to any other remedy Landlord may have, enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor; and upon any such termination, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rental and other sums due and owing by Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for damages. Tenant shall pay to Landlord as damages on the same days as Base Rental and other payments are expressed to be due under the provisions of this Lease, the total amount of such Base Rental and other payments, less such part, if any, of such payments that Landlord shall have been able to collect from a new tenant upon reletting. In this regard the parties further agree that although Landlord shall use its reasonable effort to relet the Premises after Tenant has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. Landlord shall have the right at any time to demand final settlement. Upon demand for a final settlement, Landlord shall have the right to receive, and Tenant hereby agrees to pay, as damages for Tenant's breach and in addition to the Reimbursable Costs prescribed in the final section of this Paragraph 26, the difference between the total rental provided for in this Lease for the remainder of the Lease Term and the reasonable rental value of the Premises for such period, such difference to be discounted to present value at a rate equal to the rate of interest allowed by law (at the time the demand for final settlement is made) when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of 6% per annum).

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity. Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other peaceable means. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which constitutes the balance of the Lease Term) and on such

16

terms and conditions (which may include free rent, rental concessions or tenant inducements of any nature) as Landlord in its absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting (the **"Reimbursable Costs"**). In the event any rentals actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rental payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord, and Tenant shall have no right with respect thereto (except, however, same shall be applied to Tenant's deficiency, if any). In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rental or any other sum due hereunder or any deficiency between the rental and any other sum provided for by this Lease for a calendar month and the rental and any other sum actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rental deficiencies at one time. Any suit shall not prejudice in any way the right of Landlord to bring a similar action for any subsequent rental deficiency or deficiencies.

26.     **Security Deposit.** The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant upon the occurrence of any event of default by Tenant or upon termination of this Lease. Landlord may commingle the Security Deposit with Landlord's other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant within thirty (30) days of the termination of this Lease. If Landlord transfers its interest in the Premises during the term of this Lease, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

27..    **Landlord's Lien and Security Interest.** Landlord shall have a Landlord's statutory lien, and in addition thereto Landlord shall have, and Tenant hereby grants unto Landlord, a security interest in all of the goods, wares, furniture, fixtures, office equipment, supplies and other property of Tenant now or hereafter placed in, upon, or about the Premises and all proceeds thereof, as security for all of the obligations of Tenant under this Lease, provided that Tenant shall have the right to make sales of its goods, wares and merchandise to its customers in the normal and regular course of its business conducted in the Premises free and clear of the aforesaid lien and security interest. Tenant shall not remove any of said personal property from the Premises until all of Tenant's obligations under this Lease have been satisfied in full. Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession by peaceable means of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated on the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made; and at any such sale the Landlord or its assigns may purchase unless otherwise prohibited by law. The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this Paragraph 28. Any surplus shall be paid to Tenant or as otherwise required by law; and Tenant shall pay any deficiencies forthwith. Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Texas Uniform Commercial Code. Upon request by Landlord, Tenant shall provide the name and address of any entity that has, or claims to have, an interest in any property located on the Premises and a description of such property. Failure to provide such list shall result in a

17

presumption that all property located in the Premises belongs to Tenant free from all claims. Without intending to exclude any other manner of giving Tenant any required notice, any requirement of reasonable notice to Tenant of Landlord's intention to dispose of any collateral pursuant to the enforcement of said security interest shall be met if such notice is given in the manner prescribed in Paragraph 37 of this Lease at least five days before the time of any such disposition. Landlord shall have all of the rights and remedies of a secured party under law.

28.     **Remedies.** No act or thing done by Landlord or its agents during the term hereof shall be deemed an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord. No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention is given to Tenant. Notwithstanding any such reletting or reentry or taking possession, Landlord may at any time thereafter elect to terminate this Lease for a previous default. Landlord's acceptance of rent following an event of default hereunder shall not be construed as Landlord's waiver of such event of default. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default. The failure of Landlord to enforce the rules described in Paragraph 15 against Tenant or any other tenant in the Building shall not be deemed a waiver of any such rules. No provisions of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and is signed by Landlord. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies. If Landlord brings any action under this Lease, or consults or places this Lease or any amount payable by Tenant hereunder with an attorney for the enforcement of any of Landlord's rights hereunder, then Tenant agrees to pay to Landlord the reasonable attorney's fees and other costs and expenses incurred by Landlord in connection therewith.

29..    **Joint and Several Liability.** If there are two or more parties comprising Tenant, the obligations imposed upon Tenant pursuant to this Lease shall be joint and several. If there is a guarantor of Tenant's obligations under this Lease, the obligations of Tenant shall be joint and several obligations of Tenant and such guarantor, and Landlord need not first proceed against Tenant hereunder before proceeding against such guarantor; nor shall any such guarantor be released from its guarantee for any reason whatsoever, including, without limitation, any amendment of this Lease, any forbearance by Landlord or waiver of any of Landlord's rights, the failure to give Tenant or such guarantor any notices, or the release of any party liable for the payment of Tenant's obligations hereunder.

30..    **Constructive Eviction.** Tenant shall not be entitled to claim a constructive eviction from the Premises unless Tenant shall have first notified Landlord in writing of the condition or conditions giving rise thereto, and, if the complaints be justified, unless Landlord shall have failed to remedy such conditions within a reasonable time after receipt of said notice.

31.     **Building Name.** Landlord reserves the right at any time to change the name by which the Building is designated, and Landlord shall have no obligation or liability whatsoever for costs or expenses incurred by Tenant as a result of such name change of the Building.

32.     **Subordination and Attornment; Notice to Mortgagee.** (a) This Lease and all rights of Tenant hereunder are subject and subordinate to any deeds of trust, mortgages or other instruments of security which do now or may hereafter cover the Building and the Land or any interest of Landlord therein, and to any and all advances made on the security thereof, and to any and all increases, renewals, modifications, consolidations, replacements and extensions of any of such deeds of trust, mortgages or instruments of security. This provision is hereby declared by Landlord and Tenant to be self-operative and no further instrument shall be required to effect such subordination of this Lease. Tenant shall, however, upon demand at any time or times execute, acknowledge and deliver to Landlord any and all instruments and certificates that, in the judgment of Landlord, may be necessary or proper to confirm or evidence such subordination, and Tenant

18

| Tenant's | Landlord's |
| Initials | Initials |

hereby irrevocably appoints Landlord as Tenant's agent and attorney-in-fact for the purpose of executing, acknowledging and delivering any such instruments and certificates. However, notwithstanding the generality of the foregoing provisions of this Paragraph 33, Tenant agrees that any such mortgagee shall have the right at any time to subordinate any such deeds of trust, mortgages or other instruments of security to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Tenant further covenants and agrees upon demand by Landlord's mortgagee at any time, before or after the institution of any proceedings for the foreclosure of any such deeds of trust, mortgages or other instruments of security, or sale of the Building pursuant to any such deeds of trust, mortgages or other instruments of security or voluntary sale, to attorn to such purchaser upon any such sale and to recognize and attorn to such purchaser as Landlord under this Lease. The agreement of Tenant to attorn upon demand of Landlord's mortgagee contained in the immediately preceding sentence shall survive any such foreclosure sale or trustee's sale.

(b)     Tenant further agrees that whenever Tenant receives written notice of a deed of trust, mortgage or other instrument of security affecting the Land and/or Building, then Tenant shall give to the mortgagee written notice of each and every default under this Lease by Landlord; moreover, Tenant shall not exercise any remedies under this Lease unless the mortgagee fails to cure such default within twenty (20) days, or within such longer period as may be reasonably necessary if such default cannot be cured within twenty (20) days, after the mortgagee has received such notice. Notwithstanding anything to the contrary which may be contained in this subsection (b), Tenant further agrees that this subsection (b) is solely for the benefit of an applicable mortgagee, i.e., granting to a mortgagee the option to cure a default by Landlord; and no mortgagee shall ever have any obligation to cure a default by Landlord.

(c)     Tenant hereby agrees to execute, acknowledge and deliver to Landlord's mortgagee any and all instruments and certificates that in the judgment of Landlord's mortgagee may be necessary or proper to confirm or evidence the agreements set out above in this Paragraph 33, and Tenant hereby irrevocably appoints Landlord's mortgagee as Tenant's agent and attorney-in-fact for the purpose of executing, acknowledging and delivering any such instruments and certificates.

33.     **Lease Certificates; Financial Statements.** Tenant agrees to furnish from time to time, within ten (10) days after requested by Landlord, a certificate signed by Tenant and addressed to Landlord -- or at Landlord's direction to any potential successor to Landlord or any existing or potential holder of a deed of trust or mortgage covering the Land and Building or any interest of Landlord therein -- to the effect that this Lease is then presently in full force and effect and specifying any modifications; that the term of this Lease has commenced and the full rental is then accruing hereunder; that Tenant has accepted possession of the Premises and that any improvements required by the terms of this Lease to be made by Landlord have been completed to the satisfaction of Tenant; that no rent under this Lease has been paid more than thirty (30) days in advance of its due date; that the address for notices to be sent to Tenant is as set forth in this Lease; that Tenant, as of the date of such certificate, has no charge, lien or claim of offset under this Lease or otherwise against rents or other charges due or to become due hereunder; and that to the knowledge of Tenant, Landlord is not then in default under this Lease. The certificate shall also contain an acknowledgment by Tenant of receipt of notice of the assignment of this Lease to such holder and the agreement by Tenant with such holder that from and after the date of such certificate, Tenant will not pay any rent under this Lease more than 30 days in advance of its due date, will not surrender or consent to the modification of any of the terms of this Lease nor to the termination of this Lease by Landlord, and will not seek to terminate this Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to the holder of such deed of trust or mortgage (at such holder's last address furnished to Tenant) and until a reasonable period of time shall have elapsed following the giving of such notice, during which period such holder shall have the right, but shall not be obligated, to remedy such act or omission; provided, however, that if Tenant's certificate is executed before the assignment of Landlord's interest in the Lease to such holder, then the agreement of Tenant described in this sentence will be of no effect under such certificate unless Tenant is furnished with a copy of the assignment to such holder within ninety (90) days after the date of such certificate. Tenant shall also furnish to Landlord when requested by Landlord, but no more often than one time per calendar year, a statement of the financial condition of Tenant prepared by an independent Certified Public Accountant and in form reasonably satisfactory to Landlord.

19

Tenant's     Landlord's
Initials     Initials

34.     **Limitation of Landlord Liability.** The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Building and the Land, and Landlord shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord. Notwithstanding anything to the contrary contained in this Lease, in the event Landlord sells, assigns, transfers or conveys its interest in the Land, Landlord shall have no liability for any acts or omissions that occur after the date of said sale, assignment, transfer or conveyance.

35.     **Consents.** In all circumstances under this Lease where the prior consent of one party (the "consenting party"), whether it be Landlord or Tenant, is required before the other party (the "requesting party") is authorized to take any particular type of action, such consent shall not be withheld in a wholly unreasonable and arbitrary manner; however, the requesting party agrees that its exclusive remedy if it believes that consent has been withheld improperly (including, but not limited to, consent required from Landlord pursuant to Paragraph 11 or Paragraph 21 of this Lease) shall be to institute litigation either for a declaratory judgment or for a mandatory injunction requiring that such consent be given (with the requesting party hereby waiving any claim for damages, attorneys fees or any other remedy unless the consenting party refuses to comply with a court order or judgment requiring it to grant its consent).

36.     **Notices.** Any notice required or permitted to be given hereunder by one party to the other shall be deemed to be given when deposited in the United States mail, certified or registered mail, return receipt requested, with sufficient postage prepaid, or hand delivered, addressed to the respective party to whom notice is intended to be given at the address of such party set forth below its name where it has executed this Lease. Either party hereto may at any time by giving written notice to the other party in the aforesaid manner designate any other address in substitution of the foregoing address to which any such notice shall be given.

37.     **Brokerage.** Landlord and Tenant warrant to each other that they have not had any dealings with any broker or agent in connection with the negotiation or execution of this Lease except for the Leasing Agent, or Agents, if any, listed in Paragraph 1(f) of this Lease; and each party agrees to indemnify the other party and hold the other party harmless from and against any and all costs, expenses or liability for commissions or other compensation or charges claimed by any other broker or agent, through commitments of the indemnifying party with respect to this Lease.

38.     **Force Majeure.** Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, the party taking the action shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any reasonable delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party; provided, however, in no event shall the foregoing apply to the financial obligations of either Landlord or Tenant to the other under this Lease, including Tenant's obligation to pay Base Rentals and all other amounts payable to Landlord hereunder.

39.     **No Third Party Beneficiary.** This Lease is for the sole benefit of Landlord, its successors and assigns, and Tenant, its permitted successors and assigns, and it is not for the benefit of any third party.

40..    **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

41.     **Binding Effect.** The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and to their respective heirs, personal representatives,

20

<table>
<tr><td>Tenant's<br>Initials</td><td>Landlord's<br>Initials</td></tr>
</table>

successors and assigns, subject to the provisions of Paragraph 21, Paragraph 25, Paragraph 35 and Paragraph 46 hereof.

42.    **Applicable Law; Consent to Jurisdiction**. This Lease shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States applicable to transactions in the State of Texas. Tenant hereby irrevocably agrees that any legal action or proceeding against it with respect to this Lease may be maintained in the courts of county where rent is payable under this Lease, or at Landlord's option in the U.S. District Court for the Northern District of Texas; and Tenant hereby consents to the jurisdiction and venue of such courts.

43.    **Entire Agreement; No Warranties**. This Lease contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements, understandings, promises, and representations made by either party to the other concerning the subject matter hereof and the terms applicable hereto. It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that there have been no agreements pertaining to the Premises, the Building or this Lease not incorporated in writing herein and that this Lease shall not be altered, waived, amended or extended, except by a written agreement signed by the parties hereto, unless otherwise expressly provided herein. Landlord's duties and warranties are limited to those set forth in this Lease, and shall not include any implied duties or warranties, all of which are hereby disclaimed by Landlord and waived by Tenant. In particular, Landlord disclaims, and Tenant waives, any warranty that the Premises are suitable or fit for any particular purpose or use.

44.    **NO IMPLIED REPRESENTATIONS**. LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION, PROMISE OR UNDERSTANDING OF THE OTHER, OR OF ANY LEASING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH BELOW:

_____

_____

_____

21

Tenant's    Landlord's
Initials    Initials

[x]    IN THIS LEASE.

[ ]    IN _____ AS WELL AS IN THIS LEASE.

NOTE:  IF NO "X" (OR OTHER MARK DESIGNATING A CHOICE) IS PLACED IN EITHER BOX IN THIS PARAGRAPH 45, THEN THE FIRST BOX WILL BE DEEMED TO HAVE BEEN MARKED.

45.    **Effective Date.** ·  The submission by Landlord of this instrument to Tenant for examination, negotiation or signature does not constitute an option for, or a representation by Landlord regarding, a prospective lease.  This Lease shall be effective if and when (and only if and when) it has been executed by both Landlord and Tenant.  When such condition has been satisfied, the effective date of this Lease shall be the latest date accompanying a signature by Landlord and Tenant below; and if either or both signatures fail to be accompanied by a date, then the date of such signature(s) shall be established by the best alternative evidence.  If for any reason whatsoever this Lease has not been fully executed within fifteen (15) business days after the signature of the first party to sign, then this Lease shall be null and void and of no force or effect; provided, however, that if more than 15 business days elapse between the dates upon which Landlord and Tenant sign this Lease, but this Lease nevertheless is in fact fully executed by both parties and following the execution of this Lease by both parties either (i) Landlord and Tenant mutually agree to Approved Working Drawings for leasehold improvements to the Premises (as contemplated in Paragraph 3 of Exhibit D), or (ii) Tenant occupies the Premises, or both, then the immediately preceding provision of this sentence shall be inoperative and the remainder of this Lease shall be in full force and effect.

**LANDLORD:**

Sole Manager of 2425 West Loop, LP,

By: _____

Name: _BRADLEY S. PARKER_____

Title: _AUTHORIZED AGENT_____


**TENANT:**

Jetall companies, inc

By: _____

Name: _BRADLEY S. PARKER_____

Title: _AUTHORIZED AGENT_____


Date of Signature: _5/13/15_____

22

| Tenant's Initials | Landlord's Initials |

## EXHIBIT "A" TO LEASE AGREEMENT

## LEGAL DESCRIPTION

Being 2.4462 Acres (called 2.4455) of land out of the William White survey, Abstract No. 836 and out of a 7.913 acre tract of land described as two in a deed from Anna Skinner Green to R.E. Smith Dated August 15, 1950 as recorded at Volume 2145, Page 350 in the deed records of Harris County, Texas; and being more particularly described by metes and bounds as follows:

COMMENCING: at a found 5/8 –inch iron rod in the Northerly right-of-way line of Westheimer Road (R.O.W. varies), being the Southeast corner of a 2.4385 acre parcel conveyed by Lincoln National Life Insurance Company to Red Lion Hotels, Inc. in a deed recorded in Harris County Clerk's File No. S056346 and the southwest corner of the 3.4385 acre parcel conveyed by Harvey R. Houck, Jr. to Restprop, Ltd. in a deed recorded in Harris County Clerk's File No. R2288886;

THENCE: Northerly N 2 deg 23 min 52 sec West 204.61 feel along the common line of the aforesaid 2.3468 acre parcel to the west and 3.4385 acre parcel to the east, to the Northeast corner of the 2.3468 acre parcel being the southeast corner of the herein described parcel and the POINT OF BEGINNING, from which a found ½-inch iron rod in a 12-inch Hackberry Tree bears North 58 deg 29 min West 0.72 feet;

THENCE: Westerly along the common line of the 2.3468 acre parcel to the south and the herein described parcel the north South 87 deg 44 min 46 sec West 464.50 feet (called 464.47 feet) to a point on the Easterly right-of-way (R.O.W.) line in Interstate 610 West Loop and the southwest corner of the herein described parcel, whence a found X in concrete bears South 39 deg 35 min West 0.71 feet from whence a found railroad spike with X bears South 19 deg 50 min East 0.34 feet;

THENCE: Northerly along the easterly R.O.W. line of Interstate 610 West Loop (R.O.W. 350 feet) North 10 deg 55 min 17 sec East 251.27 feet to a point whence a found X in concrete bears North 33 deg 17 min East 0.53 feet and whence a found P.K. nail bears South 11 deg 55 min East 0.39 feet said point also being the southwest corners of a 7.8998 acre parcel as shown on the Houston Venture Plan Unrestricted Reserve A Filed in the Harris County Map Records as Film Code Number 356074, and the northwest corner of the herein described parcel;

THENCE: Easterly along the common line of the above indicated 7.8998 acre parcel to the north and the herein described parcel to the south North 87 deg 44 min 46 sec East 406.61 feet (called 406.40 feet), to a point of the westerly line of a 3.4385 acre parcel of land presently owned by X in concrete bears North 12 deg 36 min East 0.34 feet;

THENCE: Southerly along a common line of the above indicated 3.4385 acre parcel to the east and therein described parcel to the west, South 02 deg 23 min 52 sec East 244.64 to the POINT OF BEGINNING containing 106,557 square feet, 2.4462 acres more or less.

23

<table>
<tr><td>Tenant's<br>Initials</td><td>Landlord's<br>Initials</td></tr>
</table>

## EXHIBIT B TO LEASE AGREEMENT

### FLOORPLAN



24

Tenant's    Landlord's
Initials    Initials

## EXHIBIT C TO LEASE AGREEMENT

### Parking Privileges

1. **Parking Spaces.** At all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease as defined in Paragraph 26 of this Lease, Landlord hereby agrees to make parking spaces available to Tenant as follows: 3.5 parking spaces per thousand square feet, 12 of which shall be reserved parking spaces. The location of such spaces shall be selected by Landlord in its sole discretion.

2. **Parking Rental.** The rent for all parking spaces which are allotted to Tenant pursuant to Paragraph 1 immediately above shall be the rate which is from time to time designated by Landlord as standard for the Building. On the execution date of the Lease, the rate is **$0.00** for each "reserved" parking space in the garage and **$0.00** for each "unreserved" garage space. All payments of rent for parking spaces shall be made (i) at the same time as each Base Rental is due under the Lease and (ii) to Landlord or to such persons as Landlord may direct from time to time.

3. **Parking; Allocation Devises.** Landlord reserves the right to change its system for allocating parking spaces, e.g., magnetic parking cards, parking stickers and other devices or forms of identification. If Landlord issues magnetic parking cards, parking stickers or any other device or form of identification, they shall remain the property of Landlord and shall not be transferable. Tenant will be obligated to pay a replacement charge, equal to the amount posted from time to time by Landlord, for loss or other replacement of any magnetic parking card or parking sticker issued by Landlord.

4. **Damage to or Condemnation.** If Landlord fails or is unable to provide any parking space to Tenant pursuant to Paragraph 1 above because of damage or condemnation, such failure or inability shall never be deemed to be a default by Landlord as to permit Tenant to terminate the Lease, either in whole or in part. Instead, Tenant's obligation to pay rent for any such parking space, which is not provided by Landlord shall be abated for so long as Tenant does not have the use of such parking space, and such abatement shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of such failure or inability to provide Tenant with such parking space.

5. **Rules and Regulations.** A condition of any parking shall be compliance by the parker with garage or lot rules and regulations, including any sticker or other identification system which may be established by Landlord. The following rules and regulations are in effect until notice is given to Tenant of any change. Landlord reserves the right to modify and/or adopt such other reasonable and generally applicable rules and regulations for the applicable parking areas as it deems necessary for the operation of such areas.

   (a) Cars must be parked entirely within the painted stall lines.

   (b) All directional signs and arrows must be observed.

   (c) The speed limit shall be five (5) miles per hour.

   (d) Parking is prohibited in areas not striped for parking, aisles, areas where "no parking" signs are posted, in cross hatched areas and in such other areas as may be designated by Landlord or Landlord's agent(s) including, but not limited to, areas designated as "Visitor Parking" or reserved spaces not rented under this Agreement.

   (e) Every parker is required to park and lock his or her own car. All responsibility for damage to cars or persons or loss of personal possessions is assumed by the parker.

   (f) Spaces which are designated for small, intermediate or full-sized cars shall be so used. No intermediate or full-size cars shall be parked in parking spaces limited to compact cars.

6. **Special Provisions Regarding Over-Parking.** Landlord agrees to use its good faith efforts to monitor the parking usage of tenants in the Building and attempt to restrict tenants against permitting their owners, officers, employees, agents and invitees to utilize more parking spaces than they are allotted pursuant to their respective leases. Tenant agrees to cooperate with Landlord's efforts in this regard. In addition, and without limiting the generality of the immediately preceding sentence, Tenant further agrees that if and to the extent requested in writing by Landlord because of Landlord's concern that Tenant's owners, officers, employees, agents and/or invitees are utilizing more

Tenant's          Landlord's
Initials           Initials

parking spaces than Tenant has been allotted under this Exhibit C, then at Landlord's option any one or more of the following shall apply (i.e., the following are cumulative and not mutually exclusive):

(a)     Tenant shall deliver written notices to all employees and other persons who might be utilizing parking spaces, advising them of the parking limits under this Exhibit C.

(b)     Tenant shall furnish to Landlord a complete list of license numbers of all automobiles operated by Tenant and its owners, officers, employees, agents and invitees who might be utilizing parking spaces.

(c)     If any automobile or other vehicle owned by Tenant or any of its employees, agents or other invitees is utilizing a parking space in excess of those allotted to Tenant under this Exhibit C, Tenant shall pay to Landlord as additional rent upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, that such automobile or other vehicle is so parked.

(d)     If any overparking by Tenant, its employees, agents and other invitees, persists after written notice thereof from Landlord to Tenant, such continued overparking shall constitute a failure of Tenant to comply with this Exhibit C; and such written notice from Landlord shall constitute the "written notice thereof" which is contemplated in item (ii) of Section 26(a) of this Lease, i.e., the overparking shall constitute an event of default under this Lease if not cured within 30 days after such written notice.

26

<table>
<tr><td>Tenant's<br>Initials</td><td>Landlord's<br>Initials</td></tr>
</table>

**EXHIBIT D TO LEASE AGREEMENT**

**Leasehold Improvements Agreement**

THIS LEASEHOLD IMPROVEMENTS AGREEMENT (this "Agreement") is hereby incorporated into the attached Lease Agreement (the "Lease"), executed concurrently herewith by and between the "Landlord" and the "Tenant" described in such Lease, and constitutes the entire agreement of Landlord and Tenant with respect to the construction and completion of the Premises described in the Lease. In the event of a conflict between the provisions of this Agreement and other provisions of the Lease, the provisions of this Agreement, as amended, will control. Terms defined in the Lease, when used herein, shall have the same meanings as are ascribed to them in the Lease.

1.   Premises Condition. Subject to the provisions of this Agreement, Tenant has agreed to accept the Premises "as is," in their presently existing condition. Tenant acknowledges having inspected the Premises.

2.   Space Plan. Landlord shall provide space planning at no cost to Tenant.

3.   Working Drawings. If and after Tenant's proposed space plan and any revisions thereto have been approved by Landlord, Tenant shall deliver to Landlord proposed working drawings for the leasehold improvements to be constructed in the Premises based upon the space plan approved by Landlord. The working drawings shall consist of any and all architectural, electrical, mechanical, plumbing, structural, communication/security drawings, and written specifications necessary to permit Landlord to construct the fixed leasehold improvements. The working drawings and any revisions thereto shall be prepared at Tenant's sole cost and expense and shall be subject to the written approval of Landlord, which approval shall not be unreasonably withheld. Landlord's review and/or approval of the working drawings shall not constitute any representation, warranty or agreement of Landlord as to the adequacy, efficiency, performance or desirability of the space plan, working drawings or contemplated leasehold improvements, or the compliance by the working drawings or the leasehold improvements with the space plan or any applicable laws, ordinances, codes, rules or regulations.

4.   Landlord's Work: Tenant accepts Leased Premises in an "As-Is" condition. Landlord shall provide Tenant with a Tenant Improvement Allowance of $40.00 per Rentable Square Foot to be used for Leasehold Improvements.

5.   Certificate of Occupancy; Tenant's Occupancy of the Premises. Landlord and Tenant agree that (a) Tenant will be responsible for obtaining whatever Certificate of Occupancy may be required by applicable law in connection with the Required Improvements, provided that Tenant cooperates in connection therewith and Tenant will occupy the Premises as soon as possible after the date of this Lease.

27

| Tenant's Initials | Landlord's Initials |
| --- | --- |

**EXHIBIT E TO LEASE AGREEMENT**

**Building Rules and Regulations**

1.  Sidewalks, doorways, vestibules, corridors, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises and for going from or to another part of the Building.

2.  Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable materials shall be thrown or placed therein. Damage resulting to any such fixtures or appliances or surrounding areas from misuse by Tenant shall be repaired at the sole cost and expense of Tenant, and Landlord shall not in any case be responsible therefor.

3.  No signs, advertisements or notices shall be painted or affixed on or to any windows or doors or other parts of the Building except of such color, size and style and in such places as shall be first approved in writing by Landlord. No nails, hooks or screws shall be driven or inserted in any part of the Building except by the Building maintenance personnel nor shall any part of the Building be defaced by Tenant. No curtains or other window treatments will be placed between the glass and the Building standard window treatments.

4.  Landlord will provide and maintain an alphabetical directory of each Tenant's firm name on the first floor (main lobby) of the Building. No other directory shall be permitted unless previously consented to by Landlord in writing.

5.  Tenant shall not place any additional lock or locks on any doors in or to the Premises without Landlord's prior written consent. A reasonable number of keys to the locks on the doors which access the Premises from the Common Areas shall be furnished by Landlord to Tenant, and Tenant shall not have any duplicate keys made. Upon termination of the Lease, Tenant shall return all keys to Landlord and shall provide to Landlord a means of opening all safes, cabinets and vaults being left with the Premises.

6.  With respect to work being performed by Tenant in the Premises with the approval of Landlord, Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service to them to Landlord for Landlord's supervision, approval and control before the performance of any contractual services. This provision shall apply to work performed in the Building including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and any and all installation of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building. Tenant must have Landlord's written approval prior to employing any contractor. Any and all such contractors shall comply with these Rules and Regulations for such services including, but not limited to, insurance requirements. All work in or on the Building shall comply with any and all codes.

7.  Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of any bulky materials, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be restricted to such hours as Landlord shall designate. All such movement shall be under the supervision of Landlord and in the manner agreed between Tenant and Landlord by prearrangement before performance. Such prearrangement initiated by Tenant will include determination by Landlord, and subject to its decision and control, as to the time, method and routing of movement and as to limitations for safety or other concerns which may prohibit any article, equipment or any other item from being brought into the Building. Tenant is to assume all risk as to damage to articles moved and injury to person or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord and other tenants if damaged or injured as a result of acts in connection with carrying out this service for Tenant from the time of entering the property to completion of work; and Landlord shall not be liable for acts of any person engaged in, or any damage or loss to any of

28

Tenant's         Landlord's
Initials          Initials

said property or persons resulting from any act in connection with such service performed for Tenant.

8.  Landlord shall have the power to prescribe the weight and position of safes and other heavy equipment, which shall, in all cases, be positioned to distribute the weight and stand on supporting devices approved by Landlord. All damage done to the Building by taking in or putting out any property of Tenant, or done by Tenant's property while in the Building, shall be repaired at the expense of Tenant.

9.  Tenant, in its capacity as an employer, shall establish -- and shall use reasonable measures to enforce -- a policy for its employees which prohibits firearms (including, but not limited to, concealed handguns) in the Building and the Premises.

10.  Tenant shall cooperate with Landlord's employees in keeping its Premises neat and clean. Tenant shall not employ any person for the purpose of such cleaning other than the Building's cleaning and maintenance personnel. Landlord shall be in no way responsible to Tenant, its agents, employees or invitees for any loss of property from the Premises or public areas or for any damage to any property thereon from any cause whatsoever.

11.  To insure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to the Premises except by persons appointed or approved by Landlord in writing.

12.  Corridor doors, when not in use, shall be kept closed.

13.  Should Tenant require telegraphic, telephonic, annunciator or other communication service, Landlord will direct the electrician in writing where and how wires are to be introduced and placed and none shall be introduced or placed except as Landlord shall direct. Electric current shall not be used for power in excess of standard office use or heating without Landlord's prior written permission. Landlord shall have the sole discretion as to which communication company or companies are permitted to enter the Building and service tenants in the Building.

14.  Tenant shall not make or permit any improper odors or noises in the Building or otherwise interfere in any way with other tenants or persons having business with them.

15.  Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No animals shall be brought into or kept in, on or about the Premises.

16.  No machinery other than standard office equipment shall be operated by Tenant in its Premises without the prior written consent of Landlord, nor shall Tenant use or keep in the Building any flammable or explosive fluid or substance.

17.  No portion of the Premises shall at any time be used or occupied as sleeping or lodging quarters.

18.  Landlord will not be responsible for money, jewelry or other personal property lost or stolen in or from the Premises or public areas regardless of whether such loss or theft occurs when the area is locked against entry or not.

19.  Landlord reserves the right to rescind any of these rules and regulations and to make such other and further rules and regulations as in its judgment shall from time to time be advisable for the safety, protection, care and cleanliness of the Building, the use and operation thereof, the preservation of good order therein and the protection and comfort of the tenants and their agents, employees and invitees, which rules and regulations, when made and written notice thereof is given to Tenant, shall be binding upon Tenant in like manner as if originally herein prescribed; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

| Tenant's | Landlord's |
|----------|------------|
| Initials | Initials |

## EXHIBIT F TO LEASE AGREEMENT

### JANITORIAL SPECIFICATIONS

Landlord's janitorial service shall perform according to the following specifications:

**NIGHTLY FIVE (5) NIGHTS PER WEEK**
Dust and Damp Mopping
  All hard surfaced floors, including hallways, office areas, etc.

Vacuuming
  All carpeted areas will be completely vacuumed. This will include moving light furniture other than desks and file cabinets.

Spot Cleaning
  All carpeted areas to remove deposits of grease, oil, beverages, etc.
  All walls, doors, window sills, ledges, elevator doors, etc., to remove smudges, finger prints and splash marks.
  Wall areas around light switches.
  All hard surfaced floor areas to remove spillage and other marks.
  All interior glass areas to include desk tops.

Dusting
  All desks that are clear of paper; items on desk will be dusted, but not moved.
  All telephones
  All file cabinets
  All chair rails
  All tables, counter tops, lounge chairs, etc.
  Furnishings, horizontal and vertical.

Lunchroom/Breakroom
  Table tops, counter tops, sinks and food preparation area will all be cleaned.
  All bright work will be polished.

Stairwell/Storage Rooms
  Will be swept and mopped as necessary.

Elevators
  Vacuum carpets and spot clean.
  Clean elevator threshold tracks.
  Clean interior wall surfaces.
  Clean elevator doors.

Drinking Fountains
  All fountains will be cleaned with germicidal cleaner.

Glass Cleaned
  All glass tables and desk tops will be cleaned to remove smudges.
  All glass doors at reception and waiting rooms.

Lavatories
  Plumbing fixtures, including all basins, bowls, urinals and toilet seats will be cleaned and disinfected.
  Sweep and wet mop floors with germicidal cleaner.
  Dust all ledges, vents and partitions.
  Polish all mirrors and bright-work.

30

| Tenant's | Landlord's |
|----------|------------|
| Initials | Initials |

Damp wipe all partitions.
Restock all restroom dispensers.
Sanitary napkin receptacles cleaned and sanitized.
All counter surfaces will be cleaned and disinfected.
Clean all soap and paper good dispensers.

## Waste Baskets/Trash & Recycle

Will be emptied and wiped clean; if liners are used, will be emptied only.  (Liners replaced as needed.)  Outside of wastebaskets will be wiped as necessary.
All trash will be collected and deposited in an area designated by Landlord and in dumpsters provided by Landlord.
Boxes marked "TRASH" will be collected and deposited in an area designated by Landlord.

## Entrance Lobby

Vacuum receptionist area completely.
Polish elevator cabs.
Sweep and/or vacuum walk-off mats.
Broom sweep front and sidewalk to entrance lobby.
The entrance lobby will receive special attention to maintain an eye-pleasing appearance at all times.
Planters will be checked nightly for litter.

### WEEKLY OPERATIONS TO BE PERFORMED

All picture frames and moldings will be dusted.
All interior window sills and ledges will be dusted.
All ledges, sills, and rails will be dusted.
All vertical surfaces on furnishings will be dusted.
Dust and vacuum all lavatory vents and light exterior surfaces.

### MONTHLY OPERATIONS TO BE PERFORMED

Dust all ventilation grills and vacuum surrounding ceiling tile as needed.
Dust or damp wipe all baseboards as needed.
Entry door glass will be squeegee cleaned inside and outside.

### QUARTERLY OPERATIONS TO BE PERFORMED

Interior and exterior window cleaning as needed.

### FLOOR MAINTENANCE

Hall corridors mopped nightly and polished weekly and scrubbed every four (4) months or three (3) times per year.
Office/work areas will be mopped nightly, polished weekly and scrubbed every four (4) months or three (3) times per year.
Lavatory floors will be mopped nightly and scrubbed every four (4) months or three (3) times per year.

*Landlord reserves the right to makes changes and adjustments to the schedule periodically.*

31

| Tenant's | Landlord's |
|----------|-----------|
| Initials | Initials |

# FIRST AMENDMENT

# TO

# LEASE AGREEMENT

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** ("Amendment") is dated the 6th day of April 2018 by and between 2425 WL, LLC ("Landlord") and Jetall Companies, Inc. ("Tenant").

WHEREAS, the original Lease Agreement ("Lease") between Landlord and Tenant was made to be effective the 1st day of August 2015;

WHEREAS, the parties hereto desire to amend the original Lease to amend and restate various provisions of the Lease;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agrees that Landlord shall take possession of Tenant's Premises in order for VRBex Inc. to occupy the Premises for up to 60 months ("VRBex Term"), commencing on June 1, 2018 ("VRBex Commencement Date") and its expiring on June 1, 2023 ("VRBex Expiration").

The provisions of the Lease are added, amended, or deleted as follows:

1. <u>Section 1(e) Base Rental</u>. All amounts listed in paragraph 1(e) of the Lease are suspended/abated from the VERBex Commencement Date through the end of the VRBex Term and VRBex Expiration.
2. <u>Section 4 Additional Rent</u>. All rental obligations of Tenant listed in Section 4 of the Lease are suspended as of the VRBex Commencement Date, through the VERBex Term.
3. <u>Section 5 Payments and Performance</u>. All payment and performance obligations of Tenant listed in the Lease are suspended as of the VRBex Commencement Date, through the VRBx Term.
4. <u>Section 19 Termination Right</u>. The first sentence of Section 19 remains intact, however the second sentence of Section 19 is deleted in its entirety.
5. <u>Section 20 Assignment and Subletting</u>. Section 20(a)-(d) is deleted in its entirety, and restated to read as follows:
   a. "Tenant shall be permitted to assign or mortgage its Lease or sublet all or any part of the Premises upon prior written notice to Landlord of such assignment, mortgage or sublet."
6. <u>Section 23 Taxes</u>. All duties of Tenant under Section 23 are suspended from the VRBex Commencement Date through the VRBex Term and VRBex Expiration
7. Section 27. Deleted in its entirety.
8. Section 32. Deleted in its entirety.
9. Section 33. Deleted in its entirety.

**(Signature page to follow)**

## SIGNATURE PAGE TO AMENDMENT

**LANDLORD:**

2425 WL, LLC

By:_____
         Authorized Representative

Title: _____

Date: _____

**TENANT:**

**JETALL COMPANIES, INC.**

By: _____
         Authorized Representative

Title: _____

Date _____

Email: _____

Phone: _____

Fed Tax ID: _____

# SECOND AMENDMENT

# TO

# LEASE AGREEMENT

**THIS SECOND AMENDMENT TO LEASE AGREEMENT** ("Amendment") is dated the 1st day of February 2019 by and between Galleria 2425 Owner, LLC ("Landlord") and Jetall Companies, Inc. ("Tenant").

WHEREAS, the original Lease Agreement ("Lease") between Landlord and Tenant was made to be effective the 1st day of August 2015;

WHEREAS, the parties hereto desire to amend the original Lease and First Amendment to the Lease to amend and restate various provisions of the Lease and First Amendment;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agree to the following:

The provisions of the Lease are added, amended, or deleted as follows:

1. <u>Section 1(e) Base Rental</u>. All amounts listed in paragraph 1(e) of the Lease are suspended from the Sonder Commencement Date through the end of the Sonder Term.
2. <u>Section 4 Additional Rent</u>. All payment and performance obligations of Tenant listed in the Lease are suspended as of the Sonder Commencement Date, through the end of Sonder Term.
3. <u>Section 5 Payments and Performance</u>. All payment and performance obligations of Tenant listed in Section 5 of the Lease are suspended as of the Sonder Commencement Date, through the end of the Sonder Term.
4. <u>Signage and Naming Rights</u>. Tenant is granted absolute and exclusive signage rights on all surfaces of the building, parking garage, and the exterior of the property, including exclusive naming rights. These rights are subject and subordinate to the rights of Stage Stores, Inc.'s in their lease agreement. Tenant recognizes that Stage Stores, Inc. possesses building signage rights, and any and all rights of Tenant are subordinate to Stage Stores, Inc.'s signage rights.
5. <u>Section 23 Taxes</u>. All duties of Tenant under Section 23 are suspended from the Sonder Commencement Date through the Sonder Term.

**(Signature page to follow)**

## SIGNATURE PAGE TO AMENDMENT

**LANDLORD:**

Galleria 2425 Owner, LLC

By:_____
    Authorized Representative

Title: _____Auth by Rv_____

Date: ____Feb 1 2019_____

**TENANT:**

**JETALL COMPANIES, INC.**

By: _____
    Authorized Representative

Title: _____Feb 1 2019_____


Date_____

Email: _____

Phone: _____

Fed Tax ID: _____

# THIRD AMENDMENT

# TO

# LEASE AGREEMENT

**THIS THIRD AMENDMENT TO LEASE AGREEMENT** ("Amendment") is dated the 1st day of August 2022 by and between Galleria 2425 Owner, LLC ("Landlord") and Jetall Companies, Inc. ("Tenant").

WHEREAS, the original Lease Agreement ("Lease") between Landlord and Tenant was made to be effective the 1st day of August 2015;

WHEREAS, the parties hereto desire to amend the original Lease, First Amendment to Lease, and Second Amendment to Lease to amend and restate various provisions of the Lease, First Amendment to Lease and Second Amendment to Lease;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agree to the following:

1. 1(c) "Premises" shall mean 19,500 square feet located on the 11th floor at 2425 W. Loop South, Houston, TX 77027 (the "Building").
2. 1(e) "Base Rental" shall mean the schedule attached hereto as Exhibit A.
3. 20. Notwithstanding the provisions of section 20, the Tenant may sublet the Premises or any part thereof without Landlord approval.
4. 31. Deleted in its entirety.
5. Exhibit B. Amended to be the 11th Floor of the Premises.
6. Exhibit D. Section 4. Deleted and replaced with:

   "Landlord shall provide Tenant with a Tenant Improvement Allowance of $100.00 per Rentable Square Foot to be used for leasehold Improvements or, at Tenant's sole election, may be used to offset Rent that becomes due and payable."

**(Signature page to follow)**

## SIGNATURE PAGE TO AMENDMENT

**LANDLORD:**

**Galleria 2425 Owner, LLC**

By: _____
        Authorized Representative

Title: _____

Date: _____

**TENANT:**

**JETALL COMPANIES, INC.**

By: _____
        Authorized Representative

Title: _____

Date _____

Email: _____

Phone: _____

Fed Tax ID: _____

EXHIBIT A

| Lease Month From | Lease Month To | # Months | Total/Full Monthly Rent | Total/Full Annual Rent |
|---|---|---|---|---|
| 08/01/2022 | 09/31/2023 | 14 | $0.00 | $0.00 |
| 10/01/2023 | 09/30/2024 | 12 | $35,750.00 | $429,000.00 |
| 10/01/2024 | 09/30/2025 | 12 | $36,822.50 | $441,870.00 |
| 10/01/2025 | 09/30/2026 | 12 | $37,927.18 | $455,126.10 |
| 10/01/2026 | 09/30/2027 | 12 | $39,064.99 | $468,779.88 |
| 10/01/2027 | 09/30/2028 | 12 | $40,236.94 | $482,843.27 |
| 10/01/2028 | 09/30/2029 | 12 | $41,444.05 | $497,328.56 |
| 10/01/2029 | 09/30/2030 | 12 | $42,687.37 | $512,248.41 |
| 10/01/2030 | 09/30/2031 | 12 | $43,967.99 | $527,615.86 |
| 10/01/2031 | 09/30/2032 | 12 | $45,287.03 | $543,444.33 |